SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:     (214) 981-3400
Email:         tom.califano@sidley.com
               rpatel@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:     (212) 839-5599
Email:         wcurtin@sidley.com
               pventer@sidley.com
               anne.wallice@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND
ADMINISTER PREPETITION REFUND PROGRAMS, AND (B) PAY AND HONOR
RELATED PREPETITION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

**Emergency relief has been requested.  Relief is requested not later than 1:30 p.m. prevailing Central Time on January 14, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on the matters set forth in this motion on January 14, 2025, at 1:30 p.m. prevailing Central Time in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 650.479.3207.  The meeting code is 2304 154 2638.  Video communication will be by the use of the Cisco WebEx platform.  Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page.  Click the settings icon in the upper right corner and enter your name under the personal information setting.  WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.**

**Hearing appearances must be made electronically in advance of electronic hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion (this "Motion").  In support of this Motion, the Debtors state as follows:

## RELIEF REQUESTED

1.     By this Motion, the Debtors seek entry of an interim order and final order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order") (a) authorizing, but not directing, the Debtors to, in the ordinary course of business and consistent with prior practice, (i) maintain and administer their prepetition Refund Programs (as defined below), and (ii) pay and otherwise honor certain prepetition obligations related thereto, and (b) granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The legal predicates for the relief requested in this Motion are sections 105(a), 363(b) and 541 of title 11 of the United States Code (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

5.      The Debtors and their non-Debtor affiliates (collectively, the "Company") are significant providers of coordinated regional healthcare services in California, Connecticut, Pennsylvania, and Rhode Island.  The Company's business can be broadly divided into two segments: (1) hospital operations, which consist of, among other things, the ownership and operation of 16 acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services spanning multiple states, and (2) physician-related services, including (a) certain owned and managed medical groups, independent physician associations, managed services organizations and risk taking entities, (b) Prospect Health Plan, Inc., a Knox-Keene licensed entity, and (c) one licensed acute hospital operating as Foothill Regional Medical Center

(collectively, "PhysicianCo").   **The PhysicianCo entities are not Debtors in these chapter 11 cases**.

6.     Beginning on January 11, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

7.     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Paul Rundell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.[2]

## THE REFUND PROGRAMS

8.     In the ordinary course of business, the Debtors operate pursuant to numerous contracts and agreements, as well as various state and federal laws and administrative rules (such laws and rules, collectively, the "Regulations"), which in certain instances require the Debtors to issue refunds, reimbursements, or payments, as applicable, to patients and third-party payors, including healthcare insurers, managed care organizations, plan vendors, commercial payors, private pay sources, Medicare, Medicaid, medical service plan and claims administrators, and

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration, as applicable.

other governmental and quasi-governmental agencies (collectively, the "Refund Recipients").[3]

The Debtors may owe refunds to Refund Recipients as a result of an overpayment by such parties,

as well as pursuant to the terms of the Debtors' contracts with Health Plans or Physician Affiliates

(both, as defined below).   The Debtors routinely process refunds, or are subject to offsets or

recoupments for reimbursement of overpayments or payments made by or on behalf of patients,

resulting from the interaction between the Debtors' billing procedures, patient medical insurance

deductibles, and third-party payments, including payments made in connection with extended

repayment plans with the applicable federal or state agencies overseeing Medicare and Medicaid

(the "Refund Programs").   As described further herein, the Debtors may owe refunds to Refund

Recipients as a result of overpayment by such parties.   The estimated amounts outstanding under

the Refund Programs as of the Petition Date are summarized below and are described in further

detail herein:

| Obligation | Description | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Patient Refunds | Obligations relating to payment by patients and adjustments of patient accounts | $0.4 million |
| Health Plan Refunds | Obligations relating to payment by Insurers of patient expenses | $21.0 million |
| Physician Affiliate Refunds | Obligations relating to payment by Health Plans of Physician Affiliate Expenses | $76.1 million |

---

[3]     Under a final rule issued by the Centers for Medicare and Medicaid Services ("CMS"), Medicare Part A and B
providers and suppliers must report and return overpayments received on behalf of Medicare beneficiaries by the
later of the date that is 60 days after the date an overpayment was identified, or the due date of any corresponding
cost report, if applicable.  See 42 C.F.R. §§ 401 and 402.  Health care providers and suppliers are also subject to
statutory requirements under the Social Security Act, and the failure to report and remit overpayments from
Medicare pursuant to the final rule may give rise to False Claims Act liability, significant monetary liabilities, or
exclusion from the Medicare program.

| Medicare Advances | Obligations relating to Medicare advances | $42.0 million |
| California Hospital Fee Program | Obligations relating to payment by California Hospital Fee Program | $198.5 million |

9.      The Debtors estimate, as of the Petition Date, they have accrued approximately $338.0 million of unpaid Refunds (as defined below), $63.5 million of which they estimate will become due and payable during the first thirty (30) days following the Petition Date (the "Interim Period").[4]  By this Motion, the Debtors seek authority, but not direction, to pay or otherwise honor accrued and unpaid prepetition obligations in connection with the Refund Programs and to continue such programs on a postpetition basis in the ordinary course of business.

## I.      Patient Refunds

10.      In the ordinary course of business, the Debtors bill patients and insurers for medical services provided to patients.  After a patient pays the Debtors for medical services, a "credit balance" may occur when the total payments and/or adjustments exceed the gross charges on a patient account.  Once this credit balance has been identified and validated by the Debtors, the patient is entitled to a credit or refund from the Debtors (the "Patient Refunds").

11.      Patient Refunds typically result from: (a) duplicate payments, (b) adjustments to a patient's out-of-pocket obligations following receipt of the insurance payments, (c) billing corrections, or (d) a chance to the applicable patient's insurance coverage, including on account of

---

[4]      At any given time, it is difficult to determine the total amount of outstanding overpayments that are required to be refunded. There is typically a period of time between when the patient is treated, when the overpayment is recognized or determined, and when the overpayment is entered into the Debtors' billing system. Moreover, some refund checks issued to Refund Recipients before the Petition Date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system and, accordingly, have not been honored and paid as of the Petition Date. Nonetheless, the Debtors are required, under contract and various laws and Regulations, to reimburse Refund Recipients as overpayments are identified.

secondary insurance coverage.  The Debtors estimate that approximately $0.4 million in Patient

Refunds have accrued and are unpaid as of the Petition Date.

12.     By this Motion, the Debtors seek authority, but not direction, to pay accrued and

unpaid Patient Refunds in the ordinary course of business.

**II.     Health Plan Refunds**

13.     In the ordinary course of business, the Debtors are paid by various healthcare

insurers and health plans (the "Health Plans"), for services provided to patients.  Based upon the

Debtors' arrangements with the Health Plans and pursuant to various Regulations, if a Health Plan

overpays for services rendered to patients, the Debtors are obligated to refund the overpaying party

for the excess amounts paid to the Debtors (such refunds, the "Health Plan Refunds").  Health Plan

Refunds typically result from (a) duplicate payments made for the same service, (b) overpayment

by a Health Plan or coinsurer, (c) instances in which a claim must be voided due to error after a

Health Plan has already paid, (d) payments made by a Health Plan for services rendered after

termination of coverage, (e) payments received by multiple Health Plans, and (f) errors in

contracted and scheduled capitation payment runs.  The Debtors estimate that approximately $21.0

million in Health Plan Refunds have accrued and have not been paid or otherwise honored as of

the Petition Date.

14.     When providing value-based healthcare, the Debtors are at risk of

underperformance on those medical expenses incurred by Health Plans, including inpatient and

hospital care, specialists, and medicines, net of rebate, for which the Debtors bear risk (the "Third

Party Medical Costs"), relative to gross revenue received for serving patients under those Health

Plan Agreements.  In a given month, if Third Party Medical Costs exceed the gross revenue for

the Health Plan, the Debtors may find themselves in a deficit position with that Health Plan.  These

deficits are typically not refunded to the Health Plan; rather, they are offset with future surpluses

to bring the credit account back to breakeven or a net surplus position. Thus, while a refund is not paid in cash, a Health Plan may apply a future surplus to deficits which otherwise would be paid out in cash, to offset deficit positions when they occur. Alternatively, there may be circumstances in which deficits continue and are not satisfied by future surpluses. In such scenarios, based on contractual terms, the Health Plans may demand repayment or settlement of such deficits.

15.     The Debtors identify potential credit balances for the Health Plans when the Health Plans contact the Debtors' billing and coding, contracting, or finance departments. Once the Debtors have identified, quantified, and validated any credit balances associated with a Health Plan, the Debtors either submit a request to the Health Plan that the amount of the credit balance be recouped from future payments, per the surplus/deficit dynamic described above, or issue a refund check to the Health Plan. The mechanics for issuing refunds for each Health Plan are set forth within the Health Plan Agreements and pursuant to Regulations. The Health Plan Agreements are extremely complex, covering various different healthcare insurance programs, with varying billing cadences. Accordingly, it is difficult for the Debtors to estimate at any given time the aggregate surplus or deficit amounts owed from, or owing to, the various Health Plans.

16.     By this Motion, the Debtors seek authority, but not direction, to pay or honor accrued and unpaid Health Plan Refunds in the ordinary course of business.

III.    **Physician Affiliate Refunds**

17.     In the ordinary course of business, the Debtors permit independent physician practices (the "Physician Affiliates") to participate in value-based cost-sharing under the Debtors' contracts with the Health Plans (the "Health Plan Agreements"). The Debtors enter into primary care physician provider agreements with Physician Affiliates (the "Physician Affiliate Contracts") in order to coordinate the delivery of medical services through myriad affiliate provider practices. After the Debtors have (i) received payments from the Health Plans pursuant to the Health Plan

Agreements, and, (ii) where applicable, refunded amounts to the Health Plans owing under the Health Plan Agreements, the Debtors pass on the contractually negotiated share of such payments to Physician Affiliates in accordance with the terms of the Physician Affiliate Contracts.

18.     Occasionally, a Physician Affiliate may dispute capitation payments, bonus, or shared savings amounts remitted as described above.  The Debtors estimate that approximately $76.1 million in Refunds to Physician Affiliate have accrued and are unpaid as of the Petition Date.

## IV.     Medicare Advances

19.     In the aftermath of the COVID-19 pandemic, as well as a cyber-attack on its computer systems, the Debtors experienced significant financial difficulties.  As such, the Debtors were eligible and received relief from the Coronavirus Aid, Relief and Economic Security Act, the Paycheck Protection Program and Health Care Enhancement Act (the "PPPHCE Act"), the Continuing Appropriations Act, 2021 and Other Extensions Act, and the Consolidated Appropriations Act, 2021 (collectively, (the "COVID Acts").  The COVID Acts also revised the Medicare accelerated payment program in an attempt to disburse payments to hospitals and other care providers more quickly.

20.     The Debtors received advance payments from the Medicare accelerated payment program beginning in 2020 related to the COVID-19 pandemic (the "COVID-19 Medicare Advances").  The Debtors estimate that approximately $30.6 million in COVID-19 Related Medicare Advances remain outstanding as of the Petition Date.

21.     In August 2023, the Company's health information system was infiltrated by a cyber-attack and was forced to shutdown all computer systems and networks and immediately implement downtime procedures.  This resulted in a reduction in patient admissions, the curtailment of non-emergent outpatient visits and procedures, and a pivot to paper documentation to capture necessary documentation for clinical and billing purposes.  At the same time, staffing

levels could not be reduced due to the additional manual workload, leading to additional costs.

Due to the delay in billing, the accounts receivable as of September 30, 2023, were higher than

typical levels, and the Company received accelerated payments pursuant to the Medicare

accelerated payment program (the "Cyber Attack Medicare Advances" and, together with the

COVID-19 Medicare Advances, the "Advances").   The Debtors estimate that approximately $11.4

million in Cyber Attack Related Medicare Advances remain outstanding as of the Petition Date.

## V.     California Hospital Fee Program

22.     The Debtors receive revenues related to supplemental Medi-Cal payments under

the California provider fee program (such program, the "California Hospital Fee Program").  The

California Hospital Fee Program is funded by quality assurance fees ("QAF") paid by participating

hospitals and matching federal funds.  Based on formulas contained in California Regulations, as

well as modeling done by the California Hospital Association, the Debtors have accrued

$198.5 million of liability and estimate to receive approximately $220.9 million in receivables

related to the California Hospital Fee Program.

23.     By this Motion, the Debtors seek authority, but not direction, to pay accrued and

unpaid obligations related to the California Hospital Fee Program in the ordinary course

of business.

## VI.     The Debtors Require Authority to Continue the Refund Programs

24.     The Debtors seek authority to continue the Refund Programs in the ordinary course

consistent with past practice and to honor certain prepetition obligations under such Refund

Programs.  The Debtors' patients, physicians, Physician Affiliates, and Health Plans, are pivotal

to the success of the Debtors' enterprise.  Failure to maintain the Refund Programs could not only

materially harm the trust and confidence of the Debtors' patients and other Refund Recipients

during these chapter 11 cases, but would potentially jeopardize the Debtors' ability to legally

operate under the Regulations and to receive capitation payments for services rendered through agreements with the Health Plans.  Absent the requested relief, the ensuing termination of Health Plan Agreements could cause significant harm to the Debtors' business to the detriment of all stakeholders and lead to potential legal challenges.

25.     As discussed above, it is difficult to determine the total amount of outstanding overpayments that have been identified, but for which a refund check has not yet been issued or offsetting has not yet occurred.  There is typically a significant lag between when a patient is treated, when the credit balance is identified, quantified, and validated, and when the Refund is ultimately issued to the appropriate Refund Recipient.  With respect to the Health Plan Refunds, the Debtors' aggregate surplus/deficit position with respect to the Health Plans is constantly in flux and is difficult to estimate or predict at any given time in light of the complexities of the various payor agreements and the different billing terms.  Moreover, some refund checks issued to Refund Recipients before the Petition Date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system prior to the Petition Date and, accordingly, have not been honored and paid as of the Petition Date.  However, as set forth above the Debtors are required, under contract and the Regulations, to report and remit reimbursements to Refund Recipients as overpayments are identified.  Accordingly, the Debtors seek authority to honor certain prepetition obligations related to the Refund Programs and to continue to do so, as necessary, on a postpetition basis in the ordinary course of business and consistent with prior practice.

## BASIS FOR RELIEF REQUESTED

I.    **The Debtors Should Be Authorized to Honor Refund Programs**

    A.    **Certain Overpayments Attributable to the Refunds Are Not Property of the Debtors' Estates**

26.    Section 541 of the Bankruptcy Code generally provides that all property in which a debtor has a legal or equitable interest, including any interest in property that a debtor acquires postpetition, becomes property of the estate upon the commencement of a chapter 11 case. 11 U.S.C. § 541(a)(1), (a)(7).  Importantly, section 541 of the Bankruptcy Code does not by itself create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").  Indeed, Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367–68 (1977); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").  Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the case, such property does not become property of the debtor's estate under section 541 of the Bankruptcy Code and the debtor is prohibited from distributing such property to its creditors.  *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.").

27.     Further, courts have interpreted section 541(d) of the Bankruptcy Code to provide "expressly" that "property in which a debtor holds only bare legal title is not property of the estate." *Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006).  When a debtor holds legal title to, but does not have equitable interest in, certain property, the debtor must turn such property over to the holders with such equitable interest in the property.  *See MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner.").  A debtor who holds proceeds attributable to property owned by another holds only bare legal title to such property, and thus must turnover such proceeds to the interest holder of such property.  *See, e.g.*, *In re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (awarding holder of participation ownership interest proceeds of a property sale because holder was beneficial owner, and debtor only held legal title to the proceeds).

28.     The Debtors do not have equitable title to the identified, quantified, and validated overpayments held for the benefit of the Refund Recipients.  Instead, holding such overpayments is akin to the Debtors holding funds in trust.  The Supreme Court has held that property held by debtors for a third party (such as funds held on account of a resulting trust) is not property of the estate.  *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate). Other courts have held that property over which the debtor is merely exercising some "power . . . solely for the benefit of an entity other than the

debtor" is not property of the estate. *In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010). Thus, any property held by the Debtors on account of the Refund Programs may be not property of the Debtors' estates.

29.     Because the Debtors may not have legal or equitable interest in the overpayments, the Debtors should be permitted to honor their obligations under the Refund Programs. Since such identified, quantified, and validated amounts are the property of the Refund Recipients and not property of the Debtors' estates, the relief requested in this motion will not prejudice creditors or other parties in interest.

**B.      Payment is Authorized by Sections 363(b) and 105(a) of the Bankruptcy Code**

30.     Courts in this jurisdiction and others have recognized that it is appropriate to authorize the payment of prepetition obligations on a postpetition basis where necessary to protect and preserve the estate, provided that such payments are supported by sound business purposes or necessary for an effective reorganization. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also In re Meridian Auto. Sys.-Composites Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (authorizing payment of prepetition claims to suppliers where payments were provided in return for favorable trade terms). These courts acknowledge that various legal approaches rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

31.     A bankruptcy court may authorize a debtor to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code. 11 U.S.C. § 363(b)(1). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11

U.S.C. § 363(b)(1).  To approve the use of assets outside the ordinary course of business pursuant

to section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound

business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward

Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999)

(internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D.

Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v.

Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)

(citation omitted); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d

Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits

is a near-Herculean task.").

32.     In addition, the Court has the authority, pursuant to its equitable powers under

section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief

is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the

Bankruptcy Code.  Indeed, courts have recognized that there are instances when a debtor's

fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim."  *In re

CoServ*, 273 B.R. at 497.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to

"issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a); *see In re Ionosphere Clubs*, 98 B.R. at 174-75 (applying section

105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical

benefits, and business expense claims to debtor's employees).  Section 1107(a) of the Bankruptcy

Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and

preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee."). Courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus.").

33.    The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business. *In re CoServ, L.L.C.*, 273 B.R. at 492–93 (discussing the doctrine). The Debtors, operating their businesses as a debtors in possession under Bankruptcy Code §§ 1107(a) and 1108, are fiduciaries with the implicit duty to "to protect and preserve the estate, including an operating business's going-concern value." *Id.* at 497. As observed in *CoServ*, the debtor-in-possession's role as the equivalent of a trustee (pursuant to Bankruptcy Code § 1107(a)) provides a bridge from § 105(a) to the Doctrine of Necessity. *Id.* at 496–97. Thus, in certain instances, "it is only logical that the bankruptcy court be able to use Section 105(a) of the Code to authorize satisfaction of a prepetition claim in aid of preservation or enhancement of the estate." *Id.*

34.     The relief requested herein is appropriate and warranted under both section 105(a)

of the Bankruptcy Code and, assuming, arguendo, that the overpayments are property of the

Debtors' estate, section 363(b) of the Bankruptcy Code.   The Debtors' failure to provide

reimbursement for overpayments, continue to operate pursuant to negotiated contractual

arrangements, or pay or honor prepetition amounts owed, has potentially deleterious effects on

operations and the value of the Debtors' estates.   Pursuant to the Regulations and certain contracts,

the Debtors are required to repay Refund Recipients for overpayments as they arise or risk, among

other things, losing CMS certification and, consequentially, being excluded from the Medicare,

Medicaid, or other federal health care programs on which the Debtors crucially rely for patient

enrollment and, by extension, capitation fees.   Further, the Debtors risk losing the trust of the

impacted Refund Recipients, and new and existing patients alike may be unwilling to engage with

the Debtors going forward.   If that were to occur, the negative impact on the Debtors' business,

their estates, creditors, and patients would be significant and potentially irreversible.   It is therefore

necessary that the Debtors be permitted to pay or otherwise honor their obligations under the

Refund Programs.   Courts in this circuit and others have granted authority for debtors to pay similar

obligations as those sought to be paid hereunder as a routine matter in similar cases.[5]

35.     Additionally, if the obligations under the Refund Programs are not honored, the

Debtors may face legal sanctions or be liable for fines in the jurisdictions in which they operate.

For instance, the Patient Protection and Affordable Care Act ("ACA") enacted new rules

governing overpayments made by Medicare and Medicaid.  42 U.S.C. § 18001 et seq.  Pursuant to

---

[5]     *See, e.g., In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr S.D. Tex. June 27, 2023) (Docket No.
452) (authorizing debtors to honor prepetition obligations under patient, healthcare facility, and insurance refund
programs); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 1, 2023) (Docket No. 81)
(authorizing debtors to honor prepetition obligations related to patient refunds, insurance refunds, and rebates);
*In re Cano Health, Inc.*, No. 24-10164 (KBO) (Bankr. D. Del. Mar. 5, 2024) (Docket No. 260) (authorizing
debtors to maintain and administer refund programs and honor related prepetition obligations).

the integrity provisions of the Medicare and Medicaid programs under the ACA, a person has "60 days after the date on which the overpayment was identified" to report and return such overpayment. 42 U.S.C. § 1320a-7k(d)(2).  Any overpayment retained after the 60-day deadline is an "obligation" subject to liability under the False Claims Act ("FCA").  *Id.* at § 1320a-7k(d)(3). The FCA states in relevant part that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government . . . is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(G); *see also* 31 U.S.C. § 3729(b)(3) (the term "obligation" means an "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment").  Accordingly, if the Debtors fail to obtain the relief sought by the Motion and are unable to report and return any overpayments by the 60-day deadline set forth by the ACA, the Debtors may be subject to penalties and treble damages under the FCA.

36.    For the foregoing reasons, the continuation of Debtors' Refund Programs is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases.  Accordingly, the Debtors request that the Court authorize, but not direct, the Debtors to perform their obligations under the Refund Programs in the ordinary course of business.

## II.    Cause Exists to Authorize the Debtors' Applicable Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Obligations Related to the Refund Programs

37.    The Debtors further request that the Court authorize applicable financial institutions to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic fund

transfers requested, or to be requested by or on behalf of the Debtors relating to the Refund Programs, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payment. The Debtors represent that these checks and requested electronic fund transfers are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of obligations related to the Refund Programs. Accordingly, the Debtors believe that checks or electronic fund transfers other than those relating to authorized payments will not be honored inadvertently. Any such financial institution may rely on the representations of such Debtors as to which checks are issued or electronic fund transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry. The Debtors also seek authority, but not direction, to issue new postpetition checks or affect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of obligations related to the Refund Programs that are dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

## EMERGENCY CONSIDERATION

38.    The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to swiftly and efficiently move forward with a value-maximizing process. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**PROCESSING OF CHECKS AND ELECTRONIC FUNDS TRANSFERS**

39.    Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to an authorized payment in respect of the relief requested herein.  Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS**

40.    The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**RESERVATION OF RIGHTS**

41.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under

section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## **NOTICE**

42.    Notice of this Motion has been provided by email, facsimile, or overnight courier to the proposed Complex Service List (as defined in the Creditor Matrix Motion filed contemporaneously herewith).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PREVIOUS REQUEST**

43.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of the page intentionally left blank]*

WHEREFORE, the Debtors request entry of interim and final orders substantially in the forms attached hereto granting the relief requested herein and granting such other relief as is just and proper.

Dated:  January 13, 2025
Dallas, Texas

       */s/ Thomas R. Califano*

       **SIDLEY AUSTIN LLP**
       Thomas R. Califano (24122825)
       Rakhee V. Patel (00797213)
       2021 McKinney Avenue, Suite 2000
       Dallas, Texas 75201
       Telephone: (214) 981-3300
       Facsimile: (214) 981-3400
       Email:  tom.califano@sidley.com
          rpatel@sidley.com

       *and*

       William E. Curtin (*pro hac vice* pending
       Patrick Venter (*pro hac vice* pending)
       Anne G. Wallice (*pro hac vice* pending)
       787 Seventh Avenue
       New York, New York 10019
       Telephone: (212) 839-5300
       Facsimile: (212) 839-5599
       Email:  wcurtin@sidley.com
          pventer@sidley.com
          anne.wallice@sidley.com

       *Proposed Attorneys for the Debtors*
       *and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on January 13, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ *Thomas R. Califano*
Thomas R. Califano