SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:   (214) 981-3300
Facsimile:   (214) 981-3400
Email:      tom.califano@sidley.com
            rpatel@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:   (212) 839-5300
Facsimile:   (212) 839-5599
Email:      wcurtin@sidley.com
            pventer@sidley.com
            anne.wallice@sidley.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

## DEBTORS' EMERGENCY
## MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY
## CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS AND (B)
## LIEN CLAIMANTS; (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY
## OF OUTSTANDING PURCHASE ORDERS; AND (III) GRANTING RELATED RELIEF

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
      proposed claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is
      3824 Hughes Ave., Culver City, CA 90232.

**Emergency relief has been requested. Relief is requested not later than 1:30 p.m. prevailing Central Time on January 14, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on the matters set forth in this motion on January 14, 2025, at 1:30 p.m. prevailing Central Time in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 650.479.3207. The meeting code is 2304 154 2638. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting. WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.**

**Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion (this "Motion"). In support of this Motion, the Debtors state as follows:

### **RELIEF REQUESTED**

1.     By this Motion, the Debtors seek entry of an interim order and final order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business and consistent with customary past practice, based on their sound business judgment, certain prepetition claims of (i) vendors whose goods and services are necessary to provide essential healthcare services, maintain the safety of their medical facilities or are otherwise essential to the Debtors' operations or the operations of their affiliated provider practices (the "Critical Vendors", and such claims, the "Critical Vendor Claims") and (ii) service providers and other counterparties that may be entitled to assert statutory, common law, or

possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (the "Lien Claimants", and such claims, the "Lien Claims" and, together with the Critical Vendors, the "Trade Claimants" and the Trade Claimants' prepetition claims, the "Trade Claims"); (b) confirming the administrative priority of all undisputed obligations of the Debtors for postpetition goods and services ordered under prepetition purchase orders; and (c) granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

2.      As set forth below, the Debtors' Trade Claimants are critical to the Debtors' ability to maintain safe and effective medical centers and provide high-quality health and wellness care to their patients.  The medical centers run by the Debtors and their affiliated provider practices require a steady supply of goods and services from the Patient Care and Safety Vendors, the Specialized Healthcare Service Vendors, and the Revenue Cycle Management, Information Technology, Software and Administrative Service Vendors (each as defined below) to provide indispensable healthcare services and to maintain safe medical centers.  Any disruption in the provision of such goods and services would have far-reaching and adverse economic and operational impacts on the Debtors' business and could harm the health and well-being of the Debtors' patients.

3.      The Debtors engage service providers to, among other things repair medical equipment, ship medical and pharmaceutical supplies, transport patients, cater meals, and manage facilities.  In many cases, these goods and services are highly specialized and, in some cases, may give rise to mechanics', possessory, or other liens.  In most cases, finding replacement vendors for these goods and services on a timely basis would be extremely difficult and costly.  Even where

alternative vendors exist, the time and costs associated with switching from one vendor to another could irreparably harm the Debtors' business and ultimately harm the Debtors' patients.

4.       By this Motion, the Debtors are requesting authority to pay Trade Claims in an aggregate amount not to exceed (i) $9,200,000 upon entry of the proposed Interim Order to be used to satisfy Trade Claims that will become due during the period between the Petition Date and the final hearing on the Motion (the "Interim Period"); and (ii) $39,600,000 upon entry of the proposed Final Order, inclusive of amounts paid under the proposed Interim Order, in each case as they become due in the ordinary course of business (collectively, the "Trade Claimant Cap"). The following table summarizes the amounts of Trade Claims per category the Debtors are requesting authority to pay pursuant to the Motion.

| Category of Trade Claims | Amount Seeking Authority to Pay on Interim Basis | Amount Seeking Authority to Pay on Final Basis (Inclusive of Interim Amount) |
|---|---|---|
| Critical Vendor Claims | $7,500,000 | $34,500,000 |
| Lien Claims | $1,700,000 | $5,100,000 |
| **Total Trade Claims:** | $9,200,000 | $39,600,000 |

## JURISDICTION AND VENUE

5.       The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       The legal predicates for the relief requested herein are sections 105(a), 363, 503(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

7.      The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

8.      The Debtors and their non-Debtor affiliates (collectively, the "Company") are significant providers of coordinated regional healthcare services in California, Connecticut, Pennsylvania, and Rhode Island.  The Company's business can be broadly divided into two segments: (1) hospital operations, which consist of, among other things, the ownership and operation of 16 acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services spanning multiple states, and (2) physician-related services, including (a) certain owned and managed medical groups, independent physician associations, managed services organizations and risk taking entities, (b) Prospect Health Plan, Inc., a Knox-Keene licensed entity, and (c) one licensed acute hospital operating as Foothill Regional Medical Center (collectively,  "PhysicianCo").   *The PhysicianCo entities are not Debtors in these chapter 11 cases*.

9.      Beginning on January 11, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

10.     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater

detail in the *Declaration of Paul Rundell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith.[2]

## THE TRADE CLAIMANTS

### I.    Critical Vendors

11.    The Debtors are in the highly complex and heavily regulated business of providing essential health and wellness care.  The Debtors' vendors and suppliers are thus a critical component of the Debtors' ability to manage safe medical facilities and provide high-quality care to patients.  The Debtors' ability to continue generating revenue and operating their business, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' ability to effectively manage the intricate process by which patients are treated.  This course begins from the initial point of scheduling appointments, wends through the complex process of providing treatment, and terminates with account settlement with payors and patients.  The Debtors rely on products and services provided by Critical Vendors that enable them to effectively manage this complex process and intend on paying only those that are *truly* essential to the Debtors' operations and business, and that will benefit the Debtors' estates.

12.    As set forth in the First Day Declaration, to mitigate the risks to the Debtors' business by failing to pay prepetition amounts owed to Critical Vendors, the Debtors and their advisors engaged in a comprehensive process to (a) identify those vendors that are "critical" to the Debtors' business and go-forward operation and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors and their patients at the outset of these chapter 11 cases as a result of nonpayment of Critical Vendor Claims.  In this process, the Debtors, with the

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

assistance of their restructuring professionals, assessed a variety of qualitative and quantitative

factors, including:

- the impact of non-payment on patient care;

- the goods or services provided by a vendor;

- whether goods or services are provided pursuant to a contract or on a purchase-order basis;

- the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) would exceed the amount of a vendor's prepetition claim;

- which suppliers would be prohibitively expensive or practically difficult to replace;

- which suppliers would present an unacceptable risk to the Debtors' operations given the volume or type of essential services or products that such suppliers provide;

- whether the vendor or supplier is party to an executory contract with the Debtors;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether the Debtors' inability to pay all or part of a vendor's prepetition claim could trigger financial distress for the applicable vendor, leading to future difficulty of that vendor's ability to perform;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether the vendor is currently refusing to supply the Debtors with goods or services or is refusing to do so without cash up front;

- whether the vendor meeting the foregoing criteria is able or likely to refuse to provide product or services to the Debtors postpetition if its prepetition balances are not paid; and

- whether a vendor was located in a jurisdiction that would likely honor the applicability of the Bankruptcy Code.

13.     After a thorough analysis involving an assessment applying the above factors, the Debtors designated certain vendors and processes as necessary to legally and financially continue operations without negatively impacting patient care and, thus, preserve value for the benefit of the estates and creditors.  The relief requested in this Motion seeks to pay prepetition amounts owed to the Critical Vendors in an amount not to exceed $7,500,000 on an interim basis—which represents approximately 1.6% of overall prepetition amounts owed to vendors and payors—and $34,500,000 on a final basis—which represents approximately 7.2% of overall prepetition amounts owed to vendors and payors (all figures calculated as of the Petition Date).

14.     The Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations or negatively impact patient care, with the need to limit the expenditure of estate resources.  In that regard, the Debtors undertook a lengthy process to ensure that the Critical Vendors truly represent those vendors most vital to the Debtors' ongoing operations.  Paying targeted prepetition claims of Critical Vendors will benefit the Debtors' estates, both monetarily and operationally, by preserving liquidity and enabling the Debtors to operate smoothly during these chapter 11 cases.

15.     The Critical Vendors fall generally, but not exclusively, into three categories, each as defined below: (a) Patient Administration, Care, and Safety Vendors; (b) Specialized Healthcare Service Vendors; and (c) Revenue Cycle Management, Information Technology, Software, and Administrative Service Vendors.

### A.     Patient Care and Safety Vendors

16.     As healthcare providers, the Debtors operate in one of the most heavily regulated and closely scrutinized industries in the country.  To operate and maintain their medical facilities, the Debtors rely on vendors who provide a constant flow of supplies and services that are mission-critical to the operation of the Debtors' business (the "Patient Care and Safety Vendors").  The

Patient Care and Safety Vendors provide, among other things, various medical equipment and supplies, such as prescription medication, pharmaceutical supplies typically ordered on an as-needed basis, medical implants, ambulatory equipment, diagnostic instruments, and medical disposables.

17.     The Debtors' ability to succeed in the healthcare space and provide continuity of care relies on, among other things, their business relationships with the Patient Care and Safety Vendors.  Even where alternative vendors exist, the time and costs associated with switching to a new provider would likely be significant and detrimental to the Debtors' estates, and could have an adverse effect on patient health.  Any disruption in the supply of such goods and services could jeopardize the Debtors' ability to safely maintain and operate their medical centers, compromise the Debtors' ability to maintain their high standards of patient care and safety, and ultimately result in significant liability or expense to the Debtors' estates.

18.     The Patient Care and Safety Vendors are distinguishable from other vendors that are critical to the Debtors' business in that the Patient Care and Safety Vendors have a direct, profound impact on the Debtors' ability to operate medical service facilities, care for patients, care for patients, and meet regulatory requirements.  The extensive, comprehensive regulations and requirements to which the Debtors are subject can only be fulfilled through uninterrupted access to the essential goods and services provided by the Patient Care and Safety Vendors.

19.     In many instances, the Patient Care and Safety Vendors are the only vendors able to produce or deliver the products or services sufficient to meet the Debtors' operational needs.  If certain Patient Care and Safety Vendors refuse to provide products and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors.  This process could take several weeks or even months,

resulting in a detrimental impact to the Debtors' ability to care for patients and general operational stability.  In some cases, there may be no true replacement if a relationship with a Patient Care and Safety Vendor falters.  Even where alternative vendors exist, the time and costs associated with switching from one vendor to another would likely be significant and detrimental to the Debtors' estates and to the quality of patient care.

20.    Accordingly, the Debtors request authority to pay the claims of Patient Care and Safety Vendors as they become due and payable, and to continue paying them in the ordinary course of business and consistent with customary past practice.  The Debtors intend to pay prepetition claims of Patient Care and Safety Vendors only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

21.    The Debtors estimate that, as of the Petition Date, approximately $27,500,000 is outstanding on account of Patient Care and Safety Vendors' claims, approximately $6,200,000 of which is due or will become due and payable during the Interim Period.

**B.    Specialized Healthcare Service Vendors**

22.    In addition to the Patient Care and Safety Vendors, the Debtors rely on other Critical Vendors (the "Specialized Healthcare Service Vendors") for certain services that are critical to maintaining the Debtors' operations, and ensuring a high quality of patient care, including clinical laboratory services and diagnostic testing, blood collection and distribution, transportation of patients, and preparation of specialized meals.

23.    In the ordinary course of business, the Debtors incur obligations to their Specialized Healthcare Service Vendors for such services—the payment of which is necessary to ensure the health and safety of patients and the regulatory compliance of the Debtors' operations.  Absent the ability to continue payment to the Specialized Healthcare Service Vendors, the Debtors risk essential service disruptions that could risk harming not only the going-concern value of their

business, but also the health and safety of their patients, the integrity of their facilities, the safety

of doctors and staff, compliance with regulatory laws, and the quality of medical care provided.

24.     The Debtors request authority to pay the claims of Specialized Healthcare Service

Vendors as they become due and payable, and to continue paying them in the ordinary course of

business and consistent with customary past practice.  The Debtors intend to pay prepetition claims

of the Specialized Healthcare Service Vendors only where they believe, in their business judgment,

that the benefits to their estates from making such payments will exceed the costs.

25.     The Debtors estimate that, as of the Petition Date, approximately $5,100,000 is

outstanding on account of Specialized Healthcare Service Vendor claims, approximately

$1,100,000 of which is due or will become due and payable during the Interim Period.

**C.      Revenue Cycle Management, Information Technology, Software, and Administrative Services Vendors**

26.     The Debtors and their affiliated provider practices require the services of certain

Critical Vendors that provide revenue cycle management services (the "Revenue Cycle

Management Vendors") to effectively operate their business, as well as the provision of business-

critical information technology systems, products, and administrative services (the "Information

Technology, Software, and Administrative Services Vendors"), collectively (the "Revenue Cycle

Management, Information Technology, Software, and Administrative Services Vendors").

27.     Revenue cycle management is the process by which healthcare providers track

patient care from initial registration and appointment scheduling through the final payment by

patients and/or payors (such as insurance providers, Medicare, or Medicaid) for medical services

provided.  This process involves numerous parties and is highly complex.  The services provided

by the Revenue Cycle Management Vendors include collecting information from patients, such as

insurance coverage before the patient arrives for an appointment, coding medical procedures and

diagnoses, determining the appropriate billable charges for medical services provided, insurance identification chart abstraction, submitting claims to insurance companies, collecting and processing payments from patients, and collecting payments from third-party payors.

28.   Revenue cycle management is directly related to the Debtors' ability to generate revenue—without the Revenue Cycle Management Vendors to help manage this process, the Debtors would be unable to bill and collect payments for medical services provided to patients. The Debtors do not have the technology or personnel necessary to manage this complex process without the services provided by the Revenue Cycle Management Vendors.   Further, it would be impossible to replace the Revenue Cycle Management Vendors without causing significant disruption to the business—the Revenue Cycle Management Vendors have longstanding relationships with the Debtors, are ingrained with the Debtors' technology and software, and have a deep understanding of the Debtors' complex business and how it operates.   Even where alternative vendors exist, the time and costs associated with switching from a Revenue Cycle Management Vendor to a new provider would likely be significant and detrimental to the Debtors' estates.

29.   If the Revenue Cycle Management Vendors are not paid prepetition amounts, they may refuse to continue providing services to the Debtors, endangering a critical mechanism of generating revenue and irrevocably damaging the Debtors' relationships with patients and the various third parties involved in the revenue management cycle process, including insurers, physicians, and other healthcare partners.

30.   The Debtors and their affiliated provider practices also rely on the Information Technology, Software, and Administrative Services Vendors for the provision of business-critical information technology systems, products, and administrative services.  For example, some of the

Information Technology, Software, and Administrative Services Vendors provide the Debtors with the specialized information technology infrastructure necessary for the administration of the Debtors' day-to-day operational activities, including certain, finance, medical operation, and billing support functions. Even a short interruption in the provision of any of these products or services could have potentially disastrous effects on the Debtors' business and daily operations, with compounding long-term effects on the Debtors' reputation and, in turn, the success of these chapter 11 cases. Most of these Critical Vendors are virtually irreplaceable due to the specialized nature of the products and services provided to the Debtors. Even where alternative vendors exist, the time and costs associated with switching from an Information Technology, Software, and Administrative Services Vendor to a new provider would likely be significant and detrimental to the Debtors' estates due to the extensive development timeline required to produce replacement technologies.

31.    As of the Petition Date, the Debtors estimate that approximately $1,900,000 is outstanding on account of obligations to the Revenue Cycle Management, Information Technology, Software, and Administrative Services Vendors, approximately $200,000 of which is due or will become due and payable during the Interim Period.

## II.    Lien Claimants

32.    The Debtors routinely do business with Lien Claimants, who perform various services for the Debtors, including the installation and repair of specialized medical equipment in the Debtors' medical centers, maintenance, improvement, renovation, and construction of the Debtors' medical centers, and distribution of pharmaceuticals, all of which are necessary for the Debtors' business.

33.    The medical centers operated by the Debtors may require specialized maintenance and repair services provided by third parties on a regular or *ad hoc* basis. Repairing malfunctions

13

and performing routine maintenance of the Debtors' medical equipment are essential parts of the

Debtors' operations, and also require the skill of specialized third-party servicers. Such specialized

repairs and maintenance ensure the uninterrupted operations of the Debtors' medical centers, and

ensure the Debtors continue to provide patient care in accordance with their high standards of

service and safety for patients and employees.

34.    The Debtors may also undertake necessary or required expansion, development,

renovation, and maintenance across their facilities. Projects could involve the use of mechanics,

electricians, and other skilled labor. Non-payment of Lien Claims could lead to shortages of

skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors. Any

of these events would affect the Debtors' anticipated costs and timetables for projects. The cost

of a project may vary significantly from initial expectations, and the Debtors may have a limited

amount of capital resources to fund cost overruns which, in turn, would delay completion until

adequate funding is available. Such delay would be value-destructive to the Debtors' estates

and business.

35.    The Debtors' business requires them to partner with certain shippers to conduct

smooth and fast deliveries of expensive medical equipment, and highly perishable medical supplies

and medication, such as intravenous liquids, insulin, injections, vaccines, and other perishable

medications that require refrigeration or special handling. Possible loss of long-term relationships

with the shippers could result in catastrophic injuries to patients receiving treatment in the Debtors'

facilities and may cause serious reputational, financial, and logistical damage to the

Debtors' business.

36.    Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens

on goods in their possession or on property they improved, as applicable, to secure payment of the

charges or expenses incurred in connection with these prepetition obligations.  In the event these claims remain unpaid, the Lien Claimants could attempt to assert liens or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession and retention of the Debtors' goods and supplies, or enforcement of a mechanic's lien, would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims.  Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

37.    To continue using the Lien Claimants' services, the Debtors request authority to pay the prepetition Lien Claims as they become due and payable and to continue paying Lien Claims in the ordinary course of business.  The Debtors seek authority to pay only those amounts of Lien Claims that the Debtors determine to be necessary or appropriate to (a) obtain the release of critical or valuable goods and (b) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.  The Debtors estimate that, as of the Petition Date, approximately $5,100,000 is outstanding on account of Lien Claims, approximately $1,700,000 of which is due or will become due during the Interim Period.

## PAYMENT OF OUTSTANDING PURCHASE ORDERS

38.    Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods or services that will not be delivered until after the Petition Date (collectively, the "Outstanding Purchase Orders").  To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) or provide services with respect to such Outstanding Purchase Orders unless the Debtors issue substitute purchase orders postpetition.  Receiving

delivery or services on account of the Outstanding Purchase Orders is critical to preventing any disruption to the company's business operations. To prevent disruption to the Debtors' business operations, the Debtors seek an order (a) granting administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods or services subject to Outstanding Purchase Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

## CUSTOMARY TRADE TERMS

39.     As a condition to receiving payment on account of the Critical Vendor Claims, the Debtors may require such Critical Vendors to: (a) continue supplying goods and services to the Debtors on trade terms that are at least as favorable to the Debtors as those in effect prior to the Petition Date and (b) agree that they shall not be permitted to cancel any contract or agreement pursuant to which they provide services to the Debtors (collectively along with any other terms, the "Agreed Terms"); *provided* that the Debtors continue to pay for such goods and services and are not otherwise in breach of such contract or agreement. The Debtors may seek such agreement in writing in advance of any payment on a Critical Vendor Claim (which may be agreed to via email between the Critical Vendor and the Debtors (or their respective counsel)). The Debtors reserve the right to require more favorable trade terms from any Critical Vendor as a condition to payment of any prepetition claim.

40.     If any Critical Vendor accepts payment for a prepetition obligation of the Debtors premised on compliance with the above conditions, and thereafter fails to comply with the Agreed Terms, the Debtors request that such payment be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code, and that such Critical Vendor be required to immediately repay the Debtors any payment made on account of its asserted claim to the extent the aggregate

amount of such payments exceeds the postpetition obligations then outstanding, without the right

of any setoffs, claims, provision for payment of reclamation or trust fund claims or otherwise.

## BASIS FOR RELIEF REQUESTED

**I.   Extraordinary Circumstances Exist to Warrant Payment of the Trade Claims, and Payment Is Warranted under Section 363(b)(1) of the Bankruptcy Code, the Doctrine of Necessity, and as a Valid Exercise of the Debtors' Fiduciary Duties.**

41.   Courts have recognized that it is appropriate to authorize the payment of prepetition

obligations where necessary to protect and preserve the estate, including an operating business's

going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)

("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply

such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of

prepetition claims in appropriate cases."); *see also In re Scotia Dev., LLC*, No. 07-20027, 2007

WL 2788840, at *2 (Bankr. S.D. Tex. Sep. 21, 2007) (outlining the factors for when a critical

vendor payment is necessary); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y.

1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such

payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In doing

so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), 1107(a),

and 1108 of the Bankruptcy Code support the payment of prepetition claims as provided herein.

42.   Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he

[debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C.  § 363(b)(l).  Under section 363(b) of the

Bankruptcy Code, courts require only that a debtor "show that a sound business purpose justifies

such actions."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (quotation omitted).

Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)

(citation omitted); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that

"[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean

task"); *see also Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad

flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate

business justification). Pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]." 11 U.S.C. § 105(a); *CoServ*, 273 B.R. at 497 ("These are simply examples of

claims that may require satisfaction for the debtor in possession to perform its fiduciary

obligations. In such instances, it is only logical that the bankruptcy court be able to use Section

105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of

preservation or enhancement of the estate."); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D.

Tex. 2004) (citing *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003)).

43.    Further, under section 1107(a) and 1108 of the Bankruptcy Code, a debtor in

possession is given the same rights and powers as a trustee appointed in a bankruptcy case,

including the "implied duty of the debtor-in-possession to 'protect and preserve the estate,

including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59

(Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497). No provision of the Bankruptcy Code

expressly prohibits the postpetition payment of prepetition Trade Claims. The above-referenced

sections of the Bankruptcy Code authorize such payments when the payments are critical to

preserving the going-concern value of a debtor's estate, as is the case here.

44.    The relief requested herein is in the best interest of their estates, creditors, and other

parties in interest. Delaying payment of the Trade Claims would risk severe disruption to the

Debtors' operations, potentially jeopardizing the ability of the Debtors to successfully restructure.

45.    A significant portion of the Trade Claims are held by vendors that provide the

Debtors goods and services necessary to run their business, as described above, which the Debtors

cannot easily or inexpensively replace, if at all.  In many cases, including where a Trade Claimant

may itself be facing financial hardship or where a Trade Claimant may be able to easily transition

their business to competitors of the Debtors, the Debtors' failure to pay Trade Claims may result

in Trade Claimants halting work for, or delaying deliveries to, the Debtors, which may severely

disrupt the Debtors' business.  Any disruption to services due to the inability or time required to

find a replacement vendor or any risk to safety would affect the Debtors' ability to attract and

maintain customers.

46.    Disruption stemming from nonpayment may occur before the Debtors would be

able to successfully bring an action to compel performance or otherwise enforce the automatic

stay.  Also, the Debtors interact with the Trade Claimants pursuant to a variety of arrangements,

including arrangements that may not be executory in nature.  The counterparty of such an

arrangement may not agree to continue to do business with the Debtors unless paid on account of

prepetition amounts due from the Debtors and would be under no obligation to do so.  Delaying

payment of Trade Claims beyond normal practices could damage their going concern value by

undermining the "business as usual" message that serves as a cornerstone to these chapter 11 cases.

47.    The relief requested by this Motion represents a sound exercise of the Debtors'

business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates

and patients, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  The

authority to satisfy Trade Claims in the initial days of these chapter 11 cases without disrupting the Debtors' operations will maintain the integrity of the Debtors' medical centers, the high standard of patient care, preserve the value of the Debtors' estates, and allow the Debtors to efficiently administer these chapter 11 cases. Failure to pay these claims would jeopardize patient care and destroy value that would otherwise inure to the benefit of the Debtors' estates.

48.     Moreover, allowing the Debtors to pay Trade Claims, including Critical Vendor Claims, is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). Accordingly, authorizing the Debtors to pay prepetition amounts related to Trade Claims is in the best interests of the Debtors, their estates, and their economic stakeholders.

49.     Indeed, the Debtors submit that *all* of the Debtors' stakeholders will benefit if the Court grants the requested relief. A slight disruption to the goods and services provided by Trade Claimants could risk the health of the Debtors' patients, disrupt important relationships with patients, and erode the value of the Debtors' estates. The resulting harm to the Debtors' estates would undoubtedly far exceed the Trade Claimant Cap.

50.     In addition, the Debtors routinely do business with a number of vendors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered. Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on goods in their possession or on property they improved, as applicable, to secure payment of the charges or expenses incurred in connection with these prepetition obligations. The Lien Claimants'

possession, and retention, of the Debtors' goods and supplies or enforcement of a mechanic's lien would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims.

51.    Given the nature of the goods and services provided by Trade Claimants, the consequences if Trade Claimants cease providing such goods and services to the Debtors, and the resulting loss of value to the Debtors' estates, the relief requested herein is necessary and appropriate.  The Debtors' authority to address Trade Claims in the initial days of these cases will send a clear signal to their suppliers and customers that the Debtors are both willing and able to conduct business after the Petition Date.

52.    Accordingly, there are extraordinary circumstances which justify the relief requested herein: namely to avoid damage to the Debtors' businesses and ensure a timely restructuring process.  As such, the relief requested herein is in the best interest of the Debtors' estates, creditors, and other parties in interest and should be approved.

## II.    Proper Payment of Trade Claims Pursuant to Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity Under the *CoServ* Factors

53.    Section 105(a) of the Bankruptcy Code allows a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  § 105(a).  And pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors, operating their businesses as a debtors in possession, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497 (Bankr. N.D. Tex. 2002).  The duty "to protect and preserve the estate, including an operating business's going-concern value" is implicit in the duties of chapter 11 debtors in possession.  *Id.*  Accordingly, this district has recognized the "Doctrine of Necessity" (also known

as the "Necessity of Payment Rule") to authorize payment of certain prepetition obligations. *Id.*
at 492–93 (discussing the doctrine); *see also In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D
La. 1989) ("While pre-petition claims are normally disposed of in a plan of reorganization and in
accordance with statutory priorities, there are well-established 'necessity of payment' and similar
exceptions.").[3]

54.    Courts have noted that there are instances in which debtors may fulfill their
fiduciary duties only "by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.
The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a
valid exercise of a debtor's fiduciary duties when the payment "is the only means to effect a
substantial enhancement of the estate," and also when the payment was to the "sole suppliers of a
given product." *Id.* at 497–98.

55.    In *CoServ*, the Court held that a debtor must demonstrate the following three
elements in order to meet the "necessity" requirement: (1) it must be critical that the debtor deal
with the claimant; (2) unless the debtor deals with the claimant, the debtor risks the probability of
harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern
value, which is disproportionate to the amount of the claimant's prepetition claim; and (3) there is
no practical or legal alternative by which the debtor can deal with the claimant other than by
payment of the claim. *Id.* at 498. The Court further emphasized the propriety of paying unsecured
claims where "existing senior creditors consent" *id.* at 493-94, and of satisfying prepetition
obligations to the extent such payment would not ultimately "prefer" one creditor over another. *Id.*

---

[3]    Additionally, some courts have found that section 363(b) of the Bankruptcy Code authorizes payment of
prepetition claims. *See, e.g., In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005)
(recognizing and applying §§ 105(a) and 363 of the Bankruptcy Code to justify the payment of prepetition
obligations in appropriate circumstances).

56.    Payment of Trade Claims meets each element of the standard articulated by the court in *CoServ*.  The failure to timely pay Trade Claims could jeopardize patient well-being and diminish the value of the Debtors' estates.  The harm and economic disruption that would stem from the failure to timely pay Trade Claims is grossly disproportionate to the amount of the prepetition claims that would have to be paid.  Finally, with respect to each of the classes of Trade Claims, the Debtors have determined that no practical or legal alternative to payment of Trade Claims exists, and continued partnership with Trade Claimants is necessary to avoid significant diminution in value of the Debtors' estates.  The Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code through payment of Trade Claims.

## III.    The Outstanding Purchase Orders Should Be Entitled to Administrative Expense Priority

57.    Pursuant to section 503(b)(l) of the Bankruptcy Code, obligations that are in connection with the postpetition delivery of foods and services, including goods and services ordered prepetition, are in fact administrative expense priority claims because they benefit the estate postpetition.  See 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses).  The granting of the relief sought herein with respect to the Outstanding Purchase Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest.

58.    Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Purchase Orders to provide certain vendors with assurance of such administrative priority.  The accompanying disruption to the continuous and timely flow of critical services and other goods to the Debtors would potentially force the Debtors

to halt operations, disrupting the Debtors' businesses and lead to a loss of revenue all to the detriment of the Debtors and their creditors. Accordingly, the Debtors request that the Court confirm the administrative expense priority status of the Outstanding Purchase Orders and authorize the Debtors to pay the Outstanding Purchase Orders in the ordinary course of business.

59.     Courts in this district have approved similar relief in other chapter 11 cases. *See*, *e.g.*, *In re CareMax, Inc.*, Case No. 24080093 [Docket No. 229] (Bankr. N.D. Tex. Nov. 17, 2024); *In re Eiger Biopharmaceuticals, Inc.*, Case No. 24-80040 [Docket No. 92] (Bankr. N.D. Tex Apr. 1, 2024); *In re Ebix, Inc.*, Case No. 23-80004 [Docket No. 185] (N.D. Tex. Dec. 17, 2023).

## PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS

60.     Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to an authorized payment in respect of the relief requested herein. Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## EMERGENCY CONSIDERATION

61.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to swiftly and efficiently move forward with a value-maximizing process. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of

Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an

emergency basis.

## **REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS**

62.    The Debtors request a waiver of any applicable notice requirements under

Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to

Bankruptcy Rule 6004(h).    As explained above and in the First Day Declaration, the relief

requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing

operations and value-maximizing process.    Accordingly, ample cause exists to justify the waiver

of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by

Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **RESERVATION OF RIGHTS**

63.    Nothing contained herein or any action taken pursuant to relief requested is

intended to be or shall be construed as (a) an admission as to the validity of any claim against the

Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of,

basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a

promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in

interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or

granting of approval for assumption of any agreement, contract, program, policy, or lease under

section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability,

or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors'

estates.    Likewise, if the Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended to be and should not be construed as an admission to the validity of

any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute

such claim.

## **NOTICE**

64.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the proposed Complex Service List (as defined in the Credit Matrix Motion filed contemporaneously herewith); and (b) the Trade Claimants.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PREVIOUS REQUEST**

65.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of the page intentionally left blank]*

WHEREFORE, the Debtors request entry of interim and final orders, substantially in the forms attached hereto, granting the relief requested herein and granting such other relief as is just and proper.

Dated:  January 13, 2025
Dallas, Texas

/s/ Thomas R. Califano
**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:          tom.califano@sidley.com
                rpatel@sidley.com
*and*

William E. Curtin (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:     (212) 839-5599
Email:          wcurtin@sidley.com
                pventer@sidley.com
                anne.wallice@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

## **Certificate of Service**

I certify that on January 13, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Thomas R. Califano*
Thomas R. Califano
