SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:         tom.califano@sidley.com
               rpatel@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:         wcurtin@sidley.com
               pventer@sidley.com
               anne.wallice@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER
(I) APPROVING AND AUTHORIZING (A) THE ASSET PURCHASE AGREEMENT
AND THE PRIVATE SALE OF THE PENNSYLVANIA HOSPITALS FREE AND
CLEAR OF INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) THE SETTLEMENT BY
AND AMONG THE DEBTORS, THE PENNSYLVANIA ATTORNEY GENERAL,
SAMUEL LEE, AND DAVID TOPPER, PURSUANT TO BANKRUPTCY RULE 9019;
AND (II) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 2:30 p.m. prevailing Central Time on February 6, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on the matters set forth in this motion on February 6, 2025, at 2:30 p.m. prevailing Central Time in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 650.479.3207. The meeting code is 2304 154 2638. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting. WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.**

**Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion (this "Motion"). In support of this Motion, the Debtors state as follows:

**PRELIMINARY STATEMENT**

1.        As stated at the Debtors' first day hearing, one of the Debtors' immediate goals in filing these chapter 11 cases was to avoid the closure of the Pennsylvania Hospitals (as defined below) and allow the facilities to continue to provide critical healthcare access to the underserved populations in Pennsylvania. Thanks to the tireless efforts of the Attorney General's Office for the Commonwealth of Pennsylvania (the "Pennsylvania AG") and the Commonwealth of Pennsylvania (the "Commonwealth"), the Debtors are able to come before this Court seeking

1

authorization to transfer the Pennsylvania Hospitals to an entity supported by the Commonwealth—patient care in Eastern Pennsylvania will not face disruption or any further risks. Further, the Debtors now have a pathway to transition the Pennsylvania Hospitals to another operator, thereby avoiding continuing losses or risk to the broader chapter 11 cases. Additionally, the transactions contemplated herein allow the Debtors' estates to avoid significant administrative expense and to comply with applicable law.

2.      The Debtors, through this Motion, request the Court authorize and approve (i) the Debtors' entry into the APA (as defined below) and the expedited private sale of the Pennsylvania Hospitals to a non-profit entity formed to serve the health care needs of Delaware Country for this purpose (the "Purchaser"), and (ii) the Debtors' entry into the 9019 Settlement (as defined below) with the Pennsylvania AG, Samuel Lee, and David Topper, regarding certain mutual releases related to the Pennsylvania Litigation (as defined below).

3.      Beginning in 2014 and continuing after the Debtors' acquisition of the Pennsylvania Hospitals in 2016, the Pennsylvania Hospitals suffered significant losses. Moody's Ratings downgrade of the Debtors' credit outlook to negative in 2019 and the sale-leasebacks with MPT in that same year created additional pressures on the Pennsylvania Hospitals. In 2022, following significant marketing efforts, the Debtors entered into an agreement to sell the Pennsylvania Hospitals. Unfortunately, negotiations fell apart six months later, and the Debtors instead made the decision to close Delaware County Memorial Hospital ("DCMH"), leading to a lawsuit (the "Foundation Litigation") filed by the Foundation for Delaware County (the "Foundation"), a nonprofit representing the Pennsylvania Hospital's interests.[2] The Foundation

---

[2]     The Pennsylvania AG joined as intervenor on October 5, 2022.

Litigation was stayed in October 2023 to allow the Debtors to find another purchaser. Although a potential purchaser was identified in 2024, the sale did not move forward.

4.      The Debtors have searched for alternative options since then, including seeking potential purchasers, working to identify potential third-party operators for the surrender of the hospitals, pursuing government funding, and exploring every alternative to maintain operations. Due to the urgent and unsustainable liquidity crisis at these hospitals, the Debtors were preparing in earnest for the potentially unavoidable decision to shut hospital doors and begin turning away patients. Merely hours before that decision would have had to be made, the Debtors, the Commonwealth, and the Pennsylvania AG were able to find a resolution—the Debtors' consummation of the sale of the Pennsylvania Hospitals to the Purchaser (the "Sale Transaction").

5.      As further described herein, the Sale Transaction is the only viable alternative to an immediate, forced shutdown of the Pennsylvania Hospitals and the attendant costs and disruption that shutdown would entail. The Debtors' DIP Budget only provides for funding of the Pennsylvania Hospitals' operations until January 31, 2025. An expedited shutdown would prove devastating to the Debtors' patients relying on the Debtors for care and will severely compromise the Debtors' ability to preserve the value of their remaining assets for the benefit of their stakeholders.

6.      In connection with the Sale Transaction and as a result of good-faith, arm's-length negotiation, the Debtors, the Pennsylvania AG, Samuel Lee, and David Topper reached a settlement (the "9019 Settlement") resolving certain key issues among the parties related to the Pennsylvania Litigation. The 9019 Settlement affords the Debtors the opportunity to conserve estate resources that would otherwise have been expended on the Pennsylvania Litigation, enabling the Debtors to continue focusing on providing quality care to their patients and effectuating sale

transactions for their remaining hospitals while alleviating the Debtors' ongoing liquidity pressures.

7.      Accordingly, the Debtors respectfully request that the Court grant an emergency hearing on this Motion and the relief requested herein.

## RELIEF REQUESTED

8.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):

i)      approving and authorizing (a) the asset purchase agreement (the "APA"), a copy of which is attached to the Order as Exhibit 1, by and between the Debtors and the Purchaser, (b) the sale of the Assets (as defined in the APA) free and clear of all liens, claims, and encumbrances (collectively, the "Interests"), and (c) the procedures relating to assumption by the Debtors and assignment to the Purchaser of certain executory contracts and unexpired leases (the "Executory Contracts") free and clear of all Interests;

ii)     pursuant to Rule 9019 of the Bankruptcy Rules (as defined below), approving the proposed settlement (the "9019 Settlement")[3] by and among the Debtors, the Pennsylvania AG, Samuel Lee, and David Topper, regarding certain mutual releases set forth in the Settlement Term Sheet (the "Releases"); and

iii)    granting related relief.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]     A term sheet detailing the 9019 Settlement is attached as Exhibit 2 to the Order (the "Settlement Term Sheet").

10.     The statutory and legal predicates for the relief requested herein are sections 105,

363, 365, and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), the Federal

Rules of Bankruptcy Procedure 2002, 6004, 6006, and 9019 (the "Bankruptcy Rules"), Local

Bankruptcy Rule for the Northern District of Texas 6004-1 (the "Local Bankruptcy Rules"), and

the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case

Procedures").

11.     The Debtors confirm their consent to the entry of a final order by the Court in

connection with the Motion in the event that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with

Article III of the United States Constitution.

## BACKGROUND

12.     The Debtors and their non-Debtor affiliates (collectively, the "Company") are

significant providers of coordinated regional healthcare services in California, Connecticut,

Pennsylvania, and Rhode Island.  The Company's business can be broadly divided into two

segments: (1) hospital operations, which consist of, among other things, the ownership and

operation of 16 acute care and behavioral hospitals, providing a wide range of inpatient and

outpatient services spanning multiple states, and (2) physician-related services, including

(a) certain owned and managed medical groups, independent physician associations, managed

services organizations and risk taking entities, (b) Prospect Health Plan, Inc., a Knox-Keene

licensed entity, and (c) one licensed acute hospital operating as Foothill Regional Medical Center

(those businesses described in (2), collectively, "PhysicianCo").  *The PhysicianCo entities are*

*not Debtors in these chapter 11 cases*.

13.     Beginning on January 11, 2025 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors

continue to operate their businesses and manage their properties as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of

a trustee or examiner in these cases.  On January 29, 2025, the Office of the United States Trustee

appointed the Official Unsecured Creditors' committee.

14.     A detailed description of the Debtors and their business, and the facts and

circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater

detail in the *Declaration of Paul Rundell in Support of Debtors' Chapter 11 Petitions and First

Day Pleadings* [Docket No. 41] (the "First Day Declaration").[4]

## INTRODUCTION

### I.     The Pennsylvania Hospitals

15.     In July 2016, the Debtors acquired the Crozer-Keystone Health System based in

Springfield, Pennsylvania, the largest employer and healthcare provider in Delaware County,

located southwest of Philadelphia.  The Crozer-Keystone System, today called Crozer Health

("Crozer Health"), consists of four general acute care hospitals and also operates several outpatient

facilities and a comprehensive physician network of primary care and specialty practices

(collectively, the "Pennsylvania Hospitals").

16.     Since the acquisition of the Pennsylvania Hospitals, the Debtors have developed

and maintained numerous wellness, health education, and community programs benefitting many

people in the diverse Delaware County community and beyond.  Despite such positive impacts on

the community, Crozer Health faced a series of financial challenges beginning in 2014.  As a result,

the Debtors embarked on a strategic divestiture of its Pennsylvania Assets.

---

[4]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day
Declaration or the APA, as applicable.

## II.    Marketing Process and Efforts to Identify New Operators.

17.    As described in the First Day Declaration, the Debtors engaged in a fulsome marketing process for its Pennsylvania Hospitals, first in 2022 and again in 2023.  In 2022, the Debtors entered into an agreement with a potential Purchaser, but negotiations fell apart and the Purchaser later terminated.  Facing an imminent liquidity shortfall, the Debtors attempted to transition Delaware County Memorial Hospital to meet community needs by providing behavioral health services.  Following the Debtors' announcement of the transition on September 21, 2022, CKHS, Inc. and the Foundation filed suit and included a request for a permanent injunction to prohibit the Debtors' transition plans.  That litigation led to a partial injunction that was stayed and vacated weeks later by the Commonwealth, but increasing staff departures led the Department of Health to halt admissions at DCMH in November 2022, which put DCMH's transition efforts on an indefinite pause.

18.    The Foundation Litigation was stayed in October 2023 to allow the Debtors to find another purchaser.  The Debtors engaged in an additional marketing process, which resulted in one potential viable purchaser.  However, the sale proposal required compliance with many conditions, including state approval.  Those conditions were not met, and the Debtors lost another Purchaser.

## III.    Ongoing Litigation and Related Concerns.

19.    In response to these operational changes to the two hospitals, and coupled with operational challenges in running the remaining hospitals, in October 2024, the Pennsylvania AG filed a complaint against certain of the Debtors and their affiliates and principals seeking, among other relief, the appointment of a receiver to manage the Pennsylvania Hospitals (such litigation, together with the Foundation Litigation, the "Pennsylvania Litigation").  In its complaint, the Pennsylvania AG alleged that the Debtors breached the asset purchase agreement, related to the 2016 acquisition of Crozer Health, by shutting down the Delaware County Memorial Hospital and

all inpatient services at Springfield Hospital while unjustly enriching itself by redirecting funds to its investors.

## IV.     Coordination with the Commonwealth of Pennsylvania.

20.     Despite the ongoing litigation, the Debtors have continued to work hand-in-hand with the Pennsylvania AG and the Pennsylvania Governor's office to explore all potential alternatives, including the potential transfer of the Pennsylvania Hospitals to new operators in a manner supported by the regulators, to avoid the closure of the Pennsylvania Hospitals.

21.     Fortunately, the parties were able to reach a consensual resolution with respect to both (i) the funding, management, and transfer necessary to continue operating the Pennsylvania Hospitals, and (ii) the Pennsylvania Litigation.

## SALE TRANSACTION

22.     As noted above and in further detail in the First Day Declaration, the Debtors commenced these chapter 11 cases in part to facilitate an orderly sale or transfer of the Debtors' assets (including the Assets) and operations during the Debtors' liquidity crisis.  Consummation of the Sale Transaction must be completed as soon as possible in order to ensure stability in patient care, provide certainty to creditors and parties in interest regarding the continued provision of medical care in the served communities, and preserve the value of the Assets.

23.     The APA was proposed, negotiated and entered into by the Debtors and Purchaser, with support from the Commonwealth, without collusion, in good faith and as a result of arm's-length bargaining, and is expected to close as soon as possible following the receipt of Court approval.  The concomitant elimination of ongoing expenses from the Debtors' balance sheet is critical to the success of the remainder of these chapter 11 cases.  Without this sale, the costs of ongoing operations will continue to deplete the Debtors' liquidity and result in operations ceasing and employees being terminated.

24.     Under these circumstances, the Debtors believe that the expedited private sale of the Assets to the Purchaser pursuant to the terms and conditions of the APA is both appropriate and in the best interest of the Debtors, the estates, and their creditors.   Given the extensive prepetition marketing process of the Assets, the Debtors' dire liquidity position, and other efforts to date, the Debtors believe a sale process on an expedited timeline is not only appropriate, but necessary.   The Debtors and their advisors will, of course, consider any viable proposals for the Assets, and, to the extent such proposals might constitute higher and better offers for the subject assets, the Debtors will entertain any such proposals.

## SUMMARY OF PROPOSED TERMS OF THE APA

25.     The principal terms of the APA are included in the chart at **Exhibit B.**[5]

## ASSUMPTION AND ASSIGNMENT PROCEDURES FOR THE SALE TRANSACTION

26.     The Debtors also request that the Court approve the Assumption and Assignment Procedures described below.   The Debtors submit that service of the Motion and the Potential Assumption and Assignment Notice attached hereto as **Exhibit D** on the applicable contract counterparties to the Executory Contracts is proper and sufficient to provide notice to the counterparties of the Assumption and Assignment Procedures and the proposed Cure Amounts associated with their contract(s).

27.     To facilitate the Sale Transaction, the Debtors seek authority to assume and assign the applicable Executory Contracts to the Purchaser in accordance with the following Assumption and Assignment Procedures and the APA:

    a.   As soon as practicable following the date hereof, the Debtors shall file with the Court, post on the case website at https://omniagentsolutions.com/Prospect, and

---

[5]     The description of the APA provided herein is an overview of the significant terms of the document.   To the extent that the description of the APA discussed in this Motion is inconsistent with the terms of such document, the terms of the APA shall govern.

serve on each Counterparty to an Executory Contract listed thereon, a Potential Assumption and Assignment Notice (such filing date, the "Assumption Notice Filing Date").

b.  The Potential Assumption and Assignment Notice shall identify all Executory Contracts that the Debtors and Purchaser believe may be assumed and assigned in connection with the sale of the Purchased Assets and set forth a good faith estimate of the Cure Amounts applicable to each such Executory Contract (and if no Cure Amount is estimated to be applicable with respect to any particular Assigned Contract, the Cure Amount designated for such Executory Contract shall be "$0.00"). If a Counterparty objects to assignment of the applicable Executory Contract on any grounds, such Counterparty must file with the Court and serve on each of (a) counsel to the Debtors, (b) counsel to the Committee, if any, (c) the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee"), and (d) counsel to the Purchaser, a written objection (a "Cure Objection") **no later than fourteen (14) days after filing of the Potential Assumption and Assignment Notice** (the "Objection Deadline"). Any Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Rules; and (iii) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Executory Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

c.  On or before the date that is fifteen (15) Business Days after the Assumption Notice Filing Date or such other date as agreed in writing by the Purchaser and Seller (the "Designation Deadline"), Purchaser shall provide to the Debtors a list of those Executory Contracts that Purchaser elects to have assumed by and assigned to Purchaser (i.e., the Assigned Contracts).

d.  Any time after the Assumption Notice Filing Date and prior to the Designation Deadline, the Debtors, in consultation with the Purchaser, reserve the right, and are authorized but not directed, to: (i) add previously omitted Executory Contracts as contracts to be assumed and assigned to the Purchaser in accordance with the definitive agreement for the Sale Transaction; (ii) remove an Executory Contract from the Potential Assumption and Assignment Notice that the Purchaser proposes be assumed and assigned to it in connection with the Sale Transaction; or (iii) modify the previously stated Cure Amount associated with any Executory Contract. The Debtors shall promptly provide notice of such addition, removal, or modification to such applicable counterparty to the Executory Contracts.

e.  The Debtors will seek Court approval of the assumption and assignment to the Purchaser of those Executory Contracts that have been selected by such Purchaser

to be assumed and assigned.  The Debtors and their estates reserve any and all rights with respect to any Executory Contracts that are not ultimately designated.

f.  If no Objection is timely filed with respect to an Executory Contract: (i) the Counterparty to such Executory Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Purchaser of the Executory Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Purchaser); (ii) any and all defaults under the Executory Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Amount set forth in the applicable Potential Assumption and Assignment Notice for such Executory Contract; and (iii) the Counterparty shall be forever barred from asserting any other claims related to such Executory Contract against the Debtors and their estates or the Purchaser, or the property of any of them, that existed prior to the entry of the order resolving the Cure Objections and the Order.

g.  To the extent that the parties are unable to consensually resolve any Cure Objection with regard to any Contract (such contract, a "Disputed Agreement"), such Disputed Agreement may be conditionally assumed and assigned, with the consent of the Purchaser, pending the entry of a Disputed Agreement Order (as defined below).  In the event a Disputed Agreement remains unresolved as of the Designation Deadline, the Debtors shall either settle the objection of such party or shall litigate such objection under procedures as established by the Court; *provided*, that in no event shall the Debtors settle a Cure Objection with regard to any potential Assigned Contract without the express written consent (such consent not to be unreasonably withheld) of Purchaser (with an email consent being sufficient).  Upon entry of an order of the Court (if necessary) determining any Cure Amount and authorizing the assumption and assignment to Purchaser of such Disputed Agreement after the Designation Deadline, which order shall be in form and substance acceptable to Purchaser (a "Disputed Agreement Order"), Purchaser shall have the option to designate the Disputed Agreement as an Assigned Contract or an Excluded Contract.  If Purchaser elects to designate the Disputed Agreement as an Excluded Contract, (a) such Disputed Agreement shall automatically be deemed to be an Excluded Contract for all purposes under the Order and the APA, and (b) Purchaser shall not be obligated to pay any Cure Amount or liabilities associated with such Disputed Agreement.  If Purchaser elects to designate the Disputed Agreement as an Assigned Contract, such Disputed Agreement shall be deemed an Assigned Contract for all purposes hereunder and, for the avoidance of doubt, Purchaser shall assume the Disputed Agreement and shall be responsible for paying the associated Cure Amount (if any) with respect to such Disputed Agreement.  If Purchaser does not designate such Disputed Agreement as either an Excluded Contract or an Assigned Contract within five (5) Business Days after the date of the Disputed Agreement Order (or such later date as agreed by the Debtors and Purchaser), (a) such Disputed Agreement shall automatically be deemed to be an

Excluded Contract for all purposes under this Order and the APA, and (b) Purchaser shall not be obligated to pay any Cure Amount or liabilities associated with such Disputed Agreement.

## 9019 SETTLEMENT

28.     As discussed above, following months of several weeks of hard-fought, collaborative negotiations, and extensive discussions on a path forward with respect to the Pennsylvania Hospitals, the Debtors have successfully secured a settlement resolving certain key issues among the Debtors and the Pennsylvania AG.

29.     Moreover, as described herein, the 9019 Settlement will mitigate the potential material costs associated with prolonged litigation related to the Pennsylvania Lawsuits, and represents an arm's-length package deal, and is an integral factor, combined with the consummation of the Sale Transaction, to providing the Debtors with a viable, value-maximizing path forward.

30.     The key terms of the 9019 Settlement are as follows:[6]

    i)     The Debtors, Samuel Lee, and David Topper are deemed released and discharged in the Pennsylvania Litigation by the Pennsylvania AG; and

    ii)    The Pennsylvania AG is deemed released and discharged by the Debtors in connection with the Pennsylvania Litigation.

## BASIS FOR RELIEF

**I.     The Debtors Have Demonstrated a Sound Business Justification for Entry Into the Interim Management Agreement and the APA.**

31.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

---

[6]    The summary of the 9019 Settlement set forth in this section is qualified in its entirety by the provisions of the 9019 Settlement.  To the extent there exist any inconsistencies between this summary and the 9019 Settlement, the 9019 Settlement shall govern.

32.     To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtors' decision is supported by some articulated business justification.  *See Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988); *Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991).   Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

33.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Section 363(b)(1).   When applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005); *In re First Wellington Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687, at *8-9 (N.D. Ill. September 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

34.     Further, a debtor may sell estate property outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).  "Great judicial deference is given to the [debtor in possession's] exercise of business judgment" regarding the sale of estate property.  *In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).  Once a debtor articulates a good business reason for the sale of estate property outside the ordinary course of business, it is

presumed that the debtor's decision to move forward with the sale was made "on an informed basis, in good faith, and in the honest belief that the [transaction] was in the best interests of the [debtor] company." *see Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as [the sale of estate property] appears to enhance [the] debtor's estate, court approval of a [debtor in possession's] decision to [sell the property] should only be withheld if the [debtor's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (internal quotation marks and citation omitted); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990).

35.     As noted at the Debtors' first day hearing, failure to transition the Pennsylvania Hospitals swiftly and efficiently risks the Debtors' entire chapter 11 cases.  With the release of the Senate Report and increased speculation about a potential chapter 11, the Debtors' vendors immediately began seeking enhanced payment terms—as testified to by the Debtors' Chief Restructuring Officer, Paul Rundell, in one day, the Debtors received requests for $16.6 million across the enterprise. $13.1 million of that was vendors operating in Pennsylvania.  Further, a closure likely would not have solved the Debtors financial concerns (much less address the focus on ensuring no patient disruption or risk to access to patient care).  A closure of the Pennsylvania Hospitals would have been detrimental to both patient care and the Debtors' operations.  From both a patient care as well as financial perspective, closure of the Pennsylvania Hospitals was a worst case outcome.

36.     Moreover, the Pennsylvania AG contends that under the Delaware County Orphans' Court order, dated June 28, 2016, the Debtors are obligated to operate all four of the Pennsylvania Hospitals until June of 2026.  The Pennsylvania AG's claims are based on providing health care to the public and the hospitals' operations being critical components of public health

and safety, and could result in a court order that is not dischargeable in this proceeding.  As two

of these hospitals have closed, such a court order would create additional liabilities for the Debtors,

including both from the ongoing operational losses and the costs of reopening the hospitals, which

would be hundreds of millions of dollars.  Under the Debtors' agreement with the Pennsylvania

AG, the Pennsylvania AG is willing to release the Debtors from this obligation in exchange for

the transfer of the Pennsylvania Hospitals described in the APA.

37.      In the instant case, (a) adequate justification exists for the approval of the Sale

Transaction; (b) the APA was negotiated at arm's length and in good faith with a third-party

Purchaser; (c) the Purchase Price represents a fair and reasonable price for the Assets; (d) the sale

and the Purchaser are supported by the Pennsylvania AG and the Commonwealth; and (e) adequate

and reasonable notice will be provided to the relevant parties.  As such, the Debtors respectfully

request that the Sale Transaction therefore be authorized.

## II.      Selling the Assets by Sale Conducted Without an Auction Is Appropriate.

38.      Bankruptcy Rule 6004(f)(1) permits sales conducted without an auction.  Fed. R.

Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or

by public auction.").  Further, courts have generally held that a debtor has broad discretion in

determining the manner in which assets are sold.  *In re Bakalis*, 220 B.R. 525, 531 (Bankr.

E.D.N.Y. 1998) (noting that a trustee has "'ample discretion to administer the estate, including

authority to conduct public or private sales of estate property.'") (*citing In re WPRV-TV, Inc.*, 143

B.R. 315, 319 (D.P.R. 1991)).  So long as a debtor maximizes the return to its estate, a court should

defer to a debtor's business judgment regarding how to structure an asset sale.  *Bakalis*, 220 B.R.

at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a

duty is imposed on the trustee to maximize the value obtained from a sale); *In re NEPSCO, Inc.*,

36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363

sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if the Debtors conclude that conducting a sale without a public auction is in the best interests of their estates, the Debtors should be permitted to do so. *See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

39.     There is a strong business justification for the private sale of the Assets without a postpetition auction process. As discussed above, for several years prior to the Petition Date, the Debtors widely marketed the Pennsylvania Hospitals for sale. In 2022, the Debtors entered into an agreement with a potential Purchaser, but negotiations fell apart and the Purchaser later terminated. The Debtors engaged in an additional marketing process, which resulted in one potential viable purchaser. However, the sale proposal required compliance with many conditions, including state approval. Those conditions were not met, and the Debtors lost another Purchaser. Despite such exhaustive prepetition marketing process, the Debtors' do not have any other actionable offers for the Assets.

40.     Further, while the Debtors will provide extensive notice of the Transaction (including through service of the motion and publication notice) on a postpetition basis and consider any higher or better offer received, the APA represents the highest and best offer that could reasonably be obtained for the Assets under the circumstances.

41.     In addition, as further described in the First Day Declaration, due to the Debtors' dire liquidity situation, the Sale Transaction must be completed as soon as possible in order to ensure stability in patient care, provide certainty to creditors and parties in interest regarding the

continued provision of medical care in the served communities, preserve the value of the Assets. The expedited timeline set forth is necessary not only to maximize the value of the Debtors' estates, but to preserve value for the Debtors as a going concern, to the benefit of all stakeholders.

**III. The Assets Should Be Sold Free and Clear of Interests Under Sections 363(f) and 105 of the Bankruptcy Code.**

42.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

(a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."). Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Debtor's assets free and clear of any claims against the Debtor. *See In re Westmoreland Coal Co.*, 968 F.3d 526, 543 (5th Cir. 2020); *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)).

43.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that

is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."   11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").   As such, a court may authorize the sale of a debtor's assets free and clean of any liens, even if section 363(f) does not apply.  *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.*, No. 01–0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of section 363(f)."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

44.    Moreover, the Debtors will send notice of the Sale Transaction to purported lienholders.  If such lienholders do not object to the proposed sale, then their consent should be presumed.  In accordance therewith, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Assets timely objects to this Motion, such party shall be deemed to have consented to the sale of the Assets.  *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

45.    The Debtors believe that one or more of the tests of section 363(f) will be satisfied with respect to the Sale Transaction.  In the event that the Debtors' purported lienholders do not

consent (explicitly or implicitly) to the Sale Transaction and this Court determines that none of the tests of section 363(f) are satisfied, this Court should its equitable powers to authorize the sale of the Assets free and clear of Interests. Importantly, the Purchaser would not have entered into the APA and would not consummate the Sale Transaction if the sale of the Assets was not free and clear of the Interests or if the Purchaser would be liable for such Interests, including, without limitation and as applicable, liabilities that are not expressly assumed by the Purchaser as set forth in the APA or pursuant to the Order. As the Debtors have made clear herein and through these chapter 11 cases, failing to consummate the Sale Transaction would prove devastating to the Debtors' patients relying on the Debtors for care and would severely compromise the Debtors' ability to preserve the value of their remaining assets for the benefit of their stakeholders.

46.     As such, the Debtors request that the Court authorize the sale of the Assets free and clear of any Interests, in accordance with sections 363(f) and 105(a) of the Bankruptcy Code.

**IV.     Purchaser Is Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

47.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies of Pennsylvania,*

*Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

48.     The Debtors request a finding that the Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.  The terms and conditions of the APA have been negotiated by the Debtors and the Purchaser at arm's length and in good faith.  Neither the Debtors nor any of their current or former officers or directors have any connection with the Purchaser to the best of the Debtors' information and belief.  The Purchaser is a sophisticated party (and is represented by experienced and sophisticated counsel), and the Debtors believe that the Purchaser has not engaged in any conduct that would indicate or constitute a lack of good faith. Although the Bankruptcy Code does not define "good faith purchaser," the Fifth Circuit has stated that a good faith purchaser is one who (a) "purchases the assets for value, in good faith, and without notice of adverse claims" and (b) has not conducted itself in a way that "involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014). Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable and the terms of the transaction are fully disclosed.  *In re Abbotts Diaries* 788 F.2d at 149–50.   Accordingly, the Debtors believe that the Purchaser is entitled to the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**V.     Purchaser Is Entitled to the Protections of Section 363(n) of the Bankruptcy Code.**

49.     The Debtors submit that the terms and conditions of the sale have been negotiated by the Seller and Purchaser, as applicable, at arm's length and in good faith, with the assistance of

the Debtors' professional advisors, and that the parties did not engage in any conduct that would

cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

50.    Based on the foregoing, the Debtors submit that they have demonstrated that the

proposed sale is a sound exercise of the Debtors' business judgment and should be approved as a

good faith transaction.

**VI.    Assumption and Assignment of the Executory Contracts Should Be Authorized.**

51.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor-in-possession "subject to the court's approval, may assume or reject any executory contract

or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing approval of a

debtor's decision to assume or reject an executory contract is whether the debtor's reasonable

business judgment supports assumption or rejection.  *Mirant Corp. v. Potomac Electric Power Co.

(In re Mirant Corp.)*, 378 F.3d 511, 524–25 & n.5 (5th Cir. 2004).  Under the business judgment

test, a court should approve a debtor's proposed assumption if such assumption will benefit the

estate.  *In re Food City, Inc.*, 94 B.R. 91, 93–94 (Bankr. W.D. Tex. 1988).

52.    The business judgment test "requires only that the trustee [or debtor in possession]

demonstrate that [assumption] or rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*,

72 B.R. 845, 846 (Bankr. W.D. Pa. 1987); *see In re J. C. Penney Direct Mktg. Servs., LLC*, 50

F.4th 532, 533–35 (5th Cir. 2022) (noting business judgment standard applies to assumption of

lease contracts).  Any more exacting scrutiny would slow the administration of a debtor's estate

and increase costs, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten a court's ability to control a case impartially.  *See

Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant

to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must

"cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

53.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); *see also In re Lil' Things*, 220 B.R. 583, 590–91 (Bankr. N.D. Tex. May 21, 1998)*; In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtors' assets).  Section 365(f)(2)(B) requires that the non-debtor contract counterparty be given adequate assurance of future performance by an assignee.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000); *see Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant.  *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

54.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *Richmond Leasing*, 762 F.2d at 1309.  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g.*, *Id.* at 1309–10; *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from a debtor has financial

resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

55.     Any assumption of the Executory Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Executory Contracts is necessary to the Debtors' ability to obtain the best value for the Assets.  Given that consummation of the Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption and assignment of any Executory Contracts is an exercise of sound business judgment and, therefore, should be approved.

56.     The consummation of any sale involving the assignment of the Executory Contracts will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Executory Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.

57.     The Debtors' assumption and assignment of the Executory Contracts will also be contingent upon payment of the Cure Amounts and effective only upon the closing of the sale or any later applicable date of assumption and assignment.  Each counterparty to the Executory Contracts that the Debtors seek to assume and assign to the Purchaser will be served with this Motion, as well as the Potential Assumption and Assignment Notice, which identifies the Executory Contracts that the Debtors may seek to assume and assign to the Purchaser as well as the Cure Amounts.

58.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment.  Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to the Executory Contracts

to raise objections to the assumption and assignment of the Executory Contracts as proposed in this Motion are adequate to protect the rights of counterparties to the Executory Contracts. Additionally, the Debtors believe that the Purchaser is able to demonstrate adequate assurance of future performance to the counterparties of the Executory Contracts. In the event that such counterparties object on adequate assurance of future performance grounds, the Debtors will present facts at the hearing on this Motion to show the financial wherewithal, willingness and ability of the Purchaser to perform under the Executory Contracts.

**VII.    The 9019 Settlement Should Be Authorized.**

59.    Settlements in bankruptcy are favored as a means to minimize litigation, expedite administration of the bankruptcy estate, and provide for efficiently resolving bankruptcy cases. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Under Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc.* (*In re AWECO, Inc.*), 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

60.    In evaluating a request under Bankruptcy Rule 9019, the United States Court of Appeals for the Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider: "(1) the probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) the complexity and likely duration of the litigation and any attendant expense,

inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id.* Under the third factor, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.* (*In re Foster Mortg. Corp.*), 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

61.    The bar for approving a settlement is low in the Fifth Circuit: "[a] proposed compromise and settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness." *See Gilmour v. Conn. Gen. Life. Ins. Co. (In re Victory Med. Center Mid-Cities, LP)*, 601 B.R. 739, 749 (Bankr. N.D. Tex. 2019) (citing *In re Mirant Corp.*, 348 B.R. 725, 743 (Bankr. N.D. Tex. 2006)). When a bankruptcy court evaluates a Bankruptcy Rule 9019 settlement, "[it] is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F.3d 349 (5th Cir. 1997). Rather, "[t]he judge need only apprise himself [sic] of the relevant facts and law so that he can make an informed and intelligent decision." *Id.* (citing *La Salle Nat'l Bank v. Holland* (*In re American Reserve Corp.*), 841 F.2d 159, 163 (7th Cir. 1987)).

i)    **The Probability of Success, Complexity, and Likely Duration of the Litigation**

62.    The first and second factors address the probability of success, complexity, and likely duration of the litigation, and weigh in favor of approving the 9019 Settlement. Through the Pennsylvania Litigation, the Debtors and their affiliates face several claims related to

wrongdoing and mismanagement of the Pennsylvania Hospitals, and are subjected to the possibility of the appointment of a receiver to manage such hospitals.  Following active negotiations in an effort to resolve their issues, the parties were able to reach a negotiated resolution as embodied in the 9019 Settlement.  The alternative to a negotiated resolution would involve drawn out litigation, which would take months, if not years, to resolve.  Given that engaging in litigation is an inherently time-consuming and costly process, and that the Debtors are limited by their financial constraints, the probability of the Debtors succeeding in a protracted legal battle is lessened.  In contrast, the 9019 Settlement provides the Debtors with much-needed, and immediate, relief from such litigation and the uncertainty related thereto, without the need for any additional expense, delay, or risk.  As such, the Debtors submit that the 9019 Settlement, and the mutual Releases granted by the parties contained therein, is a reasonable resolution of the outstanding issues between the parties.

ii)    **All Other Factors Bearing on the Wisdom of the Compromise**

63.    Additionally, the Debtors' entry into the 9019 Settlement is fair and reasonable and in the best interest of creditors.  The 9019 Settlement provides for the mutual release of all Released Claims related to the Pennsylvania Litigation among the Debtors, the Pennsylvania AG, Samuel Lee, and David Topper and comes as a result of good-faith, arm's-length negotiation.

64.    The 9019 Settlement affords the Debtors the opportunity to conserve estate resources that would otherwise have been expended on the Pennsylvania Litigation, enabling the Debtors to continue focusing on providing quality care to their patients and effectuating sale transactions for their remaining hospitals while alleviating the Debtors' ongoing liquidity pressures.  All of the above factors support that decision, and the Court should therefore approve the 9019 Settlement.

## EMERGENCY CONSIDERATION

65.     The Debtors respectfully request emergency consideration of this Motion.  As described herein, the Debtors believe that immediate relief is necessary to avoid irreparable harm to the Debtors and their estates.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

66.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

67.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of

any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## NOTICE[7]

68.     Notice of this Motion has been provided by email, facsimile, overnight courier, or first-class mail to: including: (a) the Complex Service List (as defined in the Creditor Matrix Order [Docket No. 3]); (b) all entities known to have asserted any Interest in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Sale Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Assets that could potentially be assumed and assigned to the Purchaser; (e) the Pennsylvania AG; (f) the Commonwealth of Pennsylvania; (g) all known creditors of the Debtors; (h) CMS; (i) all other Person(s) who have formally appeared in these chapter 11 cases; (j) the Pension Benefit Guaranty Corporation ("PBGC"); and (k) counsel to the proposed Purchaser, Stradley Ronon Stevens & Young, LLP, 2005 Market Street, Suite 2600, Philadelphia, PA 19103 (Attn: William Sasso (WSasso@stradley.com), Thomas Xi (TIX@stradley.com) and Julie Murphy (Jmmurphy@stradley.com)).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PREVIOUS REQUEST

69.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

---

[7]     Following the filing of this Motion, a sale notice (the "Sale Notice"), substantially in the form attached hereto as **Exhibit C**, will be published in the Philadelphia Inquirer.

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the

form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such

other relief as is just and proper.

Dated:  January 31, 2025
Dallas, Texas

*/s/ Thomas R. Califano*

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:      (214) 981-3300
Facsimile:       (214) 981-3400
Email:             tom.califano@sidley.com
                        rpatel@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:      (212) 839-5300
Facsimile:       (212) 839-5599
Email:             wcurtin@sidley.com
                        pventer@sidley.com
                        anne.wallice@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

## **Certificate of Service**

I certify that on January 31, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Thomas R. Califano*
Thomas R. Califano