

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 14, 2025**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered)<br>Related to Dkt. Nos. 48 and 101 |

### FINAL ORDER (I) AUTHORIZING
### (A) POSTPETITION FINANCING AND (B) THE
### USE OF CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING
### SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING
### ADEQUATE PROTECTION TO PREPETITION LENDERS; (IV) MODIFYING
### THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Prospect Medical Holdings, Inc. and its affiliated

debtors, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases"), seeking entry of a final order (this "Final Order" and,

together with all exhibits hereto and the Interim Order,[2] the "DIP Orders"), pursuant to

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

[2] The term "Interim Order" means the *Interim Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 101] entered by the Court on January 14, 2025.

sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), 506, and 507

of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002,

4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and rules 2002-1, 4001-1, 5005-1, and 9013-1 of the Bankruptcy Local Rules for the

Northern District of Texas (the "Local Rules"), and the Procedures for Complex Cases in the

Northern District of Texas (the "Complex Case Procedures"), that, among other things:

i.      authorizes the Debtors, jointly and severally, to obtain a non-amortizing priming super-priority senior secured postpetition credit facility ("DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $100,000,000 of which, upon entry of the Interim Order and subject to the terms and conditions set forth therein and in the DIP Term Sheet (as defined in the Interim Order), $29,000,000 (the "Interim Amount") was made available to the Debtors and drawn in a single draw, and the remainder of the DIP Commitment (as defined below), subject to and after the entry of this Final Order, will be available through additional draws, in each case subject to the terms and conditions set forth in this Final Order and the *Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement* among the Debtors, as Borrowers,[3] and JMB Capital Partners Lending, LLC or its designees or assignees, as Lender (the "DIP Lender"), which shall be substantially in the form attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral, or related documents and agreements, including the DIP Orders, each as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");[4]

ii.     approves the terms of the DIP Credit Agreement and the other DIP Documents, and authorizes the Debtors to execute, deliver, and perform under the DIP Documents;

iii.    authorizes the Debtors, on a final basis, to issue, incur, and guarantee all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including the Commitment Fee, the Exit Fee, and any other fees payable pursuant to the DIP Documents), and all other obligations due or payable to or for the benefit of the DIP Lender under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.    authorizes and directs the Debtors, on a final basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Documents and this Final Order to (a) fund the postpetition working capital needs of the Debtors; (b) pay fees, costs and expenses of the DIP Facility on the

---

[3]   For the avoidance of doubt and notwithstanding anything contrary in the DIP Documents, the term "Borrowers" shall not include Prospect Healthcare Facilities Management, LLC, PHP Holdings, LLC, or any of PHP Holdings, LLC's direct or indirect subsidiaries (collectively, "PhysicianCo").

[4]   Capitalized terms used but not otherwise defined herein have the meaning set forth in the Motion or the applicable DIP Documents.

2

terms and conditions described in this Final Order and the DIP Documents; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Documents, the Approved Budget (as defined below), and this Final Order;

v.      authorizes and approves, on a final basis, the Debtors' grant to the DIP Lender of valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out (as defined below) and the Permitted Prior Liens (as defined in the DIP Credit Agreement), and (b) liens in the DIP Collateral (as defined below) and all proceeds thereof, including all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral"), pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve-Out and the Permitted Prior Liens;

vi.     authorizes and approves, on a final basis, the Debtors' grant to the Prepetition Secured Parties (as defined below), as adequate protection of their respective interest in the Prepetition Collateral (as defined below), of valid, enforceable, non-avoidable, and automatically and fully perfected security interests and replacement liens in the DIP Collateral, solely to the extent of any Diminution (as defined below) of the Prepetition Secured Parties' respective interest in the Prepetition Collateral, as more fully set forth herein, subject and subordinate only to the Carve-Out, the Permitted Prior Liens, the DIP Liens (as defined below), and DIP Superpriority Claims (as defined below), without waiver of the Debtors' or any other parties' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties;

vii.    authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Final Order and the DIP Documents;

viii.   authorizes, as applicable, payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Documents;

ix.     subject to the terms hereof, a waiver of (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

x.      modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Documents and this Final Order, and authorizes the DIP Lender to deliver any notices and exercise rights and remedies, as contemplated in this Final Order and the DIP Documents; and

xi.     waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the First Day Declaration (as defined in the Motion), the Rundell Declaration (as defined

in the Motion), the *Supplemental Declaration of Paul Rundell in Support of the Debtors' DIP Motions* [Docket No. 569], the DIP Credit Agreement, the other DIP Documents, the other papers filed with this Court, the evidence submitted and arguments made at the interim hearing held and concluded before this Court on January 14, 2025 (the "Interim Hearing") and at the February 12, 2025, hearing on this Final Order (the "Final Hearing"); and due and sufficient notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Final Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE FINAL HEARING**:[5]

    a.    **Petition Date**.  Commencing on January 11, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

---

[5]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

b.  **Debtors in Possession**.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

c.  **Jurisdiction and Venue**.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

d.  **Notice**.  The Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Final Order shall be required.

e.  **Interim Order**.  On January 14, 2025, the Court entered the Interim Order, pursuant to which the Court, *inter alia*, (i) authorized the Debtors to obtain postpetition secured financing from the DIP Lender, on an interim basis, under the terms and condition set forth therein and in the DIP Documents, and (ii) approved the DIP Term Sheet.

f.  **Committee Formation**.  On January 29, 2025, an official committee of unsecured creditors (the "Creditors' Committee"), as provided for under section 1102 of the Bankruptcy Code, was appointed by the United States Trustee for the Northern District of Texas (the "U.S. Trustee").

g.  **No Credit Available on More Favorable Terms**.  Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Interim Hearing and the Final Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense.  The Debtors are also unable to obtain sufficient secured credit without (i) granting to the DIP Lender the DIP Liens and the DIP Superiority Claims and (ii) granting the Adequate Protection Liens (as defined below), in each case subject and

5

subordinate to the Carve-Out and the Permitted Prior Liens, as set forth herein and in the DIP Documents.

       h.    **Good Faith**.  Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including the use of Cash Collateral) under the DIP Facility, as provided by the DIP Documents, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and payments as set forth in the DIP Orders and the other DIP Documents, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, are integral, critical, and essential components of the DIP Facility provided by the DIP Lender; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and all terms, conditions, and relief set forth in and otherwise approved by the DIP Orders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders (as applicable) or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

       i.    **Good Cause**.  Good cause has been shown for the entry of this Final Order, and the entry of this Final Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The relief requested in the Motion is fair and reasonable and in the best interest of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets.

       j.    **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion.  The financing provided pursuant to the DIP Orders and the DIP Documents and the authority to use Cash Collateral granted

herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) fund any obligations benefiting from the Carve-Out; (iii) continue the orderly continuation of the operation of their businesses, in an effort to maintain the health and safety of their patients; (iv) maintain business relationships with customers, vendors, and suppliers; (v) make payroll for their employees, including providers essential for patient care; and (vi) satisfy other working capital and operational needs.

k.     **Willingness to Provide Financing**.  The DIP Lender has committed to provide financing to the Debtors subject to:  (i) entry of the DIP Orders; (ii) approval of the terms and conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Credit Agreement; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to the DIP Orders and the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to the DIP Orders and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

l.     **Priming of Prepetition Liens**; **Adequate Protection**.  As of the Petition Date, the Prepetition Secured Parties[6] have asserted claims against certain of the Debtors under applicable agreements, including the Prepetition Loan Documents,[7] or applicable law (all such asserted claims, the "Prepetition Obligations"), and the Prepetition Secured Parties have asserted that such Prepetition Obligations were secured by liens and security interests granted by certain of the Debtors or otherwise arising under applicable law (all such asserted liens and security interests, the "Prepetition Liens") on and in the assets of the Debtors to the extent set forth under the

---

[6]   The "Prepetition Secured Parties" means, collectively, (i) the lenders, lessors, agents and other parties to the Prepetition Loan Documents (collectively, the "Prepetition Lenders"), (ii) the Pension Benefit Guaranty Corporation ("PBGC"), on behalf of the Crozer-Keystone Health System Employees Retirement Plan ("Crozer Plan") and the Eastern Connecticut Health Network, Inc. Pension Plan ("ECHN Plan"), (iii) the State of Connecticut, and (iv) any party in interest with a valid, enforceable, non-avoidable, and perfected lien as of the Petition Date (or perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

[7]   The "Prepetition Loan Documents" means, collectively, the eCapital Credit Agreement, the HospitalCo Term Loan Agreement, the PhysicianCo Loan Agreement, the MPT PA Mortgage Loan Agreement and the other MPT Obligations Documents (each as defined in the DIP Credit Agreement), respectively.

applicable agreements, including the Prepetition Loan Documents, or applicable law (all such assets, the "Prepetition Collateral").[8] The priming of the asserted security interests in and liens on the Prepetition Collateral and any other interests of the Debtors in property under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Credit Agreement and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their business for the benefit of their estates and creditors, and the Debtors would not be able to obtain postpetition financing in a sufficient amount without granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, and without waiving the Debtors' or any other parties' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties, the Prepetition Obligations or the Prepetition Liens, the Prepetition Secured Parties shall receive adequate protection as set forth in this Final Order, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any decrease in the value of its interest, if any, in the Prepetition Collateral resulting from (i) the use, sale, or lease by the Debtors of the Prepetition Collateral during the pendency of the Chapter 11 Cases; (ii) the DIP Liens and the Carve-Out pursuant to this Final Order and the DIP Documents; or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such actual diminution, collectively, "Diminution").

 m. **DIP Budget**. The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget, a copy of which is attached to the Interim Order as Exhibit 2 (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Documents, the "Initial DIP Budget"). The Initial DIP Budget reflects, among other things, for the 13-week period commencing on or about the Petition Date, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating

---

[8] For the avoidance of doubt, nothing contained herein shall constitute any stipulation or acknowledgement as to the validity or enforceability of the Prepetition Loan Documents, or the validity, enforceability, priority or perfection of the Prepetition Obligations or Prepetition Liens asserted by the Prepetition Lenders, and all rights, claims, causes of action, objections, defenses and challenges with respect to the Prepetition Lenders, the Prepetition Loan Documents, the Prepetition Obligations and the Prepetition Liens asserted by the Prepetition Lenders, whether held by the Debtors, the Committee or any other party in interest, is hereby expressly preserved.

cash flow and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement or the other DIP Documents, and such modified, amended, extended and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Credit Agreement) shall constitute, without duplication, an "Approved Budget"); provided, however, that any changes to the professional fee budget for Committee professionals shall require the prior written consent of the Committee. As part of the process for determining an Approved Budget, any Professional Person (as defined herein) may request a "true up" for any accrued fees and expenses exceeding the amounts estimated as part of any prior Approved Budget, with such requests subject to approval in the Debtors' reasonable discretion (with consent of the DIP Lender). A copy of the Approved Budget for purposes of this Final Order is attached hereto as **Exhibit 2**. This Approved Budget has been prepared by the Debtors, their management and their advisors, and the Debtors believe that the Approved Budget is reasonable under the circumstances. The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) and the terms of the DIP Documents in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for in this Final Order.

n.    **Use of Cash Collateral and Proceeds of DIP Facility**. As a condition to the Debtors' entry into the DIP Credit Agreement and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Final Order, the DIP Documents, and the Approved Budget (subject to Permitted Variances). Except as otherwise set forth in the DIP Orders, all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts

receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order or the DIP Documents, the FRMC Deposit Account (as defined in the Cash Management Order[9]), the FRMC Accounts (as defined in the Cash Management Order), any other bank accounts owned by PhysicianCo, and funds held therein shall not constitute the DIP Lenders' Cash Collateral.

o.    **Section 506(c) and Marshaling**.  As material inducement to the DIP Lender's agreement that the DIP Liens and DIP Superpriority Claims shall be subject to payment of the Carve-Out and the Permitted Prior Liens, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

p.    **Requisite Authority**.  Upon entry of this Final Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Credit Agreement and the other DIP Documents to which it is a party and to perform its obligations thereunder.

q.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules. Consummation of the DIP Facility and the permitted use of Prepetition Collateral in accordance with this Final Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

---

[9]    The *Amended Order (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue To Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; and (II) Granting Related Relief* (the "Cash Management Order").

**IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted**.  The relief sought in the Motion is GRANTED on a final basis as set forth herein.  Entry into the DIP Credit Agreement and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral on a final basis is authorized, in each case, subject to the terms and conditions set forth in this Final Order and in the DIP Documents, including the Approved Budget (subject to Permitted Variances).  All objections to the Motion to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      **Authorization of the DIP Facility**.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Credit Agreement and the other DIP Documents, and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of the DIP Orders and the other DIP Documents, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Documents, and the creation, perfection, and continuation (as applicable) of the DIP Liens described in and provided for by the DIP Orders and the DIP Documents.  Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Orders and the other DIP Documents, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the other DIP Documents), including the Commitment Fee and the Exit Fee, as well as any reasonable and documented fees and expenses of counsel to the DIP Lender (subject to paragraph 27 of this Final Order), in each case as set forth herein and in the DIP Credit Agreement, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Final Order and the other DIP Documents.  Upon execution and delivery, the DIP Credit Agreement and, as applicable, the other DIP Documents, shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.  All provisions of the DIP Credit Agreement are incorporated herein and approved

in their entirety.  Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Credit Agreement and the other DIP Documents.

3.    **DIP Obligations**.  The DIP Orders and the DIP Documents shall constitute and evidence the validity and binding effect of the DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (the "Successor Case").  The DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under the DIP Documents and the DIP Orders, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under the DIP Documents and the DIP Orders.  The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Documents and the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Credit Agreement) or as otherwise set forth in the DIP Documents.  No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4.    **Authorization to Borrow**.  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Credit Agreement

12

and the other DIP Documents and to take such other and further acts as may be necessary, appropriate or desirable in connection therewith.  Upon entry of this Final Order, the Debtors are authorized to borrow up to the aggregate amount of the Commitments (as defined in the DIP Credit Agreement, and as used in the DIP Orders, the "DIP Commitment"), and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Documents, and the DIP Obligations are hereby approved on a final basis (as and when such amounts become earned, due, and payable in accordance with the DIP Documents) without the need to seek further Court approval.  Notwithstanding the foregoing and anything else to the contrary set forth herein, without the prior written consent of MPT,[10] no more than $46,000,000 in aggregate principal amount of DIP Loans incremental to the Interim Amount may be drawn prior to the entry by the Court of an order approving the transactions contemplated by that certain Summary of Proposed Settlement Terms among the Debtors and MPT as described on the record at the Final Hearing (the "Settlement Term Sheet"), in form and substance consistent with the Settlement Term Sheet and otherwise acceptable to each of the Debtors and MPT, and in form and substance reasonably acceptable to the DIP Lender (the "Settlement Approval Order").  The borrowing of DIP Loans under the DIP Orders and the other DIP Documents shall permanently decrease the DIP Commitment and, once repaid, the DIP Loans incurred may not be re-borrowed.

5.      **DIP Collateral**.  The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all of such Debtor's personal property and other assets, in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before or after the Petition Date, and wherever located, including, without limitation, the following:  (a) all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property

---

[10] As used in this Final Order, "MPT" means Medical Properties Trust, Inc., together with its subsidiaries or other affiliates that hold claims against any Debtor.

(including, without limitation, all equity interests owned by such Debtor in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds (including, without limitation, the proceeds of the Rhode Island Business Sale), and all products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York), (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of Collateral and any proceeds thereof, and (c) all proceeds of Avoidance Actions[11]; provided, however, that notwithstanding anything to the contrary in the DIP Orders or the DIP Credit Agreement, the term "DIP Collateral" (and any component thereof) shall exclude all Excluded Assets (as defined in the DIP Credit Agreement).

6.  **Disposition of Collateral**.  Notwithstanding anything otherwise provided herein, it shall be deemed an Event of Default under the DIP Credit Agreement and the other DIP Documents if the Debtors sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Final Order or the Approved Budget (subject to the Permitted Variances), without the prior written consent of the DIP Lender, which consent shall not unreasonably be withheld or delayed, or further order of the Court.  Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course

---

[11] For the purposes of this Final Order, "Avoidance Actions" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

of business shall, subject to the satisfaction of the Carve-Out and the lien priorities set forth herein
and in the DIP Documents, be used to immediately satisfy the DIP Obligations.

7.     **DIP Liens**.  To secure the DIP Obligations the DIP Lender was granted, effective
immediately upon entry of the Interim Order and approved on a final basis by this Final Order,
valid, binding, enforceable, non-avoidable, and automatically and properly perfected security
interests in and liens on the DIP Collateral (the "DIP Liens") as follows, in each case subject to
the Carve-Out and Permitted Prior Liens:

a.     **Liens Priming the Prepetition Liens**.  Pursuant to section 364(d)(1) of the
Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable and
automatically and fully perfected first-priority senior priming liens and security
interests in all DIP Collateral, regardless of where located and subject only to the
Carve-Out and the Permitted Prior Liens, which senior priming liens and security
interests in favor of the DIP Lender shall be senior to the Prepetition Liens (except
to the extent such Prepetition Liens are also Permitted Prior Liens[12]);

b.     **Liens on Unencumbered Property**.  Pursuant to section 364(c)(2) of the
Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and
automatically and fully perfected first-priority liens on and security interests in all
DIP Collateral that is not otherwise subject to any valid, enforceable, non-avoidable
and perfected lien on or security interest as of the Petition Date or a valid,
enforceable, non-avoidable lien or security interest in existence as of the Petition
Date and perfected subsequent to the Petition Date as permitted under section
546(b) of the Bankruptcy Code, subject only to the Carve-Out;

---

[12] Notwithstanding anything herein to the contrary, Permitted Prior Liens does not include Liens granted under the
DIP Orders (other than the Carve-Out) or any Liens in favor of (i) the Prepetition Lenders (other than eCapital in
respect of the eCapital Priority Collateral), (ii) the Pension Benefit Guaranty Corporation, on behalf of the Crozer Plan
and the ECHN Plan or (iii) the State of Connecticut.

     c.   **Liens Junior to Permitted Prior Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, and automatically and fully perfected junior liens on and security interests in all DIP Collateral that is subject to Permitted Prior Liens (including, for the avoidance of doubt, the eCapital Priority Collateral); and

     d.   **eCapital Priority Collateral**.  Notwithstanding anything in the DIP Orders or the other DIP Documents to the contrary, the DIP Liens granted to the DIP Lender in the eCapital Priority Collateral (as defined in the DIP Credit Agreement) shall be subject and subordinate only to any valid, perfected, and unavoidable liens held by eCapital in the eCapital Priority Collateral and the Carve-Out.  For the avoidance of doubt, the DIP Lender shall be granted valid, enforceable, non-avoidable automatically and fully perfected second liens on and security interests in all of the eCapital Priority Collateral.

Other than as set forth herein or in the other DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case.  The DIP Liens shall not be subject to section 510(c), 549, or 550 of the Bankruptcy Code.  To the extent applicable non-bankruptcy law does not permit the DIP Liens to attach directly to any DIP Collateral, the DIP Liens shall be legal, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective priming security interests in and liens on any proceeds from any sale or other disposition of such DIP Collateral and such proceeds shall constitute DIP Collateral.

8.      **DIP Superpriority Claims**.  Subject to and subordinate to only the Carve-Out and the Permitted Prior Liens, the DIP Lender was granted, effective immediately upon entry of the Interim Order and approved on a final basis by this Final Order, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate in the Chapter 11 Cases and any Successor Case (without the need to file any proof of claim) for all DIP Obligations (collectively, the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.  The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates and all proceeds thereof, excluding only the Carve-Out and the Excluded Assets; subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by the Bankruptcy Court.

9.      **No Obligation to Extend Credit**.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Documents unless (a) all of the conditions precedent and other terms under the DIP Orders and the other DIP Documents have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Credit Agreement or the other DIP Documents (including this Final Order) has occurred and is continuing.

10.      **Use of DIP Facility Proceeds**.  The Debtors shall be permitted to use loans, extensions of credit, and any other financial accommodations available under the DIP Facility only for the purposes specifically set forth in this Final Order and the other DIP Documents.

Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

11.    **No Monitoring Obligation**.  The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Final Order and the other DIP Documents, including the Approved Budget (subject to the Permitted Variances).

12.    **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Final Order and the other DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the DIP Termination Declaration Date.

13.    **Adequate Protection for Prepetition Secured Parties**.  Subject to the limitations described in the DIP Orders, as adequate protection, solely to the extent of any Diminution of the Prepetition Secured Parties' asserted interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve-Out and the Debtors' continuing use of the Prepetition Collateral (and, with respect to MPT, certain additional accruals as set forth herein), the Prepetition Secured Parties received, effective immediately upon entry of the Interim Order and approved on a final basis by this Final Order (or shall receive immediately upon entry of this Final Order, as applicable); provided, however, that the State of Connecticut shall receive as adequate protection the terms and conditions of the stipulation attached hereto as **Exhibit 3**:

> a.  continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral (other than proceeds of Avoidance Actions), which shall be subject and subordinated only to the Carve-Out, the DIP Liens, and Permitted Prior Liens (the "Adequate Protection Liens") and which, except as otherwise provided in the DIP

Orders, (a) shall maintain the respective priorities among the Prepetition Secured Parties in the Prepetition Collateral as of the Petition Date, (b) shall otherwise be senior to all other security interests in, liens on, or claims against the Prepetition Collateral, and (b) shall not otherwise be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, and shall not be subject to sections 510(c), 549 or 550 of the Bankruptcy Code, without waiver of any of the Debtors' or any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties; *provided, however,* that MPT shall receive replacement liens (which replacement liens shall constitute Adequate Protection Liens) on all DIP Collateral, which will be subject to and subordinate to the Carve-Out, the Permitted Prior Liens, and the DIP Liens and senior to all other liens on the DIP Collateral; *provided* further that, subject to any alternative priority set forth in any subsequent order of this Court addressing the matter and to PBGC's right to oppose any request for entry of any such order, as to any asset constituting DIP Collateral, such replacement liens of MPT shall have the same relative priority with respect to the replacement liens of the PBGC granted pursuant to this Final Order as MPT's prepetition liens have with respect to PBGC's prepetition liens with respect to such asset; and

b.  (i) for MPT, in addition to the replacement liens detailed above, (A) superpriority administrative expense claims (subject and subordinate to such claims in respect of the Carve-Out, the Permitted Prior Liens, and the DIP Superpriority Claims and senior to all other claims), (B) current payment in cash of MPT's professional fees and expenses, in an amount no more than $1.25 million per month, with unpaid accruals (including, without limitation, amounts in excess of such cap) secured by the

19

replacement liens granted to MPT described above and constituting superpriority administrative expense claims of MPT as set forth above; and (C) claims of $5 million per month, secured by the replacement liens granted to MPT described above and constituting superpriority administrative expense claims of MPT as set forth above; (ii) for Prepetition Secured Parties who are equipment lessors, timely performance of postpetition rent payments by the Debtors pursuant to the terms of the parties' lease agreement, unless and until such lease agreement is rejected under section 365 of the Bankruptcy Code, and (iii) for Prepetition Secured Parties who are governmental taxing authorities, the same reporting requirements and obligations set forth in paragraph 15 of this Final Order.

c. Notwithstanding anything set forth herein to the contrary, any adequate protection payments, liens, or claims required or provided under this Final Order, including to MPT, may be subject to clawback, disgorgement or recharacterization as payments of principal, to the extent the applicable prepetition liens or claims are determined by a further order of the Court to be avoidable, unenforceable or unperfected as of the Petition Date, or unsecured in whole or in part. All parties reserve all rights in connection with the foregoing, including with respect to whether relief should be granted and the remedies that may be sought in any further proceeding.

14. **Modification of DIP Documents**. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Documents any non-material modifications of the DIP Documents without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon four (4) business days' notice to the U.S. Trustee and the Prepetition Secured Parties; provided that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Documents

20

shall not require an order of this Court; provided further that the Debtors and the DIP Lender shall not modify the provisions hereof or the DIP Documents related to PhysicianCo, the FRMC Accounts, or the FRMC Deposit Account without (i) the prior consent of PhysicianCo or FRMC, as applicable or (ii) a further order from this Court; provided, further, that all modifications, amendments, supplements or waivers shall be provided to the Committee no later than three (3) days prior to the effectiveness thereof for non-material amendments, and four (4) business days prior to the effectiveness thereof, for material amendments.

15.      **DIP Facility Reporting**.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Documents and in accordance with the Approved Budget.  The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Documents.  The Debtors shall contemporaneously provide the Committee, the PBGC and PhysicianCo with all reports, notices, documents, and other information required to be delivered to the DIP Lender under the DIP Documents (as currently in effect, or pursuant to any additional requirements that may be added after the date hereof) and this Final Order, including any new Budget, Updated Budget, and Variance Reports (each as defined in the DIP Credit Agreement).

16.      **Perfection of DIP Liens and Adequate Protection Liens**.  Each of the DIP Orders shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein and herein, including the DIP Liens, the Adequate Protection Liens, and the FRMC Lien (as defined below), without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted in the applicable DIP Orders.  Notwithstanding the foregoing, the DIP Lender and the Prepetition

21

Secured Parties are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, deposit account control agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens and the Adequate Protection Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens. The DIP Lender and the Prepetition Secured Parties may, in their respective sole discretion, file an electronic copy or photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.   To the extent that a Prepetition Secured Party is, with respect to the DIP Collateral, a secured party under any Prepetition Loan Documents or is listed as loss payee, lenders' loss payee or additional insured under any Debtor's insurance policies, the DIP Lender shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable, solely to the extent as the secured party, mortgage, the loss payee, or additional insured of the DIP Collateral (notwithstanding anything to the contrary in the DIP Documents).   For the avoidance of doubt, any deposit account control agreements contemplated by the DIP Credit Agreement shall automatically supersede any preexisting deposit account control agreements, without the necessity of any further action, including by the Debtors, the DIP Lender, or the Prepetition Secured Parties. Upon the request of the DIP Lender, each Debtor, without any further consent of any party, is authorized to take, execute, deliver, and file any such instruments contemplated by the DIP Credit Agreement to enable the DIP Lender to further validate, perfect, preserve, and enforce the DIP Liens and the applicable Adequate Protection Liens respectively.

17.     **Modification of Automatic Stay**.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors, the DIP Lender,

PhysicianCo, and, as applicable, the Prepetition Secured Parties to accomplish the transactions contemplated by this Final Order and the other DIP Documents.

18. **Proceeds of Subsequent Financing**. If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents or otherwise at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Credit Agreement) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve-Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Final Order and the other DIP Documents; provided, however, that nothing contained herein or the DIP Documents shall preclude the Debtors from seeking to refinance the DIP Facility.

19. **Payments Held in Trust**. Except as expressly permitted in the DIP Orders, the DIP Credit Agreement, or otherwise ordered by this Court, including in respect of the Carve-Out and the Permitted Prior Liens, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Facility in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Orders or the applicable DIP Documents; provided, however, payments made to Alta Newport Hospital, LLC from the FRMC Deposit Account in accordance with the procedures set forth in the Cash Management Order shall not be deemed to be held in trust and shall not be required to be turned over to the DIP Lender.

23

20.     **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Documents and applicable law; and (b) maintain the cash-management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

21.     **Right to Credit Bid**.  Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

22.     **DIP Termination Event; Exercise of Remedies.**

    a.   **DIP Termination Event**.  For purposes of this Final Order, the term "<u>DIP Termination Event</u>" shall mean:  (i) the occurrence of the Maturity Date, (ii) the occurrence of any material breach or Event of Default under the DIP Credit Agreement, the DIP Orders, or any other DIP Documents; or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitment in accordance with the terms of the DIP Documents.

    b.   **Exercise of Remedies**.  Upon the occurrence of a DIP Termination Event, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the

following actions, at the same or different time:  (i) deliver a written notice (which may be via email) to counsel for the Debtors, the U.S. Trustee, counsel for the Prepetition Secured Parties, and counsel for the Creditors' Committee (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date") and deliver a Carve-Out Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitment) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Credit Agreement; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

c. **Waiting Period Procedures**.  The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) business days following the DIP Termination Declaration Date (such period, including as such period may be tolled, the "Waiting Period").  If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court.  At any hearing regarding a Remedies Notice, the Debtors may only raise the issue of whether an Event of Default has occurred, but for avoidance of doubt the Committee's and all other parties' rights and remedies are expressly preserved (including the right to seek non-consensual use of Cash Collateral).  During the

25

Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this Final Order, the other DIP Documents, and the Approved Budget, solely to pay any expenses which are necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Credit Agreement).

d. **Rights and Remedies Following Termination Date**. Following a DIP Termination Declaration Date and unless this Court has entered an order prior to the expiration of the Waiting Period to the contrary, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Final Order, the other DIP Documents, and applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with the DIP Documents, this Final Order, and applicable law.

23. **No Waiver by Failure to Seek Relief**. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Orders, the other DIP Documents, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Orders, the other DIP Documents, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under the DIP Orders or the other DIP Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consents required hereunder by the DIP Lender shall be implied, including by any inaction or acquiescence by the DIP Lender.

24.     **Carve-Out**.

a.   **Priority of Carve-Out**.  The DIP Liens and the DIP Superpriority Claims shall be
subject and subordinate to payment of the Carve-Out and any transaction fees or
the like earned by, and unpaid to, Houlihan Lokey, Inc., subject to paragraph 45 of
this Final Order.  The Carve-Out shall be senior to all claims and liens over all
assets of the Debtors, including any DIP Collateral, as set forth in the DIP Orders.

b.   **Carve-Out**.  The term "Carve-Out" shall mean the sum of (i) all fees required to
be paid to the Clerk of the Court and to the United States Trustee under 28 U.S.C.
§ 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717
("Statutory Fees"), which shall not be subject to the Approved Budget; (ii) Court-
allowed fees and expenses of a trustee appointed under section 726(b) of the
Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at
any time, whether by interim order, procedural order, or otherwise, all unpaid fees
and expenses, including transaction fees or similar fees (the "Allowed Professional
Fees"), incurred by persons or firms retained by the Debtors pursuant to sections
327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and persons
or firms retained by the Creditors' Committee pursuant to sections 328 or 1103 of
the Bankruptcy Code or the patient care ombudsman in these Chapter 11 Cases (if
any) (the "Committee Professionals" and, together with the Debtor Professionals,
the "Professional Persons"), at any time before or on the first calendar day
following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined
below), whether allowed by the Court prior to or after delivery of a Carve-Out
Trigger Notice (the "Pre-Trigger Date Fees"), subject, in the case of all Professional
Persons, and solely for purposes of this clause (iii) of the Carve-Out, to the
Approved Budget, provided that Professional Persons may carry forward budgeted
but unused amounts set forth in the Approved Budget for any week for use in any

one or more subsequent weeks; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000 incurred after the first calendar day following delivery by the DIP Lender of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (which shall not be subject to the Approved Budget) (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap" or the "Carve-Out Cap"); provided that nothing herein shall be construed to impair the ability of the DIP Lender to object to the fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds.  Solely for purposes of clause (iii) of the Carve-Out, in the event that Allowed Professional Fees exceed or are expected to exceed the amounts provided in the Approved Budget, the parties will negotiate in good faith (but without further obligation) regarding a proposed amendment to the Approved Budget to address such additional Allowed Professional Fees.  For purposes of this Final Order, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Prepetition Secured Parties, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Loans under and as such terms are defined in the DIP Credit Agreement, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

c.  **Fee Reserve**.  As soon as reasonably practicable following the entry of this Final Order, and each week thereafter, the Debtors shall transfer cash on hand or cash proceeds from the DIP Facility in an amount equal to the amount of fees and expenses reflected in the Approved Budget for the Debtor Professionals and the

Committee Professionals, respectively, into two segregated Carve-Out Accounts[13] (one for Debtor Professionals and one for Committee Professionals) in an amount equal to the amount of fees and expenses reflected in the Approved Budget for each Professional Person for such week. The Debtors shall be authorized to use funds held in the Carve-Out Accounts solely to pay professional fees of the applicable Professional Persons, as they become allowed, due and payable pursuant to any compensation procedures of the Court until the payment in full of all allowed professionals fees; *provided*, that the Debtors' obligations to pay allowed professional fees shall in no way be limited to funds held in the applicable Carve-Out Accounts.

d.  The Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date (and any available cash thereafter) to transfer to the applicable Carve-Out Accounts an amount of cash equal to the remaining unfunded portion of the Carve-Out (less any retainers held by Professional Persons). Neither the DIP Lender nor any of the Prepetition Secured Parties shall sweep or foreclose upon any cash on hand or subsequent cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Accounts have been fully funded in an amount equal to all remaining unfunded portions of the Carve-Out as required hereunder.

e.  Upon entry of this Final Order, any amounts previously funded to the segregated "Carve-Out Trigger Notice Reserve" pursuant to the Interim Order, in addition to any unfunded and accrued amounts as of the entry of the Final Order by any Debtor Professional, shall be appropriately re-distributed into the two Carve-Out Accounts pursuant to this paragraph. The Carve-Out Accounts shall be funded on a weekly

---

[13] "Carve-Out Account" means a separate segregated account not subject to the control of the DIP Lender, the DIP ABL Lender or any of the Prepetition Secured Parties. For the avoidance of doubt, any fees due to Houlihan Lokey shall not be payable from the Carve-Out Account of the Committee Professionals.

basis, and shall contain an amount equal to the amount of fees reflected in the
Approved Budget for the Debtor Professionals and the Committee Professionals,
respectively from the Closing Date through the weekly date of funding. The
aggregate amounts within the Approved Budget allocated for Committee
Professionals may be reallocated among Committee Professionals, as determined
by the Committee Professionals.

f.   **Carve-Out Draw**.   Subject to exhaustion of the DIP Commitment and the
applicable terms of the DIP Documents, the Debtors shall be permitted to draw on
the DIP Facility in the amount of any remaining unfunded portions of the Carve-
Out, notwithstanding any default, Event of Default, or the occurrence of a Trigger
Date. Any Carve-Out Trigger Notice shall be deemed a consent by the DIP Lender
to authorize the Debtors to deposit Cash Collateral or DIP Facility proceeds into
the applicable Carve-Out Accounts in an amount equal to the unfunded portion of
the sum of the Post-Carve-Out Trigger Notice Cap and any budgeted amounts
reflected in the Approved Budget through the date of the Carve-Out Trigger Notice
that have not already been deposited in the Carve-Out Accounts.

g.   Notwithstanding anything contained herein to the contrary, funds transferred to the
Carve-Out Accounts (i) shall be held in trust exclusively for the benefit of the
Professional Persons, including with respect to obligations arising under the Carve-
Out, and (ii) shall not be subject to any liens or claims granted to the DIP Lender
or any other creditors and shall not constitute DIP Collateral or Prepetition
Collateral; *provided*, *however*, that the DIP Lender shall have a reversionary
interest in the funds held in the Carve-Out Accounts, if any, after all amounts
included in the Carve-Out have been funded into the applicable Carve-Out
Accounts and all Allowed Professional Fees have been paid in full pursuant to a
final order of the Court. All funds in the Carve-Out Accounts shall be used to pay

30

all obligations set forth in the definition of Carve-Out until such obligations are paid in full.

    h.   **Payment of Allowed Professional Fees Prior to the Trigger Date**.  Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

    25.   **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**.  The DIP Lender shall not be obligated, liable, or in any way responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Creditors' Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses. Notwithstanding anything contained herein to the contrary, neither the Carve-Out, the Approved Budget or any Professional Fee Budget shall constitute a cap or limitation on the amount of professional fees that may be allowed by the Court and due and payable by the Debtors.

    26.   **Approval of DIP Fees**.  In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including the Commitment Fee (which was deemed fully earned and allowed on a final basis upon entry of the Interim Order and was paid in full in cash from the proceeds of the "Initial Draw," as that term is defined in the DIP Term Sheet), the Exit Fee, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such

fees, together, the "DIP Fees").  The DIP Fees were approved on a final basis upon entry of the
Interim Order and were deemed to be allowed, fully earned, non-refundable, and payable in
accordance with the terms of the DIP Term Sheet without the need for any further order of this
Court.  The DIP Fees and the approval thereof in the Interim Order is hereby ratified and adopted
in full and such amounts shall continue to be deemed allowed, fully earned, and non-refundable;
provided that, upon entry of this Final Order, the DIP Fees shall be payable in accordance with the
terms of the DIP Credit Agreement and any other applicable DIP Documents.  The DIP Fees shall
be part of the DIP Obligations.

     27.    **DIP Lender's Professionals' Fees**.  Professionals for the DIP Lender (Norton
Rose Fulbright US LLP, the "DIP Lender's Professionals"), shall provide summary copies of any
invoices (which shall not be required to contain time entries and which may be redacted or
modified to the extent necessary to delete any information subject to the attorney-client privilege,
any information constituting attorney work product or any other confidential information, and the
provision of such invoices shall not constitute any waiver of the attorney-client privilege, the
attorney work product doctrine or any other evidentiary privilege or protection recognized under
applicable law) with: (i) a summary of the work performed during the relevant compensation
period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each
professional and paraprofessional who worked on the matter during the relevant compensation
period; and (iii) the total fee amount being requested by electronic mail to the U.S. Trustee and
counsel to the Creditors' Committee contemporaneously with the delivery of such fee and expense
statements to the Debtors.  The Debtors shall promptly pay in full all such invoiced fees and
expenses at the conclusion of the Review Period (as defined below) other than the Disputed
Invoiced Fees (as defined below).  Any objections raised by the Debtors, the U.S. Trustee or the
Creditors' Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in
writing and state with particularity the grounds therefor and must be submitted to the applicable
professional within ten (10) days of the receipt of such invoice (the "Review Period") (to be

followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days' prior written notice by the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, on or about the Closing Date, the Debtors shall pay fees and expenses of the DIP Lender's Professionals incurred prior to such date, without the need to first deliver a copy of its invoice as provided for herein. No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

28.     **Alvarez & Marsal**. The Debtors' chief restructuring officer (the "CRO") and any Additional Personnel (as defined in the Alvarez & Marsal Retention Application), will provide by email to the Debtors, the DIP Lender, and the Notice Parties (as defined in the Alvarez & Marsal Retention Application) each month a summary copy of fees and categorized expenses incurred (the "Invoiced Fees") which shall include (i) a summary of the work performed during the relevant compensation period, (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period, and (iii) the total fee amount being requested, and such invoice summary shall not be required to contain time entries (the "Invoice"). Prior to the payment of any Invoiced Fees, the Invoice shall be served by email on counsel to the Debtors, the DIP Lender, and the Notice Parties, who shall have ten (10) calendar days (the "Review Period") to review and assert any objections thereto, including to the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees"). For the avoidance of doubt, following the Review Period, the Debtors shall pay in full all Invoiced Fees other than the Disputed Invoiced Fees within five days of the date on which A&M informs the Debtors by email of the non-Disputed Invoiced Fees.

29.     **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in

respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Documents or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.

30. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Case, the Interim Order was deemed to constitute a timely filed proof of claim, and the entry of this Final Order shall be deemed to constitute a timely and valid amendment of such proof of claim. Any order entered by this Court in relation to the establishment of a bar date ( a "Bar Date Order") for any claim (including administrative claims) in the Chapter 11 Cases or Successor Case shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) one or more proofs of claim (including master or aggregate proofs of claim) in the Chapter 11 Cases for any claim allowed herein or that the DIP Lender otherwise has or may have in respect of the Debtors. In addition, notwithstanding anything to the contrary in any Bar Date Order, PBGC shall be allowed to file one master set of proofs of claim in the case of the main Debtor with respect to all amounts owed by PGBC by the Debtors and such master set of proofs of claim shall be deemed to have been filed against each of the Debtors.

31. **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve-Out and Other Funds**. Except as otherwise permitted in the DIP Documents (including the DIP Orders) and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve-Out may not be used, directly or indirectly, by any of the Debtors, the Creditors' Committee, any other official or unofficial committee, or any trustee or other estate representative appointed in the

34

Chapter 11 Cases (or any Successor Case) or any other person or entity (or to pay any professional
fees, disbursements, costs or expenses incurred in connection therewith) in connection with
(a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon
any of the DIP Collateral; (b) using or seeking to use Cash Collateral without the permission of
the DIP Lender or selling or otherwise disposing of DIP Collateral without the prior written
consent of the DIP Lender, as permitted by the DIP Documents, or further order of the Court;
(c) using or seeking to use any insurance proceeds constituting DIP Collateral without the prior
written consent of the DIP Lender; (d) seeking to amend or modify any of the rights granted to the
DIP Lender under the DIP Orders or the DIP Documents, including seeking to use Cash Collateral
or DIP Collateral on a contested basis; (e) litigating, objecting to, challenging or contesting in any
manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral
(including Cash Collateral) or any other claims held by or on behalf of the DIP Lender; (f)
litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the
validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the
DIP Liens, or any other liens or interests of the DIP Lender; (g) seeking to subordinate,
recharacterize, disallow or avoid the DIP Obligations; or (h) any other prohibited or otherwise
restricted use of proceeds as set forth in the DIP Documents; provided, however, that, upon an
Event of Default or DIP Termination Event, nothing herein shall limit the Debtors' right to move
for an order of the Court authorizing the use of Cash Collateral absent the DIP Lender's consent.
Notwithstanding anything to the contrary contained in the DIP Orders, the other DIP Documents,
or the Approved Budget, the Debtors shall be permitted and directed to (i) continue to fund the
FRMC Deposit Account and (ii) otherwise make or effectuate any payments to PhysicianCo, each
in accordance with the Cash Management Order.

32.   **Releases**.  In addition to the releases granted in the Interim Order, upon entry of
this Final Order, the Debtors, on their own behalf and on behalf of their estates, forever and
irrevocably:  (a) release, discharge, and acquit the DIP Lender and each of its respective former or

current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Documents; and (b) waive, discharge and release any and all defenses (including offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations; provided however, that nothing contained herein shall release the DIP Lender from its commitments and obligations hereunder and under the DIP Documents.

33.   **Waivers**.

a.   **Limitation on Charging on Expenses**.  No costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b.   **No Marshaling**.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Final Order and the other DIP Documents; *provided, however*, notwithstanding anything contained in this paragraph, the DIP Orders or the DIP Documents to the contrary, prior to seeking payment of any DIP Obligations, DIP Liens or DIP Superpriority Claims from proceeds of Avoidance Actions, the DIP Lender shall first satisfy such obligations, liens and claims from all DIP Collateral other than proceeds of Avoidance Actions ("Other DIP Collateral") and shall only

avail itself of proceeds of Avoidance Actions if the DIP Obligations are unable to be Paid in Full[14] from the Other DIP Collateral.

34.     **No Lender Liability**.  In determining to make any loan or accommodation of any kind (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans.  Furthermore, nothing in the DIP Orders or the other DIP Documents shall impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

35.     **Limitation of Liability**.  Nothing in the DIP Orders, the other DIP Documents, the Prepetition Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

36.     **Limitation on Governmental Entities**.  The authority of any governmental unit (as defined in the Bankruptcy Code), including the United States Department of Health and Human

---

[14]  For purposes hereof, the term "Paid in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

Services, all applicable State governments (including the States of California, Pennsylvania, and Rhode Island) other than the State of Connecticut and all departments, divisions, agencies (including any Medicaid and health agencies), and fiscal intermediaries of the foregoing ("Governmental Entities," and each, a "Governmental Entity"), shall be governed by this Final Order.  For the avoidance of doubt, Governmental Entity and Governmental Entities as used in this DIP Order shall not include the State of Connecticut, its municipalities, and its departments, divisions and agencies, including Medicaid and health agencies and fiscal intermediaries.  A Governmental Entity shall have no right to recoup provider reimbursement overpayments that were made to a Debtor from any amounts due to a Debtor other than to recoup such overpayments that arise under the same provider agreement, or comparable applicable statutes, regulations or arrangements, and in the same provider cost-year as the amounts due to such Debtor arose.  Except as set forth in paragraph 7 of this Final Order, no person, including a Governmental Entity, will be permitted to obtain a lien or claim that is equal or senior to the liens or claims of the DIP Lender on the DIP Collateral or otherwise granted to the DIP Lender under the DIP Orders.  Nothing contained herein shall: (a) limit the right of a Governmental Entity to seek relief from the automatic stay pursuant to section 362 of the Bankruptcy Code in order to exercise its right of setoff in respect of prepetition underpayments against prepetition overpayments, or postpetition underpayments against postpetition overpayments; or (b) prejudice the recoupment rights of a Governmental Entity in connection with a Debtor's assumption of its contract with such entity (including, as applicable, such Debtor's Medicare Provider Agreement); provided that, in each case, the Debtors' and DIP Lender's rights to dispute, challenge, or raise defenses to such alleged rights are hereby reserved.  A Governmental Entity shall be required to promptly remit to the applicable Debtor any amounts that represent offsets or recoupments by such Governmental Entity in contravention of the this Final Order.  For the avoidance of doubt, nothing contained in this paragraph will abrogate any police or regulatory power of any Governmental Entity.

37. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

38. **Insurance Proceeds and Policies**. The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (notwithstanding anything to the contrary in the DIP Documents).

39. **No Waivers or Modifications of Interim Order**. The Debtors have agreed not to and shall not seek any modification or extension of this Final Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

40. **Binding Effect of this Final Order**. Immediately upon entry of this Final Order by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other creditors of any of the Debtors, the Creditors' Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any Successor Case; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including Cash Collateral) by or extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

41. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan.

42.     **Survival**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Case. The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the DIP Lender or otherwise approved or set forth in the DIP Orders and the other DIP Documents, and the adequate protection provided to the Prepetition Secured Parties pursuant to the DIP Orders, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Final Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to this Final Order and the other DIP Documents, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).   The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Case, following dismissal of any of the Chapter 11 Cases or any Successor Case, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

43.     **Necessary Actions**.  The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Final Order and the other DIP Documents.

44.     **Enforceability**.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

45.     **Final Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of this Final Order and the other DIP Documents, the terms and provisions of this Final Order shall govern and control to the extent of such conflict or inconsistency.  Any reference to "DIP Documents" herein shall be construed to mean, as the case may be, such DIP Documents as modified by this Final Order.

46.     **Headings**.  All paragraph headings used in this Final Order are for ease of reference only and shall not affect the construction or interpretation hereof.

47.     **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Documents or this Final Order.

48.     **FRMC**.  Notwithstanding anything to the contrary contained in the DIP Orders or the other DIP Documents, to secure the Debtors' obligations to Alta Newport Hospital, LLC ("FRMC") in respect of the Intercompany Claims under and as defined in the Cash Management Order as more fully set forth therein, FRMC was granted, effective immediately upon entry of the Interim Order and approved on a final basis by this Final Order, a valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected first-priority security interest in, and lien on, the FRMC Deposit Account and all funds held in the FRMC Deposit Account (the "FRMC Lien").  Notwithstanding anything to the contrary contained in the DIP Orders or the other DIP Documents, the FRMC Deposit Account, the FRMC Accounts, and any other bank accounts owned by PhysicianCo shall be free of the DIP Superpriority Claims, the DIP Liens, the Carve-Out (with respect to the FRMC Deposit Account, except to the extent of any funds thereunder determined in accordance with the Cash Management Order not to be owed to FRMC), the Permitted Prior Liens, and any other Adequate Protection Liens granted under the DIP Orders and any other order granting postpetition financing by this Court.

49.     **Fisher**. Notwithstanding any language to the contrary in this Final Order, this Final Order does not affect or impair any rights, or remedies or claims that Fisher Scientific Company

LLC, and its divisions and subsidiaries ("Fisher") may have (a) in relation to reclamation claims, to the extent valid and not subject to avoidance, and to the extent actually avoided, under applicable law pertaining to any equipment or goods sold, delivered or otherwise supplied to the Debtors by Fisher within forty-five days prior to the Petition Date, (b) to assert an administrative expense claim against the Debtors under any applicable provision of the Bankruptcy Code, including section 503(b)(9), or (c) in respect of any executory contracts between Fisher and the Debtors, if any. Any such rights, remedies, and claims, if any, are preserved and reserved; *provided, however*, that the rights of the Debtors, the DIP ABL Lender, and all other parties in interest to oppose and object to Fisher's assertion of any such rights, claims, or remedies, if any, and to seek any related relief, are preserved and reserved, and the rights of Fisher to seek additional adequate protection and/or other relief are reserved and preserved.

50.    **ABL DIP Orders Not Modified**.  Nothing in this Final Order shall modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of (a) with respect to the interim period, the *Interim Order (I) Authorizing (A) Postpetition ABL Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 102] (the "Interim ABL DIP Order") or (b) the *Final Order (I) Authorizing (A) Postpetition ABL Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Final ABL DIP Order," and together with the Interim ABL DIP Order, the "ABL DIP Orders").

51.    **The North River Insurance Company**.  Notwithstanding any other provisions of this Final Order, nothing in the DIP Orders or the other DIP Documents shall prime any setoff and/or recoupment rights of The North River Insurance Company under applicable law; provided

that the Debtors' and the DIP Lender's respective rights to dispute or challenge any such alleged setoff or recoupment rights are hereby preserved.

52.    **Atlantic Specialty Insurance Company**.  Nothing in this Final Order shall alter, prejudice, prime, modify, or impair any rights or interests of the Debtors' sureties under any surety bonds, related indemnity agreements, and/or in any collateral of such sureties; <u>provided</u> that the Debtors' and the DIP Lender's respective rights to dispute or challenge any such alleged rights or interests are hereby preserved.

53.    **SFS**.  Siemens Financial Services, Inc. ("<u>SFS</u>") is party to multiple prepetition Master Equipment Lease Agreements, Leasing Schedules and Agreements (collectively, the "<u>SFS Leases</u>") with various Debtors pursuant to which it leases and/or finances certain medical and other equipment (collectively, the "<u>SFS Equipment</u>") to the Debtors vital to their healthcare businesses, for which SFS filed precautionary UCC financing statements to protect its interest in the SFS Equipment ("<u>SFS Liens</u>").  To the extent the classification of any of the SFS Liens are challenged and determined (a) to be prepetition purchase money security interests, such SFS Liens shall be included in the definition of Permitted Prior Liens and (b) to be prepetition non-purchase money security interests, SFS shall be entitled to Adequate Protection Liens with respect to such SFS Liens; <u>provided</u> that, in each case, the Debtors' and the DIP Lender's respective rights to dispute or challenge any such alleged liens are hereby preserved.

54.    **Miscellaneous**.

    a.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.  Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion under the circumstances, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

    b.    Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

     c.   All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

55.    **PBGC**. In addition to Adequate Protection Liens, (i) postpetition interest shall accrue on PBGC's prepetition secured claim against the Debtors in the amount of $137,845 per month, which interest shall be paid-in-kind on the 11th day of each month (with the first such payment to be made upon the entry of this Final Order) with such amounts to constitute an allowed administrative expense claim against the Debtors that shall be paid in accordance with any chapter 11 plan the Debtors may confirm in these cases, (ii) the Debtors shall pay PBGC's outside professionals' reasonable fees and expenses in an amount not to exceed $35,000 per month, subject to the ability of such professionals to carry any unused portion of such monthly amount forward or back to pay fees and expenses incurred in prior or future months, as applicable, (iii) PBGC's outside professionals shall seek payment of their fees and expenses from the Debtors pursuant to the procedures set forth in paragraph 27 of this Final Order; (iv) the Debtors shall preserve all documents related to the Crozer Plan, the ECHN Plan, and the Waterbury Hospital Cash Balance Retirement Plan (collectively, the "Pension Plans") and coordinate with PBGC in good faith to arrange for the delivery of such documents to PBGC upon its request; (v) the Debtors shall respond promptly to PBGC's requests for information regarding the Pension Plans; and (vi) in exchange for PBGC's agreement to resolve its filed objection to the Motion on the terms set forth in this Final Order, the Debtors shall not agree, absent entry of an order, to grant adequate protection to any other Prepetition Secured Party that would diminish the nature, extent, amount or priority of the Adequate Protection Liens and other adequate protection provided to PBGC in this Final Order.

56.    **PBGC Subordination Agreement**.  Nothing herein, including any party's consent to the entry of this Final Order, shall be deemed to waive, modify, or otherwise impair the respective rights of the DIP ABL Lender (as defined in the Final ABL DIP Order) or PBGC, pursuant to the PBGC Subordination Agreement (as defined in the Final ABL DIP Order).

57.    **WPM**.  With respect to Walter P. Moore and Associates, Inc.  WPM ("<u>WPM</u>"), any statutory lien arising under California law for work completed and/or materials provided with respect to the California Hospitals under the Contracts (each as defined in the WPM Objection) shall be a Permitted Prior Lien only up to an amount not to exceed $650,000 (the "Permitted Prior Lien Cap").  Any amounts in excess of the Permitted Prior Lien Cap shall be subordinate to the DIP Liens.  Notwithstanding the forgoing, nothing herein shall affect or impair any lien rights of WPM as against any non-debtors or non-debtor property. The DIP Lender, Debtors and WPM reserve all rights with respect to the amount of the claim secured by the lien and any proposed cure costs.  The Debtors shall file a motion to assume the Contracts within five (5) business days after the entry of this Final Order and will seek to have such motion heard by the Court within 30 days of entry of this Final Order, subject to the Court's availability.

58.    As noted by the Court at the Final Hearing, after entry of this Final Order, any Objecting Party[15] shall have the right to file a separate motion with the Court to request additional adequate protection of their asserted interests in the Prepetition Collateral. The ability of the Debtors or any other party in interest to oppose any such relief is hereby reserved.

# # # END OF ORDER # # #

---

[15] "<u>Objecting Party</u>" has the meaning given to such term in the *Debtors' Omnibus Reply in Support of Debtors' DIP Motions* [Docket No. 574].

Order submitted by:

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:      (214) 981-3400
Email:           tom.califano@sidley.com
                     rpatel@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:      (212) 839-5599
Email:           wcurtin@sidley.com
                     pventer@sidley.com
                     anne.wallice@sidley.com

*Attorneys to the Debtors*
*and Debtors in Possession*