SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
    rpatel@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    wcurtin@sidley.com
    pventer@sidley.com
    anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |
| | Objection Deadline: March 19, 2025 |
| | Hearing Date: March 19, 2025, at 9:30 a.m. (CT) |

## MOTION OF THE DEBTORS PURSUANT TO BANKRUPTCY RULE 9019
## FOR APPROVAL OF SETTLEMENT WITH MPT

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

If you object to the relief requested, you must respond in writing.  Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txnb.uscourts.gov no more than twenty-four (24) days after the date this motion was filed.  If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk and filed on the docket no more than twenty-four (24) days after the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on March 19, 2025, at 9:30 a.m. prevailing Central Time in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242. You may participate in the hearing either in person or by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 650.479.3207.  The meeting code is 2304 154 2638.  Video communication will be by the use of the Cisco WebEx platform.  Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page.  Click the settings icon in the upper right corner and enter your name under the personal information setting.  WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.

Hearing appearances must be made electronically in advance of electronic hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above captioned chapter 11 cases (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of an order (the "Order")[2] pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) approving the terms of the global settlement (the "Global Settlement") between the Debtors and Medical Properties Trust, Inc. and certain of its affiliates ("MPT" and, together with the Debtors, the "Settlement Parties") as set forth in the term sheet attached as Exhibit A hereto (the "Settlement

---

[2]     The Debtors will file a proposed Order as soon as it is finalized.

Term Sheet");[3] and (b) granting related relief.  Concurrently herewith, the Debtors are filing the *Debtors' Motion for Entry of an Order (I) Authorizing (A) Postpetition Financing and (B) The Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "MPT DIP Motion"), seeking approval of the Junior DIP (as defined herein).

2.      In support of this Motion, the Debtors rely upon and incorporate the *Declaration of Matthew Niemann in Support of the Motion of the Debtors Pursuant to Bankruptcy Rule 9019 for Approval of the Global Settlement With MPT* (the "Niemann Declaration") and the *Declaration of Paul Rundell in Support of the Motion of the Debtors Pursuant to Bankruptcy Rule 9019 for Approval of the Global Settlement With MPT* (the "Rundell Declaration").  The Debtors also rely on and incorporate by reference the *Declaration of Paul Rundell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "First Day Declaration").[4]

## PRELIMINARY STATEMENT

3.      The Global Settlement is a major achievement that accomplishes several critical goals.  First, it provides a clear path for resolution of these cases without months (or years) of costly and uncertain litigation between the Debtors and MPT.  Second, it provides the Debtors with new financing to fund these cases, and specifically with further runway to fund a robust but expedited sale process for the Debtors' assets.  Third, it provides a mechanism to ensure that the

---

[3]     The Settlement Term Sheet was also filed as Exhibit A to the *Stipulation between the Debtors and Medical Properties Trust, Inc. Regarding Global Settlement*. [Docket No. 633-1]  The Settlement Parties are working on further definitive documentation relating to the Global Settlement, and will file that when it is finalized and executed. All summaries of the settlement in this motion are qualified by the Settlement Term Sheet.

[4]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration, Niemann Declaration, Rundell Declaration, or Settlement Term Sheet, as applicable.

Debtors' hospital operations and related real estate in California and Connecticut can be sold together on a going-concern basis, without risk of disruption to patient care and without resolving complex disputes regarding ownership and control of the real estate. The settlement, in short, solves an array of problems, charts a path forward to negotiation and confirmation of a chapter 11 plan, and creates significant opportunities for recovery, including for creditors other than MPT.

   4. To that end, the Global Settlement resolves the following issues, among others:

- The ability of the Debtors to "prime" MPT's secured debt with debtor in possession financing essential for the operation of the Debtors' facilities and administration of these cases;

- The potential dispute regarding the Debtors' payment of rent to MPT pursuant to section 365 of the Bankruptcy Code;

- The requirement that the Debtors assume or reject MPT's Master Leases (defined herein) within the time periods set forth in section 365(d)(4) of the Bankruptcy Code;

- The question whether MPT's Master Leases are true leases with the applicable real estate owned by MPT for all purposes, or should instead be recharacterized as financing arrangements;

- The question whether there is any basis to recharacterize MPT's Master Leases as unsecured loans or joint venture interests as opposed to obligations secured by senior liens on the applicable real estate and the Debtors' other assets;

- Other disputes between the Debtors' estates and MPT regarding the priority of MPT's claims, including potential claims for subordination; and

- The Debtors' ability to market their hospitals together with the real property upon which they are situated.

5.    By entering the Global Settlement, the Debtors have avoided the cost and uncertainty of litigation while at the same time achieving material benefits for the Debtors' estates and creditors other than MPT.  Among other things, the settlement provides the Debtors with incremental liquidity through a junior DIP from MPT, including funds necessary to make legally required seismic improvements at the Debtors' California facilities.  The settlement also provides for the treatment of MPT's claims and the sharing of sales proceeds and asset recoveries between MPT (including as purported real estate owner) and the Debtors' estates. That "sharing" agreement provides substantial benefits to unsecured creditors in particular, because it ensures that—once DIP-related and senior funded-debt claims are paid—unsecured creditors will share in recoveries, without risk that MPT, as real estate owner and/or secured lender, will receive and absorb all available value.

6.    The Global Settlement is the result of intense and good-faith negotiations between the Debtors and MPT.[5]  The relationship between the Debtors and MPT is made up of multiple complex financing and commercial transactions.  The Debtors and MPT could have been mired in litigation that would delay resolution of this case for months (if not years), drained the Debtors' estates of scarce liquidity, distracted the Debtors' management and professionals from the administration of this case, and increased the risk that the Debtors' hospitals could not survive as going concerns and that these cases would be rendered administratively insolvent.  Instead, MPT and the Debtors have agreed to a resolution which avoids litigation and provides for a clear path to marketing of the Debtors' assets and for a sharing of sale proceeds.

---

[5]    *See* Niemann Declaration at ¶ 8.

7.      Since the beginning of these Chapter 11 Cases, the Debtors have been trying to avoid the pitfalls that befell the *Steward Health Care System* debtors, which may now be administratively insolvent.[6]   In *Steward*, the debtors and MPT (as landlord) did not reach agreement on, among other things, allocation of value as between real estate and hospital operations.   Instead, the hospital real estate was marketed separately from the underlying operations, an arrangement that led to various problems.[7]   The Global Settlement here, reached at the one-month mark of these Chapter 11 Cases, resolves that critical issue and others, and thereby puts the Debtors on a solid footing to maximize value and move these Chapter 11 Cases forward.

8.      The Global Settlement has six main categories of agreements between the Parties (all of which are more fully set forth in the Settlement Term Sheet):[8]

- **Stipulation of MPT's Claim as Secured Claim**.  The Debtors are stipulating and agreeing that MPT has a secured claim comprised of (i) amounts that will be due under the Junior DIP facility (including the full roll-up of the Obligations (as defined in the MPT Term Loan Agreement (as defined below)) (the "MPT Term Loan Obligations") and certain specified accruals), (ii) amounts due and owing under the Pennsylvania Mortgage Loan (approximately $190 million), (iii) accrued and unpaid rent, impositions, and expenses under the MPT Master Leases (approximately $102 million before certain provider tax liens and mechanics liens), (iv) other claims and related obligations under the Master Leases not reflected in the foregoing (described in the Term Sheet as "Tranche 8" claims), and (v) interest and other accruals on the aforementioned amounts.

---

[6]   *See* United States Trustee's Objection to the Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Latham & Watkins LLP as Co-Counsel for the Debtors Effective as of December 2, 2024, *In re Steward Health Care System, LLC*, Case No. 24-90213 (Bankr. S.D. Tex. 2024) [Docket No. 3776] at ¶ 12 (asserting that the Steward Health debtors are unable to satisfy outstanding administrative claims).

[7]   *See* Emergency Motion of Debtors Requesting Entry of an Order Directing Mediation of Disputes Relating to Allocation of Sale Proceeds and Related Issues with Medical Properties Trust, *In re Steward Health Care System, LLC*, Case No. 24-90213 (Bankr. S.D. Tex. 2024) [Docket No. 776] at ¶¶ 1–5 (describing the inability to conduct a productive sale process while these disputes with MPT were unresolved).

[8]   All amounts that are indicated as due and owing pursuant to various contractual and financing arrangements between the Debtors and MPT are preliminary and subject to ongoing diligence and resulting revision.

o MPT can credit-bid its secured claim on the California or Connecticut assets, subject to payment in cash of senior obligations and *pari passu* distributions under the waterfall (described below).

o MPT waives its right to any recovery from the first $10 million of proceeds of estate causes of action, which shall fund administrative and priority claims and unsecured creditor recoveries.

- **Economic Effect of Recharacterization**.  Although MPT will not be divested of ownership in the real estate as a legal matter, the Debtors have obtained certain economic effects of recharacterizing the MPT Master Leases as secured financings. In particular, with respect to the California and Connecticut sales (where the land is leased from MPT), the Debtors can market the operations and the real property together, and the value of any new or assumed leases will be paid in cash or credited to the Debtors, as described in further detail below.

- **Consent to, and Adequate Protection under, the JMB DIP Facility**.

o MPT consents to the JMB and eCapital DIP facilities, subject to certain terms.

o MPT is receiving adequate protection in the form of (i) replacement liens, (ii) superpriority administrative expense priority on its Junior DIP Claims (including accrued and rolled-up amounts), (iii) current payment in cash of reasonable professional fees since the Petition Date, capped at $1.25 million in cash per month (with additional amounts accruing to the Junior DIP), and (iv) $5 million monthly Junior DIP accrual (as a partial substitute for current cash payment of rent or interest). The adequate protection was approved as part of the JMB DIP Facility and will be further incorporated into the Junior DIP as stated.

- **Junior DIP Financing**.  MPT shall provide a $25 million new money commitment, comprised of (i) a $13.5 million delayed-draw term loan and (ii) an $11.5 million seismic funding advance.  Upon entry of the Order, the MPT Term Loan Obligations will be fully rolled up, and, subject to certain conditions, MPT will advance the $11.5 million seismic funding.

- **Sales Process.**  The agreement varies by state, but ensures a unified sales process for operations in each of Pennsylvania, California, Connecticut, and Rhode Island.

- **Value Allocation.**  The Debtors and MPT have agreed on a recovery waterfall meant to resolve the otherwise challenging issue of allocating value as between property of the estate (hospital operations) and real estate (which may not be property of the estate).  This waterfall (summarized here, and provided in more detail below) complies with the priority scheme of the Bankruptcy Code, except to the extent that

7

MPT is consenting to more favorable distributions to other stakeholders, and provides the estate and unsecured creditors with at least $10 million in recoveries from certain litigation claims (plus additional recoveries based on sale results).

| 1 | eCapital DIP and JMB DIP Facilities |
|---|---|
| 2 | MPT Junior DIP: $25 million new-money *plus* full roll-up of the MPT Term Loan Obligations *plus* adequate protection amounts |
| 3 | PBGC Secured Claims: approximately $24.3 million plus adequate protection with respect thereto as set forth in the Final JMB DIP Order[9] (paid only from proceeds of collateral on which PBGC has a senior priority lien) |
| 4 | CT Secured Claims: in an amount to be determined, plus adequate protection with respect thereto as set forth in the Stipulation[10] (paid only from proceeds of collateral on which CT has a senior priority lien) |
| 5 | Reserved |
| 6 | Estate & UCC Administrative Fund: $10 million of proceeds (paid only from proceeds of estate causes of action) |
| 7 | 90% to MPT and 10% to Estates until MPT Priority 7 Claims are paid in full<br><br>MPT Priority 7 Claims consist of the MPT Mortgage Loan (including principal, interest, fees, and other amounts), rent, impositions, expenditures, and select amounts due under the MPT Master Leases |
| 8 | 80% to MPT and 20% to Estates until MPT Priority 8 Claims are paid in full<br><br>MPT Priority 8 Claims consist of approximately $971 million of other claims and related obligations in respect of the MPT Master Leases not reflected in the above tranches |
| 9 | 100% to Estates |

9.      As further described below, entry into and implementation of the Global Settlement is in the best interests of the Debtors and their estates and satisfies the requirements under Bankruptcy Rule 9019 and applicable law. Here, the Global Settlement provides substantial benefits to the Debtors and their estates, including avoiding substantial delay, costs and risks

---

[9]    The "Final JMB DIP Order" means the *Amended Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 698], entered by the Court on February 18, 2025.

[10]    The "Stipulation" means the *Stipulation Between the Debtors, the DIP Lender and the State of Connecticut Regarding the Final DIP Order*, dated as of February 13, 2025 [Docket No. 698-3].

associated with pursuing litigation against MPT, without any guarantee of success. The Global Settlement will allow the Debtors' hospitals to remain open, gives the Debtors the opportunity to save up to approximately 4,500 jobs, and paves the way for the Debtors to negotiate and implement a value-maximizing chapter 11 plan that adheres to the requirements of the Bankruptcy Code.

10.     For all these reasons, and as further described below, the Court should approve the Global Settlement between the Debtors and MPT.

## JURISDICTION AND VENUE

11.     The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The legal predicates for the relief requested in this Motion are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Bankruptcy Rules.

13.     The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

A.      **General Background**

14.      The Debtors and their non-Debtor affiliates (collectively, the "<u>Company</u>") are significant providers of coordinated regional healthcare services in California, Connecticut, Pennsylvania, and Rhode Island.  The Company's business can be broadly divided into two segments: (1) hospital operations, which consist of, among other things, the ownership and operation of 16 acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services spanning multiple states, and (2) physician-related services, including (a) certain owned and managed medical groups, independent physician associations, managed services organizations and risk taking entities, (b) Prospect Health Plan, Inc., a Knox-Keene licensed entity, and (c) one licensed acute hospital operating as Foothill Regional Medical Center (collectively, "<u>PhysicianCo</u>").   The PhysicianCo entities are not Debtors in these Chapter 11 Cases.

15.      Beginning on January 11, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases.  On January 29, 2025, the Office of the United States Trustee established the Official Unsecured Creditors' Committee (the "<u>Creditors' Committee</u>").  [Docket No. 295].

16.      A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' Chapter 11 Cases, are set forth in greater detail in the First Day Declaration.

B.    **The Claims of the Settlement Parties Against Each Other**

1.    **MPT's Claims against the Debtors**

a.    The MPT Master Leases

17.    On August 23, 2019, certain of the Debtors (the "MLI Lessees") entered into that certain Master Lease Agreement ("Master Lease I") among Prospect CCMC, LLC (Crozer Chester Medical Center, Springfield Hospital, Taylor Hospital), Prospect DCMH, LLC (Delaware County Memorial Hospital),[11] Prospect Manchester Hospital, Inc. (The Manchester Memorial Hospital), and Prospect Rockville Hospital, Inc. (The Rockville General Hospital Incorporated) as lessees, and certain affiliates of MPT as the lessors party thereto.  The MLI Lessees also entered into (i) that certain Notice of Master Lease Agreement, dated as of August 23, 2019, which was recorded as Instrument Number 006417390012 in Record Book 4598, Page 483-494, in the real property records of Manchester, Connecticut and (ii) that certain Notice of Master Lease Agreement, dated as of August 23, 2019, which was recorded as Instrument Number 3418 in Volume 2623, Page 51, in the real property records of Vernon, Connecticut.

18.    On August 23, 2019, certain other Debtors (the "MLII Lessees", and together with the MLI Lessees, the "Debtor Lessees") entered into that certain Master Lease Agreement ("Master Lease II") among Prospect CCMC, LLC, Southern California Healthcare System, Inc. (Southern California Hospital at Hollywood, Southern California Hospital at Van Nuys, Southern California Hospital at Culver City), Alta Los Angeles Hospitals, Inc. (Los Angeles Community Hospital, Norwalk Community Hospital doing business as Los Angeles Community Hospital at Norwalk, Los Angeles Community Hospital at Bellflower), and Prospect Waterbury, Inc. (The Waterbury Hospital) as lessees, and MPT as the lessors party thereto (the "Master Lease II", and

---

[11]    The leases involving the properties of Prospect CCMC and Prospect DCMH were later converted to a mortgage.

together with the Master Lease I, the "MPT Master Leases").  The MLII Lessees also entered into (i) that certain Notice of Master Lease Agreement, dated as of August 23, 2019, which was recorded as Instrument Number 2019-16543 in Record Book 8002, Page 315, in the real property records of Waterbury, Connecticut, (ii) that certain Notice of Master Lease Agreement, dated as of August 23, 2019, which was recorded as Instrument Number 003584 in Volume 1037, Page 617, in the real property records of Naugatuck, Connecticut, and (iii) that certain Memorandum of Master Lease Agreement, dated as of August 23, 2019, which was recorded as Instrument Number 20190888166, in the real property records of Los Angeles County, California.

19.    In connection with the MPT Master Leases, the Debtor Lessees, PMH, Prospect DCMH, LLC and Prospect CCMC, LLC (the "Guarantors") entered into that certain Amended and Restated Guaranty, dated as of May 23, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty"), pursuant to which the Guarantors absolutely, unconditionally, and irrevocably guaranteed the full and prompt payment when due and performance in full of the respective obligations, duties, and liabilities (as applicable) of the Debtor Lessees, PMH, Prospect DCMH, LLC, and Prospect CCMC, LLC, and their affiliates under or pursuant to the Obligation Documents (as defined in the Guaranty).

20.    The Guarantors also entered into that certain Amended and Restated Security Agreement, dated as of May 23, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), in favor of MPT, pursuant to which the payment and performance of the respective obligations, duties and liabilities (as applicable) of PMH and its affiliates under or pursuant to the Obligation Documents (as defined in the Security Agreement) are (subject to an intercreditor agreement), as of the Petition Date, secured by a first and prior security interest in the Collateral (as defined in the Security Agreement).

21.    Additionally, the Pledgors and Pledged Obligors (each as defined in the Pledge Agreement) entered into that certain Amended and Restated Pledge Agreement, dated as of May 23, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Pledge Agreement"), in favor of MPT and certain affiliates, pursuant to which the Pledgors granted such MPT parties a first priority security interest and lien on, upon and in, the Pledged Interests (as defined in the Pledge Agreement) to secure the payment and performance of the respective obligations, duties and liabilities (as applicable) of PMH and its affiliates under or pursuant to the Obligation Documents (as defined in the Pledge Agreement).

22.    The MPT lessors also (i) are beneficiaries of a Mortgage, Security Agreement and Fixture Filing, effective as of May 23, 2023, which was recorded as Instrument Number 2023025832 in Record Book 6920 Page 1615, in the Office of the Recorder of Deeds, Delaware County, PA, (ii) are assignees under various Assignments of Rents and Leases, dated as of August 23, 2019, recorded as (A) Instrument Number 006417400031 in Record Book 4598, Page 495-525, in the real property records of Manchester, Connecticut, (B) Instrument Number 3419 in Volume 2623, Page 65, in the real property records of Vernon, Connecticut, (C) Instrument Number 20190887833, in the real property records of Los Angeles County, California, (D) Instrument Number 20190887567, in the real property records of Los Angeles County, California, (E) Record Book 1037, Page 629, in the real property records of Naugatuck, Connecticut, and (F) Instrument Number 2019-16544 in Volume 8003, Page 1, in the real property records of Waterbury, Connecticut.  Further, MPT filed UCC-1 Financing Statements with respect to the security interests in the Security Agreement and Pledge Agreement, (iii) are grantees under various Special Warranty Deeds, dated as of August 23, 2019, recorded as (A) Instrument Number 006417380014 in Record Book 4598, Pages 469-482, in the real property records of Manchester,

Connecticut, (B) Instrument Number 006417370016 in Record Book 4598, Pages 453-468, in the

real property records of Manchester, Connecticut, (C) Instrument Number 3417 in Volume 2623,

Pages 33-50, in the real property records of Vernon, Connecticut, (D) Instrument Number

201916542 in Volume 8002, Page 302, in the real property records of Waterbury, Connecticut and

(E) Instrument Number 3583 in Volume 1037, Pages 602-616, in the real property records of

Naugatuck, Connecticut, (iv) are grantees under various Grant Deeds dated as of August 23, 2019,

recorded in Los Angeles County, California as (A) Instrument Number 20190888659, (B)

Instrument Number 20190888165, (C) Instrument Number 20190887832, (D) Instrument Number

20190887566, (E) Instrument Number 20190888358 and (F) Instrument Number 20190887680,

(v) are grantees under that certain Grant Deed dated as of October 13, 2020 recorded in Los

Angeles County, California as Instrument Number 20201399659, and (vi) are grantees under that

certain Grant Deed dated as of April 29, 2022 recorded in Los Angeles County, California as

Instrument Number 20220477410.

23.    On February 7, 2025, MPT filed proofs of claim against several debtors:

| Debtors | Amount[12] | Nature |
|---|---|---|
| Debtor Lease and Mortgage Loan Obligors[13] | $58,336,476.55 | Master Lease I |
| | $110,410,711.65 | Master Lease II |
| | $190,682,973.72 | Pennsylvania Mortgage Loan |
| The MPT Term Loan Obligors[14] | $84,138,141.00 | MPT Term Loan |

---

[12]    All amounts are preliminary and subject to ongoing diligence and resulting revision.

[13]    The "Debtor Lease and Mortgage Loan Obligors" are Alta Hospitals System, LLC; Alta Los Angeles Hospitals, Inc.; Coordinated Regional Care Group, LLC; PHS Holdings, LLC; Prospect ACO Holdings, LLC; Prospect ACO Northeast, LLC; Prospect CCMC, LLC; Prospect Crozer Urgent Care, LLC; Prospect Crozer, LLC; Prospect CT Management Services, Inc.; Prospect CT Medical Foundation, Inc.; Prospect CT, Inc.; Prospect DCMH, LLC; Prospect East Hospital Advisory Services, LLC; Prospect ECHN, Inc.; Prospect Health Access Network, Inc.; Prospect Health Services CT, Inc. Prospect Health Services PA, Inc.; Prospect Health Services RI, Inc.; Prospect Integrated Behavioral Health, Inc.; Prospect Manchester Hospital, Inc.; Prospect Medical Holdings, Inc.; Prospect Penn Health Club, LLC; Prospect Penn, LLC; Prospect Provider Group CT, LLC; Prospect Provider Group PA, LLC; Prospect Provider Group RI, LLC; Prospect Provider Groups, LLC; Prospect Rockville Hospital, Inc.; Prospect Waterbury, Inc.; and Southern California Healthcare System, Inc.

[14]    The "MPT Term Loan Obligors" are Alta Hospitals System, LLC; Alta Los Angeles Hospitals, Inc.;

b.    The MPT Mortgage Loan

24.    On May 23, 2023, MPT sold all of the Prospect hospitals located in Pennsylvania (the "PA Properties"), each of which was previously subject to a MPT Master Lease, to Prospect DCMH, LLC and Prospect CCMC LLC (the "Mortgage Borrower Debtors"), for $250 million consisting of a $155,223,000 mortgage loan made by MPT to the Mortgage Borrower Debtors (the "MPT Mortgage Loan") and preferred equity in non-Debtor PHP Holdings, LLC ("PHP Holdings" or "PHPH").[15]   The MPT Mortgage Loan is secured by the PA Properties and the other assets of the Mortgage Borrower Debtor and is also cross-guaranteed and cross-collateralized with the MPT Master Leases.

c.    The MPT Term Loan

25.    On May 23, 2023, certain of the Debtors (the "Term Loan Debtors") entered into that certain Loan Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "MPT Loan Agreement"), among PMH, as borrower, and the other Term Loan Debtors as guarantors, and MPT as sole lender and as administrative

---

Coordinated Regional Care Group, LLC; Healthcare Staffing on Demand, LLC; New University Medical Group, LLC; Nix Community General Hospital, LLC; Nix Hospitals System, LLC; Nix Physicans, Inc.; Nix Services, LLC; Nix SPE, LLC; PHS Holdings, LLC; Prospect ACO Holdings, LLC; Prospect ACO Northeast, LLC; Prospect Ambulatory Holding, LLC; Prospect Ambulatory Surgery Centers, LLC; Prospect Blackstone Valley Surgicare, LLC; Prospect Caring Hand, Inc.; Prospect CCMC, LLC; Prospect CharterCARE Ancillary Services, LLC; Prospect CharterCARE Home Health and Hospice, LLC; Prospect CharterCARE Physicians, LLC; Prospect CharterCARE RWMC, LLC; Prospect CharterCARE SJHSRI, LLC; Prospect CharterCARE, LLC; Prospect Crozer Ambulatory Surgery, LLC; Prospect Crozer Home Health and Hospice, LLC; Prospect Crozer Urgent Care, LLC; Prospect Crozer, LLC; Prospect CT Management Services, Inc.; Prospect CT Medical Foundation, Inc.; Prospect CT, Inc.; Prospect DCMH, LLC; Prospect East Holdings, Inc.; Prospect East Hospital Advisory Services, LLC; Prospect ECHN Eldercare Services, Inc.; Prospect ECHN Home Health, Inc.; Prospect ECHN, Inc.; Prospect Health Services CT, Inc.; Prospect Health Services PA, Inc.; Prospect Health Services RI, Inc.; Prospect Health Ventures Holdings, LLC; Prospect Home Health and Hospice, LLC; Prospect Hospital Holdings, LLC; Prospect Integrated Behavioral Health, Inc.; Prospect Management Services, LLC; Prospect Manchester Hospital, Inc.; Prospect Medical Holdings, Inc.; Prospect Penn Health Club, LLC; Prospect Penn, LLC; Prospect Provider Group CT, LLC; Prospect Provider Group PA, LLC; Prospect Provider Group RI, LLC; Prospect Provider Groups, LLC; Prospect RI Home Health and Hospice, LLC; Prospect Rockville Hospital, Inc.; Prospect Waterbury Ambulatory Surgery, LLC; Prospect Waterbury Home Health, Inc.; Prospect Waterbury, Inc.; and Southern California Healthcare System, Inc.

[15]    MPT also received a convertible promissory note, which would increase MPT's 49% interest to 82%.

agent and collateral agent, which provided for (i) a $25 million term loan facility and (ii) a $50 million delayed draw term loan facility, which has been fully drawn (collectively, the "MPT Term Loan"). The MPT Term Loan is secured by liens on substantially all of the assets of the Term Loan Debtors, including substantially all of their personal property.

d.     MPT's DIP Objection and Demand for Adequate Protection

26.    On February 5, 2025, MPT filed the *Objection of Medical Properties Trust, Inc. to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Docket No. 419] (the "MPT Objection").

27.    In the MPT Objection, MPT alleged that the Debtors failed to provide MPT with adequate protection for diminution of its collateral before seeking to prime their security interests with $100 million in new senior financing.[16] MPT demanded that the Debtors provide adequate protection, among other things, in the form of (i) rent and impositions on the Master Leases (including under § 365(d)(3)), (ii) payment of professional fees, (iii) consent rights over the DIP budget and reporting and information rights, (iv) a lien on all DIP collateral subject to the DIP liens, and (v) superpriority claims on a joint and several basis.[17]

**2.    Debtors' Claims against MPT[18]**

28.    *Recharacterization of Master Leases.*   The Debtors could attempt to recharacterize the MPT Master Leases as disguised financings, pursuant to which the Debtors would own the

---

[16]   *See* MPT Objection at ¶ 2.

[17]   *Id*. at ¶¶ 81–87.

[18]   *See* Rundell Declaration at ¶¶ 7–9.

underlying real property and would merely owe pre-petition claims to MPT.[19]  The Debtors could

take the position that characterizing the MPT Master Leases as financings would comport with the

intent of the parties, with MPT's own public filings, and with the structure and provisions of the

MPT Master Leases.  Further, the Debtors could have potentially argued that the MPT Master

Leases are unperfected secured claims.[20]

29.     *Equitable Subordination*.  The Debtors could also attempt to equitably subordinate

all of MPT's claims, including under the MPT Master Leases, MPT Mortgage Loan, and MPT

Term Loan.[21]

30.     Although the Debtors could have sought to litigate these theories, their success was

uncertain.[22]  With respect to recharacterization, the Debtors would have to bring an adversary

proceeding, and MPT argued that under California law, there is a strong presumption that a deed

and lease with an option to repurchase is a true lease.[23]  Further, MPT pointed to California law

(and other law) providing that a recharacterized real-property lease is treated as a mortgage that is

---

[19]   *See In re United Air Lines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 615 (7th Cir. 2005) (recharacterizing a lease as a financing); *In re MCorp Fin., Inc.*, 122 B.R. 49, 52–53 (Bankr. S.D. Tex. 1990) (same).

[20]   *See In re Triplex Marine Maint. Inc.*, 258 B.R. 659, 663 (Bankr. E.D. Tex. 2000) (holding that the debtor could avoid an equipment lessor/lender's unperfected security interest under section 544 of the Bankruptcy Code, resulting in the creditor holding only a general unsecured claim for the entire amount of the claim); *see also, e.g.*, Cal. Civ. Code § 2938(b) (noting California state-law recordation requirements for perfection of interests in real property); C.G.S.A. § 47-10 (noting Connecticut state-law recordation requirements for perfection of interests in real property).

[21]   *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977).

[22]   The Debtors reserve all rights related to these claims and defenses, and are merely highlighting the challenges that would have faced the Debtors in litigating these claims and defenses.  *See In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418, 430 n.4 (Bankr. S.D.N.Y. 2022) (Rule 9019 movants do not need to provide a pessimistic risk assessment of their claims in case the court does not approve the settlement).

[23]   MPT Objection at ¶ 65 (citing *In re San Francisco Indus. Park, Inc.*, 307 F. Supp. 271, 276 (N.D. Cal. 1969)).

validly perfected by the recordation of an absolute deed and memorandum of lease.[24]  The Debtors

would also need to litigate equitable subordination, which MPT would strongly contest, and there

is some case law highlighting the challenges of establishing equitable subordination.[25]  In addition,

with respect to equitable subordination, even if the elements of equitable subordination could be

established, the ultimate scope of any relief that could be obtained would be hotly contested.[26]

31.    In sum, if the issues were litigated and the Debtors expended the time and liquidity

necessary to pursue a litigated resolution to the end, the Debtors faced the risks that: (a) MPT

would be deemed to own the applicable real estate, and would also have senior secured claims

against substantially all of the Debtors' (non-real estate) assets, or (b) even if MPT's leases were

recharacterized, MPT would still have perfected secured claims on the real estate and other assets

(with the value of such claims likely exceeding the value of those assets).

32.    The need for settlement is particularly heightened by the litigation over the JMB

DIP Facility (as defined below).  The Debtors prevailed against MPT with respect to adequate

protection under the JMB DIP Facility at the First Day Hearing, after which the Court entered the

Interim JMB DIP Order.[27]  MPT appealed the Interim JMB DIP Order, and if the final hearing on

the JMB DIP Facility would have been contested, and the Debtors had prevailed, MPT would

---

[24]   MPT Objection at ¶ 66 (citing *Fox v. Peck Iron & Metal Co., Inc.*, 25 B.R. 674 (Bankr. S.D. Cal. 1982)); *see also id.* (citing *In re PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991) (secured financing); *In re Seatrain Lines, Inc.*, 20 B.R. 577 (Bankr. S.D.N.Y. 1982) (secured financing); *In re Indep. Vill., Inc.*, 52 B.R. 715 (Bankr. E.D. Mich. 1985) (secured financing)).

[25]   *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 122-23 (5th Cir. 2019).

[26]   *See In re SI Restructuring, Inc.*, 532 F.3d 355, 361 (5th Cir. 2008).

[27]   The "Interim JMB DIP Order" is the *Interim Order (I) Authorizing (A) Postpetition Financing and (B) The Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection To Prepetition Lenders; (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 101].

almost certainly have appealed the resulting final order.[28]  In its appeal of the Interim JMB DIP

Order, MPT raised several litigable issues, including (1) whether MPT's secured claims were

adequately protected by preservation of going concern value of the Debtors' assets and

replacement liens on existing MPT collateral, (2) whether professional fee claims under § 503(b)

can be made senior to claims under § 507(b), and (3) whether the Debtors could provide priming

liens on assets of Debtors involved in the Astrana sale to pay other Debtors' obligations.[29]  The

Debtors would have litigated the appeal and are confident in their positions, but there would have

been no guarantee that the Debtors would have prevailed.  Further, the uncertainty over whether

the Debtors could access the critical liquidity under the JMB DIP Facility would have presented

an overhang over the Debtors' operations, sale processes and Chapter 11 Cases.  By reaching the

Global Settlement, the Debtors are able to foreclose another avenue of lengthy, costly, and

uncertain litigation.

### **GLOBAL SETTLEMENT**

33.    The main terms of the Global Settlement are as follows:

| Provision | Summary Description |
| --- | --- |
| **Debtor in Possession Financing Facilities and Adequate Protection** | • MPT consents to the debtor-in-possession loan facility provided by eCapital (the "eCapital ABL DIP Facility") and the "DIP Facility" as defined in the First Day Declaration (the "JMB DIP Facility") (including JMB Capital's blanket priming liens) on currently agreed terms (including, without limitation, as to facility size), without amendment<br><br>• MPT shall provide a $25 million new money commitment for DIP Financing consisting of (i) a $13.5 million stand-by delayed draw term loan, subordinated (last out) to the JMB DIP Facility and (ii) the Seismic Funding Advances (as defined below) (collectively, the "Junior DIP") |

---

[28]    *See* Notice of Appeal [Docket No. 287] at 2 ("Appellants file this appeal out of an abundance of caution to preserve their appellate rights in the event, and to the extent, that the Subject Order is determined to be a final judgment, order, or decree under 28 U.S.C. § 158(a)(1).").

[29]    *See Medical Properties Trust, Inc. and Affiliated Companies' Statement of Issues and Designation of the Record on Appeal* [Docket No. 577] ¶¶ 1–6.

- MPT granted Adequate Protection in the form of (i) replacement liens (subject to and subordinate to the carve-out, the JMB DIP Facility and the eCapital ABL DIP Facility, but senior to all other liens), (ii) superpriority administrative expense priority on the Junior DIP (including, without limitation, accrued amounts and rolled-up MPT Term Loan Obligations), subject to and subordinate to the carve-out, the JMB DIP Facility and the eCapital ABL DIP Facility, but senior to all other claims, (iii) current payment in cash of reasonable professional fees commencing from the petition date, up to a maximum of $1.25 million in cash per month, with any unpaid balance accruing as additional claims under the Junior DIP, and (iv) an accrual to the Junior DIP equal to $5 million per month (offset against accrued interest and rent under Tranches 7 and 8 of the recovery waterfall set forth under the heading "Recovery Waterfall" below (the "Recovery Waterfall"), as applicable)[30]

- Upon entry of the 9019 Order (as defined below) and as adequate protection, the MPT Term Loan Obligations will be fully rolled up

- Use of proceeds of Junior DIP same as JMB DIP Facility

- (i) Reporting and information rights same as JMB DIP Facility and (ii) upon notice of a draw under the Junior DIP (other than in respect of the Seismic Funding Advances), as a condition thereto and ongoing once any portion of Junior DIP is drawn, consent right (not to be unreasonably withheld) as to future budgets same as JMB DIP Facility

- The Junior DIP shall (i) mature on 12/31/2025, (ii) earn interest at a rate of 16.00% per annum on the new money funded on the Junior DIP and 11.50% on the rolled-up MPT Term Loan Obligations, which shall be paid in kind on a quarterly basis, and (iii) receive (A) a funding fee payable in kind equal to 4% of the new money principal amount funded in respect of the Junior DIP and (B) an exit fee equal to 6% of the new money principal amount of the Junior DIP repaid.  For the avoidance of doubt, (x) no interest shall accrue on accrued adequate protection amounts and (y) no funding fees or exit fees will be payable on accrued adequate protection amounts or rolled-up MPT Term Loan Obligations

- During the period between the filing of the 9019 Motion (as defined below) and the entry of the 9019 Order (as defined below) (the "Interim Period"), the Debtors will draw no more than an additional $46 million on the JMB DIP Facility (the "Pre-9019 Cap")[31] and for the Interim Period MPT shall be granted, pursuant to any order approving the JMB DIP Facility, Adequate Protection as described above (with accrued amounts secured by replacement liens and subject to superpriority administrative

---

[30]   The adequate protection portions of the settlement were approved in substantial part in connection with the JMB DIP Facility.

[31]   Increase is to accommodate elimination of seismic funding prior to entry of 9019 Order.

| | |
|---|---|
| | expense priority as if claims under the Junior DIP). Absent approval of the 9019 Order, MPT shall be entitled to object to the DIP motion insofar as it seeks to draw any additional amounts above the Pre-9019 Cap |
| | • The 9019 Order shall provide that none of the creditors' committee's fees and expenses from and after the entry of the 9019 Order pertaining to any investigation of or litigation with MPT shall be paid pursuant to the carve-out and professional fee escrow |
| **Pennsylvania Operations** | • The Debtors shall pursue the highest and best bid for the ongoing operations of the Pennsylvania Debtor Entities (as defined in the Receiver Agreement[32], the "<u>Pennsylvania Operations</u>") (taking into account, among other things, the amount of MPT obligations being assumed and Commonwealth of Pennsylvania approval), using the NFP Transaction (as defined below) as the effective stalking-horse bid |
| | • During the stipulated receivership period in the Receiver Agreement, the Debtors will provide diligence to and cooperate with potential operators referred by MPT; to the extent any such operators are deemed acceptable by the Commonwealth of Pennsylvania, the Debtors will pursue a transaction with such operators as either a backup to or alternative to a transaction with the not for profit consortium designated in the pending sale motion (the "<u>NFP Transaction</u>") |
| | • MPT-designated / supported bids shall be submitted to and negotiated exclusively by the Debtors through Houlihan Lokey |
| | • Any transaction for the Pennsylvania Operations shall include the assumption of (i) all employee-related obligations (including accrued payroll and PTO), except pension related obligations, (ii) all outstanding or accrued and unpaid property taxes on the transferred properties, in each case for the applicable facility(ies) and (iii) assumption of mechanic's liens and equipment leases |
| | • In the event there is no acceptable transaction to the Commonwealth of Pennsylvania, MPT consents to the wind-down and closure of the operations, including without limitation the conversion of the Pennsylvania Chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, subject to (i) confirmation that MPT will not have resulting monetary obligations of any kind and (ii) application of resulting proceeds pursuant to the Recovery Waterfall as set forth herein |
| | • MPT shall irrevocably consent to a sale of all assets of the Pennsylvania Operations (including the real property), free and clear of claims, liens and encumbrances pursuant to 11 USC §363, subject to (i) confirmation that MPT will not have resulting monetary obligations of any kind and |

---

[32] The "<u>Receiver Agreement</u>" means the Form of Receiver Agreement that was filed with the Court on February 7, 2025, [Docket No. 481] at 8–13.

| | |
|---|---|
| | (ii) application of resulting proceeds pursuant to the Recovery Waterfall as set forth herein. |
| **California / Connecticut Operations** | • The Debtors shall market the California and Connecticut hospitals, exclusively through Houlihan Lokey (the "California / Connecticut Sale Process") to solicit the highest and best bid in one or more sale transactions (each a "California / Connecticut Sale") |
| | • The Debtors shall provide MPT regular updates on the California / Connecticut Sale Process |
| | • During the Interim Period and thereafter, MPT shall not initiate or have direct contact / discussions with any potential buyer who is subject to a non-disclosure agreement with the Company regarding the sale of the Debtors' California and/or Connecticut hospitals / operations; provided however, upon request of either MPT or the potential buyer, Houlihan Lokey shall arrange and participate in discussions between MPT and the potential buyer; provided further that MPT may initiate and/or have such direct contact / discussions with any of the potential buyers specified on a redacted exhibit delivered by MPT to the Debtors (the "Designated Buyers") so long as Houlihan Lokey is included in such contact / discussions or declines to be included in such contact / discussions. In the event that a buyer who is subject to an NDA contacts MPT and/or initiates discussions with MPT, in each case regarding the sale of the Debtors' California and/or Connecticut hospitals / operations (notwithstanding the restrictions of such non-disclosure agreement), MPT shall inform Houlihan Lokey and refer such buyer to coordinate a discussion through Houlihan Lokey |
| | • Negotiations specifically relating to leasing the real property from MPT, arising from the California / Connecticut Sale Process, will be coordinated and attended by Houlihan Lokey |
| | • Net sale proceeds will be distributed promptly following receipt pursuant to the Recovery Waterfall, with the proceeds allocated to MPT paid to MPT and all proceeds allocated to the estate to be distributed under a plan of reorganization consistent with the Recovery Waterfall |
| | • In the event any California / Connecticut Sale (other than a credit bid by MPT) includes a lease[33] with MPT, the value of such lease (as agreed upon by the parties at the time of the bid) will be funded by MPT and distributed in accordance with the Recovery Waterfall (Exhibit A) and if MPT is a recipient of the proceeds in the Recovery Waterfall, such new lease contribution will be on a net funded basis given the MPT recoveries |

---

[33]    During the Interim Period the parties are required to use commercially reasonable efforts to agree upon on valuation mechanics based on normalized, annualized rent with a capitalization multiple, subject to agreed exceptions, including, without limitation, characteristics (including, without limitation, creditworthiness) of tenant and deferral rent.

| | |
|---|---|
| | (*i.e.*, claim reduction); provided, however, upon agreement of the parties hereto and so long as the JMB DIP Facility has been paid in full, MPT shall be able to defer its obligation to provide cash funding pending the closing of other transactions reasonably expected to provide cash proceeds to the Recovery Waterfall. Any such deferral shall not, however, eliminate MPT's obligation for cash funding (although amount may be changed based on net funding mechanic set forth above) |
| | • MPT shall be permitted to credit bid starting with its most senior tranche of remaining claims set forth in the Recovery Waterfall in any California / Connecticut Sale (other than the participation of its deficiency claim in any recoveries allocated to the Estate); provided that the cash proceeds of any such transaction (together with other projected proceeds payable pursuant to the Recovery Waterfall as set forth in the Settlement Term Sheet) shall be sufficient to pay (i) the claims in Tranche 1 of the Recovery Waterfall, (ii) to the extent the assets subject to such credit bid are subject to priority liens in favor of the PBGC or the state of Connecticut, Tranches 3 and 4, as applicable, of the Recovery Waterfall, and (iii) to the extent MPT elects to credit bid claims allocated to Tranche 7 or Tranche 8 of the Recovery Waterfall, the recovery allocated to the Estate corresponding to the credit bid amount of such claims, in each case shall be funded in cash by MPT (unless otherwise agreed by the holders of such claims or the Estate, as applicable) |
| | • MPT shall irrevocably consent to a sale of all assets of the California / Connecticut operations (including the real property), free and clear of claims, liens and encumbrances pursuant to 11 USC §363, subject to the terms set forth herein (including as to credit bidding) and application of resulting proceeds pursuant to the Recovery Waterfall as set forth herein; provided that, with respect to a sale transaction in which the consideration includes a lease with MPT for such operations and/or real property, such lease shall be on terms acceptable to MPT in MPT's sole and absolute discretion |
| | • Bid procedures for the California / Connecticut Sale Process to be customary for typical bankruptcy sale process in the Northern District of Texas with a break-up fee and expense reimbursement not to exceed 3% of the transaction value |
| | • Notwithstanding the foregoing, the Debtors preserve their rights to pursue a plan of reorganization of some or all of the California / Connecticut Operations in lieu of a sale transaction; provided, however, that (x) MPT expressly reserves all rights to vote against, or object to, any such plan and (y) MPT shall be permitted to credit bid consistent with the Bankruptcy Code any or all of its claims as set forth herein with respect to any or all of the Debtors' assets in connection with any such plan |
| **Rhode Island Hospital Operations** | • Sale of the Rhode Island hospitals to Centurion to be completed pursuant to a 11 USC §363 private sale |

| | |
|---|---|
| | • Estimated gross sale proceeds of ~$10-15 million to be paid to the estate to pay transaction expenses of Centurion sale, with residual amount after payment of such expenses distributed pursuant to the Recovery Waterfall<br><br>• MPT agrees to support and not object to the Centurion transaction on currently agreed terms (without material modification) free and clear of applicable liens, subject to application of resulting proceeds pursuant to the Recovery Waterfall as set forth herein |
| **Rhode Island Physician Company Operations** | • Sale of Rhode Island Physician Company ("RI PCo") assets to be completed pursuant to 11 USC §363 private sale with Astrana (currently ~$67 million of gross proceeds) or such other party (as necessary)<br><br>• Net sale proceeds will be distributed promptly following receipt pursuant to the Recovery Waterfall, with the proceeds allocated to MPT paid to MPT and all proceeds allocated to the estate to be distributed under a plan of reorganization consistent with the Recovery Waterfall<br><br>• MPT agrees to support and not object to the RI PCo transaction with Astrana on currently agreed terms (without material modification), free and clear of applicable liens, subject to application of resulting proceeds pursuant to the Recovery Waterfall as set forth herein |
| **Culver City Seismic Funding** | • Promptly following entry of the 9019 Order and to facilitate the completion of the seismic upgrade at Southern California Hospital at Culver City, MPT will (i) provide the necessary approvals in support of the related PACE financing and subject to revised milestones (including, without limitation, confirmation from the California Department of Health Care Access and Information ("HCAI") that funding satisfies licensure requirements), (ii) pending receipt of such Program of All-inclusive Care for the Elderly ("PACE") financing proceeds, promptly make advances of $11.5 million (the "Seismic Funding Advances") in support of the seismic upgrade work (which payments shall be made directly to contractors (or to the Debtors as reimbursement for prior payments to such contractors in connection with the seismic upgrade) and not used for any other purpose), the amount of which Seismic Funding Advances shall be treated as a funded amount under (and added to the principal amount of) the Junior DIP and which Seismic Funding Advances shall be repaid from the PACE funds promptly after receipt thereof (with such funds not being used for any other purpose until the Seismic Funding Advances (and any interest, fees and other amounts due with respect thereto) are repaid in full) or pursuant to the Recovery Waterfall (whichever is available sooner) and (iii) reasonably cooperate with the Debtors to complete the upgrade work |
| **Settlement** | • The Debtors and MPT shall memorialize the terms of this settlement as a Bankruptcy Rule 9019 settlement agreement, subject to Bankruptcy Court approval pursuant to an order consistent herewith and otherwise acceptable to each of the Debtors and MPT, and in form and substance |

| | |
|---|---|
| | reasonably acceptable to JMB Capital (the "9019 Order"), to be entered within 30 days of the 9019 motion being filed |
| | • The 9019 Order to include findings regarding MPT lien and claim validity and mutual broad releases between the Debtors and their estates, on the one hand, and MPT, on the other hand, including broad releases for their respective existing and former board members and officers and advisors[34] |
| **Plan of Reorganization** | • During the pursuit of the California Sale and Connecticut Sale transactions, the Debtors shall commence the process for confirmation of a Plan of Reorganization (the "POR") |
| | • MPT shall be deemed to have an allowed claim secured by all the Debtors' assets in the amount equal to the amounts set forth in Tranche 2, Tranche 7, and Tranche 8 of the Recovery Waterfall |
| | • The Debtors will use the proceeds from sale transactions to pay claims pursuant to the Recovery Waterfall (net of fees, costs and expenses of the applicable sale transaction) promptly following receipt thereof (and shall not use such proceeds for any other purpose); provided, however, the Debtors shall have the right to retain up to $15 million of sales proceeds for general liquidity purposes, as necessary if the JMB DIP Facility has been paid in full or JMB Capital otherwise consents |
| | • The Debtors will hold all net sale transaction and other proceeds allocated to the estate (including MPT's participation of its deficiency claim therein) for distribution pursuant to the POR consistent with the Recovery Waterfall (and shall not use such proceeds for any other purpose) |
| | • Prior to consummation of the POR, the Debtors shall provide transition services to each of the applicable transaction counterparties pursuant to transition service agreements ("TSAs"); the POR shall provide for the formation of a special purpose vehicle ("SPV") that will be tasked with providing transition services to each of the applicable transaction counterparties pursuant to TSAs |
| **Estate & UCC Carve Out / MPT Recovery Waiver** | • MPT shall waive any recovery from the first $10 million of proceeds relating to estate causes of action (including Blue Cross / Blue Shield litigation claims) which shall be used to fund administrative claims and the fees of the UCC in excess of those included in the initial approved budget to the JMB DIP Facility, if any, as set forth in the Recovery Waterfall (the "Estate & UCC Administrative Fund") |

---

[34] As set forth in the Rundell Declaration (¶ 10), the releases of MPT and its affiliates and related parties are subject to the findings of the Investigation (as defined in the Rundell Declaration) and approval by the Transaction Committee (as defined in the Rundell Declaration). The Investigation has been ongoing since the Transaction Committee was formed, and the Transaction Committee has made significant progress and will continue working on the Investigation prior to the hearing on the Motion. The Transaction Committee expects the Investigation to conclude, with respect to potential Claims against MPT, prior to the hearing on the Motion. MPT reserves all rights in the event the Transaction Committee does not approve the release provisions.

| | | |
|---|---|---|
| | • | MPT shall waive any recovery solely in respect of the claims set forth in Tranches 7 and 8 (other than MPT's participation of the Recovery Waterfall in the portion of Tranche 8 allocated to the Estate) from (i) estate causes of action, (ii) Blue Cross / Blue Shield litigation claims and (iii) Estate & UCC Administrative Fund |
| **Milestones** | • | CA Sale Milestones: |
| | |   - Buyer outreach commenced by 2/18/25 |
| | |   - Bid Procedures Motion by 2/18/25 |
| | |   - Indication of Interest by 3/18/25 |
| | |   - Stalking Horse Agreements by 5/15/25 |
| | |   - Auction by 6/3/25 |
| | |   - Sale Hearing / Order by 6/5/25 |
| | |   - Regulatory filings submitted within ten business days of the entry of the Sale Order, but regulatory communications to commence immediately |
| | • | 9019 Order 30 days after Settlement Agreement |
| **Recovery Waterfall**[35][36] | 1 | • eCapital DIP Facility: approximately $85 million (on California accounts receivable and current assets only)<br>• JMB DIP Facility : $100 million plus all fees, interest and expenses |
| | 2 | MPT Junior DIP: Up to $25 million ($13.5 million delayed-draw Junior DIP plus up to $11.5 million of Seismic Funding Advances (if not reimbursed by PACE Loans)) plus the full roll-up of the MPT Term Loan Obligations plus adequate protection accruals plus interest, fees and expenses |
| | 3 | PBGC Secured Claims: approximately $24.3 million plus adequate protection with respect thereto as set forth in the Final JMB DIP Order (paid only from proceeds of collateral on which PBGC has a senior priority lien) |
| | 4 | CT Secured Claims: in an amount to be determined (subject to agreement between the Debtors and MPT), plus adequate protection with respect thereto as set forth in the Stipulation (paid only from proceeds of collateral on which CT has a senior priority lien) |
| | 5 | Reserved |
| | 6 | Estate & UCC Administrative Fund: $10 million of proceeds (paid only from proceeds of estate causes of action (including Blue Cross Blue Shield litigation claims)) |

---

[35]  Net transaction proceeds available for payment in the Recovery Waterfall shall be calculated on a net basis after payment of transaction fees / expenses.

[36]  All amounts that are indicated as due are preliminary and subject to ongoing diligence and resulting revision.

| 7 | • Shared between MPT and Estate: 90% to MPT and 10% to the estate until MPT Tranche 7 is paid in full |
| | • Payment of MPT Priority 7 Claims consisting of: |
| |     o MPT Mortgage Loan: $155,222,518 in principal amount plus $35,460,455.72 in accrued and unpaid interest, fees and other amounts with respect thereto |
| |     o Accrued and Unpaid Rent and Actual Out-of-Pocket Unreimbursed Impositions: $80,072,892.38 |
| |     o Other Actual Out-of-Pocket Unreimbursed Expenditures |
| |     o Interest on the MPT amounts set forth in this Tranche 7 accruing at a rate equal to 11.50% per annum and other accruals in respect of the above items (less the $5 million per month adequate protection accrual amount) |
| | • MPT waives any participation in amounts allocated to the estate |
| 8 | • Shared between MPT and Estate: 80% to MPT and 20% to the estate until MPT is paid in full |
| | • MPT Priority 8 Claims consist of ~$971 million of Master Lease claims and accruals in respect thereof not otherwise reflected in the above tranches |
| | • MPT deficiency claim participates (as a general unsecured claim) in the estate's recovery allocation |
| 9 | 100% to the estate |

34.    The Debtors have determined that the benefits of the Global Settlement greatly outweigh the cost to the Debtors' estates to pursue the claims and defenses against MPT.  Rundell Declaration at ¶ 12.  Specifically, the Global Settlement will maximize distributions for all creditors.  *Id.*  Additionally, the Global Settlement provides critical support for the Debtors' path forward in these Chapter 11 Cases, including multiple sales processes and chapter 11 plan, from the Debtor's largest pre-petition secured creditor.  *Id.*  This will enable a path forward towards a value-maximizing process to prosecute these Chapter 11 Cases to their conclusions.  *Id.*

35.    The Debtors believe that terms of the Global Settlement are fair and reasonable. Rundell Declaration at ¶ 13.  The Global Settlement avoids the delay, uncertainty and costs of prolonged litigation between Debtors and MPT over many issues, including adequate protection,

allocation of sale proceeds, the ability to undertake a value-maximizing process, recharacterization of the MPT Master Leases, and equitable subordination of MPT's claims. *Id.* The Global Settlement saves the Debtors the legal fees, costs, and other associated expenses that would continue to accrue for the duration of the litigation (and any appeals), inuring to the benefit of all stakeholders. *Id.*

36. The Global Settlement also seeks to protect the interests of unsecured creditors in particular. Under the Global Settlement, once the Debtors recover sufficient amounts to cover the first six tranches of the "Recovery Waterfall," 10% of additional recoveries are retained by the estate, with MPT waiving its participation in those amounts allocated to the estate until its "Tranche 7" claims are paid in full. In Tranche 8, moreover, the estate will retain 20% of the total recoveries (with MPT participating on account of its deficiency claims). Those allocations ensure that MPT, either as a real estate owner or a secured creditor, does not recover all distributable amounts to the exclusion of unsecured creditors. The Debtors believe instead that the settlement should allow for material recoveries for unsecured creditors without extensive and costly litigation. In the absence of the Global Settlement, unsecured creditors are at substantial likelihood of receiving little to no recoveries.

37. The Global Settlement is the product of arm's-length negotiations among the Settling Parties. Niemann Declaration at ¶ 9. The core principle of the Global Settlement is MPT's agreement that the Debtors can market and sell the hospital real estate together with the hospital operations, a result that is economically equivalent as if MPT's claims under the MPT Master Leases were recharacterized as secured debt claims. Thus, the estates avoid litigation over this issue, but more importantly it allows the Debtors to market their assets effectively, since the

28

Debtors are given the authority to sell the underlying real estate along with the operating assets free and clear of MPT's interests.  Niemann Declaration at ¶ 10.

38.     It is well within the range of reasonableness for the Debtors to enter into the Global Settlement, which represents a sound exercise of the Debtors' business judgment and is ultimately in the best interest of the Debtors' estates.  Rundell Declaration at ¶ 14.  Accordingly, the Debtors respectfully request that the Court approve the Global Settlement.

## AUTHORITY FOR RELIEF REQUESTED

39.     The Debtors are seeking this Court's approval of the Global Settlement under sections 105, 363(b), and 364(d) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules. Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain."[37]

40.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The United States Court of Appeals for the Fifth Circuit has held that there must be "some articulated business justification" for the transaction.[38]   Once a debtor articulates a valid business justification under section 363, a

---

[37]   *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section 105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code").

[38]   *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); s*ee also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

presumption arises that the debtor's decision was made on "'an informed basis, in good faith and in the honest belief that action taken was in the best interests of the company.'"[39]

41.    Section 364(d) provides, in pertinent part, that "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if— (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  As with section 363(b), the debtor's decision to incur new financing is reviewed in accordance with the business judgment standard.  *See Keybank N.A. v. Franklin Advisers, Inc.*, 616 B.R. 14, 26 (Bankr. S.D.N.Y. 2020).  The MPT Junior DIP is an integral component of the Global Settlement, and neither the Global Settlement nor the MPT Junior DIP could take place individually without the other.  In particular, MPT would not be willing to provide the MPT Junior DIP without the associated Global Settlement, and the Debtors would not be entering into the Global Settlement without obtaining the incremental financing being provided by the MPT Junior DIP.

42.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

---

[39]    *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Johns*, 2025 WL 350292, at *4 (Bankr. N.D. Tex. Jan. 30, 2025); *In re Life Partners Holdings, Inc.*, 2015 WL 8523103, *7 (W.D. Tex. Nov. 9, 2015).

43.     Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases.[40]    Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.[41]    Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court."[42]

44.     In making this determination, the United States Court of Appeals for the Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'"[43]    The Fifth Circuit has instructed courts to consider the following factors: "(1) the probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id.*

45.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement.  First, the court should consider "the paramount interest of creditors with proper deference to their reasonable

---

[40]    *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996); *see also Rivercity v. Herpel* (*In re Jackson Brewing Co.*), 624 F.2d 599, 602 (5th Cir. 1980) (settlements are a "normal part of the process of reorganization" and "a desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly").

[41]    *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).

[42]    *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

[43]    *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*, 624 F.2d at 602).

views."[44]  Second, the court should consider the "extent to which the settlement is truly the product

of arms-length bargaining, and not of fraud or collusion."[45]

46.    Generally, the bankruptcy court need not decide the issues in dispute when

evaluating a settlement.[46]  "In evaluating a Rule 9019 settlement, a bankruptcy court need not

'conduct a mini-trial to determine the probable outcome of any claims waived in the settlement.'"[47]

Instead, the bankruptcy court "need only 'canvass the issues to see whether the settlement falls

below the lowest point in the range of reasonableness."[48]  Further, if the bankruptcy court

determines that "a substantial controversy exists for which there is an uncertain outcome in

litigation", that suffices to satisfy the Rule 9019 standard.[49]

47.    After evaluating various alternatives, the Debtors have determined that the Global

Settlement is fair, equitable, in the best interests of the Debtors' estates, and falls well within the

range of reasonable outcomes.  As set forth herein, the Global Settlement is the product of good-

faith negotiations among the Settlement Parties, embodying a resolution that is beneficial to both

sides.

48.    *First*, the likelihood of the Debtors' success in litigation over recharacterization of

the MPT Master Leases as disguised financings, whether any recharacterized financings are treated

as perfected or unperfected (and subject to the strong-arm power under § 544), equitable

subordination, adequate protection, and related issues is uncertain.  However, that litigation would

---

[44]  *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.* (*In re Foster Mortg. Corp.*), 68 F.3d 914, 917 (5th Cir. 1995).

[45]  *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

[46]  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).

[47]  *Age Ref. Inc.*, 801 F.3d at 541 (quoting *Cajun Elec. Power Coop.*, 119 F.3d at 356).

[48]  *In re Goodman Networks, Inc.*, No. 22-31641, 2024 WL 460478, at *8 (Bankr. N.D. Tex. Feb. 6, 2024).

[49]  *Id.*

certainly be costly and time-consuming, would be heavily contested, and would distract and delay the Debtors' operation of the hospitals as well as their sale and plan confirmation efforts, even if the Debtors were eventually successful in their litigation.

49.    Specifically, although the Debtors believe they have strong arguments that could result in the Debtors prevailing on all of their claims and defenses against MPT, such result is not guaranteed.  As discussed, there are various scenarios in which MPT would continue to capture all or most of the value of the Debtors' estates, even if litigation were successful in some respects. Moreover, even if the Debtors were to prevail in the litigation, there is a significant risk that (absent the Global Settlement), the Debtors would not have sufficient liquidity to pursue such litigation to judgment or through any appeals.

50.    Without the Global Settlement, the Debtors' sale processes in California and Connecticut would face the same issues that befell the *Steward Health* debtors: disputes regarding allocation of sale proceeds, the ability to sell real property, classification of the hospital leases, and other issues relating to the conduct of the sale process.  Moreover, pursuing the litigation would involve complex legal issues, and could entail significant discovery, extensive briefing, and preparation for trial and other evidentiary hearings, and may not be complete for many months or years.  It would cost the Debtors' estates millions of dollars in litigation costs if these claims and defenses were fully litigated to judgment, with no guarantee of success and substantial uncertainty as to timing of resolution.

51.    *Second*, the Global Settlement is the product of hard-fought negotiations between the Debtors and MPT, each of which were represented by independent, sophisticated counsel and other advisors.  The Settlement Parties have already spent time and resources investigating and

litigating disputes prior to and during these Chapter 11 Cases, and have exchanged a number of proposals and counter-proposals and engaged in intensive negotiations.

52.    *Third*, each element of the Global Settlement is truly a compromise between the positions taken by the Debtors and MPT. The fact that the Settlement Parties essentially "split the difference" in multiple ways when negotiating the Global Settlement reflects that it is fair and equitable. The chart below reflects many (but not all) of the compromises reflected in the Global Settlement.[50]

| Topic | MPT's Best-Case Litigation Position | Debtors' Best-Case Litigation Position | Compromise |
|---|---|---|---|
| **MPT's Ownership of Real Estate (Recharacterization)** | MPT owns the CA/CT real estate because the MPT Master Leases are true leases. In addition, the Debtors waived any entitlement to make a recharacterization claim as part of the 2023 Transaction. | Debtors own the CA/CT real estate because lease is recharacterized as financing | MPT owns the real estate, but Debtors get value of lease in sale (economic equivalent of recharacterization as secured financing) and the ability to sell the fee simple interests. |
| **MPT's Secured Rent Claim** | MPT has a fully secured and perfected rent claim against all of the Debtors' personal property because of the Security Agreement and Pledge Agreement. Moreover, even if the lease were successfully recharacterized, MPT has a secured claim against the real estate | Because the lease is recharacterized, MPT has an unperfected secured claim (subject to 11 U.S.C. § 544 strong-arm power). | MPT has a perfected secured claim, but carves out $10 million for the estate and 10% under Tranche 7 and 20% under Tranche 8 of the Waterfall. |

---

[50]    The Settlement Parties on both sides reserve all rights related to these claims and defenses, and this motion merely highlights the best-case litigation positions with respect to these claims and defenses. *See In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418, 430 n.4 (Bankr. S.D.N.Y. 2022) (Rule 9019 movants do not need to provide a pessimistic risk assessment of their claims in case the court does not approve the settlement).

| Topic | MPT's Best-Case Litigation Position | Debtors' Best-Case Litigation Position | Compromise |
|---|---|---|---|
| | because of the recordation of absolute deeds, memoranda of lease, and assignments of rents and leases would result in MPT having perfected mortgage claims. | | |
| **Adequate Protection under JMB DIP Facility** | The Debtors cannot "prime" MPT without MPT's consent. MPT, in order to consent, requires (i) current rent in cash, (ii) uncapped professional fees, (iii) consent and information rights, (iv) lien on all DIP collateral, and (v) super-priority claims on a joint and several basis, as well as more limited draws on the facility. | MPT is not entitled to any additional adequate protection, as the JMB DIP Facility ensures that the Debtors can secure the highest going concern sale value for MPT's collateral. | MPT consents to financing and receives (i) accruing $5 million per month (in partial substitution of cash rent/interest), (ii) professional fees capped at $1.25 million per month, (iii) consent rights only when Junior DIP is funded and information rights only when Junior DIP is approved, (iv) replacement liens securing the Junior DIP (including roll-up and specified accruals), and (v) super-priority claims for the Junior DIP (including roll-up and specified accruals) |
| **Sale Processes** | MPT has the right to market the real estate assets independently, and would have a consent right over any transaction for the hospital operations. | Debtors have the exclusive right to market all assets. | All assets are marketed collectively and all bids shall be submitted to, and negotiated by, Houlihan Lokey, subject to various conditions as described herein. |

| Topic | MPT's Best-Case Litigation Position | Debtors' Best-Case Litigation Position | Compromise |
|---|---|---|---|
| **Assumption or Rejection and Payment of Current Rent** | Debtors are required to assume or reject both master leases *cum onere* by no later than 210 days after the Petition Date (11 U.S.C. §365(d)(4)) and to pay current rent and all other charges until assumption or rejection (11 U.S.C. § 365(d)(3)); absent valid assumption, Debtors must immediately surrender all premises upon rejection. | Debtors are entitled to seek to recharacterize leases and avoid consequence of lease treatment under § 365(d). | Debtors will be permitted to market hospitals without being required to assume and assign master leases, and without threat of surrender requirement. |
| **Credit Bidding** | MPT has uncapped credit bid right on the California/Connecticut assets and operations. | MPT cannot credit-bid its claims on the California/Connecticut assets and operations. | MPT can credit bid certain tranches under the waterfall, but must fund sufficient cash proceeds to pay the senior DIP facilities, PBGC, and state of CT and Estate participation, as applicable. |

53.    *Finally*, the Global Settlement is reasonable and in the best interests of the Debtors'

estates. The Global Settlement, if approved, affords the Debtors and their estates with numerous

benefits, including (i) a path to keep all of the Debtors' safety net hospitals in Connecticut and

California open for the benefit of the Debtors' patients, communities, and workforce of

approximately 4,500 employees, (ii) providing the Debtors with incremental liquidity under the

MPT Junior DIP, retention of waterfall proceeds, and funding to make necessary seismic repairs

to the Debtors' California facilities, (iii) a compromise of MPT's claims against the Debtors,

including for post-petition cash-pay rent and other charges (under § 365(d)(3)) on the MPT Master Leases (iv) a consensual and organized procedure for the Debtors and Houlihan Lokey to run value-maximizing sale processes for their Pennsylvania, Connecticut, California, and Rhode Island operations, and (v) providing the Debtors with access to sufficient funding and sale proceeds to ensure these Chapter 11 Cases remain stable and to solicit and confirm a chapter 11 plan. The Global Settlement is fair, equitable, and in the best interests of the Debtors' estates and represents a major milestone in the Chapter 11 Cases.

54.     For these same reasons, entering into the Global Settlement is a sound exercise of the Debtors' business judgment. Rundell Declaration at ¶ 16. The Global Settlement provides for a path forward and resolution of these cases that avoids the necessity for months of costly and uncertain litigation to determine the respective rights of the parties and the ability of the Debtors to market their assets in the most effective and value-maximizing manner possible. The Global Settlement is the product of good-faith negotiations among the Settlement Parties, embodying a resolution that is beneficial to both sides. Niemann Declaration at ¶ 11. Further, the Global Settlement affords the Debtors and their estates with numerous benefits.

55.     Accordingly, for the reasons stated in this Motion and in the related MPT DIP Motion, the Global Settlement should be approved.

## BANKRUPTCY RULES 6004(a) AND 6004(h)

56.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

57.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Complex Service List (as defined in the Creditor Matrix Order [Docket No. 123]);[51] and (b) applicable parties in interest for motion.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PREVIOUS REQUEST

58.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank]*

---

[51]    See *Order (I) Authorizing the Debtors to File (A) a Consolidated Creditor Matrix and (B) a Consolidated List of the 30 Largest Unsecured Creditors; (II) Authorizing (A) the Debtors to Redact Certain Personally Identifiable Information, and (B) the Implementation of Procedures to Protect Confidential Patient Information; (III) Establishing a Complex Service List; (IV) Approving Form and Manner of Notice of Commencement; and (V) Granting Related Relief* (the "Creditor Matrix Order").

Case 25-80002-sgj11    Doc 769    Filed 02/23/25    Entered 02/23/25 21:03:38    Desc
Main Document    Page 39 of 40

WHEREFORE, the Debtors respectfully requests the entry of the Order, granting the relief requested and granting such other and further relief as the Court deems just and proper.

Dated: February 23, 2025
Dallas, Texas

/s/ Thomas R. Califano

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
        rpatel@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    wcurtin@sidley.com
        pventer@sidley.com
        anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on February 23, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ *Thomas R. Califano*
Thomas R. Califano