SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
              rpatel@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    wcurtin@sidley.com
              pventer@sidley.com
              anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered)<br>(Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING THE CLOSURE OF THE PENNSYLVANIA**
**HOSPITALS; AND (II) GRANTING RELATED RELIEF**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

**Emergency relief has been requested. Relief is requested not later than March 11, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on the matters set forth in this motion on March 11, 2025, at 9:30 a.m. (prevailing Central Time) in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 650.479.3207. The meeting code is 2304 154 2638. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting. WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.**

**Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion (this "Motion"). In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

1. This is not the outcome the Debtors hoped for—and have been working tirelessly towards—with respect to the Pennsylvania Hospitals (as defined below). The Debtors' unequivocal goal was to avoid the closure of the Pennsylvania Hospitals and allow the facilities to continue to provide critical healthcare access to underserved populations in Pennsylvania. At the Debtors' first day hearing, the Debtors' counsel highlighted the work already ongoing with the Commonwealth of Pennsylvania (the "Commonwealth"), through its Attorney General, David W. Sunday, Jr. (the "Pennsylvania AG") as *parens patriae*, to find a solution. Since then, the Debtors, the Commonwealth, the Pennsylvania AG, and other parties have worked tirelessly to identify potential sources of funding for the Pennsylvania Hospitals. Unfortunately, despite these efforts, a solution remains uncertain, and the Debtors must therefore regrettably close the Pennsylvania

Hospitals in order to maintain patient safety and avoid the ongoing losses and risk of administrative insolvency, as well as the overarching risk posed to the rest of the Debtors' hospitals if the Pennsylvania Hospitals continue to operate beyond March 14, 2025. Therefore, the Debtors, through this Motion, request the Court to authorize the expedited closure of the Pennsylvania Hospitals.[2]

2.     Beginning in 2014 and continuing after the Debtors' acquisition of the Pennsylvania Hospitals in 2016, the Pennsylvania Hospitals experienced significant losses. In 2022, following significant marketing efforts, the Debtors entered into an agreement to sell the Pennsylvania Hospitals. Unfortunately, negotiations fell apart six months later, and the Debtors instead made the decision to close Delaware County Memorial Hospital, leading to a lawsuit filed by the Pennsylvania AG and the Foundation for Delaware County (the "Foundation"), a nonprofit representing the Pennsylvania Hospital's interests and the interests of the community in which the Pennsylvania Hospital is located. The litigation was stayed in October 2023 to allow the Debtors to find another purchaser. Although a potential buyer was identified in 2024, the sale did not move forward.

3.     The Debtors have searched for alternatives since then. Leading up to the Petition Date and continuously after the filing of these chapter 11 cases, the Debtors worked hand-in-hand with the Pennsylvania AG to craft unique, interim solutions, including the appointment of a receiver, to bridge the funding gap while negotiations were ongoing and ensure continuity of patient care until a long-term solution could be reached.

---

[2]   Per the Court's order at the March 6, 2025, hearing, the Debtors, the Foundation, the Pennsylvania AG, and Ventas will participate in an in-person meeting before 12:00 p.m. (prevailing Central Time) on Monday, March 10, 2025, to discuss a potential solution to allow the Pennsylvania Hospitals to remain open.

4.      Despite this engagement and good-faith discussions with the Pennsylvania AG and other stakeholders, no solution has been reached, and the Debtors must file this Motion.  The Debtors' urgent and unsustainable liquidity crisis in Pennsylvania leaves them with no alternative.

5.      The Pennsylvania Hospitals incur substantial ongoing losses:

|  | Hospital | City | State | Est. # of Employees[3] | Est. # of Current Patients[4] | FYTD EBITDA Through 01/31/25 |
|---|---|---|---|---|---|---|
| 1. | Crozer-Chester Medical Center | Chester | PA | 1,856 | 223 | $      (46,879,734) |
| 2. | Springfield Hospital | Springfield | PA | 62 | 0 | (2,662,519) |
| 3. | Taylor Hospital | Ridley Park | PA | 347 | 61 | (4,301,946) |
| 4. | Delaware County Memorial Hospital | Drexel Hill | PA | 0 | 0 | (2,155,677) |
| 5. | Other Facilities | - | PA | 994 | 0 | (2,198,412) |
| **TOTAL FYTD EBITDA LOSS[5]** | | | | | $ | (58,198,288) |
| **TOTAL EBITDA LOSS (PRIOR 6 MONTHS)[6]** | | | | | $ | (91,850,760) |

6.      The Debtors' DIP Budget, together with the funding available under the Receiver Agreement (as defined below), only provide for adequate funding for the Pennsylvania Hospitals through March 14, 2025.  Given the mounting losses at such hospitals, the lack of continued available funding, and the absence of a replacement operator or actionable funded alternative, the Debtors have made the difficult decision to seek approval of a safe and expeditious closing process for the Pennsylvania Hospitals.  Allowing the Pennsylvania Hospitals to continue to operate

---

[3]     Based on HR Report run as of 1/15/25.  Employees were grouped by company code, not by physical location.

[4]     Total Census per 03/04/25 census email (which includes inpatient and obs in a bed).

[5]     For the period of 10/01/24 – 01/31/25.

[6]     For the period of 08/01/24 – 01/31/25.

beyond March 14, 2025, without outside funding threatens to accelerate the financial deterioration

of the Debtors, jeopardizing the stability of their remaining hospitals and overall operations.

7.      Therefore, the Debtors have developed a closure plan (the "Closure Plan") for the

Pennsylvania Hospitals that provides for, among other things: (i) the safe transfer and discharge

of patients; (ii) the protection, transfer, and storage of medical records; (iii) the disposition of

personal property, including pharmaceuticals, hazardous materials, and medical waste at such

hospitals; (iv) rejection of executory contracts related to such hospitals; and (v) abandonment of

certain surplus, burdensome, or non-core assets, if any, at such hospitals.   A summary of the

Closure Plan is detailed herein.  These safeguards ensure that the closures proceed in a safe, orderly,

and efficient manner, while serving to protect patient safety, safeguard patient information, support

employees, and minimize disruption during this difficult but unavoidable process.  The Debtors

have engaged with the PCO on the Closure Plan and will continue to work closely with the PCO

and the PCO's counsel on the closure of the Pennsylvania Hospitals.  Without this Court's prompt

granting of approval to implement the Closure Plan, the Debtors face a substantial risk to the ability

to continue ongoing operations at every single other hospital across the Prospect system, and,

therefore, the Debtors' ability to preserve the value of their remaining hospitals for the benefit of

their stakeholders will be severely compromised.

8.      Accordingly, the Debtors respectfully request that the Court grant an emergency

hearing on this Motion and the relief requested herein.

## **RELIEF REQUESTED**

9.      By this Motion, the Debtors seek entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "Order") (a) approving the closure of the Pennsylvania Hospitals

on an expedited basis; and (b) granting related relief, including scheduling an emergency hearing

to consider approval of the Motion on a final basis.

10.    In support of this Motion, the Debtors submit the *Declaration of Paul Rundell in Support of Debtors' Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals, and (II) Granting Related Relief* (the "Rundell Declaration"), which was filed contemporaneously herewith.

## JURISDICTION AND VENUE

11.    The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    The legal predicates for the relief requested in this Motion are sections 105, 363, 554, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 2002-1(a)(2) of the Local Bankruptcy Rules for the Northern District of Texas (the "Local Bankruptcy Rules"), and the Procedures for Complex Cases in the Northern District of Texas.

13.    The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.    Filing of the Debtors' Chapter 11 Cases

14.    The Debtors and their non-Debtor affiliates (collectively, the "Company") are providers of healthcare services in California, Connecticut, Pennsylvania, and Rhode Island.  The

Company's business can be broadly divided into two segments: (1) hospital operations, which consist of, among other things, the ownership and operation of 16 acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services spanning multiple states, and (2) physician-related services, including (a) certain owned and managed medical groups, independent physician associations, managed services organizations and risk taking entities, (b) Prospect Health Plan, Inc., a Knox-Keene licensed entity, and (c) one licensed acute hospital operating as Foothill Regional Medical Center (collectively, "PhysicianCo").  ***The PhysicianCo entities are not Debtors in these chapter 11 cases***.

15.     Beginning on January 11, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases.

16.     On January 29, 2025, the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed the Official Unsecured Creditors' Committee [Docket No. 295] (the "Committee").

17.     On January 30, 2025, the U.S. Trustee appointed Suzanne Koenig as the patient care ombudsman in these chapter 11 cases [Docket No. 325] (the "PCO").

18.     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater

detail in the *Declaration of Paul Rundell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "First Day Declaration").[7]

## II.      The Pennsylvania Hospitals

19.      In July 2016, the Debtors acquired the Crozer-Keystone Health System based in Springfield, Pennsylvania, the largest employer and healthcare provider in Delaware County, located southwest of Philadelphia.  The Crozer-Keystone System, today called Crozer Health ("Crozer Health"), consists of four general acute care hospitals, several outpatient facilities, and a comprehensive physician network of primary care and specialty practices (collectively, the "Pennsylvania Hospitals").

20.      Since the acquisition of the Pennsylvania Hospitals, Crozer Health faced a series of financial challenges beginning before the Debtors' acquisition and continuing beyond the Debtors' acquisition in 2016.  As a result, the Debtors began a process to divest the Pennsylvania Hospitals in 2022.

### A.      Marketing Process and Efforts to Identify New Operators.

21.      The Debtors engaged in a marketing process for its Pennsylvania Hospitals, first in 2022 and again in 2023.  In 2022, the Debtors entered into an agreement with a potential buyer, but negotiations fell apart and the buyer later terminated.  Facing an imminent liquidity shortfall, the Debtors attempted to transition Delaware County Memorial Hospital to meet community needs by providing behavioral health services—the Debtors proposed closing Delaware County Memorial Hospital and reopening the facility an inpatient behavioral health center.  However, the Pennsylvania AG and the Foundation filed suit, and the Commonwealth did not issue the necessary licenses for the transition.

---

[7]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

22.    The litigation was stayed in October 2023 to allow the Debtors to find another purchaser.  The Debtors engaged in an additional marketing process, which resulted in one potential viable purchaser.  However, the sale proposal required compliance with many conditions, including state approval.  Those conditions were not met, and the Debtors lost another buyer.

**B.    Ongoing Litigation and Related Concerns.**

23.     In response to the financial and operational challenges in running the remaining Pennsylvania Hospitals, in October 2024, the Pennsylvania AG filed a complaint against certain of the Debtors, their principals Sam Lee and David Topper, Leonard Green Partners, and their affiliates requesting, among other relief, the appointment of a receiver to manage the Pennsylvania Hospitals.  In its complaint, the Pennsylvania AG alleged that the Debtors breached the asset purchase agreement related to the 2016 acquisition of Crozer Health by shutting down the Delaware County Memorial Hospital and all inpatient services at Springfield Hospital, while unjustly enriching itself by redirecting funds to investors.

**III.    Coordination with the Commonwealth of Pennsylvania.**

24.    Despite the ongoing litigation, the Debtors and the Pennsylvania AG have continued to work together in good faith to explore all potential alternatives, including the potential transfer of the Pennsylvania Hospitals to new operators and associated funding in a manner supported by the regulators.  The closure of the Pennsylvania Hospitals was always viewed by all parties as a last resort.

25.    On February 3, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving and Authorizing (A) the Asset Purchase Agreement and the Private Sale of the Pennsylvania Hospitals Free and Clear of Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) the Settlement by and among the Debtors, the Pennsylvania Attorney General, Samuel Lee, and David Topper, Pursuant to Bankruptcy*

*Rule 9019; and (II) Granting Related Relief* [Docket No. 332] (the "Sale Motion"), seeking approval to, among other things, transfer the Pennsylvania Hospitals to an entity supported by the Commonwealth.  Unfortunately, shortly after filing the Sale Motion, the Debtors learned that this entity would be unable to complete a transaction in the required time frame.

26.    To address certain operational and financial needs of the Pennsylvania Hospitals in light of their continued liquidity crisis, on February 7, 2025, the Debtors, the Commonwealth, and the Pennsylvania AG entered into, and the Court approved, the *Stipulation and Agreed Order Authorizing the Debtors to Enter into the Receiver Agreement with the Attorney General's Office for the Commonwealth of Pennsylvania* [Docket No. 481] (the "Receiver Stipulation"), establishing FTI Consulting, Inc. (the "Receiver") to assume the operation of the Pennsylvania Hospitals, pursuant to the provisions of applicable laws, regulations, and a receiver agreement (the "Receiver Agreement").

27.    Pursuant to the Receiver Agreement, the Commonwealth, through the Pennsylvania AG, committed to facilitate $20.2 million in funding to the Receiver (consisting entirely of advances of funds already owed to the Debtors prior to their entry into the Receiver Agreement).

28.    On February 21, 2025, the Debtors, Delaware County, Pennsylvania (the "County"), and the Commonwealth, through the Pennsylvania AG, entered into, and the Court approved, the *Stipulation and Agreed Order Authorizing Payments to the Pennsylvania Receiver* [Docket No. 749] (the "Funding Stipulation"), pursuant to which the County agreed to promptly make certain payments to the Debtors on the condition that such payments comprised a portion of the Commonwealth's $20.2 million commitment, were made directly to the Receiver and utilized consistent with the terms and conditions set forth in the Receiver Agreement.

29.     On February 21, 2025, Pursuant to the Funding Stipulation, the County remitted (1) $8.1 million on February 21, 2025, (2) $1.5 million on February 28, 2025, and (3) an additional $500,000 on March 4, 2025, to the Receiver.  The Receiver also received an additional $[11.2] million in Medicaid Disproportionate Share Hospital payments.

30.     On February 21, 2025, certain of the Debtors and the Commonwealth, through the Pennsylvania AG, entered into, and, on February 24, 2025, the Court of Common Pleas for Delaware County granted (*Nunc Pro Tunc* to February 14, 2025), the *Stipulation and Agreed Order to the Appointment of a Receiver,* pursuant to which the Receiver was officially appointed.

## PROPOSED HOSPITAL CLOSURES

31.     Despite the Debtors' extensive marketing efforts, the Debtors have not been able to secure a buyer or new operator for the Pennsylvania Hospitals.  The Debtors have also engaged with various parties to see if they would be willing to fund the Pennsylvania Hospitals through the Receiver.  Ultimately, no party has agreed to such funding.  Given that the Pennsylvania Hospitals incur significant losses and there is no prospective operator for such hospitals or funding available to cover accrued expenses beyond March 14, 2025, the Debtors have no choice but to close the Pennsylvania Hospitals.

32.     The following reflects a summary of the Debtors' proposed Closure Plan with respect to the Pennsylvania Hospitals:[8]

| Proposed Closure Date[9] | • **March 14, 2025**<br>    ○ The Debtors will adjust the date for cessation of clinical operations at each Facility if necessary to ensure safe patient care. |
|---|---|
| Timeline for Closure | • **Prior to filing of Motion**:<br>    ○ Commonwealth of Pennsylvania to oversee the safe and |

---

[8]     A complete list of the Pennsylvania Hospitals and related facilities to be closed is attached to the Order as <u>Schedule 1</u>.

[9]     The Debtors propose to close the Pennsylvania Hospitals no later than the date of closure proposed herein (any such date, the "<u>Proposed Closure Date</u>").

|  |  |
|---|---|
|  | orderly closure of the hospitals. |
|  | • **Contemporaneous with the hearing to consider approval of the Motion**:<br>   o File the Closure Plan with the appropriate regulatory authorities.<br>   o Deliver WARN Act notifications to substantially all Crozer Health employees.<br>• **4 days prior to closure**:<br>   o Post notice of closure at all entrances.<br>   o Cease elective inpatient admissions.<br>   o Cease trauma, surgical, obstetrics and gynecology, burn, behavioral health, oncology, and outpatient services.<br>   o Cease EMS Services and close Emergency Department plus ancillary support services for Emergency Department.<br>   o Discharge or transfer all remaining inpatients.<br>   o Close all ambulatory services (ambulatory services will remain open according to staffing and scheduling needs until this time).<br>• **Ongoing**: Discharge patients in the ordinary course, identify appropriate alternative locations for any patients who will need ongoing care and arrange for transfer. Participate in any required public hearings.<br>• **Proposed Closure Date**: Upon completion of emergency department closure.<br>   o Submit Application to MAC to voluntarily terminate Medicare enrollment. |
| **Plan for Employees** | • The Debtors intend to provide WARN Act notices to substantially all non-unionized employees of the Pennsylvania Hospitals and, with respect to unionized employees, the Debtors intend to provide WARN Act notices to each of the relevant union representatives, contemporaneously with the hearing to consider approval of this Motion.<br><br>• The Debtors intend to work with the relevant unions and employees to assist in the facilitation of any bumping rights in accordance with the terms of the relevant collective bargaining agreements.<br>• With regard to any unionized employees at the Pennsylvania Hospitals, the Debtors intend to provide appropriate notice and engage in effects bargaining with the relevant labor unions upon such union's request, as well as discuss shutdown plans with such unions. |
| **Plan for Transfer/Discharge of Patients** | • The majority of currently-admitted patients will be discharged in the ordinary course and, if necessary, provided with information and assistance to make follow-up appointments with replacement providers. Inpatients will be notified of the anticipated closure and will be transferred, along with their medical record information, to a hospital in the area or a hospital of their choice. The Debtors will complete the transfer or discharge of acute care patients prior to closure. |
| **Plan for Transfer and Storage of Medical Records** | • The Debtors intend to contract with a medical records custodian to ensure records are properly stored and patients can access their medical records after the closure. The Debtors will send written |

| | |
|---|---|
| | notification of how to locate patient records to all practitioners currently on the active staff of the respective hospitals. The transfer and discharge of all patients shall be conducted in a manner that ensures the protection of patient health, privacy, and safety. |
| **Plan for the Disposition of Personal Property, Including Pharmaceuticals, Hazardous Materials, and Medical Waste** | • The Debtors will manage and dispose of pharmaceuticals, hazardous materials, and medical waste in accordance with state and federal guidelines. Medications, radioactive materials, chemicals, medical waste, infectious materials and other hazardous materials will be identified, secured and inventoried, then destroyed, disposed of, returned to vendors, or transferred to other providers as appropriate. Each hospital has hired vendors to manage the disposal of medical waste and infectious materials. After termination of services, the Debtors will also retain an outside vendor to decontaminate hot rooms. |
| **Communications Plan** | • The Debtors are developing a comprehensive approach to keep patients, employees, government agencies, area hospitals and the community at large informed of the closure. In particular, the Debtors intend to contact area hospitals and outpatient practices to inform them of the proposed closure and to discuss procedures for the transfer of patients. In addition, the Debtors will notify the fire department and the appropriate government agencies of the proposed closure. The Debtors will place public notices in local newspapers regarding the location of patient medical records, and provide written notice to all active physicians as to how to locate patient records. |

## BASIS FOR RELIEF REQUESTED

**I.      The Court May Authorize the Closing of the Pennsylvania Hospitals Pursuant to Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.**

33.      The Court may authorize the closure of the Pennsylvania Hospitals pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation marks and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines,*

*Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale. . . ."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation and quotation marks omitted).   The Debtors must be able to "use" their property in a manner that permits them to stop mounting losses from the operations of the Pennsylvania Hospitals and to retain value for the benefit of the Debtors' estates, as well as preserving available liquidity to ensure patient safety at all other hospitals.   The Debtors must use their property in a manner that protects all patients in their care, who are best served by the orderly implementation of the Pennsylvania Hospital closures.

34.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).   Under section 105(a) of the Bankruptcy Code, "[t]he court

may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

35. Section 1108 of the Bankruptcy Code grants a debtor in possession the *right* to operate its businesses, providing that the trustee (or debtor in possession) "*may* operate the debtor's business." 11 U.S.C. § 1108 (emphasis added). But, in its use of the permissive "may," the statute "clearly indicates that a trustee is not required to operate the debtor's business . . . ." *In re Thrifty Liquors, Inc.*, 26 B.R. 26, 28 (Bankr. D. Mass. 1982). Indeed, section 1108 "necessarily implies the lesser authority [of a debtor] to modify the operation of the business on such grounds as [it] deems appropriate under the circumstances." *Id.* Thus, a debtor is not required to operate its business "if such operations will reduce the value of the debtor's assets or if the debtor's business is moribund." 7 Collier on Bankruptcy ¶ 1108.13 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009). Indeed, in such circumstances "continued operation of a business that ought to be closed down and liquidated may be a breach of the fiduciary duties of a trustee or debtor in possession." *Id.*

36. Bankruptcy courts have authorized the closure of hospitals pursuant to the authority provided in section 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code. *See, e.g.*, *In re Verity System of California, Inc.*, No. 2:18-bk-20151-ER (Bankr. C.D. Cal. Jan. 9, 2020) (Docket No. 3934) (authorizing the closure of a hospital pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code); *In re Saint Vincents Catholic Med. Ctrs. of New York*, No. 10-11963-CGM (Bankr. S.D.N.Y. May 14, 2010) (Docket No. 276) (authorizing the implementation of a plan of closure pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code); *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 16-17463 (Bankr. C.D. Cal. Jan. 20, 2017)

(Docket No. 633) (authorizing the closure of a hospital pursuant to section 363(b) of the Bankruptcy Code). Similar relief is regrettably also appropriate here.

## II.    Closing the Pennsylvania Hospitals Constitutes an Exercise of the Debtors' Sound Business Judgment.

37.    Absent a third party's willingness to take over or fund the operations of the Pennsylvania Hospitals, ceasing operations is the Debtors' only viable option that will stem such hospitals' substantial cash losses, preserve value for the Debtors' stakeholders, and allow the Debtors to continue to operate their remaining hospitals.

38.    The Debtors have the ability, and the duty, in an exercise of their business judgment, to determine whether to cease operations at certain hospitals, particularly where there is no other reasonable viable solution to keep such hospital open. *See In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) ("The debtor's duty to maximize estate assets may require the cessation of operations at one … location."); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap.'") (citation omitted); Memorandum of Decision, *Verity Health*, No. 2:18-bk-20151ER, at 7 ("Since it is not feasible for the Debtors to continue St. Vincent's operations, implementation of the Closure Plan is necessary to sustain public health and welfare. Public safety would be jeopardized if the Debtors allowed St. Vincent to remain open while lacking sufficient funds to support its operations."); *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 16-17463-ER (Bankr. C.D. Cal. Jan. 20, 2017), at ¶ 3 ("Public health and safety would be jeopardized if the Debtor continued to admit new patients when it lacks funds to adequately sustain operations. In fact, the Board would be acting in violation of its fiduciary duties to the community if it attempted to continue operating the hospital despite the lack of sufficient cash to sustain operations."); *Saint Vincents Cath. Med.*

*Ctrs. of New York*, 429 B.R. at 151 ("The Debtors correctly point out that the power to operate the debtor's business pursuant to 11 U.S.C. § 1108 also allows the debtor to modify or cease operations of the debtor if it is appropriate under the circumstances.").

39.     Under section 704 of the Bankruptcy Code, which is incorporated herein pursuant to section 1106(a)(1) of the Bankruptcy Code, following the decision to close a hospital, a trustee is required to use "all reasonable and best efforts to transfer patients from a health care business that is in the process of being closed to an appropriate health care business . . . . " 11 U.S.C. § 704(a)(12); *see also* 11 U.S.C. § 1106(a)(1) (requiring a chapter 11 trustee to perform certain duties of a trustee set forth in section 704 of the Bankruptcy Code, including transferring patients of a closed healthcare facility).

40.     Given the substantial operating losses at the Pennsylvania Hospitals and the absence of any viable bidder, operator, or third-party funding source for such hospitals despite the Debtors' marketing and solicitation efforts, as well as all other efforts to find any interim funded solution to continue operating the Pennsylvania Hospitals, the Debtors unfortunately have no choice but to begin to close such hospitals.

41.     The Closure Plan for the Pennsylvania Hospitals is carefully crafted to effectuate an orderly, funded wind-down that, first and foremost, protects patient safety.   In particular, the Closure Plan specifies, among other things, the plan for (i) the transfer or discharge of patients, (ii) the protection, transfer, and storage of medical records, and (iii) the disposition of personal property, including pharmaceuticals, hazardous materials, and medical waste at such hospital. Such Closure Plan minimizes the disruption to patient care and the communities in which the Pennsylvania Hospitals are located.

42.     Further, the Debtors engaged in discussions with the [PCO and the] Pennsylvania AG regarding the safe closure of the Pennsylvania Hospitals on the timelines set forth in the Closure Plan contained herein and do not expect the [PCO or the] Pennsylvania AG to object to such closing plans at this time.   Courts have approved expedited timelines for hospital closures in other similar cases.   *See, e.g.*, *Verity Health Sys.*, 2020 WL 223909, at *4 (approving expedited regulatory timeline over the objection of union); *Saint Vincents*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010) (*appeal dismissed*) 2010 WL 4456975 (S.D.N.Y. Oct. 26, 2010) (approving expeditious closing timeline over the objection of a party in interest) (citation omitted).

43.     Implementing the closure of the Pennsylvania Hospitals will allow the Debtors to avoid the continued operating losses that are harmful to the Debtors and their estates, and an expedited closure will allow the Debtors to focus on stabilizing and selling their remaining operations while ensuring patient welfare.   Any interruption or delay in the Debtors' ability to close the Pennsylvania Hospital could have serious negative consequences for the Debtors' estates. Thus, it is important that the Court grant the Debtors the ability to act in the most expeditious and efficient manner possible.

44.     There is sufficient business justification for the closing of the Pennsylvania Hospitals.  Any delay in effectuating the closure of the Pennsylvania Hospitals would prejudice estate stakeholders and risk the execution of a safe and orderly closure process.   The Debtors are working in coordination with state regulators to ensure that closures are safely executed.   For the foregoing reasons, authorizing the Debtors to close the Pennsylvania Hospitals is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases.

### III.    Abandonment of the Abandoned Assets Should Be Approved.

45.    Although the Debtors will remove equipment and other items at any of the Pennsylvania Hospitals undergoing a closure if feasible and of value to the Debtors' ongoing operations, and will dispose of regulated materials (including medical waste) and transfer, store and make available patient medical records, as required by applicable law, the Debtors also request authority to abandon certain surplus, burdensome, or non-core assets—which will include any personal property remaining at any hospital on the Proposed Closure Date that the Debtors determine is not necessary for their restructuring and too difficult to remove or expensive to store, such that the economic benefits of removing or storing such remaining property would be outweighed by the attendant costs (the "Abandoned Assets").  Any landlord or other designee will be free to sell or dispose of the Abandoned Assets after the Proposed Closure Date without notice or liability to any party.  The Abandoned Assets will primarily consist of medical equipment, fixtures, furniture, and other office equipment. To the best of the Debtors' knowledge, the abandonment of the Abandoned Assets would not be in violation of any state or local statutes or regulations reasonably designed to protect the public health or safety.  Accordingly, abandonment of the Abandoned Assets as of the Proposed Closure Date should be approved.

46.    Under section 554(a) of the Bankruptcy Code, a debtor, after notice and a hearing, is authorized to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).  The right to abandon property is virtually unfettered, unless (a) abandonment of the property will contravene laws designed to protect public health and safety or (b) the property poses an imminent threat to the public's welfare. *See Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot., (In re Midlantic Nat'l Bank)*, 474 U.S. 494, 501 (1986).  Neither of these limitations is relevant under the instant facts.

47.     The proposed abandonment procedures are necessary for the efficient administration of the Debtors' estates because they provide the Debtors with a streamlined mechanism by which they can: (a) stop the accrual of expenses associated with retaining Abandoned Assets; (b) avoid the often difficult and expensive process of locating buyers for assets that are damaged or in premises that the Debtors no longer use; and (c) minimize any distraction that may result from the challenges involved in attempting to sell illiquid assets that are of inconsequential value to the Debtors' estates.

48.     For the foregoing reasons, the abandonment of the Abandoned Assets is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases and should be authorized by the Court.

## IV.   Approval of the Closing of the Pennsylvania Hospitals on Shortened and Limited Notice Is Appropriate.

49.     The notice and hearing requirements contained in section 363(b)(1) of the Bankruptcy Code are satisfied if appropriate notice and an opportunity for a hearing are given in light of the particular circumstances of a proposed transaction. *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" to mean such notice and opportunity for a hearing "as [are] appropriate in the particular circumstances").   Courts have noted that "[t]he notice requirements of bankruptcy law are 'founded in fundamental notions of procedural due process.'" *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 467 B.R. 694, 706 (S.D.N.Y. 2012) (citations omitted).   Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id*. (internal quotation marks and citations omitted).

50.     Bankruptcy Rules 2002(a)(2) and 2002(i) require that a minimum of twenty-one (21) days' notice of the proposed use of property outside the ordinary course of business be

provided by mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed under section 1102 of the Bankruptcy Code, unless a debtor shows "cause." *See* Fed. R. Bankr. P. 2002(a)(2) and (i). Once the debtor shows "cause," however, Bankruptcy Rule 2002(a)(2) authorizes this Court to shorten the generally applicable 21-day notice period and direct a method of giving notice other than by mail. *See* Fed. R. Bankr. P. 2002(a)(2). Moreover, this Court is authorized to limit notice of the proposed use of property outside of the ordinary course of a debtor's business, even without a prior showing of cause, to any official committee appointed under section 1102 of the Bankruptcy Code and any creditor or equity holder requesting notice. *See* Fed. R. Bankr. P. 2002(i).

51.     In addition, the sale, use, or transfer of property outside the ordinary course of business may be authorized without an actual hearing, if no party in interest timely requests such a hearing. *See* 11 U.S.C. § 102(1)(B)(i) (notwithstanding the statutory requirement for "notice and a hearing," the Bankruptcy Code "authorizes an act without an actual hearing if such notice is given properly and if such a hearing is not requested timely by a party in interest").

52.     Cause exists to shorten the notice period for closure of the Pennsylvania Hospitals. The Debtors have expended a significant amount of estate resources to fund the operations of the Pennsylvania Hospitals as these facilities incurred EBITDA losses of approximately $91,850,760 during the six months preceding the date hereof. The continued funding of these losses is not sustainable for the Debtors' estates. In addition, it is imperative that the Debtors have the ability to close the facilities expeditiously following announcement of such closure given the potential for disruption to patient care due to, among other things, employee departures during the closing and transition process.

53.     Based on the foregoing, sufficient cause exists to implement facility closures on shortened notice.

**V.     Section 554(a) of the Bankruptcy Code Preempts State Regulatory Timing Requirements To the Extent Such Requirements Are Not Waived.**

54.     The Closure Plan for the Pennsylvania Hospitals is consistent with the objectives of state regulations governing the sale and closure of hospitals related to patient health, privacy and safety.   The Closure Plan ensures the safe transfer or discharge of patients; the protection, transfer, and storage of medical records; and the proper disposition of pharmaceuticals, and hazardous and medical waste.    These plans and procedures will protect the health, wellbeing, and safety of the Debtors' patients and the communities the Debtors serve in a manner consistent with applicable substantive state and federal laws, regulations, and guidelines.

55.     The Debtors recognize that under current Supreme Court law, as generally applied to property subject to environmental damage, a debtor's ability to abandon property of the estate is not unlimited.   In particular, the Supreme Court held in *Midlantic Nat'l Bank v. N.J. Dept. of Env't Protection*, 474 U.S. 494, 507 (1986), that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards."    Further, a Bankruptcy Court does not have the power to authorize an abandonment "without formulating conditions that will adequately protect the public's health and safety." *Id.*

56.     This exception, however, does not cover time limits for hospital closures exceeding 30 or 60 days, as applicable, when a shorter duration safeguards patient health and safety.   "The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from *imminent and identifiable harm*."   *Id.* at 507 n.9 (emphasis added); *see also Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1185

(5th Cir. 1986). "[T]he party opposing abandonment under Midlantic has the burden to prove that. . . the property [in question] creates an imminent and identifiable harm to the public which will be aggravated by the abandonment." *United States Sec. & Exch. Comm'n v. Heartland Grp. Ventures*, LLC, 2023 WL 10554515, at *4 (N.D. Tex. Aug. 15, 2023) (quoting *In re St. Lawrence Corp.*, 239 B.R. 720, 726-27 (Bankr. D.N.J. 1999), aff'd, 248 B.R. 734 (D.N.J. 2000)).

57.      Any opposition to the closing of the Pennsylvania Hospitals on the basis of the duration of notice procedure could not meet this burden, for at least two reasons. First, the state timing requirements are not required "to protect public health or safety." For abandonment to be harmful to public health and safety, it must be demonstrated to pose a harm to public health that is both imminent and identifiable. *Heartland*, 2023 WL 10554515, at 4 (N.D. Tex. Aug. 15, 2023). Speculative harm, or the mere belief or fear of a future problem, does not constitute imminent harm to the public. *See Midlantic*, 474 U.S. at 507 n.9 (specifying that the exception does not "encompass a speculative or indeterminate future violations of such laws that may stem from abandonment"); *Heartland*, 2023 WL 10554515, at *4 ("[B]elief and fear of a future problem does not present evidence of an imminent harm to the public"). Indeed, cases find that when all known harms have been addressed by the Debtors and only speculative harms remain, no *Midlantic* issue exists. *See Heartland*, 2023 WL 10554515, at *4 (N.D. Tex. Aug. 15, 2023).

58.      Here, the shortened timelines provided for in the Closure Plan for the Pennsylvania Hospitals plainly do not undermine public health or safety. Rather, the Debtors believe that the 11-day period will provide adequate time to implement all other state law requirements to safely close the hospitals. In these circumstances, requiring hospitals to remain fully functional and operational for 30, 60, 90 or 120 days would be *detrimental* to the patient welfare at the closing hospitals. For one thing, it could lead to impractical and unsustainable operational challenges—

including severe and dangerous staffing shortages.    It is also likely that doctors, nurses, other healthcare providers and essential employees will understandably migrate to other healthcare opportunities well before the end of the extended period.    Requiring hospitals to remain fully operational in the face of dwindling healthcare and operational staffing increases, rather than mitigates, the risks to the public health.    Rather than protecting health and safety, forcing the Debtors to continue to operate closing hospitals beyond the time contemplated by the Closure Plan risks imperiling patient health and safety, especially in light of the robust protections provided for in the Closure Plan—a plan that was otherwise carefully formulated to follow state requirements as closely as possible.

59.    Second, *Midlantic* left open that Section 554 may preempt "certain state laws imposing conditions on abandonment [that] may be so onerous as to interfere with the bankruptcy adjudication itself." *Midlantic*, 474 U.S. at 507.    Indeed, courts have recognized this important limit on the *Midlantic* exception to abandonment: "[a] bankruptcy court has some discretion if precluding abandonment would be so onerous as to interfere with the bankruptcy adjudication itself." *In re ATP Oil & Gas Corp*., 2013 WL 3157567, at *4.    In such cases, "the bankruptcy court is free to formulate conditions short of full compliance with state law that will adequately protect the public's health and safety." *Atkinson*, 248 B.R. at 736 n.6.

60.    These are the precise circumstances here.    The conditions proposed by the Debtors in the Closure Plan for the Pennsylvania Hospitals more than adequately protect patients and the interests of public health and safety.    Indeed, the Debtors have a plan to address everything from patient discharge and transfer, patient confidentiality and medical records, and the disposition of medical waste.    At the same time, requiring the Pennsylvania Hospitals to remain operational for longer periods—thus prolonging the drain on the Debtors' estates without any commensurate or

measurable public health benefit—are exactly the onerous state regulations that must yield to federal bankruptcy law.

## EMERGENCY CONSIDERATION

61.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to swiftly and efficiently move forward with a value-maximizing transaction. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

**62.**     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximization process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

63.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of,

basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## NOTICE

64.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Complex Service List [Docket No. 426]; and (b) any other party entitled to notice pursuant to Bankruptcy Rule 2022.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PREVIOUS REQUEST

65.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of the page intentionally left blank]*

26

WHEREFORE, the Debtors request entry of an order substantially in the form attached hereto granting the relief requested herein and granting such other relief as is just and proper.

Dated:  March 6, 2025
Dallas, Texas

*/s/ Thomas R. Califano*
_____
**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:      (214) 981-3300
Facsimile:      (214) 981-3400
Email:          tom.califano@sidley.com
                rpatel@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:      (212) 839-5300
Facsimile:      (212) 839-5599
Email:          wcurtin@sidley.com
                pventer@sidley.com
                anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on March 6, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Thomas R. Califano*
Thomas R. Califano