FROST BROWN TODD LLP
Rebecca L. Matthews (Texas Bar No. 24062776)
2101 Cedar Springs Road, Ste. 900
Dallas, TX 75201
214-580-8608 Telephone
214-545-3473 Facsimile
E-mail: rmatthews@fbtlaw.com

Joy D. Kleisinger (Ohio Bar No. 0101993) (*pro hac vice*)
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio  45202
513-651-6800  Telephone
513-651-6981  Facsimile
E-mail jkleisinger@fbtlaw.com

*Counsel For Fifth Third Securities, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PROSPECT MEDICAL HOLDINGS, INC.,** *et al.,* [1]<br><br><br>           **Debtors.** | **Chapter 11**<br><br>**Case No. 25-80002 (SGJ)**<br><br>**(Jointly Administered)** |

**BRIEF IN SUPPORT OF**
**MOTION OF FIFTH THIRD SECURITIES, INC. FOR ALLOWANCE OF**
**ADMINISTRATIVE EXPENSE CLAIM UNDER 11 U.S.C. § 503(b)**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................................................2

     A.     Fifth Third's Engagement and Successful Execution of Sale
            Process .........................................................................................................2

     B.     The Debtors' Bankruptcy Proceedings and Proposed Rejection of
            the Agreement...............................................................................................6

BASIS FOR RELIEF....................................................................................................................9

     A.     The Subtantial Contribution Claim Satisfies the Requirements of
            Subtantial Contribution Under 11 U.S.C. § 503(b)(3)(D). ..........................9

     B.     The Substantial Contribution Claim is Actual and Necessary...................18

     C.     The Balance of Equities Require Payment of the Transaction Fee
            from the Closing as a Priority, Substantial Contribution Claim ...............20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re American Plumbing & Mechanical, Inc.*,
    327 B.R. 273 (Bankr. W.D. Tex. 2005)...................................................................................11

*In re Bayou Group, LLC*,
    431 B.R. 549 (Bankr. S.D.N.Y. 2010)...................................................................13, 14, 15, 16

*In re Consol. Bancshares, Inc.*,
    785 F.2d 1249 (5th Cir. 1986) ......................................................................................11, 12

*In re Datavon, Inc.*,
    303 B.R. 119 (Bankr. N.D. Tex. 2003)...................................................................................15

*In re DP Partners L.P.*,
    106 F.3d 667 (5th Cir. 1997), *cert. denied,* 522 U.S. 815 (1997)................................11, 12, 19

*In re Energy Partners Ltd.*,
    422 B.R. 68 (Bankr. S.D. Tex. 2009) .....................................................................................12

*In re Essential Therapeutics, Inc.*,
    308 B.R. 170 (Bankr. D. Del. 2004) ......................................................................................13

*Lebron v. Mechem Fin.*,
    27 F.3d 937, 945 (3d Cir. 1994)............................................................................13, 14, 15, 16

*In re Lister*,
    846 F.2d 55, 57 (10th Cir. 1988) ...........................................................................................13

*In re Med General, Inc.*,
    17 B.R. 13, 14 (Bankr. D. Minn. 1981) .................................................................................12

*In re Mirant*,
    354 B.R. 113 (Bankr. N.D. Tex 2006).....................................................................................12

*In re Kidron, Inc.*,
    278 B.R. 626 (Bankr. M.D. Fla. 2002) ...................................................................................15

*Randolph v. Scruggs*,
    190 U.S. 533 (1903)..............................................................................................................12

*In re Russell Transfer, Inc.*,
    59 B.R. 871 (Bankr. W.D. Va. 1986) .....................................................................................15

**Statutes**

11 U.S.C. § 503(b)(3)(D)............................................................................................................*ibid*

**BRIEF IN SUPPORT OF**
**MOTION OF FIFTH THIRD SECURITIES, INC. FOR ALLOWANCE OF**
**ADMINISTRATIVE EXPENSE CLAIM UNDER 11 U.S.C. § 503(b)**

Fifth Third Securities, Inc., successor by merger to H2C Securities, Inc. ("Fifth Third"), by its undersigned counsel, Frost Brown Todd LLP, files this brief in support of its *Motion of Fifth Third Securities, Inc. for Allowance of Administrative Expense Claim under 11 U.S.C. § 503(b)* (this brief and the motion are collectively the "Motion") for allowance of an administrative expense claim under sections 503(b) and 503(b)(3)(D) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the chapter 11 cases of the above referenced debtors and debtors in possession (the "Debtors") and for such other and further relief as set forth in the Motion. In support of this Motion, Fifth Third submits the *Declaration of Jordan Lenning in Support of Fifth Third Securities, Inc.'s Motion for Allowance of Administrative Expense Claim Under 11 U.S.C. § 503(b)* (the "Lenning Declaration") attached hereto as **Exhibit A** and the *Declaration of Ben Mingle, CEO and President of Centurion Foundation, Inc., in Support of Fifth Third Securities, Inc.'s Motion for Allowance of Administrative Expense Claim Under 11 U.S.C. § 503(b)* (the "Mingle Declaration") attached hereto as **Exhibit B** and respectfully states as follows:

**PRELIMINARY STATEMENT[2]**

1.      Fifth Third seeks administrative priority for fees and expenses earned in connection with Fifth Third's successful efforts to market and sell the Debtors' RI Assets.  As the Debtors well know, Fifth Third's tireless efforts over the course of several years ultimately culminated in the identification of purchaser Centurion and a Court-approved sale, which will provide critical funding necessary to further the Debtors' stated primary goals of ensuring patient care, transitioning these facilities, preserving value and providing creditors with a forum to assert their

---

[2] Any capitalized term not otherwise defined in this Preliminary Statement shall have the meaning attributed to it in the remainder of the Motion.

rights. *See* Transcript of January 14, 2025 Hearing (the "First Day Transcript"), at 24:6-9.[3] As more fully discussed herein, Fifth Third served as the Debtors' exclusive investment banker with respect to the RI Assets and provided investment banking services over the course of four years to achieve this result. The Debtors should not be permitted to now close on the sale and reap the benefits of that transaction without compensating Fifth Third for its impactful work.  Indeed, as indicated by the Purchaser itself, without Fifth Third's efforts, Centurion would not have come to be the Purchaser for these assets.  *See* Mingle Declaration at ¶ 19.  Accordingly, given Fifth Third has directly and significantly facilitated a sale that benefits the Debtors' estate and all parties in interest, Fifth Third's unpaid fees and expenses are allowable as a substantial contribution under Sections 503(b) and 503(b)(3)(D) of the Bankruptcy Code.

## JURISDICTION AND VENUE

2.      On January 11, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

3.      This Court has jurisdiction over these chapter 11 cases under 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of this proceeding and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory basis for the relief requested in this Motion is Section 503(b), and in particular subsection 503(b)(3)(D), of the Bankruptcy Code.

## RELIEF REQUESTED

5.      By this Motion, Fifth Third seeks, pursuant to section 503(b)(3)(D) of the Bankruptcy Code, allowance of an administrative expense claim in the amount of

---

[3] Relevant excerpts of the First Day Transcript have been attached hereto as **Exhibit C**.

(i) approximately $5,000,000.00 representing the Transaction Fee (as defined herein), [4] plus (ii) amounts incurred and to be incurred on account of this Motion and the prosecution of Fifth Third's rights in these chapter 11 cases (together, the "Substantial Contribution Claim").

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Fifth Third's Engagement and Successful Execution of Sale Process

6.    Prior to the Petition Date, on March 10, 2021, the Debtors and Fifth Third entered into that certain Engagement Letter (the "Agreement"), pursuant to which the Debtors engaged Fifth Third to serve as its "exclusive[5] investment banker and financial advisor" with respect to the marketing and sale of the Debtors' Rhode Island business (the "RI Assets" or "Purchased Assets"). A true and correct copy of the Agreement is attached to the Lenning Declaration as Exhibit 1.

7.    As the Debtors' exclusive investment banker and financial advisor, Fifth Third not only canvased the market and ultimately introduced the Debtors to proposed purchaser Centurion Foundation, Inc. ("Centurion"), with whom Fifth Third had a long-standing relationship, but also provided, *inter alia*, marketing strategy advice, financial modeling, evaluation and analysis of purchase offers, negotiation of financial provisions with proposed purchasers, due diligence services, and assisted with necessary regulatory approvals, related amendments to the purchase agreement and various closing-related tasks in connection with the sale of the Purchased Assets over the course of multiple years (collectively, the "Services"). *See* Agreement, § 1(a)-(m).

8.    The Agreement sets forth a Fee Schedule detailing the fees owed to Fifth Third throughout the course of the engagement (the "Fee Schedule"). Agreement, § 2. The Fee Schedule contemplates "Work Fees" comprised of the following: (a) a nonrefundable $50,000 retainer fee (the "Retainer"); (b) a $200,000 Report Fee upon Fifth Third's delivery of a Market Assessment

---

[4] Subject to final calculation and discussion with Debtors' counsel regarding the final transaction numbers.

[5] *See* Agreement, § 7.

Report (the "Report Fee"); and (c) milestone fee(s) in the amount of $100,000 upon the execution

of a Definitive Agreement regarding a Transaction (the "Milestone Fee"). *Id.* These fees were all

timely paid as further set forth in the Lenning Declaration.

9.      Separate and apart from the Work Fees, and in recognition of the significant

additional work that would be required of Fifth Third *after* payment of the Milestone Fee, the Fee

Schedule provides that "[u]pon the consummation of any Transaction, the fees outlined in this

Section 2(b) shall be paid by the [the Debtors] to [Fifth Third] as the Transaction Fee." Agreement,

§ 2(b). The Transaction Fee is calculated as follows:

> To the extent the Company consummates a Transaction, a Transaction Fee will be
> due to [Fifth Third] upon the consummation of that Transaction in any amount
> equal to 3.00% of the Transaction Value  up to and including $125 million; plus
> 4.00% of the Transaction Value in excess of $125 million; minus the amount of any
> Work Fees paid or due pursuant to Section 2.a above provided that the Transaction
> Fee shall in no event be less than $1,250,000 ("Minimum Fee").  For the avoidance
> of doubt, the Minimum Fee shall be an aggregate amount for all Transactions, or
> parts thereof, that may be covered by the terms of this Agreement.

Agreement, § 2(b).[6]

10.      Importantly, the Agreement includes a "Tail Provision" providing that if at any time

prior to the twelve (12) month anniversary of the termination of the Agreement the Debtor

consummates a transaction, or enters into a definitive agreement or "Transaction Commitment"

that subsequently results in a transaction "where the other party thereto was located or otherwise

engaged in discussions with H2C regarding a potential Transaction during the term of this

Agreement" being consummated, "***H2C will be entitled to payment in full of the Transaction Fee***

***described in Section 2 of this Agreement upon the consummation of the Transaction.***"

Agreement, § 4.

---

[6] The Agreement also makes clear that "No fee payable by the Company to any other advisor to the Company or any
other person or entity in connection with any Transaction or the subject matter of this Agreement shall reduce or
otherwise affect any fee payable to [Fifth Third] hereunder." Agreement, § 2(c).

11.     Given the Debtors' desired goals of transferring the RI Assets to a not-for-profit entity, Fifth Third first focused on not-for-profit mid to large sized hospitals and health systems with a current presence in the Northeast or Mid-Atlantic and an anticipated desire to be in New England and, specifically, Rhode Island. Lenning Decl. at ¶ 9. After the initial focus on not-for-profit hospitals and health systems resulted in no signed letters of intent, Fifth Third pivoted and added not-for-profit foundations to serve as potential purchasers and/or managers of the RI Assets. *Id.* With these parameters, and after significant investment and hard work, Fifth Third narrowed the potential interested purchasers down to twenty-six (26) entities (collectively, the "Potential Purchasers").

12.     At all times, Fifth Third was responsible for identifying a purchaser, and negotiating and securing a letter of intent with that purchaser. As a direct result of Fifth Third's continued efforts, on November 18, 2022, the Debtors and Centurion entered into that certain Asset Purchase Agreement (the "Original Centurion APA") for the purchase of the RI Assets (the "Transaction"). Mingle Decl. at ¶ 11. A true and correct copy of the Original Centurion APA is attached to the Mingle Declaration as Exhibit 1. In recognition of those efforts, in March of 2023 after the Original Centurion APA, as amended, was finalized the Debtors paid Fifth Third the Milestone Fee of $100,000.00. Lenning Decl. at ¶ 18.  Section 3.19 of the Original Centurion APA provides that aside from Fifth Third, there are no other parties entitled to "broker's, finder's or similar fees or commissions in connection with [the Transaction]."  Original Centurion APA, § 3.19; Schedule 3.19; *see also* Mingle Decl. at ¶ 17.

13.     However, Fifth Third's work pursuant to the Agreement was far from done at that juncture.  As further set forth in the Lenning Declaration, Fifth Third has worked *hundreds* of hours since March of 2023 to accomplish this sale but has not received any payments from the Debtor since payment of the Milestone Fee. For example, Fifth Third provided substantial

5

assistance and services in order to obtain necessary regulatory approvals. Lenning Decl. at ¶ 15. Fifth Third worked tirelessly with the regulatory authorities in compiling marketing materials and feedback from potential acquirers from the marketing exercise, and developing the proceeds, networking capital, and funds flow analysis. Lenning Decl. at ¶ 15. Indeed, Bill Hanlon, Managing Director of Fifth Third, who is now retired, testified during a hearing for the Rhode Island Attorney General on why the Centurion transaction was the most compelling solution for the Purchased Assets. Lenning Decl. at ¶ 15; Mingle Decl. at ¶ 13. Fifth Third continued to assist with respect to compiling responses to regulatory questions as recently as the last four (4) months and achieved final regulatory approval in November 2024, prior to retention of the Debtors' new investment banker. Lenning Decl. at ¶ 15.

14. In addition to the Services associated with obtaining regulatory approvals, Fifth Third has continued to play a substantive and meaningful role in consummating the Transaction. Fifth Third assisted in meeting closing conditions and participated in weekly calls as recently as the first week of January 2025, immediately prior to the Debtors' bankruptcy filings. Lenning Decl. at ¶ 20. Further, Fifth Third not only established and maintained the data room (including post-petition), but was still responding to requests for information on a post-petition basis up until mere days before the sale hearing. Mingle Decl. at ¶ 18. The data room was in fact still being used by the Debtors and the Purchaser after the approval of the sale of the RI Assets and was accessed as recently as March 5, 2025. Lenning Decl. at ¶ 23. Notwithstanding continued use of the Fifth Third data room for the estate's benefit, on February 18, 2025, the Debtors purported to reject Fifth Third's Agreement as of February 19, 2025, as more fully detailed below.

15. As set forth in the Mingle Declaration, without the efforts of Fifth Third, Centurion would not have been introduced to Prospect, nor committed to or otherwise ever sought to purchase the RI Assets. Mingle Decl. at ¶¶ 5-6, 19.

**B.      *The Debtors' Bankruptcy Proceedings and Proposed Rejection of the Agreement***

16.      From the outset of these proceedings, the Debtors have emphasized the critical importance of the sale of the RI Assets.  At the First Day hearing on January 14, 2025, the Debtors acknowledged being "under an agreement since 2022 with an entity called Centurion for the transfer of these hospitals" and that they simply "have converted that prepetition agreement into a Section 363 sale agreement."  First Day Transcript at 19:12-17.  Mr. Neimann of Houlihan Lokey testified to the "$80-million-dollar deal with Centurion" as appearing to be on track and just needing to be conformed to a 363 process. *Id*. at 89:8-15.  Mr. Rundell, the Debtors' Chief Restructuring Officer observed, however, that the Debtors' burn rate would be "astronomically higher" if they had to shut Rhode Island down (if the sale were to fall through). *Id*. at 57:11-17.[7] As further acknowledged by the Debtors, "Rhode Island is also a hospital that loses money and has had issues.  It's also a safety-net hospital system." *Id*. at 19:20-22. As testified by Mr. Rundell, safety net hospitals means "they're typically the only hospital within a certain region within a city, and the ability to get care, while there might be another hospital, you know, 20, 30, 40 minutes away, somebody has deemed that they're incredibly important to that area, to that community, and that's why they're called a safety-net hospital." *Id*. at 42:21-43:2. Perhaps for these reasons, and to ensure the seamless continuation of the sale process knowing the Debtors would eventually attempt to avoid paying for such services, the Debtors and their counsel did not respond to repeated inquiries from Fifth Third as to how they would be retained and continued to utilize Fifth Third's services for weeks post-petition. Relying on the Debtors' requests for assistance, Fifth Third continued to perform consistent with the Agreement.

---

[7] Mr. Neimann similarly testified, "Healthcare receivables are tough enough to collect in a going concern; even more difficult in liquidation. So whatever the recovery value is going concern, it's going to be significantly less in our estimate in a liquidation."  First Day Transcript at 91:19-22.

17.     On January 29, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 305] (the "OCP Motion"). In the OCP Motion, the Debtors averred that they "employ various attorneys, accountants, advisors, actuaries, and other professionals in the ordinary course of their business" (collectively, the "OCPs"). OCP Motion at ¶ 8. The OCP Motion identifies a "nonexclusive list" of 46 of the Debtors' current OCPs (the "OCP List"). The OCP Motion asserts that the "continued employment and compensation of the OCPs *is in the best interests of the Debtors' estates, their creditors, and other parties in interest*…[because] the OCPs have significant knowledge, expertise, and familiarity with the Debtors and their operations." *Id.* at ¶ 9 (emphasis added). Subject to an OCP complying with certain disclosure and reporting requirements, the Debtors are authorized to pay one hundred percent (100%) of the OCPs fees and expenses (subject to certain caps) in the ordinary course of business without a formal application to this Court. Fifth Third was not included on the OCP List.[8]

18.     On February 3, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving and Authorizing (A) the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets Free and Clear of Interests, (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) the Assignment of Certain Permits; and (II) Granting Related Relief* [Docket No. 349] (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors sought approval of the sale of the RI Assets to Centurion (the "RI Sale") on substantially the same terms negotiated with the assistance of Fifth Third. The Debtors again emphasized the critical importance of this sale: "As the Debtors have made clear herein and through these chapter 11 cases, failing to consummate the Sale Transaction would prove devastating to the Debtors' patients

---

[8] The OCP Motion was granted by this Court on February 12, 2025 [Docket No. 612].

relying on the Debtors for care and would severely compromise the Debtors' ability to preserve the value of their remaining assets for the benefit of their stakeholders." *Id.* at ¶ 34.

19.     On February 10, 2025, Fifth Third filed its *Limited Objection to the Sale Motion* [Docket No. 530] (the "Limited Objection").  While Fifth Third of course supported and continues to support the sale, the Limited Objection highlighted the lack of transparency in the Sale Motion regarding Fifth Third's role in connection with effectuating the sale to Centurion and sought payment of the Transaction Fee at the closing of the sale of the RI Assets, in accordance with the terms of the Agreement.[9]  Despite repeated outreach in the weeks prior to the sale hearing, only the evening prior to the sale hearing did the Debtors substantively respond, finally advising Fifth Third that they intended to reject the Agreement.

20.     On February 12, 2025, while not making any determination as to Fifth Third's claim, the Court approved the sale of the Rhode Island business.  *See Order Approving and Authorizing (A) the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets Free and Clear of Interests, (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) the Assignment of Certain Permits; and (II) Granting Related Relief* [Docket No. 606] (the "Sale Order"). The Sale Order approved the form of the Asset Purchase Agreement accompanying the Sale Motion (the "Approved APA"), which contained substantially the same terms included in the Original Centurion APA, with *one notable distinction*: the removal of payment of the Transaction Fee to Fifth Third. Unchanged, however, is the fact that the RI Sale still boasts an impressive $80,000,000.00 Purchase Price and allows the Debtors to avoid incurring further losses associated with the RI Assets. Sale Motion at Exh. A, pg. 60 of 143.

---

[9] Fifth Third also raised concerns about a potential conflict of interest, as further discussed herein.

21.     On February 18, 2025, more than five weeks after the Petition Date and one week after entry of the Sale Order, the Debtors filed the *Notice of Rejection of Executory Contracts and Leases* [Docket No. 709] (the "<u>Rejection Notice</u>"), which lists the Agreement as a contract to be rejected. The Rejection Notice requested that the proposed effective date of rejection of the Agreement be February 19, 2025, just weeks before the proposed closing of the sale of the Rhode Island business to Centurion. On March 3, 2025, Fifth Third filed its Objection to the Rejection Notice [Docket No. 840] (the "<u>Rejection Objection</u>").

22.     As set forth above, the Transaction Fee is payable to Fifth Third upon closing of the sale of the RI Assets. By the Rejection Notice, the Debtors attempt to avoid payment of the Transaction Fee, or indeed any further compensation to Fifth Third on account of its facilitation of this critical sale of the RI Assets. Accordingly, in conjunction with its Rejection Objection, Fifth Third is compelled to file this Motion to ensure payment for its efforts and ultimate success in obtaining a purchaser for the RI Assets, which culminated in this Court's entry of the Sale Order.

## **BASIS FOR RELIEF**

**A.     *The Substantial Contribution Claim Satisfies the Requirements of Substantial Contribution Under 11 U.S.C. § 503(b)(3)(D)***

23.     Section 503(b) of the Bankruptcy Code provides in relevant part:

After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including –

. . .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by –

. . .

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; . . .

11 U.S.C. § 503(b)(3)(D).

24.     Section 503(b)(3)(D) expressly provides for the allowance of "actual, necessary expenses" incurred by "a creditor" "in making a substantial contribution in a case under" chapter 11 as an administrative expense. *Id*. Among other things, these provisions "promote meaningful . . . participation in the reorganization process." *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986) (quoting *In re Gen. Oil Distribs.*, 51 B.R. 794, 805 (Bankr. E.D.N.Y. 1985)). Since "substantial contribution" is not defined in the Bankruptcy Code, courts have typically referred to a substantial contribution as (1) a contribution that results in "significant and tangible" or "concrete benefit" to the estate; (2) contribution that "confers a direct, significant and demonstratively positive benefit upon the estate"; or (3) contribution that "lead[s] directly to tangible benefits to the creditors, debtor or the estate[.]" *In re American Plumbing & Mechanical, Inc.*, 327 B.R. 273, 280 (Bankr. W.D. Tex. 2005) (citing *In re Alumni Hotel Corp.*, 203 B.R. 624, 631 (Bankr. E.D. Mich. 1996)).  The United States Court of Appeals for the Fifth Circuit has further interpreted that term to mean a contribution that is "considerable in amount, value or worth." *In re DP Partners L.P.*, 106 F.3d 667, 672-73 (5th Cir. 1997), cert. denied, 522 U.S. 815 (1997). "[S]ervices which make a substantial contribution are those which foster and enhance, rather than retard or interrupt the process of reorganization." *Id.* (quoting *In re Consol. Bancshares, Inc.*, 785 F.2d at 1253). In the Fifth Circuit, courts can consider the following factors to determine whether the applicant is entitled to a substantial contribution claim:

(1) whether the services involved in the contribution provided a benefit to the estate;

(2) whether the services involved in the contribution were undertaken just for the applicant alone or for the benefit of all parties in the case;

(3) whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate;

(4) whether the benefit conferred through the applicant's contribution exceeds the cost which the applicant seeks to assess against the estate;

(5) whether the efforts of the applicant were duplicative of efforts undertaken by statutory fiduciaries;

(6) whether the applicant profited from the situation or rather faced substantial loss if it had not undertaken the approach that it did; and

(7) whether the applicant had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some fashion in which caused the debtor to incur costs or which delayed resolution of the case.

*In re Mirant*, 354 B.R. 113, 132-35 (Bankr. N.D. Tex 2006). This Court is afforded "broad discretion" in determining "whether an applicant has provided a substantial contribution." *In re Energy Partners, Ltd.*, 422 B.R. 68, 80 (Bankr. S.D. Tex. 2009) (citing *In re Consol. Bancshares*, 785 F.2d at 1253) (in considering whether services constitute a substantial contribution, courts have considered whether these services provided a benefit to the estate); *see also In re DP Partners Ltd.*, 106 F.3d at 673 ("The development of a more concrete standard of substantial contribution is best left on a case-by-case basis.").

25.     In addition, courts for many years have recognized that prepetition activities conferring a benefit on the bankruptcy estate may also be entitled to postpetition administrative expense treatment. *See Randolph v. Scruggs*, 190 U.S. 533 (1903) (holding that a claim for prepetition professional services incurred by an assignee of an assignment for the benefit of creditors could be allowed and paid as a "preferential claim" so long as the services were beneficial to the bankruptcy estate); *In re Med General, Inc.*, 17 B.R. 13, 14 (Bankr. D. Minn. 1981) ("shortly after the inception of the modern Bankruptcy Act," the Supreme Court held in *Randolph v. Scruggs* "that pre-petition activities which directly benefited or tended to preserve the estate of the debtor could claim entitlement to treatment as expense of administration."); 11 U.S.C. § 503, Legislative Statements (referencing *Randolph v. Scruggs* and its precedent "accord[ing] administrative expense status to services rendered by a prepetition custodian or other party to the extent such services actually benefit the estate."). Similarly, prepetition expenses constituting a "substantial contribution" may be allowed as administrative expenses under 11 U.S.C. §§ 503(b)(3)(D) and

12

503(b)(4). *See*, *e.g.*, *Lebron v. Mechem Fin.*, 27 F.3d 937, 945 (3d Cir. 1994) ("we conclude that, if the substantial contribution test is met, expenses incurred by a creditor prior to the filing of a chapter 11 petition, or while a chapter 11 case is pending, are recoverable pursuant to § 503(b)(3)(D)"); *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988) ("Administrative expenses incurred prior to the filing of a bankruptcy petition are compensable under 11 U.S.C. § 503(b)(3)(D), if those expenses are incurred in efforts which were intended to benefit, and which did directly benefit, the bankruptcy estate.").[10]

26.    One focus for whether prepetition activity can give rise to a section 503(b)(3)(D) claim is whether a benefit accrued postpetition even if the efforts occurred prepetition. *In re Essential Therapeutics, Inc*., 308 B.R. 170, 175 (Bankr. D. Del. 2004) ("Although pre-petition expenses may be recoverable as an administrative expense under section 503(b), the applicant must establish that the pre-petition efforts resulted in a substantial contribution to the estate post-petition."); *see also*, *In re Bayou Group, LLC*, 431 B.R. 549, 558-59 (Bankr. S.D.N.Y. 2010) ("it has been held that the language of section 503(b)(3)(D) is, by its plain terms, applicable not only to postpetition activity but also to prepetition activity…. 'It is the 'substantial contribution,' not the activity, that must occur 'in a case' under chapter 11, and the [contrary] argument assumes that activities conducted and expenses incurred before the filing of a chapter 11 petition cannot substantially contribute to the reorganization efforts during the pendency of a chapter 11 case' when, in fact, they can.").

27.    Fifth Third's Substantial Contribution Claim satisfies all requirements for allowance as a substantial contribution claim under section 503(b)(3)(D).

---

[10] Numerous courts have found that substantial contribution claims are allowable for prepetition activity. *See In re; Alert Holdings, Inc.*, 157 B.R. 753, 758 (Bankr.S.D.N.Y.1993); *In re Financial News Network Inc.*, 134 B.R. 732, 736 (Bankr.S.D.N.Y.1991); *In re Texaco, Inc.*, 90 B.R. 622, 630–631 (Bankr.S.D.N.Y.1988); *In re Valley Isle Broadcasting, Ltd.*, 56 B.R. 505, 506 (Bankr.D.Hawaii 1985); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 572 (Bankr.D.Utah 1985).

28.     _First_, these chapter 11 cases were filed under chapter 11 of the Bankruptcy Code.

29.     _Second_, Fifth Third is a creditor of the Debtors.[11] Under the Bankruptcy Code, a creditor is any party "that has a claim against the debtor that arose at the time of or before the" Petition Date. 11 U.S.C. § 101(10). The Bankruptcy Code defines a "claim" as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). The Substantial Contribution Claim arises from investment banking services rendered and expenses incurred in marketing the Debtors' RI Assets and facilitating the sale to Centurion. Fifth Third provided substantial services for which it has a right to payment and the Debtors remain obligated to pay the outstanding Transaction Fee upon closing of the sale of the RI Assets pursuant to the Agreement.[12]

30.     _Third_, Fifth Third's efforts to bring Centurion to the table and facilitate the sale of the RI Assets undeniably resulted in significant benefits to the Debtors, their bankruptcy estates, and other creditors and parties in interest in these cases.

31.     _Lebron v. Mechem Fin._ and _In re Bayou Group, LLC_ (cited above) offer helpful guidance.  These cases both involved parties who expended significant prepetition time and effort investigating the debtors' prepetition business affairs and identifying assets of the bankruptcy estate. Further, in both cases, the parties turned over their work product, which yielded substantial benefit to the bankruptcy estate. _Lebron v. Mechem Fin._ involved a prepetition creditor who, after

---

[11] Curiously, however, as noted at the hearing on the Sale Motion, it appears Debtors' counsel did not include H2C or Fifth Third as potential creditors, parties in interest or even as "other professionals" as part of its conflicts process. _See Declaration of Thomas R. Califano in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession Effective as of the Petition Date_, Docket No. 308-2. As further discussed below, these disclosures have not been amended.

[12] In fact, under the Agreement's Tail Provision, even if they belatedly seek to reject the Agreement now that the sale is approved and on the brink of closing, the Debtors became obligated to pay Fifth Third the Transaction Fee at closing when they entered into the Approved APA and secured entry of the Sale Order.

the appointment of a chapter 11 trustee, "gave the trustee all of the information that he had gathered during his pre-bankruptcy petition legal actions against" the debtor and an insider, which information "was critical to the Court" and "also assisted the [t]rustee in the subsequent collection of assets for the benefit of the creditors of the estate." *Lebron v. Mechem Fin.*, 27 F.3d at 941-42. In *In re Bayou Group, LLC*, an unofficial committee laid the groundwork for the chapter 11 case by moving in state court, prior to the bankruptcy, for the appointment of a receiver over the debtors with express authority to file the debtors for bankruptcy. *See In re Bayou Group, LLC*, 431 B.R. at. at 554-56. Once appointed, the receiver filed the debtors for chapter 11 bankruptcy. *Id*. The unofficial committee "shared its legal research of potential claims" with this receiver, which claims "ultimately resulted in most of the assets comprising the estate and funding the [d]ebtors' confirmed chapter 11 plan." *Id*. at 556, 565. This unofficial committee also made arrangements for "the preliminary financing commitment that served as the basis for debtor in possession financing once" the debtors filed under chapter 11. *Id*. at 556.

32.     Courts have also found that both pre- and post-petition contributions to a sale process can be the basis for a section 503(b)(3)(D) claim, including in the Northern District of Texas. *See In re Datavon, Inc.,* 303 B.R. 119, 122 (Bankr. N.D. Tex. 2003); *see also*, *In re Russell Transfer, Inc.*, 59 B.R. 871, 873 (Bankr. W.D. Va. 1986) (finding that prepetition work which resulted in a postpetition sale can give rise to a substantial contribution claim). In *Russell Transfer*, the Court found a prepetition substantial contribution claim even when the line between the activity and the post-petition sale was "indirect." *Id*. Similarly, another case found that an unsuccessful bidder had a substantial contribution claim because it had "compell[ed] the flow of due diligence" during the sale process – something Fifth Third indisputably did here. *In re Kidron, Inc*., 278 B.R. 626, 633 (Bankr. M.D. Fla. 2002) ("[W]here special or unusual circumstances are present and the unsuccessful bidder directly contributes to the sales process as necessitated by circumstances

resulting in a demonstrable benefit to the estate, then such expenses should be allowed as administrative expenses under section 503(b)(3)(D)."). If an unsuccessful bidder can have a section 503(b)(3)(D) claim for facilitating due diligence, surely the actual investment bank leading the sales process can.

33.     Since its initial engagement Fifth Third's goal has been to pursue a value-maximizing transaction for the Debtors.  Far in excess of the efforts of the claimants in the cases above, Fifth Third expended extensive prepetition time and effort, and worked diligently for years to pursue a value-maximizing transaction for the Debtors in facilitating the sale of the RI Assets to Centurion. The undeniable benefit to the estate is a Court-approved sale that is going to bring millions into the estate without the expense of having to run a potentially unsuccessful post-petition 363 sales process[13] (not to mention the collateral benefits of facilitating continuous patient care and avoiding the other negative consequences of the continued drain on the Debtors' limited resources or the potential closure of facilities).[14]  As more fully set forth in the Lenning Declaration and Mingle Declaration, Fifth Third provided substantial, valuable investment banking advice and services to the Debtors that directly benefit the Debtors via continued funding and administration of these chapter 11 cases. Also like the claimants in *Lebron* and *In re Bayou Group*, Fifth Third not only shared all of its work product, insider and historical knowledge and access to the virtual database with the Debtors' new professionals retained at the eleventh hour, but indeed, continued

---

[13] Indeed, the Debtors have acknowledged they are unaware of *any* alternative purchaser for the RI Assets. *See* Debtors' First Day Presentation, Docket No. 41, at ¶ 80.("Prospect has been pursuing sale options for its Rhode Island assets for years, and Centurion is the only party to have emerged as a potential purchaser.").

[14] In the Sale Motion, the Debtors stated point blank that the sale of the RI Assets is "critical to the success of these chapter 11 cases. Without a sale of the Purchased Assets … the Debtors may have no choice but to cease operations and terminate employees." Sale Mot. at ¶ 1. Additionally, at the First Day Hearing Mr. Rundell stated that very morning the Rhode Island hospital "had to push some surgeries and procedures because we have some vendors that needed to be cash in advance." First Day Transcript at 48:23-49:3. Mr. Rundell further testified that vendors would not continue to do business with the Debtors "because they're waiting on to see whether we have the wherewithal not just to pay them for this week but that we could pay them the week after that and for the entirety of the case, because they just are – they're living in an administratively-insolvent vendor case right now." *Id*.

to cooperate, assist and answer questions post-petition, including those being posed by other constituents to the case, in efforts to facilitate the sale.

34.    _Fourth_, as discussed above, in this case, the line between Fifth Third's pre- and post-petition activity and the post-petition benefit to the Debtors couldn't be more direct.  Fifth Third's years' long efforts culminating in this Court's entry of the Sale Order has resulted in an indisputably direct, substantial, and meaningful benefit to the Debtors' bankruptcy estates.

35.    Time and again the Debtors have acknowledged the critical nature of the sale of the RI Assets.  Yet, there would be no RI Sale for this Court to approve without the contributions of Fifth Third and the Debtors' estates would be significantly disadvantaged by the corresponding lack of funds to administer these chapter 11 cases. _See_ Mingle Decl. at ¶ 12. As noted above, Centurion would not have considered purchasing the RI Assets without the work and dedication of Fifth Third in bringing Centurion to the table and facilitating the transaction. _See generally,_ Mingle Decl.. Perhaps even more puzzling is why the Debtors would seek to employ dozens of OCPs,[15] pay a new investment banker millions in fees (but not Fifth Third)[16] and now will likely need to retain additional conflicts counsel who will inevitably incur fees and expenses getting up to speed to deal with this issue on the eve of the sale closing[17] – all at significant expense to the estate and its creditors – rather than simply paying Fifth Third (or even engaging in negotiations

---

[15] The OCPs are also being paid for pre-petition services. OCP Motion at ¶ 9. In other pleadings, the Debtors have referenced the fundamental tenet of bankruptcy law that similarly situated creditors should be treated equally (_see, e.g._, _Debtors' Objection to Motion of Jones Medical Building LLC for an Order Compelling Immediate Payment of Post-Petition Rent_ [Docket No. 1194] at ¶ 1), but have refused to even engage with Fifth Third on why it is being treated differently from every other professional in this case.

[16] _See Order Authorizing Retention and Employment of Houlihan Lokey Capital, Inc. as Investment Banker to the Debtors as of the Petition Date_ [Docket No. 726].

[17] Despite Fifth Third's counsel raising conflicts concerns on the record at the February 12, 2025 hearing, and the Court making note of the potential need for the Debtors to amend their disclosures on the docket (_see_ Docket No. 646), Debtors' counsel still has not amended their disclosures to list the numerous matters for which they represent Fifth Third. Fifth Third's pre-existing engagement letters with Debtors' counsel provide that the firm will not undertake any representation that would result in an actual or potential conflict of interest.  Certainly, there is now an actual conflict of interest between the Debtors and Fifth Third.

concerning) the agreed upon Transaction Fee for its valuable contribution, as is clearly permissible under relevant case law.[18]

36. Finally, given the long line of authority allowing administrative expense priority for substantial contributions not only for a creditor's postpetition activity but also prepetition activity that results in a substantial contribution in a chapter 11 proceeding, it is irrelevant whether it was Fifth Third's hard work over the last several years, the continued provision of investment banking services and assistance post-petition pursuant to the Agreement, and/or some combination of the two that resulted in the approval and closure of the RI Sale during the pendency of this case. Either way, it is beyond dispute that Fifth Third's hard work resulted in the "critical" sale to Centurion and a corresponding significant benefit to the estate and all parties in interest.

## B. *The Substantial Contribution Claim is Actual and Necessary*

37. In accordance with Section 503(b)(3)(D) of the Bankruptcy Code, the fees and expenses comprising the Substantial Contribution Claim are actual and necessary and should be allowed as an administrative expense under Section 503(b). The Substantial Contribution Claim is further fair and reasonable given (a) the time expended, (b) the nature and extent of the services rendered, (c) the value of such services, (d) the costs of comparable services other than in a case under this title, and (e) the results obtained.[19]

---

[18] *In re McDermott International, Inc.*, 614 B.R. 244, 254-55 (Bankr. S.D. Tex. 2020) (allowing payment of the financial advisors' success fee contained in pre-petition engagement letter on a final basis); *see also*, *In re Intelogic Trace, Inc.*, 188 B.R. 557, 558 (Bankr. W. D. Tex. 1995) (approving a "success fee" payable upon the sale of substantially all of the assets of the enterprise as an actual, necessary expense). Courts routinely award success fees or enhanced fees or bonuses for approved, retained estate professionals, similar to the Transaction Fee at issue here. It is unclear why the Debtors would pursue an alternative but also expensive path necessitating the retention of additional legal counsel and even proposing a potential success fee to a new investment banker retained mere months ago.

[19] Notably, Fifth Third's request does not circumvent Sections 327 and 330 of the Bankruptcy Code. Despite initial hopes that it would be retained by the Debtors, Fifth Third is neither proposed investment banker to the Debtors nor is seeking retention as a professional to a debtor-in-possession in a chapter 11 bankruptcy. Likewise, Fifth Third is not a postpetition professional attempting to preserve a prepetition debt in violation of the disinterestedness standard of 11 U.S.C §§ 101(14) and 327(a) (or otherwise circumventing Section 330(a)). Rather, Fifth Third is a creditor

38.   _Time and Efforts Required._ Fifth Third devoted four years working tirelessly to obtain a meaningful result for the Debtors and the ultimate sale of the RI Assets. In connection with these efforts, Fifth Third easily expended _hundreds_ of man hours and incurred necessary expenses to obtain the result reflected in the Sale Order. Lenning Declaration at ¶ 8, 9, 16.

39.   _Value of Services Provided._ The expenses incurred, _i.e._, the Transaction Fee, were reasonable, actual and necessary to advising the Debtors and obtaining a purchaser for the RI Assets (and all related Services).[20] Furthermore, the Services were beneficial to the Debtors, their respective bankruptcy estates and all creditors and parties in interest, as already discussed above. Put simply, Fifth Third's efforts enabled the Debtors to proceed with the administration of these chapter 11 cases and will result in a significant and necessary cash infusion into the estates upon closing of the RI Sale.

40.   The Fifth Circuit has stated that in assessing whether an applicant has provided a substantial contribution, the bankruptcy court "[a]t a minimum . . . should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate." _In re DP Partners_, 106 F.3d at 673. In this case, Fifth Third seeks to recover approximately $5 million, _i.e._, the Transaction Fee provided for under the Agreement. This sum represents a small percentage of the total recovery for the Debtors and their creditors resulting from the RI Sale that Fifth Third played a critical role in facilitating. While payment of the Transaction Fee does come out of the total $80 million dollar purchase price for the RI Assets, the benefits of the RI Sale (both the cash infusion into the

---

whose substantial contributions directly facilitated the administration and continuation of these chapter 11 cases. Accordingly, Sections 327(a) and 330(a) do not apply to Fifth Third in this case.

[20] To contextualize the Transaction Fee within the economics of this case, as a simple comparison Debtors' counsel has already incurred $3.7 million in fees and expenses in the first two weeks of these chapter 11 cases. _See_ Docket No. 845 (seeking compensation of $3,612,129.50 in fees and $117,001.84 in expenses for the period of January 12-31, 2025); _see also_, _Application for Entry of an Order Authorizing Retention and Employment of Houlihan Lokey Capital, Inc. as Investment Banker to the Debtors as of the Petition Date_ [Docket No. 307], which contemplated the payment of a $1,000,000 success fee to Houlihan Lokey Capital, Inc. upon the close of the sale of the RI Assets, despite the fact that Houlihan was not even retained by the Debtors until December 2024 – after all the heavy lifting on the Transaction was complete.

Debtors' estates and offloading unproductive assets) far outweigh the cost of the Transaction Fee. Again, without Fifth Third's involvement, there would be no RI Sale.

41.    *Skill Requisite to Perform Services.* Fifth Third has significant experience in marketing and facilitating the sale of distressed assets, including health systems. The Debtors knew this when they retained Fifth Third and continued to utilize their Services postpetition. Fifth Third drew on its experience, judgment, and expertise to obtain Centurion as a purchaser for the RI Assets in a difficult market and with significant hurdles.

42.    *Results Obtained*. Fifth Third's work directly facilitated the sale of the RI Assets and without such efforts the RI Assets would remain a drain on the Debtors' estates and potentially require conversion of these chapter 11 cases or the requirement of a significant infusion of cash. The Sale Order was granted and by all accounts the Debtors will soon close on the RI Sale.

**C.    *The Balance of Equities Require Payment of the Transaction Fee from the Closing as a Priority, Substantial Contribution Claim***

43.    The Debtors are requiring the Court to make decisions inside a proverbial pressure cooker of their own making. The Debtors know that this Court will not risk the Debtors' patients' healthcare – nor should it. Continuity of high-quality patient care should be a top priority. However, the Debtors should not be permitted to treat creditors inequitably in this case, particularly the very same creditors who have facilitated the Debtors' ongoing operations.

44.    Quite simply, equity and fairness dictate payment of the Transaction Fee upon the closing of the RI Sale. It is beyond inequitable for the Debtors to pay seemingly every professional in the ordinary course except for Fifth Third[21] when Fifth Third is the sole reason the RI Sale is on

---

[21] For instance, it appears that Morgan Stanley is being paid for pre- and post-petition work in connection with the sale of certain of the Debtors' assets pursuant to the *Debtors' Motion for Entry of an Order (I) Approving and Authorizing (A) Assumption of Purchase Agreement, Entry into Releases on Behalf of the Sellers and their Affiliates, and Entry into Transaction Documents, (B) Sale of Assets and Equity Interests Free and Clear of Interests, (C) Procedures Governing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Assignment of Certain Permits and Contracts; (II) Dismissing the PHS RI Chapter 11 Case Effective as of the Closing Date; and (III) Granting Related Relief* [Docket No. 590].

the brink of closing. The Debtors allowed Fifth Third to continue to provide Services for the RI Assets post-petition and strung Fifth Third along until the eleventh hour. Permitting this type of manipulation of the Bankruptcy Code has serious policy implications. It would be a dangerous precedent to set that a debtor can utilize an exclusive investment banker to do all the work in connection with a difficult sale then cast them aside on the eve of closing, especially when so many bankruptcy cases these days are filed expressly to run quick 363 sales. This type of bad faith behavior will make parties even more wary of dealing with distressed asset sales or require heftier fees, particularly given that these types of investment banking fees are almost always backloaded for practical liquidity reasons, which in turn will make both pre- and post-bankruptcy negotiations and transactions even more complicated and messy. No investment banker will want to risk working *years* without payment to close a transaction if the debtor can simply retain a new investment banker at closing. Accordingly, the Debtors should not be permitted to retain the benefit of the Services and fund these cases directly as a result of Fifth Third's efforts, provided at the Debtors' requests right up until the weekend prior to the Sale Hearing, and then simply delay or avoid payment of the Transaction Fee. Further, the Debtors' lack of transparency and communication should not be condoned.

45.     Pursuant to LBR 7001-1, Fifth Third, through counsel, requested to meet and confer with Debtors' counsel prior to filing this Motion. As of the time of this filing, Debtors' counsel has not responded to this request.

WHEREFORE, Fifth Third respectfully requests that the Court (i) allow the Substantial Contribution Claim in the amount of $5,000,000.00, plus attorneys' fees associated with the prosecution of this Motion, under 11 U.S.C. § 503(b); (ii) authorize and direct the Debtors to pay Fifth Third the Substantial Contribution Claim upon closing of the RI Sale; and (iii) grant such other and further relief as is just and reasonable.

Dated: March 24, 2025

**FROST BROWN TODD LLP**

By:*/s/ Rebecca L. Matthews*
Rebecca L. Matthews (Texas Bar No. 24062776)
2101 Cedar Springs Road, Ste. 900
Dallas, TX 75201
214-580-8608 Telephone
214-545-3473 Facsimile
E-mail: rmatthews@fbtlaw.com
- and -
Joy D. Kleisinger (Ohio Bar No. 0101993) (*pro hac vice*)
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio  45202
513-651-6800  Telephone
513-651-6981  Facsimile
E-mail jkleisinger@fbtlaw.com

**COUNSEL FOR FIFTH THIRD SECURITIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, a true and correct copy of the foregoing *Brief in Support of Fifth Third Securities, Inc.'s Motion for Allowance of Administrative Expense Claim Under 11 U.S.C. § 503(b)* was sent via ECF Noticing to all parties receiving ECF Notices in these chapter 11 cases.

*/s / Rebecca L. Matthews*
Rebecca L. Matthews

0106586.0799451   4899-5472-2082v10