# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |

## PROOF OF PUBLICATION

Attached hereto as Exhibits A - B are the Proofs of Publication for the *Notice of (I) Date by Which Parties Must File Proofs of Claim; and (II) Procedures for Filing Proofs of Claim Against the Debtor* as follows:

| Publication | Publication Date | Exhibit |
|---|---|---|
| Los Angeles Times | March 24, 2025 | Exhibit A |
| The New York Times | March 24, 2025 | Exhibit B |

/s/ Randy Lowry
Randy Lowry
Omni Agent Solutions, Inc.
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300
*Claims, Noticing, and Administrative Agent for the Debtors*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and Noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

# **EXHIBIT A**

# Los Angeles Times
## MEDIA GROUP

**PROOF OF PUBLICATION**
**(2015.5 C.C.P.)**

**STATE OF CALIFORNIA**
**County of Los Angeles**

I am a citizen of the United States and a resident of the County aforesaid; I am over the age of eighteen years, and not a party to or interested in the action for which the attached notice was published.

I am a principal clerk of the Los Angeles Times, which was adjudged a newspaper of general circulation on May 21, 1952, Cases 598599 for the City of Los Angeles, County of Los Angeles, and State of California. Attached to this Affidavit is a true and complete copy as was printed and published on the following date(s):

Mar 24, 2025

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated at El Segundo, California on this 24th day of March, 2025.

*Wendy Cooper*
_____
            **[signature]**

2300 E. Imperial Highway
El Segundo, CA 90245

7998168 – Los Angeles Times
1 of 2

**Los Angeles Times**
MEDIA GROUP

---

---

> IN THE UNITED STATES BANKRUPTCY COURT
> FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
>
> In re:               Chapter 11
> PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1]    Case No. 25-80002 (SGJ)
>             Debtors.          (Jointly Administered)
>
> **NOTICE OF (I) DATE BY WHICH PARTIES MUST FILE PROOFS OF CLAIM; AND
> (II) PROCEDURES FOR FILING PROOFS OF CLAIM AGAINST THE DEBTORS**
>
> The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 11, 2025 (the "Petition Date").
>
> The Court has established the following Bar Dates as those dates by which parties holding claims against the Debtors arising prior to the Petition Date must file proofs of claim: (a) April 18, 2025 at 4:00 p.m. (prevailing Central Time) is the date by which all entities (which includes individual persons, estates, trusts, partnerships, and corporations, among others) must file proofs of claims (the "General Bar Date"); (b) July 10, 2025 at 4:00 p.m. (prevailing Central Time) is the date by which all governmental units holding claims (whether secured, unsecured priority, or unsecured non-priority) must file proofs of claim, including claims for unpaid taxes, if any, whether such claims arise from prepetition tax years or periods, or prepetition transactions to which the Debtors were a party (the "Governmental Bar Date"); (c) to the extent applicable, the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) twenty one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules is the date by which holders of claims affected thereby must file proofs of claims (the "Amended Schedules Bar Date"); and (d) to the extent applicable, the later of (i) the General Bar Date, and (ii) thirty (30) days after the later of (a) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (b) the rejection date of any such executory contract or unexpired lease of the Debtors is the date by which holders of claims affected thereby must file proofs of claims (such date, the "Rejection Damages Bar Date").
>
> THE BAR DATES ESTABLISHED BY THE ORDER AND REFERENCED IN THIS NOTICE SUPERSEDE ANY BAR DATES ESTABLISHED, FILED, NOTICED, OR PREVIOUSLY SERVED IN THESE CHAPTER 11 CASES.
>
> ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE GENERAL BAR DATE OR THE GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.
>
> *Timely Service.* Each Proof of Claim Form, including supporting documentation, must be filed or submitted, including supporting documentation, through any of the following methods: (i) electronic submission through PACER (Public Access to Court Electronic Records at https://ecf.txnb.uscourts.gov/); (ii) via the electronic filing interface available at https://omniagentsolutions.com/Prospect or (iii) by U.S. mail, overnight U.S. mail, or other hand delivery system, so as to be **actually received** by Omni on or before the applicable Bar Date at the following address: For First-Class Mail or Overnight Mail to: Prospect Medical Holdings, Inc. Claims Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.
>
> PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.
>
> *Contents of Claim Form.* Each Proof of Claim Form must (i) be written in English; (ii) include a claim amount denominated in United States dollars (and to the extent such claim is converted to United States dollars, the conversion rate used in such conversion); (iii) conform substantially to Official Form 410; and (iv) be signed by the holder of the claim or by an authorized agent of the holder of the claim (along with documentation of such authorization).
>
> *Section 503(b)(9) Claim.* Any proof of claim asserting a claim entitled to priority under section 503(b)(9) of the Bankruptcy Code must also: (i) include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the section 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).
>
> *Original Signatures Required.* Only (i) original Proof of Claim Forms signed electronically or in ink or (ii) Proof of Claim Forms submitted and signed electronically using the electronic filing interface available at https://omniagentsolutions.com/Prospect will be deemed acceptable for purposes of claims administration. Proof of Claim Forms sent by facsimile or electronic mail will **not** be accepted.
>
> *Identification of the Debtor Entity.* Each Proof of Claim Form must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number. A Proof of Claim Form filed without identifying a specific Debtor will be deemed as filed only against Prospect Medical Holdings, Inc.
>
> *Claim Against Multiple Debtor Entities.* Except as otherwise provided in the Order or any other order of the Court, each proof of claim must state a claim against only one Debtor and clearly indicate the Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim Form, such claim may be treated as if filed only against Prospect Medical Holdings, Inc.; *provided,* that the foregoing shall not apply to parties expressly permitted to file master or aggregate Proofs of Claim under the Final DIP Orders, including the PBGC, and such master set of Proofs of Claim shall be deemed to have been filed against each of the Debtors.
>
> *Supporting Documentation.* Each Proof of Claim Form must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d). Any supporting documentation that includes personally identifiable information should be redacted or hidden prior to submission. If, however, such documentation is either voluminous or unavailable, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available, as applicable; *provided* that any creditor shall be required to transmit such documentation, if available, to Debtors' counsel upon request no later than ten (10) days from the date of such request. The terms of this paragraph shall not apply to parties permitted to file master or aggregate Proofs of Claim under the Final DIP Orders.
>
> *Additional Information.* If you have any questions regarding the claims processing and/or if you wish to obtain a copy of the Bar Date Motion, the Order, Proof of Claim Form, or related documents (and/or any other pleadings filed in these chapter 11 cases) you may do so by: (i) visiting the website of the Debtors' claims, noticing, and solicitation agent, Omni Agent Solution, Inc. ("Omni") at: https://omniagentsolutions.com/Prospect, (ii) (888) 550-3239 (Toll-Free) or (818) 510-3746 (International), and/or (iii) emailing ProspectInquiries@OmniAgnt.com. Please note that Omni **cannot** advise you on how to file, or whether you should file, a proof of claim.
>
> [1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

# Families left in dark about deportations

[**Venezuelans,** from A1] widely condemned for human rights abuses.

"This has been a torture for us, an injustice," said Antonia Cristina Barrios de Reyes, mother of Jerce Egbunik Reyes Barrios, 36, the former professional goalkeeper. "My son is not a criminal."

The social media influencer is Nolberto Rafael Aguilar Rodríguez, 32. He initially fled to Colombia, Venezuela's western neighbor, out of desperation, said his sister, Jennifer Aguilar.

"We're *campesinos*, we come from the fields," she said. "We left Venezuela because we were starving."

Reyes Barrios and Aguilar were among 261 people — the vast majority Venezuelans — expelled to El Salvador this month after the Trump administration alleged that most were affiliated with the Venezuela-based Tren de Aragua gang, which President Trump has declared a terrorist group.

The evidence of gang membership cited by the government is typically flimsy to nonexistent, defense lawyers allege, and largely based on tattoos and social media postings.

Experts say the administration's outsourcing of the detained migrants to a nation with an infamously repressive prison system has no precedent.

In El Salvador, "the United States now has a tropical gulag," said Regina Bateson, a political scientist at the University of Colorado Boulder. "The notion that the U.S. government is paying millions of dollars to another government to violate these people's rights is horrifying."

The El Salvador operation is part of a deal between the Trump administration and Salvadoran President Nayib Bukele. Advocates have filed a federal lawsuit challenging Trump's use of the Alien Enemies Act — a statute from 1798 previously only invoked during wartime — to expel most of the alleged Venezuelan gang members.

On Friday, a federal judge in Washington, D.C., vowed to "get to the bottom" of whether the Trump administration defied his order to hold off on the deportations while lawsuits challenging the expulsions played out in court.

Many relatives of the deportees deny their kin have gang ties or a criminal record, saying they were simply searching for better lives or escaping persecution in their turbulent homeland, part of the exodus that has seen millions flee Venezuela.

"We have no idea what's going to happen to Jerce," said Jair Barrios, uncle of the soccer player. "We understand and respect the laws of each country; but at the same time, we ask that, please, let justice be done and truly innocent people be released."

Reyes Barrios was detained at the Otay Mesa border post in California in September, according to a statement from his attorney, Linette Tobin, when he appeared for his appointment under the Biden administration program known as CBP One, which facilitated U.S. entry for prospective asylum applicants and others.

According to Tobin, he was mistakenly accused of Tren de Aragua affiliation based on an arm tattoo and a social media post in which he made a hand gesture that U.S. authorities called a gang sign.

The tattoo — a crown atop a soccer ball, with a rosary and the word "Díos" — is actually an homage to his favorite team, Real Madrid, Tobin wrote. The hand gesture is a popular sign language rendering of "I Love You," the lawyer added.

Reyes Barrios participated in antigovernment demonstrations in Venezuela in February and March 2024, Tobin wrote, and was subsequently arrested and tortured, enduring electric shocks and suffocation. After his release, he fled for the United States and registered for CBP One while in Mexico.

Tobin portrayed Reyes Barrios as a law-abiding person who had never been charged with a crime and wrote that he had "a steady employment record as a soccer player, as well as a soccer coach for children and youth."

Once in custody in California, Tobin wrote, Reyes Barrios applied for political asylum and other relief. A hearing had been set for April 17 at immigration court in Otay Mesa.

Reyes Barrios was deported to El Salvador on March 15.

Tricia McLaughlin, assistant secretary for the Department of Homeland Security, defended the government action.

Reyes Barrios was "not only in the United States illegally," McLaughlin wrote on X, "but he has tattoos that are consistent with those indicating TdA [Tren de Aragua] membership. His own social media indicates he is a member of the vicious TdA gang."

She added that "DHS intelligence assessments go beyond a single tattoo and we are confident in our findings."

Reyes Barrios is a "respected person" in Venezuela, said his wife, Mariyen Araujo Sandoval, who has remained in Mexico with two of the couple's four children.

"It's unjust to criminalize someone because of a tattoo," said Araujo, 32. She said she recognized her husband in the online videos of Venezuelans expelled to El Salvador.

Now dashed, she said, is her family's dream of a reunion in the United States. She now hopes for a reunion in Venezuela — if her husband can ever get out of El Salvador.

"I'm too scared to even try to go to the United States," said Araujo, who noted that she also has a tattoo, of a rose. "I'd be afraid that they would separate me from my daughters and put me in jail."

::

The Venezuelans dispatched to El Salvador have no legal recourse for appeal or release, attorneys say, and may face indefinite detention.

"There is, of course, no law, rule or judicial standard in El Salvador to outsource the prisons," said José Marinero, a Salvadoran lawyer. "These people have ... no conviction, no debt to the Salvadoran justice system."

Their predicament, activists say, highlights the erosion of democracy across the region, as well as the dramatic crackdown on migration pushed by Washington.

"There's no real safe haven left," said Michael Ahn Paarlberg, a political scientist who studies Latin America at Virginia Commonwealth University.

The Trump administration has acknowledged that many of those deported under the Alien Enemies Act have no criminal records in the United States. But the government says they may still pose a threat.

"We sent over 250 alien enemy members of Tren de Aragua, which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars," Secretary of State Marco Rubio, who brokered the deal with Bukele, declared on X.

Critics say that Trump, like Bukele, invokes crime as an excuse for suspending civil liberties.

"They're using these particularly vulnerable people as test cases," said Paarlberg, who added that the message appears to be: "If we can deport people who don't have criminal records, people who are fleeing a regime that pretty much everyone and the U.S. government agrees is authoritarian, then we can deport anyone."

Bukele, a former advertising executive who labels himself "the world's coolest dictator," dispatched video crews to record the arrival of the Venezuelans, who were led off deportation planes in shackles and had their hair shorn.

"This is a performative act of cruelty ... to scare people into not coming, to scare people who are here without papers, to scare people away from protesting," Paarlberg said.

News of the deportations has sent relatives of the expelled Venezuelans poring over videos and social media posts to determine if their loved ones were among those flown to El Salvador.

The names of the deported Venezuelans appeared on a list leaked to the media. Included was Aguilar, who garnered more than 40,000 followers as he documented his northbound trek from South America on TikTok. His feed included images from the treacherous Darien Gap, the dense jungle separating Colombia and Panama.

Jennifer Aguilar described her brother as a hard-working family man who fled Venezuela for Colombia in 2013. He has three children: an 11-year-old girl in Venezuela and a 4-year-old girl and boy, 2, in Colombia. Aguilar's sister says he got his tattoo, of playing cards and dice, to cover up a scar on his forearm from an accident he had at age 16.

According to his sister, Aguilar made his way to Mexico and secured an appointment for U.S. entry via CBP One. On June 24, he posted a video of himself boarding a plane, apparently en route to the U.S.-Mexican border.

"Have faith in God," he wrote in a caption. "Never put your head down. And trust yourself."

Jennifer Aguilar said he got a job in a travel agency in the California border city of Calexico. For reasons that remain unclear, he was detained by U.S. immigration authorities late last year.

From Colombia, where she lives with her three daughters, Jennifer Aguilar has written about her brother's plight on social media and sent messages to Venezuelan President Nicolás Maduro and to Bukele, the Salvadoran leader.

Aguilar "has never been to prison in Venezuela or in Colombia," she wrote to Bukele. "Believe me, if he was guilty I'd say: 'Leave him there.' Because we were taught to be honest and do good.

"I've tried by all means ... to be Rafael's voice," said the sister, adding that she doesn't know anyone in El Salvador. "If I could be there, I would. I'm deeply sorry that I can't."

El Salvador has rounded up and imprisoned some 85,000 people — the equivalent of 1.5% of the nation's population — since March 2022, when Bukele declared a state of emergency that effectively suspended constitutional due process rights. The Venezuelans were dispatched to the infamous Center for Terrorism Confinement, the centerpiece of Bukele's mass incarceration agenda.

*Times staff writers McDonnell and Linthicum reported from Mexico City while special correspondents Mery Mogollón and Nelson Rauda contributed, respectively, from Caracas, Venezuela, and San Salvador. Special correspondent Cecilia Sánchez Vidal contributed from Mexico City.*



JUAN BARRETO AFP / Getty Images

**VENEZUELAN** Vice President Delcy Rodríguez, center, attends a rally in the capital, Caracas, opposing the imprisonment of Venezuelans sent from the U.S. to El Salvador, where they may face indefinite detention.

> 'The notion that the U.S. government is paying millions of dollars to another government to violate these people's rights is horrifying.'
>
> —REGINA BATESON,
> political scientist at the University of Colorado Boulder

---

# Moscow strikes Ukraine ahead of talks

**The attacks, including on the capital, Kyiv, kill at least 7 people, one only 5 years old.**

By Samya Kullab

KYIV, Ukraine — At least seven people were killed after Russia launched a barrage of drones across Ukraine overnight Sunday, according to local officials and emergency services.

The attacks, including on the capital, Kyiv, came ahead of ceasefire negotiations in Saudi Arabia in which Ukraine and Russia are expected to hold indirect U.S.-mediated talks on Monday to discuss a pause in long-range attacks targeting energy facilities and civilian infrastructure.

The Ukrainian delegation is expected to meet with U.S. officials in Saudi Arabia a day ahead of the indirect talks, Ukraine's President Voldoymyr Zelensky said. Ukraine is planning to send technical teams to discuss the details of the partial ceasefire.

Speaking on "Fox News Sunday," President Trump's special envoy Steve Witkoff said he expected "some real progress" at the talks in Saudi Arabia, "particularly as it affects a Black Sea ceasefire on ships between both countries, and from that you'll naturally gravitate into a full-on shooting ceasefire."

Asked about concerns that Russian President Vladimir Putin may be looking beyond Ukraine and could press farther into Europe, even if Russia is awarded territory within Ukraine now, Witkoff said he has been asked his opinion on what Putin's motives are on a large scale.

"I simply have said that I just don't see that he wants to take all of Europe. This is a much different situation than it was in World War II. In World War II there was no NATO. You have countries that are armed there. I take him at his word in this sense."

Asked whether he was convinced that Putin wanted peace, Witkoff said: "I feel that he wants peace."

**Homes hit by debris**

Russia launched 147 drones across Ukraine overnight, according to the Ukrainian air force. Air defenses shot down 97, and 25 others didn't reach targets because of countermeasures. The attacks struck the Kharkiv, Sumy, Chernihiv, Odesa and Donetsk regions, as well as Kyiv.

Three people, including a 5-year-old child, were killed and 10 others were injured in the drone attack in Kyiv, the city's military administration said. Extended sounds of explosions were heard across the capital in the early hours as the air raid blared for more than five hours. Russian drones and debris from shot-down drones, which were flying at lower altitudes to evade air defenses, fell on residential buildings.

Residents in Kyiv surveyed the damage to their homes and neighborhoods Sunday morning. Many were disparaging of the ceasefire talks, pointing to the properties destroyed in the drone attack, saying these were more indicative of Russia's true intentions.

In an old multistory building on Kyiv's left bank that was damaged in the overnight attack, Dmytro Zapadnya, 37, said he had no faith in Russia upholding any ceasefire agreement.

"There is no point in signing anything [with Russians], because it will not be worth the cost of paper where you put this signature. Well, the only thing that is not very pleasant is that now the United States seems to have little understanding of our situation," he said.

Elsewhere, four people were killed in Russian attacks on Ukraine's Donetsk region, regional Gov. Vadym Filashkin said, including three who died in a strike on the front-line town of Dobropillya.

**'New solutions'**

In a statement on social media, Zelensky said attacks such as the one in Kyiv were a daily occurrence for Ukraine.

"This week alone, more than 1,580 guided aerial bombs, almost 1,100 strike drones and 15 missiles of various types were used against our people," he said. "New solutions are needed, with new pressure on Moscow to stop both these strikes and this war."

Also Sunday, Russia's Ministry of Defense said it had shot down 59 Ukrainian drones overnight, including 29 over the region of Rostov and 20 more over southwestern Astrakhan. In Rostov, one person was killed and a car caught fire in the Ukrainian drone attack, according to the area's temporary governor, Yuri Slyusar.

A woman also died in the Russian border village of Novostroyevka-Pervaya in the Belgorod region when a Ukrainian drone hit a car in which she was traveling.

The driver, the woman's daughter, was seriously injured in the attack, said local Gov. Vyacheslav Gladkov.

*Kullab writes for the Associated Press. AP writer Bela Szandelszky contributed to this report.*

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In re: ) Chapter 11
PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] ) Case No. 25-80002 (SGJ)
Debtors. ) (Jointly Administered)

**NOTICE OF (I) DATE BY WHICH PARTIES MUST FILE PROOFS OF CLAIM; AND (II) PROCEDURES FOR FILING PROOFS OF CLAIM AGAINST THE DEBTORS**

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 11, 2025 (the "Petition Date").

The Court has established the following Bar Dates as those dates by which parties holding claims against the Debtors arising prior to the Petition Date must file proofs of claim: (a) April 18, 2025 at 4:00 p.m. (prevailing Central Time) is the date by which all entities (which includes individual persons, estates, trusts, partnerships, and corporations, among others) must file proofs of claim (the "General Bar Date"); (b) July 10, 2025 at 4:00 p.m. (prevailing Central Time) is the date by which all governmental units holding claims for unpaid taxes, if any, whether such claims arise from prepetition tax years or periods, or prepetition transactions to which the Debtors were a party (the "Governmental Bar Date"); (c) to the extent applicable, the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) twenty one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules is the date by which holders of claims affected thereby must file proofs of claims (the "Amended Schedules Bar Date"); and (d) to the extent applicable, the later of (i) the General Bar Date, and (ii) thirty (30) days after the later of (a) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (b) the rejection date of any such executory contract or unexpired lease of the Debtors is the date by which holders of claims affected thereby must file proofs of claims (such date, the "Rejection Damages Bar Date").

**THE BAR DATES ESTABLISHED BY THE ORDER AND REFERENCED IN THIS NOTICE SUPERSEDE ANY BAR DATES ESTABLISHED, FILED, NOTICED, OR PREVIOUSLY SERVED IN THESE CHAPTER 11 CASES.**

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE GENERAL BAR DATE OR THE GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

**Timely Service.** Each Proof of Claim Form, including supporting documentation, must be filed or submitted, including supporting documentation, through any of the following methods: (i) electronic submission through PACER (Public Access to Court Electronic Records at https://ecf.txnb.uscourts.gov/); (ii) via the electronic filing interface available at https://omniagentsolutions.com/Prospect or (iii) by U.S. mail, overnight U.S. mail, or other hand delivery system, so as to be **actually received** by Omni on or before the applicable Bar Date at the following addresses: For First-Class Mail or Overnight Mail to: Prospect Medical Holdings, Inc. Claims Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

**Contents of Claim Form.** Each Proof of Claim Form must (i) be written in English; (ii) include a claim amount denominated in United States currency as of the extent such claim is converted to United States dollars, the conversion rate used in such conversion); (iii) conform substantially to Official Form 410; and (iv) be signed by the holder of the claim or by an authorized agent of the holder of the claim (along with documentation of such authorization).

**Section 503(b)(9) Claim.** Any proof of claim asserting a claim entitled to priority under section 503(b)(9) of the Bankruptcy Code must also: (i) include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the section 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).

**Original Signatures Required.** Only (i) original Proof of Claim Forms signed electronically or in ink or (ii) Proof of Claim Forms submitted and signed electronically using the electronic filing interface available at https://omniagentsolutions.com/Prospect will be deemed acceptable for purposes of claims administration. Proofs of Claim Forms sent by facsimile or electronic mail will **not** be accepted.

**Identification of the Debtor Entity.** Each Proof of Claim Form must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number. A Proof of Claim Form filed without identifying a specific Debtor will be deemed as filed only against Prospect Medical Holdings, Inc.

**Claim Against Multiple Debtor Entities.** Except as otherwise provided in the Order or any other order of the Court, each proof of claim must state a claim against only one Debtor and clearly indicate the Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim Form, such claim may be treated as if filed only against Prospect Medical Holdings, Inc. Claims Processing, the foregoing shall not apply to parties expressly permitted to file master or aggregate Proofs of Claim under the Final DIP Orders, including the PBGC, and such master set of Proofs of Claim shall be deemed to have been filed against each of the Debtors.

**Supporting Documentation.** Each Proof of Claim Form must include supporting documentation in accordance with Bankruptcy Rule 3001(c) and 3001(d). Any supporting documentation that includes personally identifiable information should be redacted or hidden prior to submission. If, however, such documentation is either voluminous or unavailable, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available, as applicable, provided that any creditor shall be required to transmit such documentation, if available, to Debtors' counsel upon request no later than ten (10) days from the date of such request. The terms of this paragraph shall not apply to parties permitted to file master or aggregate Proofs of Claim under the Final DIP Orders.

**Additional Information.** If you have any questions regarding the claims processing and/or if you wish to obtain a copy of the Bar Date Motion, the Order, Proof of Claim Form, or related documents (and/or any other pleadings filed in these chapter 11 cases) you may do so by: (i) visiting the website of the Debtors' claims, noticing, and solicitation agent, Omni Agent Solutions, Inc. ("Omni") at: https://omniagentsolutions.com/Prospect, (ii) (888) 550-3229 (Toll-Free) or (818) 510-3746 (International), and/or (iii) emailing ProspectInquiries@OmniAgnt.com. Please note that Omni **cannot** advise you on how to file, or whether you should file, a proof of claim.

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

Case 25-80002-sgj11 Doc 1344 Filed 03/25/25 Entered 03/25/25 08:38:59 Desc Main Document Page 5 of 8

# **EXHIBIT B**



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

March 24, 2025

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

3/24/2025, NY/NATL, pg B3

_Larnyce Tabron_

Sworn to me this 24th day of March, 2025

[signature]

Shannon Schmidt
Online Notary Public
State of New York
Nassau County
Commission #: 01SC0033223
Commission Expires: 01/28/2029

# Attacks on D.E.I. Show No Sign of Abating

### A major law firm cuts a deal with the president while Wall Street frets about a cherished program.

**By LAUREN HIRSCH**

In the process of attacking big law firms last week, the Trump administration hinted at another potential target: a decades-old nonprofit that helps students land jobs on Wall Street.

The Equal Employment Opportunity Commission sent letters to 20 law firms last Monday demanding information on their diversity, equity and inclusion, or D.E.I., efforts. All of the letters asked about Sponsors for Educational Opportunity, an organization known as SEO.

The letters, and the E.E.O.C.'s interest in SEO, may ultimately amount to no more than a headache. But in singling out the organization, President Trump has taken aim at a program that is core to diversity efforts on Wall Street and put a spotlight on the uncertain future of such efforts amid his escalating attacks on D.E.I.

"For several decades, that is one of the largest providers of entry-level talent that has gone on — especially across Wall Street — to grow up and be senior-level talent across all these firms," Porter Braswell, the founder of 2045 Studio, a membership network for professionals of color, told DealBook.

"It's an incredibly important organization that plays a very meaningful role in developing racially diverse talent," he added.

SEO helps prepare students for Wall Street careers, including by assisting them in getting internships at banks and law firms. The highly selective internship program is different from many of the recruiting organizations that have emerged in recent years to help firms quickly live up to their diversity promises. Lawyers say it would have traditionally eschewed legal scrutiny because it was focused on providing opportunities, not fulfilling a target for diversity numbers.

But the E.E.O.C. said in an F.A.Q. last week that it also considered benefits like training or sponsorship because of an individual's race to be examples of unlawful discrimination — even if those benefits were also available to others. While lawyers tell DealBook that they do not believe that guidance will withstand legal challenges, it could scramble diversity efforts already facing pressure. And that raises big questions for Wall Street.

A spokesperson for SEO declined to comment.

**Making a Deal With Trump**

The E.E.O.C. sent its letter to the law firms — including Kirkland & Ellis; Skadden, Arps, Slate, Meagher & Flom; and Latham & Watkins — as the Trump administration was already ramping up its assault against Big Law. Over the past two months, Mr. Trump has signed a memo stripping security clearances from lawyers at Covington & Burling and issued executive orders against Perkins Coie and Paul Weiss.

On Thursday, the chairman of Paul Weiss — long seen as the face of Big Law's diversity efforts — struck a deal with Mr. Trump to rescind the executive order in exchange for a number of concessions, including $40 million worth of pro bono work on causes supported by Mr. Trump.

As part of the deal, Paul Weiss also reiterated its commitment to "merits-based hiring, promotion and retention." Paul Weiss said it would hire an outside expert, within 14 days, to conduct "a comprehensive audit of all its employment practices."

The firm's chairman, Brad S. Karp, said in a memo to employees that the agreement was consistent with the firm's longstanding principles. But many on Wall Street viewed the deal as capitulation.

At the same time, the Trump administration is broadening its efforts to rein in diversity initiatives. On Friday, the Federal Communications Commission said it would block merger proposals from companies that practiced D.E.I.

Some banks have already shifted the way they communicate about such efforts. JPMorgan Chase wrote in an internal memo Friday that it would rename its D.E.I. operation "Diversity, Opportunity & Inclusion."

**Diversity Challenges at Law Firms**

Last year, about half of associates at law firms were women, while 31 percent were people of color, according to the National Association for Law Placement, an industry group. That was up from a decade earlier, when 45 percent of associates were women and 22 percent people of color.

The numbers get tougher when you look at the partner level. About 29 percent of partners were women in 2024 and 13 percent people of color. A decade earlier, those figures were 21 percent and 7 percent.

Big Law pushed to improve its diversity efforts after the murder of George Floyd in 2020, spending tens of millions on diversity consultants and scholarships and working with organizations to help bring in more diverse employees.

Not all of those attempts were successful, partners at law firms say. Internally and publicly, there have been debates over the costs and efficacy of these programs.

After the 2023 Supreme Court ruling ending affirmative action in U.S. schools made corporate D.E.I. programs vulnerable to legal challenges, firms began withdrawing. Mr. Trump's election and subsequent Big Law scrutiny have put these efforts into overdrive.

Some firms say they no longer provide clients racial and gender breakdowns that are often part of a pitch process. Others are no longer holding diversity-focused events. Many are scraping their websites of D.E.I. language.

Mr. Karp's deal with Mr. Trump may make it easier for firms to strike a similar deal or further expedite the D.E.I. pullback, lawyers say. ("D.E.I. will just have to wait four years," one partner told DealBook.)

But pausing won't come without backlash: An associate at Skadden said in a firmwide email on Thursday that she was putting in her conditional resignation unless the firm came up with a "satisfactory response" to the current moment.

**Wall Street Program Questioned**

Unlike some recent D.E.I. initiatives, SEO is part of the Wall Street fabric.

The program's alumni work in the highest echelons of corporate America. They include Cesar Conde, the chairman of NBCUniversal News Group; Joseph Bae, a co-C.E.O. of KKR; and Frank Baker, a co-founder of Siris Capital.

And its supporters span the political divide. They include the Citadel founder Ken Griffin, who voted for Trump in 2024, and Frank Bisignano, Mr. Trump's initial pick to lead the Social Security Administration.

It would be "very emotional" if SEO went away, Mr. Braswell told DealBook, stressing that he believed the organization would get through any pressure it faced.

For now, SEO's efforts remain unchanged. Its class of 186 is expected to start their legal internships in mid-May.


CARLY ZAVALA FOR THE NEW YORK TIMES


SHANNON FINNEY/GETTY IMAGES FOR SEMAFOR


JP YIM/GETTY IMAGES FOR THE ASIAN AMERICAN FOUNDATION

Brad S. Karp, chairman of Paul Weiss, cut a deal with President Trump that some saw as giving in. A Wall Street diversity program is also facing questions. Its alumni include Cesar Conde, top right, chairman of NBCUniversal News Group, and Joseph Bae, a co-C.E.O. of KKR.

**DealBook/**
DealBook helps you make sense of the day's most important business and policy headlines. Sign up for the newsletter at **nytimes.com/dealbook**

---

# How a Specious Theory About the Validity of Biden's Autopen Went Viral

**FROM FIRST BUSINESS PAGE**

Within days, the notion that shadowy deep state operatives had been secretly running the country instead of Mr. Biden, using a mechanical contraption to achieve their diabolical aims, had erupted into a furor.

An autopen is a machine that uses a real pen to copy a person's actual signature. Presidents and other politicians have used such devices for decades with little public interest in them. In the first two months of this year, the term was mentioned a total of 49 times on television, radio and podcasts in the United States, according to data from the media tracker Critical Mention.

It was uttered 6,188 times on March 17 alone.

Right-wing talk radio, podcasts and cable news shows have now devoted hundreds of segments to the arcana of wet signatures and autopen technology. They are particularly focused on Mr. Biden's signatures on his pardons of political allies like Senator Adam Schiff, the California Democrat, as well as his son Hunter Biden. And they claim that the former president was mentally impaired and unaware of what documents he was being asked to endorse.

President Trump himself has brought the issue up repeatedly over the past week, decrying Mr. Biden's use of the autopen. He claimed without providing evidence that Mr. Biden had not authorized the pardons, posting on Truth Social that they were "void, vacant, and of no further effect."

Although Mr. Trump himself has acknowledged using an autopen at times, he raised the question again on Friday during an Oval Office news conference: "The person that operated the autopen, I think we ought to find out who that was because I guess that was the real president."

Mr. Biden hasn't commented on whether or not he personally signed every pardon, although Neera Tanden, a senior aide during his administration, posted online this week that "there's a lot by autopen in every administration." A spokeswoman for Mr. Biden did not respond to a request for comment.

There are no federal statutes that prohibit the use of the device, and two decades ago a Justice Department memo confirmed that presidents could "direct a subordinate to affix the president's signature to" bills. A prior memo, from 1929, stated that a pardon "need not have the president's autograph," and legal experts have cast serious doubts on a president's ability to rescind another president's pardons.

The rapid transformation of a speculative and legally shaky hypothesis, concocted by pro-Trump activists into a talking point endorsed at the highest level of government, illustrates the extraordinary efficiency of today's right-wing media environment.

"It does show how corrupted our information ecosystem is that something like this can gain attention," said Welton Chang, co-founder and chief executive of Pyrra Technologies, a digital threat company that tracks trends on social media.

It is not exactly clear where the conspiracy theory took root, but Pyrra noticed a solitary posting on the 4chan message board referring to autopens and Mr. Biden back in October, even before he granted the pardons in question.

By then, Mr. Howell's Oversight Project, started in 2022 by the Heritage Foundation with a mission of "increasing aggressive oversight of the Biden administration," was already deep into its research.

Early last summer, Jason Chaffetz, a former congressman who is now a visiting fellow with the Oversight Project, floated the idea of gathering copies of presidential documents signed by Mr. Biden to see if the signatures matched up.

"It just was a suspicion that perhaps all of those were not authentic," Mr. Chaffetz said in an interview. "This is the kind of thing we dive into."

A dozen staff members began compiling documents from the Federal Register and requesting copies of resolutions and bills from Congress from the National Archives, Mr. Howell said. But after Mr. Biden dropped out of the race in late June, the project felt less urgent.

That changed when Andrew Bailey, the attorney general of Missouri, posted a three-page letter on X on March 5 calling for an "investigation into Mr. Biden's mental capacity in his final days in office." It suggested, without any direct evidence, that members of the former president's staff exploited him and pushed through executive orders and pardons he wouldn't have endorsed.

Mr. Howell said he didn't know Mr. Bailey and had no warning the letter was coming. Still, it dovetailed so perfectly with the signature research he had already conducted that he couldn't believe his luck.

"It was No. 8 on the to-do list," Mr. Howell said. "Then A.G. Bailey drops his letter and it shoots to the top."

Mr. Howell's thread on X racked up more than three million views. Within hours, the subject was being widely discussed on conservative talk radio, which often mines social media for topics.

By the next day, it had leaped to popular podcasts such as the one hosted by Glenn Beck, who has 1.4 million subscribers on YouTube, and from there to cable news, with the Fox Business Network host Elizabeth MacDonald asking, "Should we figure out who controlled Biden's autopen and who controlled Joe Biden's presidency?"

With public interest growing, the Oversight Project pushed on. "We determined that the most legally vulnerable documents were the pardons," said Mr. Howell, who published an analysis of signatures on five pardons late last week.

Those pardons, issued in the final full day of Mr. Biden's term and designed to pre-empt potential prosecution, had infuriated Mr. Trump. The swirling questions about Mr. Biden's signatures caught his attention.

"You don't use autopen. No. 1, it is disrespectful to the office. No. 2, maybe it's not even valid, because who is getting him to sign?" Mr. Trump said during a news conference at the Justice Department a day after the Oversight Project published its findings on the pardons.

Some critics, including the conservative legal scholar Jonathan Turley, have challenged the idea that the pardons could be nullified, noting that presidents are permitted to use autopen and that there has been no concrete evidence of a conspiracy to circumvent Mr. Biden's will. "This dog will not hunt," Mr. Turley wrote on X.

Mr. Howell said the only feasible way to test that question was in the courts, which would require the Justice Department's charging someone who had received a pardon from Mr. Biden with a crime.

"It's a rocket ship to the Supreme Court if that happens," Mr. Howell said, adding that his work is far from over. This week, he published a 29-page legal memo on autopens. He also pledged to use the Freedom of Information Act to seek out more documents signed by Mr. Biden and is considering hiring forensic handwriting experts to review each one.

"We're loading up the cannon for all sorts of things," he said.


CHERISS MAY FOR THE NEW YORK TIMES
Presidents and other politicians have uncontroversially substituted autopen for handwritten signatures for decades.

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In re: PROSPECT MEDICAL HOLDINGS, INC., et al., Debtors.
Chapter 11
Case No. 25-80002 (SGJ)
(Jointly Administered)

**NOTICE OF (I) DATE BY WHICH PARTIES MUST FILE PROOFS OF CLAIM; AND (II) PROCEDURES FOR FILING PROOFS OF CLAIM AGAINST THE DEBTORS**

The Debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 11, 2025 (the "Petition Date").

The Court has established the following Bar Dates as those dates by which parties holding claims against the Debtors arising prior to the Petition Date must file proofs of claim: (a) April 18, 2025 at 4:00 p.m. (prevailing Central Time) is the date by which all entities (which includes individual persons, estates, trusts, partnerships, and corporations, among others) must file proofs of claims (the "General Bar Date"); (b) July 10, 2025 at 4:00 p.m. (prevailing Central Time) is the date by which all governmental units holding claims (whether secured, unsecured priority, or unsecured non-priority) must file proofs of claim, including claims for unpaid taxes, if any, whether such claims arise from prepetition tax years or periods, or prepetition transactions to which the Debtors were a party (the "Governmental Bar Date"); (c) to the extent applicable, the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) twenty one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules is the date by which holders of claims affected thereby must file proofs of claims (the "Amended Schedules Bar Date"); and (d) to the extent applicable, the later of (i) the General Bar Date, and (ii) thirty (30) days after the later of (a) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (b) the rejection date of any such executory contract or unexpired lease of the Debtors is the date by which holders of claims affected thereby must file proofs of claims (such date, the "Rejection Damages Bar Date").

**THE BAR DATES ESTABLISHED BY THE ORDER AND REFERENCED IN THIS NOTICE SUPERSEDE ANY BAR DATES ESTABLISHED, FILED, NOTICED, OR PREVIOUSLY SERVED IN THESE CHAPTER 11 CASES.**

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE GENERAL BAR DATE OR THE GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

*Timely Service.* Each Proof of Claim Form, including supporting documentation, must be filed or submitted, including supporting documentation, through any of the following methods: (i) electronic submission through PACER (Public Access to Court Electronic Records at https://ecf.txnb.uscourts.gov/); (ii) via the electronic filing interface available at https://omniagentsolutions.com/Prospect or (iii) by U.S. mail, overnight U.S. mail, or other hand delivery service, so as to be **actually received** by Omni on or before the applicable Bar Date at the following address: For First-Class Mail or Overnight Mail to: Prospect Medical Holdings, Inc. Claims Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

*Contents of Claim Form.* Each Proof of Claim Form must (i) be written in English; (ii) include a claim amount denominated in United States dollars (and to the extent such claim is converted to United States dollars, the conversion rate used in such conversion); (iii) conform substantially to the official Proof of Claim Form 410; and (iv) be signed by the holder of the claim or by an authorized agent of the holder of the claim (along with documentation of such authorization).

*Section 503(b)(9) Claim.* Any proof of claim asserting a claim entitled to priority under section 503(b)(9) of the Bankruptcy Code must also: (i) include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the section 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).

*Original Signatures Required.* Only (i) **original** Proof of Claim Forms signed electronically or in ink or (ii) Proof of Claim Forms submitted and signed electronically using the electronic filing interface available at https://omniagentsolutions.com/Prospect will be deemed acceptable for purposes of claims administration. Proof of Claim Forms sent by facsimile or electronic mail will **not** be accepted.

*Identification of the Debtor Entity.* Each Proof of Claim Form must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number. A Proof of Claim Form filed without identifying a specific Debtor will be deemed as filed only against Prospect Medical Holdings, Inc.

*Claim Against Multiple Debtor Entities.* Except as otherwise provided in the Order or any other order of the Court, each proof of claim must state a claim against only one Debtor and clearly indicate the Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim Form, such claim may be treated as if filed only against Prospect Medical Holdings, Inc.; provided, that the foregoing shall not apply to parties expressly permitted to file master or aggregate Proofs of Claim under the Final DIP Order, including the PBGC, and such master set of Proofs of Claim shall be deemed to have been filed against each of the Debtors.

*Supporting Documentation.* Each Proof of Claim Form must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d). Any supporting documentation that includes personally identifiable information should be redacted or hidden prior to submission. If, however, such documentation is either voluminous or unavailable, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available, as applicable; provided that such claim will be required to transmit such documentation, if available, to Debtors' counsel upon request no later than ten (10) days from the date of such request. The terms of this paragraph shall not apply to parties permitted to file master or aggregate Proofs of Claim under the Final DIP Orders.

*Additional Information.* If you have any questions regarding the claims processing and/or if you wish to obtain a copy of the Bar Date Motion, the Order, Proof of Claim Form, or related documents (and/or any other pleadings filed in these chapter 11 cases) you may do so by: (i) visiting the website of the Debtors' claims, noticing, and solicitation agent, Omni Agent Solution, Inc. ("Omni") at https://omniagentsolutions.com/Prospect, (ii) (888) 550-3239 (Toll-Free) or (818) 510-3746 (International), and/or (iii) emailing ProspectInquiries@OmniAgnt.com. Please note that Omni **cannot** advise you on how to file, or whether you should file, a proof of claim.

A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims, noticing and solicitation agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.