United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(214) 767-1247

Elizabeth Ziegler Young
for the United States Trustee
*elizabeth.a.young@usdoj.gov*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 25-80002-SGJ-11** |
| **PROSPECT MEDICAL HOLDINGS,** | § | |
| **INC.,** *et al.,*[1] | § | |
| | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |

## UNITED STATES TRUSTEE'S OBJECTION TO (1) DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF PROSPECT MEDICAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES AND (2) DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (II) APPROVING THE SOLICITATION PROCEDURES IN CONNECTION WITH CONFIRMATION OF THE PLAN; (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH; (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO; AND (V) GRANTING RELATED RELIEF

[related to ECF 2095 and 2097]

TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:

Lisa L. Lambert, the United States Trustee for Region 6 (the "**United States Trustee**"),

objects to Prospect Medical Holdings, Inc., et al, (the "**Debtors**") (1) *Debtors' Motion For Entry*

*Of An Order (I) Approving The Adequacy Of The Disclosure Statement; (II) Approving The*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

*Solicitation Procedures In Connection With Confirmation Of The Plan; (Iii) Approving The Forms Of Ballots And Notices In Connection Therewith; (Iv) Scheduling Certain Dates With Respect Thereto; And (V) Granting Related Relief* (the "**Solicitation Motion**," ECF 2097) and (2) *Disclosure Statement For The Joint Chapter 11 Plan Of Prospect Medical Holdings, Inc. And Its Debtor Affiliates* (the "**Disclosure Statement**," ECF 2095).

## SUMMARY

The United States Trustee objects to the Solicitation Motion and the Disclosure Statement for the following reasons:

- The Disclosure Statement cannot be approved because it describes a plan that is not confirmable.

- Article VIII B of the *Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor Affiliates* (the "**Plan**", ECF 2094) violates the United States Bankruptcy Code by imposing nonconsensual third-party releases (the "**Third-Party Releases**") on both (i) claim interest holders in voting classes that do not return ballots ("**Ballots**") with an "opt-out" election checked; and (ii) non-voting claim and equity interest holders who do not return an opt-out form ("**Opt-Out Form**"). Specifically, these Third-Party Releases release (i) each Wind-Down Debtor (the "**Wind-Down Debtor**"), which will not exist until the Effective Date; (ii) the DIP Lenders, (iii) MPT, and (iv) the Committee and its members, along with each current and former Affiliate of each Entity.

- The proposed opt-out provisions in the Ballots and Opt-Out Forms should not be approved because they impose Third-Party Releases without the releasing parties' affirmative, voluntary, and knowing consent under state law. The releases are thus nonconsensual and cannot be approved under recent Supreme Court precedent.

- The Debtors propose to send a Patient Notice to all current and former patients, but do not clarify if the patients will be subject to the Third-Party Release.  Although the Debtors have represented to the United States Trustee the patients will not be bound by the Third-Party Release, the United States Trustee requests clarifying language to that effect in the Plan.

- The Debtors propose to waive the notice requirements to creditors whose Solicitation Packages are returned as undeliverable.  Although the Debtors have represented to the United States Trustee creditors with undeliverable addresses will not be bound by the Third-Party Release, the United States Trustee requests clarifying language to that effect in the Plan.

- Plan Article VIII C violates the Bankruptcy Code by imposing a sweeping injunction (the "**Injunction Provision**") to enforce the Third-Party Release.

- The Plan should specify that the Plan does not release claims of governmental entities exercising their police and regulatory authority.

## FACTS

### Debtors File Chapter 11

1.      The Debtors filed their voluntary petitions under Chapter 11 of the Bankruptcy Code on January 11, 2025 ("Petition Date").

2.      An Official Committee of Unsecured Creditors was appointed in this case on January 29, 2025. [docket no. 295]

### The Disclosure Statement and Plan

3.      The Debtors filed the Plan, the Disclosure Statement and Solicitation Motion on March 23, 2025.

4.     A hearing on the Solicitation Motion and Disclosure Statement is set before this Court on June 24, 2025.

5.     The Plan includes the terms of a previous approved settlement with MPT, which approved the terms of a global settlement between the Debtors, MPT and the Committee.  [docket no. 1288, Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief]

**Third Party Releases**

6.     Article VIII B of the Plan provides for the following Third-Party Releases:

*B.     Third-Party Release*

**Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims or Causes of Action asserted or assertable on behalf of the Debtors or their Estates, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the 9019 Order, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Assigned Estate Causes of Action, (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order, or (d) any Claim or obligation arising under the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

7.     The Plan defines "Released Parties" as the Debtors; the Wind-Down Debtors; the Committee and its members; the DIP Lenders; MPT and each "current and former Affiliate of each Entity" (the "**Released Parties**"). ECF 2094 at 20.

8.     The Plan defines "Non-Released Parties Schedule" as a "schedule of persons (if any) that are excluded from the definition of "Released Party", which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time prior to the Confirmation Hearing." ECF 2094 at 15.

9.     The Plan defines the "Releasing Party" as follows:

177.    "Releasing Party" means each of, and in each case in its capacity as such: (a) each Debtor; (b) each Wind-Down Debtor, as applicable; (c) the DIP Lenders; (d) MPT; (e) the Committee and its members; (f) all Holders of Claims or Interests that vote to accept the Plan and do not affirmatively opt out of the releases provided in the Plan; (g) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (h) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (i); *provided* that, in each case, an Entity shall

not be a Releasing Party if it: (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.[3]

(the "**Releasing Parties**").  ECF 2094 at 20-21.

10.     The Plan defines "Wind-Down Debtor" as each of the Debtors as of the Effective Date.  ECF 2094 at 23.

11.     The Plan defines "Debtor-Related Matters" as follows:

47.    "Debtor-Related Matters" means anything related to the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, any security of the Debtors, the purchase, sale, amendment, or recission of any Claim against or Interest in the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' intercompany transactions, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors), the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Chapter 11 Cases, the DIP Documents, the Definitive Documents, the Disclosure Statement, the New Corporate Governance Documents, the Plan (including the Plan Supplement), the Sale Transactions, or any Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

## Classification of Claims and Interests and Proposed Plan Treatment

12.    The following chart summarizes the Classes of Claims and Interests under the Plan, and whether they are entitled to vote:

[remainder of page left intentionally blank]

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | MPT Agreed Claims | Impaired | Entitled to Vote |
| Class 4 | PhysicianCo Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | PBGC Secured Claims | Impaired | Entitled to Vote |
| Class 6 | Insured Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Section 501(b) Claims | Impaired | Note Entitled to Vote (Deemed to Reject) |
| Class 9 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

13.     The Plan provides that voting creditors in Classes 3, 4, 5, 6 and 7 are deemed to

consent to the Third-Party Release unless they opt out of it on the ballot, even if they vote to reject

to the plan or choose not to vote at all.

14.     Non-voting Classes 8, 9, 10 and 11 would receive nothing under the Plan; claimants

will receive a Non-Voting Status Notice and Opt-Out Form.

**Governing Law**

15.     Plan Article XII.L defines the governing law for the Plan as the laws of the State of

Texas.  ECF 2094 at 68.

**Solicitation Package**

---

16.     Attached to the Solicitation Motion is a proposed Solicitation Package (the
"**Solicitation Package**"), which includes a cover letter (the "**Cover Letter**"), notices, Ballots, and
Opt-Out Forms.  ECF 2097.

17.     The Debtors propose that they will serve the Disclosure Statement and Plan on
claim and equity interest holders via electronic form, and only the Ballots, Cover Letter and
Confirmation Hearing Notice will be provided in paper format.  ECF 2097 at page 9.

18.     The Solicitation Package for Class 3, 4, 5, 6 and 7 creditors (collectively, "**Voting
Classes**") includes a Cover Letter, which does not reference the Third-Party Release Opt-Out.
ECF 2097, Exhibit 3 Cover Letter.

19.     The proposed Ballots for Class 3, 4, 5, 6 and 7 creditors contain the following
information:

> a.   Instructions for requesting paper versions of the Disclosure Statement and Plan on
>      page 2;
>
> b.   Checkboxes for voting either for or against the Plan on page 4;
>
> c.   Information about the Third-Party Releases on pages 2-3 and 4-7;
>
> d.   A checkbox for opting out of the Third-Party Release on page 5; and
>
> e.   The certification and signature lines on page 8.

ECF 2097, Exhibit 2.

20.     The Solicitation Motion does not provide for the solicitation of votes from the
Holders of Claims in Classes 8, 9, 10 and 11 (collectively, the "**Non-Voting Classes**").

21.     Instead, the Solicitation Motion proposes that the Debtors will send the Non-Voting
Classes a *Notice of Non-Voting Status* form ("**Non-Voting Status Notice**") and *Third Party
Release Opt-Out Form* ("**Opt-Out Form**").  ECF 2097, Exhibit 4. Thus, creditors who would not

ordinarily be required to respond to a plan because their classes are deemed to reject or deemed to accept the plan must respond to the Plan by way of the Non-Voting Notice in order to avoid having the Third Party Release imposed upon them.  Further, creditors who receive the Non-Voting Notice do not receive the full solicitation package. Instead, the creditors who receive the Non-Voting Notice are given information on how to obtain the full solicitation package from the Debtors' claims and noticing agent.

22.     The proposed Opt-Out Form for Class 8, 9, 10 and 11 creditors contain the following information:

   f.   Information about the Third-Party Releases;

   g.   A description of the Opt-Out Form as "optional;"

   h.   A checkbox for opting out of the Third-Party Release on page 3; and

   i.   The certification and signature lines on page 4.

ECF 2097, Exhibit 4.

23.     The Patient Notice provides current and former patients of the Debtors with notice of the Confirmation Hearing, deadlines to object, and information on how to obtain a copy of the Disclosure Statement, the Plan and the Solicitation Motion.  The Patient Notice is silent as to the Third-Party Release, but Debtors' counsel has represented to counsel for the United States Trustee that they do not intend to bind Patients to the Third-Party Release.  The United States Trustee requests that this be made explicit in any order granting the Solicitation Motion.

24.     The Debtors are seeking a waiver of the notice rule and excuse the Debtors from mailing Solicitation Package to addresses from which the Debtors received mailings returned as undeliverable, unless the Debtors are provided with a new mailing address sufficiently in advance of the deadline to vote.  Counsel for the Debtors has represented to counsel for the United States

Trustee that they do not intend to bind creditor from whom they have received or may receive mail

returned as undeliverable to the Third-Party Release. The United States Trustee requests that this

be made explicit in any order granting the Solicitation Motion.

**Injunction Provision**

25.     Plan Article VIII would permanently enjoin persons from pursuing any claims or

causes of action that are released, exculpated[2], or otherwise addressed by the Plan.

26.     The Injunction Provision in Plan Article VIII.D. provides:

D.      *Injunction*

**Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests or Causes of Action, as applicable, that have been released, discharged, satisfied, stayed, or terminated or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Plan Administrator, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties (as applicable): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable, unless such Holder has Filed a motion requesting the right to perform such setoff, subrogation, or recoupment on or before the Effective Date or expressly preserved its right to setoff, subrogation, or recoupment in a timely filed Proof of Claim, *provided, however,* that notwithstanding anything to the contrary herein, nothing in this clause (d) shall impar any setoff, subrogation or recoupment rights of any Governmental Unit; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable, released or settled pursuant to the Plan.**

---

[2] The Plan defines "Exculpated Parties" as the Debtors, Independent Directors and the Committee and each of its members.  ECF 2094.

**Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.**

## OBJECTIONS

### The Court should decline to approve the Disclosure Statement because the Plan is patently unconfirmable.

27.     If there is a defect that renders a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing.  *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012).  *See also, In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

28.     The Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure statement when the plan it supports may not be confirmable.  *In re American Capital Equipment, LLC*, 688 F.3d at 154.  A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing.  *Id*. at 154-55.

29.     The Plan is patently unconfirmable because it contains impermissible release and injunction provisions. Approval of the Disclosure Statement in support of a plan with such impermissible terms would mean that a patently unconfirmable Plan would be solicited.  And here, the solicitation procedures for which the Debtors seeks approval will actually facilitate certain of the Plan's flaws, because they include the opt-out provisions that will not establish actual consent

to the Third-Party Release. Rather, the Court should require the Plan and Disclosure Statement be amended to remove and/or tailor the Third-Party Release and Injunction Provision so that they comply with applicable law.

**The Third-Party Release**

### _Nonconsensual plan releases of non-debtor third parties by non-debtor third parties are not authorized under the United States Bankruptcy Code._

30.    The Supreme Court held in _Harrington v. Purdue Pharma L.P._ that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them.   603 U.S. 204, 209, 227 (2024) ("_Purdue_").   The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." _Id_. at 226. This has long been the conclusion held by the Fifth Circuit Court of Appeals. _See Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)_, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seems broadly to foreclose non-consensual non-debtor releases and permanent injunctions") ("_Pacific Lumber_").

31.    A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  As the Supreme Court recognized in _Purdue_, a release is a type of settlement agreement.  _Purdue_, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up).  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

32.     Here, there is no existing release agreement between non-debtors.  The Debtors instead seeks a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent.  Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

33.     Three inconsistent tests have been suggested for determining whether a third-party release included in a bankruptcy court order is consensual: (1) it is only consensual when there is valid consent under applicable state contract law[3]; (2) parties who do not opt out can be deemed to have consented because class-action settlements are binding on those who do not opt out[4]; and (3) parties can be deemed to have consented the same way that a litigant may forfeit rights by failing to timely respond in litigation.[5]

34.     The first test is the correct one.  State law governs whether non-debtors have agreed to release each other.  Nothing in the Bankruptcy Code allows parties to disregard state law when debtors seek to impose third-party releases in their plans.  Under Texas law, as in other states, silence is not acceptance of an offer other than in limited circumstances inapplicable here.  The Debtors thus cannot deem those claim and equity holders who fail to opt out of the Third-Party Release to have released claims because those claimants have not agreed to the Third-Party Release under state law.

### *State Contract Law Applies, Not Federal Law*

---

[3] *See, e.g., In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024); *Emerge Energy Services, LP,* No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019); *In re Digital Impact, Inc.*, 223 B.R. 1, 14-15 (Bankr. N.D. Okla. 1998); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 507 (Bankr. D.N.J. 1997).

[4] *See, e.g., In re Robertshaw US Holding Corp.,* 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024).

[5] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re LATAM Airlines Grp. SA*, 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. June 18, 2022); *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).

35.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of

claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451

(2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus, courts apply state

law when the question is whether a debtor has entered a valid settlement agreement.  *See Houston*

*v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails

to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v.*

*Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where

the United States is not a party, it is well established that settlement agreements in pending

bankruptcy cases are considered contract matters governed by state law.").

36.     The rule is no different for third-party releases.  They are separate agreements

between non-debtors governed by state law.   Unlike a bankruptcy discharge, which "is an

involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is

released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do*

*so*."  *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in

original).  *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental*

*Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions

"unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source

of the bankruptcy court's authority").  Thus, "the Bankruptcy Code has not altered the contractual

obligations of third parties, the parties themselves have so agreed."  *Arrowmill*, 211 B.R. at 507.

37.     Because the Bankruptcy Code does not authorize the imposition of an involuntary

release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law.

There is no Bankruptcy Code provision that preempts otherwise applicable state contract law

governing releases between non-debtors.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate*

*Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a

statute provides the rule of decision or authorizes a federal court to supply one, 'state law must

govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72

(1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the

Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the

state.").  Section 105(a), for example, "serves only to carry out authorities expressly conferred

elsewhere in the code."  *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But the Code

does not confer any authority to impose a release of claims between non-debtors that would not be

valid under state law.  The Bankruptcy Code does not define a "consensual release."  *See* 11 U.S.C.

§ 101.  "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism"

for third-party releases in chapter 11 plans.  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr.

S.D.N.Y. 2015).  And no Code provision authorizes bankruptcy courts to deem a non-debtor to

have consented to release claims against other non-debtors where such consent would not exist as

a matter of state law.

38.     Some courts have held that federal rather than state law applies to determine

whether a third-party release is consensual.  But because there is no applicable Code provision,

whether a non-debtor has consented to release another non-debtor is not, as one court concluded,

a "matter of federal bankruptcy law."  *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068,

at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662

B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision

of the Bankruptcy Code).  Absent express authority in the Code, federal courts cannot simply make

up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy

courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor

do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

39.    In *In re 4 West Holdings, Inc*., Judge Everett determined that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release" the Court must look to state law to determine whether opt out provisions are effective to confer consent to a third-party release. *See* Transcript of Proceedings before the Honorable Scott W. Everett held on October 18, 2022, on Motion to Enforce Confirmation Order and Releases and Injunctions Thereunder, Case No. 18-30777-SWE-11, United States Bankruptcy Court for the Northern District of Texas, Docket Entry No. 2086, p. 7 at ln. 1-6 (the "4 West Transcript").

40.    Accordingly, state-law contract principles govern whether a third-party release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453,

458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *Id.*

41.    Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

### *Under State Law, Silence Is Not Acceptance*

42.    The Debtors bear the burden to prove that the Plan is confirmable. *In re T-H New Orleans Ltd. Partnership,* 116 F.3d 790, 801 (5th Cir. 1997). They cannot meet this burden because they cannot establish that the Third-Party Release is consensual under applicable state law.

43.     Under Texas law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement. [6]  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *Advantage Physical Therapy v. Cruse*, 165 S.W.3d 21 (Tex. App. 2005) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)).

44.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[7] RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

---

[6] While the Plan provides that its construction and enforcement is governed by the laws of the State of Texas, the Debtors cannot choose the law to apply to contracts between non-debtors. Rather, ordinary choice of law principles govern which state's law applies to contracts between non-debtors, although a choice of law analysis may not be necessary absent any assertion that there is a difference in potentially applicable state laws governing what constitutes consent. *See Smallhold*, 2024 WL 4296938, at *13 n.57.

[7] Texas, like many states, follows the Restatement (Second) of Contracts § 69. See *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 52 (Tex. 2008); *The Levin Law Grp., P.C. v. Sigmon*, No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex. App. 2010); *Texas v. Triax Oil & Gas, Inc.*, 966 S.W. 2d 123, 128 (Tex. App. 1998)**.**

45.     There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent."  *Patterson*, 636 B.R. at 686; *see also, e.g.*, See *Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 131-33 (Tex. 2000) (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)**.**  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

46.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  *Id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### *Failing to Opt Out Does Not Provide the Required Affirmative Consent*

47.     The Plan imposes the Third-Party Releases on anyone who is provided a Ballot and does not return it with the opt-out box checked or anyone who is provided a Non-Voting Status Notice and does not return the Opt-Out Form.  In other words, the Debtors seeks to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent.  But under black-letter law that silence is not acceptance of the offer to release non-debtors.  *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent").

48.    A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282.  The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *Id*.  The customer did not opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *Id*. at 1282-83.

49.    The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *Norcia*, 845 F.3d at 1284 (quotation marks omitted); See *Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 131-33 (Tex. 2000)**.**  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."  *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies."  *Id*. at 1286 (quotation marks and citation omitted).

---

50.     The Ninth Circuit held that none of the exceptions to this rule applied.  *Norcia*,

845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response

to the offer, the parties did not have a prior course of dealing that might impose such a duty, and

the customer did not retain any benefits by failing to act given that the warranty applied whether

or not he opted out of the arbitration provision.  *Id*. at 1286.

51.     Here, too, Debtors' creditors have not signed an agreement to release the non-

debtor releasees nor acted in any other manner to suggest that their silence manifests an intention

to accept an offer to release the non-debtors.

### *Not voting and not opting out is not consent to release non-debtors*.

52.     Third-party releases cannot be imposed on those who do not vote and do not opt

out.  *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–

82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  442 B.R. 314, 355

(Bankr. D. Del. 2011).   This applies both to those Voting Class creditors who simply abstain

from voting or vote to reject the Plan but do not opt out and those Non-Voting Class interest

holders who are not entitled to vote.  There is no basis to infer consent by those who do not vote

and are taking no action with respect to the Plan.  Further, a creditor who rejects the Plan, but

does not opt out of the Third-Party Release should not be held to the Third-Party Release

because that creditor has rejected the Plan in full. A creditor who has rejected the Plan in full

should not be required to then reject one provision of that already rejected plan Plan by way of

the opt-out.

53.     Even where there are conspicuous warnings that a party will be bound if they

remain silent, that is not sufficient to recast a party's silence as consent to a third-party release.

*SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to

respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C.

§ 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,* 576 B.R. at 460–61

(recognizing that creditors have no duty to speak regarding a plan that would allow a court to

infer consent to third-party releases from silence). Consent thus cannot be inferred from their

silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does

not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT

(SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.*

§ 69 cmt. a.

54.    Further, "[w]hen the circumstances are equally consistent with either of two facts,

neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr.

N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do

not vote may have failed to vote for reasons other than an intention to assent to the releases.[8]

*SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at

all—but who are instead sent a Non-Voting Status Notice informing them they cannot vote,

along with an Opt-Out Form that they must return to avoid being bound by the third-party

release.

55.    "Charging all inactive creditors with full knowledge of the scope and implications

of the proposed third-party releases, and implying a 'consent' to the third-party releases based on

the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent'

beyond the breaking point." *Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay

attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the

debtor. But as to the creditor's rights against third parties—which belong to the creditor and not

---

[8] Here, the Plan and associated materials, including the Disclosure Statement, run to more than 193 pages, which do
not include the forthcoming Plan Supplement.

the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

56.     Thus, after the Supreme Court's decision in *Purdue*, one Court in the Northern District of Texas[9] addressed whether the failure to exercise an "opt-out" is effective to constitute consent to third party releases at confirmation and in the context of a motion to enforce a confirmation order.[10]  In *In re Ebix, Inc.*, the Court denied the effectiveness of opt out third party releases for creditors who failed to return a ballot.  In disallowing the inclusion of the third-party release in the proposed plan, the Court noted "[n]othing in the Bankruptcy Code or Bankruptcy Rules provides for such relief, and under Texas contract law, that the parties agree governs the third-party release under the Debtors' proposed plan, silence does not equal the consent of the affected claimants on this record." *See In re Ebix, Inc. et al*, Transcript of Ruling on Amended Chapter 11 Plan, before the Honorable Scott W. Everett held on August 2, 2024, Case No. 24-

---

[9] *Ebix* and its predecessor, *In re 4 West Holdings, Inc.*, interpret the contract law of the State of Texas. The laws of the State of Texas have long held that silence does not equal consent sufficient to support the existence of a contract, except under limited circumstances not applicable in this case.  *See Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132-33 (Tex. 2000).

[10] As Judge Everett noted in *Ebix* and *4 West Holdings, Inc.*, there are conflicting cases concerning the effectiveness of opt-out releases.  *See Ebix* Transcript, p. 9 at 19, *4 West* Transcript, p. 3 at ln. 17-19.  Judge Everett further noted that while no other bankruptcy judge in the Northern District of Texas had written on the issue, the other four judges in the Northern District of Texas had approved opt-out release structures and that he, respectfully, was parting ways with his colleagues.  *See 4 West* Transcript, p. 6 at ln. 14-16, *Ebix* Transcript, p. 5, ln. 8-11.

80004-SWE-11, United States Bankruptcy Court for the Northern District of Texas. (the "Ebix Transcript").

57.     The *Ebix* ruling conforms to that Court's prior ruling on the permissibility and effectiveness of an opt out third-party release in *4 West Holdings*, where the court found that there had not been "a determination, either in the confirmation order or since, on whether, in fact, the opt-out releases are permitted by applicable law." *See 4 West* Transcript, pp. 5-6 at ln.19-2.  *See also 4 West* Transcript, p. 13 at ln. 22-23.  Although in *Ebix* Judge Everett found those parties who returned a ballot—but failed to opt-out of the third-party release—consented to that release, the better view requires affirmative action to knowingly release third parties for the reasons discussed above.

58.     In *Ebix*, the Court stated "[o]nce consent is viewed from a contractual perspective, though, it is exceedingly difficult to construe the failure to opt out of a third-party release as valid consent." *Ebix* Transcript, p. 15, ln. 18-20.  The Court found that silence does not equal consent under Texas contract law and that none of the three exceptions to that principle—that assent to contract is supported by the parties' course of conduct, that assent to contract arises where the offeree accepts the benefit of the offer, and that assent to contract exists where the offeree misleads the offeror and that the offeree, by remaining silent, intends to accept the offer—apply to the opt out provisions in *Ebix*.  *See Ebix* Transcript p. 16-19, *See also 4 West* Transcript, pp. 18-19 at ln. 23 to 21.

59.     Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

### ***Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release.***

60.    Voting to accept a plan without checking an opt-out box does not constitute the

affirmative consent necessary to reflect acceptance of an offer to enter a contract to release

claims against non-debtors.[11]  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than

silence with respect to the offer to release claims against non-debtors.  The act of voting on a

chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence

may operate as acceptance" of a proposal that the creditor release claims against non-debtors.

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Impaired creditors have a federal right

under the Bankruptcy Code to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Merely

exercising that right does not manifest consent to release claims against non-debtors.

61.    Even more obviously, those who vote to reject the plan are not consenting to

third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement"

as to the plan, much less the third-party release, the creditor has expressly stated its rejection of

the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject

---

[11] One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote.  *See Smallhold,* 665 B.R. at 723.  The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *Id.*  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a *"manifestation of intention* that silence may operate as acceptance" of a third-party release.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).  That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[11] Thus, consent to release *third-party* claims (which are governed by *nonbankruptcy* law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the *debtor* (governed by *bankruptcy* law).

---

a plan should also be presumed to have rejected the proposed third-party releases that are set

forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have*

*been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  533 B.R.

64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

62.     Judge Everett also rejected the notion that failing to opt out from a third-party

release is akin to a default under a complaint, failure to file a proof of claim timely, or failure to

respond to a claim objection.  "All of those examples involve specific Bankruptcy or Federal

Civil Rules that permit affirmative relief to be taken against a party if they fail to act.  Here, there

are no comparable rules providing for the result of a determination of deemed assent or consent

to a contractual release through silence." *See 4 West* Transcript, pp. 20-21 at ln. 23-14.

### *There Was Insufficient Notice of the Third-Party Releases.*

63.     Although as set forth above, a failure to opt out cannot provide affirmative

consent, even if it could, the Third-Party Releases here cannot be approved because there was

insufficient notice of them.  Imputing state-law consent to a non-debtor release assumes that the

creditor understands that failure to opt out will have this dramatic impact, which would require

both that the creditor sees the non-debtor release provision and that the creditor understands its

terms.  But that assumption has no evidentiary support.

64.     There is no acceptance of an offer when there is insufficient notice of the alleged

contractual terms. *See Norcia*, 845 F.3d at 1285.  "[A]n offeree, regardless of apparent

manifestation of his consent, is not bound by inconspicuous contractual provisions of which he

was unaware, contained in a document whose contractual nature is not obvious." *Id*. (quotation

marks omitted); *see also Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir.

2017) (reaffirming that a person cannot be presumed to have agreed to contractual provisions

unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement").  Hence, failing to opt out does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details."  *In re Congoleum Corp.*, 362 B.R. at 194.

65.    Here, the Third-Party Release language is either buried in the Ballots or Non-Voting Notices.  Recipients must also take affirmative action to obtain copies of the Plan and Disclosure Statement to fully understand the proposed Third-Party Release.

66.    This is particularly true here given that the proposed Cover Letter to be sent to Voting Classes fails to reference the "opt-out" election on the Ballots and does not explain how that opt-out may affect creditors.  The two proposed forms of Ballots do not reference an opt-out provision until the bottom of page two, with the opt-out checkbox itself on either pages three or four.  Furthermore, the Debtors are proposing that they may be able to serve the Plan and Disclosure Statement via electronic means, or have claim and equity interest holders be required either to download these documents themselves or call a phone number to request hard copies in the mail.

67.    The Notice of Non-Voting Status, first and foremost, notifies creditors that they are not entitled to vote on the Plan. Thus, a recipient of a Notice of Non-Voting Status may read no further upon being so informed.  Further, the Notice of Non-Voting Status described the opt-out as "optional," effectively downplaying its importance.  Importantly in this case, those proposed to receive the Notice of Non-Voting Status will not receive the full solicitation package under the Solicitation Motion. While information concerning how to obtain a copy of the Disclosure Statement, the Plan, and other Plan documents is proposed to be provided on the

Notice of Non-Voting Status, it is undisputed that those parties would not be provided actual

notice in the form of the full text of those documents, which would more fully disclose the

parameters of the Plan provisions and releases from which they were expected to "opt out."  Any

party receiving a Notice of Non-Voting Status would have to take affirmative action to obtain

those documents in order to review and understand fully what was being asked of them in the

larger context of the Plan.  Accordingly, the parties who received the Notice of Non-Voting

Status may not fully comprehend the extent of the Third-Party Release due to a lack of notice of

the interplay between the Third-Party Release and the Plan.  The Court in *4 West Holdings, Inc.*

similarly expressed concern about lack of notice.  *See 4 West* Transcript, p. 16 at ln. 2-7 (noting

that there was no evidence that the debtors in that case gave notice to the creditor of the

bankruptcy filing, the plan and the ballot).

68.     Furthermore, a failure to check the Ballot opt-out box or return an Opt-Out Form

is not consent because—whether they are asked to vote or not—claimants have no reason to

expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the

Third Circuit has explained, there can be no presumption that someone has agreed to contractual

provisions of which they are "on notice," unless "there is a reasonable basis to conclude that

consumers will have understood the document contained a bilateral agreement."  *See Noble v.*

*Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).  *See also Norcia*, 845 F.3d

at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms

are not called to the attention of the recipient.") (quotation marks omitted).

### *Opt-Outs Cannot Be Imposed Based on a Procedural Default Theory.*

69.     Applicable state contract law cannot be disregarded on a procedural default

theory, applied by some courts, under which creditors who remain silent are held to have

forfeited their rights against non-debtors if they received notice of the non-debtor release but

failed to object, just as they would forfeit their right to object to a debtor's plan if they failed

timely to do so.[12]  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL

2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at

716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North*

*America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL

1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011);

*In re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at *17 (Bankr. S.D. Tex.

2024) (citing *Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592, at *6-8)**]**.  These courts

reasoned that so long as the creditors received notice of a proposed non-debtor release and were

informed of the consequences if they did not opt out or object to that release, there is no

unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 665

B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing]

entry of the third-party release to be entered by default").

70.    A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In*

*re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).  The *Mallinckrodt* court

stated that "the notion that an individual or entity is in some instances deemed to consent to

something by their failure to act is one that is utilized throughout the judicial system."  *Id*.

"When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or

otherwise respond, or a judgment is automatically entered against them."  *Id*. at 879.  The court

---

[12] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 2025 WL 737068, at *17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id*. at *9-*10, *12-*13.

reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *Id*.

71.     This is wrong.  First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling.  Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right.  *United States v. Olano*, 507 U.S. 725, 731 (1993).  Forfeiture, unlike waiver, is not an intentional relinquishment of a known right.  *Id*. at 733.  *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").  Forfeiture principles thus do not show consent.

72.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan.  No one has submitted the released claims for adjudication by the bankruptcy court.  *See Olano*, 507 U.S. at 731.

73.     And "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation.[13]  *Smallhold*, 665 B.R. at 709; *see also id*. at 722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245

---

[13] As discussed further below, although the United States Trustee agrees with much of the analysis in *Smallhold*, she disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

(11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

74.     But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Smallhold*, 665 B.R. at 709.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*.  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at 719-20.

75.     Because a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at 709.  And besides the flawed default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[14]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at 720 (emphasis added).

***Even if the Court Approves the Opt-Out Mechanism, the Wind-Down Debtor should be struck from list of Released Parties***

---

[14] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

76.     The Third-Party Release applies only to acts taking place on or before the Effective Date.  The Wind-Down Debtor will not exist until on or after the Effective Date, when it comes into existence.  Thus, at most, the Wind-Down Debtor would be entitled to a release only for any acts taken on the Effective Date, and not after.  Given that the Wind-Down Debtor does not yet exist until such time as the Plan goes effective, it should not be subject to the Third-Party Release.

### *The Court Should Clarify Patients are not a Releasing Party*

77.     The Patient Notice provides former and current patients with information on the Plan, Disclosure Statement and Confirmation Hearing.  It does not provide the Opt-Out Form or other information as to the releases and according to the Debtors, the patients will not be bound to the Third-Party Release.  The Plan should include language clarifying that patients are not subject to the Third-Party Release.

### *Even if the Court Approves the Opt-Out Mechanism, Parties Whose Addresses are Undeliverable Should not be Bound by the Third-Party Release*

78.     The Debtors are seeking to waive the notice requirements for creditors whose addresses are undeliverable for the Solicitation Package.  The Debtors have indicated these creditors will not be bound by the Third-Party Release and the United States Trustee requests language clarifying that creditors with undeliverable addresses are not subject to the Third-Party Release.

### **The Plan is patently unconfirmable because there is no authority for the injunction against bringing claims against non-debtors.**

79.     Plan Article VIII.D proposes an Injunction Provision that enjoins any claim or equity interest holders from bringing claims against the "Plan Administrator, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties."   The United States Trustee objects to

the Injunction Provision to the extent that it would enjoin claims against the Exculpated Parties, or the Released Parties.[15]

80.     This Court may not approve the injunction enforcing the Third-Party Release by barring claims against non-debtors.  *Purdue* held that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code.  *See Purdue*, 603 U.S. at 227.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related.  *See id*. at 222 (citing 11 U.S.C. § 524(g)).

81.     Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction.  An injunction is critically different from a consensual non-debtor release.  The legal effect of a consensual release is based on the parties' agreement.  *See Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").  The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change.  An injunction, by contrast, relies on the court's power to enter orders binding on parties.  The court must therefore have both constitutional and statutory authority to enter an injunction.  And, once such jurisdiction and authority are established, the court still must determine that an injunction is warranted.  But jurisdiction, authority, and a showing that injunctive relief is warranted are all absent here.

---

[15] The United States Trustee does not object to the Injunction Provision as it applies to the Exculpated Parties, which here consist of the Debtors, Independent Directors and the UCC members.  *See NexPoint Advisors, LP v. Highland Capital Management, LP (In re Highland Capital Management, LP),* 48 F.4th 419, 438-39 (5th Cir. 2022)("*Highland I"*).

82.     First, the bankruptcy court lacks jurisdiction to enter a permanent injunction barring claims between non-debtors. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 755, 757 (1995).   While 28 U.S.C. § 1334(b) provides concurrent jurisdiction over civil proceedings "related to" a bankruptcy case, the enjoined claims between non-debtors do not "relate to" the Debtors' chapter 11 case.

83.     "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and in any way impacts upon the handling and administration of the bankrupt estate." *Zale*, 62 F.3d at 752.   "For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999).   Post-confirmation jurisdiction is more limited.   "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.*), 266 F.3d 388, 390 (5th Cir. 2001).   "No longer is expansive bankruptcy court jurisdiction required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id*. (cleaned up).

84.     Here, the claims between non-debtors are not property of Debtors or the estate, will not impact the estate, and do not bear on the execution of the Debtors' Plan.   "[T]he state law causes of action" barred by the injunction "do not bear on the interpretation or execution of the debtor's plan." *Craig's Stores*, 266 F.3d at 391.   Nor would the post-confirmation pursuit of such claims against non-debtors have any impact on the Debtors' bankruptcy estate, which ceases to

exist at confirmation.  Accordingly, the bankruptcy court has no jurisdiction to enjoin those claims.
*Craig's Stores*, 266 F.3d at 391; *Zale*, 62 F.3d at 756-57.

85.    The bankruptcy court also lacks jurisdiction to enter injunctive relief because the
Debtors lack standing to seek it.  A party seeking injunctive relief must have standing to do so.
*City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Wells Fargo Bank, N.A. v. Stewart (In re
Stewart)*, 647 F.3d 553, 557 (5th Cir. 2011).  To have standing, the party seeking injunctive relief
must show "that he has sustained or is immediately in danger of sustaining some direct injury" and
"the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."
*Lyons*, 461 U.S. at 105; *see also Stewart*, 647 F.3d at 557.  "Absent such a showing, there is no
case or controversy regarding prospective relief, and thus no basis in Article III for the court's
power to issue an injunction."[16] *Stewart*, 647 F.3d at 557; *accord Lyons*, 461 U.S. at 101-02.  The
Debtors has made no such showing here. Accordingly, the bankruptcy court lacks jurisdiction to
enter injunctive relief barring the released claims.

86.    Second, there is no authority in the Bankruptcy Code for the injunction barring
claims between non-debtors.  The Debtors cannot rely on section 105(a) for this authority because
it "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue*, 603
U.S. at 216 n.2 (quotation marks omitted).  But nothing in the Code authorizes the court to use its
judicial power to bar claims between non-debtors.  *Id*. at 227.

87.    Finally, such an injunction is not warranted by the traditional factors that support
injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an
irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

---

[16] Although the bankruptcy court is not an Article III court, "[a] party that lacks standing to support jurisdiction in an
Article III court also lacks standing for that claim to be adjudicated by a bankruptcy court."  *Stewart*, 647 F.3d at
557.

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id.* (noting that an injunction is an "extraordinary remedy").

88.     The Debtors has not shown that any of these factors are met.  There is no imminent threat that anyone is going to bring suit on a released claim against the Exculpated Parties or the Released Parties.  And if a released claim is brought, the release may be asserted as an affirmative defense.  An injunction "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat." *Lyons*, 461 U.S. at 111 (cleaned up).  Further, the injunction harms those bound by it because it precludes them from challenging the applicability or enforceability of the third-party release (e.g., based on mistake or lack of capacity) under applicable non-bankruptcy law.

89.     Claim and interest holders who opt out of the Third-Party Releases are still bound by the Injunction Provision by virtue of its applicability to Exculpated Parties or the Released Parties.

## The Disclosure Statement and Plan should clarify that claims of governmental entities are not released.

90.     The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015).

Preserving governmental entities' ability to protect public health and safety is particularly important in the context of a healthcare company.

91.    The Disclosure Statement does not contain adequate information as to whether governmental police and regulatory powers are preserved. The Debtors should modify the Disclosure Statement and Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters.   The United States Trustee requests that the Debtors include the following language in the Plan:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## CONCLUSION

Wherefore, the United States Trustee respectfully requests that the Court deny to conditionally approve the Disclosure Statement and grant to the United States Trustee such other and further relief as is just and proper.

DATED: June 18, 2025                         Respectfully submitted,

                                             LISA L. LAMBERT
                                             UNITED STATES TRUSTEE
                                             */s/ Elizabeth Ziegler Young*
                                             Elizabeth Ziegler Young
                                             Trial Attorney
                                             Texas State Bar No. 24086345
                                             Office of the United States Trustee
                                             1100 Commerce Street, Room 976
                                             Dallas, Texas  75242
                                             (214) 767-1247
                                             elizabeth.a.young@usdoj.gov

## Certificate of Service

The undersigned counsel certifies that copies of the foregoing document were served on June 18, 2025, via ECF to those parties requesting service via ECF in this case.

*/s/  Elizabeth Ziegler Young*
Elizabeth Ziegler Young