## Exhibit A

**Stalking Horse Agreement**

*Execution Copy*

**ASSET PURCHASE AGREEMENT**

**by and between**

**NOR HEALTHCARE SYSTEMS CORP.**

**and**

**PROSPECT MEDICAL HOLDINGS, INC. AND EACH ENTITY SET FORTH ON SCHEDULE A HERETO.**

**Dated as of August 3, 2025**

Table of Contents

Page

ARTICLE 1 DEFINED TERMS ................................................................2
    1.1    *Defined Terms* ................................................................2
    1.2    *Other Definitional and Interpretive Matters* .......................................17

ARTICLE 2 THE PURCHASE AND SALE; CLOSING .............................................20
    2.1    *Purchase and Sale* ................................................................20
    2.2    *Excluded Assets* ................................................................21
    2.3    *Assumption of Liabilities* ................................................................24
    2.4    *Excluded Liabilities* ................................................................25
    2.5    *Excluded Contracts* ................................................................25
    2.6    *Nontransferable Assets and Liabilities* .......................................26
    2.7    *Closing* ................................................................26
    2.8    *Closing Deliveries of the Parties* .......................................26
    2.9    *Purchase Price* ................................................................27
    2.10    *Transfer Taxes* ................................................................28
    2.11    *Allocation of Purchase Price* .......................................28

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS .......................28
    3.1    *Organization, Good Standing and Other Matters* .......................................28
    3.2    *Authority and Enforceability* ................................................................29
    3.3    *No Conflict; Required Filings and Consents* .......................................29
    3.4    *Compliance With Laws; Permits* .......................................29
    3.5    *[Intentionally Omitted.]* ................................................................30
    3.6    *Real Property; Personal Property* .......................................30
    3.7    *Brokers and Finders* ................................................................30
    3.8    *Employee Benefit Plans* ................................................................30
    3.9    *Labor Matters* ................................................................30
    3.10    *Health Care Compliance* ................................................................31
    3.11    *Financial Statements* ................................................................31
    3.12    *No Other Representations or Warranties* .......................................32

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................33
    4.1    *Organization, Good Standing and Other Matters* .......................................33

| | | | |
|---|---|---|---|
| | 4.2 | *Authority and Enforceability* | 33 |
| | 4.3 | *No Conflict: Required Filings and Consents* | 33 |
| | 4.4 | *Financing* | 34 |
| | 4.5 | *Solvency* | 34 |
| | 4.6 | *Litigation* | 34 |
| | 4.7 | *Brokers and Finders* | 34 |
| | 4.8 | *Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties* | 34 |
| | 4.9 | *No Other Representations or Warranties* | 35 |
| | 4.10 | *No Knowledge of Seller Parties' Breach* | 35 |
| ARTICLE 5 | BANKRUPTCY COURT MATTERS | | 36 |
| | 5.1 | *Competing Transaction* | 36 |
| | 5.2 | *Bankruptcy Court Filings* | 36 |
| | 5.3 | *Assumption of Assigned Contracts* | 37 |
| ARTICLE 6 | PRE-CLOSING COVENANTS | | 39 |
| | 6.1 | *Conduct of Business* | 39 |
| | 6.2 | *Access to Information; Confidentiality* | 40 |
| | 6.3 | *Efforts to Consummate* | 41 |
| | 6.4 | *Notices and Consents* | 42 |
| | 6.5 | *Regulatory Matters and Approvals* | 42 |
| | 6.6 | *Public Announcements* | 44 |
| | 6.7 | *Update of Schedules* | 45 |
| | 6.8 | *Notification of Certain Matters* | 45 |
| | 6.9 | *Transition Services* | 45 |
| | 6.10 | *Employee Matters* | 46 |
| | 6.11 | *[Intentionally Omitted.]* | 47 |
| | 6.12 | *MPT Lease and Post-Closing Agreement Negotiations* | 47 |
| | 6.13 | *Treatment of Accrued Property Taxes* | 47 |
| | 6.14 | *Right to Bill* | 48 |
| ARTICLE 7 | POST-CLOSING COVENANTS | | 48 |
| | 7.1 | *Access to Information; Books and Records* | 48 |
| | 7.2 | *Post-Closing Receipt and Possession of Assets* | 48 |
| | 7.3 | *Tax Matters* | 49 |

7.4     *Nonassignable Assets* .................................................................................50

7.5     *Terminating Cost Reports* .............................................................................51

7.6     *Medicare Bad Debts* .....................................................................................51

7.7     *HITECH Payments* ........................................................................................52

7.8     *Medical Staff* ..................................................................................................52

ARTICLE 8 CONDITIONS PRECEDENT ...........................................................................52

8.1     *Conditions to Each Party's Obligation* ........................................................52

8.2     *Conditions to Obligation of Purchaser* ........................................................53

8.3     *Conditions to Obligations of the Seller Parties* ...........................................53

8.4     *Waiver of Condition; Frustration of Conditions* ..........................................54

ARTICLE 9 TERMINATION ................................................................................................54

9.1     *Events of Termination* ...................................................................................54

9.2     *Effect of Termination* .....................................................................................55

ARTICLE 10 GENERAL PROVISIONS ...............................................................................56

10.1    *Survival of Representations, Warranties and Covenants* .............................56

10.2    *Entire Agreement* ...........................................................................................56

10.3    *Amendment; No Waiver* ..................................................................................57

10.4    *Severability; Specific Versus General Provisions* ........................................57

10.5    *Expenses and Obligations* .............................................................................58

10.6    *Notices* ............................................................................................................58

10.7    *Counterparts* ..................................................................................................59

10.8    *Governing Law* ...............................................................................................59

10.9    *Submission to Jurisdiction; Consent to Service of Process* ..........................59

10.10   *Waiver of Jury Trial* .......................................................................................60

10.11   *Rights Cumulative* ..........................................................................................60

10.12   *Assignment* .....................................................................................................60

10.13   *Specific Enforcement; Remedies* ...................................................................61

10.14   *Third-Party Beneficiaries* ..............................................................................61

10.15   *No Personal Liability of Directors, Officers and Owners* ............................62

10.16   *General Release* .............................................................................................62

10.17   *Legal Representation* ......................................................................................63

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Schedule A | Sellers |
| | |
| Exhibit A | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit B | MPT Lease Term Sheet |
| Exhibit C | eCapital Borrowing Base |
| | |
| Schedule 1.1-a | Bellflower Land |
| Schedule 1.1-b | Culver Land |
| Schedule 1.1-c | Facilities |
| Schedule 1.1-d | Hollywood Land |
| Schedule 1.1-e | Los Angeles Land |
| Schedule 1.1-f | Norwalk Land |
| Schedule 1.1-g | Permitted Liens |
| Schedule 1.1-h | Van Nuys Land |
| Schedule 2.1(e) | Assumed Personal Property |
| Schedule 2.1(f) | Owned Intellectual Property |
| Schedule 2.2(c) | Certain Excluded IP |
| Schedule 2.2(o) | Certain Excluded Assets |
| Schedule 2.3(g) | Other Assumed Liabilities |
| Schedule 2.11 | Allocation Principles |
| Schedule 3.1(b) | Sellers' Subsidiaries |
| Schedule 3.3 | Sellers' Consents |
| Schedule 3.4(a) | Sellers' Compliance with Laws |
| Schedule 3.4(b) | Sellers' Permits |
| Schedule 3.6(b) | Third Party Leases |
| Schedule 3.6(c) | Sellers' Personal Property Leases |
| Schedule 3.7 | Sellers' Brokers and Finders |
| Schedule 3.8(a) | Seller Benefit Plans |
| Schedule 3.8(b) | Sellers' Compliance with ERISA |
| Schedule 3.8(c) | Sellers' Multi-Employer Plans |
| Schedule 3.9 | Sellers' Labor Agreements Schedule |
| Schedule 3.10(a) | Sellers' Material Overpayments or Refunds |
| Schedule 4.3 | Purchaser Consents |
| Schedule 4.6 | Purchaser Litigation |
| Schedule 4.7 | Purchaser Brokers and Finders |
| Schedule 5.3(a) | Available Contracts |
| Schedule 5.3(a)-1 | Designated Contracts Schedule |
| Schedule 6.1 | Conduct of Business |
| Schedule 6.4 | Third-Party Consents |
| Schedule 6.10(a) | Scheduled Employees |
| Schedule 8.1(b) | Required Regulatory Approvals |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of August 3, 2025 (the "**Effective Date**") is entered into by and between NOR Healthcare Systems Corp., a Nevada corporation ("**Purchaser**"), on the one hand, and Prospect Medical Holdings, Inc., a Delaware corporation ("**Seller Parent**" or the "**Seller Representative**") and each of the entities listed on Schedule A (collectively, the "**Sellers**" and together with each of their respective Subsidiaries, the "**Seller Group**" and together with Seller Parent the "**Seller Parties**"), on the other hand. Purchaser and the Seller Parties are referred to collectively herein as the "**Parties**" and each individually as a "**Party**." Capitalized terms not otherwise defined in this Agreement shall be defined in Article 1.

## RECITALS

**WHEREAS**, on January 11, 2025 (the "**Petition Date**"), Seller Parent and certain of its affiliates, including the Seller Group, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") commencing chapter 11 cases (the "**Bankruptcy Cases**") which are jointly administered under Case No. 25-80002;

**WHEREAS**, the Seller Group are debtors-in-possession under the Bankruptcy Code and manage their respective properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller Group is engaged in the Business and owns, directly or indirectly, all of the Transferred Assets;

**WHEREAS**, the Seller Group desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller Group, all of the Transferred Assets Free and Clear, and the Seller Group desires Purchaser to assume, and Purchaser desires to assume from the Seller Group all of the Assumed Liabilities, in each case, upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, within one (1) Business Day of the Effective Date, Purchaser shall deposit an aggregate amount equal to the Deposit into a distribution checking account (the "**Deposit Account**") established and maintained by the Escrow Agent;

**WHEREAS**, MPT Lessors, Seller Parent, Southern California Healthcare System, Inc. and Alta Los Angeles Hospitals, Inc. will, pursuant to the terms of this Agreement, enter into that certain MPT Agreement, which provides for the leasing of the MPT Real Property in accordance with the terms and conditions set forth therein; and

**WHEREAS**, the Transactions are subject to approval by the Bankruptcy Court and will only be consummated pursuant to, among other things, the Sale Order to be entered in the Bankruptcy Cases.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1     ***Defined Terms***. The following terms shall have the following meanings in this Agreement:

"***Accounts Receivable***" means all accounts, notes, interest and other receivables of the Seller Group, and all claims, rights, interests and proceeds related thereto, in each case arising from the rendering of services to inpatients and outpatients of the Business, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided prior to the Effective Time whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients of the Business relating to Government Reimbursement Programs and other third party patient claims due from beneficiaries or Third Party Payors.

"***Action***" means any action, proceeding, arbitration, audit, investigation or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"***Affiliate***" or "***Affiliates***" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, the election or appointment of board members, by contract or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***Allocation Principles***" has the meaning set forth in Section 2.11.

"***Alternate Transaction***" has the meaning set forth in Section 9.1(b).

"***Antitrust Laws***" has the meaning set forth in Section 6.5(b).

"***Apportioned Obligations***" has the meaning set forth in Section 7.3(c).

"***Asset Tax Return***" means a Tax Return relating to Asset Taxes.

"***Asset Taxes***" means any Taxes with respect to the ownership or operation of the Transferred Assets other than (a) Taxes based on net or gross income, and (b) Transfer Taxes.

"***Assigned Contracts***" has the meaning set forth in Section 2.1(c).

"*Assumed Liabilities*" has the meaning set forth in <u>Section 2.3</u>.

"*Assumed TSAs*" shall mean all transition services agreements and similar arrangements resulting from or related to, or executed in connection with, the disposition of the Seller Parties' and their Affiliates' assets, including the Existing TSAs, dated prior to, on or after the Closing Date, but which shall not include the Transition Services Agreement contemplated hereunder.

"*Attorney-Client Information*" has the meaning set forth in <u>Section 10.17</u>.

"*Auction*" has the meaning set forth in <u>Section 5.2(b)</u>.

"*Available Contract*" has the meaning set forth in <u>Section 5.3(a)</u>.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Sellers or their respective estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"*Back-Up Bid*" means the next highest or otherwise next best bid after the Successful Bid.

"*Back-Up Bidder*" means the party providing the Back-Up Bid.

"*Back-up Termination Date*" means the first to occur of (a) ninety (90) days after the entry of the Sale Order, (b) consummation of the Transactions with the Successful Bidder, and (c) Purchaser's receipt of notice from the Seller Representative of the release by the Sellers of Purchaser's obligations under <u>Section 5.2(b)</u>.

"*Bankruptcy Cases*" has the meaning set forth in the RECITALS.

"*Bankruptcy Code*" has the meaning set forth in the RECITALS.

"*Bankruptcy Court*" has the meaning set forth in the <u>RECITALS</u>.

"*Bellflower Land*" means certain real property located in the City of Bellflower, Los Angeles County, California as more particularly described on <u>Schedule 1.1-a</u> and made a part hereof by reference and incorporation.

"*Bellflower Property*" means the Bellflower Land and related Improvements located thereon.

"*Bid Procedures*" means those certain bidding procedures set forth as Exhibit 1 to the Bid Procedures Order, as such procedures may be amended from time to time thereafter in accordance with the Bid Procedures Order.

"*Bid Procedures Order*" means the Order of the Bankruptcy Court approving the Bid Procedures entered at Docket No. 1264.

"*Bid Protections*" has the meaning set forth in <u>Section 5.2(c)</u>.

"***Bill of Sale and Assignment and Assumption Agreement***" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between each member of the Seller Group and Purchaser, substantially in the form attached hereto as Exhibit A.

"***Books and Records***" means originals, or where not available, copies (including in electronic format), of books and records maintained in connection with the Business or the Transferred Assets, including books and records relating to books of account, ledgers and general financial accounting records, non-income Tax records, complete personnel records and employee files (including Forms I-9), machinery and equipment maintenance files, patient and customer lists, Patient Data, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, complete billing and coding records, all Third Party Payor Contracts (to the extent they are among the Assigned Contracts) and communications with payors related to such Contracts, material and research, in each case, to the extent such books and records are located at the Facilities or are exclusively used or held for use in, or otherwise exclusively relate to, the Business.

"***Break-Up Fee***" has the meaning set forth in Section 5.2(c).

"***Business***" means collectively, the businesses owned and operated by the Seller Group immediately prior to the Closing, including the businesses operated at the Facilities.

"***Business Day***" means any day other than (a) a Saturday, Sunday or federal holiday, or (b) a day on which commercial banks in Los Angeles, California are authorized or required to be closed.

"***Capitation Claims***" has the meaning set forth in Section 2.3(m).

"***CARES Act***" means the Coronavirus Aid, Relief, and Economic Security Act, as amended from time to time, and the regulations promulgated thereunder.

"***CBAs***" has the meaning set forth in Section 5.3(a).

"***Closing***" has the meaning set forth in Section 2.7.

"***Closing Date***" has the meaning set forth in Section 2.7.

"***CMIR***" has the meaning set forth in Section 6.5(d).

"***CMS***" has the meaning set forth in Section 7.6.

"***Code***" means the Internal Revenue Code of 1986, or any successor law.

"***Competing Bid***" has the meaning set forth in Section 5.1.

"***Confidentiality Agreement***" means that certain Confidentiality and Non-Disclosure Agreement, dated as of February 18, 2025, by and between Seller Parent and Healthcare Systems of America.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Continuing Employee**" has the meaning set forth in Section 6.10(b).

"**Contract**" or "**Contracts**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Contract and Cure Schedule**" has the meaning set forth in Section 5.3(a).

"**Contracting Parties**" has the meaning set forth in Section 10.15.

"**Cost Reports**" means all cost and other reports filed pursuant to the requirements of Government Reimbursement Programs, and similar or successor programs with or for the benefit of Governmental Authorities for payment or reimbursement of amounts due from them.

"**Counterparty Objection**" has the meaning set forth in Section 5.3(g).

"**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2 and all related strains and sequences) or mutations (or antigenic shifts or drifts) thereof or a disease or public health emergency resulting therefrom.

"**COVID-19 Funds**" means all grants, payments, distributions, loans, funds or other relief applied for or provided prior to the Effective Time under the CARES Act, the Paycheck Protection Program Act, or any other program authorized by any Governmental Authority or Government Reimbursement Program in response to COVID-19, including the Paycheck Protection Program, Main Street Loan Program, Provider Relief Fund, Small Rural Hospital Improvement Program, Assistant Secretary for Preparedness and Response or Hospital Preparedness Program Grants, or any other Law or program enacted, adopted or authorized in response to COVID-19; *provided*, that COVID-19 Funds does not include any Medicare Accelerated and Advance Payments.

"**Culver Land**" means certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on Schedule 1.1-b and made a part hereof by reference and incorporation.

"**Culver Property**" means the Culver Land and related Improvements located thereon.

"**Cure Costs**" means any and all costs, expenses or actions that Purchaser is required to pay or perform to assume any of the Assigned Contracts pursuant to Section 365(f) of the Bankruptcy Code.

"**Deposit**" means an amount equal to Four Million Dollars ($4,000,000) and any earnings and interest thereon.

"**Deposit Account**" has the meaning set forth in the RECITALS.

"**Designated Contracts Schedule**" has the meaning set forth in Section 5.3(a).

"**Designated Courts**" has the meaning set forth in Section 10.9(a).

"***Determined Cure Costs***" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order.

"***DOJ***" has the meaning set forth in <u>Section 6.5(a)</u>.

"***eCapital Borrowing Base***" has the meaning set forth in <u>Section 2.9(a)</u>.

"***eCAPITAL Line of Credit***" means that certain credit facility provided for under that certain Credit and Security Agreement, dated as of June 5, 2024, as amended, by and among Southern California Healthcare System, Inc., a California corporation, and Alta Hospital System, LLC, a California limited liability company, as borrowers, and eCAPITAL HEALTHCARE CORP., a Delaware corporation, as lender.

"***Effective Date***" has the meaning set forth in the Preamble.

"***Effective Time***" has the meaning set forth in <u>Section 2.7</u>.

"***Enforceability Exceptions***" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"***Environmental Laws***" means any applicable Law relating to pollution or protection of the environment or worker health and safety (in respect of exposure to Hazardous Substances), including such Laws relating to the use, treatment, storage, disposal, Release or transportation of Hazardous Substances.

"***Escrow Agent***" means Omni Agent Solutions, Inc.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Books and Records***" means the following originals and copies of those Books and Records, documents, data and information (in whatever form maintained) of the Seller Parties: (a) all corporate minute books (and other similar corporate records) and equity records, (b) any Books and Records relating to the Excluded Assets or Taxes paid or payable by the Seller Parties, (c) all Tax Returns of the Seller Parties, or (d) any Books and Records that the Seller Parties (i) are required by Law to retain (copies of which, to the extent permitted by Law and this Agreement, will be made available to Purchaser upon Purchaser's reasonable request), (ii) reasonably believes is necessary to enable it to prepare and/or file Tax Returns (copies of which will be made available to Purchaser upon Purchaser's reasonable request), or (iii) is prohibited by Law from delivering to Purchaser.

"***Excluded Contracts***" has the meaning set forth in <u>Section 2.5</u>.

"***Excluded IP***" has the meaning set forth in <u>Section 2.2(c)</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.4</u>.

"***Excluded Payments***" has the meaning set forth in <u>Section 2.2(u)</u>.

"***Excluded Supplemental Payments***" has the meaning set forth in <u>Section 2.2(u)</u>.

"***Executory Contract***" means any executory Contract or unexpired lease for non-residential real property to which any Seller Party is a party within the meaning of Section 365 of the Bankruptcy Code, but excluding Contracts and unexpired Leases that are not solely related to the Business or related to the supply of goods or services, beyond the Business, on a national or regional basis.

"***Existing TSAs***" shall mean the Purchase Services Transition Agreement and Information Technology Transition Services Agreement identified on <u>Schedule 5.3(a)</u>.

"***Facilities***" means the facilities and sites licensed to be operated by the Seller Group under a Permit held by any Seller Group and any other facilities, sites, medical office buildings, surgery centers, physician offices, ancillary services facilities, land or buildings associated with the Business (whether owned or leased by a Seller Party) as set forth on <u>Schedule 1.1-c</u>.

"***Federal Health Care Program***" means any "*federal health care program*" as defined in 42 U.S.C. §1320a-7b(f), including Title XVIII of the Social Security Act ("***Medicare***"), Title XIX of the Social Security Act ("***Medicaid***"), state CHIP programs, TRICARE, the Civilian Health and Medical Program of the Department of Veterans Affairs, programs administered by the U.S. Department of Labor Employment Standards Administration's Office of Workers' Compensation Programs (e.g., administration of claims pursuant to the Black Lung Benefits Act), and similar or successor programs with or for the benefit of designated federal or state residents.

"***Final Order***" means an Order of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; *provided*, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"***Free and Clear***" means free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"***FTC***" has the meaning set forth in <u>Section 6.5(a)</u>.

"***GAAP***" means generally accepted accounting principles in the United States as of the Effective Date.

"***Government Reimbursement Programs***" means any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purposes of paying for health care services. Such programs shall include, but not be limited to, any Federal Health Care Program.

"***Governmental Authority***" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS).

"***Hazardous Substances***" means any substances, materials or wastes which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials,"

"toxic substances," "pollutants" or "contaminants" under any Environmental Law, including any petroleum or refined petroleum products, radioactive materials, friable asbestos or polychlorinated biphenyls.

"*Health Care Laws*" means (a) the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b), the Federal False Claims Act (31 U.S.C. § 3729 et seq.), and the Federal Civil Monetary Penalties Law (42 U.S.C. § 1320a-7b), (b) the Health Insurance Portability and Accountability Act of 1996, as amended by the HITECH Act, and their implementing regulations (collectively, "*HIPAA*"), (c) the federal physician self-referral Law (42 U.S.C. §1395nn and §1395(q)) (commonly known as the "*Stark Law*"), (d) Laws relating to the regulation, provision, administration of, billing of, coding of or payment for healthcare products or services, and (e) the federal Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act.

"*HIPAA*" has the meaning set forth in Section 1.1.

"*Historical Financial Statements*" has the meaning set forth in Section 3.11.

"*HITECH Act*" means the Health Information Technology for Clinical Health Act of 2009.

"*HITECH Payments*" means HITECH incentive payments and rights to receive such payments based on attestations submitted or to be submitted with respect to "meaningful use" of certified electronic health record technology ("certified EHR technology") (as those terms are defined under §§ 4101, 4102 and 4201 of the HITECH Act), pursuant to the requirements of the implementing regulations under the HITECH Act.

"*Hollywood Land*" means certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on Schedule 1.1-d and made a part hereof by reference and incorporation.

"*Hollywood Property*" means the Hollywood Land and related Improvements located thereon.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"*Improvements*" means the existing improvements on the Land and the buildings and any improvements constructed on the Land.

"*Information Privacy and Security Laws*" has the meaning set forth in Section 3.10(d).

"*Intellectual Property*" means any and all intellectual property rights arising from the following: (a) patents and patent applications; (b) trademarks, service marks, trade dress, service names, trade names, brand names, logos, business names, corporate names and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; and (e) internet domain name registrations.

"*Interim Lease Agreement*" means that certain Sale Leaseback Agreement to be entered into by and between Seller Group and Purchaser at Closing, which will provide for a lease or license to Seller Group of the Transferred Assets from the Purchaser pursuant to the terms thereof.

"*Interim Management Agreement*" means that certain Interim Management Agreement to be entered into by and between Seller Group and Purchaser at Closing which will provide for the continued management and operation of the Facilities by Purchaser in accordance with the terms and conditions set forth therein until the necessary licensure, permits, and government approvals have been obtained by Purchaser.

"*Interim Period*" has the meaning set forth in Section 6.1.

"*Inventory*" means all inventories of supplies, drugs, food, janitorial and office supplies, raw materials, work in progress, packaging, supplies, parts, and other disposables and consumables, including, but not limited to any rights to rebates, refunds or discounts due with respect to those Assets (i) located at, ordered for, or in transit to the Facilities or (ii) used in the operation of the Business or produced in the Business.

"*IRS*" means the United States Internal Revenue Service.

"*Knowledge*" means (a) with regard to the Sellers, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Von Crockett and Alfredo Sabillo, in each case, as of the Effective Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) and (b) with regard to Purchaser, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Faisal Gill, in each case, as of the Effective Date or the Closing Date, as applicable (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"*Land*" means collectively, the Van Nuys Land, the Hollywood Land, the Los Angeles Land, the Culver Land, the Bellflower Land and the Norwalk Land.

"*Law*" or "*Laws*" means any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute.

"*Law Firm*" means Sheppard Mullin Richter and Hampton LLP and its successors.

"*Lease*" means any lease, lease amendments, guarantees, exhibits, addenda, and riders thereto and any other documents creating a possessory interest in or to property.

"*Liabilities*" means debts, liabilities, duties, obligations or commitments of any nature, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"*Lien*" or "*Liens*" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens issued pursuant to Section 361, 363 or 364 of the Bankruptcy Code), encumbrance, defect or

irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under the Bankruptcy Code.

"***Lookback Period***" means the period of time beginning on the date that is exactly two (2) years prior to the Effective Date and ending on the Effective Date or the Closing Date, as applicable.

"***Los Angeles Land***" means certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on Schedule 1.1-e and made a part hereof by reference and incorporation.

"***Los Angeles Property***" means the Los Angeles Land and related Improvements located thereon.

"***Losses***" means, with respect to any Person, any actual losses, Liabilities, claims, demands, judgments, damages, fines, suits, actions, out-of-pocket costs and expenses (including reasonable attorneys' fees) against or affecting such Person; *provided*, *however*, that the Parties agree that "Losses" shall not include (a) any consequential, incidental, indirect, special, punitive, exemplary or treble damages, (b) calculations of damages or loss using loss of future revenue, income or profits or diminution of value, (c) damages based on a multiple of value or (d) loss of business reputation or opportunity.

"***Material Adverse Effect***" means a material adverse effect on the business, financial condition or results of operations of the Business (including the Transferred Assets and Assumed Liabilities) taken as a whole; *provided*, *however*, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by any Seller at the request of or with the consent of Purchaser or otherwise in compliance with the terms of this Agreement or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Laws or accounting rules (including GAAP) or any

interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Sellers' Schedules or any matter of which Purchaser is aware as of the date hereof; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the Parties, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by the Sellers or any of their Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Cases; (m) any action required to be taken under any Law or Order or any existing Contract by which any Seller (or any of its properties) is bound; (n) seasonal changes in the results of operations of any Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions, or (p) the Retained Business.

"*Medicaid*" has the meaning set forth in Section 1.1.

"*Medicare*" has the meaning set forth in Section 1.1.

"*MPT*" means Medical Properties Trust, Inc.

"*MPT Agreement*" means that certain Master Agreement (California Lease) to be entered into by and among MPT Lessors, Seller Parent, Southern California Healthcare System, Inc. and Alta Los Angeles Hospitals, Inc.

"*MPT Lease Term Sheet*" "has the meaning set forth in Section 6.12.

"*MPT Lessors*" means collectively, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT of Culver City PMH, L.P., MPT of Bellflower PMH, L.P. and MPT of Norwalk PMH, L.P, each a Delaware limited partnership.

"*MPT Real Property*" means collectively, the Van Nuys Property, the Hollywood Property, the Los Angeles Property, the Culver Property, the Bellflower Property and the Norwalk Property.

"**MPT Real Property Deliverables**" means all documents and instruments identified as deliverables in the MPT Agreement.

 "*New MPT Lease*" has the meaning set forth in Section 6.12.

"*Nonparty Affiliates*" has the meaning set forth in Section 10.15.

"*Norwalk Land*" means certain real property located in the City of Norwalk, Los Angeles County, California as more particularly described on Schedule 1.1-f and made a part hereof by reference and incorporation.

"*Norwalk Property*" means the Norwalk Land and related Improvements located thereon.

"*October 2025 QAF Receivable*" means that amount scheduled to be paid on or around October 2025 pursuant to the Quality Assurance Fee Program and arising out of or attributable to services provided by the Business prior to the Closing.

"*OHCA*" means the California Office of Health Care Affordability.

"*OHCA Notice*" has the meaning set forth in Section 6.5(d).

"*Order*" means any award, decision, injunction, judgment, ruling, decree or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator.

"*Organizational Documents*" means (a) the articles or certificates of incorporation and the bylaws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"*Outside Date*" has the meaning set forth in Section 9.1(f).

"*Owned Intellectual Property*" means the Intellectual Property owned by the Sellers that is exclusively used in the Business.

"*PACE Financing*" means collectively, (a) the Assessment Contract by and between Alta Los Angeles Hospitals, Inc. and the California Statewide Communities Development Authority dated as of July 19, 2019, as may be amended from time to time and (b) the Assessment Contract by and between Southern California Healthcare System, Inc. and the California Statewide Communities Development Authority dated as of July 19, 2019, as may be amended from time to time.

"*Parties*" and "*Party*" has the meaning set forth in the Preamble.

"*Patient Data*" means all data (including Personal Information) that are in the possession or under the control of the Seller Group to the extent relating to the patients of the Business and collected in the context of such Persons acting in their capacity as patients of the Business, including patient lists, patient information and all medical servicing history. The Parties acknowledge that the patients of the Business may also be patients of the Retained Business and, thus, the same or similar information may be contained in Patient Data (to the extent collected in the context of such Persons acting in their capacity as patients of the Business) and the data retained by any member of the Seller Group (to the extent collected in the context of such Persons acting in their capacity as patients of any member of the Retained Business).

"*Permit*" means all permits, authorizations, license, registration, certificates, franchises, consents and other approvals from any Governmental Authority.

"*Permitted Liens*" means (a) Liens for Taxes, assessments or other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings; (b) mechanics',

carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business for obligations that are not overdue or are being contested in good faith by appropriate proceedings; (c) zoning, entitlement and building regulations and land use restrictions; (d) covenants, conditions, restrictions, easements, rights of way, zoning ordinances, and other similar encumbrances and matters of record and any other Liens affecting title to the MPT Real Property; (e) matters that would be disclosed by an inspection or accurate survey of each parcel of MPT Real Property; (f) purchase money Liens and Liens securing rental payments under capital lease arrangements; (g) Liens arising under Leases of property or equipment in favor of the owner thereof; (h) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (i) deposits to secure the performance of bids, Contracts (other than for borrowed money), Leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (j) licenses of Intellectual Property granted in the ordinary course of business; (k) gaps in the chain of title of Intellectual Property applications or registrations that are evident from the records of the relevant Governmental Authority maintaining such applications or registrations; (l) Liens arising under or created by this Agreement or any of the Related Documents; (m) Liens arising in the ordinary course of business which would not reasonably be expected to have a Material Adverse Effect; and (n) Liens set forth on Schedule 1.1-g.

"**Person**" or "**Persons**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller Group (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller Group.

"**Petition Date**" has the meaning set forth in the RECITALS.

"**Post-Closing Agreements**" means the Interim Management Agreement and the Interim Lease Agreement.

"**Pre-Closing Tax Period**" means any taxable period (or a portion thereof) ending on or prior to the Closing Date including the portion of the Straddle Period ending on and including the Closing Date.

"**Previously Omitted Contract**" has the meaning set forth in Section 5.3(f).

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 5.3(f).

"**Property Tax Liabilities**" has the meaning set forth in Section 2.3(h).

"**Provision**" has the meaning set forth in Section 10.4.

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Laws,

Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic or outbreak of disease, or in connection with or in response to any other public health conditions.

"*Purchase Price*" has the meaning set forth in Section 2.9(a).

"*Purchaser*" has the meaning set forth in the Preamble.

"*Purchaser Releasing Party*" has the meaning set forth in Section 10.16(b).

"*Purchaser Schedules*" has the meaning set forth in Article 4.

"*Quality Assurance Fee Program*" shall mean the hospital quality assurance fee program enacted by the Medi-Cal Hospital Reimbursement Act of 2013.

"*Related Claims*" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents or any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the Parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"*Related Document*" or "*Related Documents*" means the Bill of Sale and Assignment and Assumption Agreement, the Interim Management Agreement, the Interim Lease Agreement, the MPT Agreement, the New MPT Lease, and any other document, agreement, certificate or instrument entered into in connection with this Agreement; *provided*, *however*, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in Article 10 to the extent, and only to the extent, that any such document expressly conflicts with Article 10.

"*Release*" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment of any Hazardous Substances.

"*Required Regulatory Approvals*" means the approvals from Governmental Authorities set forth on Schedule 8.1(b).

"*Retained Business*" means any and all businesses of the Seller Parties and their Affiliates, other than the Business.

"*Sale Order*" means an Order of the Bankruptcy Court issued pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance acceptable to Purchaser and the Sellers, in each Party's commercially reasonable discretion, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the Transactions

Free and Clear and containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"***Scheduled Employees***" has the meaning set forth in <u>Section 6.10(a)</u>.

"***Scheduled Employees Schedule***" has the meaning set forth in <u>Section 6.10(a)</u>.

"***Scheduled Exclusions***" has the meaning set forth in <u>Section 2.2(o)</u>.

"***Seller(s)***" has the meaning set forth in the Preamble.

"***Seller Access Contact***" has the meaning set forth in <u>Section 6.2(a)</u>.

"***Seller Benefit Plan***" or "***Seller Benefit Plans***" means each employee benefit plan, program, agreement, policy or arrangement that is currently maintained, sponsored, or contributed to by Seller Parent or the Seller Group for the benefit of any current or former employees of the Business and their respective dependents or beneficiaries, as set forth in <u>Schedule 3.8(a)</u>.

"***Seller Group***" has the meaning set forth in the Preamble. For purposes of clarity, (a) any reference to the Seller Group shall be a reference to each member of the Seller Group, as applicable and (b) Seller Parent shall not be deemed to be a member of the Seller Group.

"***Seller Parent***" has the meaning set forth in the Preamble.

"***Seller Parties***" has the meaning set forth in the Preamble.

"***Seller Parties' Agency Settlements***" has the meaning set forth in <u>Section 2.2(r)</u>.

"***Seller Permits***" has the meaning set forth in <u>Section 3.4(b)</u>.

"***Seller Releasing Party***" has the meaning set forth in <u>Section 10.16(a)</u>.

"***Seller Representative***" has the meaning set forth in the Preamble.

"***Seller Schedules***" has the meaning set forth in <u>Article 3</u>.

"***Seller Tax Claim***" has the meaning set forth in <u>Section 7.3(e)</u>.

"***Sellers' Bad Debts***" has the meaning set forth in <u>Section 7.6</u>.

"***Sellers' Labor Agreements Schedule***" has the meaning set forth in <u>Section 3.9</u>.

"***Solvent***" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"*Specific Provision*" has the meaning set forth in <u>Section 10.4</u>.

"*Stark Law*" has the meaning set forth in <u>Section 1.1</u>.

"*Straddle Period*" has the meaning set forth in <u>Section 7.3(b)</u>.

"*Subsidiary*" or "*Subsidiaries*" of any Person means any corporation, partnership, limited liability company or other legal entity in which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, fifty percent (50%) or more of the equity securities entitled to vote to elect the board of directors or other governing body of such legal entity.

"*Successful Bidder*" means the prevailing party designated by the Sellers with respect to the Transferred Assets.

"*Supplemental Payments*" means any additional Medicaid fee-for-service or managed care payments to the hospital to offset uncompensated care and other costs including, but not limited to, disproportionate share, upper payment limits, §1115 waiver payments, low income pool payments, Medicaid graduate medical education payments and other similar payments.

"*Tax*" or "*Taxes*" means any tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"*Tax Return*" or "*Tax Returns*" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority or otherwise sent in connection with the determination, assessment, collection or payment, of any Tax.

"*Third Party Lease*" means any lease, sublease, timeshare, license, sublicense or other occupancy agreement to which the Seller Group currently leases, subleases, licenses or otherwise grants a right to use, possess or occupy to a third party all or some portion of the MPT Real Property as set forth on <u>Schedule 3.6(b)</u>.

"*Third Party Payor*" or "*Third Party Payors*" means Government Reimbursement Programs and any other publicly or privately owned organization or entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits), any health maintenance organization, managed care organization or any employer authorized under Law to self-insure its workers' compensation risk and that pays for or reimburses at least some of the health care expenses of its beneficiaries or workers.

"*Transactions*" means the transactions contemplated by this Agreement and the Related Documents.

"*Transfer Taxes*" means any real or personal property transfer, sales, use, excise, documentary, transfer, value added, stock transfer, stamp or similar Taxes, and any transfer, recording,

registration, and any other similar fees, levies, Taxes or amounts (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, in each case, imposed or payable in connection with this Agreement and the Transactions.

"*Transferred Assets*" has the meaning set forth in <u>Section 2.1</u>.

"*Transition Services*" has the meaning set forth in <u>Section 6.9(a)</u>.

"*Transition Services Agreement*" has the meaning set forth in <u>Section 6.9(a)</u>.

"*Treasury Regulations*" means the final and temporary regulations promulgated under the Code by the United States Department of Treasury.

"*Van Nuys Land*" means that certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on <u>Schedule 1.1-h</u> and made a part hereof by reference and incorporation.

"*Van Nuys Property*" means the Van Nuys Land and related Improvements located thereon.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act.

    1.2    *Other Definitional and Interpretive Matters*.

        (a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

        (i)    <u>Calculation of Time Period</u>. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the initial reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

        (ii)    <u>Dollars</u>. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

        (iii)    <u>Exhibits and Schedules</u>. The Exhibits and Schedules (including the Seller Schedules and Purchaser Schedules) to this Agreement are an integral part of this Agreement. All Exhibits and Schedules (including the Seller Schedules and Purchaser Schedules) annexed hereto or referred to herein are hereby incorporated in and made a part

of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule with reference to any Section of this Agreement shall be deemed to have been disclosed on each other Schedule to which such disclosure may apply. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number. Any reference to gender shall include all genders or no genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)    Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including. The word "including", or any variation thereof, means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)    Successors. A reference to any Party to this Agreement, any Related Document or any other agreement or document shall include such Party's successors and permitted assigns.

(ix)    Legislation. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor, and all regulations and statutory instruments issued thereunder or pursuant thereto.

(x)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xi)    <u>Lookback Periods</u>. Any representation and/or warranty made as to any past fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction shall be deemed to have been made with respect to the Lookback Period unless another period is expressly stated.

(xii)    <u>Made Available</u>. Any reference in this Agreement to "made available" or "make available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)    All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the Parties have agreed that should any representations and warranties of any Party prove untrue, the other Parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any Party as a result of the untruth of any such representation and warranty. The phrase "to the Sellers' Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)    The Parties have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement and the Related Documents.

# ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1     ***Purchase and Sale***. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, assume and accept from the Seller Group, and the Seller Group shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the assets primarily used in connection with the Business as the same shall exist on the Closing Date, in each case, to the extent transferrable (collectively, the "***Transferred Assets***", and for the sake of clarity, not including the Excluded Assets or Scheduled Exclusions) including, all right, title and interest of the applicable Seller Group thereof in and to all of the following:

(a)     all Inventory;

(b)     the Seller Permits, to the extent transferable, (including any applications that are in process and the Medicare and Medicaid provider numbers and provider agreements) exclusively used in the Business;

(c)     all interests, rights, claims and benefits of the Seller Group pursuant to the Executory Contracts set forth on the Designated Contracts Schedule, the Assumed TSAs and the CBAs (collectively, the "***Assigned Contracts***"); *provided*, *however*, that if any Assigned Contract is re-characterized by a Final Order to not be an Executory Contract or unexpired lease under Section 365 of the Bankruptcy Code, then the property that is subject to such Assigned Contract and all of the Seller Group's rights thereunder shall be a Transferred Asset transferred to Purchaser pursuant to Section 363 of the Bankruptcy Code pursuant to <u>Section 5.3(b)</u>;

(d)     all Books and Records, documents, data and information of the Seller Group related to the Business (including the Patient Data), other than the Excluded Books and Records, except to the extent assignment or transfer thereof to Purchaser would violate any Law and unless otherwise ordered by the Bankruptcy Code pursuant to the Sale Order; *provided*, *however*, that the Seller Group shall be entitled to retain copies of any such materials;

(e)     all equipment, and other tangible personal property, including office furniture and fixtures, computers, networking equipment and supplies, listed on <u>Schedule 2.1(e)</u>;

(f)     the Owned Intellectual Property set forth on <u>Schedule 2.1(f)</u>;

(g)     all Accounts Receivable, including patient accounts receivable and the economic rights to receive cash paid pursuant to any Accounts Receivables owed from Government Reimbursement Programs or any other Third Party Payors, including any value-based programs, in each case relating to services provided by the Seller Group prior to, on or after the Effective Time;

(h)     all insurance policies and rights thereunder and all insurance proceeds arising in connection with loss of or damage to the Transferred Assets or other loss or damage in

respect of the operation of the Facilities or the Business, in each case, to the extent of any casualties occurring during the Interim Period that remain unrepaired or unrestored as of the Closing;

(i)    all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent used in or held for use for the Transferred Assets listed in clauses (a) through (h) above or the Assumed Liabilities but excluding any refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, attributable to a Pre-Closing Tax Period and any prepayments or deposits of or with respect to any Taxes attributable to a Pre-Closing Tax Period, or the Deposit;

(j)    all rights, title and interest in and to all QAF Receivables except for the October 2025 QAF Receivable, to the extent paid or payable after the Closing Date; and

(k)    the goodwill relating to or associated with the Transferred Assets.

2.2    ***Excluded Assets***. Purchaser and its designees shall acquire no right, title or interest in the assets, rights and properties of the Seller Parties set forth below (collectively, the "***Excluded Assets***") in connection with the Transaction:

(a)    any and all assets, rights and properties of the Seller Parties used in the Retained Business, including all accounts receivable (including all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source, including any accounts previously written off or charged off as bad debts), notes receivable and other rights to receive payment for goods or services provided by the Seller Parties in connection with the Retained Business;

(b)    all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, checks, funds in time and demand deposits, savings and loans or trust companies and similar cash items, including the Deposit, and all cash in the Seller Parties' adequate assurance account relating to utilities under Section 366 of the Bankruptcy Code, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(c)    all of the Seller Parties' right, title and interest in Owned Intellectual Property not set forth on Schedule 2.1(f), including as set forth on Schedule 2.2(c) (collectively, the "***Excluded IP***");

(d)    any interest of the Seller Parties under this Agreement or the Related Documents, including the right to receive the Purchase Price, and to enforce the Seller Parties' rights and remedies thereunder;

(e)    all Excluded Contracts and Contracts, other than the Assigned Contracts, to which any of the Seller Parties are a party;

(f)        any (i) Attorney-Client Information arising from communications between the Seller Parties (including any one or more officers, directors or stockholders), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(g)        (i) all Tax assets and attributes of the Seller Parties, (ii) all rights to refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, of the Seller Parties, (iii) any rights to refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, paid by or on behalf of the Seller Parties or attributable to any Pre-Closing Tax Period (as determined in accordance with Section 7.3(c) and (iv) all rights to refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, with respect to any Excluded Asset or Excluded Liability;

(h)        all Permits (including applications therefor and any trade or import/export Permits) that (i) are not related solely to the Business or (ii) are not transferable to Purchaser under applicable Law;

(i)        the Excluded Books and Records;

(j)        any shares or other interests in any Person or any securities of any Person;

(k)        all invoices, shipping documents, purchase orders and other preprinted business forms;

(l)        any and all proceeds relating to any and all bonds, letters of credit, guarantees or other security provided by the Seller Parties;

(m)        any assets not otherwise designated as Transferred Assets or from time to time designated by the Parties as Excluded Assets;

(n)        the Avoidance Actions;

(o)        all of the Seller Parties' rights, claims or causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment against third parties relating to the assets, properties, business or operations of the Seller Parties (including all payments, awards or other proceeds resulting therefrom, guarantees, warranties, indemnities and similar rights in favor of the Seller Parties or any of their Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets, including, but not limited to, all such claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment, payments, awards or other proceeds that relate to any matter set forth on Schedule 2.2(o) (collectively, the items set forth on Schedule 2.2(o), the "***Scheduled Exclusions***"), or Excluded Liabilities or with respect to the Business, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date;

(p)        all consideration received by the Seller Parties pursuant to, and all rights of the Seller Parties under, this Agreement or any Related Document, subject to the terms hereof and thereof;

(q)     peer review materials and any writings, documents and other items that are Attorney-Client Information or otherwise protected from discovery by any other cognizable privilege or protection, in each case, except to the extent related to the Assumed Liabilities;

(r)     rights to positive or negative Cost Report settlements or retroactive adjustments on the Seller Parties' Cost Reports in respect of cost report periods ended on or prior to the Closing (collectively, "***Seller Parties' Agency Settlements***");

(s)     all intercompany assets, receivables or obligations between the Seller Parties and their Affiliates;

(t)     assets and liabilities of the Seller Parties under medical malpractice risk pools and workers compensation, employee benefits stop loss and employee retirement programs;

(u)     any receipts (i) relating to any Supplemental Payments the extent the right to receive the same arise or accrues prior to the Closing Date (the "***Excluded Supplemental Payments***"); (ii) relating to the Seller Parties' Cost Reports or Seller Parties' Agency Settlements (whether resulting from an appeal by a Selling Entity or otherwise) and other risk settlements to the extent the right to receive the same arise or accrues prior to the Closing Date, (iii) which result from a Selling Parties' pursuit of one or more appeals pertaining to Medicare, Medicaid (including, without limitation, disproportionate share hospital program payments) or TRICARE to the extent the right to receive the same arise or accrues prior to the Closing Date or (iv) relating to participation in any group purchasing organization (including any tax refunds, rebates or fee sharebacks for purchases made prior to the Closing) to the extent the right to receive the same arise or accrues to the Closing Date or (v) with respect to meaningful use attestations ("***Excluded Payments***");

(v)     all general intangibles of the Business;

(w)     all existing Third Party Leases and the MPT Real Property Leases;

(x)     all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat Laws;

(y)     all Medicare Accelerated and Advance Payments, COVID-19 Funds and any Provider Relief Fund payments under the CARES Act or similar legislation that are intended to compensate any member of the Seller Group for costs incurred or lost revenue with respect to time periods prior to the Effective Time;

(z)     any pharmaceuticals that cannot, by applicable Law, be sold by any member of the Seller Group to Purchaser;

(aa)     all of the Seller Parties' right, title and interest in and to the October 2025 QAF Receivable;

(bb)     the sponsorship of and all assets maintained pursuant to or in connection with any Seller Benefit Plan and any other compensation or benefit plan, program, policy, contract or arrangement that is or was at any time sponsored, maintained, contributed to or required to be

contributed to by or on behalf of any Seller Party or under or with respect to which any Seller Party has any current or contingent liability or obligation (including on behalf of or due to an ERISA Affiliate); and

        (cc)    all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties (express or implied), indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent related to or used in or held with use for the Excluded Assets listed in clauses (a) through (bb) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller Parties and shall remain the property of the Seller Parties (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller Parties or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

        2.3    ***Assumption of Liabilities***. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms all Liabilities of the Seller Parties arising from or related to the Business or the Transferred Assets as the same shall exist on the Closing Date and irrespective of whether the same shall arise prior to, on or after the Closing Date (collectively, the "***Assumed Liabilities***"), including:

        (a)    all Liabilities arising under (i) the Executory Contracts set forth on the Designated Contracts Schedule, such Liabilities as established and agreed through the Bankruptcy Cases, in accordance with Section 5.3 hereof, (ii) the MPT Real Property, (iii) the Assumed TSAs and (iv) the CBAs;

        (b)    all Asset Taxes or Taxes relating to the Assumed Liabilities for any taxable period beginning after the Closing Date, including the portion of the Straddle Period beginning after the Closing Date (determined in accordance with Section 7.3(c)), for the avoidance of doubt, Purchaser shall have no liability for any Taxes imposed with respect to any period (or portion thereof) ending on or before the Closing Date, including Taxes assessed or payable after the Closing Date but attributable to pre-Closing periods;

        (c)    all post-petition accounts payable and accrued expenses of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business prior to the Closing by or on behalf of the Seller Group (but excluding any professional fees related to the Transactions and/or restructuring efforts), not to exceed the amount of accounts payable and accrued expenses outstanding on the Effective Date;

(d)    all Determined Cure Costs related to Assigned Contracts;

(e)    all Liabilities arising out of or relating to any Action (including any cross-claim or counter-claim or appellate proceeding), inquiry, audit, examination or investigation with respect to the Business relating to any period at or after the Closing;

(f)    the Seller Parties' obligations and Liabilities under the PACE Financing;

(g)    other Liabilities that are listed on Schedule 2.3(g);

(h)    subject to Section 6.13, all Liabilities associated with accrued property taxes under the existing MPT Real Property Leases (the "*Property Tax Liabilities*");

(i)    all Liabilities arising under or pursuant to the eCapital Line of Credit (to the extent any Liabilities remain following the Closing);

(j)    all Liabilities for any Scheduled Employees associated with any claims for accrued vacation or paid time off, accrued employee medical claims, accrued payroll, and deferred payroll taxes, in each case, as of the Closing Date;

(k)    all Liabilities associated with or related to Medicare Accelerated and Advance Payments received by or paid to the Seller Group on or before the Closing Date;

(l)    all Liabilities arising under or in connection with amounts owed under or pursuant to the Hospital Quality Assurance Fee Program in California so long as scheduled future receipts less payables for QAF8 after receipt of the October 2025 QAF Receivable, in the aggregate, remains greater than $0.00;

(m)    all Liabilities and obligations relating to or arising from capitation-based healthcare services provided to "covered persons" under or pursuant to applicable capitation Contracts by or on behalf of the Seller Group prior to the Closing Date, including, but not limited to, all claims for services rendered under capitation Contracts that were incurred prior to the Closing Date but reported or paid thereafter ("*Capitation Claims*"); notwithstanding anything herein to the contrary, Purchaser shall be responsible for the adjudication and payment of any such Capitation Claims, regardless of whether such claims are known, unknown, reported, unreported, accrued, or contingent as of the Closing Date; and

(n)    all Liabilities arising under the WARN Act and similar state or local Laws, or otherwise resulting from Purchaser's breach of the obligations set forth in Section 6.10.

2.4    *Excluded Liabilities*. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller Parties and will not assume or be liable for any liabilities of the Seller Parties that are not Assumed Liabilities (all such liabilities not being assumed herein referred to as the "*Excluded Liabilities*").

2.5    *Excluded Contracts*. Any Executory Contract not listed on the Designated Contracts Schedule provided by Purchaser to the Sellers shall be considered an excluded contract

-25-

("***Excluded Contract***") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract.

2.6    ***Nontransferable Assets and Liabilities***. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Law.

2.7    ***Closing***. The closing of the Transactions (the "***Closing***") will take place remotely by electronic exchange of documents on the date (the "***Closing Date***") that is the second (2nd) Business Day after the date on which all of the conditions set forth in <u>Article 8</u> (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the Party entitled the benefit of the same, unless another time or date is agreed to in writing by the Parties. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. The Closing shall be deemed to have occurred and to be effective as between the Parties as of 12:00 AM Pacific Time on the first calendar day after the Closing Date (the "***Effective Time***").

2.8    ***Closing Deliveries of the Parties***. At or prior to the Closing:

(a)    Purchaser and the Seller Group shall execute and deliver, and, where applicable, shall cause the MPT Lessors to execute and deliver, as applicable, each of the following:

(i)    the Bill of Sale and Assignment and Assumption Agreement;

(ii)    joint written instructions to the Escrow Agent instructing the Escrow Agent to release from the Deposit Account the entire Deposit to the Seller Parties, by irrevocable wire transfer of immediately available funds, to an account designated by the Seller Parties to the Escrow Agent;

(iii)    the Interim Management Agreement;

(iv)    the Interim Lease Agreement;

(v)    all documents required by such Party under the MPT Agreement; and

(vi)    the New MPT Lease.

(b)    Purchaser shall deliver, or cause to be delivered, to the Sellers or the applicable Person each of the following:

(i)    the eCapital Payoff Amount or the eCapital Payoff or Assumption Instrument;

(ii)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Sections 8.3(a) and 8.3(b); and

(iii)    the New MPT Lease.

(c)    the Sellers shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of each Seller as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b);

(ii)    an IRS Form W-9 with respect to each Seller (or, in the case of any Seller that is disregarded as an entity separate from its owner within the meaning of Section 301.7701-3(b)(1)(ii) of the Treasury Regulations, with respect to such owner), duly completed and executed; and

(iii)    such other documents or instruments as the Seller Parties reasonably request and are reasonably necessary to consummate the Transactions.

2.9    ***Purchase Price***.

(a)    In full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser upon the terms and subject to the conditions set forth herein, the aggregate consideration shall be (i) the assumption of the Assumed Liabilities plus (ii) either (x) an amount in cash (the "***eCapital Payoff Amount***") equal to the borrowing base under the eCapital Line of Credit calculated with historical practices as presented in Exhibit C (the "***eCapital Borrowing Base***") or (y) if the Purchaser enters into a new arrangement with eCapital Healthcare Corp. or otherwise assumes the existing eCapital Line of Credit and provides a payoff letter, release, assignment and assumption, or similar instrument (the "***eCapital Payoff or Assumption Instrument***") to the Seller Representative, then, an amount in cash (the "***eCapital Payoff Amount***") equal to the positive difference between (1) the eCapital Borrowing Base and (2) any remaining Liability or amount due under the eCapital Line of Credit after application of the eCapital Payoff or Assumption Instrument (clauses (i) and (ii) collectively, the "***Purchase Price***").

(b)    At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)       Concurrently with the execution of this Agreement (or if the execution of this Agreement occurs on a day that is not a Business Day, not later than the first Business Day following the execution of this Agreement), Purchaser shall deposit (or cause to be deposited) by wire transfer of immediately available funds an amount equal to the Deposit, until the Closing or earlier termination of this Agreement or in accordance with <u>Section 5.2(c)</u>. All fees of the Escrow Agent shall be split evenly between the Seller Group and Purchaser. The Deposit shall become payable, and shall be paid, to the Sellers at the Closing in accordance with <u>Section 2.8(a)(ii)</u>.

2.10     ***Transfer Taxes***. Purchaser and the Seller Group shall evenly split any applicable Transfer Taxes; *provided*, *however*, that, notwithstanding anything herein to the contrary, the Seller Parties shall have no obligation or Liability whatsoever with respect to any Transfer Taxes that may be due or otherwise arise in connection with the New MPT Lease. All necessary Tax Returns and other documentation with respect to Transfer Taxes will be prepared and filed by Purchaser.

2.11     ***Allocation of Purchase Price***. Purchaser and the Seller Parties agree to allocate the aggregate Purchase Price to be paid for the Transferred Assets in a manner consistent with Section 1060 of the Code and the allocation principles as mutually agreed upon by the Parties and attached hereto as <u>Schedule 2.11</u> (the "Allocation Principles"). The Allocation Principles shall be final and binding upon Sellers and Purchaser with respect to the matters relating to required tax reporting by each such Party. The Parties will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation Principles.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as disclosed in a document or on a Schedule delivered by the Sellers to Purchaser as of the Effective Date (the "***Seller Schedules***"), the Sellers hereby make the representations and warranties contained in this <u>Article 3</u> to Purchaser as of the Effective Date and the Closing Date.

3.1     ***Organization, Good Standing and Other Matters***.

(a)       Each Seller Party is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite limited liability company or corporate, as applicable, power and authority necessary to operate the Business and to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. Such Seller Party is duly qualified to do business as a foreign limited liability company or corporation in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

(b)       Each Subsidiary of the Sellers is listed on <u>Schedule 3.1(b)</u> and is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Subsidiary of the Sellers is duly qualified to do business as a foreign limited

liability company or corporation in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2     ***Authority and Enforceability***. Subject to Bankruptcy Court approval, each Seller Party has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which such Seller Party is (or at Closing, will be) a party, and the consummation by such Seller Party of the Transactions, has been duly authorized and approved by all necessary limited liability company or corporate action, as applicable, on the part of such Seller Party and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by such Seller Party and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of such Seller Party, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3     ***No Conflict; Required Filings and Consents***. Except (a) as required by the HSR Act and any other Antitrust Laws that require the consent, waiver, approval, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority, (b) such filings as may be required in connection with the Transfer Taxes described in <u>Section 2.10</u> and (c) as otherwise set forth on <u>Schedule 3.3</u>, the execution and delivery of this Agreement by the applicable Seller Party does not and the execution and delivery of the Related Documents by such applicable Seller Party will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of the Seller Parties, (ii) subject to the entry of the Sale Order, violate any Law or Order to which the Seller Party is subject or by which its properties or assets are bound, (iii) require the Seller Party to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (iv) subject to the entry of the Sale Order and subject to the ongoing production of Available Contracts, as contemplated in <u>Section 5.3(a)</u>, result in a breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any Assigned Contract or (v) subject to the entry of the Sale Order, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of the Seller Party; excluding from the foregoing <u>clauses (ii)</u> through <u>(v)</u> any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4     ***Compliance With Laws; Permits***.

(a)     Except as set forth on <u>Schedule 3.4(a)</u>, to the Sellers' Knowledge, (i) the Seller Group is conducting the Business in compliance in all material respects with all material Laws applicable to the Business, and (ii) the Seller Group has not received any written notice

during the Lookback Period of any material violations of any material Law applicable to its conduct of the Business.

(b)    Except as set forth on Schedule 3.4(b), to the Sellers' Knowledge, (i) the Seller Group possess all material Permits required for the operation of the Business as currently conducted (the "**Seller Permits**"), and (ii) the Seller Group has not received as of the Effective Date any written notice of any cancellation, suspension, revocation, invalidation or non-renewal of any Seller Permit during the Lookback Period.

3.5    *[Intentionally Omitted.]*

3.6    *Real Property; Personal Property*.

(a)    The Business does not include any real property owned by the Seller Group in fee simple.

(b)    Schedule 3.6(b) sets forth a true and correct list, by description of the lease documents and addresses of the premises, of all Third Party Leases.

(c)    Schedule 3.6(c) sets forth a list of all leases of tangible assets and other personal property of the Seller Group as of the Effective Date involving annual payments in excess of $500,000. The Seller Group has good and valid title to, or in the case of leased tangible assets and other personal property, a valid leasehold interest in (or other right to use), all of the material tangible assets and other personal property that are necessary for the Seller Group to conduct the Business, in each case, free and clear of all Liens to the maximum extent permitted by Section 363(f) of the Bankruptcy Code (other than Permitted Liens). All such material tangible assets and other personal property are in good condition and repair, normal wear and tear excepted.

3.7    *Brokers and Finders*. Except as set forth on Schedule 3.7, no Seller Party has, directly or indirectly, entered into any agreement with any Person that would obligate such Seller Party to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.8    *Employee Benefit Plans.* Schedule 3.8(a) contains a list of each Seller Benefit Plan and identifies each Seller Benefit Plan that is maintained or sponsored by Seller Parent. Except as set forth on Schedule 3.8(b), each Seller Benefit Plan (including any related trust) has been established, operated and administered in all material respects in compliance with its terms and all applicable Laws, including, as applicable in the circumstances, ERISA and the Code. Except as set forth on Schedule 3.8(c), no Seller Party maintains or contributes to (i) a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, or (ii) any "multiemployer plans" within the meaning of Section 3(37) of ERISA.

3.9    *Labor Matters.* Except as set forth in Schedule 3.9 (the "**Sellers' Labor Agreements Schedule**"), the Seller Group is not subject to any collective bargaining agreement or any labor agreement with a union or works council. There have not been any, and there are no pending, strikes, slowdowns or work stoppages. The Seller Group complies in all material respects with all applicable Laws relating to employment, labor, immigration and occupational safety and health, including wages and hours, classification, meal periods and rest breaks, drug testing,

recordkeeping, leaves of absence, workers' compensation, collective bargaining, and withholding and payment of social security and taxes. There are no pending or threatened, in writing, and for the Lookback Period there have been no employment, labor, immigration or occupational safety and health-related Actions. The Seller Group is not delinquent in any payment of wages and is not liable for any arrears to any employees or independent contractors for any wages earned. To the Sellers' Knowledge, no management-level employee or group of employees intends to terminate employment with the Seller Group. During the Lookback Period, no mass layoff, plant closing or other event as defined by the WARN Act or its state equivalents have occurred and no such events are planned.

3.10    *Health Care Compliance*.

(a)    To the Sellers' Knowledge, the Seller Group is, and during the Lookback Period has been, in each case with respect to the Business, in material compliance with all applicable Health Care Laws. Except as set forth in Schedule 3.10(a), the Seller Group, with respect to the Business, does not have any outstanding material overpayments or refunds due to any Federal Health Care Program.

(b)    To the Sellers' Knowledge, during the Lookback Period, the Seller Group has, with respect to the Business, in all material respects, timely filed all claims and reports required to be filed with respect to any Federal Health Care Programs, and all such claims and reports have been prepared in material compliance with Health Care Laws.

(c)    To the Sellers' Knowledge, during the Lookback Period, the Seller Group (i) has not been listed on the Office of Inspector General's List of Excluded Individuals and Entities or the General Services Administration's List of Excluded Individuals and Entities or been convicted of any crime or engaged in any conduct that could result in debarment under 21 U.S.C. Section 335a(a), 21 U.S.C. Section 225a(b) or any similar Laws, (ii) has not been assessed a civil monetary penalty under Section 1128A of the Social Security Act, and (iii) has not entered into a corporate integrity agreement, deferred prosecution agreement or similar arrangement with a Governmental Authority that has compliance obligations.

(d)    During the Lookback Period, the Seller Group has been in compliance in all material respects with HIPAA and applicable state Laws regulating the privacy or security of individually identifiable information (collectively, "***Information Privacy and Security Laws***"). To the Sellers' Knowledge, the Seller Group has not been under investigation by any Governmental Authority for a violation of HIPAA or any applicable Information Privacy or Security Law and has not received any written notices from the United States Department of Health and Human Services Office for Civil Rights or the Attorney General of any state or territory of the U.S. relating to any such violations, which written notice has not been resolved.

(e)    Notwithstanding anything to the contrary contained herein, the representations and warranties set forth in this Section 3.10 are the Seller Group's sole and exclusive representations and warranties regarding health care compliance matters.

3.11    *Financial Statements*. The Sellers have provided to Purchaser: (i) the unaudited consolidated balance sheets of the Sellers as of December 31, 2024; (ii) unaudited consolidated

income statements of the Sellers for the twelve-month periods ended December 31, 2024; (iii) the unaudited consolidated income statements of the Sellers for the years ended 2022, 2023 and 2024; and (iv) the unaudited consolidated balance sheet of the Sellers as of December 31, 2024 (collectively, the "***Historical Financial Statements***"). The Historical Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the period involved. The Historical Financial Statements fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated, and are true, complete and correct in all material respects.

3.12    ***No Other Representations or Warranties***.

(a)    THE TRANSFERRED ASSETS WILL BE SOLD BY THE SELLER GROUP AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE CLOSING DATE, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE MPT REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF THE SELLER GROUP INCLUDED IN THE ASSETS AND THE TRANSFERRED OBLIGATIONS ARE BEING ACQUIRED OR RECEIVED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE TRANSFERRED ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)    Except for the representations and warranties contained in this Article 3, none of the Seller Parties, nor do any other Persons on behalf of such Seller Party, make any other express or implied representation or warranty with respect to (a) the Retained Business, or (b) itself, the Business, the Facilities, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and such Seller Party disclaims any other representations or warranties, whether made by or on behalf of such Seller Party or any other Person. Such Seller Party will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document or on a Schedule delivered by Purchaser to the Sellers Parties (the "***Purchaser Schedules***"), Purchaser hereby makes the representations and warranties contained in this <u>Article 4</u> to the Seller Parties as of the Effective Date and the Closing Date.

4.1     ***Organization, Good Standing and Other Matters***. Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2     ***Authority and Enforceability***. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its equityholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3     ***No Conflict: Required Filings and Consents***. Except (a) as required by the HSR Act and any other Antitrust Laws that require the consent, waiver, approval, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority, (b) such filings as may be required in connection with the Transfer Taxes described in <u>Section 2.10</u> and (c) as set forth on <u>Schedule 4.3</u>, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Law or Order to which it is subject or by which any of its properties or assets are bound, (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date, (iv) result in a material breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any material Contract to which it is a party or (v) result in the imposition or creation of any Lien upon or with respect to any of its assets or properties; excluding from the foregoing <u>clauses (ii)</u> through <u>(v)</u> Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, (A) have a material

adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (B) otherwise prevent, hinder or delay the consummation of the Transactions.

4.4     *Financing*. Purchaser has (a) the ability to obtain funds and at the Closing shall have cash in amounts necessary to consummate the Transactions by means of cash, credit facilities or otherwise and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5     *Solvency*. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6     *Litigation*. Except as set forth on Schedule 4.6, there is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7     *Brokers and Finders*. Except as set forth on Schedule 4.7, neither Purchaser nor any of its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate Purchaser to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8     *Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties*.

(a)     Purchaser acknowledges that it and its representatives have received access to such Books and Records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees for itself and on behalf of its Affiliates that (i) it is a sophisticated purchaser and (ii) it has, with the assistance of its expert advisors, including legal counsel, conducted its own independent review, analysis, inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller Group, the Business, the Transferred Assets and the Assumed Liabilities.

(b)     Purchaser acknowledges and agrees that (i) it is purchasing the Transferred Assets on an "AS IS, WHERE IS" basis (as further described in and Section 3.12(a)), (ii) it has relied solely upon its own analysis and investigation of the Transferred Assets and Assumed Liabilities and (iii) the Seller Parties are not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of (i) the Retained Business, or (ii) except for the specific representations and warranties expressly made by the Seller Parties in

Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 10, the Business, the Transferred Assets, the Assumed Liabilities, or any of their operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, equityholder, agent, Affiliate, advisor, representative or employee of the Seller Parties has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)     Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 10, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller Parties and the Seller Parties' Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller Parties or the Seller Parties' Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)     Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 10.

4.9     ***No Other Representations or Warranties.*** Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller Parties or their representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

4.10     ***No Knowledge of Seller Parties' Breach.*** Neither Purchaser nor any of its Affiliates has knowledge of any breach of any covenant, representation or warranty by the Seller Parties or of any condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to Section 9.1(c). If information comes to Purchaser's attention on or before the Closing Date (whether through the Seller Parties or otherwise and whether before or after the Effective Date) which indicates that the Seller Parties have breached any of their covenants, representations, warranties or any other provision or condition under this Agreement, then the effect shall be as if the covenants, representations and warranties or any other provision or condition of this

Agreement had been modified in accordance with the actual state of facts existing prior to the Closing Date such that there will be no breach under the Seller Parties' covenants, representations and warranties or any other provision or condition of this Agreement in relation to such information; *provided*, *further*, that Purchaser must immediately notify the Seller Parties if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify the Seller Parties shall constitute a waiver by Purchaser of the Seller Parties' breach, if any, of this Agreement or any ancillary agreements entered into pursuant to this Agreement. Upon written request of the Seller Parties, Purchaser shall promptly confirm and remake this representation in writing.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1     ***Competing Transaction***. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) (each, a "***Competing Bid***"). From the Effective Date (and any prior time) and until the closing of the Auction (or cancellation thereof), the Seller Parties are permitted to, and to cause their representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Transferred Assets or the Retained Business. In addition, until the closing of the Auction (or cancellation thereof), the Seller Parties shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets (whether in combination with other assets of Seller Parent or the Seller Group or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Order or other applicable Law, including supplying information relating to the Business and the Retained Business and the assets of Seller Parent or the Seller Group to prospective purchasers of the Business and the Retained Business.

5.2     ***Bankruptcy Court Filings***.

(a)     Subject to Section 5.1, the Seller Parties shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. The Seller Parties shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. The Seller Parties further covenant and agree that, after entry by the Bankruptcy Court of the Sale Order, and contingent on the Sale Order becoming final and non-appealable, the terms of any other proposed order submitted by the Seller Parties to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller Representative to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of

providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each of the Parties shall use its respective commercially reasonable efforts to defend such appeal.

(b)     If an auction is conducted pursuant to the Bid Procedures Order (the "**Auction**") and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bid Procedures Order, be required to serve as the Back-Up Bid if Purchaser is the next highest or otherwise best bidder for the Transferred Assets at Auction. If Purchaser is chosen as the Back-Up Bid, Purchaser will be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as may be amended with the Seller Representative's written consent prior to or at the Auction) open and irrevocable until the Back-up Termination Date. If the agreement with the Successful Bidder (other than Purchaser) is terminated prior to closing under such agreement, Purchaser will be deemed to be the Successful Bidder and Purchaser will forthwith consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be amended with the Seller Representative's written consent prior to or at the Auction), subject to the right of Purchaser to elect to not serve as the Back-Up Bid at any time after the Back-up Termination Date.

(c)     The Seller Parties acknowledge and agree that Purchaser has expended considerable time and expense in connection with this Agreement and the Related Documents and the negotiation hereof and thereof and the identification and quantification of assets of the Seller Group. In consideration therefor, the Seller Parties have, in accordance with the terms hereof and the Bid Procedures Order, filed with and received the approval of the Bankruptcy Court to (i) provide Purchaser with bid protections (the "**Bid Protections**"), in an amount that shall not in the aggregate exceed $2,000,000 (the "**Break-Up Fee**"), and (ii) upon termination of this Agreement in accordance with Section 9.1(g), return the Deposit to Purchaser. The Sellers shall pay to Purchaser the Bid Protections in any event, no later than the third (3rd) Business Day after the consummation of an Alternate Transaction.

5.3     ***Assumption of Assigned Contracts***.

(a)     Schedule 5.3(a) sets forth a complete list of all Executory Contracts to which the Seller Group is a party and that are used or held exclusively for use in the operation of, or relating to, the Business or the Transferred Assets, including the Cure Costs in respect of each such Executory Contract (each, an "**Available Contract**"). The Sellers have made available, or prior to the Closing will make available, to Purchaser true and complete copies of all such Available Contracts. No later than fourteen (14) days prior to the Closing, Purchaser shall designate in writing which Available Contracts from Schedule 5.3(a) that it desires to be assumed by the Seller Parties at the Closing and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and such Contracts shall be set forth on Schedule 5.3(a)-1 (the "**Designated Contracts Schedule**"). Notwithstanding anything to the contrary, the Existing TSAs, all agreements set forth on the Sellers' Labor Agreements Schedule (the "**CBAs**") and all other Assumed TSAs shall be deemed to be Assigned Contracts, whether or not such Contracts are listed on the Designated Contracts Schedule, and Purchaser shall assume such Contracts at the Closing.

(b)     Unless the Bankruptcy Court orders otherwise, each Available Contract listed on the Designated Contracts Schedule will be an Assigned Contract and assigned to Purchaser on the Closing Date. Purchaser shall pay on or before the Closing Date all Cure Costs with respect to any Assigned Contract that is consensually resolved or finally determined by the Bankruptcy Court. If any cure objection is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date with respect to any Assigned Contract, subject to a final resolution of such cure objection or final determination by the Bankruptcy Court, solely to the extent Purchaser is satisfied with such resolution or determination, the Seller Group shall assign such Assigned Contract to Purchaser. Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection, solely to the extent Purchaser is satisfied with such resolution or determination, Purchaser shall promptly pay to such non-Seller Group counterparty any remaining Cure Costs owing to such non-Seller Group counterparty with respect to such Assigned Contract.

(c)     Each Available Contract that is listed on Schedule 5.3(a) (as may be amended from time to time) that is not listed on the Designated Contracts Schedule will be deemed an Excluded Contract under this Agreement and all Liabilities thereunder shall be Excluded Liabilities.

(d)     The Seller Group and Purchaser will comply with the procedures set forth in the Bid Procedures Order with respect to the assumption and assignment of any Available Contract pursuant to, and in accordance with, this Section 5.3.

(e)     No designation of any Contract for assumption and assignment in accordance with this Section 5.3, the Bid Procedures Order or the Sale Order will give rise to any right to any adjustment to the Purchase Price.

(f)     If prior to the earliest of (i) confirmation of a plan in the Bankruptcy Cases, (ii) entry of an order dismissing the Bankruptcy Cases, or (iii) Closing, it is discovered that a Contract should have been listed on Schedule 5.3(a) but was not so listed (any such Contract, a "**Previously Omitted Contract**"), the Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract (the "**Previously Omitted Contract Notice**") and provide Purchaser with a copy of such Previously Omitted Contract and the Cure Cost (if any) in respect thereof. Purchaser shall thereafter deliver written notice to the Sellers, no later than three (3) Business Days following the receipt of such Previously Omitted Contract Notice, noting whether Purchaser elects to so include such Previously Omitted Contract on the Designated Contracts Schedule.

(g)     If Purchaser includes a Previously Omitted Contract on the Designated Contracts Schedule in accordance with Section 5.3(f), the Seller Group shall file and serve a notice on the counterparty to such Previously Omitted Contract notifying such counterparty of the Seller Group's intention to assign to Purchaser such Previously Omitted Contract, including the proposed Cure Cost (if any). Such notice shall provide such Contract counterparties with fourteen (14) calendar days to object, in writing, to the Sellers and Purchaser to the assignment and assumption of its Contract (the "**Counterparty Objection**"). If such counterparty, the Seller Group and Purchaser are unable to reach a consensual resolution with respect to any Counterparty Objection,

unless otherwise agreed by Purchaser, the Seller Parties will seek a hearing before the Bankruptcy Court to seek approval of the assumption and assignment of such Previously Omitted Contract to Purchaser. If no Counterparty Objection is timely served on the Seller Group and Purchaser, then such Previously Omitted Contract shall be deemed assumed by and assigned to Purchaser pursuant to the Sale Order. The Seller Group and Purchaser shall execute, acknowledge and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable for Purchaser to assume the rights and obligations under such Previously Omitted Contract. Purchaser shall pay or cause to be paid all Cure Costs in respect of any Previously Omitted Contract that becomes an Assigned Contract for which Purchaser has not paid or caused to be paid upon or before the Closing.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1    ***Conduct of Business***. Except (w) as set forth on <u>Schedule 6.1,</u> (x) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; *provided*, *however*, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within forty-eight (48) hours after written request for such consent is provided by the Sellers to Purchaser), (y) for actions taken or omitted to be taken by Seller Parent or the Seller Group in response to any Public Health Measure, or (z) as is otherwise permitted, contemplated, or required by this Agreement, any Available Contract, by applicable Laws or by order of the Bankruptcy Court, from the Effective Date through the earlier of the Closing Date or the termination of this Agreement (the "***Interim Period***") in accordance with its terms:

(a)    Each Seller shall, and shall cause the Seller Group to, use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted during the twelve (12) months immediately preceding the Effective Date; and

(b)    The Sellers shall not, and shall cause the Seller Group not to:

(i)    sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii)    except in the ordinary course of business, acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except Inventory), that as of the Closing would constitute Transferred Assets;

(iii)    change its present accounting methods or principles in any material respect, except as required by GAAP or applicable Law;

(iv)    change the borrowing base under the eCapital Line of Credit, unless new base is fully assumed by Purchaser;

(v)      other than in the ordinary course of business, amend, modify or terminate any Assigned Contract that would have a Material Adverse Effect or affect the Transferred Assets in any material respect.

(c)      Subject to the Interim Management Agreement, notwithstanding anything to the contrary, (i) nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing, (ii) prior to the Closing, the Seller Parties shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over their Business, assets and operations, and (iii) the Seller Parties shall not be prohibited or restricted in any manner from taking all actions they deem necessary, in their sole discretion, in response to patient safety concerns or issues or in connection, generally, with maintaining patient safety at the Facilities.

(d)      Nothing in this Section 6.1 shall be deemed to limit the ability of or otherwise prohibit the Seller Parties or any of their Affiliates from having discussions with respect to, or otherwise taking actions in connection with, the Bankruptcy Cases or any potential sale or disposition of all or any portion of the Retained Business.

6.2      *Access to Information; Confidentiality*.

(a)      During the Interim Period, the Sellers shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least forty-eight (48) hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, Books and Records of Seller Parent or the Seller Group related to the Business or the Transferred Assets that are in the possession or under the control of the Seller Group; *provided*, *however*, that (i) all requests for access shall be directed to Andrew Turnbull (aturnbull@hl.com), Daniel Martin (dmartin@hl.com), and Grant Hubbell (grantland.hubbell@hl.com) or such other Person as the Sellers may designate in writing from time to time (the "***Seller Access Contact***"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller Group, (iii) the Sellers shall have the right to have one or more of their representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which Seller Parent or the Seller Group is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law, and (vii) nothing herein shall require the Sellers or their Affiliates or representatives to furnish to Purchaser or provide Purchaser with access to (A) Attorney-Client Information, (B) information that legal counsel for the Sellers reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to applicable Law (including any Public Health Measure), or (C) information that would cause significant competitive harm to Seller Parent or the Seller Group if the Transactions are not consummated.

(b)      Notwithstanding anything to the contrary contained in this Agreement, during the Interim Period, except with respect to MPT to the extent consistent with the Bid

Procedures Order and that certain Stipulation, dated February 13, 2025, by and among Seller Parent, MPT, and the other parties thereto, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller Parent, the Seller Group, the Business, the Transaction or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Sellers, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in such Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)       Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto and hereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller Parties or the Retained Business, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the duration of the confidentiality of the Confidentiality Agreement shall be deemed extended, without any further action by the Parties, for a period of time equal to the period of time elapsed between the date such Confidentiality Agreement was initially signed and the date of termination of this Agreement.

(d)       Notwithstanding anything to the contrary contained herein, nothing in this Section 6.2 shall limit the ability of the Parties or any of their respective Affiliates to make any disclosure to their respective tax advisors or any taxing authority.

6.3     *Efforts to Consummate.* Except as otherwise provided in this Agreement (including Section 5.1), each of the Parties agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Effective Date, including satisfying the conditions precedent set forth in Article 8 applicable to such Party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed and (c) and executing any additional instruments reasonably requested by another Party (without cost or expense to the executing Party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; *provided*, *however*, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.4 or Section 6.5, neither the Sellers nor their Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4     ***Notices and Consents***. Reasonably promptly following the execution of this Agreement, the Sellers will give, or cause to be given, applicable notices to third parties and thereafter will use commercially reasonable efforts (as limited by Section 6.3) to obtain the third-party Consents set forth on Schedule 6.4; *provided*, *however*, that no representation, warranty, covenant or agreement of the Seller Parties shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (a) the failure to obtain any such third-party Consent, (b) any termination of a Contract as a result of the failure to obtain such third-party Consent or (c) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Consent or any such termination.

6.5     ***Regulatory Matters and Approvals***.

(a)     Each of Purchaser and the Sellers will provide any notices to and make any filings with any Governmental Authority that are necessary to consummate the Transactions. Without limiting the generality of the foregoing, the Sellers and Purchaser shall, no later than ten (10) days after the Effective Date, or at such other time as mutually agreed by the Parties, prepare and file with the United States Federal Trade Commission (the "***FTC***") and the United States Department of Justice (the "***DOJ***") the notification and report form required under the HSR Act for the Transactions and seek to obtain early termination of the waiting period thereunder. Each of Purchaser and the Sellers shall submit as soon as practicable and advisable any supplemental or additional information which may reasonably be requested by the FTC and the DOJ or by any other Governmental Authority in connection with such filings and shall comply in all material respects with all applicable Laws relating thereto.

(b)     Without limiting the generality of the foregoing: (i) Purchaser shall, and shall cause its Affiliates to, promptly take any and all steps necessary to avoid, eliminate or resolve each and every impediment and obtain all clearances, consents, approvals and waivers under the HSR Act, the Sherman Antitrust Act, the Clayton Act, the Federal Trade Commission Act, and any other United States federal or state or foreign statutes, rules, regulations, Orders, administrative or judicial doctrines or other Laws designed to prohibit, restrict or regulate actions for the purpose or effect of monopolization or restraint of trade (collectively "***Antitrust Laws***") that may be required by any Governmental Authority, so as to enable the Parties to cause the Closing to occur as soon as practicable and in any event prior to the Outside Date, including (A) proposing, negotiating, offering to commit and effect (and if such offer is accepted, committing to and effecting), by Order, consent decree, hold separate order, trust, or otherwise, the sale, divestiture, license, disposition or holding separate of such assets or businesses of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates), or otherwise offering to take or offering to commit to take any action (including any action that limits its freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, properties or services of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates)) to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (B) terminating, relinquishing, modifying or waiving existing relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates); (C) creating any relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates); and (D) entering or offering to

-42-

enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Authority in connection with any of the actions contemplated by the foregoing clauses (A) through (C) (*provided*, that the Seller Parties shall not be obligated to take any such action unless the taking of such action is conditioned upon the consummation of the Transactions), in each case, as may be necessary, required or advisable in order to satisfy the requirements of any applicable Antitrust Law, to avoid the entry of, or to effect the dissolution of or to vacate or lift, any Order (whether temporary, preliminary or permanent) that would otherwise have the effect of restraining, preventing or delaying the consummation of the Transactions, or to avoid the commencement of any Action that seeks to prohibit the Transactions; and (ii) if any objections are asserted with respect to the Transactions under any applicable Antitrust Law or if any Action, whether judicial or administrative, is instituted by any Governmental Authority or any private party challenging the Transactions as violating any applicable Antitrust Law, each of Purchaser and the Seller Parties shall cooperate with one another and Purchaser shall use its best efforts to: (A) oppose or defend against any action to prevent or enjoin consummation of the Transactions, and (B) take such action as necessary to overturn any action by any Governmental Authority or private party to block consummation of the Transactions, including by defending any Action brought by any Governmental Authority or private party in order to avoid entry of, or to have vacated, overturned or terminated, including by appeal if necessary, any Law or Order (whether temporary, preliminary or permanent) that would restrain, prevent or delay the Transactions, or in order to resolve any such objections or challenge as such Governmental Authority or private party may have to such Transactions under such Laws so as to permit consummation of the Transactions.

(c)     Subject to Sections 6.5(a) and 6.5(d), Purchaser shall use its best efforts to prepare and submit all other required regulatory filings to applicable regulatory agencies within ten (10) days after the entry of the Sale Order.

(d)     Pursuant to the California Healthcare Transactions Laws, as soon as reasonably practicable following the Effective Date, Purchaser and the Sellers, as applicable, will each prepare and submit a Notice of a Material Change Transaction (the "***OHCA Notice***") with OHCA and shall request an expedited review of such OHCA Notice at the time of such submission; *provided*, *however*, that Purchaser and the Sellers will work collaboratively and in good faith to coordinate their respective OHCA Notices before they are submitted to OHCA. Purchaser and the Sellers shall incorporate mutually agreed upon comments provided by the other Party into the OHCA Notice and shall file the OHCA Notice accordingly. Purchaser and the Sellers shall timely respond to all requests from OHCA for additional information and/or documentation related to the OHCA Notice, the Transactions, or any cost and market impact review that OHCA determines is required under Cal. Code Regs. tit. 22, § 97441 (the "***CMIR***"), and shall provide the other Party with a reasonable opportunity to review and comment on any supplemental information or documentation that is submitted to OHCA in response to such requests prior to submission, and Purchaser and the Sellers shall consider in good faith and incorporate any such reasonable comments provided by the other Party into any such submission. Purchaser will not participate (or agree to participate) in any substantive meeting or discussion with OHCA regarding the OHCA Notice, the Transactions, or the CMIR (if applicable) unless it notifies the Sellers in writing promptly upon receipt of such request from OHCA, consults the Sellers in advance, and, to the extent permitted by OHCA, gives the Sellers the reasonable opportunity to attend and participate in such meeting or discussion to the extent permitted by applicable Law.

(e)     Each of Purchaser and the Sellers will promptly notify the other Party of any written communication made to or received by Purchaser, the Sellers or both, as the case may be, from any Governmental Authority regarding the Transactions, and, subject to applicable Law, if practicable, (i) permit the other Parties to review in advance any proposed written communication to any such Governmental Authority and incorporate the other Parties' reasonable comments, (ii) not agree to participate in any substantive meeting or discussion with any such Governmental Authority in respect of any filing, investigation, or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other Parties in advance, and (iii) to the extent permitted by such Governmental Authority, give the other Parties the opportunity to attend, and promptly furnish the other Parties with copies of all correspondence, filings, and written communications between them and their Affiliates and their respective representatives on one hand and any such Governmental Authority or its staff on the other hand, with respect to this Agreement and the Transactions; *provided*, *however*, that this Agreement shall not obligate any Party to disclose to any other Party such portions of any proposed or final correspondence, filing, or other written communication with a Governmental Authority or its staff as the Party to such correspondence, filing or communication may reasonably deem competitively-sensitive, privileged or confidential vis-à-vis the other Party, except that it shall disclose matters to the external counsel of the other Party to the extent reasonably necessary in order to enable the Party to fulfill its cooperation obligations in this Section 6.5(e).

(f)     Purchaser shall not, and shall not permit any of its Affiliates to, acquire or agree to acquire by way of arrangement, amalgamation, merger or consolidation with, or by purchasing a substantial portion of the assets or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to or the consummation of such acquisition, arrangement, amalgamation, merger or consolidation would reasonably be expected to (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) significantly increase the risk of any Governmental Authority entering an order prohibiting the consummation of the Transactions, or (iii) delay the consummation of the Transactions.

(g)     Purchaser and the Sellers shall not withdraw any filings under the HSR Act or extend or consent to any extension of any applicable waiting or review period or enter into any agreement with a Governmental Authority to not consummate the Transactions, except upon the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed.

6.6     ***Public Announcements***. Between the date of this Agreement and the Closing Date, except to the extent required by or necessary in connection with any applicable Law or Action (including in connection with the Bankruptcy Cases), neither Purchaser nor the Seller Parties shall, and Purchaser and the Seller Parties shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any public press release or public announcement of any kind without the prior written consent of Purchaser, the Seller Parties and, if MPT is referenced therein, MPT; *provided*, *however*, that the Seller Parties and their Affiliates may make announcements or communications from time to time in reasonable coordination with Purchaser to their respective employees, customers, suppliers and other business relations and otherwise as the Seller Parties

may reasonably determine is necessary to comply with the Bankruptcy Code, applicable Law and/or the requirements of this Agreement, any other agreement to which the Seller Parties or any such Affiliate is a party or any securities exchange on which the securities of the Seller Parties or any such Affiliate are listed. Purchaser and the Seller Parties shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the Parties and, if MPT is referenced therein, MPT. MPT is expressly designated as a third-party beneficiary of this Section 6.6. Accordingly, MPT shall have the right to enforce this Section 6.6 directly against the Parties.

6.7    *Update of Schedules*. From time to time prior to the Closing, the Seller Parties may supplement or amend the Seller Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller Parties as of the Effective Date would have been required to be set forth or described in such Seller Schedules. From and after the Closing, references to the Seller Schedules shall be references to the Seller Schedules as supplemented, modified, or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller Parties has occurred (other than through notice from the Sellers), Purchaser shall promptly so notify the Sellers, in reasonable detail. Nothing in this Agreement, including this Section 6.7, shall imply that the Seller Parties are making any representation or warranty as of any date other than the Effective Date and/or the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

6.8    *Notification of Certain Matters*. Until the Closing, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance, or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Article 8 becoming incapable of being satisfied.

6.9    *Transition Services*.

(a)    During the Interim Period, the Parties agree to work in good faith to identify any ongoing services related to the Business that Purchaser anticipates requiring from the Seller Parent or its Affiliates post-Closing that are not included in the Transferred Assets (the "***Transition Services***"). The Parties agree that to the extent such Transition Services are required for the continued operation of the Business, the Parties shall use commercially reasonable efforts to negotiate the terms of a Transition Services Agreement (the "***Transition Services Agreement***"), including, but not limited to, the fees and costs to be charged for the Transition Services, which such fees shall be consistent with fair market value, the duration of the Transition Services Agreement, and any other terms and provisions of the Transition Services Agreement. The Transition Services Agreement will not be assignable by the Seller Parent to a non-Affiliate third party without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    Purchaser agrees that effective as of the later of the Closing Date or the effective date of the applicable Assumed TSA, other than with respect to the Seller Parent's obligations under the Transition Services Agreement, Purchaser will (i) assume any and all obligations of the Seller Parent, its Affiliates, its Subsidiaries or their permitted designees, under any Assumed TSA, regardless of whether such obligations arose prior to, on or after the Closing

-45-

Date, and (ii) perform all of the Seller Parent, its Affiliates, its Subsidiaries or their permitted designees' obligations under the Assumed TSAs.

6.10    ***Employee Matters.***

(a)    Schedule 6.10(a) sets forth the names of all individuals who are Seller Party employees as of the Effective Date and whose job responsibilities relate to the ownership, operation or use of the Transferred Assets (the "***Scheduled Employees***"). Schedule 6.10(a) also sets forth, for each Scheduled Employee, as applicable, the Scheduled Employee's job title, date of hire, location of employment, exempt or non-exempt status under applicable Law, annual base salary or hourly wage rate (as applicable), and target bonus opportunity for 2025 (if applicable) (the "***Scheduled Employees Schedule***"). The Scheduled Employees Schedule shall be held in confidence and shall not be filed with the Bankruptcy Court (unless under seal). From time to time following the Effective Date (and not later than fifteen (15) Business Days prior to the expected Closing Date), to the extent necessary, the Seller Parties shall update the Scheduled Employees Schedule to reflect any changes thereto permitted by this Agreement. The Seller Parties shall provide Purchaser with any such updated Scheduled Employees Schedule at least twelve (12) Business Days prior to the expected Closing Date.

(b)    At least sixty (60) days prior to the expected Closing Date, Purchaser shall deliver to the Seller Parties the form of written offer of employment that is to be provided to the Scheduled Employees in accordance with the requirements set out in this Section 6.10, and agrees to consider in good faith any comments provided by the Seller Parties on such form. No later than forty-five (45) days prior to the expected Closing Date, Purchaser shall offer employment, on an "at will" basis, in writing to substantially all of the Scheduled Employees effective as of the Closing. For purposes of this Section, "substantially all of the Scheduled Employees" shall mean at least ninety-five percent (95%) of all Scheduled Employees. No later than ten (10) Business Days prior to the expected Closing Date, Purchaser shall deliver to the Seller Parties a list identifying each Scheduled Employee who has then accepted Purchaser's offer of employment (each Scheduled Employee who accepts such offer on or prior to the Closing Date, successfully fulfills the conditions of such offer, as determined in Purchaser's sole discretion, and actually commences employment with Purchaser, a "***Continuing Employee***"). In the event any, some or all of the Scheduled Employees do not accept offers of employment with Purchaser, no Material Adverse Effect shall have been deemed to occur solely due to such refusal. Purchaser will not take any actions that would result in or cause the Seller Parties any Liability under the WARN Act or any similar state or local Law. Purchaser shall be responsible for any WARN Act Liability, as well as any Liabilities arising under any similar state or local Law, resulting from the termination of any Seller Party employee in connection with the Closing.

(c)    Except to the extent otherwise required by applicable Law, Purchaser shall provide each Continuing Employee with: (i) annual base salary or hourly wage rate and cash target incentive compensation opportunities that are no less favorable, in the aggregate, than the annual base salary or hourly wage rate and cash target incentive compensation opportunities provided by Purchaser to its similarly situated employees, and (ii) other employee benefits that are substantially comparable in the aggregate to those provided by Purchaser to its similarly situated employees; provided, in either case, if Purchaser has no such similarly situated employees, each such applicable Continuing Employee shall receive an annual base salary or hourly wage rate and cash

-46-

target incentive compensation opportunities and other employee benefits that are no less favorable than those which such Continuing Employee received immediately prior to the Closing Date from the Seller Parties. Notwithstanding anything herein to the contrary, Purchaser shall provide compensation to such Continuing Employees so as to not trigger any notification or other obligations under the WARN Act or similar state or local Laws. Purchaser shall provide Continuing Employees who are subject to a collective bargaining agreement with the same terms and conditions of employment provided for under their respective agreements for the term of such agreements.

(d)     The provisions of this Section 6.10 are solely for the benefit of the Parties, and no Continuing Employee (including any beneficiary or dependent thereof) or any other Person shall be regarded for any purpose as a third-party beneficiary of the Agreement, and no provision of this Section 6.10 shall create such rights in any such Persons with respect to the compensation, terms and conditions of employment or benefits that may be provided to any such employee or beneficiary or dependent by the Seller Parties, Purchaser or any of their respective Affiliates or under any benefit plan (including any Seller Benefit Plans) which the Seller Parties, Purchaser or any of their respective Affiliates may maintain, other than what is legally required in accordance with applicable Laws. Nothing in this Agreement is intended to (i) be treated as an amendment of any particular Seller Benefit Plan, (ii) prevent Purchaser or any of its Affiliates from amending or terminating any compensation or benefit plan of Purchaser or its Affiliates (including any Seller Benefit Plan) on or after the Closing Date in accordance with the terms of such plan or applicable Law, or (iii) prevent Purchaser or any of its Affiliates from terminating the employment of any Continuing Employee.

6.11     *[Intentionally Omitted.]*

6.12     *MPT Lease and Post-Closing Agreement Negotiations.*

(a)     Purchaser and Seller covenant and agree that they will use best efforts to (i) agree upon the form of Post-Closing Agreements to be entered into at Closing; and (ii) enter into the MPT Agreement with MPT and/or MPT Lessors, in each case, on or before the date that is two days before the Auction. The Parties shall not unreasonably withhold, condition, or delay their agreement to the MPT Agreement or the Post-Closing Agreements.

(b)     Purchaser covenants and agrees that it shall, at its sole cost and expense, use best efforts to finalize a written lease agreement and ancillary documents related thereto for the MPT Real Property (collectively, the "*New MPT Lease*") on terms materially consistent with the term sheet attached hereto as Exhibit B (the "*MPT Lease Term Sheet*"), subject to such changes as may be mutually agreed by Purchaser and the MPT Lessors. Purchaser shall not unreasonably withhold, condition, or delay its agreement to terms proposed by the MPT Lessors that are consistent with the MPT Lease Term Sheet. Purchaser shall keep the Seller Representative reasonably informed of the status of the New MPT Lease negotiations.

6.13     *Treatment of Accrued Property Taxes*. Purchaser shall have the right, but not the obligation, to address payment of the Property Tax Liabilities in the New MPT Lease. The Seller Group acknowledges and agrees that Purchaser need not pay for, or otherwise resolve, the Property Tax Liabilities in full at the Closing in order to satisfy Purchaser's obligations hereunder.

-47-

6.14    ***Right to Bill***. For a period of time mutually agreed to by the Parties, and to the extent consistent with the Interim Management Agreement and allowed by applicable Law, the Seller Group grants Purchaser and its Affiliates a license to use the Seller Group's billing identification information (which information shall include, as applicable, such Seller's name, Medicare and related Medicaid and Medi-Cal provider numbers, federal employer identification number, and such other information as may be reasonably necessary) for purposes of submitting claims to Medicare, Medicaid, Medi-Cal, and all other Government Reimbursement Programs for services provided at the Facilities by Purchaser or any of its Affiliates after the Effective Time.

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1    ***Access to Information; Books and Records***. The Parties acknowledge that subsequent to the Closing, the Seller Parties may need access to information or documents included in the Transferred Assets and in the control or possession of Purchaser for the purposes of concluding the Transactions, audits, compliance with Laws, and the prosecution or defense of third party claims. Accordingly, Purchaser shall for a period of ten (10) years after the Closing, and until the expiration of the applicable statute of limitations with respect to any governmental or third party claims, maintain in accordance with retention requirements under applicable Law and make reasonably available to the Seller Parties and their respective representatives and/or Governmental Authorities, upon written request and at the expense of the Seller Parties, copies of such documents and information as may be available relating to the Business for periods prior to the Closing Date to the extent necessary to facilitate concluding the Transactions, audits, compliance with Laws and the prosecution or defense of claims. The Parties shall reasonably cooperate with the other in connection with the handling of any such post-Closing matters as may reasonably be requested, in each case, at the sole cost and expense of the requesting Seller Party. On and after the end of the applicable retention period, Purchaser shall, and shall cause its Affiliates to, provide the Seller Parties with at least ten (10) Business Days prior written notice before destroying, altering or otherwise disposing any such Books and Records, during which period the Seller Parties may elect to take possession, at its own expense, of such Books and Records. In addition, following the Closing, Purchaser shall provide the Seller Group with reasonable access to, or provide copies (at the Seller Group's sole cost and expense) of patient and medical records used in connection with the Business prior to the Effective Time to the extent permitted by Law and as reasonably necessary for purposes of the Seller Group's bona fide compliance with applicable Laws, regulatory requirements or litigation matters.

7.2    ***Post-Closing Receipt and Possession of Assets***.

(a)    After the Closing Date, the Seller Group shall transfer, or shall cause to be transferred, promptly to Purchaser from time to time (but in any event no less frequently than on a monthly basis) any payments constituting Transferred Assets received by the Seller Group. After the Closing Date, Purchaser shall transfer promptly to the Seller Parties, from time to time (but in any event no less frequently than on a monthly basis), any payments constituting Excluded Assets, including any accounts receivable constituting Excluded Assets, received by Purchaser after the Closing.

(b)     In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any other Excluded Asset, Purchaser shall promptly notify the Seller Parties of its receipt or possession of such other Excluded Asset and transfer, at the Seller Group's expense, such Excluded Asset to the Seller Group. In the event that, after the Closing Date, the Seller Group receives or otherwise is in possession of any other Transferred Asset, the Seller Group shall promptly notify Purchaser of the Seller Group's receipt or possession of such other Transferred Asset and shall transfer, or cause to be transferred, at Purchaser's expense (unless the Seller Group was required to transfer such Transferred Asset to Purchaser at Closing, in which case, and without limitation of any other remedies available to Purchaser, such transfer will be at the Seller Group's expense), such Transferred Asset to Purchaser.

7.3     ***Tax Matters***.

(a)     The Seller Parties shall be responsible for preparing and filing or causing to be prepared and filed all Asset Tax Returns for taxable periods ending on or before the Closing Date that are required to be filed (taking into account all extensions properly obtained) after the Closing. After the Closing, Purchaser will assist and cooperate with the Seller Parties in preparing and filing such Asset Tax Returns.

(b)     Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Asset Tax Returns that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "***Straddle Period***"). Purchaser shall prepare such Tax Returns in a manner consistent with past practice except as required by applicable Law and shall provide the Sellers with completed drafts of such Tax Returns for the Sellers' review and comment at least thirty (30) days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within thirty (30) days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Tax Returns as are requested by the Sellers, and Purchaser shall not file such Tax Returns without the prior written consent of the Sellers (not to be unreasonably withheld, conditioned, or delayed).

(c)     For purposes of this Agreement, in the case of any Straddle Period, any Asset Taxes that are real property Taxes, personal property Taxes, ad valorem and similar periodic Taxes levied on or with respect to the Transferred Assets for any Straddle Period (collectively, the "***Apportioned Obligations***") shall be apportioned on a per diem basis. All property Taxes shall be pro-rated based on the period to which such Taxes apply with regard to the date of assessment. The Apportioned Obligations shall be prorated (based on the most recent available Tax statement, latest Tax valuation and latest bills) as of the Closing. If the Closing occurs before the Tax rate is fixed for the then current fiscal or calendar year, whichever is applicable, the proration of the corresponding Taxes shall be on the basis of the tax rate for the last preceding year applied to the latest assessed valuation. For the avoidance of doubt, to the extent the Seller Parties have prepaid or deposited any amounts of any Asset Taxes prior to the Closing, the Sellers shall receive credit for such amounts in determining payments of Asset Taxes.

(d)     Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return, or take any other action that could be reasonably likely to result in an adverse

-49-

Tax consequence in respect of any Pre-Closing Tax Period or Straddle Period relating to the Seller Group or Seller Parent or the Business without the prior written consent of the Sellers (not to be unreasonably withheld, conditioned, or delayed).

(e)     Purchaser shall promptly notify the Sellers in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened United States federal, state, local or foreign Tax audits, Actions or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller Group or Seller Parent may be liable (a "***Seller Tax Claim***").

(f)     The Seller Parties shall have the sole right to control the defense or resolution of any Seller Tax Claim, and to employ counsel of its choice at the Sellers' expense.

(g)     After the Closing, each of the Seller Parties and Purchaser shall use commercially reasonable efforts to (and shall cause their respective Affiliates to use commercially reasonable efforts to):

(i)     timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce) Transfer Taxes;

(ii)     cooperate fully in preparing for and defending any audits or Actions of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets payable by, the Seller Group or Seller Parent for any Pre-Closing Tax Period or Straddle Period;

(iii)     maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other Parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and

(iv)     furnish the other Parties, as reasonably requested, with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, Action, assessment or information request relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other Parties, as reasonably requested, with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other Party).

7.4     ***Nonassignable Assets***. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if, notwithstanding the provisions of Section 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the Consent of a third party, would constitute a breach or other contravention under any

Contract or Law to which any Seller Party is a party or by which it is bound, or in any way adversely affect the rights of any Seller Party or, upon transfer, Purchaser under such asset, permit, claim or right. Purchaser agrees that no Seller Party or any of their Affiliates shall have any liability to Purchaser arising out of or relating to the failure to obtain any such Consent that may be required in connection with the Transactions, except to the extent that such failure is caused by any breach by any Seller Party of its obligations hereunder.

7.5     ***Terminating Cost Reports***.

(a)     The Seller Parties shall prepare and timely file all Cost Reports relating to the periods ending on or prior to the Closing Date or required as a result of the consummation of the Transactions. Purchaser shall forward to the Seller Parties any and all correspondence relating to the Seller Parties' Cost Reports or the Seller Parties Agency Settlements within ten (10) Business Days after receipt by Purchaser. Purchaser shall not reply to any such correspondence without the Seller Parties' written approval. Purchaser shall remit any receipts relating to the Seller Parties' Cost Reports or the Seller Parties Agency Settlements within ten (10) Business Days after receipt by Purchaser and forward any demand for payments within ten (10) Business Days after receipt by Purchaser. The Seller Parties shall retain all rights to the Seller Parties' Cost Reports and Seller Parties' Agency Settlements, including the right to appeal any Medicare determinations relating to the Seller Parties' Agency Settlements and the Seller Parties' Cost Reports. The Seller Parties shall retain the originals of the Seller Parties' Cost Reports, correspondence, work papers and other documents relating to the Seller Parties' Cost Reports and the Seller Parties' Agency Settlements and furnish copies of such documents to Purchaser upon reasonable request.

(b)     Purchaser, upon reasonable notice, during normal business hours and at the sole cost and expense of the Seller Parties, shall reasonably cooperate with the Seller Parties in regard to the preparation, filing, handling and appeals of the Seller Parties' Cost Reports. Such cooperation shall include the providing of statistics and obtaining files at the Seller Parties' facilities and the coordination with the Seller Parties pursuant to adequate notice of Medicare and Medicaid exit conference or meetings. Purchaser shall, upon reasonable notice, during normal business hours and at the sole cost and expense of the Seller Parties, and subject to applicable Law regarding confidentiality of patient records, provide reasonable access by the Seller Parties to all records of the Business and, to the extent permitted by Law, shall allow the Seller Parties to copy any documents relating to the Sellers' Cost Reports and appeals thereof. Following the Closing, Purchaser shall not, and shall not permit any of their Affiliates to, refile, reopen, file any appeal with respect to or otherwise amend any Seller Parties' Cost Report relating to the periods ending on or prior to the Closing Date in each case without the prior written consent of the Seller Parties.

7.6     ***Medicare Bad Debts***. Purchaser shall have the right, in its sole discretion to submit a claim for reimbursement to The Centers for Medicare and Medicaid Services ("***CMS***") for any Medicare bad debt reimbursement associated with services furnished prior to the Closing Date ("***Sellers' Bad Debt***") on Purchaser's Cost Reports for the period in which Sellers' Bad Debt becomes uncollectible. In the event that Purchaser receives any payments from CMS as reimbursement for any of Sellers' Bad Debt claims submitted by Purchaser, Purchaser shall retain the full amount of such payment received by Purchaser for Sellers' Bad Debts. Any additional payment, to the extent that Purchaser receives such payment from CMS as a result of the Cost

Report audit of Sellers' Bad Debts claims submitted by Purchaser or any final settlement shall be retained by Purchaser.

7.7     **HITECH Payments**. After the Closing Date, during normal business hours, the Seller Group will use commercially reasonable efforts to cooperate with Purchaser in providing documents or data that Purchaser reasonably and in good faith believes are necessary or appropriate to file with respect to receiving HITECH Payments for federal fiscal years (or portions thereof) ending prior to the Closing Date or to substantiate the Seller Parties' claim for HITECH Payments for such periods. In the event that there is any state or federal audit related to any attestation or other filing contemplated by this Section 7.7, the Seller Group shall reasonably cooperate with Purchaser, at Purchaser's expense, with respect to any such audit.

7.8     **Medical Staff**. In support of the continuity of care in the community, excluding physicians and other practitioners whose medical staff membership or clinical privileges have been terminated or not renewed by Purchaser or any of its Affiliates, and subject to Purchaser's reasonable opportunity to conduct due diligence review of physicians and other practitioners at the Facilities, Purchaser will extend medical staff membership and clinical privileges to physicians and other practitioners at the Facilities who are in good standing as of the Closing Date. After the Closing, the medical staff at the Facilities will be subject to the medical staff bylaws and medical staff policies of the Facilities as of the Closing, as may be amended by Purchaser or any of its Affiliates, as applicable, to be generally consistent with the medical staff bylaws, medical staff policies, and credentialing policies and processes of Purchaser and its Affiliates.

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1     **Conditions to Each Party's Obligation**. The respective obligations of the Parties to effect the Transactions are subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Seller Parties and Purchaser), at or prior to the Closing, of the following conditions:

(a)     HSR Act. The applicable waiting periods, together with any extensions thereof, under the HSR Act shall have expired or been terminated (and, for avoidance of doubt, such expiration or termination under the HSR Act shall be effective for purposes hereof regardless of whether any Party has been notified by a Governmental Authority that its investigation of the Transactions remains open and ongoing).

(b)     Required Regulatory Approvals. The Parties shall have obtained all Required Regulatory Approvals with applicable Governmental Authorities with respect to the Transactions.

(c)     No Injunctions or Restraints. No Order or Law preventing the consummation of the Transactions shall be in effect; *provided*, *however*, that, this Section 8.1 shall not apply to any Action arising out of any bankruptcy proceeding (the absence of which shall not be a condition to Closing).

(d)     Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Seller Parties and Purchaser in their respective sole discretion).

(e)     MPT Agreement. The MPT Agreement has been entered into and MPT Lessors shall have delivered, or caused to be delivered, to the Escrow Agent the MPT Real Property Deliverables and the closing of the transactions contemplated by the MPT Agreement shall have occurred in accordance with the terms thereof and hereof.

(f)     New MPT Lease. The MPT Lessors shall have delivered, or caused to be delivered, to the Escrow Agent the duly executed copy of the New MPT Lease.

8.2     *Conditions to Obligation of Purchaser*. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Sellers set forth in Article 3 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality," "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, in the aggregate, a Material Adverse Effect.

(b)     Performance of Covenants and Obligations. The Seller Parties shall have performed, or cause to have been performed, or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)     Closing Deliverables. The Seller Parties shall have delivered to Purchaser the closing deliverables required to be delivered by the Seller Parties pursuant to Section 2.8(a) and Section 2.8(c).

8.3     *Conditions to Obligations of the Seller Parties*. The obligation of the Seller Parties to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Seller Parties), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article 4 shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, in the aggregate, (i) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (ii) otherwise prevent, hinder or delay the consummation of the Transactions.

(b)    <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)    <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller Parties the closing deliverables required to be delivered by Purchaser pursuant to <u>Section 2.8(b)</u> and <u>Section 2.8(c)</u>.

8.4    ***Waiver of Condition; Frustration of Conditions***. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller Parties may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, commercially reasonable efforts to consummate the Transactions.

# ARTICLE 9
# TERMINATION

9.1    ***Events of Termination***. Notwithstanding anything to the contrary, this Agreement may be terminated, and the Transactions may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of Purchaser and the Seller Representative;

(b)    by Purchaser or the Seller Parties, by written notice to Purchaser or the Seller Parties from the other, if (i) the Bankruptcy Court shall enter an order approving a Competing Bid or any sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "***Alternate Transaction***"), and (ii) such Alternate Transaction is consummated;

(c)    by Purchaser, by written notice from Purchaser to the Seller Representative, if there has been a material breach or inaccuracy of a covenant, representation or warranty made by the Seller Parties in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller Parties prior to the earlier of (i) thirty (30) Business Days after receipt of written notice from Purchaser requesting such breach be cured, or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(d)    by the Seller Parties, by written notice from the Seller Representative to Purchaser, if there has been a material breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) thirty (30)

Business Days after receipt of written notice from the Seller Parties requesting such breach be cured or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> shall not be available to the Seller Parties if the failure of the Seller Parties to fulfill any of their obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller Parties in this Agreement;

(e)    by Purchaser or the Seller Parties, by written notice from Purchaser or the Seller Representative to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Law or taken any other action restraining, enjoining, or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall not be available to the Party seeking to terminate if any action of such Party or any failure of such Party to act has contributed to such Order or other action and such action or failure constitutes a material breach of this Agreement;

(f)    by Purchaser or the Seller Parties, by written notice from Purchaser or the Seller Representative to the other, if the Closing has not occurred on or prior to ninety (90) days following the Effective Date (the "***Outside Date***"); *provided*, *however*, that if the Required Regulatory Approvals have not been granted by the Outside Date, then the Sellers (in their sole discretion and immediately upon written notice to Purchaser prior to the expiration of the then current Outside Date) may extend the Outside Date up to a maximum period of six (6) months; *provided, further,* that the Party exercising the right to terminate this Agreement pursuant to this <u>Section 9.1(f)</u> shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement; or

(g)    by Purchaser, by written notice from Purchaser to the Seller Representative, if Purchaser is not the Successful Bidder or the Back-Up Bidder for all or substantially all of the Transferred Assets pursuant to the Sale Order.

9.2    ***Effect of Termination***.

(a)    In the event that this Agreement shall be terminated pursuant to <u>Section 9.1</u>, (i) Purchaser and its representatives shall promptly return all documents, work papers, and other materials of the Seller Parties including any confidential information, and (ii) all further obligations of the Parties under this Agreement shall terminate without further Liability or obligation to the other Parties; *provided*, *however*, that, notwithstanding the foregoing, the Liabilities and obligations under (A) the Confidentiality Agreement, and (B) <u>Section 6.2(c)</u>, this <u>Section 9.2</u> and <u>Article 10</u> shall continue in full force and effect.

(b)    If this Agreement is terminated prior to the Closing pursuant to <u>Section 9.1(d)</u>, then the Seller Parties and Purchaser will deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release from the Deposit Account the entire Deposit to the Seller Parties, by irrevocable wire transfer of immediately available funds, to an account designated by the Seller Parties to the Escrow Agent and the Deposit, which shall constitute

liquidated damages (and not a penalty), shall be delivered to the Seller Parties within two (2) Business Days following delivery of such joint written instructions.

(c) If this Agreement is terminated for any reason in accordance with the terms of this Agreement other than by the Seller Parties pursuant to Section 9.1(d), (i) the Seller Representative and Purchaser shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release from the Deposit Account the entire Deposit to Purchaser, by irrevocable wire transfer of immediately available funds, to an account designated by Purchaser to the Escrow Agent, and (ii) the Deposit shall be delivered to Purchaser within two (2) Business Days following delivery of such joint written instructions. Any issue regarding the entitlement to the Deposit shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d) Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1, no such termination shall relieve Purchaser from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement and the Seller Parties shall be entitled to all remedies available at law or in equity; *provided*, *however*, that absent Fraud or willful misconduct, and other than as provided in this Section 9.2, notwithstanding anything to the contrary contained in this Agreement, the maximum Liability of the Seller Parties under this Agreement (including for any and all such breaches or if this Agreement is terminated by Purchaser or Seller pursuant to Section 9.1(b)) shall be limited to the return of the Deposit.

## ARTICLE 10
## GENERAL PROVISIONS

10.1 *Survival of Representations, Warranties and Covenants*.

(a) All covenants and agreements contained in this Agreement that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefor terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 6.2, Section 9.2, this Article 10 and the Confidentiality Agreement shall survive the Closing.

(b) Following the Closing, and except with respect to the Sellers' post-Closing covenants and obligations in this Agreement and the Post-Closing Agreements, none of the Seller Parties nor any of their representatives shall have any liability or obligation of any nature whatsoever to Purchaser, Purchaser's representatives, or any other Person arising out of or relating to (i) this Agreement or the Transactions, or (ii) the use, ownership or operation of the Business or the Transferred Assets following the Effective Time.

10.2 *Entire Agreement*. This Agreement, including the Exhibits and Schedules (including the Seller Schedules and Purchaser Schedules) hereto, the Confidentiality Agreement

and the Related Documents, contain the entire understanding of the Parties with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings, and understandings (including any letters of intent or term sheets), whether written or oral, among the Parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The Parties have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the Parties expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the Parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the Parties hereby agree that neither Party shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3    ***Amendment; No Waiver***. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any Party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4    ***Severability; Specific Versus General Provisions***. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law. No Party shall assert, and each Party shall cause its respective Affiliates or related Parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant

or agreement of the Seller Parties contained in this Agreement or the Schedules (each, a "**_Provision_**") addresses a particular issue with specificity (a "**_Specific Provision_**"), and no breach by the Seller Parties exists under such Specific Provision, the Seller Parties shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Sellers' Knowledge, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

10.5    **_Expenses and Obligations_**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the Parties in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the Party that has incurred such expenses; *provided*, *however*, that Purchaser and Seller Group shall evenly split the cost of any filing fees that relate to any filing or notification required by any Governmental Authority, including filing fees under the HSR Act.

10.6    **_Notices_**. All notices, demands, and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered to the recipient, (b) upon transmission by email to the recipient, if sent on a Business Day on or prior to 5:00 PM Pacific Time, and if not, it shall be deemed given on the next Business Day (*provided*, that no notice of failed transmission is received), (c) one (1) Business Day after the Business Day on which such notice, demand, or communication is deposited with a nationally recognized overnight courier service (charges prepaid) and addressed to the intended recipient, and (d) when delivered after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Notices, demands, and communications to the Parties shall, unless another address is specified in writing, be sent to the addresses indicated below:

If to Purchaser:

NOR Healthcare Systems Corp.
505 North Brand Blvd
Suite 1200
Glendale, CA 91203
Attention: Faisal Gill

Email: fgill@amhealthsystems.com

If to the Seller Parties:

Prospect Medical Holdings, Inc.
3415 South Sepulveda Blvd., 9th Floor
Los Angeles, CA 90034
Attention: General Counsel

Email: frank.saidara@pmh.com

with a copy to (which will not constitute notice):

Sheppard Mullin Richter & Hampton LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, California 90067
Attention:  Eric A. Klein, Esq.;
                    Nioura F. Ghazni, Esq.

Email:  EKlein@sheppardmullin.com;
            nghazni@sheppardmullin.com

and

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Attention:  Thomas R. Califano, Esq.;
                    William E. Curtin, Esq.;
                    Anne G. Wallice, Esq.

Email:  tom.califano@sidley.com;
            wcurtin@sidley.com;
            anne.wallice@sidley.com

10.7    ***Counterparts***. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronically transmitted portable document format (PDF) (in each case, complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com)) shall be effective as delivery of a manually executed counterpart of this Agreement and sufficient to bind the Parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the Party's intent or the effectiveness of such signature.

10.8    ***Governing Law.*** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any other jurisdiction.

10.9    ***Submission to Jurisdiction; Consent to Service of Process***.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed

and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; *provided*, *however*, that if the Bankruptcy Cases have closed or the Bankruptcy Court does not have jurisdiction, the Parties agree to irrevocably submit to the exclusive jurisdiction of the Court of Chancery located in the State of Delaware or, solely if such Court of Chancery declines jurisdiction, in any federal court located in the State of Delaware, or solely if such federal court declines jurisdiction, in any state court located in the State of Delaware (the "**Designated Courts**") over all Related Claims, and each Party hereby irrevocably agrees that all Related Claims may be heard and determined in the Designated Courts. The Parties hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in the Designated Courts or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereby consents to process being served by any Party in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.10   **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11   **Rights Cumulative**. All rights and remedies of each of the Parties will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or applicable Law.

10.12   **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the Parties. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any Party at any time, whether or not by operation of law, without the prior written consent of the Seller Parties and Purchaser, and any attempted assignment without the required consent shall be void; *provided*, *however*, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources, and (b) the Seller Parties may assign any of their rights or delegate any of its duties under this Agreement (i) to any of their Affiliates, and (ii) for collateral security purposes to any lender of the Seller Parties or their Affiliates; *provided*, *further*, *however*, that, in each case, such assignment shall not release

Purchaser from its obligations under this Agreement and the Seller Parties shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13   ***Specific Enforcement; Remedies***. The Parties agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Parties in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) Purchaser, on the one hand, and the Seller Parties, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Seller Parties to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Seller Parties nor Purchaser would have entered into this Agreement. Remedies shall be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Agreement. Each of the Parties hereby (i) waives any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, (ii) waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief, and (iii) agrees not to assert that a remedy of specific performance or other equitable relief is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the Parties otherwise have an adequate remedy at law. Notwithstanding anything to the contrary, in no event shall this <u>Section 10.13</u> be used, alone or together with any other provision of this Agreement, to require the Seller Parties to remedy any breach of any representation or warranty of the Seller Parties.

10.14   ***Third-Party Beneficiaries***. Except as set forth in <u>Section 6.6</u> (solely with respect to MPT's consent rights therein), <u>Section 10.15</u> (with respect to the Nonparty Affiliates), and <u>Section 10.16</u> (with respect to the released parties identified therein), <u>Section 10.17</u> (with respect to the members of the Seller Group) and the next sentence, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement. From and after the Closing, all of the Persons identified as third-party beneficiaries in the first sentence of this <u>Section 10.14</u> shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were Parties. The representations and warranties in this Agreement are the product of negotiations among the Parties and are for the sole benefit of the Parties. Any inaccuracies in such representations and warranties are subject to waiver by the Parties in accordance with this Agreement without notice or Liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the Parties of risks associated with particular matters regardless of the knowledge of any Party. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

10.15   ***No Personal Liability of Directors, Officers and Owners***. All Related Claims may be made only against (and are those solely of) the entities that are expressly identified as Parties (the "***Contracting Parties***"). No Person who is not a Contracting Party, including any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any Contracting Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any of the foregoing (collectively, "***Nonparty Affiliates***"), shall have any Liability pursuant to any Related Claim; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, and (b) each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Documents.

10.16   ***General Release***.

(a)    Effective as of the Closing, each Seller Party, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "***Seller Releasing Party***"), hereby fully, irrevocably and unconditionally releases and forever discharges Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Transferred Assets and Assumed Liabilities, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Seller Releasing Party of any Action it may have (i) under this Agreement or any of the other Related Documents or (ii) arising out of or related to the Retained Business.

(b)    Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "***Purchaser Releasing Party***"), hereby fully, irrevocably and unconditionally releases and forever discharges each of the Seller Parties, their respective Affiliates, and each of the Seller Parties' and their respective Affiliates' past and present directors, managers, officers, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based

upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Purchaser Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

10.17 *Legal Representation*. Purchaser and the Seller Parties acknowledge and agree that the Law Firm has represented the Seller Parties and their Affiliates in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Related Documents and the consummation of the Transactions, and that the Seller Group, their Affiliates and their partners, officers, directors and representatives have a reasonable expectation that the Law Firm will represent them in connection with any Action involving any member of the Seller Group, on the one hand, and Purchaser or any of its Affiliates and representatives, on the other hand, arising under this Agreement, the Related Documents or the Transactions. Purchaser hereby, on behalf of itself and its Affiliates and representatives, irrevocably: (a) acknowledges and agrees that any attorney-client privilege, solicitor-client privilege, work product or other attorney-client or solicitor-client confidential information ("*Attorney-Client Information*") arising from communications prior to the Closing between the Seller Parties (including any one or more officers, directors or stockholders of the Seller Parties), on the one hand, and the Law Firm, on the other hand, are not included in the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Business or the Transferred Assets, that any such Attorney-Client Information shall be deemed property of, and controlled solely by, the Sellers for the benefit and on behalf of the Seller Group and, upon request, shall convey and transfer any Attorney-Client Information to the Sellers; (b) acknowledges and agrees that the Seller Group shall have the right to retain, or cause the Law Firm to retain, any such documentation or information in the possession of the Law Firm or the Seller Group at the Closing; (c) agrees not to access, retain or use any documentation or information constituting Attorney-Client Information and that Purchaser shall not have any right to waive any attorney-client privilege or other right to confidentiality with respect to such Attorney-Client Information; (d) disclaims the right to assert a waiver by any member of the Seller Group with regard to the attorney-client privilege, solicitor-client privilege or other right to confidentiality with respect to such Attorney-Client Information solely due to the fact that such documentation or information is physically in the possession of Purchaser after the Closing; (e) consents to the Law Firm's representation after the Closing of any member of the Seller Group in any Action that may relate to Purchaser or the Transactions and consents to and waives any conflict of interest arising therefrom without the need for any future waiver or consent; and (f) consents to the disclosure by the Law Firm to any member of the Seller Group of any documentation or information obtained by the Law Firm during the course of its representation of the Seller Parties or any Affiliate thereof prior to the Closing, whether related to this Agreement, the Related Documents, the Transactions or otherwise, whether or not such disclosure is made prior to or after the Closing and whether or not the documentation or information disclosed is subject to any attorney-client privilege, solicitor-client privilege or confidentiality obligation to any Seller Party, any Affiliate thereof, or any other Person. In the event that any Action arises after the Closing between Purchaser and a Person other than a member

of the Seller Group, Purchaser shall not disclose any documentation or information that is subject to an attorney-client privilege or other rights of confidentiality referenced in this Section 10.17 without the prior written consent of the Sellers; *provided*, *however*, that if Purchaser is required by judicial order or other legal process to make such disclosure, Purchaser shall promptly notify the Sellers in writing of such requirement (without making disclosure) and shall provide the Sellers with such cooperation and assistance as shall be necessary to enable the Sellers to prevent disclosure by reason of such attorney-client privilege, solicitor-client privilege or other rights of confidentiality. This Section 10.17 is for the benefit of the members of the Seller Group and such Persons are intended third-party beneficiaries of this Section 10.17.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed and delivered as of the Effective Date.

**PURCHASER**:

NOR HEALTHCARE SYSTEMS
By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed and delivered as of the Effective Date.

**SELLER PARENT ON ITS OWN BEHALF, AS THE SELLER REPRESENTATIVE, AND ON BEHALF OF THE SELLERS:**

PROSPECT MEDICAL HOLDINGS, INC.

By: _____

Name: Paul Rundell

Title:   Chief Restructuring Officer

## **Schedule A**

(a)    Alta Hospitals System, LLC, a California limited liability company

(b)    Southern California Healthcare System, Inc. d/b/a Southern California Hospital at Hollywood, Southern California Hospital at Van Nuys and Southern California Hospital at Culver City

(c)    Alta Los Angeles Hospitals, Inc. d/b/a Los Angeles Community Hospital, Los Angeles Community Hospital at Norwalk and Los Angeles Community Hospital at Bellflower

(d)    Coordinated Regional Care Group, LLC