SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
    rpatel@sidley.com
    mquejada@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    wcurtin@sidley.com
    pventer@sidley.com
    anne.wallice@sidley.com

*Attorneys for the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN OF PROSPECT MEDICAL
HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ...................................1

    A.     Defined Terms ................................................................................................1

    B.     Rules of Interpretation ..................................................................................31

    C.     Computation of Time ....................................................................................32

    D.     Reference to Monetary Figures ....................................................................32

    E.     Controlling Document ..................................................................................32

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND STATUTORY FEES .................................................................................................32

    A.     Administrative Claims ..................................................................................32

    B.     DIP Claims ...................................................................................................33

    C.     Backstop Facility Claims .............................................................................34

    D.     Professional Compensation Claims ..............................................................35

          1.     Final Fee Applications and Payment of Professional Compensation Claims ....35

          2.     Post-Confirmation Date Fees and Expenses ....................................................35

          3.     Professional Fee Reserve Account ..................................................................36

    E.     Priority Tax Claims ......................................................................................36

    F.     Statutory Fees...............................................................................................36

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......37

    A.     Classification of Claims and Interests..........................................................37

    B.     Treatment of Claims and Interests ...............................................................38

          1.     Class 1 – Other Secured Claims .....................................................................38

          2.     Class 2 – Other Priority Claims ......................................................................38

          3.     Class 3 – MPT Agreed Claims .......................................................................39

          4.     Class 4 – MPT Note Claims ...........................................................................39

          5.     Class 5 – PhysicianCo Subordinated Secured Note Claims.............................40

          6.     Class 6 – PBGC Secured Claim ......................................................................40

          7.     Class 7 – Insured Claims ................................................................................41

          8.     Class 8–General Unsecured Claims ................................................................42

          9.     Class 9 – Section 510(b) Claims .....................................................................43

          10.    Class 10 – Intercompany Claims.....................................................................43

          11.    Class 11 – Existing Equity Interests................................................................43

          12.    Class 12 – Intercompany Interests ..................................................................43

    C.     Special Provision Governing Unimpaired Claims........................................44

D.     Elimination of Vacant Classes ..................................................................44

E.     Voting Classes ..........................................................................................44

F.     Presumed Acceptance by Non-Voting Classes ........................................44

G.     Controversy Concerning Impairment .......................................................44

H.     Subordination of Claims ...........................................................................44

I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code 45

J.      Insurance ...................................................................................................45

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .............................45

A.     General Settlement of Claims and Interests .............................................45

B.     The Plan Administrator .............................................................................45

       1.     The Plan Administrator ...................................................................45

       2.     Corporate Existence ........................................................................47

       3.     Plan Administrator Rights and Powers ...........................................47

       4.     Exculpation, Indemnification, Insurance and Liability Limitation ...................48

       5.     Tax Matters .....................................................................................48

       6.     Pension Plan Obligations ................................................................48

       7.     Compensation and Expenses of the Plan Administrator .................48

C.     Reorganized PMH .....................................................................................49

D.     Liquidation Transactions ..........................................................................49

       1.     Wind Down ......................................................................................49

E.     Sources of Consideration for Plan Distributions .....................................50

F.     Vesting of Assets ......................................................................................50

G.     Preservation of Causes of Action .............................................................51

H.     GUC Trust .................................................................................................51

       1.     Interest in the GUC Trust ................................................................51

       2.     Creation and Governance of the GUC Trust ...................................51

       3.     GUC Trust Trustee and the GUC Trust Agreement .........................55

       4.     Cooperation of the Debtors .............................................................55

       5.     Assigned Estate Causes of Action ...................................................56

       6.     GUC Trust Expenses .......................................................................56

       7.     Tax Treatment .................................................................................56

       8.     Termination and Dissolution of the GUC Trust ..............................57

       9.     Single Satisfaction of Allowed Claims from the GUC Trust ...........57

I.      Insurance Trust ..........................................................................................57

        1.       Creation and Purpose of the Insurance Trust ..................................................57

        2.       Insurance Trustee and Insurance Trust Agreement ........................................58

        3.       Administration of Insured Claims ...................................................................58

        4.       Cooperation of the Debtors ............................................................................59

        5.       Single Satisfaction of Allowed Claims from the Insurance Trust....................59

        6.       Interest in the Insurance Trust .......................................................................59

        7.       Tax Treatment ................................................................................................59

  J.       Corporate Action..................................................................................................60

  K.      Cancellation of Existing Securities and Agreements...........................................60

  L.      Effectuating Documents; Further Transactions ...................................................60

  M.    Section 1146 Exemption from Certain Taxes and Fees........................................61

  N.      Sale Orders...........................................................................................................61

  O.     DIP Orders ...........................................................................................................61

  P.      Authority to Act ...................................................................................................61

  Q.     Separate Plans ......................................................................................................62

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
.................................................................................................................................62

  A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .................62

  B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases...................63

  C.      Reservation of Rights...........................................................................................63

  D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired
Leases..................................................................................................................63

  E.      Indemnity Obligations .........................................................................................64

  F.      Insurance Policies ................................................................................................64

  G.     Employment Agreements......................................................................................64

  H.     Modifications, Amendments, Supplements, Restatements, or Other Agreements ........64

  I.       Nonoccurrence of Effective Date..........................................................................64

  J.       Employee Compensation and Benefits ..................................................................64

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS....................................................65

  A.      Distributions on Account of Claims Allowed as of the Effective Date ........................65

  B.      Compliance with Tax Requirements......................................................................65

  C.      Date of Distributions............................................................................................66

  D.      Disbursing Agent .................................................................................................66

  E.      Rights and Powers of Disbursing Agent ...............................................................66

  F.      Surrender of Instruments......................................................................................67

G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .................67

H.    Manner of Payment ......................................................................................................67

I.    Foreign Currency Exchange Rate ...............................................................................67

J.    Setoffs and Recoupment ..............................................................................................68

K.    Minimum Distribution .................................................................................................68

L.    Allocations ...................................................................................................................68

M.    Distributions Free and Clear .......................................................................................68

N.    Claims Paid or Payable by Third Parties ....................................................................68

    1.    Claims Paid by Third Parties...............................................................................68

    2.    Claims Payable by Third Parties .........................................................................69

    3.    Applicability of Insurance Policies .....................................................................69

O.    No Post-Petition Interest on Claims.............................................................................69

ARTICLE VII. PROCEDURES FOR RESOLVING  CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ............................................................................................70

A.    Allowance of Claims....................................................................................................70

B.    Claims Administration Responsibilities ......................................................................70

C.    Estimation of Claims and Interests .............................................................................70

D.    Adjustment to Claims or Interests Without Objection.................................................70

E.    Time to File Objections to Claims ...............................................................................71

F.    Disallowance of Claims or Interests ...........................................................................71

G.    Disallowance of Late Claims .......................................................................................71

H.    Disputed Claims Process..............................................................................................71

I.    Amendments to Claims ................................................................................................71

J.    No Distributions Pending Allowance ..........................................................................72

K.    Distributions After Allowance .....................................................................................72

ARTICLE VIII. RELEASE, INJUNCTION, AND RELATED PROVISIONS ..........................72

A.    Debtor Release .............................................................................................................72

B.    Third-Party Release ......................................................................................................73

C.    Exculpation ..................................................................................................................74

D.    Injunction .....................................................................................................................74

E.    Settling Insurer Injunction ..........................................................................................75

F.    PBGC Release & Exculpation Carve-Out ...................................................................76

G.    Release of Liens ...........................................................................................................76

H.    Gatekeeper Provision ..................................................................................................77

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .............................78

iv

A.     Conditions Precedent to the Effective Date ............................................................. 78

B.     Waiver of Conditions Precedent to the Effective Date .................................................. 79

ARTICLE X. RETENTION OF JURISDICTION ............................................................ 79

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....... 81

A.     Modification and Amendment ................................................................................. 81

B.     Effect of Confirmation on Modifications .................................................................. 81

C.     Revocation or Withdrawal of Plan ........................................................................... 81

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................................... 82

A.     Immediate Binding Effect ...................................................................................... 82

B.     Additional Documents ........................................................................................... 82

C.     Substantial Consummation ..................................................................................... 82

D.     Reservation of Rights ............................................................................................ 82

E.     Successors and Assigns .......................................................................................... 82

F.     Determination of Tax Liabilities ............................................................................. 82

G.     Dissolution of the Committee ................................................................................. 83

H.     Termination and Discharge of Patient Care Ombudsman ............................................ 83

I.     Notices ............................................................................................................... 83

J.     Term of Injunctions or Stays .................................................................................. 84

K.     Entire Agreement ................................................................................................. 85

L.     Plan Supplement .................................................................................................. 85

M.     Governing Law .................................................................................................... 85

N.     Nonseverability of Plan Provisions .......................................................................... 85

O.     Votes Solicited in Good Faith ................................................................................. 86

P.     Closing of the Chapter 11 Cases ............................................................................. 86

**INTRODUCTION**

The Debtors propose this Plan under section 1121 of the Bankruptcy Code. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement Filed contemporaneously with this Plan for a discussion of the Debtors' history, business, and prepetition capital structure, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan.

Supplemental agreements and documents referenced in this Plan and the Disclosure Statement are available for review on both the Bankruptcy Court's docket and on the Debtors' case information website: https://omniagentsolutions.com/Prospect.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN**.

**ARTICLE I.**
**DEFINED TERMS AND RULES OF INTERPRETATION**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "9019 Order" means the *Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief* [Docket No. 1287].

2.    "Accrued Loans" means accrued obligations in lieu of current interest and rent payments on MPT's prepetition claims, accruing in an amount equal to $5,000,000 per month, which first such accrual occurred on the HospitalCo Petition Date (prorated based on actual days in January from and after the HospitalCo Petition Date) and with each subsequent $5,000,000 accrual being added to the aggregate principal amount of outstanding Accrued Loans on the first day of each month thereafter, beginning February 1, 2025.

3.    "Ad Hoc Insured Claim Counsel" means counsel who have appeared in the Chapter 11 Cases to each of (a) the Ad Hoc Committee of Medical Malpractice Claimants (as defined in Docket No. 893), (b) the Group of Medical Malpractice Claimants (as defined in Docket No. 1144), and (c) the Personal Injury Claimants (as defined in Docket No. 1646).

4.    "Administrative Claim" means a Claim of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating Debtors' business; (b) Allowed Professional Compensation Claims; (c) Statutory Fees; (d) 503(b)(9) Claims; and (e) all other Claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court.

1

5.      "<u>Administrative Claims Bar Date</u>" means 5:00 p.m. prevailing Central Time on the date that is 30 days after the Effective Date, and is the deadline by which a claimant must File a request for payment of any Administrative Claim (excluding Professional Compensation Claims) arising on or after the Petition Date, through and including the Effective Date.

6.      "<u>Affiliate</u>" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced Entity was a debtor in a case under the Bankruptcy Code.

7.      "<u>Allowed</u>" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan (including any Claim or Interest that is upheld or otherwise Allowed pursuant to a settlement executed by a Debtor, Reorganized PMH, or a Wind-Down Debtor (as applicable) in accordance with the Plan), (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors', Reorganized PMH's, or the Wind-Down Debtors' (as applicable) reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor.  A Proof of Claim Filed after the Bar Date is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. "Allow," "Allowing," and "Allowance" shall have correlative meanings.  The MPT Agreed Claims and the PBGC Secured Claim are Allowed in the amounts set forth in the Global Settlement Agreement, subject in all respects to the terms thereof and the 9019 Order.  The JMB DIP Claim and the eCapital DIP ABL Claim are Allowed as set forth in the JMB DIP Order and eCapital DIP ABL Order.

8.      "<u>Approved Budget</u>" means the "Approved Budget" under paragraph O of the eCapital DIP ABL Order, as modified pursuant to paragraph 3 of the 9019 Order, and paragraph 1 of the Supplemental Junior DIP Order; *provided* that MPT shall not modify the Approved Budget in respect of the Committee's Professional Compensation Claims, as agreed to with the Debtors for July, August, September and October.

9.     "Assigned Estate Causes of Action" means, collectively, all Estate Causes of Action not released pursuant to this Plan, the DIP Orders, the Global Settlement Agreement and the PBGC Waiver, including any Estate Causes of Action against any parties included on the Non-Released Parties Schedule, except: (a) Causes of Action against the Debtors' current directors and officers;[2] (b) Estate Causes of Action to enforce the Global Settlement Agreement; (c) Estate Causes of Action in respect of the Junior DIP Facility and Backstop Facility, and (d) to the extent the PhysicianCo Release Effective Date does not occur on or before the Effective Date, the PhysicianCo Causes of Action, if any, against PBGC.  Estate Causes of Action against Yale, in connection with the purchase or proposed purchase of any hospital-related assets in Connecticut, shall be Assigned Estate Causes of Action, provided that the litigation of such claims, including the distribution of any proceeds, shall be subject to Article IV.H hereof. PhysicianCo Causes of Action (except to the extent set forth in clause (d) above) shall be Assigned Estate Causes of Action, provided that the litigation of such claims, including the distribution of any proceeds, shall be subject to Article IV.H hereof.

10.     "Avoidance Actions" means any and all claims and Causes of Action which any of the Debtors, the Estates, or any other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11.     "Backstop Credit Agreement" means that certain Super-Priority Senior Secured Debtor-in-Possession Loan and Security Agreement, to be dated as of the Effective Date (as amended, supplemented, or otherwise modified from time to time), by and among PMH and the other Debtors party thereto, as borrowers, and MPT, as the Backstop Facility Lender, with respect to the Backstop Facility and on terms consistent with those set forth in the Superpriority DIP Term Sheet, dated as of August 3, 2025, as approved by the Supplemental Junior DIP Order, and on such other terms as are agreed between the Debtors and MPT (it being understood that the Committee reserves all rights to object to the Backstop Credit Agreement to the extent it is not consistent with such term sheet or includes material terms not addressed therein).

12.     "Backstop Facility" means the super-priority senior secured postpetition single draw credit facility made in an aggregate principal amount of up to $30,000,000 to pay Allowed Administrative Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims which remain unpaid as of the Effective Date to the extent such claims are not (or will not) otherwise be paid from Net Proceeds distributed in accordance with the Recovery Waterfall and/or the Debtors' available cash (including in any Professional Fee Reserve Account or other similar reserve).

13.     "Backstop Facility Claim" means any Claim derived from, based upon, or secured pursuant to the Backstop Facility Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, and other charges arising thereunder or related thereto, in each case, with respect to the Backstop Facility, including all Claims for and/or otherwise related to any obligations arising thereunder.

---

[2]   Subject to the outcome of any ongoing diligence efforts of the PMH Transaction Committee and the Committee's review of such investigation

14.     "Backstop Facility Documents" means collectively, the Supplemental Junior DIP Order and the Backstop Credit Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any notes, certificates, guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, documents, and instruments, related to or executed in connection with the Supplemental Junior DIP Order or the Backstop Credit Agreement (including any amendments, restatements, supplements, or modifications of any of the foregoing).

15.     "Backstop Facility Lender" means MPT, as lender, under the Backstop Credit Agreement.

16.     "Backstop Lien" means that perfected, first-priority security interest in and lien on the proceeds of Assigned Estate Causes of Action and all other assets, if any, transferred (or to be transferred) to the GUC Trust securing all amounts owing under the Backstop Facility.

17.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

18.     "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

19.     "Bankruptcy Rules" means Federal Rules of Bankruptcy Procedure.

20.     "Bar Date" means, with respect to any particular Claim, the applicable date set by the Bankruptcy Court as the last day for Filing Proofs of Claim or requesting allowance of Administrative Claims in the Chapter 11 Cases for such Claim, whether pursuant to the Confirmation Order, the Plan, the *Order (I) Setting Bar Dates for Filing Proofs of Claim; (II) Approving Form and Manner for Filing Proofs of Claim; (III) Approving the Notice of Bar Dates; and (IV) Granting Related Relief* [Docket No. 1262] (including as extended to PhysicianCo [Docket No. 2474]), or any other applicable order of the Bankruptcy Court.

21.     "Bid Procedures Order" means the *Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling Auction(s) and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof (II)(A) Authorizing the Sale of the Assets Free and Clear of All Encumbrances, and (B) Approving the Assumption and Assignment of the Assumed Contracts, and (III) Granting Related Relief* [Docket No. 1264].

22.     "Blue Torch" means Blue Torch Capital L.P.

23.     "Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of Texas.

24.     "California Assets" means the assets sold or transferred in the California Sale Transaction.

25.    "California Purchase Agreement" means one or more asset or equity purchase agreement(s) for the California Assets, in each case, in form and substance consistent with the terms of the Global Settlement Agreement, as may be amended, supplemented, or otherwise modified from time to time in accordance with the California Sale Order or further order of this Bankruptcy Court.

26.    "California Purchaser" means one or more purchaser(s) under the California Purchase Agreement.

27.    "California Seller Parties" means Prospect Medical Holdings, Inc., Alta Hospitals System, LLC, Southern California Healthcare System, Ind., Alta Los Angeles Hospitals, Inc., Coordinated Regional Care Group, LLC.

28.    "California Stalking Horse APA" means that certain Asset Purchase Agreement (including all exhibits, schedules, and addendum thereto, as maybe be amended, amended and restated, supplemented, or modified from time to time), by and between the California Seller Parties and the California Stalking Horse Purchaser [Docket No. 2738-1].  If the California Stalking Horse Purchaser is the Successful Bidder, the California Stalking Horse APA shall be the California Purchase Agreement.

29.    "California Stalking Horse Purchaser" means NOR Healthcare Systems Corp., the purchaser that has agreed to purchase the California Assets under the California Stalking Horse APA, and assume certain liabilities of the California Seller Parties as specifically enumerated in the California Stalking Horse APA.

30.    "California Sale Order" means an order of the Bankruptcy Court approving the California Sale Transaction, and in a form and substance reasonably acceptable to eCapital, MPT, and JMB (for so long as any obligations under the JMB DIP Credit Agreement remain outstanding, other than any indemnification obligations and other obligations which by their terms expressly survive the termination of the JMB DIP Credit Agreement ), and the Debtors (pursuant to the Global Settlement Agreement).

31.    "California Sale Transaction" means the sale of any or all of the Debtors' assets located in (or otherwise supporting the Debtors' operations in) California, in one or more transaction(s).

32.    "Cash" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

33.    "Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.   Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity;

5

(b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim for subordination, including pursuant to section 510 of the Bankruptcy Code; and (g) any claim for recharacterization.

34.    "Centerbridge" means Centerbridge Credit CS, L.P.

35.    "Chapter 11 Cases" means, collectively, those certain chapter 11 bankruptcy cases of the Debtors jointly administered under the caption *In re Prospect Medical Holdings, Inc., et al.*, Case No. 25-80002 (SGJ) (Bankr. N.D. Tex. 2025).

36.    "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

37.    "Claims Objection" means an objection to the allowance of a claim as set forth in section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and/or any Bankruptcy Court order regarding omnibus claims objections.

38.    "Claims Objection Bar Date" means 5:00 p.m. Central Time on the date that is 180 days after the Effective Date and is the deadline by which a Claims Objection must be made; *provided* that the Claims Objection Bar may be extended upon presentment of an order to the Bankruptcy Court by the Plan Administrator or GUC Trust Trustee.

39.    "Claims Register" means the register managed by the Notice and Claims Agent reflecting Filed Proofs of Claim.

40.    "Claims Resolution Procedures" has the meaning ascribed thereto in the Claims Resolution Procedures Order.

41.    "Claims Resolution Procedures Order" means the *Order (I) Approving and Authorizing Mandatory Claim Resolution Procedures to Resolve Professional Liability and General Liability Claims; and (II) Granting Related Relief* [Docket No. 2180].

42.    "Class" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

43.    "Committee" means the official committee of unsecured creditors appointed by the U.S. Trustee under section 1102(b) of the Bankruptcy Code in these Chapter 11 Cases on January 29, 2025 [Docket No. 295].

44.    "Conditions Precedent to the Effective Date" means the conditions set forth in Article IX.A of this Plan.

45.    "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

46.    "Confirmation Date" means the date on which Confirmation occurs.

47. "<u>Confirmation Hearing</u>" means the hearing conducted by the Bankruptcy Court to consider confirmation of the proposed Plan under section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

48. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

49. "<u>Connecticut ECHN Assets</u>" means the assets of Eastern Connecticut Health Network, including Rockville General Hospital and Manchester Memorial Hospital, sold or transferred pursuant to the Connecticut ECHN Purchase Agreement.

50. "<u>Connecticut ECHN Purchase Agreement</u>" means one or more asset or equity purchase agreement(s) for the Connecticut ECHN Assets, in each case, in form and substance consistent with the terms of the Global Settlement Agreement, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Connecticut ECHN Sale Order or further order of this Bankruptcy Court.

51. "<u>Connecticut ECHN Purchaser</u>" means one or more purchaser(s) under the Connecticut ECHN Purchase Agreement.

52. "<u>Connecticut ECHN Seller Parties</u>" means Prospect Medical Holdings, Inc., Prospect CT, Inc., Prospect ECHN, Inc., Prospect Rockville Hospital, Inc., Prospect Manchester Hospital, Inc., Prospect CT Medical Foundation, Inc., Prospect ECHN Home Health, Inc., Prospect, Healthcare Staffing on Demand, LLC, Prospect Caring Hand, Inc., Prospect Provider Group CT, LLC, Coordinated Regional Care Group, LLC, and Prospect Health Services CT, Inc.

53. "<u>Connecticut ECHN Stalking Horse APA</u>" means that certain Asset Purchase Agreement (including all exhibits, schedules, and addendum thereto, as maybe be amended, amended and restated, supplemented, or modified from time to time), by and between the Connecticut ECHN Seller Parties and the Connecticut ECHN Stalking Horse Purchaser [Docket No. [•]]. If the Connecticut ECHN Stalking Horse Purchaser is the Successful Bidder, the Connecticut ECHN Stalking Horse APA shall be the Connecticut ECHN Purchase Agreement.

54. "<u>Connecticut ECHN Stalking Horse Purchaser</u>" means [•], the purchasers that have agreed to purchase the Connecticut ECHN Assets under the Connecticut ECHN Stalking Horse APA, and assume certain liabilities of the Connecticut ECHN Seller Parties as specifically enumerated in the Connecticut ECHN Stalking Horse APA.

55. "<u>Connecticut ECHN Sale Order</u>" means an order of the Bankruptcy Court approving the Connecticut ECHN Sale Transaction, and in form and substance reasonably acceptable to JMB (for so long as any obligations under the JMB DIP Credit Agreement remain outstanding, other than any indemnification obligations and other obligations which by their terms expressly survive the termination of the JMB DIP Credit Agreement), MPT, and the Debtors (pursuant to the Global Settlement Agreement).

56. "<u>Connecticut ECHN Sale Transaction</u>" means the sale of the Debtors' Connecticut ECHN Assets located in (or otherwise supporting the Debtors' operations in) Connecticut in one or more transaction(s).

57.    "Connecticut Waterbury Assets" means the assets, including certain of the Debtors' real property located in the Town of Waterbury, Hartford County, Connecticut, sold or transferred in the Connecticut Waterbury Sale Transaction.

58.    "Connecticut Waterbury Purchase Agreement" means one or more asset or equity purchase agreement(s) for the Connecticut Waterbury Assets, in each case, in form and substance consistent with the terms of the Global Settlement Agreement, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Connecticut Waterbury Sale Order or further order of this Bankruptcy Court.

59.    "Connecticut Waterbury Purchaser" means one or more purchaser(s) under the Connecticut Waterbury Purchase Agreement.

60.    "Connecticut Waterbury Seller Parties" means Prospect Medical Holdings, Inc., Prospect Waterbury, Inc., Cardiology Associates of Greater Waterbury, LLC, Prospect Waterbury Ambulatory Surgery, LLC, and Prospect Waterbury Home Health, Inc.

61.    "Connecticut Waterbury Stalking Horse APA" means that certain Asset Purchase Agreement (including all exhibits, schedules, and addendum thereto, as may be amended, amended and restated, supplemented, or modified from time to time), by and between the Connecticut Waterbury Seller Parties and the Connecticut Waterbury Stalking Horse Purchaser. If the Connecticut Waterbury Stalking Horse Purchaser is the Successful Bidder, the Connecticut Waterbury Stalking Horse APA shall be the Connecticut Waterbury Purchase Agreement.

62.    "Connecticut Waterbury Stalking Horse Purchaser" means [•], the purchaser that has agreed to purchase the Connecticut Waterbury Assets under the Connecticut Waterbury Stalking Horse APA, and assume certain liabilities of the Connecticut Waterbury Seller Parties as specifically enumerated in the Connecticut Waterbury Stalking Horse APA.

63.    "Connecticut Waterbury Sale Order" means an order of the Bankruptcy Court approving the Connecticut Waterbury Sale Transaction, and in form and substance reasonably acceptable to MPT and the Debtors (pursuant to the Global Settlement Agreement).

64.    "Connecticut Waterbury Sale Transaction" means the sale of the Debtors' Connecticut Waterbury Assets located in (or otherwise supporting the Debtors' operations in) Connecticut in one or more transaction(s).

65.    "Consummation" means the occurrence of the Effective Date.

66.    "Cure" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed or assumed and assigned by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

67.    "D&O Liability Insurance Policies" means, collectively, each director and officer liability insurance policy and any "tail policy" to which any of the Debtors are a party as of the Effective Date.

68.     "Debtor Releases" means the releases set forth in Article VIII.A herein.

69.     "Debtor-Related Matters" means anything related to the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, any security of the Debtors, the purchase, sale, amendment, or recission of any Claim against or Interest in the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' intercompany transactions, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors), the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Chapter 11 Cases, the DIP Documents, the Definitive Documents, the Disclosure Statement, the New Corporate Governance Documents, the Plan (including the Plan Supplement), the Sale Transactions, or any Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

70.     "Debtors" means, collectively, the HospitalCo Debtors and the PhysicianCo Debtors.

71.     "Deferred Decision Contract" means those Executory Contracts set forth on Deferred Decision Contracts Schedule, which schedule shall be included in the Plan Supplement, that the Debtors have deferred their decision to assume or reject such Executory Contract until the Deferred Decision Deadline; *provided*, that each Deferred Decision Contract shall be automatically rejected on the Deferred Decision Deadline unless the Debtors, pursuant to Article V.A. of this Plan, amend the Schedule of Assumed Contracts to designate such Deferred Decision Contract as assumed.

72.     "Deferred Decision Deadline" means the date that is 90 days after the Effective Date; *provided*, that the Debtors, or Reorganized PMH, as applicable, may extend such date in successive 90 day increments for up to one year after the Effective Date; *provided, further*, that such extensions shall be noticed on the Bankruptcy Court docket.

73.     "Definitive Documents" means, collectively, and in each case acceptable to the Debtors:  (a) this Plan (including the Plan Supplement and any and all exhibits, supplements, appendices, and schedules hereto and thereto), in form and substance reasonably acceptable to the DIP Lenders and, to the extent provided for in the PBGC Waiver, PBGC; (b) the Confirmation Order, in form and substance reasonably acceptable to the DIP Lenders and, to the extent provided for in the PBGC Waiver, PBGC; (c) the Disclosure Statement Order (including all exhibits, supplements, appendices, and schedules thereto); (d) the Solicitation Materials, including the

9

Disclosure Statement, and any such other agreements, instruments, and documents as may be necessary or reasonably desirable to consummate and document the Transactions; (e) the Sale Transactions Documents and any documents governing, or orders of the Bankruptcy Court approving, any Sale Transactions, each in form and substance reasonably acceptable to eCapital (in its capacity as DIP Lender) and MPT, consistent with the terms of the Global Settlement Agreement; (f) the TSAs, each in form and substance reasonably acceptable to MPT and consistent with the terms of the Global Settlement Agreement; (g) the GUC Trust Documents, each in form and substance reasonably acceptable to MPT and the Committee (or the GUC Trust Trustee (as applicable)) and consistent with the terms of the Global Settlement Agreement and the Junior DIP Orders; (h) the Insurance Trust Documents; (i) the Backstop Facility Documents, each in form and substance acceptable to MPT; and (j) all documents, instruments, deeds, notifications, agreements, and transactions, in each case related to the Global Settlement, each of which shall be consistent with the terms of the Global Settlement Agreement and the Junior DIP Orders; *provided*, *however*, to the extent any provision of any Definitive Document is materially inconsistent with the Global Settlement Agreement, 9019 Order, the Supplemental Junior DIP Order, PBGC Waiver, or Recovery Waterfall, any such party to the Global Settlement (or PBGC with respect to the PBGC Waiver) who is adversely affected thereby shall have consent rights as to the form and substance of any such provision.

74.    "DIP Claims" means, collectively, the JMB DIP Claim, the eCapital DIP ABL Claim, and the Junior DIP Claim which shall have the priorities set forth in the DIP Orders.

75.    "DIP Credit Agreements" means, collectively, the JMB DIP Credit Agreement, the eCapital DIP ABL Credit Agreement, and the Junior DIP Credit Agreement.

76.    "DIP Documents" means, collectively, the JMB DIP Documents, the eCapital DIP Documents, and the Junior DIP Documents.

77.    "DIP Lenders" means, collectively, JMB, eCapital, MPT, and their respective successors and assigns (in their respective capacities as lenders under the applicable DIP Credit Agreements).

78.    "DIP Orders" means, collectively, the JMB DIP Order, the eCapital DIP ABL Order, the 9019 Order (as it relates to the Junior DIP Facility), the JMB DIP Upsize Order, and the Supplemental Junior DIP Order.

79.    "Disallowed" means all or that portion, as applicable, of any Claim or Interest which: (a) has been disallowed under the Plan, the Bankruptcy Code, applicable law or by a Final Order; (b) is scheduled by the Debtors as being in an amount of zero dollars ($0.00) or as contingent, disputed, or unliquidated and as to which no Proof of Claim was timely filed or deemed timely filed prior to the applicable Bar Date pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the order approving the Bar Date, or otherwise deemed timely filed under applicable law; or (c) is not scheduled by the Debtors and as to which no Proof of Claim or request for allowance of an Administrative Claim (as applicable) has been timely filed or deemed timely filed prior to the applicable Bar Date pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

80.     "<u>Disbursing Agent</u>" means, as applicable, (a) with respect to distributions to Holders of General Unsecured Claims through the GUC Trust, the GUC Trust Trustee or the Person or Entit(ies) selected by the Committee in accordance with the GUC Trust Documents; (b) with respect to distributions from the Insurance Trust, the Insurance Trustee, and (c) with respect to all other distributions, the Debtors, the Wind-Down Debtors, Reorganized PMH, or the Plan Administrator or the Person or Entit(ies) selected by the Plan Administrator to make or to facilitate distributions pursuant to and in accordance with the Plan, which Entity may include the Notice and Claims Agent.

81.     "<u>Disclosure Statement</u>" means the related disclosure statement with respect to the Plan, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

82.     "<u>Disclosure Statement Order</u>" means the order approving the Disclosure Statement.

83.     "<u>Disputed</u>" means, with respect to any Claim or Interest, any Claim or Interest or any portion thereof that is not yet Allowed or Disallowed.

84.     "<u>Distributable Cash</u>" means the Cash on hand of the Debtors or, after the Effective Date, the Wind-Down Debtors or Reorganized PMH, available for distribution as of the Effective Date or such applicable later date pursuant to the terms of the Plan.

85.     "<u>Distribution Record Date</u>" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court.

86.     "<u>eCapital</u>" means eCapital Healthcare Corp.

87.     "<u>eCapital DIP ABL Claim</u>" means any Claim derived from, based upon, or secured pursuant to the eCapital DIP Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, and other charges arising thereunder or related thereto, in each case, with respect to the eCapital DIP ABL Facility, including all Claims for and/or otherwise related to Obligations (as defined in the eCapital DIP ABL Credit Agreement).

88.     "<u>eCapital DIP ABL Credit Agreement</u>" means that certain Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement, dated as of February 13, 2025, by and among Southern California Healthcare System, Inc. and the other borrowers party thereto, as borrowers, and eCapital, as lender, as may be amended, supplemented, or otherwise modified from time to time, including by that certain Amendment No. 1 to Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement, dated as of March 19, 2025.

89.     "<u>eCapital DIP ABL Facility</u>" means the super-priority senior secured postpetition revolving credit facility made in accordance with the eCapital DIP ABL Credit Agreement and the DIP Orders in an aggregate principal amount of up to $90,000,000.

90.   "eCapital DIP ABL Order" means, together, (a) the *Interim Order (I) Authorizing (A) Postpetition ABL Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 102] and (b) the *Amended Final Order (I) Authorizing (A) Postpetition ABL Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 695].

91.   "eCapital DIP Documents" means, collectively, the eCapital DIP ABL Order, the eCapital DIP ABL Credit Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any notes, certificates, guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, documents, and instruments, related to or executed in connection with the eCapital DIP ABL Order or the eCapital DIP ABL Credit Agreement (including any amendments, restatements, supplements, or modifications of any of the foregoing).

92.   "Effective Date" means the date after the Confirmation Date on which (a) all Conditions Precedent to the Effective Date have been satisfied or waived in accordance with the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

93.   "Employment Agreement" means any agreement relating to the employment of any of the Debtors' current employees.

94.   "Entity" has the meaning as defined in section 101(15) of the Bankruptcy Code.

95.   "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 (2018 & Supp. IV 2023).

96.   "Estate" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

97.   "Estate Causes of Action" means any and all Causes of Action held by, belonging to, or asserted or capable of being asserted by any of the Debtors or their Estates.

98.   "Exculpated Parties" means, collectively, (1) the Debtors, and (2) any statutory committee and each of its members.

99.   "Executory Contract" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

100.   "Existing Equity Interests" means an Interest in a Debtor existing as of the Effective Date.

101.    "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

102.    "Final Order" means an order or judgment of the Bankruptcy Court or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule (or analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code, may be Filed with respect to such order or judgment.

103.    "General Unsecured Claim" means any Claim that is not an Administrative Claim (including a Professional Compensation Claim), a DIP Claim, a PBGC Secured Claim, Priority Tax Claim, an Other Secured Claim, an Other Priority Claim, a Prepetition ABL Claim, an MPT Agreed Claim, an MPT Note Claim, a PhysicianCo Subordinated Note Claim, a Section 510(b) Claim, or an Intercompany Claim.  Any MPT Deficiency Claim is a General Unsecured Claim.

104.    "Global Settlement Agreement" means the *Settlement and Support Agreement* attached as Exhibit 1 to the 9019 Order, dated as of March 19, 2025, by and among the Debtors, the Committee, and MPT.

105.    "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

106.    "GUC Priority Recovery" has the meaning assigned to such term in Article IV.H.2.

107.    "GUC Trust" means one or more trusts and/or sub-trusts formed under the GUC Trust Agreement(s), which trust(s) shall hold the GUC Trust Assets.

108.    "GUC Trust Agreement" means the trust or similar agreement providing for the GUC Trust, in form and substance reasonably acceptable to the Debtors, the Backstop Facility Lender and the Committee and consistent with the terms of the Global Settlement Agreement and the Junior DIP Orders, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

109.    "GUC Trust Assets" means, subject to Article IV.H hereof, the Global Settlement Agreement and the Junior DIP Orders, the Assigned Estate Causes of Action, the proceeds of the Assigned Estate Causes of Action, the MPT GUC Advance and any other assets transferred to the GUC Trust from time to time.

110.    "GUC Trust Cooperation Agreement" means an agreement, which may be the GUC Trust Agreement, between the Debtors and the GUC Trust, to be operative as of and after the Effective Date, (a) transferring to the GUC Trust, *inter alia*, certain documents, information, and privileges relevant for the pursuit and administration by the GUC Trust of the Assigned Estate Causes of Action; and (b) providing for reasonable terms for cooperation between the Wind-Down Debtors, Reorganized PMH, and the GUC Trust regarding the same, in form and substance reasonably acceptable to the Debtors, MPT and the Committee and consistent with the terms of the Global Settlement Agreement and Junior DIP Orders.

111.    "GUC Trust Documents" means the GUC Trust Agreement and all other agreements, documents, procedures, and instruments delivered or entered into in connection with the establishment, formation, and implementation of the GUC Trust, including the GUC Trust Cooperation Agreement, each in form and substance reasonably acceptable to the Debtors, MPT, and the Committee and consistent with the terms of the Global Settlement Agreement and Junior DIP Orders.

112.    "GUC Trust Expenses" means all reasonable and documented post-Effective Date fees, costs, and expenses of and incurred by the GUC Trust, including legal and other professional fees, costs, and expenses, administrative fees and expenses, insurance fees, taxes, and escrow expenses, including reasonable fees and expenses of the GUC Trust Trustee, which shall be paid in accordance with the GUC Trust Agreement and consistent with the Global Settlement Agreement and Junior DIP Orders.

113.    "GUC Trust Holdback" means Net Proceeds of any of (a) the California Sale Transaction, the Connecticut ECHN Sale Transaction, the Connecticut Waterbury Sale Transaction, the Pennsylvania Wind Down, and the Rhode Island HospitalCo Sale Transaction or (b) Assigned Estate Causes of Action in an amount equal to $10,000,000 after application of such Net Proceeds to the DIP Claims pursuant to the Recovery Waterfall and Junior DIP Orders, that will be held back by the Debtors and not distributed on account of MPT Agreed Claims.

114.    "GUC Trust Interests" means all beneficial interests in the GUC Trust granted, as applicable, to each Holder of an Allowed General Unsecured Claim, which shall entitle  such Holder to a Pro Rata share in the GUC Trust Assets that remain after the obligations under the Backstop Facility are paid in full in cash in accordance with the GUC Trust Agreement, the Junior DIP Orders and Article IV.H hereof.

115.    "GUC Trust Trustee" means the trustee for the GUC Trust to be selected by the Committee subject to the Backstop Facility Lender's consent (such consent not to be unreasonably withheld, conditioned or delayed), which Person (and any successor GUC Trust Trustee) shall be a "U.S. Person" as determined for U.S. federal income tax purposes.

116.    "Holder" means any Entity that holds a Claim or Interest, as applicable.

117.    "HospitalCo" or "HospitalCo Debtors" or "HCo Debtors" means, collectively: Prospect Medical Holdings, Inc.; Prospect Hospital Holdings, LLC; Coordinated Regional Care Group, LLC; Prospect East Hospital Advisory Services, LLC; Prospect East Holdings, Inc.; Hospital Advisory Services, Inc.; Alta Hospitals System, LLC; Prospect NJ, Inc.; Prospect CT,

Inc.; Prospect Penn, LLC; Prospect Home Health and Hospice, LLC; Prospect Health Ventures Holdings, LLC; Prospect Provider Groups, LLC; Prospect Ambulatory Holding, LLC; PHS Holdings, LLC; Prospect Integrated Behavioral Health, Inc.; Prospect ACO Holdings, LLC; Nix Hospitals System, LLC; Nix Community General Hospital, LLC; Nix SPE, LLC; Nix Physicians, Inc.; Nix Services, LLC; Prospect Nix Home Health and Hospice, LLC; Prospect CharterCARE, LLC; Alta Los Angeles Hospitals, Inc.; Southern California Healthcare System, Inc.; Prospect Oldco NJ, Inc.; Prospect Crozer, LLC; Prospect ECHN Home Health, Inc.; Prospect Waterbury Home Health, Inc.; Prospect Crozer Home Health and Hospice, LLC; Prospect Management Services, LLC; Prospect Ambulatory Surgery Centers, LLC; Prospect Health Services CT, Inc.; Prospect Health Services RI, Inc.; Prospect Health Services PA, Inc.; Prospect ACO Northeast, LLC; Prospect Waterbury, Inc.; Healthcare Staffing on Demand, LLC; Prospect CT Management Services, Inc.; Prospect ECHN, Inc.; Prospect Caring Hand, Inc.; Prospect Provider Group RI, LLC; Prospect Provider Group NJ, LLC; Prospect Provider Group CT, LLC; Prospect Provider Group PA, LLC; Prospect Crozer Ambulatory Surgery, LLC; Prospect Waterbury Ambulatory Surgery, LLC; Cardiology Associates of Greater Waterbury, P.C.; Prospect CharterCARE RWMC, LLC; Prospect CharterCARE SJHSRI, LLC; Prospect CharterCARE Physicians, LLC; Prospect Blackstone Valley Surgicare, LLC; Prospect CCMC, LLC; Prospect DCMH, LLC; Prospect Crozer Urgent Care, LLC; Prospect Health Access Network, Inc.; Prospect Penn Health Club, LLC; Prospect RI Home Health and Hospice, LLC; New University Medical Group, LLC; Prospect CharterCARE Home Health and Hospice, LLC; Associates in Primary Care Medicine, Inc.; Prospect ECHN Eldercare Services, Inc.; Prospect Rockville Hospital, Inc.; Prospect Manchester Hospital, Inc.; Prospect CharterCARE Ancillary Services, LLC; and Prospect CT Medical Foundation, Inc.

118.    "<u>HospitalCo Intercreditor Agreement</u>" means that certain Intercreditor Agreement, dated as of May 23, 2023, by and among MPT of Upper Darby PMH, LLC, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upland PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Waterbury PMH, LLC, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, LL.P., MPT of Los Angeles PMH, L.P., MPT of Culver City PMH, L.P., PMT of Bellflower PMH, L.P., PMT of Norwalk PMH, L.P., MPT TRS Lender PMH, LLC, Wilmington Trust, National Association and MPH and certain other direct and indirect subsidiaries of MPG party thereto from time to time, as amended, supplemented or otherwise modified from time to time, including by that certain Amendment No. 1 to Intercreditor Agreement, dated as of June 5, 2024.

119.    "<u>HospitalCo Petition Date</u>" means the date on which each of the HospitalCo Debtors Filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases, or January 11, 2025.

120.    "<u>Impaired</u>" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

121.    "<u>Indemnification Obligations</u>" means, collectively, each of the Debtors' indemnification obligations (whether arising from charters, bylaws, limited liability company agreements, other organizational documents, or contracts) in place as of the Effective Date to indemnify the Debtors' officers, directors, agents, or employees serving in such roles as of the Petition Date with respect to all present and future actions, suits, and proceedings against the

Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors.

122. "Initial Contribution" has the meaning set forth in Article IV.H.2 herein.

123. "Insurance Policies" means all insurance policies that have been issued at any time to or provide coverage to the Debtors (or reinsurance to the Debtors' captive insurer) regarding Claims for personal injury, wrongful death, medical malpractice, or similar tort Claims, in each case, against the Debtors and all agreements, documents, or instruments relating thereto; *provided* that "Insurance Policies" does not include any such policies that are, or have been, assumed and assigned to the Purchaser on or before the Effective Date pursuant to the Purchase Agreements, the Sale Orders, and section 365 of the Bankruptcy Code.

124. "Insurance Trust" means the one or more trusts and/or sub-trusts formed under the Insurance Trust Agreement(s), which trust(s) shall hold the Insurance Trust Assets.

125. "Insurance Trust Agreement" means the trust or similar agreement (if any) providing for the Insurance Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof, which shall be in form acceptable to the Debtors and the Insurance Trustee (in consultation with the Committee).

126. "Insurance Trust Assets" means the proceeds of a settlement, sale or other transaction between or among one or more Settling Insurers and the Debtors, Wind-Down Estates, or Insurance Trustee with respect to Insurance Policies that have been issued at any time to, or provide coverage to, the Debtors (or reinsurance to the Debtors' captive insurer) regarding Claims for personal injury, wrongful death, medical malpractice, or similar tort Claims), which shall not include the D&O Liability Insurance Policies or any proceeds thereof.

127. "Insurance Trust Documents" means the Post-Confirmation Claims Resolution Procedures, the Insurance Trust Agreement and all other agreements, documents, procedures, and instruments delivered or entered into in connection with the establishment, formation, and implementation of the Insurance Trust.

128. "Insurance Trustee" means the Honorable Judge Harlin D. Hale (Ret.), and any successor that may be appointed in accordance with the terms of the Insurance Trust Agreement.

129. "Insured Claim" means a Claim for personal injury, wrongful death, medical malpractice, or similar tort Claim that is or may be covered by one or more professional liability or general liability Insurance Policies, or for which a Debtor is entitled to indemnification, reimbursement, contribution, or other payment under one or more Insurance Policies; *provided*, *however*, that all Claims for any deductible or self-insured retention obligations of the Debtors shall be treated as General Unsecured Claims (to the extent Allowed) subject to Article III.B.7.b herein.

130. "Insured Deficiency Claim" has the meaning set forth in Article III.B.7.b herein.

131. "Insurer" means an insurer or reinsurer that issued Insurance Policies.

132.    "<u>Intercompany Claim</u>" means a Claim held by a Debtor against a Debtor.

133.    "<u>Intercompany Interests</u>" means all interests of any Debtor in any other Debtor.

134.    "<u>Interest(s)</u>" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

135.    "<u>IRC</u>" means the Internal Revenue Code of 1986, as amended.

136.    "<u>IRS</u>" means the Internal Revenue Service.

137.    "<u>IRS Form</u>" means IRS Form W-9, W-8BEN, any acceptable substitute, or any other tax information form that the Debtors, the Plan Administrator, or the GUC Trust Trustee (solely with respect to General Unsecured Claims) may require from a Holder of a Claim for a distribution under the Plan.

138.    "<u>JMB</u>" means JMB Capital Partners Lending, LLC or its designees or assignees.

139.    "<u>JMB DIP Claim</u>" means any Claim derived from, based upon, or secured pursuant to the JMB DIP Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, and other charges arising thereunder or related thereto, in each case, with respect to the JMB DIP Facility, including all Claims for and/or otherwise related to Obligations (as defined in the JMB DIP Credit Agreement), to the extent the JMB DIP Facility has not been previously terminated and such Obligations Paid in Full (as defined in the JMB DIP Order).

140.    "<u>JMB DIP Credit Agreement</u>" means that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of February 13, 2025, by and among PMH and the other borrowers party thereto, as borrowers, and JMB, as lender, as may be amended, supplemented, or otherwise modified from time to time, including by that certain Amendment No. 1 to Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of March 19, 2025 and that certain Amendment No. 2 to Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of July 9, 2025.

141.    "<u>JMB DIP Documents</u>" means, collectively, the JMB DIP Order, the JMB DIP Upsize Order, the JMB DIP Credit Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any notes, certificates, guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, documents, and instruments, related to or executed in connection with the JMB DIP Order or the JMB DIP Credit Agreement (including any amendments, restatements, supplements, or modifications of any of the foregoing as in effect prior to the entry of the Supplemental Junior DIP Order).

142.   "JMB DIP Facility" means the super-priority senior secured postpetition credit facility made in accordance with the JMB DIP Credit Agreement, the JMB DIP Order, and the JMB DIP Upsize Order in an aggregate principal amount of up to $130,000,000 (as may be amended, supplemented, or otherwise modified from time to time in accordance with the JMB DIP Documents).

143.   "JMB DIP Order" means, together, (a) the *Interim Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 101], (b) the *Amended Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 698], and (c) the JMB DIP Upsize Order.

144.   "JMB DIP Upsize Order" means the *Order Authorizing the Debtors' Entry into the DIP Upsize* [Docket No. 2477].

145.   "Junior DIP Claim" means any Claim derived from, based upon, or secured pursuant to the Junior DIP Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, and other charges arising thereunder or related thereto, in each case, with respect to the Junior DIP Facility, including all Claims for and/or otherwise related to Obligations (as defined in the Junior DIP Credit Agreement).

146.   "Junior DIP Credit Agreement" means that certain Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of March 20, 2025, by and among PMH and the other borrowers thereto, as borrowers, and MPT, as lender, as may be amended, supplemented, or otherwise modified from time to time, including by that certain Amendment No. 1 to Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of August [20], 2025.

147.   "Junior DIP Documents" means, collectively, the 9019 Order (as it relates to the Junior DIP Facility), the Supplemental Junior DIP Order, the Junior DIP Credit Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any notes, certificates, guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, documents, and instruments, related to or executed in connection with the 9019 Order (as it relates to the Junior DIP Facility), the Supplemental Junior DIP Order or the Junior DIP Credit Agreement (including any amendments, restatements, supplements, or modifications of any of the foregoing).

148.   "Junior DIP Facility" means the super-priority secured postpetition credit facility made in accordance with and subject to the Junior DIP Credit Agreement, the 9019 Order, and the Supplemental Junior DIP Order in an aggregate principal amount of up to $105,000,000 *plus* the full roll-up of the MPT Term Loan Obligations *plus* the Accrued Loans *plus* accrued obligations in respect of the unpaid balance of the reasonable professional fees of MPT commencing from the HospitalCo Petition Date, *plus* all related fees, interest and expenses.

18

149.   "<u>Junior DIP Orders</u>" means, together, (a) the 9019 Order and (b) the Supplemental Junior DIP Order.

150.   "<u>Law</u>" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

151.   "<u>Lien</u>" means a lien as defined in section 101(37) of the Bankruptcy Code.

152.   "<u>Liquidation Analysis</u>" means the analysis of a liquidation scenario under chapter 7 of the Bankruptcy Code for these Debtors, to be filed as part of the Plan Supplement.

153.   "<u>Liquidation Transactions</u>" means the transactions described in Article IV.D of the Plan.

154.   "<u>MPT</u>" means Medical Properties Trust, Inc. and its affiliates.

155.   "<u>MPT Agreed Claims</u>" means, collectively, the MPT Senior Agreed Claims and the MPT Junior Agreed Claims.  The MPT Agreed Claims are subject in all respects to the Recovery Waterfall and the Junior DIP Orders.

156.   "<u>MPT Convertible Note</u>" means that certain Convertible Promissory Note, dated as of May 23, 2023, by and among PHPH, as issuer, and MPT Picasso Investors TRS, LLC, as holder (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

157.   "<u>MPT Deficiency Claim</u>" means any remaining MPT Agreed Claim following distributions to MPT (as opposed to the Estates) under Tranches 1b, 2, 3 & 4a, 4b, 6 and 7 of the Recovery Waterfall in the Global Settlement Agreement.

158.   "<u>MPT GUC Advance</u>" has the meaning set forth in Article IV.H.2 herein.

159.   "<u>MPT Junior Agreed Claims</u>" means, collectively:  (a) MPT Master Lease Claims in the amount of $868,618,295 in respect of the lease base and accruals in respect thereof (other than the accrual that comprise the Accrued Loans) that are not otherwise included as MPT Senior Agreed Claims; and (b) any MPT Deficiency Claim not otherwise paid pursuant to the Recovery Waterfall or this Plan, which for the purposes of this definition shall be granted the same treatment as a General Unsecured Claim under Article III of this Plan.

160.   "<u>MPT Master Lease Agreements</u>" means, together, (a) that certain Master Lease Agreement, by and among Prospect CCMC, LLC, Prospect DCMH, LLC, Prospect Manchester Hospital, Inc., and Prospect Rockville Hospital, Inc., as lessees, and certain MPT affiliates, as the lessors party thereto, and (b) that certain Master Lease Agreement, by and among Prospect CCMC, LLC, Southern California Healthcare System, Inc., Alta Los Angeles Hospitals, Inc., and Prospect Waterbury, Inc., as lessees, and certain MPT affiliates, as the lessors party thereto, dated August 23, 2019, in each case as may be amended, supplemented, or otherwise modified from time to time.

161.    "MPT Master Lease Claims" means any Claim arising under or relating to the MPT Master Lease Agreements.

162.    "MPT Mortgage Loan Agreement" means that certain Real Estate Loan Agreement, by and among Prospect DCMH, LLC, and Prospect CCMC, LLC, as borrowers, and certain MPT affiliates, as lenders, dated May 23, 2023, as may be amended, supplemented, or otherwise modified from time to time.

163.    "MPT Mortgage Loan Claims" means any Claim arising under or relating to the MPT Mortgage Loan Agreement.

164.    "MPT Mortgage Loans" means the loans incurred under the MPT Mortgage Loan Agreement.

165.    "MPT Note Claims" means any Claim arising under or relating to the MPT Convertible Notes.

166.    "MPT Senior Agreed Claims" means, collectively:  (a) MPT Mortgage Loan Claims in the amount of $155,222,518 in principal plus $12,513,819.83 in accrued and unpaid interest, fees and other amounts; (b) MPT Master Lease Claims in the amount of $75,496,030.20; (c) $400,000 of additional actual out-of-pocket unreimbursed expenditures for which MPT is owed reimbursement pursuant to the agreements underlying clauses (a) and (b) that are not accounted for in clauses (a) and (b); and (d) interest on clauses (a)–(c) accruing at a rate equal to 9.00% per annum and other fees, interest, expenses, and other accruals in respect of clauses (a)–(c) (including interest accruing on the MPT Mortgage Loans and ongoing accruals of rent under the MPT Master Lease Agreements), less the aggregate amount of Accrued Loans under the Junior DIP Facility.

167.    "MPT Term Loan Agreement" means that certain Loan Agreement, dated as of May 23, 2023, by and among PMH and certain of its subsidiaries party thereto, as borrowers, the lenders from time to time party thereto, and MPT TRS Lender PMH, LLC, as administrative agent and collateral agent, as amended, supplemented, or otherwise modified from time to time.

168.    "MPT Term Loan Obligations" means the Obligations (as defined in the MPT Term Loan Agreement).

169.    "Net Proceeds" means with respect to any (a) transaction entered into by any of the Debtors or their respective Estates, (b) sale or disposition by any person of collateral under the Junior DIP Facility or the assets or real estate related to the California Sale Transaction, Connecticut ECHN Sale Transaction, Connecticut Waterbury Sale Transaction, Pennsylvania Wind Down, Rhode Island HospitalCo Sale Transaction or Rhode Island PhysicianCo Sale Transaction or (c) damages, other recoveries or settlement payments received by Debtors or their respective Estates in respect of any Estate Causes of Action, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or damages, other recoveries or settlement payment or through the payment of deferred consideration or damages, other recoveries or settlement payments) by or on behalf of any of the Debtors or their respective Estates (or any successor thereto) in connection therewith (including after paydown of the PhysicianCo Term Loan Claims and the PBGC Payment, the amount of cash proceeds received by the Debtors from the PhysicianCo Sale Transaction (if any)), after deducting therefrom only

(x) fees, commissions, costs and expenses related thereto, in each case, incurred by the Debtors and required to be paid in connection with such transaction, (y) taxes (other than taxes imposed on or measured by overall net income or any other similar measure) paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction or proceeding, as the case may be, and (z) the GUC Trust Holdback.

170.    "Non-Released Parties Schedule" means a schedule of persons (if any) that are excluded from the definition of "Released Party", which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time prior to the Confirmation Hearing.

171.    "Non-Settling Insurer" means any Insurer other than a Settling Insurer.

172.    "Notice and Claims Agent" means Omni Agent Solutions, Inc., in its capacity as claims, noticing, and solicitation agent for the Debtors.

173.    "OCP" means an ordinary course professional whose retention and compensation has been authorized by the Bankruptcy Court pursuant to the OCP Order.

174.    "OCP Order" means the *Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 612].

175.    "Ombudsman" means the Patient Care Ombudsman, Suzanne Koenig, solely in her capacity as such, appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 333 of the Bankruptcy Code.

176.    "Other Priority Claim" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

177.    "Other Secured Claim" means any Secured Claim, other than a DIP Claim, an MPT Note Claim, a PhysicianCo Subordinated Note Claim, the PBGC Secured Claim, a Prepetition ABL Claim, certain Capital Lease Claims (as described below) or an MPT Agreed Claim. Certain claims of the State of Connecticut are Other Secured Claims, as set forth in the Recovery Waterfall and DIP Orders. If a claim arises from a capital lease and such capital lease is secured, the claim will be treated as a secured claim under section 506 in the amount of the value of the collateral and any remaining deficiency will be a general unsecured claim. Therefore, a "Capital Lease" will be treated in accordance with applicable law, and treatment as a secured claim will be subject to a perfected security interest.

178.    "PBGC" means the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States, created under Title IV of ERISA to administer the federal pension insurance program.

179.    "PBGC Payment" means the $24,746,636 payment made by the PhysicianCo Purchaser to PBGC on July 1, 2025, as required under the PBGC Waiver and the 9019 Order.

180. "PBGC Reserve Account" means, in the event that the PhysicianCo Release Effective Date does not occur on or before the Effective Date, the reserve account established for the benefit of PBGC on account of the PBGC Secured Claim and funded by the Wind-Down Debtors or the Plan Administrator, as applicable, prior to the Effective Date in an the amount of $10 million.

181. "PBGC Secured Claim" means PBGC's Allowed Secured Claim against each HospitalCo Debtor in the amount of $23,733,992, plus accrued and unpaid amounts of adequate protection due and owing to PBGC under paragraph 12 of the 9019 Order.

182. "PBGC Unsecured Claim" means, collectively, the general unsecured claims asserted under the Proofs of Claim filed by the PBGC against each of the HospitalCo Debtors in the Chapter 11 Cases related to the Pension Plans for (a) unpaid minimum funding contributions owed to the Pension Plans under 29 U.S.C. §§ 1082, 1083 and 1362(b) and 26 U.S.C. §§ 412 and 430, (b) the Pension Plans' unfunded benefit liabilities under 29 U.S.C. § 1362(b), and (c) pension insurance premiums under 29 U.S.C. §§ 1306 and 1307, including termination premiums at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7).

183. "PBGC Waiver" means that certain *Agreement and Waiver of Release*, dated as of June 30, 2025, entered into by and among PMH, Prospect Healthcare Facilities Management, LLC, PHPH, PBGC, and MPT.

184. "Pennsylvania Debtors" means, collectively:  Prospect Penn, LLC; Prospect Crozer, LLC; Prospect CCMC, LLC; Prospect DCMH, LLC; Prospect Crozer Urgent Care, LLC; Prospect Penn Health Club, LLC; Prospect Crozer Home Health and Hospice, LLC; Prospect Crozer Ambulatory Surgery, LLC; Prospect Health Services PA, Inc.; and Prospect Provider Group PA, LLC.

185. "Pennsylvania Purchase Agreement" means one or more asset or equity purchase agreement(s) in respect of the Pennsylvania Sale Transaction, in each case, in form consistent with the terms of the Global Settlement Agreement, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Pennsylvania Sale Order or further order of this Bankruptcy Court.

186. "Pennsylvania Sale Transaction" means the sale of certain of Pennsylvania Debtors' assets pursuant to the Pennsylvania Wind Down.

187. "Pennsylvania Sale Order" means an order of the Bankruptcy Court approving the Pennsylvania Sale Transaction.

188. "Pennsylvania Wind Down" means the wind down of the Pennsylvania Debtors' hospitals and the sale(s) of any available assets thereof pursuant to the *Order (I) Approving the Closure of Certain of the Pennsylvania Hospitals; (II) Approving the Pennsylvania Asset Sale Procedures; and (III) Granting Related Relief* [Docket No. 1613].

189. "Pension Plans" means the Crozer-Keystone Health System Employees Retirement Plan, the Eastern Connecticut Health Network, Inc. Pension Plan, and the Waterbury Hospital

22

Cash Balance Retirement Plan, single-employer defined benefit plans insured by the PBGC and covered by Title IV of ERISA, 29 U.S.C. §§ 1301-1461.

190.     "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

191.     "Petition Date" means either of the HospitalCo Petition Date or the PhysicianCo Petition Date, as applicable.

192.     "PHPH" means PHP Holdings, LLC.

193.     "PhysicianCo" or "PhysicianCo Debtors" or "PCo Debtors" means, collectively: PHPH; Prospect Intermediate Holdings, LLC; Prospect Provider Group TX, Inc.; Prospect Health Services TX, Inc.; ProMed Health Care Administrators; Prospect Health Services AZ, LLC; Prospect Medical Group AZ, LLC; Prospect West Coast ACO Holdings, LLC; Prospect ACO, LLC; Prospect Medical Systems, LLC; RightRX; Prospect CA Holdings (Physicians), Inc.; Prospect Intermediate Physician Holdings, Inc.; New Genesis Medical Associates, Inc.; Care@Home Solutions CA, Inc.; Primary and Multi-Specialty Clinics of Anaheim, Inc.; Prospect Medical Group, Inc.; Prospect Health Source Medical Group, Inc.; Genesis Healthcare of Southern California, Inc., a Medical Group; Nuestra Familia Medical Group, Inc.; StarCare Medical Group, Inc.; Prospect Professional Care Medical Group, Inc.; Prospect NWOC Medical Group, Inc.; Pomona Valley Medical Group, Inc.; Upland Medical Group, a Professional Medical Corporation.

194.     "PhysicianCo Assets" means all assets of PhysicianCo, including, but not limited to, the proceeds of any PhysicianCo Causes of Action.

195.     "PhysicianCo Causes of Action" means any and all Causes of Action held by, belonging to, or asserted or capable of being asserted by any of the PhysicianCo Debtors or their Estates.

196.     "PhysicianCo Collateral" means the "PhysicianCo Collateral" (as defined in the PhysicianCo Term Loan Security Agreement) in which Prospect Intermediate Holdings, LLC, Prospect Physician Holdings, Inc., and the PhysicianCo guarantors granted a lien in favor of the collateral agent under the PhysicianCo Term Loan Security Agreement.

197.     "PhysicianCo Petition Date" means the date on which each of the PhysicianCo Debtors Filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases, or July 7, 2025.

198.     "PhysicianCo Purchaser" means, collectively:  Astrana Health, Inc.; Astrana Health Management, Inc.; Metropolitan IPA; Astrana Care Hospital, LLC; AstranaCare Partners of Arizona, LLC; ApolloCare Partners of Texas PLLC; and AMG, a Professional Medical Corporation.

199.     "PhysicianCo Release Effective Date" means the earlier of (i) the effective date of a confirmed chapter 11 Plan for the PhysicianCo Debtors or such other Final Order of the Bankruptcy Court that fully and finally releases any and all claims or PhysicianCo Causes of Action, if any, against PBGC, or (ii) two years after PBGC's receipt of the PBGC Payment.

23

200. "PhysicianCo Sale Transaction" means the sale transaction contemplated by the Rhode Island PhysicianCo Purchase Agreement.

201. "PhysicianCo Sellers" means, collectively: PHP Holdings, LLC; PHS Holdings, LLC; Prospect Intermediate Holdings, LLC; Prospect Provider Group RI, LLC; Prospect Medical Systems, LLC; Prospect Provider Group TX, Inc.; Prospect Health Services TX, Inc.; Prospect Medical Group AZ, LLC; RightRX; Prospect Physician Holdings, Inc.; Prospect Intermediate Physician Holdings, Inc.; New Genesis Medical Associates, Inc.; Primary and Multi-Specialty Clinics of Anaheim, Inc.; Prospect Health Source Medical Group, Inc.; Genesis HealthCare of Southern California, Inc.; Prospect Medical Group, Inc.; Nuestra Familia Medical Group, Inc.; StarCare Medical Group, Inc.; Prospect Professional Care Medical Group, Inc.; Prospect NWOC Medical Group, Inc.; Upland Medical Group; Pomona Valley Medical Group, Inc.; and PMH, as the seller representative.

202. "PhysicianCo Subordinated Secured Note" means that certain Subordinated Secured Promissory Note, dated July 1, 2025, by and among PhysicianCo and the holders thereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

203. "PhysicianCo Subordinated Secured Note Claims" means any Claim arising under or relating to the PhysicianCo Subordinated Note.

204. "PhysicianCo Term Loan Agreement" means that certain Financing Agreement, by and among PHP Holdings, LLC, Prospect Intermediate Holdings, LLC, and Prospect Physician Holdings, Inc., as borrowers, the other guarantors party thereto, Centerbridge and Blue Torch, as lenders, and Wilmington Trust, National Association, as administrative agent and collateral agent, dated May 23, 2023 (as amended, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1, dated as of October 24, 2023, that certain Amendment No. 2, dated as of November 14, 2023, that certain Amendment No. 3, dated as of February 27, 2024, that certain Amendment No. 4, dated as of April 30, 2024, and that certain Amendment No. 5, dated as of June 5, 2024).

205. "PhysicianCo Term Loan Claims" means any Claim arising under or relating to the PhysicianCo Term Loan Agreement.

206. "PhysicianCo Term Loan Security Agreement" means that certain Pledge and Security Agreement, dated as of May 23, 2023, by and among Prospect Intermediate Holdings, LLC, Prospect Physician Holdings, Inc., the PhysicianCo guarantors, the other guarantors party thereto, and the collateral agent, as may be amended, supplemented, or otherwise modified from time to time.

207. "Plan" means this plan under chapter 11 of the Bankruptcy Code, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, including the Plan Supplement, which is incorporated herein by reference, including any and all exhibits, supplements, appendices, and schedules hereto and thereto.

208. "<u>Plan Administrator</u>" means the Person or Entity appointed by the Debtors on the Effective Date to administer and wind down each Debtor's remaining business operations, as described in more detail in Article IV.B herein.

209. "<u>Plan Distribution</u>" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under this Plan.

210. "<u>Plan Objection Deadline</u>" means the deadline to File objections to the confirmation of the Plan pursuant to the Disclosure Statement Order.

211. "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be amended, supplemented, or otherwise modified from time to time through the Effective Date in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed no later than seven (7) days prior to the Plan Objection Deadline by the Debtors, including the following: (a) the Sale Transaction Documents; (b) the TSAs; (c) the GUC Trust Documents; (d) the identity of the Plan Administrator; (e) the Liquidation Analysis (if not previously filed); (f) to the extent applicable, the Schedule of Assumed Executory Contracts and Unexpired Leases; (g) to the extent applicable, the Deferred Decision Contracts Schedule; (h) the Assigned Estate Causes of Action; (i) the Non-Released Parties Schedule; (j) the Backstop Credit Agreement; and (k) the Insurance Trust Documents.

212. "<u>PMH</u>" means Prospect Medical Holdings, Inc.

213. "<u>PMH Independent Directors</u>" means the current disinterested directors appointed to the board of directors of PMH pursuant to (a) that certain written consent of the board of directors of PMH dated October 4, 2024 and (b) that certain resolution of the board of directors of PMH dated October 29, 2024.

214. "<u>PMH Transaction Committee</u>" means the transaction committee established by the board of directors of PMH pursuant to that certain resolution of the board of directors of PMH dated January 23, 2025.

215. "<u>Post-Confirmation Claims Resolution Procedures</u>" means the post-confirmation claims resolution procedures, which shall conform with the Claims Resolution Procedures (with only necessary Plan-related modifications), and which will be included in the Plan Supplement.

216. "<u>Prepetition ABL Claims</u>" means any Claim arising under or relating to the Prepetition ABL Credit Agreement.

217. "<u>Prepetition ABL Credit Agreement</u>" means that certain Credit and Security Agreement, by and among Southern California Healthcare System, Inc., Alta Los Angeles Hospitals, Inc., and Alta Hospitals System, LLC, as borrowers, and eCapital, as lender, dated as of June 5, 2024, as may be amended, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment to Credit and Security Agreement, dated as of August 16, 2024.

218.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

219.    "Pro Rata" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

220.    "Professional" means a Person or Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, or 331 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to a Bankruptcy Court order.

221.    "Professional Compensation Claim" means a Claim against a Debtor for professional services rendered and costs incurred between the Petition Date and the Effective Date by a Professional, including estimates through the Effective Date, in connection with the Chapter 11 Cases.

222.    "Professional Fee Reserve Account" means, together, the reserve accounts established and funded by the Debtors prior to the Effective Date pursuant to paragraph 24(c) of the JMB DIP Order and paragraph 25(d) of the eCapital DIP ABL Order.

223.    "Proof of Claim" means a proof of claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date.

224.    "Purchase Agreements" means, collectively, (a) the California Purchase Agreement, (b) the Connecticut ECHN Purchase Agreement, (c) the Connecticut Waterbury Purchase Agreement, (d) the Rhode Island HospitalCo Purchase Agreement, (e) the Rhode Island PhysicianCo Purchase Agreement, (f) the Pennsylvania Purchase Agreement or (g) any other asset purchase agreement approved by the Sale Orders.

225.    "Purchased Assets" means, collectively, the California Assets, the Connecticut ECHN Assets, the Connecticut Waterbury Assets, the Rhode Island HospitalCo Assets, and the Rhode Island PhysicianCo Assets.

226.    "Purchaser" means, collectively: (a) the California Purchaser; (b) the Connecticut ECHN Purchaser; (c) the Connecticut Waterbury Purchaser (d) the Rhode Island HospitalCo Purchaser; and/or (e) any purchaser of any other of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

227.    "Recovery Waterfall" means the recovery waterfall in Section 8.03 of the Global Settlement Agreement.

228.    "Related Party" means each of, and in each case in its capacity as such, current directors, managers, and officers, and current and former committee members, members of any governing body, advisory board members, members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, management companies, fund advisors or managers, predecessors, participants, successors, assigns, representatives, subsidiaries, Affiliates, partners, limited

26

partners, general partners, principals, employees, agents, trustees, financial advisors, attorneys (including any other attorneys or professionals retained by any current director or former director, manager, or officer in his or her capacity as director, manager, or officer of an entity), accountants, investment bankers, investment advisors, consultants, and other professionals and advisors and any such Related Party's respective heirs, executors, estates, and nominees; *provided, however,* that notwithstanding the foregoing or anything else contained herein, no persons listed on the Non-Released Parties Schedule shall be a Related Party.

229.   "Released Party" means each of and in each case in its capacity as such:  (a) each Debtor and its respective Estate; (b) each Wind-Down Debtor, as applicable, and Reorganized PMH; (c) the DIP Lenders; (d) MPT; (e) Centerbridge; (f) Blue Torch; (g) PBGC; (h) the Committee and its members; (i) the Ombudsman; (j) the Backstop Facility Lender; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l) that is not included on the Non-Released Parties Schedule; and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided* that, in each case, an Entity shall not be a Released Party if it (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation; *provided, further,* that notwithstanding the foregoing or anything else contained herein, no persons listed on the Non-Released Parties Schedule shall be a Released Party.[3]

230.   "Releasing Party" means each of, and in each case in its capacity as such: (a) each Debtor and its respective Estate; (b) each Wind-Down Debtor, as applicable and Reorganized PMH; (c) the DIP Lenders; (d) MPT; (e) Centerbridge; (f) Blue Torch; (g) PBGC; (h) the Committee and its current and former members (each in their sole capacity as such); (i) all Holders of Claims or Interests that vote to accept the Plan and do not affirmatively opt out of the releases provided in the Plan; (j) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) the Backstop Facility Lender; (m) each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) each Related Party of each Entity in clause (a) through this clause (n) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through clause (m); *provided* that, in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.

231.   "Remnant Assets" means any assets of the Debtors that are not Purchased Assets or GUC Trust Assets.

232.   "Reorganized PMH" means PMH as reorganized pursuant to the Plan.

233.   "Rhode Island HospitalCo Assets" means the assets sold or transferred in the Rhode Island HospitalCo Sale Transaction.

---

[3]   This definition and any related provision in this Plan remain subject to the outcome of any ongoing diligence efforts of the PMH Transaction Committee and the Committee's review of such investigation.

234. "Rhode Island HospitalCo Purchase Agreement" means that certain Amended and Restated Asset Purchase Agreement, dated as of February 2, 2025, by and among the Rhode Island HospitalCo Sellers and the Rhode Island HospitalCo Purchaser, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Rhode Island HospitalCo Sale Order or further order of this Bankruptcy Court.

235. "Rhode Island HospitalCo Purchaser" means, collectively:   The Centurion Foundation, Inc.; CharterCARE Health of Rhode Island, Inc.; CharterCARE Roger Williams Medical Center; CharterCARE Our Lady of Fatima Hospital; CharterCARE Health of Rhode Island Foundation, Inc.; CharterCARE Blackstone Surgery Center, LLC; CharterCARE Physicians, LLC; CharterCARE Home Health and Hospice, LLC; and CharterCARE Associates in Primary Care Medicine, LLC.

236. "Rhode Island HospitalCo Sale Order" means the *Order (I) Approving and Authorizing (A) The Asset Purchase Agreement, (B) the Sale of the Debtors' Assets Free and Clear of Interests, (C) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Assignment of certain Permits; and (II) Granting Related Relief* [Docket No. 606].

237. "Rhode Island HospitalCo Sale Transaction" means the sale transaction authorized pursuant to the Rhode Island HospitalCo Sale Order.

238. "Rhode Island HospitalCo Sellers" means, collectively:   PMH; Prospect CharterCARE, LLC d/b/a CharterCARE Health Partners; Prospect CharterCARE RWMC, LLC d/b/a Roger Williams Medical Center f/k/a Roger Williams General Hospital; Prospect RI Home Health and Hospice, LLC; Prospect CharterCARE Home Health and Hospice, LLC; New University Medical Group, LLC d/b/a University Medical Group; Prospect CharterCARE SJHSRI, LLC d/b/a Our Lady of Fatima Hospital; Prospect CharterCARE Physicians, LLC d/b/a CharterCARE Medical Associates; Prospect CharterCARE Ancillary Services, LLC; and Prospect Blackstone Valley Surgicare, LLC.

239. "Rhode Island PhysicianCo Assets" means all or substantially all of the Debtors' equity interests in Prospect Health Services RI, Inc. d/b/a Prospect ACO Rhode Island and the Debtors' assets held by Prospect Provider Group RI, LLC d/b/a CharterCARE Provider Group RI.

240. "Rhode Island PhysicianCo Purchase Agreement" means one or more asset or equity purchase agreement(s) for the Rhode Island PhysicianCo Assets, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Rhode Island PhysicianCo Sale Order or further order of this Bankruptcy Court.

241. "Rhode Island PhysicianCo Sale Order" means an order of the Bankruptcy Court approving the Rhode Island PhysicianCo Sale Transaction.

242. "Rhode Island PhysicianCo Sale Transaction" means the private sale to Astrana Health, Inc. of the Rhode Island PhysicianCo Assets.

243. "Sale Orders" means, collectively:  (a) the  California  Sale  Order;  (b) the Connecticut ECHN Sale Order; (c) Connecticut Waterbury Sale Order (d) the Rhode Island

HospitalCo Sale Order; (e) the Rhode Island PhysicianCo Sale Order; and (f) any other order approving the sale of certain of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

244.    "Sale Transactions" means the California Sale Transaction, the Connecticut ECHN Sale Transaction, the Connecticut Waterbury Sale Transaction, the Rhode Island HospitalCo Sale Transaction, and/or the Rhode Island PhysicianCo Sale Transaction.

245.    "Sale Transactions Documents" means the definitive documents to effectuate the Sale Transactions, including the California Purchase Agreement, the Connecticut Purchase Agreement, the Rhode Island HospitalCo Purchase Agreement, and the Rhode Island PhysicianCo Purchase Agreement, including the PBGC Waiver, in each case, in form and substance consistent with the terms of the Global Settlement Agreement.

246.    "Sale Transaction TSAs" mean those transaction services agreements entered into in connection with the Sale Transactions.

247.    "Schedule of Assumed Executory Contracts and Unexpired Leases" means the list of Executory Contracts and Unexpired Leases that will be assumed pursuant to Article V of the Plan, which shall be included in the Plan Supplement.

248.    "Schedule of Deferred Decision Contracts" means the list of Deferred Decision Contracts that are subject to the Deferred Decision Deadline.

249.    "Schedules" means, collectively, the schedule of assets and liabilities and statement of financial affairs Filed by each Debtor pursuant to section 521 of the Bankruptcy Code, the Bankruptcy Rules, and the official bankruptcy forms, as the same may be amended, modified, or supplemented from time to time.

250.    "Section 510(b) Claim" means any Claim against any Debtor that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code, whether by operation of Law or contract.

251.    "Secured" means, when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court as a Secured Claim.

252.    "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

253.   "Settled Insurance Policy" means any Insurance Policy that was issued by an Insurer and has been settled, sold, or otherwise compromised between a Settling Insurer and the Debtors, Wind-Down Estates, or Insurance Trustee.

254.   "Settling Insurer" means any Insurer that enters into a settlement, sale or other transaction with the Debtors, Wind-Down Estates, or Insurance Trustee, which settlement sale or other transaction has been approved by the Bankruptcy Court by October 1, 2025, including any settlement, compromise, buyback or similar agreement concerning an Insurance Policy; provided, however, an Insurer shall not be a Settling Insurer to the extent such Insurer's Insurance Settlement Agreement is terminated in accordance with its terms.

255.   "Settling Insurer Injunction" means the injunction set forth in Article VIII.E herein.

256.   "Solicitation Materials" means solicitation materials and documents to be included in the solicitation packages.

257.   "SPV" means the special purpose vehicle to be formed by the Debtors and through which the Debtors, the Plan Administrator, or a third party will provide transition services to each of the applicable Sale Transaction counterparties pursuant to the TSAs.

258.   "Statutory Fees" means all fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code, to the extent applicable.

259.   "Successful Bid" has the meaning set forth in the Bid Procedures Order.

260.   "Successful Bidder" has the meaning set forth in the Bid Procedures Order.

261.   "Supplemental Junior DIP Order" means, together, (a) the *Interim Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. 2739] and (b) the *Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. [•]]

262.   "Third-Party Release" means the releases by the Releasing Parties as set forth in Article VIII.B herein.

263.   "Transactions" means the transactions described in Article IV of the Plan.

264.   "TSA(s)" means one or more transition service agreements, in form and substance consistent with the terms of the Global Settlement Agreement, pursuant to which the Debtors, the Plan Administrator, or a third party, through the SPV, shall provide transition services to each of the applicable Sale Transaction counterparties.

265.   "U.S. Trustee" means the United States Trustee for the Northern District of Texas.

266.    "<u>Unexpired Lease</u>" means a lease to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

267.    "<u>Unimpaired</u>" means, with respect to a Claim or Class of Claims, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

268.    "<u>Wind-Down</u>" means the post-Effective Date functions of the Plan Administrator as set forth in the definition of "Plan Administrator."

269.    "<u>Wind-Down Budget</u>" means a budget for any fees, costs, and expenses associated with the post-Effective Date wind-down process.

270.    "<u>Wind-Down Debtor</u>" means each of the Debtors other than the Reorganized PMH following the Effective Date.

271.    "<u>Wind-Down Reserve</u>" means a segregated account established by the Wind-Down Debtors and funded in accordance with the Wind-Down Budget.

272.    "<u>Yale</u>" means Yale New Haven Health Services Corporation or any of its affiliates.

B.    *Rules of Interpretation*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (e) any reference to an Entity as Holder of a Claim or Interest includes that Entity's successors and assigns; (f) subject to the provisions of any contract, charters, bylaws, partnership agreements, limited liability company agreements, operating agreements, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (g) any immaterial effectuating provisions may be interpreted by the Debtors, the Wind-Down Debtors, Reorganized PMH, or the Plan Administrator (as applicable) in such a

manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other entity; (h) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.  Any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter unless otherwise specified herein.

D.      *Reference to Monetary Figures*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

E.      *Controlling Document*

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided* that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PRIORITY TAX CLAIMS, AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Compensation Claims), DIP Claims, and Priority Tax Claims have not been classified for purposes of voting or receiving distributions, and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.  For the avoidance of doubt, the treatment of all Administrative Claims (including Professional Compensation Claims), DIP Claims, and Priority Tax Claims shall be consistent with the Recovery Waterfall and the DIP Orders, including any exhibits thereto.

A.      *Administrative Claims*

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim (other than a Professional Compensation Claim or a DIP Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Claim in accordance with the following:

(a) (i) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter; (ii) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided* that any Allowed Administrative Claim assumed by any Purchaser shall be deemed paid in full under the Plan.

Except for Professional Compensation Claims and DIP Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors or the Plan Administrator (as applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date. The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

**Except for Administrative Claims subject to 11 U.S.C. § 503(b)(1)(D) (for which a Governmental Unit shall not be required to file a request for payment for any Claims covered by 11 U.S.C. § 503(b)(1)(B) or (C)) as otherwise provided in Article II.B, Article II.C, or Article II.E herein, Holders of Administrative Claims (other than Professional Compensation Claims) that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, the Plan Administrator, the Estates, or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.**

B.    *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the applicable DIP Documents, including principal, interest, fees, costs, other charges, and expenses. To the extent each DIP Claim has not previously been satisfied in full in accordance with the terms and conditions of the applicable DIP Documents and/or Sale Orders, and except to the extent that a Holder of a DIP Claim agrees to a different treatment, each Holder of a DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, payment in full in Cash on the Effective Date.

For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all non-contingent indemnity obligations owed to the DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Documents. The Debtors' obligation to pay contingent indemnity obligations owed to the DIP Lenders, to the extent not indefeasibly paid in full in Cash on or before the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

All reasonable and documented unpaid fees and expenses of the DIP Lenders, to the extent payable pursuant to the DIP Documents, shall be paid in full in Cash pursuant to the DIP

Documents, without any requirement to File a fee application with the Bankruptcy Court or for the Bankruptcy Court's review or approval.

C.    *Backstop Facility Claims*

Contemporaneously with the Effective Date, if and only to the extent necessary to pay Administrative Claims, Other Priority Claims, and Priority Tax Claims on the Effective Date, the Debtors shall enter into the Backstop Facility.  All amounts owing by the Debtors under the Backstop Facility shall be secured by the Backstop Lien on the proceeds of Assigned Estate Causes of Action and all other assets, if any, transferred (or to be transferred) to the GUC Trust.  To the extent granted, the guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to the Backstop Facility Documents are granted in good faith as an inducement to the Backstop Facility Lender to extend credit thereunder, shall be valid and enforceable, and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the Backstop Facility Documents.  Interest on the term loan advanced under the Backstop Facility shall accrue at a rate equal to 14.00% per annum, payable in kind (capitalizing at the end of each fiscal year) and shall mature on the date that is the fifth anniversary of the term loan advance thereunder (such date, the "Backstop Maturity Date"), with mandatory repayment provisions upon the earlier of the Backstop Maturity Date or recovery of the Backstop Facility through application of Net Proceeds under the Recovery Waterfall as set forth in Article IV.H below.

Substantially concurrently with the Effective Date, the GUC Trust will assume all of the Debtors' obligations under the Backstop Facility.

The Backstop Facility shall be subject to the following conditions precedent to draw:

(1) the Effective Date shall occur substantially contemporaneously;

(2) the Confirmation Order shall be acceptable to the Backstop Facility Lender in its reasonable discretion, the Debtors shall be in compliance with the Confirmation Order in all respects and the Confirmation Order shall not be stayed, shall be in full force and effect and shall not have been reversed, vacated, amended, supplemented or otherwise modified without the Backstop Facility Lender's consent;

(3) the repayment in full in cash (or otherwise in accordance with Section 7.02(f) of the Settlement Agreement or the Lease Repayment Option (as defined in the Junior DIP Credit Agreement)) of all indebtedness and other obligations outstanding under the Junior DIP Credit Agreement;

(4) all other MPT Agreed Claims shall have been paid in accordance with the Recovery Waterfall;

(5) the full amount of the GUC Trust Holdback, as well as any amount allocated to the Estates under Tranches 6, 7 or 8 of the Recovery Waterfall and/or for distribution to holders of General Unsecured Claims pursuant to Class 8 – General Unsecured Claims pursuant Article

III.B.8.b (ii) below, shall have been used by the Debtors to pay allowed Administrative Claims, Priority Tax Claims and Other Priority Claims in connection with consummation of the Plan; and

(6) all accrued and unpaid fees and expenses to be paid under the Backstop Facility for which invoices have been presented, if any, shall have been paid.

D.    *Professional Compensation Claims*

1.    Final Fee Applications and Payment of Professional Compensation Claims

All requests for payment of Professional Compensation Claims (other than from OCPs) for services rendered and reimbursement of expenses incurred through the Effective Date shall be filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims (subject to the Approved Budget) after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. Objections to Professional Compensation Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Compensation Claims. Following such twenty-one (21) day period, if no objections have been filed, the Court may enter an order approving the payment of such Professional Compensation Claims, absent a hearing. Upon entry of any such order, the Plan Administrator shall make all payments for any such approved Professional Compensation Claims in accordance with Article II.D.3 hereof. To the extent any Cash is remaining in the Professional Fee Reserve Account following irrevocable payment in full of all Allowed Professional Compensation Claims (including Allowed Professional Compensation Claims arising after the Confirmation Date), such Cash shall be transferred to the Wind-Down Debtors.

2.    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Plan Administrator (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Plan Administrator (as applicable). Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Plan Administrator (as applicable) may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Plan Administrator (as applicable) shall pay, within ten (10) Business Days after submission of a detailed invoice such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors or the Plan Administrator (as applicable). If the Debtors or the Plan Administrator dispute the reasonableness of any such invoice, the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

3.   Professional Fee Reserve Account

On the Effective Date, the Debtors shall fund an amount in Cash into the Professional Fee Reserve Account equal to (a) the aggregate accrued and unpaid Professional Compensation Claims as of the Effective Date (which shall be estimated by each applicable Professional in its reasonable discretion based on the amount of then-accrued Professional Compensation Claims plus a reasonable estimate of fees and expenses that will accrue up until the Effective Date), less (b) any amount then held in the Professional Fee Reserve Account.

Funds held in the Professional Fee Reserve Account shall be held for the benefit of the Professionals and shall not be property of the Estates.  The Professionals shall reasonably and in good faith estimate their Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimates to the Debtors no later than ten (10) Business Days prior to the anticipated Effective Date, such estimates may be revised and provided to the Debtors no later than two (2) Business Days prior to the anticipated Effective Date.

Professional Compensation Claims shall be paid in full without interest or other earnings therefrom, in Cash, from the Professional Fee Reserve Account, in such amounts as are Allowed by the Bankruptcy Court, as soon as reasonably practicable after such Professional Compensation Claims are Allowed.  The obligations of the Estates with respect to Professional Compensation Claims shall not be deemed limited by nor deemed limited to the balance of funds held in the Professional Fee Reserve Account.  To the extent that funds held in the Professional Fee Reserve Account are insufficient to satisfy the amount of accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency.  No Liens, claims, or interests shall encumber the Professional Fee Reserve Account in any way, other than customary liens in favor of the depository bank at which the Professional Fee Reserve Account is maintained.

E.     Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

F.     Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Plan Administrator shall pay any and all Statutory Fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each of the Debtors and the Plan Administrator, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of a Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Except for the Claims addressed in Article II herein, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in another Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been otherwise paid, released, or satisfied at any time.

The treatment of Claims and Interests shall be consistent in all respect with the Global Settlement Agreement and the related Recovery Waterfall and the Junior DIP Orders, as set forth therein.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | MPT Agreed Claims | Impaired | Entitled to Vote |
| Class 4 | MPT Note Claims | Impaired | Entitled to Vote |
| Class 5 | PhysicianCo Subordinated Secured Note Claims | Impaired | Entitled to Vote |
| Class 6 | PBGC Secured Claim | Impaired | Entitled to Vote |
| Class 7 | Insured Claims | Impaired | Entitled to Vote |
| Class 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

37

| Class 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
|---|---|---|---|
| Class 11 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

    *B.*    *Treatment of Claims and Interests*

      1.   <u>Class 1 – Other Secured Claims</u>

          a.    *Classification*:  Class 1 consists of all Other Secured Claims.

          b.    *Treatment*:  Except to the extent the Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, at the Debtors' option: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; or (iii) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided* that any Other Secured Claims assumed by any Purchaser shall be deemed paid in full under the Plan. For the avoidance of doubt, the treatment of all Other Secured Claims shall be consistent with the Recovery Waterfall and the DIP Orders, including any exhibits thereto.

          c.    *Voting*:  Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

      2.   <u>Class 2 – Other Priority Claims</u>

          a.    *Classification*:  Class 2 consists of all Other Priority Claims.

          b.    *Treatment*:  Except to the extent the Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; *provided* that any Other Priority Claim assumed by any Purchaser shall be deemed paid in full under the Plan.

          c.    *Voting*:  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section

1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3 – MPT Agreed Claims

   a.  *Classification*:  Class 3 consists of all MPT Agreed Claims.

   b.  *Treatment*:   To the extent any Allowed MPT Agreed Claims remain outstanding on the Effective Date, and except to the extent that a Holder of an Allowed MPT Agreed Claim agrees to less favorable treatment, each Holder of an Allowed MPT Agreed Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, in each case subject to the Recovery Waterfall, the Global Settlement Agreement and the Junior DIP Orders:  (i) on account of any MPT Senior Agreed Claim, 90% of the Net Proceeds (other than Net Proceeds of Assigned Estate Causes of Action, but including (subject to Article IV.H) the proceeds of or recoveries from any Estate Cause of Action against Yale) (in each case, to the extent such allocation of Net Proceeds has not already been remitted on account of the MPT Senior Agreed Claims pursuant to the Global Settlement Agreement and Junior DIP Orders); and (ii) on account of any MPT Junior Agreed Claim, (A) 78% of the Net Proceeds (other than Net Proceeds of Assigned Estate Causes of Action, but including (subject to Article IV.H) the proceeds of or recoveries from any Estate Cause of Action against Yale) (in each case, to the extent such allocation of Net Proceeds has not already been remitted on account of the MPT Junior Agreed Claims pursuant to the Global Settlement Agreement and Junior DIP Orders); and (B) subject to Article IV.H.2, any MPT Deficiency Claim that remains unpaid shall be deemed a General Unsecured Claim under Class 8.

   c.  *Voting*:  Class 3 is Impaired, and Holders of Class 3 MPT Agreed Claims are entitled to vote to accept or reject the Plan.

4.  Class 4 – MPT Note Claims

   a.  *Classification*:  Class 4 consists of all MPT Note Claims.

   b.  *Allowance*: On the Effective Date, the MPT Note Claims shall be Allowed in the aggregate amount of $755,353,205.89.

   c.  *Treatment*:   To the extent any Allowed MPT Note Claims remain outstanding against PhysicianCo on the Effective Date, and except to the extent that a Holder of an Allowed MPT Note Claim agrees to less favorable treatment, each Holder of an Allowed MPT Note Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim its Pro Rata share of the PhysicianCo Assets (including PhysicianCo Causes of Action and the proceeds thereof).

d.  *Voting*:  Class 4 is Impaired, and Holders of Class 4 MPT Note Claims are entitled to vote to accept or reject the Plan.

5.  <u>Class 5 – PhysicianCo Subordinated Secured Note Claims</u>

a.  *Classification*:  Class 5 consists of all PhysicianCo Subordinated Secured Note Claims.

b.  *Treatment*:  To the extent any Allowed PhysicianCo Subordinated Secured Note Claims remain outstanding on the Effective Date, and except to the extent that a Holder of an Allowed PhysicianCo Subordinated Secured Note Claim agrees to less favorable treatment, each Holder of an Allowed PhysicianCo Subordinated Secured Note Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim its Pro Rata share of the PhysicianCo Assets (including PhysicianCo Causes of Action and the proceeds thereof) after payment in full of the Allowed MPT Note Claims.  If Class 5 votes in favor of the Plan, Holders of Allowed PhysicianCo Subordinated Secured Note Claims shall be Released Parties; otherwise they shall not be Released Parties.

c.  *Voting*:  Class 5 is Impaired, and Holders of Class 5 PhysicianCo Subordinated Secured Note Claims are entitled to vote to accept or reject the Plan.

6.  <u>Class 6 – PBGC Secured Claim</u>

a.  *Classification*:  Class 6 consists of the PBGC Secured Claim.

b.  *Treatment*:  To the extent any Allowed PBGC Secured Claims remain outstanding on the Effective Date, and except to the extent PBGC agrees in writing to less favorable treatment, PBGC shall receive in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Secured Claim, subject to the PBGC Waiver:

i)  if the PhysicianCo Release Effective Date does not occur on or before the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, shall establish the PBGC Reserve Account and reserve Cash sufficient to fund such account in accordance with the PBGC Waiver; *provided*, that the PBGC Reserve Account shall terminate, and the amounts held therein shall be distributed pursuant to the Recovery Waterfall, upon the earlier of (a) the PhysicianCo Release Effective Date and (b) the expiration of two (2) years following the PhysicianCo Petition Date with no timely challenge to the PBGC Payment having been asserted in the chapter 11 proceedings; or

ii)  if the PhysicianCo Release Effective Date occurs on or before the Effective Date, the Wind-Down Debtors or the Plan Administrator,

as applicable, shall not establish or fund any PBGC Reserve Account, and PBGC waives any participation on account of its Allowed PBGC Secured Claim or adequate protection with respect thereto in any remaining Net Proceeds (if any) allocated to the Debtors' Estates pursuant to Tranches 3 and 4 of the Recovery Waterfall.

c.   *Voting*:  Class 6 is Impaired and PBGC is entitled to vote to accept or reject the Plan.

7.   Class 7 – Insured Claims

a.   *Classification*:  Class 7 consists of all Insured Claims.

b.   *Treatment*:  Except to the extent that a Holder of an Insured Claim agrees to less favorable treatment, each Holder of an Insured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, the treatment provided in the Post-Confirmation Claims Resolution Procedures.

Pursuant to the Post-Confirmation Claims Resolution Procedures, the Insurance Trustee and applicable Holder shall exchange offers to agree on the Allowed amount of such Holder's Insured Claim, which may be paid from the Insurance Trust and/or an Allowed General Unsecured Claim, and the remaining unpaid amount of such Holder's Insured Claim may be liquidated in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies.  If the offer exchange procedures do not result in a consensual resolution of the Allowed amount of such Holder's Insured Claim, the Insurance Trustee and applicable Holder shall proceed to mediation under the terms of the Post-Confirmation Claims Resolution Procedures.  If mediation is unsuccessful (or for any other reason described in the Post-Confirmation Claims Resolution Procedures), the applicable Holder can liquidate their Insured Claim in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies, and in the event that (A) the applicable Insurer denies the tender of defense or there are no applicable or available Insurance Policies, or (B) the proceeds from applicable and available Insurance Policies have been exhausted or are otherwise insufficient to pay in full a Holder's Allowed Insured Claim, as determined by an order or judgment by a court of competent jurisdiction or under a settlement or compromise of such Holder's Allowed Insured Claim, then such Holder shall be entitled to its Pro Rata share of GUC Trust Interests as if such Holder was a member of Class 8 – General Unsecured Claims, based on the amount of an Allowed Claim equal to the amount of the Allowed Insured Claim *less* the amount of available proceeds paid on such Allowed Insured Claim from the applicable and available Insurance Policies (the "Insured Deficiency Claim").

41

In no event shall any Holder of an Allowed Insured Deficiency Claim be entitled to receive more than one hundred percent (100%) of the Allowed amount of their respective Allowed Insured Deficiency Claim. In no event shall any Holder of an Allowed Insured Deficiency Claim receive payment from the GUC Trust on account of such Allowed Insured Deficiency Claim in an amount that exceeds the Pro Rata share of GUC Trust Interests such Holder would have received had the Holder's Claim been classified in Class 8.

Some of the Insured Claims are fully insured, and no deductible or self-insured retention amount would be payable by the Debtors under the terms of the applicable Insurance Policy. As to other Insured Claims, the Debtors may owe deductible or self-insured retention amounts. The Debtors shall not be responsible to Holders of Allowed Insured Claims for any deductible or self-insured retention obligations, and all Claims for such deductibles and self-insured retention obligations shall be treated as Class 8 General Unsecured Claims, to the extent Allowed. In any event, the applicable Debtors are legally obligated to pay Allowed Insured Claims in their full face amount.

    c.    *Voting*: Class 7 is Impaired, and Holders of Class 7 Insured Claims are entitled to vote to accept or reject the Plan.

8. <u>Class 8–General Unsecured Claims</u>

    a.    *Classification*: Class 8 consists of all General Unsecured Claims, including with respect to the HospitalCo Debtors, the PBGC Unsecured Claim.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim its Pro Rata share of (i) GUC Trust Interests (subject to the terms thereof with respect to the MPT Deficiency Claims) and (ii) the remaining Net Proceeds (if any) after distributions to Class 3, Class 4, and Class 5 (other than Net Proceeds of Assigned Estate Causes of Action, but including (subject to Article IV.H) the proceeds of or recoveries from any Estate Cause of Action against Yale or any PhysicianCo Causes of Action); *provided* that (A) any General Unsecured Claim assumed by any Purchaser on a final basis shall be deemed paid in full under the Plan and shall not be entitled to any recovery from the GUC Trust Assets or remaining Net Proceeds (if any) and (B) MPT waives any participation in such remaining Net Proceeds (if any) allocated to the Debtors' Estates pursuant to Tranche 6 of the Recovery Waterfall.

    c.    *Voting*: Class 8 is Impaired, and Holders of Class 8 General Unsecured Claims are entitled to vote to accept or reject the Plan.

9. Class 9 – Section 510(b) Claims

    a.    *Classification*: Class 9 consists of all Section 510(b) Claims.

    b.    *Treatment*: On the Effective Date, all Section 510(b) Claims shall be discharged and released, and each Holder of such Allowed Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Allowed Section 510(b) Claim.

    c.    *Voting*: Class 9 is Impaired. Holders of Claims in Class 9 are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

10. Class 10 – Intercompany Claims

    a.    *Classification*: Class 10 consists of all Intercompany Claims.

    b.    *Treatment*: Each Intercompany Claim shall be, at the option of the Debtors, reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors.

    c.    *Voting*: Holders of Claims in Class 10 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

11. Class 11 – Existing Equity Interests

    a.    *Classification*: Class 11 consists of all Existing Equity Interests.

    b.    *Treatment*: All Existing Equity Interests will be cancelled and extinguished, and Holders of Existing Equity Interests shall receive no recovery on account of such Interests.

    c.    *Voting*: Class 11 is Impaired. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

12. Class 12 – Intercompany Interests

    a.    *Classification*: Class 12 consists of all Intercompany Interests.

    b.    *Treatment*: Each Intercompany Interest shall be, at the option of the Debtors, reinstated, set off, settled, distributed, contributed, cancelled, or

released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors.

  c.   *Voting*: Holders of Interests in Class 12 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims*

  Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Plan Administrator with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.   *Elimination of Vacant Classes*

  Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

E.   *Voting Classes*

  The Debtors assert that only Classes 3, 4, 5, 6, 7, and 8 are impaired and entitled to vote to accept or reject the Plan.

F.   *Presumed Acceptance by Non-Voting Classes*

  With respect to each Debtor, if a Class contained Claims eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.   *Controversy Concerning Impairment*

  If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Hearing.

H.   *Subordination of Claims*

  The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Plan Administrator

(as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto, subject in all respects to the Global Settlement Agreement and the 9019 Order.

I.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III of the Plan.  The Debtors hereby request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The Debtors reserve the right to request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plan.

J.    *Insurance*

Notwithstanding anything to the contrary in the Plan, if any Claim (other than an Insured Claim, which shall receive such treatment as a Class 7 Insured Claim) is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests*

Pursuant to section 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided pursuant to this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of such Claims or Interests, and is fair, equitable, and reasonable.

B.    *The Plan Administrator*

1.    The Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors and Reorganized PMH in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other governing body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by this Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or governing body of the

Wind-Down Debtors and Reorganized PMH shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and Reorganized PMH, and shall succeed to the powers of the Wind-Down Debtors' or Reorganized PMH's, as applicable, managers, directors, officers, and other governing bodies.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors and Reorganized PMH.  The foregoing shall not limit the authority of the Wind-Down Debtors, Reorganized PMH, or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement or other agreement entered into on or after the Effective Date.  Following the Effective Date, the Plan Administrator is given full power of attorney and had the authority to execute and/or endorse documentation on behalf of the Debtors in furtherance of the Plan and the Debtors' liquidation, including but not limited to, the filing of final tax returns and the dissolution of the Debtors.

The powers of the Plan Administrator shall include, but not be limited to, any and all powers and authority to implement this Plan and the Sale Transactions and wind down the business and affairs of the Debtors, Reorganized PMH, and the Wind-Down Debtors, including, but not limited to:   (a) providing transition services and obligations required under the Purchase Agreements, including maintaining necessary licensures and government approvals, to the extent required thereunder, all as approved pursuant to the Sale Orders; (b) providing transition services required under any other asset purchase agreement(s) entered into by the Debtors and any third party and approved by the Bankruptcy Court prior to the Effective Date; (c) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors; (d) administering employee termination and wind-down matters; (e) maintaining and distributing the Professional Fee Reserve Account; (f) administering the Remnant Assets; (g) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under this Plan; (h) making distributions as contemplated under this Plan, except with respect to General Unsecured Claims pursuant to the GUC Trust Documents; (i) filing and prosecuting objections and/or settlements of disputed Claims that are not General Unsecured Claims, pursuant to the GUC Trust Documents; (j) upon resolution of disputed Claims that are not General Unsecured Claims, making distributions as appropriate and consistent with the GUC Trust Documents; (k) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (l) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (m) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors and Reorganized PMH on and after the Effective Date; (n) administering and paying taxes of the Wind-Down Debtors or Reorganized PMH, including filing tax returns; (o) representing the interests of the Wind-Down Debtors, Reorganized PMH, or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (p) closing the Chapter 11 Cases of the Wind-Down Debtors and Reorganized PMH; (q)  funding the PBGC Reserve Account (if necessary); and (r) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of this Plan and consistent with the GUC Trust Documents and the Junior DIP Orders.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the

46

appointment of a permanent or interim successor Plan Administrator appointed by the Debtors or as approved by the Bankruptcy Court.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors and Reorganized PMH shall be terminated.

2.  <u>Corporate Existence</u>

As of the Effective Date, the current board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or governing bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or governing body, as applicable, of the Debtors, or the members of any Debtor; *provided, however,* the Plan Administrator may retain certain officers as required under applicable law, including for regulatory purposes.  Subject in all respects to the terms of this Plan, each Debtor shall be dissolved as soon as practicable on or after the Effective Date.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and governing body, as applicable, of the Debtors, Reorganized PMH, and the Wind-Down Debtors or the with respect to their affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any Debtor, together with all other necessary corporate and company documents, to effect the dissolution of such Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any applicable Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of PMH or any of its Affiliates.

3.  <u>Plan Administrator Rights and Powers</u>

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of

such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

4.   Exculpation, Indemnification, Insurance and Liability Limitation

The Plan Administrator and GUC Trust Trustee and all professionals retained by the Plan Administrator or GUC Trust Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, in all respects by the Wind-Down Debtors, Reorganized PMH, or the GUC Trust, as applicable, to the fullest extent permitted by applicable law. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the obligations of the Wind-Down Debtors and Reorganized PMH, including appropriate directors' and officers' insurance with respect to the Wind-Down.

Notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

5.   Tax Matters

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each Debtor reflecting all tax consequences relating to the activities of the Wind-Down Debtors and Reorganized PMH as attributable to and for the account of the applicable Debtor and shall pay all taxes required to be paid for any of the Debtors or their Estates and Wind-Down Debtors and Reorganized PMH, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

6.   Pension Plan Obligations

After the Effective Date, the Plan Administrator, Reorganized PMH, and the Wind-Down Debtors, as applicable, shall preserve all documents related to the Pension Plans and shall coordinate with PBGC in good faith to arrange for the delivery of such documents to PBGC upon its request. The Plan Administrator, Reorganized PMH, and the Wind-Down Debtors, as applicable, shall respond reasonably and in good faith to PBGC's requests for information regarding the Pension Plans, and each of them shall use commercially reasonable efforts to cooperate with PBGC in the transfer of the Pension Plans to PBGC and to facilitate such transfer to PBGC upon termination of the Pension Plans.

7.   Compensation and Expenses of the Plan Administrator

The Plan Administrator's post-Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes imposed on the Wind-Down Debtors or Reorganized PMH) and

any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve, as applicable, if such amounts relate to any actions taken hereunder.

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, Reorganized PMH, or the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors or Reorganized PMH thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget. Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

C.    *Reorganized PMH*

On the Effective Date, PMH shall take any actions as may be necessary or appropriate to establish Reorganized PMH, including the Debtors' assumption of the Sale Transaction TSAs and assignment to Reorganized PMH. Nothing herein shall modify the Plan Administrator's authority to implement the Sale Transactions pursuant to this Plan. The Wind-Down Budget shall provide for reasonable costs and expenses to operate Reorganized PMH and comply with Reorganized PMH's obligations under the assumed Sale Transactions TSAs.

D.    *Liquidation Transactions*

On or before the Effective Date, the Debtors or the Plan Administrator shall enter into and take any actions that may be necessary or appropriate to effectuate the Sale Transactions or the Wind-Down, as applicable, including: (a) the execution and delivery of appropriate agreements or other documents of consolidation, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of any appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, duty, or obligation on terms consistent with this Plan; (c) the filing of appropriate documents with the appropriate governmental authorities pursuant to applicable law; and (d) any and all other actions that the Debtors or the Plan Administrator determine are necessary or appropriate to effectuate the Plan.

1.    <u>Wind Down</u>

Following the Effective Date, the Plan Administrator shall Wind-Down the business affairs and operations of the Debtors. The responsibilities and authority of the Plan Administrator shall include the following: (a) preserving and liquidating the Debtors' assets remaining after consummation of the Sale Transactions, if any; (b) considering, litigating, or resolving disputed Claims; (c) distributing the Distributable Cash and other assets of the Debtors' Estates pursuant to

the terms of this Plan to Holders of Allowed Claims and Interests; (d) administering the Professional Fee Reserve Account and the Wind-Down Budget on the terms set forth herein; (e) procuring the necessary insurance to facilitate the Wind-Down, including appropriate D&O Liability Insurance Policies; (f) administering and paying taxes, including, among other things, (i) filing tax returns (to the extent not the obligation of any Purchaser), and (ii) representing the interest and account of the Debtors before any taxing authority in all matters; (g) retaining and paying, without the need for retention or fee applications, professionals in connection with the Plan Administrator's performance of its duties under this Plan; (h) distributing information statements as required for U.S. federal income tax and other applicable tax purposes; (i) complying with any continuing obligations under the Purchase Agreements, as applicable, and the Global Settlement Agreement; (j) Filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases; (k) making distributions to Professionals for Allowed Professional Compensation Claims from the Professional Fee Reserve Account; and (l) performing such other responsibilities as may be vested in the Plan Administrator pursuant to this Plan or an order of the Bankruptcy Court (including the Confirmation Order), or as may be necessary and proper to carry out the provisions of this Plan.

E.     *Sources of Consideration for Plan Distributions*

Subject to the provisions of the Plan concerning the Professional Fee Reserve Account and the Wind-Down Budget, the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) shall fund distributions under the Plan from (a) the Net Proceeds, (b) the proceeds of the GUC Trust, (c) the MPT GUC Advance (if applicable), (d) the Backstop Facility (if applicable), (e) the Debtors' Cash on hand, and (f) with respect to Insured Claims, the Insurance Trust.

F.     *Vesting of Assets*

Except as otherwise provided in this Plan, the Global Settlement Agreement, the 9019 Order, or the Sale Orders, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate (other than the Assigned Estate Causes of Action) and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Wind-Down Debtor or Reorganized PMH, as applicable, free and clear of all Claims, Liens, encumbrances, charges, Causes of Action, or other interests. Subject to the terms of this Plan, on or after the Effective Date, the Plan Administrator may use, acquire, and dispose of property, and may prosecute, compromise, or settle any Claims and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.

On the Effective Date, the attorney-client privilege, the attorney work product doctrine and any similar privilege against disclosure, and all other similar immunities (collectively, "Privileges") belonging to the Debtors or their Estates that concern or in any way relate to any of the Remnant Assets, or that would apply to communications, documents, or records recorded in magnetic, optical, or other form of electronic medium concerning or in any way relating to any Remnant Assets, shall vest in the Wind-Down Debtors or Reorganized PMH, as applicable. The Plan Administrator shall have the sole right to waive Privileges that concern or in any way relate to any of the Remnant Assets or that would apply to communications, documents, or electronic

records concerning or in any way relating to any Remnant Assets. The Plan Administrator shall have the sole right to waive Privileges that concern or in any way relate to any of the assets vesting in the Wind-Down Debtors or Reorganized PMH, as applicable, or that would apply to communications, documents, or electronic records concerning or in any way relating to any such assets.

G.    *Preservation of Causes of Action*

Except as otherwise provided in this Plan, the Global Settlement Agreement, the 9019 Order, or the Sale Orders, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (other than the Assigned Estate Causes of Action) that are not otherwise transferred or sold pursuant to the Sale Transactions or distributed pursuant to the Plan, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors and their Estates pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and their Estates as of the Effective Date. Except for any Cause of Action to enforce the Plan or any right under the 9019 Order or PBGC Waiver (to the extent the PhysicianCo Release Effective Date does not occur prior to or on the Effective Date), no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.

H.    *GUC Trust*

1.    Interest in the GUC Trust

Any and all interests in the GUC Trust will not, and are not intended to, constitute "securities" and will not be registered pursuant to the Securities Act, as amended, or any state securities law. However, if it should be determined that interests in the GUC Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the GUC Trust. Any and all interests in the GUC Trust shall not be certificated, shall be subject to certain restrictions, and all interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. However, if it should be determined that interests in the GUC Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the GUC Trust.

2.    Creation and Governance of the GUC Trust

On the Effective Date, the Debtors shall be deemed to transfer to the GUC Trust all of their rights, title, and interest in and to all of the Assigned Estate Causes of Action free and clear of all Liens, charges, Claims, encumbrances, and interests, in accordance with section 1141 of the

Bankruptcy Code. The GUC Trust shall be formed for the exclusive benefit of the Backstop Facility Lender and Holders of General Unsecured Claims (including the MPT Deficiency Claim). The GUC Trust Agreement shall be executed, and the Debtors (in consultation with the Committee and MPT) shall take all steps necessary to establish the GUC Trust and the beneficial interests therein in accordance with the Plan, the Global Settlement Agreement, the Junior DIP Orders and the GUC Trust Documents, as applicable.

In accordance with the Global Settlement Agreement and the Junior DIP Orders, (a) the GUC Trust Holdback consisting of $10,000,000 from all Net Proceeds (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) shall be used to fund the GUC Trust Expenses (the "Initial Contribution"); provided that the Initial Contribution may be used instead by the Debtors to the extent necessary to pay Administrative Claims, Other Priority Claims and Priority Tax Claims in connection with Confirmation (and shall be so used by the Debtors, in accordance with clause (5) of the third paragraph of Article II.C above, prior to drawing on the Backstop Facility); and (b) the first $40,000,000 of Net Proceeds of the Assigned Estate Causes of Action (paid only from proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale or any PhysicianCo Causes of Action)) (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) shall be used by the Debtors (x) first, to repay any and all amounts (including interest) owed in connection with the Backstop Facility (including the amount of the MPT GUC Advance, if any, and any interest thereon) in full in cash, and only thereafter, (y) to fund the GUC Trust Expenses and distributions to Holders of General Unsecured Claims (excluding any MPT Deficiency Claims (it being understood that, after the first $40,000,000 of such Net Proceeds has been so expended, the MPT Deficiency Claims shall share pro rata in all distributions to General Unsecured Creditors based on the Claim amount)). Notwithstanding the foregoing, if the amount of such Net Proceeds received pursuant to the foregoing clause (b)(y) is less than $10,000,000, an incremental amount of Net Proceeds of the Assigned Estate Causes of Action (paid only from proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale or any PhysicianCo Causes of Action)) (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) shall be used to ensure that a total of $10,000,000 (the "GUC Priority Recovery") is used to fund the GUC Trust Expenses and distributions to Holders of General Unsecured Claims (excluding any MPT Deficiency Claims (it being understood that, in such case, after the first $40,000,000 of such Net Proceeds and such incremental amount have been so expended, the MPT Deficiency Claims shall share pro rata in all distributions to General Unsecured Creditors based on the Claim amount)). Notwithstanding the foregoing, if more than $5,000,000 of the Initial Contribution is used by the Debtors to pay Administrative Claims and Other Priority Claims in connection with Consummation, MPT will advance (not subject to any fee) to the GUC Trust, promptly following written request by the GUC Trust, an amount equal to the difference between (x) $5,000,000 and (y) the portion of the Initial Contribution (which cannot be less than $0) not used by the Debtors to pay Administrative Claims and Other Priority Claims in connection with Confirmation (the "MPT GUC Advance"); provided that the MPT GUC Advance shall increase dollar-for-dollar the then outstanding amount (if any) under the Backstop Facility and shall be repaid on a priority basis, as set forth herein, consistent with any other Backstop Facility obligations. The MPT GUC Advance shall be used by the GUC Trust to fund the GUC Trust Expenses. Notwithstanding anything contained herein or otherwise, the GUC Trust shall first apply any amounts—other than the Initial Contribution and the proceeds of the MPT GUC Advance (which shall be used by the GUC Trust to fund GUC Trust Expenses) and proceeds of Estate Causes of Action against Yale and PhysicianCo Causes of Action (which shall be applied

as set forth below)—received by the GUC Trust promptly following receipt thereof to repay the Backstop Facility (including the MPT GUC Advance) plus interest thereon (which shall accrue at a rate equal to 14.00% per annum, payable in kind (capitalizing at the end of each fiscal quarter)) until paid in full, and only thereafter shall the GUC Trust distribute amounts received (other than the Initial Contribution, the proceeds of the MPT GUC Advance, and the proceeds of Estate Causes of Action against Yale and PhysicianCo Causes of Action) in accordance with clause (b)(y) of this paragraph. For the avoidance of doubt, to the extent the GUC Trust Trustee and MPT agree that the GUC Trust will borrow additional amounts from MPT (beyond the MPT GUC Advance) to fund litigation or expenses, nothing herein shall prevent the GUC Trust from agreeing to secure such loans with proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale or any PhysicianCo Causes of Action) (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) and to repay such borrowings before distributing amounts to Holders of General Unsecured Claims, including on account of the GUC Priority Recovery.

Additional Net Proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale and PhysicianCo Causes of Action), paid only from proceeds of such Estate Causes of Action (after repayment of the obligations under the Backstop Facility (including the amount of the MPT GUC Advance, if any) in full in cash), shall be used to fund distributions to all Holders of General Unsecured Claims (including any MPT Deficiency Claim) on a Pro Rata basis.

Proceeds of any Estate Cause of Action against Yale shall be distributed pursuant to Tranches 1, 2, 3 & 4a, 4b, 6 and 7 of the Recovery Waterfall and the Junior DIP Orders unless MPT elects in its sole discretion that such proceeds shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders). Unless MPT elects in its sole discretion that Estate Causes of Action against Yale shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders) the costs of litigation relating to any such Estate Cause of Action against Yale will be separately funded by MPT pursuant to arrangements acceptable to MPT and no other GUC Trust assets shall be required to be used to pursue such Estate Causes of Action (it being understood that MPT shall have no obligation to provide such funding and, if MPT does not provide such funding, the proceeds of any such Estate Causes of Action against Yale shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, with such proceeds distributed to Holders of General Unsecured Claims (including any MPT Deficiency Claim on a pro rata basis, other than as provided herein))). Following the Effective Date and assignment of Estate Cause of Action against Yale to the GUC Trust for pursuit consistent with this paragraph, unless MPT has determined that the Estate Cause of Action against Yale shall be funded by the GUC Trust and the proceeds thereof distributed in accordance with Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, MPT shall have control over settlement of any such Estate Cause of Action, subject to consultation with the GUC Trust Trustee, and MPT shall have control over the litigation of any such Estate Cause of Action, including choice of counsel, subject to consultation with the GUC Trust Trustee.

PhysicianCo Causes of Action shall be treated as Assigned Estate Causes of Action and assigned to the GUC Trust. Proceeds of such PhysicianCo Causes of Action shall be distributed to MPT on account the MPT Note Claims unless MPT elects in its sole discretion that such

proceeds shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders). Notwithstanding anything to the contrary herein, MPT Notes Claims and PhysicianCo Subordinated Note Claims shall not receive any distribution on account of Assigned Estate Causes of Action that are not PhysicianCo Causes of Action. Unless MPT elects in its sole discretion that PhysicianCo Causes of Action shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders), the costs of litigation relating to any such PhysicianCo Causes of Action will be separately funded by MPT pursuant to arrangements acceptable to MPT and no other GUC Trust assets shall be required to be used to pursue such PhysicianCo Causes of Action (it being understood that MPT shall have no obligation to provide such funding and, if MPT does not provide such funding, the proceeds of any such PhysicianCo Causes of Action shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, with such proceeds distributed to Holders of General Unsecured Claims (including any MPT Deficiency Claim on a pro rata basis, other than as provided herein)).  Following the Effective Date and assignment of PhysicianCo Causes of Action to the GUC Trust for pursuit consistent with this paragraph, unless MPT has determined that the PhysicianCo Causes of Action shall be funded by the GUC Trust and the proceeds thereof distributed in accordance with Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, MPT shall have control over settlement of any such PhysicianCo Causes of Action (solely to the extent such Causes of Action relate to PhysicianCo), subject to consultation with the GUC Trust Trustee, and MPT shall have control over the litigation of any such PhysicianCo Causes of Action (solely to the extent such Causes of Action relate to PhysicianCo), including choice of counsel, subject to consultation with the GUC Trust Trustee.  To the extent any PhysicianCo Causes of Action are also Causes of Action of HospitalCo, the GUC Trust Trustee and MPT will negotiate in good faith to agree on any funding and settlement thereof, and the allocation with respect to the Net Proceeds thereof, and, absent agreement, shall be entitled to present any issue with respect thereto to the Bankruptcy Court.

Any transfer to the GUC Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trust Trustee shall be the exclusive administrator of the assets of the GUC Trust for purposes of 31 U.S.C. § 3713(b) and section 6012(b)(3) of the IRC, as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trust Trustee's duties under the GUC Trust Agreement.  The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trust Trustee.  The powers, rights, and responsibilities of the GUC Trust Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article IV.H.2.  Until repayment in full of the Backstop Facility, the Backstop Facility Lender shall have consent rights (not to be unreasonably withheld, conditioned or delayed) over the GUC Trust Trustee's decisions with respect to the Assigned Estate Causes of Action.  The GUC Trust Trustee shall hold and distribute the proceeds of the GUC Trust in accordance with the provisions of this Plan, the Junior DIP Orders, the Global Settlement Agreement and the GUC Trust Agreement.  At all times, the GUC Trust Trustee shall reasonably cooperate with MPT to liquidate the GUC Trust Assets.  After the Effective Date, the Debtors, Reorganized PMH, and the Wind-Down Debtors (as applicable) shall have no interest in the Assigned Estate Causes of Action except as set forth in the GUC Trust Agreement.

3. <u>GUC Trust Trustee and the GUC Trust Agreement</u>

The GUC Trust Agreement generally will provide for, among other things: (a) the transfer of the Assigned Estate Causes of Action to the GUC Trust; (b) the mechanics of the payment of GUC Trust Expenses; (c) the retention of counsel, accountants, financial advisors, or other professionals; (d) litigation of any Assigned Estate Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (e) making distributions to holders of GUC Trust Interests, as provided in this Plan, the Junior DIP Orders and in the GUC Trust Agreement. The GUC Trust Trustee, on behalf of the GUC Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Assigned Estate Causes of Action, the Net Proceeds, the Backstop Facility and the MPT GUC Advance, each in accordance with this Plan, the Global Settlement Agreement, the Junior DIP Orders and the GUC Trust Agreement. The GUC Trust Agreement shall include reasonable and customary provisions that allow for indemnification of the GUC Trust Trustee by the GUC Trust. Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the proceeds of the Assigned Estate Causes of Action.

Notwithstanding anything contained herein, the GUC Trust shall be established for the purpose of providing the GUC Trust Trustee with the authority to, among other things: (i) repay the obligations under the Backstop Facility (including the amount of the MPT GUC Advance, if any) in full in cash, (ii) make distributions of the GUC Trust Assets to Holders of Allowed General Unsecured Claims; (iii) reconcile, contest, object to, seek to subordinate, compromise, or settle any and all Disputed General Unsecured Claims; (iv) perform such other functions as are provided for in the Plan or the GUC Trust Documents and (v) cooperate with MPT with respect to the foregoing in accordance with the Junior DIP Orders.

4. <u>Cooperation of the Debtors</u>

The Wind-Down Debtors, Reorganized PMH, and the Plan Administrator shall reasonably cooperate with the GUC Trust, MPT, the GUC Trust Trustee and their agents and representatives in the administration of the GUC Trust, including, providing reasonable access to books and records with respect to (a) the investigation, prosecution, compromise, and/or settlement of the Assigned Estate Causes of Action, (b) contesting, settling, compromising, reconciling, and objecting to Claims, and (c) administering the GUC Trust. The Wind-Down Debtors and Reorganized PMH shall take all reasonable efforts to assist the GUC Trust and MPT in connection with the foregoing, and the GUC Trust and/or MPT may enter into agreements with the Wind-Down Debtors and Reorganized PMH in order to obtain information from the Wind-Down Debtors and Reorganized PMH on a confidential basis, without being restricted by or waiving any applicable work product, attorney-client, or other privilege. The GUC Trust's receipt of documents, information or communications from the Wind-Down Debtors or Reorganized PMH (as applicable) shall not constitute a waiver of any privilege. For the avoidance of doubt, the GUC Trust shall not be responsible for legal fees, if any, incurred by the Wind-Down Debtors, Reorganized PMH, or the Plan Administrator in fulfilling its obligations under this Article IV.H.4 or any other provisions of this Plan.

5.  <u>Assigned Estate Causes of Action</u>

Subject to the terms of this Plan relating to Assigned Estate Causes of Action against Yale and PhysicianCo Causes of Action, the GUC Trust Trustee shall have the exclusive right in respect of all Assigned Estate Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all such Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein, in the Global Settlement Agreement, in the Junior DIP Orders or in the GUC Trust Agreement.  From and after the Effective Date, the GUC Trust Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trust Trustee's duties under the GUC Trust Agreement.  In connection with the investigation, prosecution, and/or compromise of the Assigned Estate Causes of Action (subject to the terms of this Plan relating to Assigned Estate Causes of Action against Yale and PhysicianCo Causes of Action) the GUC Trust Trustee may expend such portion of the proceeds of the GUC Trust as he or she deems necessary, as provided in the GUC Trust Agreement and the Junior DIP Orders.

The GUC Trust may elect to waive any preference claim otherwise constituting an Assigned Estate Cause of Action against any individual vendor so long as all such waived preference claims against such individual vendor and any of its affiliates are for an aggregate claimed amount not in excess of $2,000,000 per transaction.

6.  <u>GUC Trust Expenses</u>

From and after the Effective Date, the GUC Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the GUC Trust Expenses, including but not limited to reasonable and documented fees and expenses of the GUC Trust Trustee and the fees and expenses of any professionals retained by the GUC Trust in accordance with this Plan, the Global Settlement Agreement, the Junior DIP Orders, and the GUC Trust Agreement.  The Wind-Down Debtors or Reorganized PMH shall not be responsible for any costs, fees, or expenses of the GUC Trust.

7.  <u>Tax Treatment</u>

In furtherance of this Article IV.H, (a) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, subject to the DOF Election, as a "grantor trust" within the meaning of sections 671 through 679 of the IRC owned by the holders of GUC Trust Interests, which shall be treated as the grantors of such trust, consistent with the terms of the Plan; (b) the sole purpose of the GUC Trust shall be the liquidation and distribution of the Assigned Estate Causes of Action in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (c) for U.S. federal income tax purposes, all parties (including the Debtors and the Estates, holders of GUC Trust Interests and the GUC Trust Trustee) shall treat the transfer of GUC Trust Assets (net of any applicable liabilities) to the GUC Trust for the benefit of the Holders of GUC Trust Interests as, the transfer by the Debtors of the GUC Trust Assets, subject to applicable liabilities and obligations, directly to the holders of GUC Trust Interests in satisfaction of their

Claims, followed by the transfer of such assets by such holders to the GUC Trust; (d) all parties shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trust Trustee (or its designee), including for U.S. federal income tax purposes; (e) the GUC Trust Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (f) the GUC Trust Trustee shall annually send to each holder of GUC Trust Interests a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal, state and local income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trust Trustee of a private letter ruling if the GUC Trust Trustee so requests one, or adverse determination by the IRS upon audit), the GUC Trust Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed General Unsecured Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any other appropriate elections (a "DOF Election")) unless, either all of the GUC Trust Assets have been distributed to the holders of the GUC Trust Interests or the percentage of the GUC Trust Assets distributable to each holder of the GUC Trust Interests has become fixed and determinable, and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of GUC Trust Interests and the GUC Trust Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. As to any assets allocable to, or retained on account of, Disputed General Unsecured Claims, all distributions shall be net of any expenses, including taxes, relating to the retention or disposition of such assets, and the GUC Trust Trustee shall be responsible for payment, solely out of the assets of such retained assets, of any taxes imposed on or in respect of such assets. All parties (including the Debtors, Reorganized PMH, and the Wind-Down Debtors, the Estates, the GUC Trust Trustee and the holders of GUC Trust Interests) will be required to report for tax purposes consistently with the foregoing.

8.   Termination and Dissolution of the GUC Trust

The GUC Trust Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trust Trustee under the Plan and the GUC Trust Agreement have been made, in accordance with the Global Settlement Agreement and Junior DIP Orders. Upon termination and dissolution of the GUC Trust, any remaining proceeds of the GUC Trust shall be distributed to holders of GUC Trust Interests in accordance with the GUC Trust Agreement.

9.   Single Satisfaction of Allowed Claims from the GUC Trust

Notwithstanding anything to the contrary herein, in no event shall holders of GUC Trust Interests recover more than the full amount of their Allowed Claims from the GUC Trust.

I.   *Insurance Trust*

1.   Creation and Purpose of the Insurance Trust

On or prior to the Effective Date, the Debtors shall take all necessary steps to establish the Insurance Trust as one or more standalone trust and/or sub-trusts in accordance with the Plan and the Insurance Trust Documents. The corpus of the Insurance Trust shall consist of the Insurance Trust Assets. The Debtors shall transfer the Insurance Trust Assets to the Insurance Trust. Neither the D&O Liability Insurance Policies nor their proceeds shall be transferred to the Insurance Trust or become Insurance Trust Assets at any time.

The Insurance Trust shall be established for the purposes of liquidating the Insurance Trust Assets and distributing the proceeds thereof in accordance with the Plan and the Insurance Trust Documents, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Insurance Trust and the purposes described in the Plan. Upon the transfer of the Insurance Trust Assets to the Insurance Trust, the Debtors will have no reversionary or further interest in or with respect to the Insurance Trust Assets.

2.    Insurance Trustee and Insurance Trust Agreement

The Debtors have designated the Insurance Trustee for the Insurance Trust for the purposes of administering the Insurance Trust, as more fully described in the Insurance Trust Documents. The reasonable costs and expenses of the Insurance Trustee shall be paid from the Insurance Trust.

The Insurance Trust Agreement generally will provide for, among other things: (a) the transfer of the Insurance Trust Assets to the Insurance Trust; (b) the mechanics of the payment of the reasonable costs and expenses of the Insurance Trustee; (c) the retention of counsel, accountants, financial advisors, or other professionals; and (d) making distributions to applicable holders of Allowed Insured Claims. The Insurance Trustee, on behalf of the Insurance Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Insurance Trust Assets, in accordance with this Plan and the Insurance Trust Agreement. The Insurance Trust Agreement shall include reasonable and customary provisions that allow for indemnification of the Insurance Trustee by the Insurance Trust. Any such indemnification shall be the sole responsibility of the Insurance Trust and payable solely from the proceeds of the Insurance Trust Assets.

3.    Administration of Insured Claims

All Insured Claims will be administered pursuant to the Post-Confirmation Claims Resolution Procedures and any other Insurance Trust Documents. The Post-Confirmation Claims Resolution Procedures shall conform with the Claims Resolution Procedures (with only necessary Plan-related modifications). Pursuant to the Post-Confirmation Claims Resolution Procedures, the Insurance Trustee may make offers or agree in mediation with a Holder of an Insured Claim on the Allowed amount of such Holder's Insured Claim, which may be paid from the Insurance Trust and/or an Allowed General Unsecured Claim, and the remaining unpaid amount of such Holder's Insured Claim may be liquidated in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies. The Insurance Trustee shall not use Insurance Trust Assets from Settled Insurance Policies that provided coverage only to the Debtors' Pennsylvania operations to pay any Allowed Insured Claims that are non-

58

Pennsylvania Insured Claims, and *vice versa*. The Insurance Trustee may, however, use Insurance Trust Assets from Settled Insurance Policies from one policy year of coverage to pay Allowed Insured Claims that trigger a different policy year of coverage.

The Debtors or the Insurance Trustee, as applicable, shall provide regular notifications to Holders of outstanding Insured Claims regarding the amount of Insurance Trust Assets in the Insurance Trust and the Debtors' Insurers that have become Settling Insurers and the Insurance Policies that have become Settled Insurance Policies. Upon reasonable request of a Holder of an Insured Claim, the Debtors or the Insurance Trustee, as applicable, shall inform such Holder as to the status of the Insurance Policies that may provide coverage for such Holder's Insured Claim.

4.   Cooperation of the Debtors

The Wind-Down Debtors, Reorganized PMH, and the Plan Administrator shall reasonably cooperate with the Insurance Trust, the Insurance Trustee and their agents and representatives in the administration of the Insurance Trust, including, providing reasonable access to books and records with respect to contesting, settling, compromising, reconciling, and objecting to Claims, and administering the Insurance Trust. The Wind-Down Debtors and Reorganized PMH shall take all reasonable efforts to assist the Insurance Trust in connection with the foregoing, and the Insurance Trust may enter into agreements with the Wind-Down Debtors or Reorganized PMH in order to obtain information from the Wind-Down Debtors or Reorganized PMH on a confidential basis, without being restricted by or waiving any applicable work product, attorney client, or other privilege. The Insurance Trust's receipt of documents, information or communications from the Wind-Down Debtors or Reorganized PMH shall not constitute a waiver of any privilege.

5.   Single Satisfaction of Allowed Claims from the Insurance Trust

Notwithstanding anything to the contrary herein, in no event shall holders of Allowed Insured Claims recover more than the full amount of their Allowed Insured Claims from the Insurance Trust.

6.   Interest in the Insurance Trust

Any and all interests in the Insurance Trust will not, and are not intended to, constitute "securities" and will not be registered pursuant to the Securities Act, as amended, or any state securities law. However, if it should be determined that interests in the Insurance Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the Insurance Trust (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).

7.   Tax Treatment

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, except to the extent the Debtors determine otherwise in their reasonable discretion to treat all or any portion of the Insurance Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, the Debtors expect to treat the Insurance Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the Insurance

Trustee will take a position on the Insurance Trust's tax return accordingly.  To the extent the Debtors determine in their reasonable discretion to treat all or any portion of the Insurance Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes.

J.      *Corporate Action*

On the Effective Date, the Debtors shall not be dissolved unless and until the Plan Administrator determines that dissolution will not have any adverse impact on the value of the Debtors' assets; *provided* that neither the Debtors nor any party released pursuant to Article VIII herein shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors; *provided further* that nothing in the Plan shall be construed as relieving the Debtors or the Plan Administrator (as applicable) of their duties to pay Statutory Fees as required by the Bankruptcy Code and applicable law until such time as a final decree is entered in the Debtors' Chapter 11 Cases or the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  The Plan Administrator shall submit with the appropriate governmental agencies a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a Certificate of Dissolution from the applicable Secretary of State or equivalent body.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of this Plan, and the directors and officers of the Debtors shall be deemed to have resigned in favor of the ongoing administration of the Debtors' affairs by the Plan Administrator.  From and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Debtors' Estates, as applicable, provided that neither of them shall have duties other than as expressly set forth in the Plan or the Confirmation Order.

K.      *Cancellation of Existing Securities and Agreements*

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan and the Global Settlement Agreement, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Plan Administrator.  The Holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

L.      *Effectuating Documents; Further Transactions*

Upon entry of the Confirmation Order, the Debtors or the Plan Administrator (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments,

releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of this Plan and any transactions described in or contemplated by this Plan.  The Debtors or the Plan Administrator, all Holders of Claims or Interests receiving distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

M.     *Section 1146 Exemption from Certain Taxes and Fees*

To the extent permitted by section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan, (iv) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument or transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, deed tax, stamp tax, conveyance fee, intangibles other or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment, and as directed by and upon entry of the Confirmation Order, the appropriate U.S. federal, state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

N.     *Sale Orders*

Notwithstanding anything to the contrary herein, nothing in this Plan or the Plan Supplement shall affect, impair or supersede the Sale Orders or Sale Transactions Documents, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan or the Plan Supplement.

O.     *DIP Orders*

Notwithstanding anything to the contrary herein, nothing in this Plan or the Plan Supplement shall affect, impair, or supersede the DIP Orders, each of which remains in full force and effect and governs (to the extent there are any obligations remaining under the relevant DIP Documents) in the event of any inconsistency with the Plan or the Plan Supplement.

P.     *Authority to Act*

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

Q.      *Separate Plans*

Notwithstanding the combination of separate chapter 11 plans for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the Confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein (which exclusion includes the Indemnification Obligations and the D&O Liability Insurance Policies) or otherwise identified on the Schedule of Assumed Executory Contracts and Unexpired Leases or Deferred Decision Contracts Schedule, if any (which shall be included in the Plan Supplement), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than the Global Settlement Agreement and those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Transactions Documents or this Plan, and payment of any Cures relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

Any objection to the proposed assumption or cure amount by a counterparty to an Executory Contract of Unexpired Lease must be Filed by no later than the date provided in the applicable notice of assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed.  Notwithstanding anything to the contrary in the Plan, the Debtors, as applicable, reserve the right to alter, amend, modify, or supplement Schedule of Assumed Executory Contracts and Unexpired Leases, in each case, at any time through and including the Deferred Decision Deadline, which such amended Schedule of Assumed Executory Contracts and Unexpired Leases shall be Filed with the Bankruptcy Court; *provided*, *however*, that after the Confirmation Date, the Debtors may not subsequently reject any Executory Contract, other than a Deferred Decision Contract, previously designated as assumed or assumed and assigned absent the consent of the applicable contract counterparty, or an order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure claim.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Bankruptcy Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Plan Administrator within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable. Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions herein.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties.**

C. *Reservation of Rights*

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors or the Plan Administrator, or their respective affiliates has any liability thereunder. Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, or the Plan Administrator under any executory or non-executory contract or unexpired or expired lease. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors, Reorganized PMH, the Wind-Down Debtors, or the GUC Trust Trustee (as applicable) shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

D. *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued

maintenance obligations.  The Plan shall constitute a motion to reject all such Executory Contracts or Unexpired Leases that are subject to rejection under this Article V.

E.    *Indemnity Obligations*

Each of the Debtors' Indemnification Obligations shall not be discharged, impaired, or otherwise affected by the Plan.  The Indemnification Obligations shall be deemed Executory Contracts assumed by the Debtors under the Plan.

F.    *Insurance Policies*

Each Insurance Policy to which the Debtors are a party as of the Effective Date shall be deemed an Executory Contract and shall be automatically assumed or assumed and assigned by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

G.    *Employment Agreements*

Any Employment Agreement not assumed and assigned pursuant to the Sale Transactions Documents as part of the Sale Transactions shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code on the Effective Date of the Plan.

H.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

I.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J.    *Employee Compensation and Benefits*

With the exception of the Pension Plans, all employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans,

disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, Executory Contracts under this Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Plan, nothing herein or in the Confirmation Order shall be deemed or construed as a finding that the Pension Plans are Executory Contracts, nor shall the Pension Plans be deemed rejected or rejectable pursuant to the Plan or otherwise, it being expressly understood that Title IV of ERISA provides the exclusive means for terminating the Pension Plans, 29 U.S.C. § 1341(a)(1).

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distributions on Account of Claims Allowed as of the Effective Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests.  Consistent with this Plan and the GUC Trust Documents, the applicable Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date.  The applicable Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

Except as otherwise provided herein and consistent with the GUC Trust Documents, the applicable Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the applicable Disbursing Agent; *provided, further*, that to the extent a Proof of Claim has been Filed, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. Notwithstanding the foregoing, the applicable Disbursing Agent shall make distributions to PBGC in accordance with PBGC's written instructions.

B.    *Compliance with Tax Requirements*

In connection with this Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (a) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (b) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under this Plan until its withholding or reporting obligation is satisfied pursuant to the

preceding sentences.  Any amounts withheld pursuant to this Plan and remitted to the appropriate Governmental Unit shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Plan Administrator or GUC Trust Trustee, as applicable, the appropriate IRS Form or other tax forms or documentation requested by the Plan Administrator or GUC Trust Trustee, as applicable, to reduce or eliminate any required U.S. federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Administrator for distribution to the GUC Trust and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against such Debtor or the Plan Administrator or its respective property.  PBGC shall not be required to deliver any IRS Form or other tax forms or documentation in order to receive any distribution to which it may be entitled under the Plan.

Notwithstanding the above, each Holder of an Allowed Claim or Interest that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

C.    *Date of Distributions*

Distributions shall be made on or after the Effective Date to Holders of Allowed Claims or Allowed Interests.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

D.    *Disbursing Agent*

Except as may be otherwise provided in the Sale Orders, all distributions under this Plan shall be made by the applicable Disbursing Agent on and after the Effective Date and as provided herein and consistent with the GUC Trust Documents and the Junior DIP Orders.  The applicable Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

E.    *Rights and Powers of Disbursing Agent*

The applicable Disbursing Agent may:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of this Plan and GUC Trust Documents; (b) make all distributions contemplated hereby; and (c) perform such other duties as may be required of the applicable Disbursing Agent pursuant to this Plan or GUC Trust Documents

or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

F.      *Surrender of Instruments*

As a condition precedent to receiving any distribution under this Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Plan Administrator or the Plan Administrator's designee. Any holder of such instrument or note that fails to (a) surrender the instrument or note or (b) execute and deliver an affidavit of loss or indemnity reasonably satisfactory to the Plan Administrator and furnish a bond in form, substance, and amount reasonably satisfactory to the Plan Administrator within six (6) months of being entitled to such distribution shall be deemed to have forfeited all rights and claims and may not participate in any distribution hereunder.

G.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

Subject to applicable Bankruptcy Rules and the GUC Trust Documents, all distributions to Holders of Allowed Claims or Allowed Interests shall be made by the applicable Disbursing Agent, who shall transmit such distributions to the applicable Holders of Allowed Claims or Interests or their designees.

If any distribution to a Holder of an Allowed Claim (a) is returned as undeliverable for lack of a current address or otherwise or (b) is not cashed or otherwise presented for collection by the Holder of the Allowed Claim within ninety (90) calendar days after the mailing of such distribution, the Plan Administrator or GUC Trust Trustee, as applicable, shall be authorized to cancel such distribution check and File with the Bankruptcy Court the name and last known address of the Holder of undeliverable distribution or uncashed distribution, as applicable. If, after the passage of thirty (30) calendar days after such Filing, the payment or distribution on the Allowed Claim still cannot be made, then (a) the Holder of such Claim shall cease to be entitled to the undeliverable distribution or uncashed distribution, which will revert to the Plan Administrator or GUC Trust Trustee, as applicable, for distribution in accordance with the terms of this Plan and GUC Trust Documents, if applicable, and (b) the Allowed Claim of such Holder shall be deemed disallowed and expunged for purposes of further distributions under the Plan.

H.      *Manner of Payment*

Except as specifically provided herein, at the option of the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

I.      *Foreign Currency Exchange Rate*

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal* on the Petition Date.

J.      *Setoffs and Recoupment*

The Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), and applicable bankruptcy and/or non-bankruptcy law, without the approval of the Bankruptcy Court and upon no less than fourteen (14) calendar days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any claims of any nature whatsoever that the Debtors or their Estates may have against the Holder of such Allowed Claim; *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, of any such claim the Debtors or their Estates may have against the Holder of such Claim.

Notwithstanding anything to the contrary herein, the DIP Claims and any Plan distributions to be made on account of such DIP Claims shall not be subject to set off and/or recoupment by the Debtors, Reorganized PMH, or the Wind-Down Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors, Reorganized PMH, and the Wind-Down Debtors hereby waive any and all rights of set off or recoupment against such DIP Claims.

K.      *Minimum Distribution*

No payment of Cash in an amount of less than one hundred U.S. dollars ($100.00) shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be used in accordance with the Plan and the Wind-Down Budget.  If the Cash available for the final distribution is less than the cost to distribute such funds, the Plan Administrator or GUC Trust Trustee, as applicable, may donate such funds to the unaffiliated charity of its choice.

L.      *Allocations*

Except as otherwise provided in this Plan, the GUC Trust Documents, or any DIP Order or as otherwise required by law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

M.      *Distributions Free and Clear*

Except as otherwise provided in this Plan, any distribution or transfer made under this Plan, including distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to this Plan.

N.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) on account

of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Plan Administrator or the GUC Trust Trustee (as applicable) without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) on account of such Claim, such Holder shall, within fourteen (14) calendar days of receipt thereof (forty-five (45) calendar days if the recipient is the PBGC), repay or return the distribution to the Plan Administrator or the GUC Trust Trustee (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.  Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.  Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as set forth in Article VIII herein, nothing in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Plan Administrator or Insurance Trustee, may hold against any other Entity, including Insurers under Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

O.    *No Post-Petition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Global Settlement Agreement, the 9019 Order, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING
## CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.  *Allowance of Claims*

Consistent with Article IV.H.3 herein and the GUC Trust Documents, after the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest that are not General Unsecured Claims immediately prior to the Effective Date.

B.  *Claims Administration Responsibilities*

Except as otherwise specifically provided in this Plan, including Article IV.H.3, the GUC Trust Documents, or the Insurance Trust Documents, and only with respect to any Claims or Interests that are not General Unsecured Claims, after the Effective Date, the Plan Administrator shall have the sole authority to:  (a) File, withdraw, or litigate to judgment, objections to such Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court with respect to such Claims and Interests.

C.  *Estimation of Claims and Interests*

In accordance with this Plan, including Article IV.H.3, and the GUC Trust Documents, before or after the Effective Date, the Debtors, the Plan Administrator, or GUC Trust Trustee as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision otherwise herein, a Claim that has been expunged or disallowed from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court or as otherwise provided pursuant to a Final Order of the Bankruptcy Court (including any stipulation).  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim the Debtors, the Plan Administrator, or GUC Trust Trustee as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

D.  *Adjustment to Claims or Interests Without Objection*

Any Claim that has been paid, satisfied, or assumed by the Purchaser(s) in the Sale Transactions, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Plan Administrator, GUC Trust Trustee, as applicable,

without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E.      Time to File Objections to Claims

Except as otherwise provided herein, any objections to Claims shall be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Debtors or the Plan Administrator, as applicable).

### F.      Disallowance of Claims or Interests

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Plan Administrator, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### G.      Disallowance of Late Claims

Except as provided herein or otherwise agreed to by the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, any Holder of a Claim Filed via Proof of Claim after the Bar Date shall not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### H.      Disputed Claims Process

All Claims held by Persons or Entities against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims shall not be entitled to vote to accept or reject this Plan.  A Claim deemed Disputed pursuant to this Article VII.H shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors the Plan Administrator, or GUC Trust Trustee, as applicable, from such Holder have been paid.

### I.      Amendments to Claims

Except as provided herein, on or after the Effective Date, without the prior authorization of the Bankruptcy Court, the Debtors, the Plan Administrator, or the GUC Trust Trustee, as applicable, a Claim may not be Filed or amended, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

J.      *No Distributions Pending Allowance*

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

K.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Wind-Down Debtors, Reorganized PMH, or the GUC Trustee, as applicable, shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan, unless otherwise provided by order of the Bankruptcy Court. No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim unless the Plan provides otherwise.

## ARTICLE VIII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Debtor Release*[4]

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that any of the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the 9019 Order, or any document, instrument, or agreement (including those set forth in the Plan**

---

[4]   Release provisions remain subject to ongoing review and modification, including as part of the Independent Investigation. Accordingly, the Debtors reserve the right to modify the persons listed, if any, on the Non-Released Parties Schedule.

Supplement) executed to implement the Plan, (b) any Claim or obligation arising under the Plan, or (c) any Claims or Causes of Action that are determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable) asserting any claim or Cause of Action released pursuant to the Debtor Release.

B.    *Third-Party Release*

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims or Causes of Action asserted or assertable on behalf of the Debtors or their Estates, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the 9019 Order, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) actual fraud, willful misconduct, or gross negligence as determined by a Final Order, or (c) any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

73

Notwithstanding anything to the contrary in the Plan, nothing herein shall release, impair or otherwise affect any party's, including MPT's (a) rights to enforce the Global Settlement Agreement and the Junior DIP Orders, (b) rights, liens, security interests or obligations in respect of the HospitalCo Intercreditor Agreement, or (c) claims or Causes of Action of any kind against any non-Debtor subsidiaries of Prospect Medical Holdings, Inc.

Subject to the terms of this Plan (including the Settling Insurer Injunction) and the Insurance Trust Documents, the Third-Party Release shall not preclude a Holder of an Insured Claim from pursuing an action against one or more of the Debtors in a nominal capacity to liquidate such Holder's Insured Claim in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies or to determine the amount of an Insured Deficiency Claim.

C.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from any claim or Cause of Action related to any act or omission taking place between the Petition Date and the Effective Date in connection with, relating to, or arising out of the Debtor-Related Matters, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Global Settlement Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Assigned Estate Causes of Action.

D.    Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests or Causes of Action, as applicable, that have been released, discharged, satisfied, stayed, or terminated or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Plan Administrator, Reorganized PMH, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties (as applicable): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (c) creating, perfecting, or enforcing any encumbrance of

any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable, unless such Holder has Filed a motion requesting the right to perform such setoff, subrogation, or recoupment on or before the Effective Date or expressly preserved its right to setoff, subrogation, or recoupment in a timely filed Proof of Claim, *provided, however*, that notwithstanding anything to the contrary herein, nothing in this clause (d) shall impair any setoff, subrogation or recoupment rights of any Governmental Unit; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable, released or settled pursuant to the Plan.

Subject to the terms of this Plan (including the Settling Insurer Injunction) and the Insurance Trust Documents, the Injunction shall not preclude a Holder of an Insured Claim from pursuing an action against one or more of the Debtors in a nominal capacity to liquidate such Holder's Insured Claim in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies or to determine the amount of an Insured Deficiency Claim.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

E.      *Settling Insurer Injunction*

In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to a Settled Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to a Settled Insurance Policy from or against any Settling Insurer, solely to the extent that such Settling Insurer has been released from such Claim under such Settled Insurance Policy pursuant to an settlement, sale or other transaction between a Settling Insurer and the Debtors, including:

i)   commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy;

ii) enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy;

iii) creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy;

iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy; and

v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such Settled Insurance Policy.

Subject to the terms of this Plan and the Insurance Trust Documents, the Settling Insurer Injunction shall not preclude a Holder of an Insured Claim from seeking recovery from a Settling Insurer in a nominal capacity, but solely to recover only from available insurance or reinsurance provided by one or more Non-Settling Insurers.

F.    *PBGC Release & Exculpation Carve-Out*

Nothing in these Chapter 11 Cases, the Disclosure Statement, the Plan, or the Confirmation Order shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plans for breach of any fiduciary duty under ERISA, with respect to the Pension Plans, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.[5]  The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or other document filed in these Chapter 11 Cases.  Except to the extent otherwise specifically set forth herein, and without constituting an opt-out of the Third Party Release, or in any other agreements between the Debtors and the PBGC, the Debtors shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, and any other applicable law relating to the Pension Plans.

G.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim,

---

[5]    For the avoidance of doubt, this provision does not affect or alter any release provided to MPT, its affiliates or associated individuals or entities pursuant to the 9019 Order or PBGC Waiver.

satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the terms of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

If any Holder of an Other Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Other Secured Claim, as soon as practicable on or after the date such Holder has been satisfied in full pursuant to the Plan, such Holder (or the agent for such Holder) shall take any and all steps requested by the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Plan Administrator shall be entitled to make any such filings or recordings on such Holder's behalf. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

H.     *Gatekeeper Provision*

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Exculpated Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article VIII.A, Article VIII.B, Article VIII.C, and Article VIII.D without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against any of the Exculpated Parties and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any Exculpated Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action. Nothing herein shall apply to any action by MPT or PBGC to enforce the Global Settlement Agreement or the 9019 Order (including the PBGC Waiver).

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

*A.*    *Conditions Precedent to the Effective Date*

The following shall be conditions precedent to the occurrence of the Effective Date:

(a)    the Bankruptcy Court shall have entered an order approving the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)    the Bankruptcy Court shall have entered the Confirmation Order;

(c)    the Plan, the Disclosure Statement, and the other Definitive Documents shall be in full force and effect;

(d)    the Sale Transactions shall have been consummated substantially on the terms described in the applicable Sale Order(s) and the Debtors shall have received the proceeds therefrom;

(e)    the Debtors shall have fully funded the Professional Fee Reserve Account and the Wind-Down Budget;

(f)    solely in the event the PhysicianCo Release Effective Date does not occur on or before the Effective Date, the Debtors shall have reserved Cash sufficient to fund the PBGC Reserve Account;

(g)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(h)    the Plan Administrator shall have been appointed in accordance with the terms hereof and shall have accepted his or her appointment;

(i)    the GUC Trust shall have been formed and funded in accordance with the terms hereto and consistent with the GUC Trust Documents and the Junior DIP Orders;

(j)    the GUC Trust Trustee shall have been appointed in accordance with the terms hereof and the Junior DIP Orders and shall have accepted his or her appointment;

(k)    the Debtors shall not have breached their obligations under the Global Settlement Agreement, the 9019 Order or the Supplemental Junior DIP Order, unless such breach has been waived by the other parties thereto in accordance with its terms; and

(l)     to the extent the Backstop Facility will be funded, all conditions precedent to the effectiveness of the Backstop Facility shall have been satisfied or duly waived.

B.     *Waiver of Conditions Precedent to the Effective Date*

Unless otherwise specifically provided for in the Plan, the conditions set forth in Article IX.A of the Plan may be waived, in whole or in part, by the Debtors, and, with respect to (i) and (j) in Article IX.A, the Committee and MPT; *provided*, *however*, that Article IX.A.(f) may only be waived with the express, written consent of PBGC.

## ARTICLE X.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

2.     Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim objections, allowance, disallowance, subordination, estimation and distribution.

3.     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.

4.     Resolve any matters related to:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure amount arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

5.     Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

6.     Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

7.     Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters.

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

10.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

11.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

12.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

13.      Determine any other matters that may arise in connection with or related to the DIP Orders and the Debtors' use of cash collateral, the Sale Transactions Documents, the Global Settlement Agreement, the Disclosure Statement, the Plan, and the Confirmation Order.

14.      Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Plan.

15.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any Holder for amounts not timely repaid.

16.      Adjudicate any and all disputes arising from or relating to distributions under the Plan.

17.      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

18.      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Global Settlement Agreement, the 9019 Order or the Confirmation Order.

19.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

20.      To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

21.      To hear and determine any Causes of Action that may be brought by the Plan Administrator or the GUC Trust Trustee.

22.     To hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtors, the Plan Administrator, or the GUC Trust Trustee pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

23.     Enter an order or final decree concluding or closing the Chapter 11 Cases.

24.     Enforce all orders previously entered by the Bankruptcy Court.

25.     Hear any other matter over which the Bankruptcy Court has jurisdiction.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendment*

This Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided* that the Plan shall not be so amended, modified, or supplemented in any manner inconsistent with the Global Settlement Agreement, 9019 Order, the Supplemental Junior DIP Order or Recovery Waterfall without the prior written consent of MPT and the Committee. In addition, after the Confirmation Date, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented, to the extent permitted by section 1127 of the Bankruptcy Code.

B.     *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (3) nothing contained in this Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Administrator, the Holders of Claims or Interests, the Released Parties, and each of their respective successors and assigns.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Plan Administrator, or the GUC Trustee (as applicable) and all Holders of Claims or Interests receiving distributions pursuant to the Plan (solely in their capacity as such), shall from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

C.      *Substantial Consummation*

On the Effective Date, this Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

D.      *Reservation of Rights*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

F.      *Determination of Tax Liabilities*

As of the Effective Date, the Plan Administrator (to the extent not the responsibility of the Purchaser(s)) will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates; *provided* that the Plan Administrator shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors (which Interests shall be cancelled

pursuant to this Plan), but shall provide such Holders with any information reasonably required to prepare such forms. The Debtors or the Plan Administrator shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' Estates for any tax incurred during the administration of these Chapter 11 Cases.

G.   *Dissolution of the Committee*

On the Effective Date, the Committee will dissolve and the members thereof will be released and discharged from all duties and obligations arising from or related to these Chapter 11 Cases except in connection with final fee applications of Professionals for services rendered prior to the Effective Date and appeals to which the Committee is a party.

H.   *Termination and Discharge of Patient Care Ombudsman*

To the extent not already addressed in any Order of this Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Ombudsman in connection with the Chapter 11 Cases, and the retention or employment of the Ombudsman's attorneys, financial advisors, and other agents, shall be terminated on the Effective Date. Upon termination, the Ombudsman shall dispose of any documents provided to her in the course of her reporting with the exception of any documents the Ombudsman may be required to retain in accordance with any applicable policies or law. For the avoidance of doubt, the Ombudsman and her professionals shall be entitled to file final fee applications for allowance and payment of any fees and expense incurred to and including the Effective Date.

Prior to issuing or serving upon the Ombudsman or her professionals any formal or informal discovery request, including, but not limited to, any subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Debtors, the Chapter 11 Cases, the Ombudsman's evaluation, or her reports (collectively, the "Discovery"), any creditor or party-in-interest in the Chapter 11 Cases must first file an appropriate pleading with this Bankruptcy Court to request permission to initiate the Discovery.

I.   *Notices*

In order for all notices, requests, and demands to or upon the Debtors or the Plan Administrator, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Prospect Medical Holdings, Inc.<br>3824 Hughes Ave., Culver City, CA 90232<br><br>Attn:  Frank Saidara, General Counsel<br>(frank.saidara@pmh.com) and<br>Paul Rundell, Chief<br>Restructuring Officer<br>(prundell@alvarezandmarsal.com) | Sidley Austin LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas 75201<br>Telephone: (214) 981-3300<br>Facsimile: (214) 981-3400<br>Attn:  Thomas R. Califano<br>(tom.califano@sidley.com); Rakhee V. Patel<br>(rpatel@sidley.com); Maegan Quejada<br>(mquejada@sidley.com)<br><br>and<br><br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 839-5300<br>Facsimile: (212) 839-5599<br>Attn:  William E. Curtin<br>(wcurtin@sidley.com);<br>Patrick Venter (pventer@sidley.com); and<br>Anne G. Wallice (anne.wallice@sidley.com) |
| **Plan Administrator** | **Counsel to the Plan Administrator** |
| To be provided. | To be provided. |

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Plan Administrator is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests.

J.     *Term of Injunctions or Stays*

Except as otherwise provided in this Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under this Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (a) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (b) the date that the Chapter 11 Cases are

84

dismissed pursuant to a final order of the Bankruptcy Court. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

K.    *Entire Agreement*

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan, subject to the Global Settlement Agreement and 9019 Order; *provided*, *however*, that the Global Settlement Agreement and 9019 Order shall not be superseded by the Plan with respect to the subject thereof.

L.    *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or the Plan Administrator's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website at https://omniagentsolutions.com/Prospect. All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

M.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

N.    *Nonseverability of Plan Provisions*

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Administrator (as applicable); and (c) nonseverable and mutually dependent.

O.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

P.      *Closing of the Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Plan Administrator shall promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to rule 3022-1(a) of the Bankruptcy Local Rules for the Northern District of Texas, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

[*Remainder of page intentionally left blank.*]

Dated: August 27, 2025                    Respectfully submitted,


                                          */s/ Paul Rundell*
                                          Paul Rundell
                                          Chief Restructuring Officer
                                          Prospect Medical Holdings, Inc. and each
                                          Debtor party to the Plan