**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT**
**FOR THE JOINT CHAPTER 11 PLAN OF**
**PROSPECT MEDICAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:      (214) 981-3400
Email:            tom.califano@sidley.com
                      rpatel@sidley.com
                      mquejada@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:      (212) 839-5599
Email:            wcurtin@sidley.com
                      pventer@sidley.com
                      anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

# INTRODUCTION

Prospect Medical Holdings, Inc. ("PMH") and its hospital-related debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "HCo Debtors"), and physician-related debtor affiliates (the "PCo Debtors" and together with the HCo Debtors, the "Debtors") as debtors and debtors in possession, provide this disclosure statement (this "Disclosure Statement") to provide information regarding the *Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for the purpose of soliciting votes to accept or reject the Plan, including how to object to Confirmation of the Plan.

**The Debtors urge each Holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.**

**The Debtors strongly encourage Holders of Claims in Class 3, Class 4, Class 5, Class 6, Class 7, and Class 8 to read this Disclosure Statement (including the Risk Factors described in Article XVI hereof) and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that the Plan provides for the greatest and earliest possible recoveries to Holders of Claims and Interests and that any alternative would result in unnecessary delay, uncertainty, and expense to the Debtors' estate. Accordingly, assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.**

**EACH DEBTOR'S BOARD OF DIRECTORS (OR APPLICABLE GOVERNING BODY) HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BY NO LATER THAN OCTOBER 8, 2025**

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.** Notwithstanding anything herein to the contrary, any and all consent rights set forth in the Settlement Agreement and/or the Junior DIP Orders with respect to the form and substance of the Plan, any Definitive Documents, all exhibits to the Plan, the Plan Supplement and/or any other agreement or matter contemplated thereby, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A of the Plan) and be fully enforceable as if stated in full herein.

**AT 4:00 P.M. (PREVAILING CENTRAL TIME)** PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

**DISCLAIMER**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF PROSPECT MEDICAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR**

WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND

SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN OR MAKING A DETERMINATION AS TO WHETHER TO OBJECT TO CONFIRMATION OF THE PLAN.

THE BANKRUPTCY COURT'S CONDITIONAL OR FINAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

# TABLE OF CONTENTS

ARTICLE I. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .......................................................................................... 1

    A.    What is chapter 11? .......................................................................................... 1

    B.    Why are the Debtors sending me this Disclosure Statement? ........................... 1

    C.    Am I entitled to vote on the Plan? ................................................................... 1

    D.    What will I receive from the Debtors if the Plan is consummated? ................... 1

    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim? ....................................................................... 2

    F.    Are any regulatory approvals required to consummate the Plan? ..................... 2

    G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ....... 2

    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ....................................................................................... 2

    I.    What are the sources of Cash and other consideration required to fund the Plan? ........... 3

    J.    What is the GUC Trust? .................................................................................. 3

    K.    What is the Insurance Trust? ........................................................................... 3

    L.    Is there potential litigation related to the Plan? ............................................... 4

    M.    Does the Plan preserve Causes of Action? ...................................................... 4

    N.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ....................................................................................... 4

    O.    When is the deadline to vote on the Plan? ....................................................... 5

    P.    How do I vote on the Plan? ............................................................................. 5

    Q.    Why is the Bankruptcy Court holding a Confirmation Hearing? ..................... 5

    R.    What is the purpose of the Confirmation Hearing? ......................................... 6

    S.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ....................................................................................... 6

    T.    Do the Debtors recommend voting in favor of the Plan? ................................. 7

    U.    Who supports the Plan? ................................................................................... 7

ARTICLE II.  OVERVIEW OF THE PLAN ........................................................... 7

    A.    Introduction .................................................................................................... 7

    B.    The Plan ......................................................................................................... 7

    C.    The Adequacy of This Disclosure Statement ................................................... 8

    D.    Summary of Classes and Treatment of Claims or Interests ............................... 9

    E.    Non-Voting Package ..................................................................................... 10

v.

F.     Solicitation Package ................................................................................ 11

G.     The Patient Notice ................................................................................. 11

H.     Voting and Confirmation of the Plan ..................................................... 12

I.      Releases by the Debtors Set Forth in the Plan ...................................... 16

ARTICLE III. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
OVERVIEW ........................................................................................................ 16

A.     Corporate History .................................................................................. 16

B.     Business Operations .............................................................................. 18

C.     The Debtors' Prepetition Corporate Structure ...................................... 19

D.     Corporate Governance ........................................................................... 19

E.     The Debtors' Prepetition Capital Structure ........................................... 20

F.     Prepetition Litigation and Related Concerns ........................................ 24

G.     Events Leading to the Chapter 11 Filings ............................................. 27

ARTICLE IV. EVENTS DURING THE CHAPTER 11 CASES ............................................. 32

A.     First and Second Day Relief .................................................................. 32

B.     DIP Facilities ........................................................................................ 35

C.     Retention Applications and Related Motions ......................................... 37

D.     Appointment of the Statutory Committee and Patient Care Ombudsman ...................... 38

E.     Meetings of Creditors and Filing of Schedules, Statements, and Financial Affairs ........ 39

F.     Other Procedural and Administrative Motions ...................................... 40

G.     Global Settlement .................................................................................. 43

H.     Investigation of Certain Claims and Causes of Action .......................... 44

I.      Private Sale Processes ........................................................................... 48

J.      Postpetition Sale of the Pennsylvania Assets ........................................ 49

K.     Postpetition Sale of the California and Connecticut Assets ................... 52

L.     Monetization of Additional Assets ......................................................... 53

M.     Adversary Proceedings and Other Bankruptcy Litigation .................... 54

N.     Termination of the Pension Plans .......................................................... 56

O.     Bar Dates ............................................................................................... 56

P.     Key Employee Retention and Incentive Plans ....................................... 57

Q.     Exclusivity ............................................................................................. 58

R.     Claims Reconciliation ............................................................................ 58

S.     Proposed Confirmation Schedule .......................................................... 59

ARTICLE V. ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND
STATUTORY FEES ............................................................................................ 59

A.    Administrative Claims ................................................................................ 59

B.    DIP Claims................................................................................................. 60

C.    Backstop Facility Claims ........................................................................... 60

D.    Professional Compensation Claims ........................................................... 61

E.    Priority Tax Claims.................................................................................... 63

F.    Statutory Fees............................................................................................ 63

ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 63

A.    Classification of Claims and Interests........................................................ 63

B.    Treatment of Claims and Interests ............................................................. 65

C.    Special Provision Governing Unimpaired Claims....................................... 72

D.    Elimination of Vacant Classes .................................................................. 72

E.    Voting Classes .......................................................................................... 72

F.    Presumed Acceptance by Non-Voting Classes........................................... 72

G.    Controversy Concerning Impairment ........................................................ 72

H.    Subordination of Claims ........................................................................... 72

I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 73

J.    Insurance .................................................................................................. 73

ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 73

A.    General Settlement of Claims and Interests................................................ 73

B.    The Plan Administrator.............................................................................. 73

C.    Reorganized PMH..................................................................................... 77

D.    Liquidation Transactions ........................................................................... 77

E.    Sources of Consideration for Plan Distributions ........................................ 78

F.    Vesting of Assets ...................................................................................... 78

G.    Preservation of Causes of Action............................................................... 79

H.    GUC Trust................................................................................................. 79

I.    Insurance Trust.......................................................................................... 86

J.    Corporate Action....................................................................................... 88

K.    Cancellation of Existing Securities and Agreements................................... 88

L.    Effectuating Documents; Further Transactions .......................................... 89

M.    Section 1146 Exemption from Certain Taxes and Fees............................... 89

N.    Sale Orders............................................................................................... 89

O.    DIP Orders ............................................................................................... 89

P.    Authority to Act ........................................................................................ 90

Q. Separate Plans ................................................................................................... 90

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................................................................................................... 90

A. Assumption and Rejection of Executory Contracts and Unexpired Leases ..................... 90

B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ....................... 90

C. Reservation of Rights ..................................................................................................... 91

D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases 92

E. Indemnity Obligations .................................................................................................... 92

F. Insurance Policies ........................................................................................................... 92

G. Employment Agreements ................................................................................................ 92

H. Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 92

I. Nonoccurrence of Effective Date ..................................................................................... 93

J. Employee Compensation and Benefits ............................................................................. 93

ARTICLE IX. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 93

A. Distributions on Account of Claims Allowed as of the Effective Date ........................... 93

B. Compliance with Tax Requirements ................................................................................ 94

C. Date of Distributions ....................................................................................................... 94

D. Disbursing Agent ............................................................................................................. 95

E. Rights and Powers of Disbursing Agent .......................................................................... 95

F. Surrender of Instruments ................................................................................................. 95

G. Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................... 95

H. Manner of Payment ......................................................................................................... 96

I. Foreign Currency Exchange Rate ..................................................................................... 96

J. Setoffs and Recoupment ................................................................................................... 96

K. Minimum Distribution ..................................................................................................... 96

L. Allocations ....................................................................................................................... 96

M. Distributions Free and Clear ........................................................................................... 97

N. Claims Paid or Payable by Third Parties .......................................................................... 97

O. No Post-Petition Interest on Claims ................................................................................. 98

ARTICLE X. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ........................................................................................................... 98

A. Allowance of Claims ......................................................................................................... 98

B. Claims Administration Responsibilities ............................................................................ 98

C. Estimation of Claims and Interests ................................................................................... 98

ix

D.    Adjustment to Claims or Interests Without Objection ..................................................... 99

E.    Time to File Objections to Claims ...................................................................................... 99

F.    Disallowance of Claims or Interests ................................................................................... 99

G.    Disallowance of Late Claims .............................................................................................. 99

H.    Disputed Claims Process ..................................................................................................... 99

I.    Amendments to Claims ...................................................................................................... 100

J.    No Distributions Pending Allowance ............................................................................... 100

K.    Distributions After Allowance .......................................................................................... 100

ARTICLE XI. RELEASE, INJUNCTION, AND RELATED PROVISIONS .......................... 100

A.    Debtor Release .................................................................................................................. 100

B.    Third-Party Release .......................................................................................................... 101

C.    Exculpation ....................................................................................................................... 102

D.    Injunction ......................................................................................................................... 102

E.    Settling Insurer Injunction ................................................................................................ 103

F.    PBGC Release & Exculpation Carve-Out ........................................................................ 104

G.    Release of Liens ............................................................................................................... 105

H.    Gatekeeper Provision ....................................................................................................... 105

ARTICLE XII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ......................... 106

A.    Conditions Precedent to the Effective Date ..................................................................... 106

B.    Waiver of Conditions Precedent to the Effective Date .................................................... 107

ARTICLE XIII. RETENTION OF JURISDICTION ................................................................ 107

ARTICLE XIV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN . 109

A.    Modification and Amendment .......................................................................................... 109

B.    Effect of Confirmation on Modifications ......................................................................... 109

C.    Revocation or Withdrawal of Plan ................................................................................... 109

ARTICLE XV. MISCELLANEOUS PROVISIONS ................................................................ 110

A.    Immediate Binding Effect ................................................................................................. 110

B.    Additional Documents ...................................................................................................... 110

C.    Substantial Consummation ............................................................................................... 110

D.    Reservation of Rights ....................................................................................................... 110

E.    Successors and Assigns ..................................................................................................... 110

F.    Determination of Tax Liabilities ....................................................................................... 110

G.    Dissolution of the Committee ........................................................................................... 111

H.    Termination and Discharge of Patient Care Ombudsman ................................................ 111

I.    Notices ................................................................................................................. 111

J.    Term of Injunctions or Stays........................................................................... 112

K.    Entire Agreement ............................................................................................ 113

L.    Plan Supplement ............................................................................................. 113

M.    Governing Law ............................................................................................... 113

N.    Nonseverability of Plan Provisions................................................................ 113

O.    Votes Solicited in Good Faith......................................................................... 114

P.    Closing of the Chapter 11 Cases .................................................................... 114

ARTICLE XVI. RISK FACTORS ................................................................................ 114

A.    Bankruptcy Law Considerations..................................................................... 114

B.    Allowance of Claims....................................................................................... 118

C.    Risks Related to Recoveries Under the Plan................................................... 118

D.    Disclosure Statement Disclaimers .................................................................. 119

ARTICLE XVII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
CONSUMMATION OF THE PLAN .......................................................................... 121

A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.................. 123

B.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
Claims Entitled to Vote on the Plan....................................................................... 124

C.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
Allowed Claims Entitled to Vote on the Plan ........................................................ 126

D.    Information Reporting and Back-Up Withholding. ........................................ 128

E.    FATCA. ............................................................................................................ 128

F.    Importance of Obtaining Professional Tax Assistance.................................... 129

ARTICLE XVIII. ADDITIONAL INFORMATION ................................................... 129

ARTICLE XIX. RECOMMENDATION AND CONCLUSION.................................. 129

## EXHIBITS

Exhibit A      Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor Affiliates

Exhibit B      Liquidation Analysis

Exhibit C      Corporate Organization Chart

Exhibit D      Restructuring Support Agreement

Exhibit E      Committee Letter

# ARTICLE I.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**A.      What is chapter 11?**

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.   This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of August 20, 2025).  Each category of Holders of Claims and Interests, pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "<u>Class</u>."  Each Class's respective voting status is set forth in Article III of the Plan and Article VI of this Disclosure Statement.

**D.      What will I receive from the Debtors if the Plan is consummated?**

A summary of the anticipated recovery to Holders of Claims or Interests under the Plan is set forth in Article II.D of this Disclosure Statement.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your

ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN ARTICLE II.D HEREIN ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

 **E.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Compensation Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A description of these Claims and their treatment is included in Article II of the Plan and Article V of this Disclosure Statement.

 **F.** **Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

 **G.** **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance as to what precisely will happen. It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of potential consequences of extended Chapter 11 Cases, or of a liquidation scenario under chapter 7 of the Bankruptcy Code, see Article XVI of this Disclosure Statement, and the Liquidation Analysis attached to this Disclosure Statement as **Exhibit B**.

 **H.** **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of

---

[3] The recoveries set forth herein may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Sale Transactions and prosecution and settlement of the Retained Causes of Action.

Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article XII of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date," for a discussion of conditions precedent to Consummation of the Plan.

## I. What are the sources of Cash and other consideration required to fund the Plan?

Subject to the provisions of the Plan concerning the Professional Fee Reserve Account and the Wind-Down Budget, the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) shall fund distributions under the Plan from (a) the Net Proceeds, (b) the proceeds of the GUC Trust, (c) the MPT GUC Advance (if applicable), (d) the Backstop Facility (if applicable), (e) the Debtors' Cash on hand, and (f) with respect to Insured Claims, the Insurance Trust.

## J. What is the GUC Trust?

On the Effective Date, the Debtors shall be deemed to transfer to the GUC Trust all of their rights, title, and interest in and to all of the Assigned Estate Causes of Action free and clear of all Liens, charges, Claims, encumbrances, and interests, in accordance with section 1141 of the Bankruptcy Code. The GUC Trust shall be formed for the exclusive benefit of the Backstop Facility Lender and Holders of General Unsecured Claims (including the MPT Deficiency Claim). The GUC Trust Agreement shall be executed, and the Debtors (in consultation with the Committee and MPT) shall take all steps necessary to establish the GUC Trust and the beneficial interests therein in accordance with the Plan, the Global Settlement Agreement, the Junior DIP Orders and the GUC Trust Documents, as applicable. *See* Article IV.H of the Plan for a more detailed discussion of the GUC Trust.

## K. What is the Insurance Trust?

The Insurance Trust shall be established for the purposes of liquidating the Insurance Trust Assets and distributing the proceeds thereof in accordance with the Plan and the Insurance Trust Documents, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Insurance Trust and the purposes described in the Plan. Upon the transfer of the Insurance Trust Assets to the Insurance Trust, the Debtors will have no reversionary or further interest in or with respect to the Insurance Trust Assets. Pursuant to the Insurance Trust Documents, the Insurance Trustee may make offers or agree in mediation with a Holder of an Insured Claim on the Allowed amount of such Holder's Insured Claim, which may be paid from the Insurance Trust and/or an Allowed General Unsecured Claim, and the remaining unpaid amount of such Holder's Insured Claim may be liquidated in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies. *See* Article IV.I of the Plan for a more detailed discussion of the Insurance Trust and Article IV.F.2 of this Disclosure Statement for a more detailed discussion of the Debtors' insurance program, specifically with respect to Insured Claims.

**L.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**M.     Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that have previously been settled or are expressly waived, relinquished, exculpated, released, compromised, or settled, as described in greater detail in Article IV.G of the Plan.

**N.     Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?[4]**

Yes, the Plan contains certain releases, exculpations, and injunctions, as set forth in Article VIII of the Plan and Article XI of this Disclosure Statement.  At the Confirmation Hearing, the Debtors will present evidence to demonstrate the basis for and propriety of the release and exculpation provisions, including that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "<u>RELEASING PARTIES</u>" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:  (A) EACH DEBTOR AND ITS RESPECTIVE ESTATE; (B) EACH WIND-DOWN DEBTOR, AS APPLICABLE, AND REORGANIZED PMH; (C) THE DIP LENDERS; (D) MPT; (E) CENTERBRIDGE; (F) BLUE TORCH; (G) PBGC; (H) THE COMMITTEE AND ITS CURRENT AND FORMER MEMBERS (EACH IN THEIR SOLE CAPACITY AS SUCH); (I) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN; (J) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO**

---

[4]     Release provisions remain subject to ongoing review and modification, including as part of the Independent Investigation.  Accordingly, the Debtors reserve the right to modify the persons listed, if any, on the Non-Released Parties Schedule.

DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (L) THE BACKSTOP FACILITY LENDER; (M) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (N); AND (N) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (M) SOLELY TO THE EXTENT SUCH RELATED PARTY MAY ASSERT CLAIMS OR CAUSES OF ACTION ON BEHALF OF OR IN A DERIVATIVE CAPACITY BY OR THROUGH AN ENTITY IN CLAUSE (A) THROUGH CLAUSE (M); PROVIDED THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.

THE FOLLOWING PARTIES, COLLECTIVELY AND IN EACH CASE IN ITS CAPACITY AS SUCH, ARE INCLUDED IN THE DEFINITION OF "RELEASED PARTIES":  (A) EACH DEBTOR AND ITS RESPECTIVE ESTATE; (B) EACH WIND-DOWN DEBTOR, AS APPLICABLE, AND REORGANIZED PMH; (C) THE DIP LENDERS; (D) MPT; (E) CENTERBRIDGE; (F) BLUE TORCH; (G) PBGC; (H) THE COMMITTEE AND ITS MEMBERS; (I) THE OMBUDSMAN; (J) THE BACKSTOP FACILITY LENDER; (K) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (L); AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (L); PROVIDED THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; PROVIDED, FURTHER, THAT NOTWITHSTANDING THE FOREGOING, NO PERSONS LISTED ON THE NON-RELEASED PARTIES SCHEDULE SHALL BE A RELEASED PARTY.

O.    **When is the deadline to vote on the Plan?**

The Voting Deadline is **October 8, 2025 at 4:00 p.m. (prevailing Central Time)**.

P.    **How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims or Interests that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' Notice and Claims Agent, Omni Agent Solutions, Inc. ("Omni"), **on or before the Voting Deadline of October 8, 2025 at 4:00 p.m. (prevailing Central Time)**.

Q.    **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Code to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  Further, before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a

kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.

The Debtors have requested that the Bankruptcy Court hold the Confirmation Hearing on **October 14, 2025** at 9:30 a.m. (prevailing Central Time). All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

### R.    What is the purpose of the Confirmation Hearing?

The purpose of the Confirmation Hearing is to confirm a chapter 11 plan of reorganization put forth by the Debtors. The confirmation of a plan by a bankruptcy court binds the debtor, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

### S.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Prospect Ballot Processing Center
c/o Omni
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

*By electronic mail at:*
ProspectInquiries@OmniAgnt.com

*By telephone (US & Canada toll-free) at:*
(818) 510-3746

*or*

*By telephone (international) at:*
(888) 550-3239

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://omniagentsolutions.com/Prospect (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**T.     Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of the Debtors' stakeholders, and that any alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**U.     Who supports the Plan?**

The Plan is supported by the Debtors and the Official Committee of Unsecured Creditors (the "Committee").

## ARTICLE II.
## OVERVIEW OF THE PLAN

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THEIR CREDITORS. THEREFORE, THE DEBTORS RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT A BALLOT TO ACCEPT THE PLAN.**

**A.     Introduction**

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as **Exhibit A**, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Article XII herein.  There is no assurance that these conditions will be satisfied or waived.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a chapter 11 plan are that the plan: (i) is accepted by the requisite holders of claims or interests in impaired classes under the plan; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.

In this instance, only Holders of Claims in Classes 3, 4, 5, 6, 7, and 8 are entitled to vote to accept or reject the Plan.  Classes 1 and 2 are unimpaired and therefore deemed to vote to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 9 and 11 are impaired and receiving no distribution and therefore deemed to vote to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Because Classes 10 and 12 are deemed to accept or reject the Plan, they are not entitled to vote.  *See* Article II.G.5 for a discussion of the Bankruptcy Code's requirements for Plan Confirmation.

**B.     The Plan**

The Debtors intend to sell all or substantially all of their assets pursuant to section 363(f) of the Bankruptcy Code prior to and in connection with confirmation of the Plan.  Subsequent to

confirmation, the Debtors intend to enter the next phase of these Chapter 11 Cases, which involves the (i) wind-down of the Debtors; and (ii) the liquidation of the Debtors' remaining assets.

A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan. To that end, the Debtors have filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement. The Plan contemplates a liquidation of the Debtors and their Estates pursuant to the Liquidation Transactions. The primary objective of the Plan is to maximize the value of recoveries to Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution in accordance with the Bankruptcy Code and Plan. The Debtors assert that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan. The Plan classifies Holders of Claims or Interests according to the type and nature of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes the Debtors assert are: (1) unimpaired or impaired by the Plan; or (2) deemed to accept or reject the Plan. Claims against the Debtors and Interests in the Debtors are classified in twelve (12) separate Classes, as described herein.

## C.    The Adequacy of This Disclosure Statement

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors are providing this Disclosure Statement in accordance with those requirements. This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan, and projected recoveries thereunder (Article II hereof);

- the statutory requirements for confirming the Plan (Article II.G hereof);

- the Debtors' organizational structures, business operations, and financial obligations (Article III hereof);

- the events leading to the filing of the Debtors' Chapter 11 Cases (Article III hereof);

- the major events during the Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases (Article IV hereof);

- certain risk factors that Holders of Claims and Interests should consider before voting to accept or reject the Plan (Article XVI hereof);

- the classification and treatment of Claims or Interests under the Plan, including identification of the Holders of Claims or Interests entitled to vote on the Plan (Article VI hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims and Interests pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Article VII hereof);

- the releases contemplated by the Plan that the Debtors assert are integral to the overall settlement of Claims pursuant to the Plan (Article XI hereof); and

- certain United States federal income tax consequences of the Plan (Article XVII hereof).

In support of the adequacy and approval of this Disclosure Statement, the Committee has submitted a letter on behalf of all General Unsecured Creditors, attached hereto as **Exhibit E**.

### D. Summary of Classes and Treatment of Claims or Interests

The classification of Claims or Interests, the estimated aggregate amount of Claims in each Class, and the amount and nature of distributions to Holders of Claims or Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Compensation Claims) and Priority Tax Claims have not been classified for purposes of voting or receiving distributions. For a discussion of certain additional matters related to Administrative Claims (including Professional Compensation Claims) and Priority Tax Claims, see Article II of the Plan. Estimates are subject to change.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash or other assets to be distributed to Holders of Allowed Claims or Interests in that Class, divided by the estimated aggregate amount of Allowed Claims or Interests in that Class. In determining those amounts, the Debtors have assumed that the Plan is consummated as described herein.

For a discussion of various factors that could materially affect the amount of assets to be distributed pursuant to the Plan, see Article XVI of this Disclosure Statement.

| SUMMARY OF ESTIMATED RECOVERIES ($ in 000's) | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims or Interests | Estimated % Recovery Under Plan |
| Class 1 | Other Secured Claims[5] | Unimpaired | $199,161 | 20% - 24% |
| Class 2 | Other Priority Claims | Unimpaired | $2,546 | 0% |

---

[5] Certain provider tax claims of the State of Connecticut are included in Class 1 and are secured up to the value of their collateral.

| Class 3 | MPT Agreed Claims | Impaired | $1,150,267 | 8% - 11% |
|---------|-------------------|----------|-----------|----------|
| Class 4 | MPT Note Claims | Impaired | $755,353 | 0% - 1% |
| Class 5 | PhysicianCo Subordinated Secured Note Claims | Impaired | $15,034 | 0% |
| Class 6 | PBGC Secured Claim | Impaired | - | N/A |
| Class 7 | Insured Claims[6] | Impaired | $1,283,090 | 0% - TBD |
| Class 8 | General Unsecured Claims[7] | Impaired | $3,767,187 | 0% - TBD |
| Class 9 | Section 510(b) Claims | Impaired | - | N/A |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | $5,603,847 | 0% |
| Class 11 | Existing Equity Interests | Impaired | - | N/A |
| Class 12 | Intercompany Interests | Unimpaired | - | N/A |

### E.    Non-Voting Package

The Notice and Claims Agent will mail, or cause to be delivered, to Holders of Claims that are unimpaired under the Plan and who are, pursuant to section 1126(f) of the Bankruptcy Code, conclusively deemed to accept the Plan or, pursuant to section 1126(g) of the Bankruptcy Code, conclusively deemed to reject the Plan, a non-voting package (the "Non-Voting Package"), which shall consist of a notice of non-voting status (the "Notice of Non-Voting Status") and a release opt-out form (the "Release Opt-Out Form").  As further discussed in the Disclosure Statement Motion, the Non-Voting Package shall (a) inform recipients of their status of Holders or potential Holders of Claims in non-voting Classes; (b) provide the full text of the releases, exculpation, and injunction provisions set forth in the Plan; (c) include a Release Opt-Out, by which Holders may elect to opt out of the Third-Party Release included in the Plan by checking a prominently featured and clearly labeled box; (d) where applicable, provide information on how certain Holders in a non-voting Class may opt out electronically; and (e) provide the deadline on or before which all Release Opt-Outs must be received by the Notice and Claims Agent.

---

[6]    Recoveries to Holders of Allowed Insured Claims are dependent on a number of issues.  First, a Holder's recovery depends on the result of the Post-Confirmation Claims Resolution Procedures with respect to such Insured Claim. Second, the quantum of Insurance Trust Assets that can be distributed by the Insurance Trustee to Holders of Allowed Insured Claims  pursuant to the terms of the Plan and the Insurance Trust Documents is uncertain because the Debtors are still negotiating with its Insurers to reach a settlement, sale or other transaction.

[7]    Recoveries to Holders of General Unsecured Claims are dependent on proceeds from Estate Causes of Action pursuant to the Global Settlement.  The Debtors are continuing their investigation and analysis of the Estate Causes of Action.  At present, the Debtors lack sufficient information to determine, with reasonable certainty, the likelihood of success or the potential range of recoveries, if any, that may be realized from the prosecution, settlement, or other resolution of such causes of action.  Accordingly, no value has been assigned to the Estate Causes of Action in this Liquidation Analysis at this time.  The omission of any value at this time does not constitute, and shall not be construed as, a waiver, release, or abandonment of any such causes of action, all of which are expressly preserved. Actual recoveries, if any, may differ materially from any estimates that may be developed at a later date.

The Non-Voting Package may also be obtained free of charge from the Notice and Claims Agent by: (1) visiting https://omniagentsolutions.com/Prospect; (2) submitting an inquiry to the Notice and Claims Agent at ProspectInquiries@OmniAgnt.com; or (3) calling (US & Canada toll-free) (818) 510-3746 or (international) (888) 550-3239.

### F.    Solicitation Package

The Notice and Claims Agent will mail, or cause to be delivered, to Holders of Claims and Interests that are impaired under the Plan and who are entitled to vote to accept or reject the Plan a solicitation package (the "<u>Solicitation Package</u>"), which shall consist of the Solicitation Order (excluding all exhibits, except as discussed herein), Cover Letter, Disclosure Statement (including the Plan and other exhibits thereto), a copy of the Solicitation Procedures, the Confirmation Hearing Notice, and the appropriate ballot (the "<u>Ballot</u>"), which will include a Release Opt-Out. The Solicitation Package shall (a) inform recipients of their status of Holders or potential Holders of Claims or Interests in Classes entitled to vote to accept or reject the Plan; (b) provide the full text of the releases, exculpation, and injunction provisions set forth in the Plan; (c) include a Release Opt-Out, by which Holders may elect to opt out of the Third-Party Release included in the Plan by checking a prominently featured and clearly labeled box; (d) where applicable, provide information on how certain Holders in a voting Class may opt out electronically; and (e) provide the deadline on or before which all Ballots and Release Opt-Outs must be received by the Notice and Claims Agent.

The Solicitation Package may also be obtained free of charge from the Notice and Claims Agent by: (1) visiting https://omniagentsolutions.com/Prospect; (2) submitting an inquiry to the Notice and Claims Agent at ProspectInquiries@OmniAgnt.com; or (3) calling (US & Canada toll-free) (818) 510-3746 or (international) (888) 550-3239.

**Any Holder of Claims and Interest whose Solicitation Package or Non-Voting Package are returned as undeliverable, and who do not receive a subsequent Solicitation Package or Non-Voting Package at the appropriate address, are not subject to the Third-Party Release included in the Plan and do not need to elect to opt out of such Third-Party Release**.

### G.    The Patient Notice

The Notice and Claims Agent will mail, or cause to be delivered, to the Debtors' current and former patients who did not file a proof of claim and are not otherwise Holders of Claims and Interest (collectively, the "<u>Patients</u>"), a simplified notice (the "<u>Patient Notice</u>"). The Patient Notice will provide Patients notice, in plain language, of, among other things, (i) the filing of the Plan and Disclosure Statement, (ii) the date of the Confirmation Hearing and Objection Deadline, and (iii) instructions on how to obtain copies of the documents filed in these Chapter 11 Cases, including the Plan and the Disclosure Statement.   To easily access copies of the Plan and Disclosure Statement, the Patient Notice will include a QR code that Patients can scan.   **Non-**

**creditor patients are not subject to the Third-Party Release included in the Plan and do not need to elect to opt out of such Third-Party Release.**[8]

### H. Voting and Confirmation of the Plan

#### 1. Certain Factors to be Considered Prior to Voting

There are a variety of factors that all Holders of Claims or Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors assert that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Compensation Claims, which would likely reduce the recoveries to the Holders of Claims or Interests.

#### 2. Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of Claims against or Interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims or Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims or Interests that do not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan. The classification of Claims or Interests is summarized, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired, in Article VI of the Disclosure Statement. **August 20, 2025** (the "Voting Record Date"), shall serve as the voting record date for administrative convenience. The Voting Record Date shall be used for the purpose of determining which Holders of Claims in Class 3, Class 4, Class 5, Class 6, Class 7, and Class 8 are entitled to receive a Solicitation Package.

Voting on the Plan by each Holder of a Claim in Class 3, Class 4, Class 5, Class 6, Class 7, and Class 8 is important. Please carefully follow all of the instructions contained on the Ballot(s) provided to you. All Ballots must be completed and returned in accordance with the instructions provided. To be counted, your Ballot(s) must be received by **October 8, 2025 at 4:00 p.m.**

---

[8] For the avoidance of doubt, any Patient listed as a known creditor in the Debtors' schedules or that files a timely Proof of Claim will receive the full Solicitation Package or Non-Voting Package, as applicable, and will be subject to the Third-Party Release included in the Plan.

**(prevailing Central Time)** (the "Voting Deadline") at the address set forth on the pre-addressed envelope provided to you or electronically via the Notice and Claim Agent's e-Ballot portal.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please call or email the Debtors' Notice and Claims Agent by: (1) visiting https://omniagentsolutions.com/Prospect; (2) submitting an inquiry to the Notice and Claims Agent at ProspectInquiries@OmniAgnt.com; or (3) calling (US & Canada toll-free) (818) 510-3746 or (international) (888) 550-3239. Further, this Disclosure Statement, the Plan, and all of the related exhibits and schedules are available, without charge, to any party in interest at https://www.omniagentsolutions.com/Prospect.

Ballots cannot be transmitted orally, by email, or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service, regular U.S. mail, or electronically via the Notice and Claim Agent's e-Ballot portal promptly, so that it is received by the Notice and Claim Agent before the Voting Deadline.

### 3. Plan Objection Deadline

The deadline to file objections to the Confirmation of the Plan (each, a "Confirmation Objection") is **October 8, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Objection Deadline"). All Confirmation Objections must be in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount of the Claim or Interest held by the objector. Any Confirmation Objection must be filed with the Bankruptcy Court and served on the Debtors, the Official Committee of Unsecured Creditors, counsel to the DIP Lenders, and the U.S. Trustee on or before the Objection Deadline.

### 4. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Debtors are requesting that the Bankruptcy Court approve this Disclosure Statement on a final basis prior to confirming the Plan. The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing without further notice to parties in interest.

### 5. Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:[9]

- the Plan has classified Claims and Interests in a permissible manner;

---

[9]   The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan that has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest Holders;

- the Plan is feasible;

- all U.S. Trustee Fees due and owing have been paid or the Plan provides for the payment thereof on the Effective Date; and

- the Plan is in the "best interests" of all Holders of Claims or Interests in an impaired Class by providing to those Holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each Holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim or Interest in that Class has accepted the Plan.

6.    <u>Acceptance</u>

A Plan is accepted by an impaired Class of Holders if at least two-thirds in dollar amount and a majority in number of Claims of that Class vote to accept the Plan. Only those Holders of Claims and Interests who actually vote (and are entitled to vote) to accept or to reject a Plan count in this tabulation.

7.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless liquidation or reorganization is proposed in the Plan).

Because the Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test, the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under the Plan.

Based on the Debtors' analysis, including the information that will be contained in **<u>Exhibit B</u>** regarding recoveries available to Holders of Allowed Claims or Interests under the Plan, the Plan Administrator will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors have determined that the Plan will meet the feasibility requirements of the Bankruptcy Code.

8. <u>Best Interests Test; Liquidation Analysis</u>

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of that impaired Class a recovery on account of the holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that the holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To address the best interests test, the Debtors File contemporaneously with this Disclosure Statement the Liquidation Analysis, attached hereto as **Exhibit B**.

The Debtors have analyzed the factors that will impact recoveries (the "<u>Recoveries</u>") available to creditors in each scenario: the Liquidation Transactions, and a chapter 7 liquidation. These factors include professionals' fees and expenses, asset disposition expenses, applicable taxes, potential Claims arising during the pendency of the Plan or chapter 7 cases and trustee fees and expenses. The Liquidation Analysis includes a summary of the Recoveries under the Plan and in a hypothetical chapter 7 liquidation.

In summary, the Debtors demonstrate in the Liquidation Analysis that a chapter 7 liquidation would result in diminution in the recoveries to be realized by Holders of Allowed Claims or Allowed Interests, as compared to the proposed distributions under the Plan. Consequently, the Debtors demonstrate in the Liquidation Analysis that the Plan will provide a greater ultimate return to Holders of Allowed Claims and Interests than would a chapter 7 liquidation of the Debtors.

9. <u>Valuation of the Debtors</u>.

Because the Debtors are conducting a marketing process for the potential Sale Transactions pursuant to which they solicited any and all bids of the Debtors' equity or assets as a going concern, the Debtors have not conducted a "book-based" valuation analysis. Accordingly, the ultimate recoveries will result from the Debtors' realization of the highest available valuation of the Debtors' equity or assets. Such a valuation satisfies the Debtors' obligations under section 1129 of the Bankruptcy Code and obviates the need for an independent valuation analysis. *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *see also In re CareMax, Inc.* (Bankr. N.D. Tex. Dec. 20, 2024) [Docket No. 270] (order conditionally approving disclosure statement without a valuation analysis); *In re Ebix, Inc.* (Bankr. N.D. Tex. June 27, 2024) [Docket No. 696] (order approving disclosure statement without a valuation analysis); *Vertex Energy, Inc* (Bankr. S.D. Tex. Nov. 18, 2024) [Docket No. 431] (same); *Center for Autism and Related Disorders, LLC*, et. al., No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 18, 2023) [Docket No. 273] (same); *In re Pipeline Health System, LLC, et. al.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) [Docket No. 282] (same).

In the event, however, the Debtors determine that a valuation analysis is necessary, they will file, no later than the date that the Plan Supplement is filed, such valuation analysis and will service notice thereof on Holders of Claims in the Voting Classes as promptly as practicable upon filing. *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) [Docket No. 360] (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary).

10. <u>Compliance with Applicable Provisions of the Bankruptcy Code</u>

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors considered each of these issues in the development of the Plan and have determined that the Plan complies with all provisions of the Bankruptcy Code.

11. <u>Alternatives to Confirmation and Consummation of the Plan</u>

The Debtors evaluated alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors concluded that the Plan is the best alternative and will maximize recoveries by Holders of Allowed Claims and Allowed Interests, if the Plan is not confirmed, the Debtors, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to file and solicit acceptances of a plan or plans) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan. Further, if no plan under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases. In liquidation cases under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of the Debtors and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidation, see Article XVI.A of this Disclosure Statement. The Debtors have determined that confirmation and Consummation of the Plan is preferable to the available alternatives.

**I.     Releases by the Debtors Set Forth in the Plan**

Article VIII of the Plan provides that each Released Party is deemed released by the Debtors and their Estate from any and all claims and Causes of Action except as set forth therein. The Debtors have determined that applicable law and the facts support those releases and that the Bankruptcy Court can and should approve them.

**ARTICLE III.**
**THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS**
**OVERVIEW**

**A.     Corporate History**

Established as a California-based company in the mid-to-late 1990s, the Debtors (together with their non-Debtor affiliates, the "<u>Company</u>" or "<u>Prospect</u>") are a significant provider of healthcare services, focusing on providing care to underserved communities and providing a

comprehensive range of services tailored to their specific communities, including partnerships with other area hospitals, physicians, and health plans.

### 1. Expansion of HospitalCo

Beginning in 2010, Prospect expanded beyond its California base by acquiring hospitals in Texas, Rhode Island, New Jersey, Connecticut, and Pennsylvania and has since invested roughly $420 million in mandatory capital projects in Rhode Island, Connecticut, and Pennsylvania, with additional substantial expenditures in California, Texas, and New Jersey. Key transactions include the purchase of Nix Health Care System in Texas (2012); a joint-venture acquisition of CharterCARE's two Rhode Island hospitals (2014); the purchase of East Orange General Hospital in New Jersey (2016); the acquisition of Crozer-Keystone Health System ("Crozer Health"), a four-hospital system in Springfield, Pennsylvania and the largest employer and healthcare provider in Delaware County (2016); and the purchase of the Eastern Connecticut Health Network ("EHCN") comprising three Connecticut hospitals—Manchester Memorial, Rockville General, and Waterbury Hospital—also in 2016.

### 2. Formation of PhysicianCo

In January of 2023, the Company commenced discussions with key creditors, MPT and the lenders under their ABL credit facility, which matured in late February 2023. As a result of these negotiations, the ABL lenders agreed to forbear from exercising remedies and MPT agreed to make a $50 million capital injection, all predicated on (i) a corporation reorganization separating PCo from the remainder of the Company, or HCo, (ii) the exchange by MPT of certain lease and loan obligations for equity in PCo and (iii) the refinancing the ABL credit facility with new financing provided to PCo. This comprehensive liability management transaction (the "2023 Transaction") took place in two steps.

First, on March 30, 2023, certain Prospect subsidiaries that formed part of the Company's managed care business were transferred to a newly-formed subsidiary of PHPH, in exchange for junior preferred equity in PHPH.[10] Additionally, Alta Newport Hospital, LLC, dba Foothill Regional Medical Center ("FRMC"), transferred its real estate to a newly-formed property holding company, FRMC Hospital Property, LLC ("PropCo"), with PropCo assuming the existing mortgage loan owed to MPT (the "FRMC Mortgage Loan") and leasing the property to FRMC, which retained the hospital operations (in such capacity, "OpCo").[11] MPT then advanced $50 million of new money to PHPH in exchange for a note convertible into senior preferred equity of PHPH (the "Initial MPT Convertible Note").

Second, on May 23, 2023, MPT exchanged (a) the Initial Convertible Note, (b) the FRMC Mortgage Loan in a principal amount approximately $160.4 million, (c) a loan to PMH in a principal amount of approximately $113 million, (d) unpaid property insurance, rent deferrals in

---

[10]  These units were redeemed with funds received from the Prepetition Term Loan Lenders on May 23, 2023.

[11]  The separation of OpCo and PropCo took place in anticipation of MPT's acquisition of equity in PHPH, as regulatory approval was required for MPT's indirect ownership of OpCo. Upon regulatory approval, which was then expected to be received in June 2023, OpCo would merge into PropCo and the intercompany lease would be terminated, with FRMC fully part of PhysicianCo.

respect of the Company's leased properties in California and Connecticut and interest thereon, together with accrued and unpaid interest on the notes described in the foregoing clauses (b) and (c), in an amount equal to approximately $194.5 million, and (e) approximately $203 million deficiencies in respect of unpaid Connecticut and Pennsylvania rent (collectively, the "Legacy Obligations"), for (i) a note convertible into senior preferred equity of PHPH in an initial principal amount of approximately $646 million (the "Prepetition MPT Convertible Note"), secured, on a junior basis to the PhysicianCo Term Loan (as defined below), by equity in PHPH's direct subsidiaries, and (ii) senior preferred equity of PHPH, comprising 49% of the equity of PHPH, with a value of approximately $75 million.[12]

Concurrently with Prospect's transaction with MPT, the Prepetition Term Loan Lenders made a $375 million loan to certain PhysicianCo entities, allowing Prospect to satisfy its then-existing ABL obligation in the amount of approximately $200 million.[13]

HospitalCo remained 100% owned by PMH and PhysicianCo was owned 51% by PMH and 49% by MPT, with MPT holding the overwhelming majority of the equity value, taking into account the Prepetition MPT Convertible Note.

### B.     Business Operations

As noted above, following the 2023 Transaction, the Company was generally divided into two divisions for operational purposes: HospitalCo and PhysicianCo.

#### 1.     HospitalCo

Consisting of PMH and its hospital subsidiaries, this segment historically encompassed the ownership and operation of 16 acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services. Each of the HCo Debtors' hospitals provided a comprehensive range of medical services expressly tailored to the populations of their particular communities, including partnerships with other local hospitals, physicians, and health plans.

#### 2.     PhysicianCo

Consisting of PHPH and its physician-related subsidiaries and affiliates, this segment historically encompassed the Company's affiliated medical groups, including the medical groups that Prospect managed, and the Company's independent physician association ("IPA"). The medical groups comprised a network of independent physicians that contracted with HMOs, which is a well-established model designed to motivate physicians to practice preventative medicine and reduce unnecessary procedures. The IPA segment involved the management of physician services for HMO enrollees through a network of affiliated physicians. One of the former PhysicianCo

---

[12]   As part of the 2023 Transactions, MPT also (i) transferred the Pennsylvania real estate then leased to the Company for a purchase price consisting of a new $150 million mortgage loan and $100 million of obligations included in the obligations described in clause (e) above, and (ii) provided commitments to fund up to $75 million of new term loans to HospitalCo to support ongoing liquidity needs.

[13]   The remainder of the funds were utilized to fulfill certain regulatory capital requirements for PhysicianCo, payment of fees and expenses associated with consummation of the transaction, and to allow PMH to catch up on certain outstanding accounts payables amounts.

entities, Prospect Health Plan, Inc., also held a limited Knox-Keene licensed health plan in California, which allowed it to offer comprehensive health insurance plans to its members. Through the IPAs, both employed and independent physicians joined with the Debtors' health systems to contract with payers and participated in capitation, bundled payments, and other value-based payment methodologies to improve their practice environment, performance, and financial results.

Following the close of the Astrana Sale, the remaining PCo Debtors have ceased all operations and have no employees.

### C.     The Debtors' Prepetition Corporate Structure

Each of the PCo Debtors is an indirect, majority-owned subsidiary of the HCo Debtors. PMH, the parent holding company of HospitalCo, is the 51% majority owner of PHPH, the parent holding company of PhysicianCo.   PHPH is managed by Prospect Healthcare Facilities Management, LLC ("PHFM"), a wholly-owned subsidiary of PMH.  PHFM is not a Debtor in these Chapter 11 Cases.

A copy of the Company's post-Astrana sale organizational chart is attached hereto as **Exhibit C**.

### D.     Corporate Governance[14]

#### 1.     Prospect Medical Holdings, Inc.

The PMH Board of Directors consists of the following six directors:

| |
|---|
| Samuel Lee |
| Von Crockett |
| David Topper |
| Mitchell Lew |
| Alan Carr* |
| Jeremy Rosenthal* |

In connection with the Company's evaluation of strategic alternatives, on October 4, 2024, PMH created a special committee and appointed Alan Carr and Elizabeth Abrams as independent directors.  The special committee was formed with the power to, among other things, evaluate and enter into (a) strategic alternatives and (b) settlement terms and conditions arising out of any potential claims or causes of action.   On October 21, 2024, in anticipation of executing a forbearance agreement with MPT, the special committee was disbanded.  Upon disbandment of the special committee, Elizabeth Abrams was removed as an independent director and replaced with Jeremy Rosenthal (Mr. Rosenthal and Mr. Carr, in their respective capacities as independent directors of PMH, the "Independent Directors").

---

[14]    In this section, a name marked with an asterisk denotes an independent or outside director or manager, as applicable.

On January 20, 2025, in connection with their restructuring efforts, PMH formed a special transaction committee (the "Transaction Committee"), composed of Independent Directors Jeremy Rosenthal and Alan Carr, as well as Von Crockett as voting members, and Paul Rundell and Frank Saidara as advisory members. The Transaction Committee is vested with, among other things, the exclusive authority to review, negotiate, evaluate, propose, approve, and enter into settlement terms and conditions in response to, arising from, in connection with, or related to any potential claims or causes of action of PMH, and direct the prosecution, litigation, and settlement of such claims and any related issues.

2.     Prospect Healthcare Facilities Management, LLC

The PHFM Board of Directors consists of the following six managers:

| Samuel Lee |
|---|
| Von Crockett |
| Mitchell Lew |
| Alan Carr* |
| Elizabeth Abrams* |
| Sherman Edmiston* |

On October 4, 2024, PHFM (1) appointed Alan Carr and Elizabeth Abrams as independent managers, and (2) established a special committee (the "PhysicianCo Special Committee") to, among other things, evaluate and enter into strategic alternatives.

On April 7, 2025, pursuant to a Joint Written Consent of PMH and Board of Managers of PHFM, (1) the number of seats on the Board of Managers of PHFM was increased from five to six and Sherman Edmiston was appointed as an additional independent manager, and (2) amended and restated the Original Charter of the PhysicianCo Special Committee (the "Amended and Restated Charter") to establish an Independent Committee of the Board of Managers (the "Independent Committee") with authority over, *inter alia*, matters related to the Astrana Sale and intercompany transactions or other matters presenting conflicts between PhysicianCo and HospitalCo.

Upon the closing of the Astrana Sale, the Board of Managers of PHFM disbanded the PhysicianCo Special Committee and the Independent Committee.

E.     **The Debtors' Prepetition Capital Structure**

As of the HCo Petition Date, the HCo Debtors had approximately $1.1 billion in obligations outstanding, consisting of approximately (a) $760 million in lease obligations under the Prepetition HospitalCo MPT Master Leases; (b) $167 million in aggregate principal amount outstanding under the Prepetition HospitalCo MPT Mortgage Loan; (c) $75 million in aggregate principal amount outstanding under the Prepetition HospitalCo Term Loan Facility; and (d) $84 million in aggregate principal amount outstanding under the Prepetition HospitalCo Revolving Credit Facility.

As of the PCo Petition Date, the PCo Debtors had a total principal amount outstanding of approximately $772.4 million on account of secured debt obligations. This consists of approximately (a) $15 million in aggregate principal amount outstanding under the Prepetition Subordinated Secured Note (which relates to amounts voluntarily subordinated by the Prepetition Term Loan Lenders to facilitate the Astrana Sale) and (b) $757.4 million in aggregate principal amount outstanding under the Prepetition MPT Convertible Note.

| Debt Facility[15] | Principal Amount Outstanding[16] | Counterparty |
|---|---|---|
| Prepetition HospitalCo MPT Master Leases[17] * | $760 million | MPT |
| Prepetition HospitalCo MPT Mortgage Loan* | $167 million | MPT |
| Prepetition HospitalCo Term Loan Facility* | $75 million | MPT |
| Prepetition HospitalCo Revolving Credit Facility* | $84 million | eCapital (as defined below) |
| Prepetition Subordinated Secured Note | $15 million | Centerbridge and Blue Torch |
| Prepetition MPT Convertible Notes | $757.4 million | MPT |
| **Total** | **$1.858 billion** | |

    1.    <u>HospitalCo Obligations</u>

    a.    *The MPT Master Leases*

In 2019, certain of the Debtors (such Debtors, the "<u>Debtor Lessees</u>") and affiliates of MPT entered into a series of transactions whereby the Debtors sold and leased-back certain of their hospital facilities to affiliates of MPT pursuant to two master leases: (1) that certain *Master Lease Agreement (Master Lease I)*, dated as of August 23, 2019 (as amended, restated, or modified from time to time, "<u>Master Lease I</u>") that relates to certain of the Debtors' hospital operations in Pennsylvania and Connecticut; and (2) that certain *Master Lease Agreement (Master Lease II)*, dated as of August 23, 2019 (as amended, restated, or modified from time to time, "<u>Master Lease II</u>" and, together with Master Lease I, the "<u>MPT Master Leases</u>") that relates to certain of the Debtors' hospital operations in California, Pennsylvania, and Connecticut.

To secure all obligations arising under the MPT Master Leases and related documents, on May 23, 2023, the Debtor Lessees executed an Amended and Restated Guaranty under which they

---

[15]    Debtor entities are obligors under facilities marked with an asterisk (*), and Debtor entities are guarantors, but not obligors under facilities marked with two asterisks (**). Unmarked facilities do not implicate Debtor entities.

[16]    As of December 31, 2024.

[17]    The Debtors do not consent to the Prepetition HospitalCo MPT Master Leases being deemed true leases, nor do the Debtors waive any rights with respect to recharacterization of the Prepetition HospitalCo MPT Master Leases.

jointly and severally guaranteed full payment and performance. That same day, they granted MPT (i) a first-priority security interest in personal property collateral pursuant to an Amended and Restated Security Agreement; and (ii) a first-priority pledge of equity interests pursuant to an Amended and Restated Pledge Agreement. The security interests were perfected by UCC-1 financing statements.

MPT's collateral package also included: (a) a Mortgage, Security Agreement and Fixture Filing recorded on May 23, 2023 in Delaware County, Pennsylvania; (b) Assignments of Rents and Leases, Special Warranty Deeds, and Grant Deeds recorded on August 23, 2019 in the relevant Connecticut and Los Angeles County, California records; (c) Special Warranty Deeds recorded on August 23, 2019 in the relevant Connecticut counties; and (d) additional Grant Deeds recorded in Los Angeles County on August 23, 2019, October 13, 2020 and April 29, 2022. These instruments collectively gave MPT a first-priority lien on the real and personal property, rents, and equity interests that secured the Debtors' obligations under the MPT Master Leases.

b. *The MPT Mortgage Loan*

On May 23, 2023, Prospect DCMH, LLC, and Prospect CCMC, LLC, as borrowers, and certain MPT affiliates, as lenders, entered into that certain Real Estate Loan Agreement (as amended and restated, supplemented, or otherwise modified from time to time, the "MPT Mortgage Loan"), pursuant to which approximately $167 million of term loans remained outstanding as of the Petition Date. The MPT Mortgage Loan is secured by the PA Properties and the other assets of the Mortgage Borrower Debtor and is also cross-guaranteed and cross-collateralized with the MPT Master Leases.

c. *The MPT Term Loan Facility*

On May 23, 2023, certain of the Debtors (the "Term Loan Debtors") entered into that certain Loan Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "MPT Loan Agreement"), among PMH, as borrower, and the other Term Loan Debtors as guarantors, and MPT as sole lender and as administrative agent and collateral agent, which provided for (i) a $25 million term loan facility and (ii) a $50 million delayed draw term loan facility, which has been fully drawn (collectively, the "MPT Term Loan"). The MPT Term Loan is secured by liens on substantially all of the assets of the Term Loan Debtors, including substantially all of their personal property.

d. *HospitalCo Revolving Credit Facility*

On June 5, 2024, certain Debtors entered into that certain Credit and Security Agreement (as amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment to Credit and Security Agreement, dated as of August 16, 2024, the "Revolving Credit Agreement"), by and among Southern California Healthcare System, Inc., Alta Los Angeles Hospitals, Inc., and Alta Hospitals System, LLC, as the borrowers, and eCapital Healthcare Corp. ("eCapital"), as lender, which provided for a $90 million revolving credit facility (the "HospitalCo Revolving Credit Facility"). The HospitalCo Revolving Credit Facility is secured by liens on substantially all of the assets and equity of the California hospitals, subject to an intercreditor agreement.

2. PhysicianCo Obligations

a. *Subordinated Secured Note*

On May 23, 2023, certain PCo Debtors and HCo Debtors entered into a Financing Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1, dated as of October 24, 2023, that certain Amendment No. 2, dated as of November 14, 2023, that certain Amendment No. 3, dated as of February 27, 2024, that certain Amendment No. 4, dated as of April 30, 2024, that certain Amendment No. 5, dated as of June 5, 2024, and that certain Amendment No. 6, dated as of April 7, 2025, the "PhysicianCo Term Loan"), by and among PHPH, as holdings, PIH, and Prospect Physician Holdings, Inc., as borrowers ("Borrowers"), the other guarantors party thereto (the "Guarantors"), the Prepetition Term Loan Lenders, and Wilmington Trust, National Association, as administrative agent and collateral agent (the "Agent" and together with the Borrowers, the Guarantors, and the Prepetition Term Loan Lenders, the "Prepetition Term Loan Parties"), which provided for a $375 million term loan facility that was subsequently increased by $50 million of additional term loans on November 14, 2023 and an additional $34 million of additional term loans on April 7, 2025 (the "PhysicianCo Term Loan Facility").

The PhysicianCo Term Loan Facility was secured by liens on substantially all assets of PHPH and its subsidiaries (other than Prospect Health Plan, Inc.), and by liens on assets of PMH and Alta Hospital System, LLC and its subsidiaries, including the equity of the California hospitals. The liens on the accounts receivable, inventory and related current assets of PMH, Alta Hospital System, LLC, and its subsidiaries were junior to the liens securing the Prepetition HospitalCo Term Loan Facility (as defined in the HCo First Day Declaration) in favor of MPT and, subsequently, to the liens securing the Prepetition HospitalCo Revolving Credit Facility (as defined in the HCo First Day Declaration) in favor of eCapital Healthcare Corp. The liens on the equity of the California hospitals were junior to liens securing the Prepetition HospitalCo Term Loan Facility, the Prepetition HospitalCo MPT Master Leases (as defined in the HCo First Day Declaration) and the Prepetition HospitalCo MPT Mortgage Loan (as defined in the HCo First Day Declaration), each in favor of MPT.

On July 1, 2025, the Prepetition Term Loan Parties executed a payoff letter (the "Payoff Letter") pursuant to which the Borrowers agreed to pay the total principal amount under the PhysicianCo Term Loan Facility, together with all accrued but unpaid interest thereon, and the total amount of all premiums, fees, costs, expenses, and other amounts and obligations owed under the PhysicianCo Term Loan Facility, less $14,996,396.01—totaling $519,566,136.88 (the "Payoff Amount"). The Borrowers paid the Payoff Amount on July 1, 2025.

In exchange for the remaining outstanding obligations under the PhysicianCo Term Loan Facility, certain of the PCo Debtors (and, by subsequent joinder thereto, the other PCo Debtors, as co-borrowers) issued to the Prepetition Term Loan Lenders a subordinated secured promissory note in an aggregate amount of $14,996,396.01 (the "Prepetition Subordinated Secured Note"). The principal amount accrues payment-in-kind interest at a rate of 15.00% per annum; the outstanding principal amount under the Prepetition Subordinated Secured Note, along with all accrued and unpaid interest thereon, is due and payable on July 1, 2027. The Prepetition Subordinated Secured Note is collateralized by up to $1,500,000 of cash (the "Account

Collateral"), which is held in the PCo Bank Account at City National Bank. Pursuant to the RSA (as defined below), the Prepetition Subordinated Secured Note is junior in right of payment to the Prepetition MPT Convertible Note.

b. *Prepetition MPT Convertible Notes*

As described above, on May 23, 2023, PHPH executed the Prepetition MPT Convertible Note in the original principal amount of approximately $646 million to MPT Picasso Investors TRS, LLC (the "Prepetition MPT Noteholder"). The interest on the Prepetition MPT Convertible Note capitalizes monthly. The Prepetition MPT Convertible Note is secured by a lien on the equity in the direct subsidiary of PHPH and, pursuant to an amendment thereto entered into as of July 1, 2025, the Account Collateral, which liens are senior to the liens under the Prepetition Subordinated Secured Note.

**F. Prepetition Litigation and Related Concerns**

1. Pennsylvania Litigation

On October 28, 2024, the Attorney General's office for the Commonwealth of Pennsylvania filed suit against PMH, Prospect Crozer, LLC, Leonard Green and Partners, and two PMH directors (collectively the "Pennsylvania Defendants") alleging the mismanagement and neglect of Crozer Health. The lawsuit alleges that PMH violated the terms of the purchase agreement under which PMH purchased Crozer Health, including by cutting services, closing certain facilities, and failing to fully fund pension accounts for Crozer Health retirees. In response to these issues, the Attorney General's office has filed a civil complaint to address the management concerns and require Prospect Medical to fund operating costs until its sale to a nonprofit charitable successor. The lawsuit also sought a preliminary injunction to maintain existing service lines and the appointment of a receiver to manage the Crozer Health System to prevent further closures and service cuts.

2. Connecticut Litigation

In October 2022, Yale New Haven Health Services Corporation ("Yale"), as buyer, and PMH and certain of its Connecticut affiliates (collectively, "CT Prospect"), as seller, entered into an Asset Purchase Agreement (the "CT APA") for three Connecticut-based hospitals—Waterbury Hospital, Manchester Memorial Hospital and Rockville General Hospital and their affiliated entities (the "CT Businesses").

In May 2024, Yale filed a lawsuit in the Connecticut Superior Court (the "Connecticut State Court") seeking to be released from its obligation to acquire the CT Businesses for the reasons stated in the Second Amended Complaint (defined below) (the "Connecticut Litigation").[18]

---

[18] *See Yale New Haven Health Services Corporation's Reservation of Rights to Debtors' Motion for Entry of an Order Approving Bidding Procedures for the California and Connecticut Assets* [Doc. No. 1143]; *see also* Second Am. Complaint at 7-14, *Yale New Haven Health Servs. Corp. v. Prospect Med. Holdings, Inc.*, No. HHD-CV24-6184328-S (Conn. Super. Ct. Oct. 22, 2024) ("Second Am. Complaint").

On June 6, 2024, CT Prospect filed an application for prejudgment remedy against Yale, seeking prejudgment attachment of Yale's property sufficient to secure the purchase price under the CT APA of $453 million.[19] The Connecticut State Court entered an order (the "PJR Order") approving a stipulation between CT Prospect and Yale pursuant to which Yale agreed to "maintain an aggregate balance in the Subject Account sufficient to fund the closing of the transaction if so ordered, provided that [CT] Prospect agrees that a trial on the merits will occur in December 2024."[20] On August 13, 2024, CT Prospect withdrew its application for prejudgment remedy against Yale.[21]

On December 6, 2024, CT Prospect filed its Third Amended Counterclaim in the Connecticut Litigation against Yale seeking entry of an order directing Yale to close the transaction contemplated by the CT APA, or in the alternative, money damages for Yale's alleged breach of the CT APA.[22]

On January 22, 2025, CT Prospect removed the Connecticut Litigation to the U.S. District Court for the District of Connecticut (the "Connecticut Federal Court") and then sought to transfer the Connecticut Litigation to this Bankruptcy Court.[23] Yale filed a motion for abstention and equitable remand requesting that the Connecticut Federal Court remand the Connecticut Litigation to the Connecticut State Court.[24] On July 22, 2025, the Connecticut Federal Court entered an order granting Yale's motion to remand the Connecticut Litigation to the Connecticut State Court and denying CT Prospect's motion to transfer.[25]

The Debtors allege they were relying on closing the CT APA to strengthen their financial position and that Yale's allegations were a pretext for Yale to justify a reduction in purchase price. The Debtors further allege that as a result of the unsuccessful sale, the Debtors continued to experience operational losses in Connecticut. The Debtors contend that the litigation with Yale became an additional strain on the Debtors' resources because significant time and expenses were required to respond to Yale's allegations. Yale disagrees with and disputes the Debtors'

---

[19] Application for Prejudgment Remedy, *Prospect Med. Holdings, Inc. v. Yale New Haven Health Servs. Corp.*, No. HHD-CV24-5083574-S (Conn. Super. Ct. June 6, 2024).

[20] Stipulation and [Proposed] Order; Order at 3, *Prospect Med. Holdings, Inc. v. Yale New Haven Health Servs. Corp.*, No. HHD-CV24-5083574-S (X07) (Conn. Super Ct., July 5, 2024; Aug. 13, 2024). Though trial did not occur in December 2024, CT Prospect and Yale have not sought any modification of the PJR Order and an aggregate balance sufficient to fund the closing of the transaction continues to be maintained in the Subject Account.

[21] Withdrawal, *Prospect Med. Holdings, Inc. v. Yale New Haven Health Servs. Corp.*, No. HHD-CV24-5083574-S (Conn. Super. Ct. Aug. 13, 2024).

[22] Third Am. Counterclaim at ¶¶ 113-142, Prayer for Relief ¶¶ 1-6, *Yale New Haven Health Servs. Corp. v. Prospect Med. Holdings, Inc.*, No. HHD-CV24-6184328-S (Conn. Super Ct., Dec. 6, 2024).

[23] The removed case is styled *Yale New Haven Health Services Corporation v. Prospect Medical Holdings, Inc., et al.*, Case No. 3:25-cv-00105-MPS (D. Conn.).

[24] Pl.'s Motion for Abstention and Equitable Remand, Dkt. No. 11, *Yale New Haven Health Services Corporation v. Prospect Medical Holdings, Inc., et al.*, Case No. 3:25-cv-00105-MPS (D. Conn. Jan. 28, 2025).

[25] *Ruling on Plaintiff's Motion to Remand and Defendant's Motion to Transfer*, Case No. 3:25-cv-00105-MPS (D. Conn. July 22, 2025).

characterization of and all of the Debtors' allegations regarding the Connecticut Litigation, and Yale contends the Debtors are not entitled to any damages from Yale.

### 3. Other Significant Litigation

As of the Petition Date, litigation claims were pending against various Company entities that are incorporated in the following states: California, Connecticut, Delaware, New Jersey, Pennsylvania, Rhode Island, and Texas. These claims largely fall into three categories:

- Business litigation (*e.g.*, breach of contract, unpaid invoices, unlawful retaliation, unfair business practices, defamation, misappropriation of trade secrets, lease evictions, breach of fiduciary duties, and property tax disputes);

- Employment litigation (*e.g.*, discrimination, failure to pay wages, and wrongful termination); and

- Other litigation (*e.g.*, negligence, medical malpractice, personal injury, wrongful death, and failure to properly treat or diagnose).

### 4. Civil Investigative Demands

#### a. *Department of Justice*

Two Civil Investigative Demands ("CIDs") have been served on Prospect entities by the Department of Justice ("DOJ"). On October 30, 2023 the DOJ issued a CID to PMH pursuant to the False Claims Act. The CID alleged that PMH upcoded certain secondary diagnoses on claims for inpatient health that were submitted to federal healthcare programs. The CID required PMH to respond within 20 days with various documentation regarding various patients and the secondary diagnoses. An additional CID was issued to Prospect Medical Systems, LLC (PMS), a non-Debtor subsidiary of Prospect Intermediate Holdings, LLC, on May 17, 2024. This CID was also issued under the False Claims Act, alleging that PMS submitted false diagnosis codes with the goal of increasing risk-adjusted payments under the Medicare Advantage and Med-Cal Managed Care programs. PMS was required to send various documentation regarding their contracts with Medicare and Med-Cal and their processes for determining diagnostic claims.

#### b. *Connecticut*

The Connecticut Department of Consumer Protection ("DCP") has issued two CIDs to Prospect entities. On January 11, 2024, the DCP issued a CID pursuant to the Connecticut Unfair Trade Practices Act ("CUTPA") in connection to an investigation related to a security breach of PMS's electronic files and a related allegation that PMS failed to properly safeguard patient information. The CID required Prospect entities operating in Connecticut to send in documentation related to the August 2023 cybersecurity incident by February 7, 2024. A second CID was issued to PMS on April 19, 2024 in connection to an investigation into hospital funding practices that may qualify as unfair or deceptive acts under CUTPA. The Prospect Connecticut entities were required to respond with documentation relating to the finances and funding of their entities by May 19, 2024.

5. <u>Employee Compensation Concerns</u>

a. *401(k) Match*

On the Petition Date Debtors maintained a defined contribution plan for the benefit of all employees that met the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "401(k) Savings Plan"). The 401(k) Savings Plan was primarily funded with withholdings from employee wages, though the Company also matched a percentage of an employee's contribution to the 401(k) Savings Plan. However, due to the Company's liquidity shortfalls, said match has been drastically underfunded in recent years, and as of the Petition Date the Debtors estimated they owed nearly $48 million with respect to the 401(k) Savings Plan.

b. *Employee Leave*

The Debtors' employees are eligible for certain paid time off and related benefits. As of the Petition Date, the Debtors estimated approximately $51,400,000 had accrued on the Debtors' books and records with respect to the aforementioned benefits.

c. *Unions*

As of the HCo Petition Date the Debtors employed approximately 5,500 Union employees (the "Union Employees"), who had certain union-specific contributions, such as union dues and other payments, withheld from their wages (the "Union Dues"). These amounts were deducted from the Union Employees' pay and remitted by the Debtors to the appropriate unions.

6. <u>U.S. Senate Investigation and Report</u>

On January 7, 2025, Senators Chuck Grassley and Sheldon Whitehouse of the Bipartisan Senate Budget Committee released a report (the "Senate Report") on their investigation on the impact of private equity firms investing in healthcare companies. Leonard Green & Partners, L.P. ("LGP") and its 11-year majority ownership of Prospect was a primary focus of the investigation and subsequent report. The Senate Report alleges a pattern of mismanagement that prioritized shareholder investments over patient and provider well-being. The Senate Report alleges that while the conditions and quality of care in Prospect's hospitals deteriorated, and the health system took on unsustainable debts and untenable lease agreements, LGP executives took home hundreds of millions in dividends and preferred stock redemptions. Employees of the hospitals were rewarded for reaching certain milestones related to the profits of the hospitals, but no similar incentives were in place for care quality or patient health. The Senate Report ultimately concluded that LGP's management decisions jeopardized patient health and eroded the already precarious financial conditions at many Prospect hospitals.

**G. Events Leading to the Chapter 11 Filings**

The continuing cash drain on Prospect and numerous operational issues, along with an inability to raise additional capital, required Prospect to begin exploring strategic alternatives to address its go-forward liquidity position. Prior to each of the Petition Dates (as defined below), the HCo Debtors and the PCo Debtors, respectively, engaged advisors to assist in these efforts, including Sidley Austin LLP ("Sidley"), as restructuring counsel, Alvarez & Marsal North

America, LLC ("A&M"), as financial advisor, and Houlihan Lokey, Inc. ("Houlihan" and, together with Sidley and A&M, the "Advisors"), as investment banker.

After exploring various potential pathways, each of the HCo Debtors and the PCo Debtors, respectively, determined to file these Chapter 11 Cases, all in an effort to maximize the value of their assets and operations for the benefit of their creditors and all parties in interest.

      1.    Operational Headwinds and Liquidity Challenges

      a.    *COVID-19*

The COVID-19 pandemic had lasting impacts on Prospect's businesses and operations. The pandemic simultaneously drove up labor, drug, PPE, and other supply costs while reducing revenue by postponing elective procedures and suppressing inpatient and outpatient volumes. Longer patient stays, heavy reliance on specialized equipment, and a payer mix dominated by Medicare, Medicaid, and uninsured patients intensified financial pressure. Despite receiving some relief from the federal Coronavirus Aid, Relief, and Economic Security (CARES Act), the funds offset only a fraction of these losses.

      b.    *Inflation*

Inflation compounded these challenges: contract-nurse rates rose more than 200 percent, drug expenses increased 30.5 percent, and medical-supply costs climbed 33.7 percent per adjusted patient through March 2024. Medicare and Medicaid rate increases lagged well behind inflation, and the Debtors lacked leverage to secure meaningful private-payer adjustments, leaving reimbursement growth far below expense escalation.

      c.    *Pension Plans*

Prior to the HCo Petition Date, the Company assumed three single employer pension plans from distressed hospitals in connection with its strategic hospital acquisitions: (1) the Eastern Connecticut Health Network, Inc. Employees Retirement Plan (the "ECHN Plan"); (2) the Waterbury Hospital Cash Balance Retirement Plan ( the "Waterbury Plan"); and (3) the Crozer-Keystone Health System Employees Retirement Plan (the "Crozer Plan" and together with the ECHN Plan and Waterbury Plan, the "Pension Plans").

Due to Prospect's severe liquidity constraints, as of the HCo Petition Date, all three Pension Plans were underfunded, with an estimated underfunding liability of approximately $312 million as of November 30, 2024, in the aggregate. Failure to make 2023 required contributions triggered about $24 million in statutory liens that the Pension Benefit Guaranty Corporation ("PBGC") perfected on September 17, 2024 against 61 Prospect entities. As of the filing of this Disclosure Statement, the Debtors have terminated their Pension Plans, which is discussed in further detail below.

      d.    *CARES Act*

As of September 30, 2024, the Company had approximately $32.3 million of outstanding liabilities arising under the CARES Act. After taking into consideration additional accrued late

payment penalties and interest fees, such liabilities are currently estimated at over $33 million enterprise-wide.

e.     *Cybersecurity Attack*

In August 2023, the Company suffered a sophisticated cybersecurity attack that compromised its IT systems and sensitive data (such attack, the "Cybersecurity Attack"). The Cybersecurity Attack resulted in the disruption of operations, data loss, and reputational damage. The Company incurred significant costs in responding to the attack and implementing additional security measures. The Cybersecurity Attack also caused a reduction in patient volume and resulted in lost and delayed collections for services and receivables.

As noted above, on January 11, 2024, the DCP issued a CID pursuant to the CUPTA on account of the Cybersecurity Attack, alleging that the Debtors' management services organization—Prospect Medical Systems, LLC ("PMS")—failed to properly safeguard patient information. Several lawsuits have also been filed against certain of the PCo Debtors on account of the Cybersecurity Attack, including two separate class actions. While the Company had insurance coverage in place at the time of the Cybersecurity Attack, it proved to be insufficient to fully cover the losses incurred and the potential costs of pending litigation.

2.     HospitalCo Operational Strategies

Recognizing the need for operational turnarounds, Prospect retained Alvarez & Marsal Healthcare Industry Group, LLC to implement drastic reforms, in particular at their East Coast hospitals. As a result, Prospect ultimately implemented several mitigation strategies, including cost-cutting measures and service line optimization, across its hospitals in California, Rhode Island, Pennsylvania, and Connecticut. In California, Prospect devised effective operational plans and efficiencies that revitalized the California hospitals' financial health, even in the face of rising labor and other costs. Despite Prospect's concerted efforts and success in California, the Company was unable to achieve overall financial stability, as hospitals outside of California continued to incur unsustainable losses due to the lingering effects of the COVID-19 pandemic and inflation, reimbursement limitations, and shifting patient demographics.

3.     Strategic Divestitures

a.     *Hospital Sales*

As a result of mounting losses in Texas, Prospect shut down its hospitals in San Antonio, Texas, in 2019. Prospect later divested its Texas real estate in 2020. In October 2021, Prospect OldCo NJ, Inc. (f/k/a Prospect EOGH, Inc.) sold the East Orange General Hospital in East Orange, New Jersey, to EOH Acquisition Group, LLC.

Prospect continued to embark on a strategic divestiture of subsidiaries, including the going-concern sale of its hospitals in New Jersey, Texas, Pennsylvania, Connecticut, and Rhode Island.

Further details regarding the Debtors' business and operations may be found in the *Declaration of Paul Rundell in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "First Day Declaration").

b.    *The Astrana Sale*

The 2023 Transaction proved insufficient to effectuate a turnaround of Prospect's businesses.  Facing mounting operational losses, litigation expenses, and near-term pension plan contribution payments, among other liabilities, Prospect needed to secure an infusion of liquidity to continue operating as a going concern.  Therefore, the Company embarked on the marketing and sale of PhysicianCo in late 2023.  The Company initially received strong consideration and interest from a number of potential acquirers, and executed 36 non-disclosure agreements with various parties.  After further engagement with the interested purchasers, the Company ultimately received qualified bids from Astrana Health, Inc. ("Astrana") and one other party.

After months of negotiations and a thorough diligence process, PCo Debtors PHPH and PIH, and PHS Holdings, LLC ("PHS," and together with PHPH and PIH, the "Prospect Equity Sellers"), certain of their PCo and HCo Debtor affiliates listed on Schedule C.1 to the AEPA (the "Prospect Asset Sellers," and together with the Prospect Equity Sellers, the "Sellers"), and PMH, and Astrana and certain of its affiliates (collectively with Astrana, the "Buyer" and, together with the Sellers, the "Parties"), entered into an *Asset and Equity Purchase Agreement*, dated as of November 8, 2024 (as may be amended, supplemented, or modified from time to time, the "AEPA," and the transaction contemplated thereby, the "Astrana Sale"), for the sale of all or substantially all of the assets (including certain equity interests) of the PCo Debtors and certain former PCo affiliates, along with a small portion of the assets in certain former HCo Debtors.  Pursuant to the AEPA, the Buyers agreed to pay an aggregate purchase price of $745 million, minus certain purchase price adjustments.

On July 1, 2025 (the "Closing Date"), the Astrana Sale closed.  Pursuant to the AEPA, (a) the equity interests in each of the former PhysicianCo affiliates Prospect Health Plan, Inc., a Knox-Keene licensed entity, and FRMC, were transferred to Astrana, along with PhysicianCo joint venture Gateway Medicor-Rancho Cucamonga, Inc. (of which PhysicianCo formerly owned 51%), and (b) all assets, properties, rights, titles and interests of the Prospect Asset Sellers (including HCo Debtor Prospect Provider Group RI, LLC (as discussed further below)) were sold to Astrana.  After calculating all pre-Closing adjustments required under the AEPA and the Side Letter, the adjusted purchase price was approximately $698.5 million.  Additional information regarding the Astrana Sale and the distribution of the proceeds therefrom can be found in the *Declaration of Daniel Martin in Support of the Astrana Sale Waterfall* [Docket No. 2454] (the "Astrana Waterfall Declaration").

Pursuant to the AEPA, the PCo Debtors retained certain "Excluded Liabilities" following the Closing Date, including, *inter alia*, (i) pre-Closing litigation arising from the 2023 cyber-security attack and other professional- and general-liability lawsuits, and (ii) potential WARN Act, severance, wage, and benefits exposure for former employees.

4.    Engagement with Key Stakeholders

Recognizing the necessity of an in-court process for the PCo Debtors, the Debtors engaged with certain key stakeholders, including the PBGC, the Prepetition Term Loan Lenders, and the Prepetition MPT Noteholder.

### a. *Waiver Agreement with PBGC*

As contemplated under the AEPA and the 9019 Order (as defined below), as a condition to the closing of the Astrana Sale, the Debtors were required to provide Astrana with a written release and waiver, in a form satisfactory to PBGC, by and among PBGC, the applicable Company entities, and MPT, pursuant to which PBGC would waive any and all claims it otherwise could assert against Astrana, including any Prospect Acquired Entity, on account of the Pension Plans.

Accordingly, on June 30, 2025, PMH, PHFM, and PHPH entered into that certain Agreement of Waiver and Release (the "PBGC Waiver Agreement") with PBGC and MPT. The PBGC Waiver Agreement provides, among other things, that PBGC would (i) provide the release of Astrana required to close the Astrana Sale, and (ii) release its claims against the PhysicianCo entities upon the earlier of (a) the effective date of a confirmed chapter 11 plan for the PCo Debtors or such other final order of the Bankruptcy Court providing a release by the PCo Debtors' estates of all claims or Causes of Action against PBGC, or (b) two (2) years after PBGC's receipt of $24,746,636.00 from Astrana (the "Modified PBGC Payment") following the close of the Astrana Sale (such date, the "PhysicianCo Release Effective Date"). The PBGC Waiver Agreement further provides that, if the effective date of any chapter 11 plan for the HCo Debtors occurs before the PhysicianCo Release Effective Date, such HCo Debtors' plan shall reserve $10 million (the "PBGC Reserve Account") on account of the PBGC Secured Claim until the earlier of the PhysicianCo Release Effective Date and two (2) years following the commencement of the chapter 11 cases of the PCo Debtors with no timely challenge to PBGC's receipt of the Modified PBGC Payment having been raised by that time. At the closing of the Astrana Sale, PBGC delivered its release of claims against Astrana, thereby allowing the Astrana Sale to close, and PBGC received the Modified PBGC Payment.

### b. *Restructuring Support Agreement*

The Company, in consultation with its Advisors, worked with the Prepetition Term Loan Lenders and MPT in its capacity as Prepetition MPT Noteholder and Holder of Series A-1 Preferred Units (collectively, the "Consenting Stakeholders"), to negotiate and document a restructuring support agreement (the "RSA") and obtain certain commitments prior to the filing of the PCo Debtors' Chapter 11 Cases. On June 30, 2025, after good faith, arm's-length negotiations, the Debtors reached an agreement with the Consenting Stakeholders on the terms of the RSA attached hereto as **Exhibit D**.

The RSA contemplates the joint administration of the Chapter 11 Cases to achieve the swiftest and most value-maximizing exit for all the Debtors' stakeholders. The RSA further provides that following the joint administration of the Chapter 11 Cases, the PCo Debtors will file and seek confirmation of a Plan that contemplates, among other things, the wind-down of each of the PCo Debtors' estates. In exchange for their support of the Plan, the release of the PCo Debtors, and the ability of the PCo Debtors to use the Account Collateral for the payment of the Debtors' professional fees, the Prepetition MPT Noteholder and Prepetition Term Loan Lenders will receive releases under the Plan.

# ARTICLE IV.
## EVENTS DURING THE CHAPTER 11 CASES

### A.     First and Second Day Relief

####     1.     HCo Debtors' First Day Relief

Beginning on the January 11, 2025 (the "HCo Petition Date"), the HCo Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  On or soon after the HCo Petition Date, the Debtors filed a number of motions and other pleadings (collectively the "HCo First Day Motions") to ensure an orderly transition into chapter 11.  The HCo Debtors have received orders granting the relief requested in all of the First Day Motions on a final basis from the Bankruptcy Court.

The following chart displays the First Day Motions and their respective interim, if applicable, and final orders:

| Motion/Application Name | Motion Docket No. | Order Docket No(s). |
|---|---|---|
| *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion") | 2 | 93 |
| *Debtors' Emergency Motion for Entry of an Order (I) Authorizing The Debtors To File (A) a Consolidated Creditor Matrix and (B) a Consolidated List of the 30 Largest Unsecured Creditors; (II) Authorizing (A) the Debtors to Redact Certain Personally Identifiable Information, and (B) the Implementation of Procedures to Protect Confidential Patient Information; (III) Establishing a Complex Service List; (IV) Approving Form and Manner of Notice of Commencement; and (V) Granting Related Relief* (the "Creditor Matrix Motion") | 3 | 123 |
| *Debtors' Emergency Motion for Entry of an Order (i)(a) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies and (b) Establishing Procedures for Resolving Objections by Utility Companies; (ii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (iii) Granting Related Relief* (the "Utilities Motion") | 4 | 109 |
| *Debtors' Emergency Motion for Entry of an Order (i) Extending Time to File (a) Schedules and Statements of Financial Affairs and (b) 2015.3 Reports, and (ii) Granting Related Relief* (the "SOAL/SOFA Motion") | 5 | 110 |
| *Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent,* | 6 | 94 |

| | | |
|---|---|---|
| *Effective as of the Petition Date* (the "<u>Claims Agent Retention Application</u>") | | |
| *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain their Insurance Policies, Surety Bonds, and Letters of Credit, (B) Honor All Obligations Related Thereto, and (C) Amend, Renew, Supplement, Extend, or Replace Existing Coverage; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (the "<u>Insurance Motion</u>") | 7 | 96 |
| *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Taxes and Fees and (II) Granting Related Relief* (the "<u>Tax Motion</u>") | 9 | 97, 607 |
| *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Lien Claimants, and (II) Granting Related Relief* (the "<u>Critical Vendor Motion</u>") | 11 | 99, 603 |
| *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Satisfy Prepetition Employee Compensation and Benefit Obligations and (B) Continue their Employee Programs Policies and Procedures in the Ordinary Course, and (II) Granting Related Relief* (the "<u>Wages Motion</u>") | 12 | 98 |
| *Debtors' Emergency Motion for Entry of An Order (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintaining Existing Business Forms and Books and Records; and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>") | 21 | 103, 783 |

On February 9, 2025, the HCo Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Wages and Benefit Obligations and (II) Granting Related Relief* [Docket No. 496, 576] (the "<u>Supplemental Wages Motion</u>"), which sought authorization to pay prepetition amounts on account of (a) wages to certain employees and (b) certain employee benefit obligations. On February 13, 2025, the Bankruptcy Court entered an order [Docket No. 653] approving the Supplemental Wages Motion.

Pursuant to section 10(g) of the Original Cash Management Order [Docket No. 103], the HCo Debtors were authorized to amend provisions of the Original Cash Management Order with the consent of FRMC. Accordingly, on February 21, 2025, the HCo Debtors filed a *Notice of Amended Cash Management Order* [Docket No. 764], providing notice that the HCo Debtors, following extensive, good faith negotiations with the Committee, the DIP Lenders, and FRMC, were revising the Original Cash Management Order to modify the procedures governing the operation of the FRMC Deposit Account (as defined in the Cash Management Motion). On February 24, 2025, the Bankruptcy Court entered the Amended Cash Management Order [Docket No. 783].

2. <u>PCo Debtors' First Day Relief</u>

On July 7, 2025 (the "<u>PCo Petition Date</u>" and together with the HCo Petition Date, the "<u>Petition Dates</u>"), the PCo Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. On the PCo Petition Date, the Debtors filed the following motions to ensure the PCo Debtors' orderly transition into chapter 11 (collectively, the "<u>PCo First Day Motions</u>" and together with the HCo First Day Motions, the "<u>First Day Motions</u>"):

- "<u>PCo Joint Administration Motion</u>": *Debtors' Emergency Motion for Entry of an Order (I) Directing the Joint Administration of the PCo Debtors' Chapter 11 Cases with the HCo Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2438], seeking an order directing the joint administration of the PCo Debtors' chapter 11 cases, for procedural purposes only, with the current jointly administered cases of the HCo Debtors; and

- "<u>First Joinder Motion</u>": *Debtors' Emergency Motion for Entry of an Order (I) Applying Certain Orders in the HCo Debtors' Chapter 11 Cases to the PCo Debtors and (II) Granting Related Relief* [Docket No. 2445], seeking authorization to apply certain orders entered in the HCo Debtors' chapter 11 cases, as modified in the First Joinder Motion, to the PCo Debtors in their respective chapter 11 cases, effective as of the PCo Petition Date. Specifically, the Debtors requested that the Bankruptcy Court apply the following HCo Orders to the PCo Debtors and their respective chapter 11 cases:[26]

    - Claims Agent Retention Order;
    - Complex Chapter 11 Case Order;
    - Creditor Matrix and Noticing Order;
    - Cash Management Order;
    - Bar Date Order; and
    - Claims Resolution Procedures Order.

On July 9, 2025, the Bankruptcy Court entered orders approving the PCo Joint Administration Motion [Docket No. 2473] and the First Joinder Motion [Docket No. 2476].

In addition to the PCo First Day Motions, the Debtors also filed a second joinder motion [Docket No. 2446] (the "<u>Second Joinder Motion</u>"), seeking authorization to apply the Wage Orders entered in the HCo chapter 11 cases, as modified in the Second Joinder Motion, to the PCo Debtors in their respective chapter 11 cases.

On July 23, 2025, the Bankruptcy Court entered an order approving the Second Joinder Motion [Docket No. 2605].

---

[26] By the First Joinder Motion, the Debtors did ***not*** request that ***all*** orders entered in the HCo Debtors' chapter 11 cases apply in the PCo Debtors' chapter 11 cases. Rather, the Debtors only sought the relief necessary to administer the PCo Debtors' chapter 11 cases and complete an orderly wind down.

### B. DIP Facilities

1. **JMB DIP Facility**

On the HCo Petition Date, the HCo Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 48] (the "JMB DIP Motion"). By the JMB DIP Motion, the HCo Debtors sought authorization to enter into the JMB DIP Credit Agreement, which provided new money term loans in the aggregate principal amount of $100 million. The JMB DIP Credit Agreement contains certain terms, conditions, and milestones, each as set forth therein.

On February 14, 2025, the Bankruptcy Court entered the *Amended Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use Of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 698] (the "Final JMB DIP Order").

Pursuant to the Final JMB DIP Order, on July 8, 2025, the HCo Debtors filed a *Notice of Filing of DIP Upsize Order* [Docket No. 2439] (the "DIP Upsize Notice"), providing notice of the HCo Debtors' intent to amend the JMB DIP Credit Agreement to, *inter alia*, (i) provide for the incurrence of $30 million of additional DIP financing (the "DIP Upsize"), increasing the total aggregate principal amount available under the JMB DIP Facility (as defined in the Final JMB DIP Order) from $100 million to $130 million, and (ii) extend the deadline for the Bankruptcy Court to enter an order approving a stalking horse bid for the California Hospitals (as defined in the JMB DIP Credit Agreement) or the adequacy of a disclosure statement to August 15, 2025.

At a hearing on July 9, 2025, the Bankruptcy Court entered an order authorizing the HCo Debtors' entry into the DIP Upsize [Docket No. 2477] (the "DIP Upsize Order"). Shortly thereafter, on July 21, 2025, MPT filed a *Notice of Appeal* [Docket No. 2574] providing notice of MPT's appeal of the DIP Upsize Order.

2. **eCapital DIP**

On the HCo Petition Date, the HCo Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition ABL Financing and (B) The Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing,* and *(VI) Granting Related Relief* [Docket No. 57] (the "DIP ABL Motion"). By the DIP ABL Motion, the HCo Debtors sought authorization to enter into the eCapital DIP Credit Agreement, which provided access to necessary cash collateral and $90 million in asset-based revolving loans for the HCo Debtors. The DIP ABL Credit Agreement contains certain terms and conditions, each as set forth therein.

On February 14, 2025, the Bankruptcy Court entered the *Amended Final Order (I) Authorizing (A) Postpetition ABL Financing and (B) The Use of Cash Collateral; (II) Granting*

*Liens and Providing* Superpriority *Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 695] (the "Final DIP ABL Order").

### 3. The Junior DIP

On February 23, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of a Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 765] (the "Junior DIP Motion"). By the Junior DIP Motion, the HCo Debtors sought authorization to incur a junior non-amortizing priming, super-priority secured term loan facility (the "Junior DIP Facility"), which would provide, *inter alia*, (i) new money commitments for up to $13.5 million of delayed draw term loans available in a single draw; (ii) new money commitments for up to $11.5 million of Seismic Funding Advances (as defined in the Junior DIP Motion) available in a single draw; and (iii) the roll-up of Obligations under the HospitalCo Term Loan Facility.

On March 7, 2025, the HCo Debtors filed a substantially final form of the Junior DIP Agreement [Docket No. 912]. On March 19, 2025, the HCo Debtors filed a revised Junior DIP Credit Agreement [Docket No. 1237]. The Junior DIP Facility is being provided by MPT, and was subject to approval of the 9019 Order (as described below), among other terms and conditions.

On March 20, 2025, the Bankruptcy Court entered the *Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief* [Docket No. 1287] (the "9019 Order").

### 4. Supplemental MPT DIP Facility

On July 26, 2025, the HCo Debtors filed the *HCo Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. 2629] (the "Supplemental JMB DIP Motion"). By the Supplemental JMB DIP Motion, the HCo Debtors requested an additional $55 million in new money term loans, with $15 million available immediately upon entry of an interim order, and the remainder available upon entry of a final order. At the time this motion was filed, the Debtors represented that discussions remained ongoing with JMB and MPT regarding the terms of a supplemental DIP facility in order to provide for the best source of fining for the HCo Debtors.

On August 3, 2025, the HCo Debtors filed the *Supplement to the HCo Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; And (IV) Granting Related Relief* [Docket No. 2703] (the "Supplemental MPT DIP Motion"). Pursuant to the Supplemental MPT DIP Motion, the HCo Debtors announced that they had come to an agreement with MPT on more favorable financing terms and requested approval of an upsize of $55 million in aggregate term loan commitments to its existing Junior DIP Facility, as well as an additional

upsize to the Junior DIP Facility upon the occurrence of certain conditions, in the amount of $25 million in new money commitments—which shall be used solely to repay the outstanding principal amount of the JMB DIP Facility in full (the "Supplemental Junior DIP Facility").

On August 4, 2025 and August 20, 2025, respectively, the Bankruptcy Court entered interim and final orders [Docket Nos. 2739, 2887] approving the Supplemental Junior DIP Facility.

### 5. Backstop Facility

In connection with the Supplemental Junior DIP Facility, MPT agreed to, subject to certain terms and conditions, provide the HCo Debtors with a super-priority, senior secured postpetition single-draw credit facility in an aggregate principal amount of up to $30 million to pay Allowed Administrative Claims, Allowed Other Priority Claims, and Allowed Priority Tax Claims which remain unpaid as of the Effective Date, to the extent such claims are not (or will not) otherwise be paid from Net Proceeds distributed in accordance with the Recovery Waterfall and/or the Debtors' available cash (including in any Professional Fee Reserve Account or other similar reserve) (the "Backstop Facility").

## C. Retention Applications and Related Motions

### 1. HCo Debtors

The HCo Debtors have filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these Chapter 11 Cases, as set forth in the table below. In connection with such retentions, the HCo Debtors filed a motion [Docket No. 304] and received approval to establish procedures for the interim compensation and reimbursement of professionals (the "Interim Compensation Order") [Docket No. 608].

| Professional | Role | Motion Docket No. | Order Docket No. |
|---|---|---|---|
| Alvarez & Marsal North America, LLC ("A&M") | Financial Advisor | 306 | 613 |
| Houlihan Lokey, Inc. ("HL") | Restructuring Investment Banker | 307 | 727 |
| Sidley Austin LLP ("Sidley") | Restructuring Counsel | 308 | 623 |
| Katten Muchin Rosenman LLP ("Katten") | Conflicts Counsel | 309 | 611 |
| Duane Morris LLP ("Duane Morris") | Special Counsel – Crozer Health System | 311 | 610 |

| Sheppard Mullin Richter & Hampton LLP ("Sheppard") | Special Projects Counsel – Connecticut Litigation and Sale Transactions | 326 | 622 |
|---|---|---|---|
| Law Office of Vincent P. Slusher ("Slusher") | Additional Conflicts Counsel | 1440 | 1720 |
| BDO USA, P.C. ("BDO") | Tax Accountant and Consultant | 1442 | 1721 |
| Bartko Pavia LLP ("Bartko") | Special Litigation Counsel – Claims Litigation | 1537 | 1722 |
| Keen-Summit Capital Partners, LLC ("Keen-Summit") | Real Estate Broker – Pennsylvania Real Estate | 2144 | 2377 |
| Centurion Service Group, LLC ("Centurion") | Auction Consultant – Pennsylvania Personal Property | 2321 | 2537 |
| KPMG LLP ("KPMG") | Tax Consultant | 2385 | 2565 |

The HCo Debtors also filed a motion [Docket No. 305] and obtained authority to establish procedures for the retention and compensation of professionals utilized by the Debtors in the ordinary course of their businesses (the "OCP Order") [Docket No. 612].

### 2. PCo Debtors

On August 6, 2025, the PCo Debtors filed the *Notice of Applying Certain HCo Retention Orders to the PCo Debtors as of the PCo Petition Date* [Docket No. 2746] (the "PCo Retention Notice"), seeking to extend and apply the Interim Compensation Order, the OCP Order, and certain retention orders entered in the HCo Debtors' chapter 11 cases to the PCo Debtors. Specifically, the PCo Retention Notice sought to extend the retention of the following professionals: (i) A&M, (ii) HL, (iii) Sidley, (iv) Sheppard, (v) Slusher, (vi) BDO, and (vii) Bartko.

On August 22, 2025, the Bankruptcy Court entered an order approving the order extensions requested in the PCo Retention Notice [Docket No. 2917].

### D. Appointment of the Statutory Committee and Patient Care Ombudsman

### 1. The Committee

On January 29, 2025, the U.S. Trustee filed the *Appointment of the Official Unsecured Creditors' Committee* [Docket No. 295], notifying the Bankruptcy Court of its appointment of an official committee of unsecured creditors pursuant to section 1102(b) of the Bankruptcy Code.

On March 25, 2025, the Committee filed and received authority to retain Jefferies LLC as investment banker [Docket Nos. 767, 1346, and, as amended, 1469] and Province, LLC as financial advisor [Docket Nos. 768, 1345]. On May 14, 2025, the Committee filed and received authority to retain Brinkman Law Group, PC as efficiency counsel [Docket Nos. 1342, 1943].

### 2. The Patient Care Ombudsman

On January 23, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of an Order (I) Appointing a Patient Care Ombudsman and (II) Granting Related Relief* [Docket No. 243] (the "Ombudsman Motion"), seeking entry of an order directing the appointment of a patient care ombudsman under section 333 of the Bankruptcy Code. The Bankruptcy Court entered an order granting the relief sought in the Ombudsman Motion [Docket No. 245].

On January 30, 2025, the U.S. Trustee filed the *Notice of Appointment of Patient Care Ombudsman under 11 U.S.C. § 333* [Docket No. 325], appointing Suzanne Koenig of SAK Healthcare as the patient care ombudsman (the "Ombudsman"). The Ombudsman filed and received authority to retain Greenberg Traurig, LLP as counsel [Docket Nos. 804, 1468] and SAK Management Services, LLC as medical operations advisor [Docket Nos. 805, 1464].

On March 31, 2025, the Ombudsman filed the *Ombudsman Report for the Period of 01/30/2025 through 03/31/2025* [Docket No. 1417]. On May 30, 2025, the Ombudsman filed the *Ombudsman Report for the Period of 04/01/2025 through 05/30/2025* [Docket No. 2151].

### E. Meetings of Creditors and Filing of Schedules, Statements, and Financial Affairs

#### 1. HospitalCo

On March 13, 2025, the HCo Debtors filed their Schedules of Assets (the "Schedules") and Statements of Financial Affairs and Liabilities (the "Statements"), in compliance with section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure. The Schedules and Statements set forth, among other things, the HCo Debtors' assets and liabilities, current income and expenditures, and executory contracts and unexpired leases.

The U.S. Trustee conducted the initial meeting of the HCo Debtors' creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting") on February 20, 2025 at 1:30 p.m. (prevailing Central Time). The 341 Meeting was adjourned to March 20, 2025 at 1:30 p.m. (prevailing Central Time).

#### 2. PhysicianCo

On July 17, 2025, the PCo Debtors filed their Schedules and Statements in compliance with section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure. The Schedules and Statements set forth, among other things, the HCo Debtors' assets and liabilities, current income and expenditures, and executory contracts and unexpired leases.

The U.S. Trustee conducted the PCo Debtors' 341 Meeting on August 18, 2025 at 10:00 a.m. (prevailing Central Time).

### F. Other Procedural and Administrative Motions

The HCo Debtors filed various other motions to further facilitate the smooth and efficient administration of the chapter 11 cases and to reduce the administrative burdens associated therewith, including those set forth below.

#### 1. Assumption and Rejection of Certain Contracts

In connection with the Debtors' ongoing restructuring efforts, the HCo Debtors have filed certain motions setting forth the procedures to (i) assume or assign certain executory contracts and unexpired leases specifically in connection with certain sale processes [Docket Nos. 332, 708], and (ii) reject certain executory contracts and unexpired leases on non-residential real property and to abandon certain personal property (the "Rejection Procedures") [Docket No. 8]. The HCo Debtors subsequently filed revised forms of the Rejection Procedures at docket numbers 310 and 568.

On February 12, 2025, the Bankruptcy Court approved the Rejection Procedures [Docket No. 605]. Pursuant to the Rejection Procedures and as of the filing of this Disclosure Statement, the HCo Debtors have filed 21 notices of rejection of executory contracts and unexpired leases [Docket Nos. 709, 1233, 1735, 1740, 1815, 1903, 1947, 2093, 2150, 2185, 2261, 2329, 2387, 2504, 2505, 2690, 2691 2748, 2749, 2918, 2927].

The Debtors are continuing to evaluate substantially all of their executory contracts, which number in the thousands.

#### 2. PL/GL Claims, Claims Resolution Procedures, and Applicable Insurance

Prepetition, the Debtors, and their affiliates and employees, faced over 300 lawsuits alleging professional liability or general liability claims ("PL/GL Claims"), arising primarily out of the Debtors' hospital operations. Additional proofs of claim asserting PL/GL Claims have been filed against the Debtors. Many PL/GL Claimants have filed motions to lift the automatic stay to liquidate their PL/GL Claims in state court or other non-Bankruptcy Court, which the Debtors have opposed.

To facilitate a swift and efficient resolution of the PL/GL Claims, the HCo Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving and Authorizing Mandatory Claims Resolution Procedures to Resolve Professional Liability and General Liability Claims; (II) Requiring the Debtors' Insurers to Satisfy Their Obligations under the Applicable Policies; and (III) Granting Related Relief* [Docket No. 1712] (the "Claims Resolution Procedures Motion"), seeking to approve and authorize mandatory claims resolution procedures to resolve PL/GL Claims and requiring insurers to satisfy their obligations under the applicable policies.

On June 4, 2025, the Bankruptcy Court entered the order approving the Claims Resolution Procedures. The Debtors continue to work with their insurers to reach consensual resolutions to the PL/GL Claims.

Debtor PMH is the parent company of a wholly-owned non-Debtor subsidiary, Connecticut Healthcare Insurance Company ("CHIC"). CHIC is a captive insurance company subject to the

local insurance laws and regulations of the Cayman Islands, where CHIC is incorporated and domiciled.

With respect to the professional liability and general liability programs, which would be relevant to Holders of PL/GL Claims, the Debtors' insurance program differs between hospitals and medical operations outside of Pennsylvania, on the one hand, and hospitals and medical operations inside Pennsylvania, on the other hand.

*Outside Pennsylvania*. With respect to the Debtors' hospitals and other medical operations outside Pennsylvania, for policy periods starting October 1, 2020, the first $7.5 million of defense and indemnity payments for each claim is self-insured by PMH. After that $7.5 million is paid, CHIC provides an excess healthcare professional liability and umbrella liability insurance policy, on a claims-made basis, covering healthcare professional liability and general liability (as well as automobile liability, employers' liability, helipad liability, and non-owned aircraft liability). The policy limit is $80,000,000, for each loss event and in the annual aggregate, excess of the primary coverage layers described above. This coverage is fully reinsured by third-party carriers.

For policy periods from October 1, 2017 through September 30, 2018, the first $2 million per claim is self-insured by PMH. Coverage in excess of the $2 million SIR is provided by third-party excess insurers. For policy periods from October 1, 2018 through September 30, 2020, the first $5 million per claim is self-insured by PMH, with an aggregate self-insured retention of $37 million per policy period. Coverage in excess of the $5 million SIR is provided by CHIC, and then fully reinsured. For all policy periods, both pre- and post-2020, the CHIC excess policies are claims-made policies with respect to professional liability and general liability; as such, they only cover those claims actually reported during the policy term.

| Policy Period | Self-Insured Retention | Excess Coverage Provider | Excess Coverage Details |
|---|---|---|---|
| **Oct 1, 2017 – Sep 30, 2018** | $2 million per claim | Third-Party Excess Insurers | Excess liability coverage<br>Aggregate policy limit: **$60 million** |
| **Oct 1, 2018 – Sep 30, 2020** | $5 million per claim | CHIC | Excess liability coverage<br>Aggregate policy limit: **$80 million**<br>**Fully reinsured** by third-party carriers |
| **Oct 1, 2020 – Sep 30, 2025** | $7.5 million per claim | CHIC | Excess liability coverage<br>Aggregate policy limit: **$80 million**<br>**Fully reinsured** by third-party carriers |

*Inside Pennsylvania*. With respect to the Debtors' hospitals and other medical operations inside Pennsylvania, medical professional liability and general liability coverage are provided by Prospect Medical Holdings Risk Retention Group, Inc. ("RRG"), which is a non-Debtor affiliate. RRG is a self-insurance program incorporated and domiciled in the state of Vermont, and is owned by Debtors as the sole Class A Unit holder, and insured professional corporations or other healthcare provider entities or individuals (with whom the Debtors have contractual relationships) as the Class B Unit holders.

RRG provides primary malpractice insurance coverage with legally-required limits of (a) for physicians, a $500,000 per-occurrence limit and $1,500,000 aggregate limit, and (b) for hospitals, a $500,000 per-occurrence limit and $2,500,000 aggregate limit. RRG also provides general liability coverage with a $1,000,000 per-occurrence limit and a $2,000,000 aggregate limit.

For policy periods from October 1, 2020 through the current date, RRG's primary coverage is subject to a $250,000 deductible. Policy periods prior to October 1, 2020 have a $0 deductible. For all policy periods, the MCARE Fund provides $500,000 of additional coverage in excess of the $500,000 RRG malpractice coverage for physicians, hospitals, and certain professional corporations. The MCARE Fund is subject to a $1,500,000 aggregate limit per-institution and per-physician, which has already been exhausted for some policy years (including 2019).

For policy periods prior to October 1, 2020, coverage in excess of RRG and, if not exhausted, the MCARE Fund, is provided by third-party excess insurers. However, those excess policies are subject to a $4,000,000 SIR.

For policy periods from October 1, 2020 through the current date, coverage in excess of RRG and, if not exhausted, the MCARE Fund, is provided by CHIC. The total excess policy limit is typically $80,000,000, for each loss event and in the annual aggregate, excess of the primary coverage layers described above. These CHIC policies have a $12.5 million SIR.

| Policy Period | Deductible | Primary Coverage | MCare Fund | Excess Coverage |
|---|---|---|---|---|
| Oct 1, 2016 – Sep 30, 2020 | None | **RRG** $500K/occurrence, Physicians: $1.5M aggregate Hospitals: $2.5M aggregate | $500,000 excess of $500,000 (*i.e.*, between $500K–1M) <br><br> MCare coverage is exhausted for 2019 | **Third-Party Insurers** Excess of RRG/MCare Aggregate policy limit: **$60 million** <br><br> Subject to $4M SIR |
| Post Oct 1, 2020 | $250,000 per claim | **RRG** Same limits as 2016–2020 | $500,000 excess of $500,000 (*i.e.*, between $500K–1M) | **CHIC** Excess of RRG/MCare Aggregate policy limit: **$80 million** Subject to $12.5M SIR |

Under the Plan, the Settling Insurers will contribute to the Insurance Trust and be protected by the Settling Insurer Injunction. As of the date hereof, the Debtors have not yet reached settlements, commutations, or other transactions with their Insurers. The Debtors are working diligently to negotiate with the Insurers to secure contributions to the Insurance Trust. The Debtors will provide regular updates to the Ad Hoc Insured Claim Counsel with respect to negotiations with the Debtors' insurers. Any settlement, commutation, or other transaction with Settling Insurers for contribution to the Insurance Trust must be approved by the Bankruptcy Court by October 1, 2025.

The Debtors are continuing to finalize the Post-Confirmation Claims Resolution Procedures, which shall conform with the Claims Resolution Procedures (with only necessary

Plan-related modifications). The Post-Confirmation Claims Resolution Procedures will be finalized and filed as soon as reasonably practicable, and in any event by the Plan Supplement Deadline.

### 3. De Minimis Sale Procedures Motion

On February 28, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of an Order Approving Procedures for the Sale, Transfer, and/or Abandonment of the De Minimis Assets* [Docket No. 818] (the "De Minimis Sale Procedures Motion"), seeking, *inter alia*, authorization for the HCo Debtors to implement expedited procedures for the sale, transfer, or abandonment of those assets with a transaction value equal to or less than $5 million (the "De Minimis Sale Procedures").

On March 27, 2025, the Bankruptcy Court entered the *Order Approving Procedures for the Sale, Transfer, and/or Abandonment of De Minimis Assets* [Docket No. 1377].

### G. Global Settlement[27]

On February 23, 2025, the HCo Debtors filed the *Motion of the Debtors Pursuant to Bankruptcy Rule 9019 for Approval of Settlement with MPT* [Docket No. 769] (the "9019 Motion"), seeking to approve the global settlement with MPT (the "Global Settlement"), the terms of which were substantially set forth in the Settlement Term Sheet [Docket No. 633]. On March 5, 2025, the HCo Debtors filed a form of Settlement and Support Agreement with MPT [Docket No. 871].

The Debtors engaged in extensive good faith, arm's-length negotiations with MPT and the Committee, including the PBGC, in an effort to consensually resolve the Committee's concerns regarding the Global Settlement and the 9019 Motion. Such negotiations bore significant fruit and the HCo Debtors, with the support of MPT and the Committee, filed a revised form of Settlement and Support Agreement [Docket No. 1235] and a revised form of order for the 9019 Motion [Docket No. 1238].

On March 20, 2025, the Bankruptcy Court entered the *Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief* [Docket No. 1287] (the "9019 Order"), which, among other things, approved the terms of the Global Settlement as set forth in the Settlement and Support Agreement by and between the Debtors, MPT, and the Committee attached to the 9019 Order as Exhibit 1.

As set forth *more* fully in the Settlement and Support Agreement, the Global Settlement provides for, among other things, the following:

- **Stipulation of MPT's Claim as Secured Claim**. The HCo Debtors stipulated and agreed that MPT has a secured claim comprising (i) amounts that will be due under the Junior DIP Facility, (ii) amounts due and owing under the MPT Mortgage Loan, (iii) accrued and unpaid rent, impositions, and expenses under the MPT Master

---

[27] The summary of the Global Settlement and the 9019 Motion provided herein is qualified in its entirety by reference to the Global Settlement and the 9019 Motion, as applicable.

Leases, (iv) other claims and related obligations under the MPT Master Leases not reflected in the foregoing, and (v) interest and other accruals on the aforementioned amounts.

- **Economic Effect of Recharacterization**. Although MPT will not be divested of ownership in the real estate as a legal matter, the Debtors have obtained certain economic effects of recharacterizing the MPT Master Leases as secured financings. In particular, with respect to the California and Connecticut Sale Transactions (where the land is leased from MPT), the HCo Debtors can market the operations and the real property together, and the value of any new or assumed leases will be paid in cash or credited to the Debtors.

- **Consent to the DIP Facilities**. MPT consented and withdrew all objections and appeals relating to the JMB and eCapital DIP facilities, subject to certain terms and conditioned on the receipt of certain adequate protection payments, liens, and claims.

- **Junior DIP Financing**. MPT shall provide the Junior DIP Facility.

- **Sales Process**. The agreement varies by state, but ensures a unified sales process for operations in each of Pennsylvania, California, Connecticut, and Rhode Island. With respect to the CA Sale Transaction, the Settlement and Support Agreement established certain milestones, as fully set forth therein.

- **Value Allocation**. The HCo Debtors and MPT have agreed on a recovery waterfall meant to resolve the otherwise challenging issue of allocating value as between property of the estate (hospital operations) and real estate (which may not be property of the estate). All distributions made by the HCo Debtors (including, without limitation, distributions of Net Proceeds made pursuant to the terms of the Global Settlement and distributions pursuant to the terms of any Chapter 11 Plan) shall be consistent with the recovery waterfall set forth in the Settlement and Support Agreement (the "Recovery Waterfall").

## H. Investigation of Certain Claims and Causes of Action

### 1. The Transaction Committee and Conflict Matters

As described above, on January 20, 2025, the HCo Debtors established the Transaction Committee, comprising Jeremy Rosenthal, Alan Carr, and Von Crockett as voting members and Paul Rundell and Frank Saidara as advisory members. The Transaction Committee was vested with the *exclusive* authority to, among other things, review, negotiate, evaluate, propose, approve, and enter into settlement terms and conditions in response to, arising from, in connection with, or related to any potential claims or causes of action of the Debtors.

### 2. Independent Investigation

In their capacity as members of the Transaction Committee, Jeremy Rosenthal, Alan Carr, and Paul Rundell commenced an independent investigation (the "Independent Investigation") into whether the Debtors hold any viable claims or causes of action against the Debtors' related parties and/or MPT and its related parties that are worthy of pursuit in the context of the Chapter 11 Cases.[28] Prior to the Petition Date, the Debtors retained Katten as Special Counsel to provide advice and representation in connection with certain matters related to the Chapter 11 Cases in which there is an actual or potential conflict of interest between the Debtors and any of their non-Debtor affiliates, and other such matters as the Debtors may request and Katten may agree to handle (collectively, "Conflict Matters"). Katten is advising the Transaction Committee with respect to Conflict Matters within the scope of the Transaction Committee's authority, including the Independent Investigation. As set forth in Article VIII of the Plan, the Debtor Release provision remains subject to ongoing review and modification, including as part of the Independent Investigation. Accordingly, the Debtors, in consultation with the Transaction Committee, reserve the right to modify the persons listed, if any, on the Non-Released Parties Schedule.

In furtherance of the Independent Investigation, the Transaction Committee has, to date, issued document and information requests to the Debtors seeking, among other things, Board materials and minutes, corporate governance documents, transaction documents, litigation-related documents, and certain financial information. Katten also received access to all documents produced by the Debtors to the UCC. To date, Katten has reviewed over 20,000 documents relevant to the Independent Investigation. Katten has also interviewed certain members of the Debtors' management team and certain other parties, including counsel to the Debtors in connection with certain prepetition transactions. The Transaction Committee has met with Katten on a regular basis to direct the Independent Investigation and obtain updates on the workstreams and findings from the Independent Investigation.

3. Transaction Committee's Approval of the Global Settlement

As part of the Independent Investigation, the Transaction Committee evaluated whether the Debtors held any viable claims or causes of action against MPT and its related parties. On March 7, 2025, Katten provided the Transaction Committee with a detailed 153-page privileged legal presentation setting forth analyses of potential estate claims and causes of action and the benefits of the Global Settlement. In an exercise of their reasonable business judgment and in furtherance of their fiduciary duties, the voting members of the Transaction Committee concluded that the Global Settlement was fair and reasonable and in the best interests of the Debtors' estates.

4. The Ongoing Independent Investigation of Reserved Estate Causes of Action

In accordance with its delegated authority and its members' fiduciary obligations, the Transaction Committee has been evaluating and continues to evaluate whether the Debtors hold

---

[28] Messrs. Crockett and Saidara are recused from the Independent Investigation. Mr. Carr is recused from the Independent Investigation solely with respect to matters in which there is an actual or potential conflict of interest between the Debtors and PhysicianCo.

any viable and valuable claims or causes of action that constitute Reserved Estate Causes of Action, as that term is defined in the Global Settlement.

The Independent Investigation with respect to the Reserved Estate Causes of Action has, to date, focused on two areas.

a. *Potential Estate Claims Arising from Transfers to Current Directors and Officers*

The first focus has been investigating the prepetition transactions in which PMH transferred value to certain current directors and officers and/or entities they control (collectively, the "Current D&O Transfers" and the transferees of such Current D&O Transfers, the "Current D&O Transferees"):[29] The Current D&O Transfers include the following prepetition transactions:

- PMH's issuance of approximately $456.9 million in dividends to equity holders of PMH's ultimate parent, non-Debtor, Ivy Holdings, Inc. ("Ivy Holdings") in connection with a dividend and recapitalization transaction in February 2018 (the "Dividend Recapitalization Transaction"), including approximately $158 million to Current D&O Transferees;

- PMH's payment of approximately $33.7 million in special cash bonuses to certain employees pursuant to the 2010 Stock Option Plan of Ivy Holdings as part of the Dividend Recapitalization Transaction, including approximately $21.8 million paid to Current D&O Transferees;

- PMH's issuance of an approximately $44.4 million dividend to its direct parent, Ivy Intermediate Holdings, Inc. ("Ivy Intermediate") in September 2019, which was used to repay a loan by certain equity holders to Ivy Holdings, including approximately $17.3 million paid to Current D&O Transferees;

- PMH's issuance of an approximately $11.9 million dividend to Ivy Intermediate, which was used to repurchase the shares of Ivy Holdings' equity holders as part of a change of control transaction in June 2021, including $871,379 paid to Current D&O Transferees; and

- PMH's payment of approximately $6.4 million in special cash bonuses to certain employees pursuant to the 2010 Stock Option Plan of Ivy Holdings in connection with the change of control transaction in June 2021, including approximately $5.6 million to Current D&O Transferees.

After receiving detailed privileged legal presentations from Katten providing analysis of the Current D&O Transfers, the Transaction Committee concluded that the Debtors have viable claims or causes of action related to certain of the Current D&O Transfers, including, among other things, claims to avoid certain of the D&O Transfers as constructive fraudulent transfers.

---

[29] For the avoidance of doubt, potential claims and causes of action against former directors, officers, and equity holders constitute Assigned Estate Causes of Action, as that term is defined in the Global Settlement.

Specifically, $199.4 million of the $203.6 million of transfers to the Current D&O Transferees set forth above were made to two Current D&O Transferees, David Topper and Samuel Lee (the "Excluded D&Os"). Accordingly, the Excluded D&Os will be excluded from the Plan releases. The Transaction Committee has concluded that potential claims against all other Current D&O Transferees are not worthy of pursuit because, among other reasons, such transfers relate primarily to bonuses for employee services.

<blockquote>b.     <em>Potential Estate Claims Relating to Director and Officer Conduct</em></blockquote>

The second focus of the Independent Investigation into the Reserved Estate Causes of Action has been the evaluation of the actions of the Debtors' current directors and officers other than the Excluded D&Os (the "Current D&Os") to determine if the Current D&Os' conduct gives rise to viable claims and causes of action for, among other things, breach of fiduciary duty, including with respect to the breach of the fiduciary duty of care, breach of the fiduciary duty of good faith, and breach of the fiduciary duty of loyalty during the relevant statutes of limitations for such claims.

The Transaction Committee, working with Katten, has concluded, based upon the documentation and information reviewed to date, that Prospect's current directors and officers appropriately discharged their fiduciary duties during the relevant period and, as a result, the potential claims described above are not worthy of pursuit. Further, the Current D&Os have provided significant value to the Debtors, these Chapter 11 Cases, the operation, wind-down and sales of the Debtors' hospitals during the course of the Chapter 11 Cases, and the confirmation and consummation of the Plan. Accordingly, the Current D&Os will be included in the Plan releases.

<blockquote>5.     <u>Discussions with the UCC Regarding Reserved Estate Causes of Action</u></blockquote>

As directed by the Transaction Committee, on May 29, 2025, July 12, 2025, and August 12, 2025, Katten discussed with counsel to the UCC the results of the Independent Investigation as it pertains to the Reserved Estate Causes of Action.

The Transaction Committee, the Debtors, and the UCC have been working cooperatively to assess ways to maximize the value of the Reserved Estate Causes of Action. These discussions remain ongoing.

In accordance with the Global Settlement, the Transaction Committee, on behalf of the Debtors, will negotiate in good faith with MPT and the UCC in connection with the assignment, settlement, or other action with respect to the Reserved Estate Causes of Action.

<blockquote>6.     <u>Conclusion</u></blockquote>

In accordance with its delegated authority and its members' fiduciary obligations, the Transaction Committee is continuing to investigate the Reserved Causes of Action. The description herein of transactions and potential claims and causes and action examined as part of the Independent Investigation is not exhaustive, and the Transaction Committee, working with Katten, is continuing to examine additional claims and causes of action against Related Parties and certain other parties. The Independent Investigation remains ongoing as of the date hereof, and the releases and exculpations contemplated in the Plan will remain subject to the final results of the

Independent Investigation. The Transaction Committee, working with Katten, will provide the Court and constituents with any updates to the results of the Independent Investigation prior to the hearing on confirmation of the Plan. The outcome of the Independent Investigation could result in material modifications to the Plan, including, without limitation, changes to the release and exculpation provisions as well as the Indemnification Obligations.

### I. Private Sale Processes

#### 1. The Astrana Sale

As discussed above, in November 2024, after months of extensive arm's-length negotiations, the PCo Debtors and certain of the HCo Debtors entered into that certain AEPA with Astrana. Pursuant to section 7.3(d) of the AEPA, HCo Debtor Prospect Provider Group RI, LLC ("PPG RI") and former HCo Debtor Prospect Health Services RI, Inc. ("PHS RI") were authorized to effectuate certain transactions, including a merger of the aforementioned Rhode Island physician-related entities.

On February 12, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving and Authorizing Assumption of, and Entry into, the Astrana Purchase Agreement and Transaction Documents; (II) Dismissing the PHS RI Chapter 11 Case Effective as of the Closing Date; and (III) Granting Related Relief Fee* [Docket No. 590] (the "Astrana Sale Motion"), seeking, among other things, approval of the Debtors' assumption of the AEPA, the performance by certain Debtors of their obligations thereunder, the sale of certain of the Debtors' assets and equity interests to Astrana and its affiliates, in each case, free and clear of all liens, claims, and encumbrances, and the dismissal of PHS RI's chapter 11 case.

On May 22, 2025, the Bankruptcy Court entered an order approving the Astrana Sale Motion [Docket No. 2057] (such order, the "Astrana Sale Order"). As contemplated in the Astrana Sale Order, former HCo Debtor PHS RI merged with and into HCo Debtor PPG RI, and on the Closing Date, all PPG RI assets were transferred to Astrana. The HCo Debtors' portion of the sale proceeds was approximately $67 million.

In connection with Astrana's acquisition of FRMC under the Astrana Sale, HCo Debtors PMH and Alta Hospitals System, LLC ("Alta") entered into two transition services agreements ("TSAs") with Astrana and FRMC to provide certain services to ensure continuity and stability of hospital operations during the transition period, including, among others, IT, data migration, revenue collection, supply chain procurement, and accounting. In return, Astrana and FRMC agreed to pay certain fees for the services.

#### 2. Postpetition Sale of the Rhode Island Assets

On November 18, 2022, PMH and certain of its affiliates, as sellers, and Centurion Foundation, Inc. ("Centurion"), as purchaser, entered into that certain Asset Purchase Agreement (the "Centurion Purchase Agreement") for the sale of two Rhode Island hospitals (the "Centurion Sale") in exchange for an effective purchase price of $80 million in cash, subject to certain adjustments.

On February 3, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving and Authorizing (A) the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets Free and Clear of Interests, (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) the Assignment of Certain Permits; and (II) Granting Related Relief* [Docket No. 349] (the "Centurion Sale Motion"), seeking approval of a private sale, free and clear of all interests except those enumerated in the Centurion Purchase Agreement, to Centurion pursuant to the terms of the Centurion Purchase Agreement, as amended following the commencement of these Chapter 11 Cases. The sale is subject to conditions set forth by the Rhode Island Attorney General and Rhode Island Department of Health. Prospect and Centurion have been working diligently with the Rhode Island Attorney General and the Rhode Island Department of Health to satisfy the regulatory requirements and meet the enumerated conditions.

On February 12, 2025, the Bankruptcy Court entered an order [Docket No. 606] approving the Centurion Sale Motion. Since then, the Debtors have been working diligently to close the Centurion Sale.

## J.    Postpetition Sale of the Pennsylvania Assets

In July 2016, the Debtors acquired Crozer Health, which consisted of four general acute care hospitals, several outpatient facilities, and a comprehensive physician network of primary care and specialty practices (collectively, the "Pennsylvania Hospitals"). Persistent operating losses, which pre-dated and continued after the acquisition, led the Debtors to initiate a marketing process to divest the Pennsylvania Hospitals in 2022. After negotiations with a potential buyer fell apart in 2022, the Debtors once again tried to market the assets in 2023—but to no avail.

On February 3, 2025, the HCo Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving and Authorizing (A) the Asset Purchase Agreement and the Private Sale of the Pennsylvania Hospitals Free and Clear of Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) the Settlement by and among the Debtors, the Pennsylvania Attorney General, Samuel Lee, and David Topper, Pursuant to Bankruptcy Rule 9019; and (II) Granting Related Relief* [Docket No. 332] (the "Crozer Sale Motion"), seeking approval to, among other things, transfer the Pennsylvania Hospitals to an entity supported by the Commonwealth of Pennsylvania (the "Commonwealth"). Unfortunately, shortly after filing the Crozer Sale Motion, the Debtors learned that this entity would be unable to complete a transaction in the required time frame.

Following this news, the Debtors, working closely with the Commonwealth and the Pennsylvania AG, reinitiated their marketing and sales efforts with respect to the Pennsylvania Hospitals.

### 1.    The Receiver

Without the potential of a private sale of the Pennsylvania Hospitals, the operational and financial needs of the Pennsylvania Hospitals in light of their continued liquidity crisis remained dire. To address these needs, on February 7, 2025, the HCo Debtors, the Commonwealth, and the Pennsylvania AG entered into, and the Bankruptcy Court approved, a stipulation and agreed order [Docket No. 481] installing a receiver—FTI Consulting, Inc. (the "Receiver")—to assume the

operation of the Pennsylvania Hospitals, pursuant to the provisions of applicable laws, regulations, and a receiver agreement (the "Receiver Agreement"). The Receiver Agreement was executed on February 14, 2025. On February 21, 2025, the Court of Common Pleas for Delaware County similarly approved a stipulation and agreed order recognizing the Receiver's appointment in the state of Pennsylvania (effective as of February 14, 2025).

Under the Receiver Agreement, the Commonwealth, through the Pennsylvania AG, committed to facilitate $20.2 million in funding to the Receiver (consisting entirely of advances of funds already owed to the HCo Debtors prior to their entry into the Receiver Agreement). Delaware County, Pennsylvania also agreed to make, and the Bankruptcy Court authorized [Docket No. 749], additional payments to the HCo Debtors on the condition that such payments comprised a portion of the Commonwealth's $20.2 million commitment, were made directly to the Receiver, and utilized consistent with the terms and conditions set forth in the Receiver Agreement.

2.      Closure of the Pennsylvania Hospitals

Despite the HCo Debtors' extensive marketing efforts, the HCo Debtors were not able to secure a buyer or new operator for the Pennsylvania Hospitals. Given the mounting losses at such hospitals, the lack of continued available funding, and the absence of a replacement operator or actionable funded alternative, the HCo Debtors made the difficult decision to seek approval of a safe and expeditious closing process for the Pennsylvania Hospitals.

On March 6, 2025, the HCo Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals; and (II) Granting Related Relief* [Docket No. 882] (the "Closure Motion"), which sought, among other things, approval of procedures to provide for a streamlined process for Court approval of the Pennsylvania Hospital facility closures, including rejecting executory contracts and abandoning certain assets in connection therewith (such procedures, the "Closure Plan").

At an emergency hearing on March 6, 2025 to consider the Closure Motion, the Bankruptcy Court ordered certain parties, including the HCo Debtors, the Pennsylvania AG, the Receiver, and certain other stakeholders, as applicable, to meet in-person in Harrisburg, Pennsylvania to negotiate and discuss long-term funding of the Pennsylvania Hospitals. The HCo Debtors worked around the clock to identify potential sources of funding or potential purchasers for the Pennsylvania Hospitals. Over the course of the next month, these parties met in-person several more times, pursuant to the Bankruptcy Court's orders, to avoid closing the Pennsylvania Hospitals.

Notwithstanding these efforts, the Debtors were unable to identify any viable bidder, operator, or third-party funding source for the Pennsylvania Hospitals. On April 21, 2025, the HCo Debtors filed the *Supplement to the Debtors' Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals; and (II) Granting Related Relief* [Docket No. 1574] (the "Supplemental Closure Motion" and, together with the Closure Motion, the "Closure/Sale Motion"), seeking to approve (i) the HCo Debtors' updated Closure Plan with the cessation of certain services beginning on April 22, 2025, and (ii) procedures to sell available

assets of the Pennsylvania Hospitals pursuant to either the HCo Debtors' *De Minimis* Sale Procedures or pursuant to an expedited bidding process.

On April 23, 2025 the Bankruptcy Court entered an order approving the Closure/Sale Motion [Docket No. 1613] (the "Closure Order").

### 3. Sale of the ASC/Imaging Sites

On May 27, 2025, in accordance with the Closure Order, the HCo Debtors conducted an auction to sell certain available assets of the Pennsylvania Hospitals (the "Pennsylvania ASC/Imaging Sites"). At the close of the auction, the Debtors designated (i) Christiana Care Health System, Inc. as the successful bidder, and (ii) Main Line Health, Inc. and University of Pennsylvania Health System as the back-up bidders, for the Pennsylvania ASC/Imaging Sites. On May 29, 2025, the Debtors filed the *Notice of Successful Bidder for the Pennsylvania ASC/Imaging Sites* [Docket No. 2139] (the "Pennsylvania ASC/Imaging Sites Sale Notice"). The Pennsylvania ASC/Imaging Sites Sale Notice included notice of, among other things, the agreed purchase price of $50,300,000. On June 10, 2025, the Debtors filed the *Notice of Filing of Proposed Sale Order and Asset Purchase Agreement for the Pennsylvania ASC/Imaging Sites* [Docket No. 2234].

On July 3, 2025, the Bankruptcy Court entered an order approving the asset purchase agreement for the Pennsylvania ASC/Imaging Sites [Docket No. 2412].

On August 1, 2025, the HCo Debtors filed the *Notice Of Closing Of Pennsylvania ASC/Imaging Sites Sale Transaction* [Docket No. 2687], pursuant to which they provided notice that the sale of the ASC/Imaging Sites to Christiana Care Health System, Inc. had been successfully closed.

The HCo Debtors have engaged Keen-Summit Capital Partners, LLC and Centurion Service Group, LLC to assist with the sale of the remaining Pennsylvania property and assets.

### 4. Abandonment of Pennsylvania Hospitals

On July 25, 2025, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Abandonment of Certain Pennsylvania Hospitals and Related Property and (II) Granting Related Relief* [Docket No. 2625] (the "Abandonment Motion"). Through the Abandonment Motion, the HCo Debtors requested entry of an order permitting the Debtors to abandon certain Pennsylvania hospitals and real property (the "Burdensome Property") should the Debtors fail to consume the sale of such Burdensome Property.

On August 6, 2025, the Bankruptcy Court entered the *Order (I) Approving the Abandonment of Certain Pennsylvania Hospitals and Related Property; (II) Approving the Sale of Certain Pennsylvania Hospitals and Related Property; and (III) Granting Related Relief* [Docket No. 2744]. Pursuant to such order, the Debtors are continuing sale efforts for the Burdensome Property.

### K. Postpetition Sale of the California and Connecticut Assets

On February 18, 2025, in accordance with the 9019 Settlement, the HCo Debtors filed the *Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and* Scheduling *Auction(s) and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, (II)(A) Authorizing the Sale of the Assets Free and Clear of All Encumbrances, and (B) Approving the Assumption and Assignment of the Assumed Contracts, and (III) Granting Related Relief* [Docket No. 708] (the "Bidding Procedures Motion"), seeking approval of procedures to sell the Debtors' California and Connecticut assets.

As more fully described in the Bidding Procedures Motion, the Bidding Procedures contain provisions relating to, among other things, (a) participation requirements, (b) access to due diligence, (c) requirements for Qualified Bids (as defined in the Bidding Procedures), (d) designation of Qualified Bidders (as defined in the Bidding Procedures), (e) credit bids, (f) auction procedures (as applicable); and (g) the selection of any Qualified Bids (as defined in the Bidding Procedures) as the winning bid or back-up bid.

On March 19, 2025, the Bankruptcy Court entered an order [Docket No. 1264] approving the Bidding Procedures Motion, and the Bidding Procedures attached thereto.

In addition, the Bidding Procedures established timelines governing the sale of the California and Connecticut Assets, which are consistent with the milestones set forth in the 9019 Settlement, each as more fully set forth in the Bidding Procedures.

On June 6, 2025, the HCo Debtors filed the *Notice of Revised California and Connecticut Sale Transaction Milestones* [Docket No. 2196], pursuant to which the timelines governing the sale of the California and Connecticut Assets, as set forth in the Bidding Procedures, were extended to a date to be decided on by the Debtors at a later time.

On August 5, 2025, the Debtors filed the *Notice of Designation of Stalking Horse Bidder* [Docket No. 2738], which designated NOR Healthcare Systems Corp. as the stalking horse bidder for the California Assets and set forth the following timeline:

| Event | Date |
|---|---|
| Stalking Horse Objection Deadline | August 12, 2025 at 4:00 p.m. (prevailing Central Time) |
| Bid Deadline | August 22, 2025 at 4:00 p.m. (prevailing Central Time) |
| Qualified Bid Notification | August 25, 2025 |
| Auction | August 26, 2025 |
| Adequate Assurance Objection Deadline | August 27, 2025 at 4:00 p.m. (prevailing Central Time) |
| Sale Objection Deadline | August 27, 2025 at 4:00 p.m. (prevailing Central Time) |
| Sale Hearing | August 28, 2025 at 9:30 a.m. (prevailing Central Time) |

L.     **Monetization of Additional Assets**

The Debtors continue to pursue efforts to monetize their remaining assets, including their accounts receivable that arose prior to the consummation of their asset sales and various litigation claims.  The Debtors may hold or identify additional assets, claims, and causes of action not listed.

1.     Litigation Claims

a.     *BCBS Antitrust Litigation*

Prior to the Petition Date, various healthcare providers (the "Provider Plaintiffs") brought several class action lawsuits against the national Blue Cross Blue Shield Association and its various licensees that provide commercial health insurance in their respective territories ("BCBS"), consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Provider Antitrust Litigation"), in which the Provider Plaintiffs alleged that BCBS engaged in anticompetitive conduct throughout the United States that resulted in healthcare providers being reimbursed at levels below those which would prevail in a competitive market.  As a result, all healthcare providers who were reimbursed by BCBS during the relevant period suffered economic losses.  On October 14, 2024, the Provider Plaintiffs and BCBS filed a settlement agreement providing for a resolution of the BCBS Provider Antitrust Litigation.  *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000- RDP [Docket No. 3192-1] (the "BCBS Settlement"). The court granted preliminary approval to the BCBS Settlement on December 4, 2024 and scheduled a final fairness hearing for July 29, 2025. *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP [Docket No. 3225]. Under the terms of the BCBS Settlement, healthcare providers that provided services to BCBS patients from July 24, 2008 to October 4, 2024 are able submit a proof of claim and may receive subsequent payment from a settlement fund with a total value of approximately $2.2 billion (the "BCBS Fund").  The BCBS Fund will be allocated among all providers who participate. Providers had until March 4, 2025 to opt-out of the BCBS Settlement and, instead, pursue independent litigation against BCBS.

After undertaking a thorough evaluation of their potential claims against BCBS, along with the likely recovery that Debtors reasonably could expect if they remained in the class, the Debtors determined that pursuing independent litigation against BCBS would be the best course of action for purposes of maximizing the value of the Debtors' estates.  As a result, the Debtors opted-out of the BCBS Settlement in a timely manner and instead, chose to file a complaint against BCBS in the Superior Court of California, County of Alameda.  *See Alta Los Angeles Hospitals, Inc. et al v. Blue Cross of California d/b/a Anthem Blue Cross, et al.*, Case No. 25CV114144.  The complaint asserts significant claims that arise from the same factual and legal nexus as those asserted in the BCBS Provider Antitrust Litigation.  The Debtors' BCBS Claims will entitle the Debtors to damages in amount to be proven at trial which is anticipated to be multiples of what the Debtors would have obtained had they not opted out of the BCBS Settlement  The litigation proceedings against BCBS are ongoing with anticipated trial dates ranging from the second half of 2026 through the first quarter of 2027.  The HCo Debtors have retained, and the PCo Debtors have sought to retain, Bartko to bring the independent litigation against BCBS.

b.      *Pomona Valley Litigation*

From 2000 to 2022, PCo Debtor Pomona Valley Medical Group ("PVMG") provided health care services to Inter Valley Health Plan ("IVHP") in exchange for monthly capitation payments. Although PVMG's capitation payments turned on the number of members (patients) rather than visits, PVMG still submitted to IVHP patient "encounter data," *i.e.*, data relating to patient visits and diagnosis codes that are mapped to disease groups, and IVHP would then submit the data to CMS to calculate the amount that they paid to IVHP.

In 2015, CMS alerted IVHP that, for some patients, the diagnoses in the patient encounter data were not supported by the data regarding clinic visits, meaning that CMS may have overpaid IVHP (and, in turn, that IVHP may have overpaid PVMG). PVMG immediately conducted a thorough internal investigation to determine the extent of submissions that may need to be retracted and, in 2016, PVMG disclosed its findings to IVHP. Together, PVMG and IVHP self-reported the issue to CMS, identifying the error and retracting submissions that were not supported with visits. After PVMG's self-reporting in August 2016, it was possible that CMS would come to IVHP to "claw back" any overpayments that it identified in an audit of the Code Retractions. If and to the extent that such "claw back" efforts occurred, PVMG understood and expected that IVHP would seek reimbursement.

Instead of first identifying and paying CMS for a "claw back," in July 2016, however, IVHP began to unilaterally and arbitrarily withhold capitation payments with no explanation of what funds were being withheld for what year, and no support for the overall figure other than its consultants' estimate. As a result of the withheld amounts, PVMG contends that IVHP owes them approximately $3.5 million for services rendered.

2.      Other Potential Claims and Causes of Action

The Debtors are continuing to investigate other potential claims and Causes of Action, including, but not limited to, potential ERISA (as defined below) claims against third party administrators, and other antitrust claims related to out-of-network reimbursement repricing.

M.      **Adversary Proceedings and Other Bankruptcy Litigation**

1.      Motion to Show Cause

In connection with trying to find a long-term solution for the Pennsylvania Hospitals, the HCo Debtors were engaged in several arm's-length negotiations with The Foundation for Delaware County (the "Foundation"), a non-profit, 501(c)(3), corporation in the state of Pennsylvania. In one such negotiation, the Foundation committed to (i) fund $7 million to the Receiver to allow for additional time to develop a long-term solution an (ii) fund an additional $13 million upon a satisfactory long-term resolution for the Pennsylvania Hospitals being reached no later than March 21, 2025.

On March 19, 2025, shortly after a Bankruptcy Court hearing where the HCo Debtors expressed cautious relief and optimism that a viable long-term solution for the Pennsylvania Hospitals was in progress, the Foundation orchestrated a filing in the Court of Common Pleas of Delaware County, Pennsylvania (the "State Court"). The complaint, filed in the name of a board

member of the Foundation with another board member of the Foundation as counsel, requested entry of an order instituting a permanent injunction prohibiting the Foundation from transferring any funds to the Debtors, the Receiver, or any other entity for operating the hospitals. The Foundation answered the complaint, admitted every allegation in summary fashion, and requested the State Court enter the requested judgment, which it ultimately did.

In response, on March 19, 2025, the PCO filed, and the HCo Debtors and Pennsylvania AG joined, an *Emergency Motion for Status Conference Regarding the Pennsylvania Hospitals* [Docket No. 1277], calling for an emergency status conference on March 20, 2025 regarding the Foundation's conduct.

On March 20, 2025, prior to the hearing, the HCo Debtors filed the *Debtors' Emergency Motion for (I) Entry of an Order to Appear and Show Cause against the Foundation for Delaware County and (II) the Imposition of Compensatory and Coercive Sanctions against the Foundation for Delaware County for Violations of the Automatic Stay* [Docket No. 1282] (the "Motion to Show Cause"), requesting that the Bankruptcy Court enter an order requiring the Foundation to show cause why the Bankruptcy Court should not exercise its civil contempt powers to (i) coerce the Foundation into complying with the automatic stay and (ii) compensate the Debtors for their damages, including (but not limited to) professional fees, costs, and expenses, as a result of the actions perpetrated by the Foundation and/or any additional party found to have assisted in or facilitated the culpable conduct. At the hearing on March 20, 2025, the Foundation agreed to move to have the injunction dissolved.[30]

At the Bankruptcy Court hearing on May 21, 2025, the HCo Debtors and the Foundation announced a resolution in principle, with the definitive documentation to come at a later date.

### 2. WARN Notice Class Action

On May 2, 2025, approximately 2,500 former employees who worked at the HCo Debtors' Pennsylvania Hospitals filed a putative class action in the Bankruptcy Court against Prospect Medical Holdings, Inc., Prospect CCMC, LLC, and Prospect Crozer, LLC (the "Defendant Debtors") alleging that such employees were not provided 60 days' advance written notice of their terminations.

On June 20, 2025, the Defendant Debtors filed a motion to dismiss this complaint on the grounds that the "unforeseen business circumstances" exception applies. On July 23, 2025, the Bankruptcy Court denied the Defendant Debtors' motion to dismiss. The class action remains ongoing.

### 3. CMS Adversary Proceeding

On July 11, 2025, Prospect Penn, LLC, Prospect Crozer, LLC, Prospect CCMC, LLC, Prospect DCMH, LLC, Prospect Crozer Urgent Care, LLC, Prospect Penn Health Club, LLC, Prospect Crozer Home Health and Hospice, LLC, Prospect Crozer Ambulatory Surgery, LLC, Prospect Health Services PA, Inc., and Prospect Provider Group PA, LLC (the "Crozer Debtors")

---

[30] Shortly thereafter, the Foundation filed a notice that the State Court had entered an order dissolving the injunction [Docket No. 1302].

filed a complaint (the "Complaint") against Robert F. Kennedy, Jr., in his official capacity as Secretary, United States Department of Health and Human Serves ("HHS") and Dr. Mehmet Oz, in his official capacity as Administrator, Centers for Medicare and Medicaid Services ("CMS") (together, "Defendants").  Through this Complaint the Crozer Debtors allege that CMS have terminated Medicare to certain of the Crozer Debtors on the grounds that CMS believes it is owed prepetition amounts.

The Debtors are requesting the Bankruptcy Court (i) enter a declaratory judgment in favor of the Crozer Debtors against Defendants, ordering the Defendants to reinstate the Crozer Debtors' right to submit claims for and receive Medicare payments; (ii) order the Defendants to pay damages for certain alleged violations of the Bankruptcy Code; and (iii) enjoin the Defendants from continuing these alleged violations of the Bankruptcy Code.  This matter is currently set for trial the week of January 20, 2026.

**N.      Termination of the Pension Plans**

On May 25, 2025, the PBGC issued a notice to the Debtors that the PBGC had determined under section 4042(a)(1) and (2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") that: (i) the Crozer Plan had not met the minimum funding standard required under IRC § 412, and (ii) the Crozer Plan must be terminated under ERISA § 4042(c) effective May 31, 2025.  The Debtors worked with the PBGC to voluntarily assign trusteeship of the Crozer Plan to the PBGC and avoid court involvement in the termination process and terminated the Crozer Plan as of May 31, 2025, as of which date the PBGC was appointed as statutory trustee of the Crozer Plan.

On June 26, 2025, the PBGC issued notices to the Debtors that the PBGC had determined under ERISA §4042(a)(1) and (2) that: (i) the ECHN Plan and the Waterbury Plan each had not met the minimum funding standards required under IRC § 412, and (ii) the ECHN Plan and the Waterbury Plan each must be terminated under ERISA § 4042(c) effective June 30, 2025.  The Debtors worked with the PBGC to voluntarily assign trusteeship of the ECHN Plan and the Waterbury Plan to the PBGC and avoid court involvement in the termination process and terminated the ECHN Plan and the Waterbury Plan effective as of June 30, 2025, as of which date the PBGC was appointed as statutory trustee of the ECHN Plan and the Waterbury Plan.

**O.      Bar Dates**

1.      Hco Debtors' Bar Dates

With respect to the HCo Debtors, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving Form and Manner for Filing Proofs of Claim, (III) Approving the Notice of Bar Dates, and (IV) Granting Related Relief* (the "Bar Date Motion")  [Docket No. 763], which was approved on a final basis in an order [Docket No. 1262] (the "Bar Date Order") by the Bankruptcy Court.

The Bar Date Order set the following deadlines by which certain Holders of Claims will be allowed to file a written Proof of Claim:

- **General Bar Date**: April 18, 2025 at 4:00 p.m. (prevailing Central Time) (the "HCo General Bar Date");

- **Governmental Bar Date**: July 10, 2025 at 4:00 p.m. (prevailing Central Time) (such date, the "HCo Governmental Bar Date"); and

- **Amended Schedules Bar Date**: To the extent applicable, the later of (i) the HCo General Bar Date or the HCo Governmental Bar Date, as applicable, and (ii) twenty one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules (such date, the "HCo Amended Schedules Bar Date"); and

- **Rejection Damages Bar Date**: To the extent applicable, the later of (i) the HCo General Bar Date or the HCo Governmental Bar Date, as applicable, and (ii) thirty (30) days after the later of (a) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (b) the rejection date of any such executory contract or unexpired lease of the Debtors (such date, the "HCo Rejection Damages Bar Date").

2.      PCo Debtors' Bar Dates

With respect to the PCo Debtors, on the PCo Petition Date, the Debtors filed the Omnibus Motion seeking, among other things, authority to establish the following deadlines by which Holders of Claims will be allowed to file a written Proof of Claim:

- **General Bar Date**: August 18, 2025 at 4:00 p.m. (prevailing Central Time) (the "PCo General Bar Date");

- **Governmental Bar Date**: January 5, 2026 at 4:00 p.m. (prevailing Central Time) (such date, the "PCo Governmental Bar Date"); and

- **Amended Schedules Bar Date**: To the extent applicable, the later of (i) the PCo General Bar Date or the PCo Governmental Bar Date, as applicable, and (ii) twenty one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules (such date, the "PCo Amended Schedules Bar Date"); and

- **Rejection Damages Bar Date**: To the extent applicable, the later of (i) the PCo General Bar Date or the PCo Governmental Bar Date, as applicable, and (ii) thirty (30) days after the later of (a) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (b) the rejection date of any such executory contract or unexpired lease of the Debtors (such date, the "PCo Rejection Damages Bar Date").

**P.      Key Employee Retention and Incentive Plans**

On April 22, 2025, the HCo Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Implement a Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1587] (the "KERP Motion"). By the KERP Motion, the HCo Debtors

sought authority for a key employee retention plan (the "KERP"), which was designed to secure the continued retention of 73 non-management, critical employees through the closure and wind-down of the Pennsylvania Hospitals, the consummation of Qualifying Sales (as defined in the KERP Motion), or the wind down of any remaining assets of the HCo Debtors post-Qualifying Sales. On May 1, 2025 the Bankruptcy Court entered the *Order Authorizing the Debtors to Implement a Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1754] (the "KERP Order").

On April 29, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Implement a Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 1708] (the "KEIP Motion"). By the KEIP Motion, the HCo Debtors sought authority for a key employee incentive plan ("KEIP"), which was designed to incentivize six executive employees to continue to meet and exceed challenging performance targets during these Chapter 11 Cases with the ultimate goal of maximizing the value of the Debtors' assets in California and Connecticut. On June 11, 2025, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to Implement a Key Employee Incentive Program and (II) Granting Related Relief* [Docket No. 2264] (the "KEIP Order").

## Q. Exclusivity

Pursuant to sections 1121(b) and 1121(c)(3) of the Bankruptcy Code, the Debtors had the exclusive right to file a plan (the "Exclusive Filing Period") until May 12, 2025, and the exclusive right to solicit acceptances for its plan until July 15, 2025 (the "Exclusive Solicitation Period" and together with the Exclusive Filing Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On April 12, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of an Order Extending Debtors' Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1515], pursuant to which they sought to extend the Exclusive Filing Periods. On May 8, 2025, the Bankruptcy Court entered an order [Docket No. 1876] extending the Exclusive Filing Period and the Exclusive Solicitation Period to August 11, 2025 and October 13, 2025, respectively.

## R. Claims Reconciliation

As of the filing of this Disclosure Statement, claimants filed more than 9,300 proofs of claim in the HCo Debtors' chapter 11 cases. To prepare for the Effective Date and to ensure an accurate claims register for purposes of Claims allowance and distributions, the Debtors have engaged in a comprehensive claims review and reconciliation process with their advisors.

To date, the HCo Debtors have filed eight (8) omnibus claims objections [Docket Nos. 2225, 2226, 2227, 2271, 2316, 2317, 2318, 2319] against approximately 700 Proofs of Claim. The claims objections sought to disallow Claims that: (a) are duplicative; (b) have been superseded by amended Claims; (c) have been reclassified; and (d) lack supporting documentation. The Debtors anticipate filing additional omnibus claims objections to correct the claims register. The

Bankruptcy Court subsequently entered orders sustaining the Debtors' omnibus claims objections [Docket Nos. 2895, 2896, 2897, 2899, 2900, 2901, 2914, 2919].

**S.     Proposed Confirmation Schedule**

Pursuant to the Disclosure Statement Order, the proposed schedule and deadlines for Confirmation include the following:

| Event | Date |
|---|---|
| Voting Record Date | August 20, 2025 |
| Solicitation Deadline | September 4, 2025 |
| Publication Deadline | September 4, 2025 |
| Plan Supplement Filing Deadline | October 1, 2025 |
| Voting Deadline | October 8, 2025 at 4:00 p.m. (prevailing Central Time) |
| Objection Deadline | October 8, 2025 at 4:00 p.m. (prevailing Central Time) |
| Release Opt-Out Deadline | October 8, 2025 at 4:00 p.m. (prevailing Central Time) |
| Confirmation Hearing | October 14, 2025 at 9:30 a.m. (prevailing Central Time) |

## ARTICLE V.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PRIORITY TAX CLAIMS, AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Compensation Claims), DIP Claims, and Priority Tax Claims have not been classified for purposes of voting or receiving distributions, and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. For the avoidance of doubt, the treatment of all Administrative Claims (including Professional Compensation Claims), DIP Claims, and Priority Tax Claims shall be consistent with the Recovery Waterfall and the DIP Orders, including any exhibits thereto.

**A.     Administrative Claims**

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim (other than a Professional Compensation Claim or a DIP Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Claim in accordance with the following: (a) (i) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter; (ii) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided* that any Allowed Administrative Claim assumed by any Purchaser shall be deemed paid in full under the Plan.

Except for Professional Compensation Claims and DIP Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors or the Plan Administrator (as

applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date. The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

**Except for Administrative Claims subject to 11 U.S.C. § 503(b)(1)(D) (for which a Governmental Unit shall not be required to file a request for payment for any Claims covered by 11 U.S.C. § 503(b)(1)(B) or (C)) as otherwise provided in Article II.B, Article II.C, or Article II.E of the Plan, Holders of Administrative Claims (other than Professional Compensation Claims) that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, the Plan Administrator, the Estates, or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court**.

### B.    DIP Claims

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the applicable DIP Documents, including principal, interest, fees, costs, other charges, and expenses. To the extent each DIP Claim has not previously been satisfied in full in accordance with the terms and conditions of the applicable DIP Documents and/or Sale Orders, and except to the extent that a Holder of a DIP Claim agrees to a different treatment, each Holder of a DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, payment in full in Cash on the Effective Date.

For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all non-contingent indemnity obligations owed to the DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Documents. The Debtors' obligation to pay contingent indemnity obligations owed to the DIP Lenders, to the extent not indefeasibly paid in full in Cash on or before the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

All reasonable and documented unpaid fees and expenses of the DIP Lenders, to the extent payable pursuant to the DIP Documents, shall be paid in full in Cash pursuant to the DIP Documents, without any requirement to File a fee application with the Bankruptcy Court or for the Bankruptcy Court's review or approval.

### C.    Backstop Facility Claims

Contemporaneously with the Effective Date, if and only to the extent necessary to pay Administrative Claims, Other Priority Claims, and Priority Tax Claims on the Effective Date, the Debtors shall enter into the Backstop Facility. All amounts owing by the Debtors under the Backstop Facility shall be secured by the Backstop Lien on the proceeds of Assigned Estate Causes of Action and all other assets, if any, transferred (or to be transferred) to the GUC Trust. To the extent granted, the guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to the Backstop Facility Documents are granted in good faith as an inducement to the

Backstop Facility Lender to extend credit thereunder, shall be valid and enforceable, and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the Backstop Facility Documents. Interest on the term loan advanced under the Backstop Facility shall accrue at a rate equal to 14.00% per annum, payable in kind (capitalizing at the end of each fiscal quarter) and shall mature on the date that is the fifth anniversary of the term loan advance thereunder (such date, the "<u>Backstop Maturity Date</u>"), with mandatory repayment provisions upon the earlier of the Backstop Maturity Date or recovery of the Backstop Facility through application of Net Proceeds under the Recovery Waterfall as set forth in Article IV.H of the Plan.

Substantially concurrently with the Effective Date, the GUC Trust will assume all of the Debtors' obligations under the Backstop Facility.

The Backstop Facility shall be subject to the following conditions precedent to draw:

(1) the Effective Date shall occur substantially contemporaneously;

(2) the Confirmation Order shall be acceptable to the Backstop Facility Lender in its reasonable discretion, the Debtors shall be in compliance with the Confirmation Order in all respects and the Confirmation Order shall not be stayed, shall be in full force and effect and shall not have been reversed, vacated, amended, supplemented or otherwise modified without the Backstop Facility Lender's consent;

(3) the repayment in full in cash (or otherwise in accordance with Section 7.02(f) of the Settlement Agreement or the Lease Repayment Option (as defined in the Junior DIP Credit Agreement)) of all indebtedness and other obligations outstanding under the Junior DIP Credit Agreement;

(4) all other MPT Agreed Claims shall have been paid in accordance with the Recovery Waterfall;

(5) the full amount of the GUC Trust Holdback, as well as any amount allocated to the Estates under Tranches 6, 7 or 8 of the Recovery Waterfall and/or for distribution to holders of General Unsecured Claims pursuant to Class 8 – General Unsecured Claims pursuant Article III.B.8.b (ii) of the Plan, shall have been used by the Debtors to pay allowed Administrative Claims, Priority Tax Claims and Other Priority Claims in connection with consummation of the Plan; and

(6) all accrued and unpaid fees and expenses to be paid under the Backstop Facility for which invoices have been presented, if any, shall have been paid.

**D.    Professional Compensation Claims**

1.    <u>Final Fee Applications and Payment of Professional Compensation Claims</u>

All requests for payment of Professional Compensation Claims (other than from OCPs) for services rendered and reimbursement of expenses incurred through the Effective Date shall be

filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims (subject to the Approved Budget) after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. Objections to Professional Compensation Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Compensation Claims. Following such twenty-one (21) day period, if no objections have been filed, the Court may enter an order approving the payment of such Professional Compensation Claims, absent a hearing. Upon entry of any such order, the Plan Administrator shall make all payments for any such approved Professional Compensation Claims in accordance with Article II.D.3 of the Plan. To the extent any Cash is remaining in the Professional Fee Reserve Account following irrevocable payment in full of all Allowed Professional Compensation Claims (including Allowed Professional Compensation Claims arising after the Confirmation Date), such Cash shall be transferred to the Wind-Down Debtors.

### 2. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Plan Administrator (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Plan Administrator (as applicable). Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Plan Administrator (as applicable) may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Plan Administrator (as applicable) shall pay, within ten (10) Business Days after submission of a detailed invoice such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors or the Plan Administrator (as applicable). If the Debtors or the Plan Administrator dispute the reasonableness of any such invoice, the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### 3. Professional Fee Reserve Account

On the Effective Date, the Debtors shall fund an amount in Cash into the Professional Fee Reserve Account equal to (a) the aggregate accrued and unpaid Professional Compensation Claims as of the Effective Date (which shall be estimated by each applicable Professional in its reasonable discretion based on the amount of then-accrued Professional Compensation Claims plus a reasonable estimate of fees and expenses that will accrue up until the Effective Date), less (b) any amount then held in the Professional Fee Reserve Account.

Funds held in the Professional Fee Reserve Account shall be held for the benefit of the Professionals and shall not be property of the Estates. The Professionals shall reasonably and in

good faith estimate their Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimates to the Debtors no later than ten (10) Business Days prior to the anticipated Effective Date, such estimates may be revised and provided to the Debtors no later than two (2) Business Days prior to the anticipated Effective Date.

Professional Compensation Claims shall be paid in full without interest or other earnings therefrom, in Cash, from the Professional Fee Reserve Account, in such amounts as are Allowed by the Bankruptcy Court, as soon as reasonably practicable after such Professional Compensation Claims are Allowed. The obligations of the Estates with respect to Professional Compensation Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Reserve Account. To the extent that funds held in the Professional Fee Reserve Account are insufficient to satisfy the amount of accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency. No Liens, claims, or interests shall encumber the Professional Fee Reserve Account in any way, other than customary liens in favor of the depository bank at which the Professional Fee Reserve Account is maintained.

### E.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

### F.      Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Plan Administrator shall pay any and all Statutory Fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each of the Debtors and the Plan Administrator, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of a Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE VI.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.      Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in another Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been otherwise paid, released, or satisfied at any time.

The treatment of Claims and Interests shall be consistent in all respect with the Global Settlement Agreement and the related Recovery Waterfall and the Junior DIP Orders, as set forth therein.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | MPT Agreed Claims | Impaired | Entitled to Vote |
| Class 4 | MPT Note Claims | Impaired | Entitled to Vote |
| Class 5 | PhysicianCo Subordinated Secured Note Claims | Impaired | Entitled to Vote |
| Class 6 | PBGC Secured Claim | Impaired | Entitled to Vote |
| Class 7 | Insured Claims | Impaired | Entitled to Vote |
| Class 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| Class 11 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

**B.** **Treatment of Claims and Interests**

1. <u>Class 1 – Other Secured Claims</u>

   a. *Classification:* Class 1 consists of all Other Secured Claims.

   b. *Treatment:* Except to the extent the Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, at the Debtors' option: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; or (iii) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; provided that any Other Secured Claims assumed by any Purchaser shall be deemed paid in full under the Plan. For the avoidance of doubt, the treatment of all Other Secured Claims shall be consistent with the Recovery Waterfall and the DIP Orders, including any exhibits thereto.

   c. *Voting:* Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 – Other Priority Claims</u>

   a. *Classification:* Class 2 consists of all Other Priority Claims.

   b. *Treatment:* Except to the extent the Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, treatment in a manner consistent with section 1129(a)(9) of the

Bankruptcy Code; provided that any Other Priority Claim assumed by any Purchaser shall be deemed paid in full under the Plan.

c.  *Voting:*  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3 – MPT Agreed Claims

a.  *Classification:*  Class 3 consists of all MPT Agreed Claims.

b.  *Treatment:*  To the extent any Allowed MPT Agreed Claims remain outstanding on the Effective Date, and except to the extent that a Holder of an Allowed MPT Agreed Claim agrees to less favorable treatment, each Holder of an Allowed MPT Agreed Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, in each case subject to the Recovery Waterfall, the Global Settlement Agreement and the Junior DIP Orders:  (i) on account of any MPT Senior Agreed Claim, 90% of the Net Proceeds (other than Net Proceeds of Assigned Estate Causes of Action, but including (subject to Article IV.H of the Plan) the proceeds of or recoveries from any Estate Cause of Action against Yale) (in each case, to the extent such allocation of Net Proceeds has not already been remitted on account of the MPT Senior Agreed Claims pursuant to the Global Settlement Agreement and Junior DIP Orders); and (ii) on account of any MPT Junior Agreed Claim, (A) 78% of the Net Proceeds (other than Net Proceeds of Assigned Estate Causes of Action, but including (subject to Article IV.H of the Plan) the proceeds of or recoveries from any Estate Cause of Action against Yale) (in each case, to the extent such allocation of Net Proceeds has not already been remitted on account of the MPT Junior Agreed Claims pursuant to the Global Settlement Agreement and Junior DIP Orders); and (B) subject to

Article IV.H.2 of the Plan, any MPT Deficiency Claim that remains unpaid shall be deemed a General Unsecured Claim under Class 8.

    c.    *Voting:* Class 3 is Impaired, and Holders of Class 3 MPT Agreed Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – MPT Note Claims</u>

    a.    *Classification:* Class 4 consists of all MPT Note Claims.

    b.    *Allowance:* On the Effective Date, the MPT Note Claims shall be Allowed in the aggregate amount of $755,353,205.89.

    c.    *Treatment*: To the extent any Allowed MPT Note Claims remain outstanding against PhysicianCo on the Effective Date, and except to the extent that a Holder of an Allowed MPT Note Claim agrees to less favorable treatment, each Holder of an Allowed MPT Note Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim its Pro Rata share of the PhysicianCo Assets (including PhysicianCo Causes of Action and the proceeds thereof).

    d.    *Voting:* Class 4 is Impaired, and Holders of Class 4 MPT Note Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – PhysicianCo Subordinated Secured Note Claims</u>

    a.    *Classification:* Class 5 consists of all PhysicianCo Subordinated Secured Note Claims.

    b.    *Treatment:* To the extent any Allowed PhysicianCo Subordinated Secured Note Claims remain outstanding on the Effective Date, and except to the extent that a Holder of an Allowed PhysicianCo Subordinated Secured Note Claim agrees to less favorable treatment, each Holder of an Allowed PhysicianCo Subordinated Secured Note Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim its Pro Rata share of the PhysicianCo Assets (including PhysicianCo Causes of Action and the proceeds thereof) after payment in full of the Allowed MPT Note Claims. If Class 5 votes in favor of the Plan, Holders of Allowed PhysicianCo Subordinated Secured Note Claims shall be Released Parties; otherwise they shall not be Released Parties.

     c.      *Voting:*  Class 5 is Impaired, and Holders of Class 5 PhysicianCo Subordinated Secured Note Claims are entitled to vote to accept or reject the Plan.

6.      <u>Class 6 – PBGC Secured Claim</u>

     a.      *Classification:*  Class 6 consists of the PBGC Secured Claim.

     b.      *Treatment:*  To the extent any Allowed PBGC Secured Claims remain outstanding on the Effective Date, and except to the extent PBGC agrees in writing to less favorable treatment, PBGC shall receive in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Secured Claim, subject to the PBGC Waiver:

          i.     if the PhysicianCo Release Effective Date does not occur on or before the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, shall establish the PBGC Reserve Account and reserve Cash sufficient to fund such account in accordance with the PBGC Waiver; *provided*, that the PBGC Reserve Account shall terminate, and the amounts held therein shall be distributed pursuant to the Recovery Waterfall, upon the earlier of (a) the PhysicianCo Release Effective Date and (b) the expiration of two (2) years following the PhysicianCo Petition Date with no timely challenge to the PBGC Payment having been asserted in the chapter 11 proceedings; or

          ii.    if the PhysicianCo Release Effective Date occurs on or before the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, shall not establish or fund any PBGC Reserve Account, and PBGC waives any participation on account of its Allowed PBGC Secured Claim or adequate protection with respect thereto in any remaining Net Proceeds (if any) allocated to the Debtors' Estates pursuant to Tranches 3 and 4 of the Recovery Waterfall.

     c.      *Voting:*  Class 6 is Impaired and PBGC is entitled to vote to accept or reject the Plan.

7.      <u>Class 7 – Insured Claims</u>

     a.      *Classification:*  Class 7 consists of all Insured Claims.

     b.      *Treatment:*  Except to the extent that a Holder of an Insured Claim agrees to less favorable treatment, each Holder of an Insured Claim shall receive, in full and final satisfaction, settlement, release, and

discharge of such Claim, the treatment provided in the Post-Confirmation Claims Resolution Procedures.

Pursuant to the Post-Confirmation Claims Resolution Procedures, the Insurance Trustee and applicable Holder shall exchange offers to agree on the Allowed amount of such Holder's Insured Claim, which may be paid from the Insurance Trust and/or an Allowed General Unsecured Claim, and the remaining unpaid amount of such Holder's Insured Claim may be liquidated in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies.  If the offer exchange procedures do not result in a consensual resolution of the Allowed amount of such Holder's Insured Claim, the Insurance Trustee and applicable Holder shall proceed to mediation under the terms of the Post-Confirmation Claims Resolution Procedures.  If mediation is unsuccessful (or for any other reason described in the Post-Confirmation Claims Resolution Procedures), the applicable Holder can liquidate their Insured Claim in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies, and in the event that (A) the applicable Insurer denies the tender of defense or there are no applicable or available Insurance Policies, or (B) the proceeds from applicable and available Insurance Policies have been exhausted or are otherwise insufficient to pay in full a Holder's Allowed Insured Claim, as determined by an order or judgment by a court of competent jurisdiction or under a settlement or compromise of such Holder's Allowed Insured Claim, then such Holder shall be entitled to its Pro Rata share of GUC Trust Interests as if such Holder was a member of Class 8 – General Unsecured Claims, based on the amount of an Allowed Claim equal to the amount of the Allowed Insured Claim less the amount of available proceeds paid on such Allowed Insured Claim from the applicable and available Insurance Policies (the "<u>Insured Deficiency Claim</u>").

In no event shall any Holder of an Allowed Insured Deficiency Claim be entitled to receive more than one hundred percent (100%) of the Allowed amount of their respective Allowed Insured Deficiency Claim.  In no event shall any Holder of an Allowed Insured Deficiency Claim receive payment from the GUC Trust on account of such Allowed Insured Deficiency Claim in an amount that exceeds the Pro Rata share of GUC Trust Interests such Holder would have received had the Holder's Claim been classified in Class 8.

Some of the Insured Claims are fully insured, and no deductible or self-insured retention amount would be payable by the Debtors under the terms of the applicable Insurance Policy.  As to other

Insured Claims, the Debtors may owe deductible or self-insured retention amounts. The Debtors shall not be responsible to Holders of Allowed Insured Claims for any deductible or self-insured retention obligations, and all Claims for such deductibles and self-insured retention obligations shall be treated as Class 8 General Unsecured Claims, to the extent Allowed. In any event, the applicable Debtors are legally obligated to pay Allowed Insured Claims in their full face amount.

c. *Voting:* Class 7 is Impaired, and Holders of Class 7 Insured Claims are entitled to vote to accept or reject the Plan.

8. <u>Class 8 – General Unsecured Claims</u>

a. *Classification:* Class 8 consists of all General Unsecured Claims, including with respect to the HospitalCo Debtors, the PBGC Unsecured Claim.

b. *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim its Pro Rata share of (i) GUC Trust Interests (subject to the terms thereof with respect to the MPT Deficiency Claims) and (ii) the remaining Net Proceeds (if any) after distributions to Class 3, Class 4, and Class 5 (other than Net Proceeds of Assigned Estate Causes of Action, but including (subject to Article IV.H of the Plan) the proceeds of or recoveries from any Estate Cause of Action against Yale or any PhysicianCo Causes of Action); provided that (A) any General Unsecured Claim assumed by any Purchaser on a final basis shall be deemed paid in full under the Plan and shall not be entitled to any recovery from the GUC Trust Assets or remaining Net Proceeds (if any) and (B) MPT waives any participation in such remaining Net Proceeds (if any) allocated to the Debtors' Estates pursuant to Tranche 6 of the Recovery Waterfall.

c. *Voting:* Class 8 is Impaired, and Holders of Class 8 General Unsecured Claims are entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Section 510(b) Claims</u>

a. *Classification:* Class 9 consists of all Section 510(b) Claims.

b. *Treatment:* On the Effective Date, all Section 510(b) Claims shall be discharged and released, and each Holder of such Allowed Section 510(b) Claim shall not receive or retain any distribution,

property, or other value on account of its Allowed Section 510(b) Claim.

c. *Voting:* Class 9 is Impaired. Holders of Claims in Class 9 are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

10. Class 10 – Intercompany Claims

a. *Classification:* Class 10 consists of all Intercompany Claims.

b. *Treatment:* Each Intercompany Claim shall be, at the option of the Debtors, reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors.

c. *Voting:* Holders of Claims in Class 10 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

11. Class 11 – Existing Equity Interests

a. *Classification:* Class 11 consists of all Existing Equity Interests.

b. *Treatment:* All Existing Equity Interests will be cancelled and extinguished, and Holders of Existing Equity Interests shall receive no recovery on account of such Interests.

c. *Voting:* Class 11 is Impaired. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

12. Class 12 – Intercompany Interests

a. *Classification:* Class 12 consists of all Intercompany Interests.

b. *Treatment:* Each Intercompany Interest shall be, at the option of the Debtors, reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such

Intercompany Interest, or such other treatment as is reasonably determined by the Debtors.

c.    *Voting:*  Holders of Interests in Class 12 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

## C.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## D.    Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## E.    Voting Classes

The Debtors assert that only Classes 3, 4, 5, 6, 7, and 8 are impaired and entitled to vote to accept or reject the Plan.

## F.    Presumed Acceptance by Non-Voting Classes

With respect to each Debtor, if a Class contained Claims eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

## G.    Controversy Concerning Impairment

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Hearing.

## H.    Subordination of Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or

otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Plan Administrator (as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto, subject in all respects to the Global Settlement Agreement and the 9019 Order.

### I.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III of the Plan. The Debtors hereby request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plan.

### J.     Insurance

Notwithstanding anything to the contrary in the Plan, if any Claim (other than an Insured Claim, which shall receive such treatment as a Class 7 Insured Claim) is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.     General Settlement of Claims and Interests

Pursuant to section 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of such Claims or Interests, and is fair, equitable, and reasonable.

### B.     The Plan Administrator

#### 1.     The Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors and Reorganized PMH in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other governing body, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended

by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or governing body of the Wind-Down Debtors and Reorganized PMH shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and Reorganized PMH, and shall succeed to the powers of the Wind-Down Debtors' or Reorganized PMH's, as applicable, managers, directors, officers, and other governing bodies. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors and Reorganized PMH. The foregoing shall not limit the authority of the Wind-Down Debtors, Reorganized PMH, or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement or other agreement entered into on or after the Effective Date. Following the Effective Date, the Plan Administrator is given full power of attorney and had the authority to execute and/or endorse documentation on behalf of the Debtors in furtherance of the Plan and the Debtors' liquidation, including but not limited to, the filing of final tax returns and the dissolution of the Debtors.

The powers of the Plan Administrator shall include, but not be limited to, any and all powers and authority to implement the Plan and the Sale Transactions and wind down the business and affairs of the Debtors, Reorganized PMH, and the Wind-Down Debtors, including, but not limited to: (a) providing transition services and obligations required under the Purchase Agreements, including maintaining necessary licensures and government approvals, to the extent required thereunder, all as approved pursuant to the Sale Orders; (b) providing transition services required under any other asset purchase agreement(s) entered into by the Debtors and any third party and approved by the Bankruptcy Court prior to the Effective Date; (c) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors; (d) administering employee termination and wind-down matters; (e) maintaining and distributing the Professional Fee Reserve Account; (f) administering the Remnant Assets; (g) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (h) making distributions as contemplated under the Plan, except with respect to General Unsecured Claims pursuant to the GUC Trust Documents; (i) filing and prosecuting objections and/or settlements of disputed Claims that are not General Unsecured Claims, pursuant to the GUC Trust Documents; (j) upon resolution of disputed Claims that are not General Unsecured Claims, making distributions as appropriate and consistent with the GUC Trust Documents; (k) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (l) subject to the terms set forth in the Plan, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (m) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors and Reorganized PMH on and after the Effective Date; (n) administering and paying taxes of the Wind-Down Debtors or Reorganized PMH, including filing tax returns; (o) representing the interests of the Wind-Down Debtors, Reorganized PMH, or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (p) closing the Chapter 11 Cases of the Wind-Down Debtors and Reorganized PMH; (q) funding the PBGC Reserve Account (if necessary); and (r) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan and consistent with the GUC Trust Documents and the Junior DIP Orders.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator appointed by the Debtors or as approved by the Bankruptcy Court. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors and Reorganized PMH shall be terminated.

## 2. Corporate Existence

As of the Effective Date, the current board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or governing bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or governing body, as applicable, of the Debtors, or the members of any Debtor; *provided, however,* the Plan Administrator may retain certain officers as required under applicable law, including for regulatory purposes. Subject in all respects to the terms of the Plan, each Debtor shall be dissolved as soon as practicable on or after the Effective Date.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and governing body, as applicable, of the Debtors, Reorganized PMH, and the Wind-Down Debtors or the with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any Debtor, together with all other necessary corporate and company documents, to effect the dissolution of such Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any applicable Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of PMH or any of its Affiliates.

## 3. Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

4. <u>Exculpation, Indemnification, Insurance and Liability Limitation</u>

The Plan Administrator and GUC Trust Trustee and all professionals retained by the Plan Administrator or GUC Trust Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, in all respects by the Wind-Down Debtors, Reorganized PMH, or the GUC Trust, as applicable, to the fullest extent permitted by applicable law. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the obligations of the Wind-Down Debtors and Reorganized PMH, including appropriate directors' and officers' insurance with respect to the Wind-Down.

Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

5. <u>Tax Matters</u>

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each Debtor reflecting all tax consequences relating to the activities of the Wind-Down Debtors and Reorganized PMH as attributable to and for the account of the applicable Debtor and shall pay all taxes required to be paid for any of the Debtors or their Estates and Wind-Down Debtors and Reorganized PMH, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

6. <u>Pension Plan Obligations</u>

After the Effective Date, the Plan Administrator, Reorganized PMH, and the Wind-Down Debtors, as applicable, shall preserve all documents related to the Pension Plans and shall coordinate with PBGC in good faith to arrange for the delivery of such documents to PBGC upon its request. The Plan Administrator, Reorganized PMH, and the Wind-Down Debtors, as applicable, shall respond reasonably and in good faith to PBGC's requests for information regarding the Pension Plans, and each of them shall use commercially reasonable efforts to cooperate with PBGC in the transfer of the Pension Plans to PBGC and to facilitate such transfer to PBGC upon termination of the Pension Plans.

7. <u>Compensation and Expenses of the Plan Administrator</u>

The Plan Administrator's post-Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes imposed on the Wind-Down Debtors or Reorganized PMH) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve, as applicable, if such amounts relate to any actions taken hereunder.

All costs, expenses and obligations incurred by the Plan Administrator in administering the Plan, Reorganized PMH, or the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors or Reorganized PMH thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget. Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

## C.     Reorganized PMH

On the Effective Date, PMH shall take any actions as may be necessary or appropriate to establish Reorganized PMH, including the Debtors' assumption of the Sale Transaction TSAs and assignment to Reorganized PMH. Nothing herein shall modify the Plan Administrator's authority to implement the Sale Transactions pursuant to the Plan. The Wind-Down Budget shall provide for reasonable costs and expenses to operate Reorganized PMH and comply with Reorganized PMH's obligations under the assumed Sale Transactions TSAs.

## D.     Liquidation Transactions

On or before the Effective Date, the Debtors or the Plan Administrator shall enter into and take any actions that may be necessary or appropriate to effectuate the Sale Transactions or the Wind-Down, as applicable, including: (a) the execution and delivery of appropriate agreements or other documents of consolidation, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of any appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, duty, or obligation on terms consistent with the Plan; (c) the filing of appropriate documents with the appropriate governmental authorities pursuant to applicable law; and (d) any and all other actions that the Debtors or the Plan Administrator determine are necessary or appropriate to effectuate the Plan.

1.    <u>Wind Down</u>

Following the Effective Date, the Plan Administrator shall Wind-Down the business affairs and operations of the Debtors.  The responsibilities and authority of the Plan Administrator shall include the following:   (a) preserving and liquidating the Debtors' assets remaining after consummation of the Sale Transactions, if any; (b) considering, litigating, or resolving disputed Claims; (c) distributing the Distributable Cash and other assets of the Debtors' Estates pursuant to the terms of the Plan to Holders of Allowed Claims and Interests; (d) administering the Professional Fee Reserve Account and the Wind-Down Budget on the terms set forth in the Plan; (e) procuring the necessary insurance to facilitate the Wind-Down, including appropriate D&O Liability Insurance Policies; (f) administering and paying taxes, including, among other things, (i) filing tax returns (to the extent not the obligation of any Purchaser), and (ii) representing the interest and account of the Debtors before any taxing authority in all matters; (g) retaining and paying, without the need for retention or fee applications, professionals in connection with the Plan Administrator's performance of its duties under the Plan; (h) distributing information statements as required for U.S. federal income tax and other applicable tax purposes; (i) complying with any continuing obligations under the Purchase Agreements, as applicable, and the Global Settlement Agreement; (j) Filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases; (k) making distributions to Professionals for Allowed Professional Compensation Claims from the Professional Fee Reserve Account; and (l) performing such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan or an order of the Bankruptcy Court (including the Confirmation Order), or as may be necessary and proper to carry out the provisions of the Plan.

**E.      Sources of Consideration for Plan Distributions**

Subject to the provisions of the Plan concerning the Professional Fee Reserve Account and the Wind-Down Budget, the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) shall fund distributions under the Plan from (a) the Net Proceeds, (b) the proceeds of the GUC Trust, (c) the MPT GUC Advance (if applicable), (d) the Backstop Facility (if applicable), (e) the Debtors' Cash on hand, and (f) with respect to Insured Claims, the Insurance Trust.

**F.      Vesting of Assets**

Except as otherwise provided in the Plan, the Global Settlement Agreement, the 9019 Order, or the Sale Orders, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate (other than the Assigned Estate Causes of Action) and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Wind-Down Debtor or Reorganized PMH, as applicable, free and clear of all Claims, Liens, encumbrances, charges, Causes of Action, or other interests.  Subject to the terms of the Plan, on or after the Effective Date, the Plan Administrator may use, acquire, and dispose of property, and may prosecute, compromise, or settle any Claims and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

On the Effective Date, the attorney-client privilege, the attorney work product doctrine and any similar privilege against disclosure, and all other similar immunities (collectively, "Privileges") belonging to the Debtors or their Estates that concern or in any way relate to any of the Remnant Assets, or that would apply to communications, documents, or records recorded in magnetic, optical, or other form of electronic medium concerning or in any way relating to any Remnant Assets, shall vest in the Wind-Down Debtors or Reorganized PMH, as applicable. The Plan Administrator shall have the sole right to waive Privileges that concern or in any way relate to any of the Remnant Assets or that would apply to communications, documents, or electronic records concerning or in any way relating to any Remnant Assets. The Plan Administrator shall have the sole right to waive Privileges that concern or in any way relate to any of the assets vesting in the Wind-Down Debtors or Reorganized PMH, as applicable, or that would apply to communications, documents, or electronic records concerning or in any way relating to any such assets.

## G.    Preservation of Causes of Action

Except as otherwise provided in the Plan, the Global Settlement Agreement, the 9019 Order, or the Sale Orders, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (other than the Assigned Estate Causes of Action) that are not otherwise transferred or sold pursuant to the Sale Transactions or distributed pursuant to the Plan, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors and their Estates pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and their Estates as of the Effective Date. Except for any Cause of Action to enforce the Plan or any right under the 9019 Order or PBGC Waiver (to the extent the PhysicianCo Release Effective Date does not occur prior to or on the Effective Date), no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.

## H.    GUC Trust

### 1.    Interest in the GUC Trust

Any and all interests in the GUC Trust will not, and are not intended to, constitute "securities" and will not be registered pursuant to the Securities Act, as amended, or any state securities law. However, if it should be determined that interests in the GUC Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the GUC Trust. Any and all interests in the GUC Trust shall not be certificated, shall be subject to certain restrictions, and all interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. However, if it should be determined

that interests in the GUC Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the GUC Trust.

## 2. Creation and Governance of the GUC Trust

On the Effective Date, the Debtors shall be deemed to transfer to the GUC Trust all of their rights, title, and interest in and to all of the Assigned Estate Causes of Action free and clear of all Liens, charges, Claims, encumbrances, and interests, in accordance with section 1141 of the Bankruptcy Code. The GUC Trust shall be formed for the exclusive benefit of the Backstop Facility Lender and Holders of General Unsecured Claims (including the MPT Deficiency Claim). The GUC Trust Agreement shall be executed, and the Debtors (in consultation with the Committee and MPT) shall take all steps necessary to establish the GUC Trust and the beneficial interests therein in accordance with the Plan, the Global Settlement Agreement, the Junior DIP Orders and the GUC Trust Documents, as applicable.

In accordance with the Global Settlement Agreement and the Junior DIP Orders, (a) the GUC Trust Holdback consisting of $10,000,000 from all Net Proceeds (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) shall be used to fund the GUC Trust Expenses (the "Initial Contribution"); provided that the Initial Contribution may be used instead by the Debtors to the extent necessary to pay Administrative Claims, Other Priority Claims and Priority Tax Claims in connection with Confirmation (and shall be so used by the Debtors, in accordance with clause (5) of the third paragraph of Article II.C of the Plan, prior to drawing on the Backstop Facility); and (b) the first $40,000,000 of Net Proceeds of the Assigned Estate Causes of Action (paid only from proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale or any PhysicianCo Causes of Action)) (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) shall be used by the Debtors (x) first, to repay any and all amounts (including interest) owed in connection with the Backstop Facility (including the amount of the MPT GUC Advance, if any, and any interest thereon) in full in cash, and only thereafter, (y) to fund the GUC Trust Expenses and distributions to Holders of General Unsecured Claims (excluding any MPT Deficiency Claims (it being understood that, after the first $40,000,000 of such Net Proceeds have been so expended, the MPT Deficiency Claims shall share pro rata in all distributions to General Unsecured Creditors based on the Claim amount)). Notwithstanding the foregoing, if the amount of such Net Proceeds received pursuant to the foregoing clause (b)(y) is less than $10,000,000, an incremental amount of Net Proceeds of the Assigned Estate Causes of Action (paid only from proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale or any PhysicianCo Causes of Action)) (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) shall be used to ensure that a total of $10,000,000 (the "GUC Priority Recovery") is used to fund the GUC Trust Expenses and distributions to Holders of General Unsecured Claims (excluding any MPT Deficiency Claims (it being understood that, in such case, after the first $40,000,000 of such Net Proceeds and such incremental amount have been so expended, the MPT Deficiency Claims shall share pro rata in all distributions to General Unsecured Creditors based on the Claim amount)). Notwithstanding the foregoing, if more than $5,000,000 of the Initial Contribution is used by the Debtors to pay Administrative Claims and Other Priority Claims in connection with Consummation, MPT will advance (not subject to any fee) to the GUC Trust, promptly following written request by the GUC Trust, an amount equal to the difference between (x) $5,000,000 and (y) the portion of the Initial Contribution (which cannot be less than $0) not used by the Debtors to pay Administrative Claims and Other Priority Claims

in connection with Confirmation (the "MPT GUC Advance"); provided that the MPT GUC Advance shall increase dollar-for-dollar the then outstanding amount (if any) under the Backstop Facility and shall be repaid on a priority basis, as set forth herein, consistent with any other Backstop Facility obligations. The MPT GUC Advance shall be used by the GUC Trust to fund the GUC Trust Expenses. Notwithstanding anything contained in the Plan or otherwise, the GUC Trust shall first apply any amounts—other than the Initial Contribution and the proceeds of the MPT GUC Advance (which shall be used by the GUC Trust to fund GUC Trust Expenses) and proceeds of Estate Causes of Action against Yale and PhysicianCo Causes of Action (which shall be applied as set forth below)—received by the GUC Trust promptly following receipt thereof to repay the Backstop Facility (including the MPT GUC Advance) plus interest thereon (which shall accrue at a rate equal to 14.00% per annum, payable in kind (capitalizing at the end of each fiscal quarter)) until paid in full, and only thereafter shall the GUC Trust distribute amounts received (other than the Initial Contribution, the proceeds of the MPT GUC Advance, and the proceeds of Estate Causes of Action against Yale and PhysicianCo Causes of Action) in accordance with clause (b)(y) of this paragraph. For the avoidance of doubt, to the extent the GUC Trust Trustee and MPT agree that the GUC Trust will borrow additional amounts from MPT (beyond the MPT GUC Advance) to fund litigation or expenses, nothing herein shall prevent the GUC Trust from agreeing to secure such loans with proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale or any PhysicianCo Causes of Action) (after satisfaction of Tranches 1 through 4b of the Recovery Waterfall) and to repay such borrowings before distributing amounts to Holders of General Unsecured Claims, including on account of the GUC Priority Recovery.

Additional Net Proceeds of the Assigned Estate Causes of Action (excluding any Estate Cause of Action against Yale and PhysicianCo Causes of Action), paid only from proceeds of such Estate Causes of Action (after repayment of the obligations under the Backstop Facility (including the amount of the MPT GUC Advance, if any) in full in cash), shall be used to fund distributions to all Holders of General Unsecured Claims (including any MPT Deficiency Claim) on a Pro Rata basis.

Proceeds of any Estate Cause of Action against Yale shall be distributed pursuant to Tranches 1, 2, 3 & 4a, 4b, 6 and 7 of the Recovery Waterfall and the Junior DIP Orders unless MPT elects in its sole discretion that such proceeds shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders). Unless MPT elects in its sole discretion that Estate Causes of Action against Yale shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders) the costs of litigation relating to any such Estate Cause of Action against Yale will be separately funded by MPT pursuant to arrangements acceptable to MPT and no other GUC Trust assets shall be required to be used to pursue such Estate Causes of Action (it being understood that MPT shall have no obligation to provide such funding and, if MPT does not provide such funding, the proceeds of any such Estate Causes of Action against Yale shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, with such proceeds distributed to Holders of General Unsecured Claims (including any MPT Deficiency Claim on a pro rata basis, other than as provided herein))). Following the Effective Date and assignment of Estate Cause of Action against Yale to the GUC Trust for pursuit consistent with this paragraph, unless MPT has determined that the Estate Cause of Action against Yale shall be funded by the GUC Trust and the proceeds thereof

distributed in accordance with Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, MPT shall have control over settlement of any such Estate Cause of Action, subject to consultation with the GUC Trust Trustee, and MPT shall have control over the litigation of any such Estate Cause of Action, including choice of counsel, subject to consultation with the GUC Trust Trustee.

PhysicianCo Causes of Action shall be treated as Assigned Estate Causes of Action and assigned to the GUC Trust. Proceeds of such PhysicianCo Causes of Action shall be distributed to MPT on account the MPT Note Claims unless MPT elects in its sole discretion that such proceeds shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders). Notwithstanding anything to the contrary herein, MPT Notes Claims and PhysicianCo Subordinated Note Claims shall not receive any distribution on account of Assigned Estate Causes of Action that are not PhysicianCo Causes of Action. Unless MPT elects in its sole discretion that PhysicianCo Causes of Action shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders), the costs of litigation relating to any such PhysicianCo Causes of Action will be separately funded by MPT pursuant to arrangements acceptable to MPT and no other GUC Trust assets shall be required to be used to pursue such PhysicianCo Causes of Action (it being understood that MPT shall have no obligation to provide such funding and, if MPT does not provide such funding, the proceeds of any such PhysicianCo Causes of Action shall be distributed in the same manner as proceeds of other Assigned Estate Causes of Action (pursuant to Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, with such proceeds distributed to Holders of General Unsecured Claims (including any MPT Deficiency Claim on a pro rata basis, other than as provided herein)). Following the Effective Date and assignment of PhysicianCo Causes of Action to the GUC Trust for pursuit consistent with this paragraph, unless MPT has determined that the PhysicianCo Causes of Action shall be funded by the GUC Trust and the proceeds thereof distributed in accordance with Tranche 5 of the Recovery Waterfall and the Junior DIP Orders, MPT shall have control over settlement of any such PhysicianCo Causes of Action (solely to the extent such Causes of Action relate to PhysicianCo), subject to consultation with the GUC Trust Trustee, and MPT shall have control over the litigation of any such PhysicianCo Causes of Action (solely to the extent such Causes of Action relate to PhysicianCo), including choice of counsel, subject to consultation with the GUC Trust Trustee. To the extent any PhysicianCo Causes of Action are also Causes of Action of HospitalCo, the GUC Trust Trustee and MPT will negotiate in good faith to agree on any funding and settlement thereof, and the allocation with respect to the Net Proceeds thereof, and, absent agreement, shall be entitled to present any issue with respect thereto to the Bankruptcy Court.

Any transfer to the GUC Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The GUC Trust Trustee shall be the exclusive administrator of the assets of the GUC Trust for purposes of 31 U.S.C. § 3713(b) and section 6012(b)(3) of the IRC, as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trust Trustee's duties under the GUC Trust Agreement. The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trust Trustee. The powers, rights, and responsibilities of the GUC Trust Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV.H.2 of the Plan. Until repayment in full of the Backstop Facility, the Backstop Facility

Lender shall have consent rights (not to be unreasonably withheld, conditioned or delayed) over the GUC Trust Trustee's decisions with respect to the Assigned Estate Causes of Action. The GUC Trust Trustee shall hold and distribute the proceeds of the GUC Trust in accordance with the provisions of the Plan, the Junior DIP Orders, the Global Settlement Agreement and the GUC Trust Agreement. At all times, the GUC Trust Trustee shall reasonably cooperate with MPT to liquidate the GUC Trust Assets. After the Effective Date, the Debtors, Reorganized PMH, and the Wind-Down Debtors (as applicable) shall have no interest in the Assigned Estate Causes of Action except as set forth in the GUC Trust Agreement.

3.     GUC Trust Trustee and the GUC Trust Agreement

The GUC Trust Agreement generally will provide for, among other things: (a) the transfer of the Assigned Estate Causes of Action to the GUC Trust; (b) the mechanics of the payment of GUC Trust Expenses; (c) the retention of counsel, accountants, financial advisors, or other professionals; (d) litigation of any Assigned Estate Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (e) making distributions to holders of GUC Trust Interests, as provided in the Plan, the Junior DIP Orders and in the GUC Trust Agreement. The GUC Trust Trustee, on behalf of the GUC Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Assigned Estate Causes of Action, the Net Proceeds, the Backstop Facility and the MPT GUC Advance, each in accordance with the Plan, the Global Settlement Agreement, the Junior DIP Orders and the GUC Trust Agreement. The GUC Trust Agreement shall include reasonable and customary provisions that allow for indemnification of the GUC Trust Trustee by the GUC Trust. Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the proceeds of the Assigned Estate Causes of Action.

Notwithstanding anything contained in the Plan, the GUC Trust shall be established for the purpose of providing the GUC Trust Trustee with the authority to, among other things: (i) repay the obligations under the Backstop Facility (including the amount of the MPT GUC Advance, if any) in full in cash, (ii) make distributions of the GUC Trust Assets to Holders of Allowed General Unsecured Claims; (iii) reconcile, contest, object to, seek to subordinate, compromise, or settle any and all Disputed General Unsecured Claims; (iv) perform such other functions as are provided for in the Plan or the GUC Trust Documents and (v) cooperate with MPT with respect to the foregoing in accordance with the Junior DIP Orders.

4.     Cooperation of the Debtors

The Wind-Down Debtors, Reorganized PMH, and the Plan Administrator shall reasonably cooperate with the GUC Trust, MPT, the GUC Trust Trustee and their agents and representatives in the administration of the GUC Trust, including, providing reasonable access to books and records with respect to (a) the investigation, prosecution, compromise, and/or settlement of the Assigned Estate Causes of Action, (b) contesting, settling, compromising, reconciling, and objecting to Claims, and (c) administering the GUC Trust. The Wind-Down Debtors and Reorganized PMH shall take all reasonable efforts to assist the GUC Trust and MPT in connection with the foregoing, and the GUC Trust and/or MPT may enter into agreements with the Wind-

Down Debtors and Reorganized PMH in order to obtain information from the Wind-Down Debtors and Reorganized PMH on a confidential basis, without being restricted by or waiving any applicable work product, attorney-client, or other privilege. The GUC Trust's receipt of documents, information or communications from the Wind-Down Debtors or Reorganized PMH (as applicable) shall not constitute a waiver of any privilege. For the avoidance of doubt, the GUC Trust shall not be responsible for legal fees, if any, incurred by the Wind-Down Debtors, Reorganized PMH, or the Plan Administrator in fulfilling its obligations under this Article IV.H.4 or any other provisions of the Plan.

5.     Assigned Estate Causes of Action

Subject to the terms of the Plan relating to Assigned Estate Causes of Action against Yale and PhysicianCo Causes of Action, the GUC Trust Trustee shall have the exclusive right in respect of all Assigned Estate Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all such Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided in the Plan, in the Global Settlement Agreement, in the Junior DIP Orders or in the GUC Trust Agreement. From and after the Effective Date, the GUC Trust Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trust Trustee's duties under the GUC Trust Agreement. In connection with the investigation, prosecution, and/or compromise of the Assigned Estate Causes of Action (subject to the terms of the Plan relating to Assigned Estate Causes of Action against Yale and PhysicianCo Causes of Action) the GUC Trust Trustee may expend such portion of the proceeds of the GUC Trust as he or she deems necessary, as provided in the GUC Trust Agreement and the Junior DIP Orders.

The GUC Trust may elect to waive any preference claim otherwise constituting an Assigned Estate Cause of Action against any individual vendor so long as all such waived preference claims against such individual vendor and any of its affiliates are for an aggregate claimed amount not in excess of $2,000,000 per transaction.

6.     GUC Trust Expenses

From and after the Effective Date, the GUC Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the GUC Trust Expenses, including but not limited to reasonable and documented fees and expenses of the GUC Trust Trustee and the fees and expenses of any professionals retained by the GUC Trust in accordance with the Plan, the Global Settlement Agreement, the Junior DIP Orders, and the GUC Trust Agreement. The Wind-Down Debtors or Reorganized PMH shall not be responsible for any costs, fees, or expenses of the GUC Trust.

7.     Tax Treatment

In furtherance of Article IV.H of the Plan, (a) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, subject to the DOF Election, as a "grantor trust" within the meaning of sections 671 through 679 of the IRC

owned by the holders of GUC Trust Interests, which shall be treated as the grantors of such trust, consistent with the terms of the Plan; (b) the sole purpose of the GUC Trust shall be the liquidation and distribution of the Assigned Estate Causes of Action in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (c) for U.S. federal income tax purposes, all parties (including the Debtors and the Estates, holders of GUC Trust Interests and the GUC Trust Trustee) shall treat the transfer of GUC Trust Assets (net of any applicable liabilities) to the GUC Trust for the benefit of the Holders of GUC Trust Interests as, the transfer by the Debtors of the GUC Trust Assets, subject to applicable liabilities and obligations, directly to the holders of GUC Trust Interests in satisfaction of their Claims, followed by the transfer of such assets by such holders to the GUC Trust; (d) all parties shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trust Trustee (or its designee), including for U.S. federal income tax purposes; (e) the GUC Trust Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (f) the GUC Trust Trustee shall annually send to each holder of GUC Trust Interests a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal, state and local income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trust Trustee of a private letter ruling if the GUC Trust Trustee so requests one, or adverse determination by the IRS upon audit), the GUC Trust Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed General Unsecured Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any other appropriate elections (a "DOF Election")) unless, either all of the GUC Trust Assets have been distributed to the holders of the GUC Trust Interests or the percentage of the GUC Trust Assets distributable to each holder of the GUC Trust Interests has become fixed and determinable, and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of GUC Trust Interests and the GUC Trust Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. As to any assets allocable to, or retained on account of, Disputed General Unsecured Claims, all distributions shall be net of any expenses, including taxes, relating to the retention or disposition of such assets, and the GUC Trust Trustee shall be responsible for payment, solely out of the assets of such retained assets, of any taxes imposed on or in respect of such assets. All parties (including the Debtors, Reorganized PMH, and the Wind-Down Debtors, the Estates, the GUC Trust Trustee and the holders of GUC Trust Interests) will be required to report for tax purposes consistently with the foregoing.

<h3>8.    Termination and Dissolution of the GUC Trust</h3>

The GUC Trust Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trust Trustee under the Plan and the GUC Trust Agreement have been made, in accordance with the Global Settlement Agreement and Junior DIP Orders. Upon termination and dissolution of the GUC Trust, any remaining proceeds of the GUC Trust shall be distributed to holders of GUC Trust Interests in accordance with the GUC Trust Agreement.

### 9. Single Satisfaction of Allowed Claims from the GUC Trust

Notwithstanding anything to the contrary in the Plan, in no event shall holders of GUC Trust Interests recover more than the full amount of their Allowed Claims from the GUC Trust.

## I. Insurance Trust

### 1. Creation and Purpose of the Insurance Trust

On or prior to the Effective Date, the Debtors shall take all necessary steps to establish the Insurance Trust as one or more standalone trust and/or sub-trusts in accordance with the Plan and the Insurance Trust Documents. The corpus of the Insurance Trust shall consist of the Insurance Trust Assets. The Debtors shall transfer the Insurance Trust Assets to the Insurance Trust. Neither the D&O Liability Insurance Policies nor their proceeds shall be transferred to the Insurance Trust or become Insurance Trust Assets at any time.

The Insurance Trust shall be established for the purposes of liquidating the Insurance Trust Assets and distributing the proceeds thereof in accordance with the Plan and the Insurance Trust Documents, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Insurance Trust and the purposes described in the Plan. Upon the transfer of the Insurance Trust Assets to the Insurance Trust, the Debtors will have no reversionary or further interest in or with respect to the Insurance Trust Assets.

### 2. Insurance Trustee and Insurance Trust Agreement

The Debtors have designated the Insurance Trustee for the Insurance Trust for the purposes of administering the Insurance Trust, as more fully described in the Insurance Trust Documents. The reasonable costs and expenses of the Insurance Trustee shall be paid from the Insurance Trust.

The Insurance Trust Agreement generally will provide for, among other things: (a) the transfer of the Insurance Trust Assets to the Insurance Trust; (b) the mechanics of the payment of the reasonable costs and expenses of the Insurance Trustee; (c) the retention of counsel, accountants, financial advisors, or other professionals; and (d) making distributions to applicable holders of Allowed Insured Claims . The Insurance Trustee, on behalf of the Insurance Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Insurance Trust Assets, in accordance with the Plan and the Insurance Trust Agreement. The Insurance Trust Agreement shall include reasonable and customary provisions that allow for indemnification of the Insurance Trustee by the Insurance Trust. Any such indemnification shall be the sole responsibility of the Insurance Trust and payable solely from the proceeds of the Insurance Trust Assets.

### 3. Administration of Insured Claims

All Insured Claims will be administered pursuant to the Post-Confirmation Claims Resolution Procedures and any other Insurance Trust Documents. The Post-Confirmation Claims Resolution Procedures shall conform with the Claims Resolution Procedures (with only necessary

Plan-related modifications).  Pursuant to the Post-Confirmation Claims Resolution Procedures, the Insurance Trustee may make offers or agree in mediation with a Holder of an Insured Claim on the Allowed amount of such Holder's Insured Claim, which may be paid from the Insurance Trust and/or an Allowed General Unsecured Claim, and the remaining unpaid amount of such Holder's Insured Claim may be liquidated in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies.  The Insurance Trustee shall not use Insurance Trust Assets from Settled Insurance Policies that provided coverage only to the Debtors' Pennsylvania operations to pay any Allowed Insured Claims that are non-Pennsylvania Insured Claims, and *vice versa*.  The Insurance Trustee may, however, use Insurance Trust Assets from Settled Insurance Policies from one policy year of coverage to pay Allowed Insured Claims that trigger a different policy year of coverage.

The Debtors or the Insurance Trustee, as applicable, shall provide regular notifications to Holders of outstanding Insured Claims regarding the amount of Insurance Trust Assets in the Insurance Trust and the Debtors' Insurers that have become Settling Insurers and the Insurance Policies that have become Settled Insurance Policies.  Upon reasonable request of a Holder of an Insured Claim, the Debtors or the Insurance Trustee, as applicable, shall inform such Holder as to the status of the Insurance Policies that may provide coverage for such Holder's Insured Claim.

### 4. Cooperation of the Debtors

The Wind-Down Debtors, Reorganized PMH, and the Plan Administrator shall reasonably cooperate with the Insurance Trust, the Insurance Trustee and their agents and representatives in the administration of the Insurance Trust, including, providing reasonable access to books and records with respect to contesting, settling, compromising, reconciling, and objecting to Claims, and administering the Insurance Trust.  The Wind-Down Debtors and Reorganized PMH shall take all reasonable efforts to assist the Insurance Trust in connection with the foregoing, and the Insurance Trust may enter into agreements with the Wind-Down Debtors or Reorganized PMH in order to obtain information from the Wind-Down Debtors or Reorganized PMH on a confidential basis, without being restricted by or waiving any applicable work product, attorney client, or other privilege.  The Insurance Trust's receipt of documents, information or communications from the Wind-Down Debtors or Reorganized PMH shall not constitute a waiver of any privilege.

### 5. Single Satisfaction of Allowed Claims from the Insurance Trust

Notwithstanding anything to the contrary herein, in no event shall holders of Allowed Insured Claims recover more than the full amount of their Allowed Insured Claims from the Insurance Trust.

### 6. Interest in the Insurance Trust

Any and all interests in the Insurance Trust will not, and are not intended to, constitute "securities" and will not be registered pursuant to the Securities Act, as amended, or any state securities law.  However, if it should be determined that interests in the Insurance Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the Insurance Trust (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).

7.    Tax Treatment

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, except to the extent the Debtors determine otherwise in their reasonable discretion to treat all or any portion of the Insurance Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, the Debtors expect to treat the Insurance Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the Insurance Trustee will take a position on the Insurance Trust's tax return accordingly.  To the extent the Debtors determine in their reasonable discretion to treat all or any portion of the Insurance Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes.

**J.    Corporate Action**

On the Effective Date, the Debtors shall not be dissolved unless and until the Plan Administrator determines that dissolution will not have any adverse impact on the value of the Debtors' assets; *provided* that neither the Debtors nor any party released pursuant to Article VIII of the Plan shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors; *provided further* that nothing in the Plan shall be construed as relieving the Debtors or the Plan Administrator (as applicable) of their duties to pay Statutory Fees as required by the Bankruptcy Code and applicable law until such time as a final decree is entered in the Debtors' Chapter 11 Cases or the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  The Plan Administrator shall submit with the appropriate governmental agencies a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a Certificate of Dissolution from the applicable Secretary of State or equivalent body.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers of the Debtors shall be deemed to have resigned in favor of the ongoing administration of the Debtors' affairs by the Plan Administrator.  From and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Debtors' Estates, as applicable, provided that neither of them shall have duties other than as expressly set forth in the Plan or the Confirmation Order.

**K.    Cancellation of Existing Securities and Agreements**

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan and the Global Settlement Agreement, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Plan Administrator.  The Holders of or parties to such cancelled instruments,

securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

### L. Effectuating Documents; Further Transactions

Upon entry of the Confirmation Order, the Debtors or the Plan Administrator (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan. The Debtors or the Plan Administrator, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### M. Section 1146 Exemption from Certain Taxes and Fees

To the extent permitted by section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan, (iv) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument or transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, deed tax, stamp tax, conveyance fee, intangibles other or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment, and as directed by and upon entry of the Confirmation Order, the appropriate U.S. federal, state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

### N. Sale Orders

Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Plan Supplement shall affect, impair or supersede the Sale Orders or Sale Transactions Documents, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan or the Plan Supplement.

### O. DIP Orders

Notwithstanding anything to the contrary herein, nothing in the Plan or the Plan Supplement shall affect, impair, or supersede the DIP Orders, each of which remains in full force and effect and governs (to the extent there are any obligations remaining under the relevant DIP Documents) in the event of any inconsistency with the Plan or the Plan Supplement.

### P. Authority to Act

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

### Q. Separate Plans

Notwithstanding the combination of separate chapter 11 plans for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the Confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VIII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein (which exclusion includes the Indemnification Obligations and the D&O Liability Insurance Policies) or otherwise identified on the Schedule of Assumed Executory Contracts and Unexpired Leases or Deferred Decision Contracts Schedule, if any (which shall be included in the Plan Supplement), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than the Global Settlement Agreement and those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Transactions Documents or the Plan, and payment of any Cures relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

Any objection to the proposed assumption or cure amount by a counterparty to an Executory Contract of Unexpired Lease must be Filed by no later than the date provided in the applicable notice of assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. Notwithstanding anything to the contrary in the Plan, the Debtors, as applicable, reserve the right to alter, amend, modify, or supplement Schedule of Assumed Executory Contracts and Unexpired Leases, in each case, at any time through and including the Deferred Decision Deadline, which such amended Schedule of

Assumed Executory Contracts and Unexpired Leases shall be Filed with the Bankruptcy Court; *provided*, *however*, that after the Confirmation Date, the Debtors may not subsequently reject any Executory Contract, other than a Deferred Decision Contract, previously designated as assumed or assumed and assigned absent the consent of the applicable contract counterparty, or an order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure claim.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Bankruptcy Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Plan Administrator within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable. Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions of the Plan.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties**.

**C.      Reservation of Rights**

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors or the Plan Administrator, or their respective affiliates has any liability thereunder. Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, or the Plan Administrator under any executory or non-executory contract or unexpired or expired lease. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors, Reorganized PMH, the Wind-Down Debtors, or the GUC Trust Trustee (as applicable) shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations. The Plan shall constitute a motion to reject all such Executory Contracts or Unexpired Leases that are subject to rejection under Article V of the Plan.

### E. Indemnity Obligations

Each of the Debtors' Indemnification Obligations shall not be discharged, impaired, or otherwise affected by the Plan. The Indemnification Obligations shall be deemed Executory Contracts assumed by the Debtors under the Plan.

### F. Insurance Policies

Each Insurance Policy to which the Debtors are a party as of the Effective Date shall be deemed an Executory Contract and shall be automatically assumed or assumed and assigned by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

### G. Employment Agreements

Any Employment Agreement not assumed and assigned pursuant to the Sale Transactions Documents as part of the Sale Transactions shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code on the Effective Date of the Plan.

### H. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

## I. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## J. Employee Compensation and Benefits

With the exception of the Pension Plans, all employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Plan, nothing in the Plan or in the Confirmation Order shall be deemed or construed as a finding that the Pension Plans are Executory Contracts, nor shall the Pension Plans be deemed rejected or rejectable pursuant to the Plan or otherwise, it being expressly understood that Title IV of ERISA provides the exclusive means for terminating the Pension Plans, 29 U.S.C. § 1341(a)(1).

## ARTICLE IX.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A. Distributions on Account of Claims Allowed as of the Effective Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. Consistent with the Plan and the GUC Trust Documents, the applicable Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The applicable Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

Except as otherwise provided in the Plan and consistent with the GUC Trust Documents, the applicable Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the applicable Disbursing Agent; *provided, further*, that to the extent a Proof of Claim has been filed, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. Notwithstanding the foregoing, the applicable Disbursing Agent shall make distributions to PBGC in accordance with PBGC's written instructions.

## B.    Compliance with Tax Requirements

In connection with the Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (a) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (b) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under the Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to the Plan and remitted to the appropriate Governmental Unit shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Plan Administrator or GUC Trust Trustee, as applicable, the appropriate IRS Form or other tax forms or documentation requested by the Plan Administrator or GUC Trust Trustee, as applicable, to reduce or eliminate any required U.S. federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Administrator for distribution to the GUC Trust and any Claim in respect of such distribution under the Plan shall be discharged and forever barred from assertion against such Debtor or the Plan Administrator or its respective property.  PBGC shall not be required to deliver any IRS Form or other tax forms or documentation in order to receive any distribution to which it may be entitled under the Plan.

Notwithstanding the above, each Holder of an Allowed Claim or Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## C.    Date of Distributions

Distributions shall be made on or after the Effective Date to Holders of Allowed Claims or Allowed Interests.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### D. Disbursing Agent

Except as may be otherwise provided in the Sale Orders, all distributions under the Plan shall be made by the applicable Disbursing Agent on and after the Effective Date and as provided in the Plan and consistent with the GUC Trust Documents and the Junior DIP Orders. The applicable Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### E. Rights and Powers of Disbursing Agent

The applicable Disbursing Agent may: (a) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan and GUC Trust Documents; (b) make all distributions contemplated hereby; and (c) perform such other duties as may be required of the applicable Disbursing Agent pursuant to the Plan or GUC Trust Documents or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### F. Surrender of Instruments

As a condition precedent to receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Plan Administrator or the Plan Administrator's designee. Any holder of such instrument or note that fails to (a) surrender the instrument or note or (b) execute and deliver an affidavit of loss or indemnity reasonably satisfactory to the Plan Administrator and furnish a bond in form, substance, and amount reasonably satisfactory to the Plan Administrator within six (6) months of being entitled to such distribution shall be deemed to have forfeited all rights and claims and may not participate in any distribution hereunder.

### G. Delivery of Distributions and Undeliverable or Unclaimed Distributions

Subject to applicable Bankruptcy Rules and the GUC Trust Documents, all distributions to Holders of Allowed Claims or Allowed Interests shall be made by the applicable Disbursing Agent, who shall transmit such distributions to the applicable Holders of Allowed Claims or Interests or their designees.

If any distribution to a Holder of an Allowed Claim (a) is returned as undeliverable for lack of a current address or otherwise or (b) is not cashed or otherwise presented for collection by the Holder of the Allowed Claim within ninety (90) calendar days after the mailing of such distribution, the Plan Administrator or GUC Trust Trustee, as applicable, shall be authorized to cancel such distribution check and File with the Bankruptcy Court the name and last known address of the Holder of undeliverable distribution or uncashed distribution, as applicable. If, after the passage of thirty (30) calendar days after such Filing, the payment or distribution on the Allowed Claim still cannot be made, then (a) the Holder of such Claim shall cease to be entitled to the undeliverable distribution or uncashed distribution, which will revert to the Plan Administrator or GUC Trust Trustee, as applicable, for distribution in accordance with the terms of the Plan and GUC Trust Documents, if applicable, and (b) the Allowed Claim of such Holder shall be deemed disallowed and expunged for purposes of further distributions under the Plan.

### H. Manner of Payment

Except as specifically provided in the Plan, at the option of the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### I. Foreign Currency Exchange Rate

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal* on the Petition Date.

### J. Setoffs and Recoupment

The Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), and applicable bankruptcy and/or non-bankruptcy law, without the approval of the Bankruptcy Court and upon no less than fourteen (14) calendar days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims of any nature whatsoever that the Debtors or their Estates may have against the Holder of such Allowed Claim; *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, of any such claim the Debtors or their Estates may have against the Holder of such Claim.

Notwithstanding anything to the contrary in the Plan, the DIP Claims and any Plan distributions to be made on account of such DIP Claims shall not be subject to set off and/or recoupment by the Debtors, Reorganized PMH, or the Wind-Down Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors, Reorganized PMH, and the Wind-Down Debtors hereby waive any and all rights of set off or recoupment against such DIP Claims.

### K. Minimum Distribution

No payment of Cash in an amount of less than one hundred U.S. dollars ($100.00) shall be required to be made on account of any Allowed Claim. Such undistributed amount may instead be used in accordance with the Plan and the Wind-Down Budget. If the Cash available for the final distribution is less than the cost to distribute such funds, the Plan Administrator or GUC Trust Trustee, as applicable, may donate such funds to the unaffiliated charity of its choice.

### L. Allocations

Except as otherwise provided in the Plan, the GUC Trust Documents, or any DIP Order or as otherwise required by law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### M. Distributions Free and Clear

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

### N. Claims Paid or Payable by Third Parties

#### 1. Claims Paid by Third Parties

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Plan Administrator or the GUC Trust Trustee (as applicable) without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors, the Plan Administrator, or the GUC Trust Trustee (as applicable) on account of such Claim, such Holder shall, within fourteen (14) calendar days of receipt thereof (forty-five (45) calendar days if the recipient is the PBGC), repay or return the distribution to the Plan Administrator or the GUC Trust Trustee (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

#### 2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as set forth in Article VIII of the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Plan Administrator or Insurance Trustee, may hold against any other Entity, including Insurers under Insurance Policies, nor shall anything contained in the Plan constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

### O. No Post-Petition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Global Settlement Agreement, the 9019 Order, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

### ARTICLE X.
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A. Allowance of Claims

Consistent with Article IV.H.3 of the Plan and the GUC Trust Documents, after the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest that are not General Unsecured Claims immediately prior to the Effective Date.

### B. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, including Article IV.H.3, the GUC Trust Documents, or the Insurance Trust Documents, and only with respect to any Claims or Interests that are not General Unsecured Claims, after the Effective Date, the Plan Administrator shall have the sole authority to: (a) File, withdraw, or litigate to judgment, objections to such Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court with respect to such Claims and Interests.

### C. Estimation of Claims and Interests

In accordance with the Plan, including Article IV.H.3, and the GUC Trust Documents, before or after the Effective Date, the Debtors, the Plan Administrator, or GUC Trust Trustee as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged or disallowed from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court or as otherwise provided pursuant to a Final Order of the Bankruptcy Court (including any stipulation). In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim the Debtors, the Plan Administrator, or GUC Trust Trustee as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### D. Adjustment to Claims or Interests Without Objection

Any Claim that has been paid, satisfied, or assumed by the Purchaser(s) in the Sale Transactions, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Plan Administrator, GUC Trust Trustee, as applicable, without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E. Time to File Objections to Claims

Except as otherwise provided in the Plan, any objections to Claims shall be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Debtors or the Plan Administrator, as applicable).

### F. Disallowance of Claims or Interests

Except as otherwise expressly set forth in the Plan, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Plan Administrator, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### G. Disallowance of Late Claims

Except as provided in the Plan or otherwise agreed to by the Debtors, the Plan Administrator, or GUC Trust Trustee, as applicable, any Holder of a Claim Filed via Proof of Claim after the Bar Date shall not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### H. Disputed Claims Process

All Claims held by Persons or Entities against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  A Claim deemed Disputed pursuant to Article VII.H of the Plan shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors the Plan Administrator, or GUC Trust Trustee, as applicable, from such Holder have been paid.

### I. Amendments to Claims

Except as provided in the Plan, on or after the Effective Date, without the prior authorization of the Bankruptcy Court, the Debtors, the Plan Administrator, or the GUC Trust Trustee, as applicable, a Claim may not be Filed or amended, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### J. No Distributions Pending Allowance

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

### K. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Wind-Down Debtors, Reorganized PMH, or the GUC Trustee, as applicable, shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan, unless otherwise provided by order of the Bankruptcy Court. No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim unless the Plan provides otherwise.

## ARTICLE XI.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Debtor Release[31]

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that any of the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as**

---

[31] Release provisions remain subject to ongoing review and modification, including as part of the Independent Investigation. Accordingly, the Debtors reserve the right to modify the persons listed, if any, on the Non-Released Parties Schedule.

applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the 9019 Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claim or obligation arising under the Plan, or (c) any Claims or Causes of Action that are determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, Reorganized PMH, the Wind-Down Debtors, and their Estates, (as applicable) asserting any claim or Cause of Action released pursuant to the Debtor Release.

B.     Third-Party Release

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims or Causes of Action asserted or assertable on behalf of the Debtors or their Estates, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, the 9019 Order, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) actual fraud, willful misconduct, or gross negligence as determined by a Final Order, or (c) any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall

constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall release, impair or otherwise affect any party's, including MPT's (a) rights to enforce the Global Settlement Agreement and the Junior DIP Orders, (b) rights, liens, security interests or obligations in respect of the HospitalCo Intercreditor Agreement, or (c) claims or Causes of Action of any kind against any non-Debtor subsidiaries of Prospect Medical Holdings, Inc.

Subject to the terms of this Plan (including the Settling Insurer Injunction) and the Insurance Trust Documents, the Third-Party Release shall not preclude a Holder of an Insured Claim from pursuing an action against one or more of the Debtors in a nominal capacity to liquidate such Holder's Insured Claim in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies or to determine the amount of an Insured Deficiency Claim.

C.     Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from any claim or Cause of Action related to any act or omission taking place between the Petition Date and the Effective Date in connection with, relating to, or arising out of the Debtor-Related Matters, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, the Global Settlement Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Assigned Estate Causes of Action.

D.     Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests or Causes of Action, as applicable, that have been released, discharged, satisfied, stayed, or terminated or are subject to exculpation are permanently enjoined, from and after the Effective Date, from

taking any of the following actions against, as applicable, the Plan Administrator, Reorganized PMH, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties (as applicable): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable, unless such Holder has Filed a motion requesting the right to perform such setoff, subrogation, or recoupment on or before the Effective Date or expressly preserved its right to setoff, subrogation, or recoupment in a timely filed Proof of Claim, *provided*, *however*, that notwithstanding anything to the contrary in the Plan, nothing in this clause (d) shall impair any setoff, subrogation or recoupment rights of any Governmental Unit; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action, as applicable, released or settled pursuant to the Plan.

Subject to the terms of this Plan (including the Settling Insurer Injunction) and the Insurance Trust Documents, the Injunction shall not preclude a Holder of an Insured Claim from pursuing an action against one or more of the Debtors in a nominal capacity to liquidate such Holder's Insured Claim in a forum other than this Court, but solely to recover only from the available insurance coverage under the applicable Insurance Policies or to determine the amount of an Insured Deficiency Claim.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

E.     Settling Insurer Injunction

In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to a Settled Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to a Settled Insurance Policy from or against any Settling Insurer, solely to the extent that such Settling Insurer has been released

from such Claim under such Settled Insurance Policy pursuant to an settlement, sale or other transaction between a Settling Insurer and the Debtors, including:

    i. commencing, conducting or continuing in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy;

    ii. enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy;

    iii. creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy;

    iv. asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling Insurer, or against the property of such Settling Insurer, on account of such Claim based on, arising under or attributable to such Settled Insurance Policy; and

    v. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such Settled Insurance Policy.

Subject to the terms of this Plan and the Insurance Trust Documents, the Settling Insurer Injunction shall not preclude a Holder of an Insured Claim from seeking recovery from a Settling Insurer in a nominal capacity, but solely to recover only from available insurance or reinsurance provided by one or more Non-Settling Insurers.

## F.    PBGC Release & Exculpation Carve-Out

Nothing in these Chapter 11 Cases, the Disclosure Statement, the Plan, or the Confirmation Order shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plans for breach of any fiduciary duty under ERISA, with respect to the Pension Plans, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.[32] The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or other document filed in these Chapter 11 Cases. Except to the extent

---

[32] For the avoidance of doubt, this provision does not affect or alter any release provided to MPT, its affiliates or associated individuals or entities pursuant to the 9019 Order or PBGC Waiver.

otherwise specifically set forth in the Plan, and without constituting an opt-out of the Third Party Release, or in any other agreements between the Debtors and the PBGC, the Debtors shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, and any other applicable law relating to the Pension Plans.

## G. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the terms of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

If any Holder of an Other Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Other Secured Claim, as soon as practicable on or after the date such Holder has been satisfied in full pursuant to the Plan, such Holder (or the agent for such Holder) shall take any and all steps requested by the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Plan Administrator shall be entitled to make any such filings or recordings on such Holder's behalf. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## H. Gatekeeper Provision

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Exculpated Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article VIII.A, Article VIII.B, Article VIII.C, and Article VIII.D of the Plan without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against any of the Exculpated Parties and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any Exculpated Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action. Nothing in the Plan shall apply to any action by MPT

or PBGC to enforce the Global Settlement Agreement or the 9019 Order (including the PBGC Waiver).

## ARTICLE XII.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Conditions Precedent to the Effective Date

The following shall be conditions precedent to the occurrence of the Effective Date:

a)    the Bankruptcy Court shall have entered an order approving the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

b)     the Bankruptcy Court shall have entered the Confirmation Order;

c)    the Plan, the Disclosure Statement, and the other Definitive Documents shall be in full force and effect;

d)    the Sale Transactions shall have been consummated substantially on the terms described in the applicable Sale Order(s) and the Debtors shall have received the proceeds therefrom;

e)    the Debtors shall have fully funded the Professional Fee Reserve Account and the Wind-Down Budget;

f)    solely in the event the PhysicianCo Release Effective Date does not occur on or before the Effective Date, the Debtors shall have reserved Cash sufficient to fund the PBGC Reserve Account;

g)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

h)    the Plan Administrator shall have been appointed in accordance with the terms of the Plan and shall have accepted his or her appointment;

i)    the GUC Trust shall have been formed and funded in accordance with the terms hereto and consistent with the GUC Trust Documents and the Junior DIP Orders;

j)    the GUC Trust Trustee shall have been appointed in accordance with the terms of the Plan and the Junior DIP Orders and shall have accepted his or her appointment;

k)    the Debtors shall not have breached their obligations under the Global Settlement Agreement, the 9019 Order, or the Supplemental Junior DIP Order, unless such breach has been waived by the other parties thereto in accordance with its terms; and

l)    to the extent the Backstop Facility will be funded, all conditions precedent to the effectiveness of the Backstop Facility shall have been satisfied or duly waived.

**B.     Waiver of Conditions Precedent to the Effective Date**

Unless otherwise specifically provided for in the Plan, the conditions set forth in Article IX.A of the Plan may be waived, in whole or in part, by the Debtors, and, with respect to (i) and (j) in Article IX.A of the Plan, the Committee and MPT; provided, however, that Article IX.A.(f) of the Plan may only be waived with the express, written consent of PBGC.

**ARTICLE XIII.**
**RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

a) Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

b)     Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim objections, allowance, disallowance, subordination, estimation and distribution.

c)     Decide and resolve all matters related to the granting and denying, in whole or in part of, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.

d)     Resolve any matters related to:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure amount arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

e)     Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

f)     Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

g)     Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters.

h)      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

i)      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

j)      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

k)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

l)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

m)      Determine any other matters that may arise in connection with or related to the DIP Orders and the Debtors' use of cash collateral, the Sale Transactions Documents, the Global Settlement Agreement, the Disclosure Statement, the Plan, and the Confirmation Order.

n)      Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Plan.

o)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any Holder for amounts not timely repaid.

p)      Adjudicate any and all disputes arising from or relating to distributions under the Plan.

q)      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

r)      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Global Settlement Agreement, the 9019 Order or the Confirmation Order.

s)      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

t)      To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

u)      To hear and determine any Causes of Action that may be brought by the Plan Administrator or the GUC Trust Trustee.

v)    To hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtors, the Plan Administrator, or the GUC Trust Trustee pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

w)    Enter an order or final decree concluding or closing the Chapter 11 Cases.

x)    Enforce all orders previously entered by the Bankruptcy Court.

y)    Hear any other matter over which the Bankruptcy Court has jurisdiction.

**ARTICLE XIV.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

### A.    Modification and Amendment

The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided* that the Plan shall not be so amended, modified, or supplemented in any manner inconsistent with the Global Settlement Agreement, 9019 Order, the Supplemental Junior DIP Order or Recovery Waterfall without the prior written consent of MPT and the Committee.  In addition, after the Confirmation Date, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented, to the extent permitted by section 1127 of the Bankruptcy Code.

### B.    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C.    Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

### A.       Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Administrator, the Holders of Claims or Interests, the Released Parties, and each of their respective successors and assigns.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

### B.       Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Plan Administrator, or the GUC Trustee (as applicable) and all Holders of Claims or Interests receiving distributions pursuant to the Plan (solely in their capacity as such), shall from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### C.       Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

### D.       Reservation of Rights

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

### E.       Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

### F.       Determination of Tax Liabilities

As of the Effective Date, the Plan Administrator (to the extent not the responsibility of the Purchaser(s)) will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates; *provided* that the Plan Administrator shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors (which Interests shall be cancelled

pursuant to the Plan), but shall provide such Holders with any information reasonably required to prepare such forms. The Debtors or the Plan Administrator shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' Estates for any tax incurred during the administration of these Chapter 11 Cases.

### G. Dissolution of the Committee

On the Effective Date, the Committee will dissolve and the members thereof will be released and discharged from all duties and obligations arising from or related to these Chapter 11 Cases except in connection with final fee applications of Professionals for services rendered prior to the Effective Date and appeals to which the Committee is a party.

### H. Termination and Discharge of Patient Care Ombudsman

To the extent not already addressed in any Order of this Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Ombudsman in connection with the Chapter 11 Cases, and the retention or employment of the Ombudsman's attorneys, financial advisors, and other agents, shall be terminated on the Effective Date. Upon termination, the Ombudsman shall dispose of any documents provided to her in the course of her reporting with the exception of any documents the Ombudsman may be required to retain in accordance with any applicable policies or law. For the avoidance of doubt, the Ombudsman and her professionals shall be entitled to file final fee applications for allowance and payment of any fees and expense incurred to and including the Effective Date.

Prior to issuing or serving upon the Ombudsman or her professionals any formal or informal discovery request, including, but not limited to, any subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Debtors, the Chapter 11 Cases, the Ombudsman's evaluation, or her reports (collectively, the "Discovery"), any creditor or party-in interest in the Chapter 11 Cases must first file an appropriate pleading with this Bankruptcy Court to request permission to initiate the Discovery.

### I. Notices

In order for all notices, requests, and demands to or upon the Debtors or the Plan Administrator, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Prospect Medical Holdings, Inc. 3824 Hughes Ave., Culver City, CA 90232<br><br>Attn: Frank Saidara, General Counsel (frank.saidara@pmh.com) and Paul Rundell, Chief Restructuring Officer (prundell@alvarezandmarsal.com) | Sidley Austin LLP 2021 McKinney Avenue, Suite 2000 Dallas, Texas 75201 Telephone: (214) 981-3300 Facsimile: (214) 981-3400 Attn: Thomas R. Califano (tom.califano@sidley.com); Rakhee V. Patel (rpatel@sidley.com); Maegan Quejada (mquejada@sidley.com)<br><br>and<br><br>787 Seventh Avenue New York, New York 10019 Telephone: (212) 839-5300 Facsimile: (212) 839-5599 Attn: William E. Curtin (wcurtin@sidley.com); Patrick Venter (pventer@sidley.com); and Anne G. Wallice (anne.wallice@sidley.com) |
| **Plan Administrator** | **Counsel to the Plan Administrator** |
| To be provided. | To be provided. |

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Plan Administrator is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests.

**J.    Term of Injunctions or Stays**

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under the Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (a) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (b) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

### K. Entire Agreement

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan, subject to the Global Settlement Agreement and 9019 Order; *provided*, *however*, that the Global Settlement Agreement and 9019 Order shall not be superseded by the Plan with respect to the subject thereof.

### L. Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or the Plan Administrator's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website at https://omniagentsolutions.com/Prospect. All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

### M. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

### N. Nonseverability of Plan Provisions

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Administrator (as applicable); and (c) nonseverable and mutually dependent.

### O.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

### P.    Closing of the Chapter 11 Cases

After the full administration of the Chapter 11 Cases, the Plan Administrator shall promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to rule 3022-1(a) of the Bankruptcy Local Rules for the Northern District of Texas, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**ARTICLE XVI.**
**RISK FACTORS**

Prior to voting on the Plan, Holders of Claims or Interests in Class 3, Class 4, Class 5, Class 6, Class 7, and Class 8 as well as entities in Classes not entitled to vote to accept or reject the Plan, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan.  See Article XVII of this Disclosure Statement for a discussion of tax law considerations.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the votes of Holders of Classes or Interests entitled to vote to accept or reject the Plan or require a re-solicitation of the votes of Holders of Classes or Interests entitled to vote to accept or reject the Plan.

1.    <u>The Plan May Not Be Approved or Implemented</u>

The Plan may not be approved by the Bankruptcy Court, or if approved, the Conditions Precedent to the Effective Date may not occur.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against or Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- The Debtors' ability to raise additional capital;

- The Debtors' liquidity;

- How the Debtors' businesses are viewed by regulators, investors, lenders, and credit ratings agencies;

- The Debtors' enterprise value; and

- The Debtors' business relationships with customers and vendors.

2.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

There is no guarantee that the Bankruptcy Court will agree with the classification of Claims and Interests as proposed by the Plan. Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an equity interest in a particular class only if that claim or interest is substantially similar to the other claims or interests in that class. As described herein, the Debtors believes that the Plan's classification of Claims and Interests complies with the requirements under the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth Article IX of the Plan, the confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan or be forced to convert the Chapter 11 Cases to a chapter 7 liquidation.

4.    The Debtors May Fail to Satisfy the Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

5. <u>The Debtors May Not Be Able to Secure Confirmation of the Plan</u>

There is no guarantee that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the terms and timing of any plan ultimately confirmed in the Chapter 11 Cases, and the treatment of Claims and Interest will be unknown.  In addition, if the Plan is not confirmed, a significant risk exists that the Chapter 11 Cases may be converted to cases under chapter 7.   In that event, the Debtors believe that creditor recoveries would be substantially diminished.

6. <u>The Debtors May Not Be Able to Secure Nonconsensual Confirmation</u>
<u>Over Certain Impaired Non-Accepting Classes</u>

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

7. <u>Administrative Insolvency</u>

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (i.e., allowed Administrative Expense Claims) receive Cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. To the extent that a Debtor is unable to pay such Claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan.  Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of 503(b)(9) Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm a chapter 11 plan.  Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (i.e., allowed priority tax claims) receive regular installment payments in Cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan.  Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as Cash equal to the full allowed amount of such claim).

To the extent that the Debtors are unable to pay section 507(a)(2) and (a)(3) claims in full or otherwise agree to treatment with the applicable holder, the Debtors may be unable to achieve the Effective Date of the Plan. The Debtors believe they will be able to satisfy all Allowed

Administrative Expense Claims in full as of the Effective Date. However, certain factors could impact the Debtors' administrative solvency, including reconciliation of Administrative Expense Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm or achieve the Effective Date of the Plan.

8. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of, among other things (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and (c) disorderly, expensive, and prolonged liquidation.

9. The Debtors May Object to the Amount or Classification of a Claim or an Interest

Except as otherwise provided in the Plan, the DIP Orders, and the 9019 Order, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or an Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or an Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10. Releases, Injunctions, and Exculpation Provisions May Not Be Approved

Certain parties may believe that they have valid objections to the release and exculpation provisions in the Plan. The Debtors believe that any such objection is without merit; however, in the event that any such objection is sustained by the Bankruptcy Court and such release and/or exculpation provisions are modified or stricken from the Plan, parties supportive of the Plan may withdraw their support, which may result in the Debtors being unable to confirm the Plan or any other chapter 11 plan.

11. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not met and not otherwise waived, the Effective Date will not occur.

If the Effective Date does not occur, the Plan will be null and void in all respects and the Confirmation Order may be vacated. In such event, no Plan distributions will be made, the Debtors

and all holders of Claims and Interests will be restored to the status quo ante immediately prior to Confirmation, and the Debtors' obligations with respect to all Claims and Interests will remain unchanged.

**B.        Allowance of Claims**

This Disclosure Statement has been prepared based on preliminary information concerning the Debtors' books and records.  The actual amount of Allowed Claims and Interests may differ from the Debtors' current estimates.

**C.        Risks Related to Recoveries Under the Plan**

1.        <u>Recoveries Subject to Contingencies</u>

The distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, the amount of Allowed Administrative Claims, Priority Tax Claims, and Other Secured Claims, and whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.  The estimated Claims and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims and Interests that will ultimately be Allowed.  Further, the Debtors cannot predict the amount that will be recovered from prosecution and settlement of Retained Causes of Action.  Such differences and uncertainty may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Allowed Interests under the Plan.

2.        <u>Any Valuation of Any Assets to be Distributed under the Plan Is Speculative</u>

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Claims and Interests.

3.        <u>The Debtors Cannot Guarantee the Timing of Distributions</u>

The timing of actual distributions to Holders of Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim or Interest.

4.        <u>The Debtors May Not Be Able to Accurately Report Their Financial Results</u>

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of

human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

5. <u>Certain Tax Implications of the Debtors' Bankruptcy</u>

Holders of Allowed Claims and Interests should carefully review Article XVII of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

**D. Disclosure Statement Disclaimers**

1. <u>The Financial Information Contained in This Disclosure Statement Has Not Been Audited</u>

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from that financial information, provided in this Disclosure Statement, and although the Debtors believe that the financial information herein fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any conclusions or estimates drawn therefrom, is without inaccuracies.

2. <u>Information Contained in This Disclosure Statement Is For Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. <u>This Disclosure Statement Was Not Reviewed or Approved by the SEC</u>

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4. <u>This Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended. Statements containing words such as "may," "believe," "anticipate," "expect," "intend,"

119

"plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those risks described in this Article XVI.

5.        No Legal or Tax Advice Is Provided to You by This Disclosure Statement

**This Disclosure Statement is not legal or tax advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information regarding the Plan, including how to object to Confirmation of the Plan.

6.        No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.        Failure to Identify Potential Objections

No reliance should be placed on the fact that a particular Cause of Action or potential objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Plan Administrator may, pursuant to the Plan, object to applicable Claims or Interests after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies a particular Cause of Action or objection to a Claim.

8.        Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

9.        Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this

Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

      10.    <u>No Representations Outside This Disclosure Statement are Authorized</u>

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.

## ARTICLE XVII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders of Allowed Claims in Classes 3, 4, 5, 6, 7, and 8 that are entitled to vote on the Plan. The following summary does not address the U.S. federal income tax consequences to Holders of Allowed Claims who are unimpaired, deemed to accept or reject the Plan, or otherwise entitled to payment in full under the Plan. The following discussion assumes that Holders of Allowed Claims in Classes 3, 4, 5, 6, 7, and 8 hold such Claims as "capital assets" within the meaning of section 1221 of the IRC. The following summary is based on the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances (such as the effects of Section 451(b) of the IRC conforming the timing of certain income accruals to financial statements). In addition, this summary addresses only U.S. federal income taxes. Thus, the following discussion does not address foreign, state, or local tax consequences, or any estate, gift, or other non-income tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (such as Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships or S corporations and investors therein, and Holders of Claims who are themselves in bankruptcy). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and

the activities of the partnership. If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Claims that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the Laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC), and a "Non-U.S. Holder" is a Holder (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. This discussion further assumes that the various debt and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service ("IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement. The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holder of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim; (C) whether the Holder reports income using the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Claim; and (F) whether the Holder has previously taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim. The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

## A.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

### 1.     U.S. Federal Income Tax Consequences of the Sale Transactions.

The proposed Sale Transactions contemplated by the Plan are expected to be treated as a taxable sale of the Debtors' assets.

Taxable gain or loss will be recognized in an amount equal to the amount realized on the Sale Transactions, less the aggregate adjusted basis in the assets that are subject to the Sale Transactions. The amount realized on the Sale Transactions will generally be equal to the Cash proceeds from the Sale Transactions.

### 2.     Transfer of Assets to the GUC Trust.

Pursuant to the Plan, the GUC Trust will be established and receive the GUC Trust Assets. For U.S. federal income tax purposes, the transfer of the GUC Trust Assets generally is treated as equivalent to a sale of such assets at their then fair market value.

Taxable gain or loss will be recognized in an amount equal to the amount realized on the transfer, less the aggregate adjusted basis in the assets that are subject to the transfer. The amount realized on the transfer will generally be equal to the fair market value of the assets transferred.

### 3.     Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. Under Section 108 of the IRC, a taxpayer will not, however, be required to include COD Income in gross income if the discharge occurs when the taxpayer is insolvent. The amount of COD Income excluded from gross income shall not exceed the amount by which the taxpayer is insolvent.

Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses and carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.

**B.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote on the Plan**

      1.     <u>U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting Classes</u>.

In accordance with the Plan, each Holder of Allowed Claims in Classes 3, 4, 5, 6, 7, and 8 will receive its share of the distributions as provided for in the Plan.

Each U.S. Holder of Allowed Claims consisting of indebtedness for U.S. federal income tax purposes ("<u>Debt Claims</u>") will recognize gain or loss upon consummation of the Plan equal to the difference between the "amount realized" by such U.S. Holder equal to the sum of the amount of any Cash and the fair market value of any other property (including the GUC Trust Interests) received (other than any amounts attributable to accrued but unpaid interest and possibly accrued original issue discount ("<u>OID</u>")) and such U.S. Holder's adjusted tax basis in his, her or its Claim. Any such gain or loss realized by a U.S. Holder generally should constitute capital gain or loss to such U.S. Holder. If an Allowed Claim has been held for more than one year, the U.S. Holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations.

Each U.S. Holder of Allowed Claims other than Debt Claims that are treated as capital assets will recognize gain or loss upon consummation of the Plan equal to the difference between (i) the "amount realized" by such U.S. Holder equal to the sum of the amount of any Cash and the fair market value of any other property (including the GUC Trust Interests) received and (ii) such U.S. Holder's adjusted tax basis in his, her or its Claim. Any such gain or loss realized by a U.S. Holder generally should constitute capital gain or loss to such U.S. Holder. If an Allowed Claim has been held for more than one year, the U.S. Holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations.

      2.     <u>Accrued Interest</u>.

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet included in its income. If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest. The Plan provides that all distributions to a Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to the remaining portion of such Allowed Claim, if any. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest. U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

3.      _Market Discount_.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the IRC. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated redemption price or (ii) in the case of a debt instrument issued with OID, its revised issue price, in each case, by at least a _de minimis_ amount.

Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim (other than in respect of a Claim for accrued but unpaid interest) as ordinary income to the extent of the market discount that the U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

4.      _Bad Debt Deduction_.

A U.S. Holder who receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under IRC Section 166(a). The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

5.      _GUC Trust_.

The GUC Trust will be organized for the primary purpose of maximizing the value of its assets and making distributions in accordance with the Plan with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust. It is intended that the GUC Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Section 671 through 677 of the IRC. In furtherance of this objective, the GUC Trust shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC Trust. The GUC Trust assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the holders of GUC Trust Interests, and then contributed by the holders of GUC Trust Interests to the GUC Trust in exchange for their respective GUC Trust Interests. The holders of GUC Trust Interests (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of GUC Trust Assets in the GUC Trust.

U.S. Holders of Claims that receive a GUC Trust Interest will be required to report on their U.S. federal income tax returns their share of the GUC Trust's items of income gain, loss, deduction and credit in the year recognized by the GUC Trust. This requirement may result in U.S. Holders being subject to tax on their allocable share of a portion of the GUC Trust's taxable income prior to receiving any Cash distributions from the GUC Trust. On the other hand, a distribution of

Cash by the GUC Trust will not be separately taxable to a U.S. holder of GUC Trust Interests because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Trust).

All recipients of GUC Trust Interests shall use the valuation of GUC Trust Assets transferred to the GUC Trust as established by the GUC Trust Trustee for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date. The GUC Trust Trustee will be responsible for filing information on behalf of the GUC Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes. Further, the GUC Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Trust, the Debtors or the GUC Trust Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the GUC Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations. Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed on, any such account.

No request for a ruling from the IRS will be sought on the classification of the GUC Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust. If the IRS were to successfully challenge the classification of the GUC Trust as a grantor trust, the federal income tax consequences to the GUC Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

### C. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote on the Plan

Whether a Non-U.S. Holder of Allowed Claims in Classes 3, 4, 5, 6, 7, and 8 realizes gain or loss on the consummation of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders under Article XVII.B.

#### 1. Gain Recognition.

Any gain recognized by a Non-U.S. Holder of Allowed Claims in Classes 3, 4, 5, 6, 7, and 8 generally will not be subject to U.S. federal income tax with respect to property (including Cash and GUC Trust Interests) received in exchange for such Claim, unless:

- such Non-U.S. Holder is engaged in a trade or business in the United States to which such gain is "effectively connected" for U.S. federal income tax purposes (and, if required, by an applicable income tax treaty, the Non-U.S. Holder maintains

a permanent establishment or fixed base in the United States to which gain is attributable); or

- if such Non-U.S. Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first situation above generally will be subject to U.S. federal income tax on a net income basis at the regular rates. A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second situation above will be subject to U.S. federal income tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty), which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

2.    Interest on Allowed Claims.

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest on its Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

i.    the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote (after application of certain attribution rules);

ii.   the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors as described in Section 881(c)(3)(C) of the IRC;

iii.  the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

iv.   such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base of the Non-U.S. Holder (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable

income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax pursuant to clauses (i)–(iv) above generally will be subject to withholding of U.S. federal income tax on such interest or imputed interest at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty). To claim such treaty exemption, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established. For purposes of providing a properly executed IRS Form W-8BEN or W-BENE, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### D.     Information Reporting and Back-Up Withholding.

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless you are an exempt recipient. Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) timely provides a correct taxpayer identification number ("TIN") (generally in the form of a properly executed IRS Form W-9 (or a suitable substitute form) for a U.S. Holder, or applicable IRS Form W-8 (or a suitable substitute form) for a Non-U.S. Holder (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules. A Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

### E.     FATCA.

Under Sections 1471 to 1474 of the IRC (commonly referred to as the Foreign Account Tax Compliance Act ("FATCA")), unless otherwise subject to an exception, foreign financial

institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to 30% withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules, including the availability of an exemption on such Non-U.S. Holder's ownership of the consideration being received under the Plan.

**F.      Importance of Obtaining Professional Tax Assistance.**

The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The U.S. federal, state, local, and foreign income and other tax consequences of the Plan are complex and in some cases uncertain. Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with his, her, or its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

## ARTICLE XVIII.
## ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review by no later than seven days before the deadline to object to Confirmation.

## ARTICLE XIX.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believes that the Confirmation and consummation of the Plan is in the best interests of all creditors and parties in interest, and is thus preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Class 3, Class 4, Class 5, Class 6, Class 7, and Class 8 to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated: August 27, 2025

Respectfully submitted,

/s/ Paul Rundell
Paul Rundell
Chief Restructuring Officer
Prospect Medical Holdings, Inc. and each
Debtor party to the Plan