

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 29, 2025**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-80002 (SGJ)<br><br>(Jointly Administered)<br>Rel. to Dkt. Nos. 1264, 1571, 2701, 2755 & 2989 |

### ORDER (I) AUTHORIZING
### THE SALE OF THE CALIFORNIA ASSETS
### FREE AND CLEAR OF ALL ENCUMBRANCES, (II) APPROVING
### THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED
### CONTRACTS, AND (III) GRANTING RELATED RELIEF

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

Upon consideration of the Motion[2] of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") for entry of an order (this "Sale Order"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 9013-1 of the Local Bankruptcy Rules for the Northern District of Texas (the "Local Bankruptcy Rules"), and Section E of the *Procedures for Complex Chapter 11 Cases in the Northern District of Texas* (the "Complex Case Procedures"), authorizing and approving (a) the Debtors' sale of certain of their property free and clear of liens, claims, encumbrances, and interests on the terms set forth in that certain *Asset Purchase Agreement*, dated as of August 3, 2025, by and among NOR Healthcare Systems Corp., as Purchaser, and Prospect Medical Holdings, Inc., as Seller Representative, and each entity set forth on Schedule A to the California APA, as Seller (the "California APA"), attached hereto as **Exhibit 2**; (b) the assumption and assignment of the Assigned Contracts in connection with the CA Sale Transaction, including the Cure Costs; and (c) granting related relief, all as more fully set forth in the Motion; and this Court having previously entered the *Order (I)( A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling Auction(s) and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, (II)(A) Authorizing the Sale of the Assets Free and Clear of All*

---

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to such terms in (1) the *Debtors' Motion for Entry of an Order (I)( A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling Auction(s) and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, (II)(A) Authorizing the Sale of the Assets Free and Clear of All Encumbrances, and (B) Approving the Assumption and Assignment of the Assumed Contracts, and (III) Granting Related Relief* [Docket No. 708] (the "Motion") or (2) the California APA, as applicable.

*Encumbrances, and (B) Approving the Assumption and Assignment of the Assumed Contracts, and (III) Granting Related Relief* [Docket No. 1264] (the "Bidding Procedures Order"); and the Debtors having filed the *Notice of Successful Bidder for the California Sale Transaction* [Docket No. 2989] (the "California Sale Notice"), pursuant to the Bidding Procedures Order, and selected NOR Healthcare Systems Corp. (the "Purchaser") as the highest or otherwise best bidder for the Transferred Assets  pursuant to the California APA and as from time to time may be amended in accordance with this Sale Order or further order of this Court, including by the California APA, pursuant to which the Debtors have agreed, among other things, to sell the Transferred Assets to the Purchaser, including the Assigned Contracts that will be assumed and assigned to the Purchaser on the terms and conditions set forth in the California APA inclusive of the Purchase Price (as defined below) (collectively, the "CA Sale Transaction"); and the Debtors having filed the *Notice of (I) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Amounts* [Docket No. 1571] (the "Initial Cure Notice") and the *Supplemental Notice of (I) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Costs* [Docket No. 2701] (the "Amended Cure Notice" and together with the Initial Cure Notice, the "Cure Notices") and will serve the *Assigned Contracts and Cure Amounts* (the "Assignment Notice") in accordance with the Bidding Procedures Order; and this Court having conducted the hearing to consider approval of the CA Sale Transaction (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the CA Sale Transaction; and this Court having reviewed and considered (i) the Motion and the exhibits thereto, (ii) the First Day Declaration [Docket No. 41], (iii) and the *Declaration of Andrew Turnbull in Support of the Debtors' Proposed Order (I) Authorizing the Sale of California Assets Free and Clear of all Encumbrances, (II) Approving the Assumption and*

*Assignment of the Assigned Contracts, and (III) Granting Related Relief* [Docket No. 2990], and the arguments and representations of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that due and proper notice of the Motion, the California APA, the Cure Notices, the Assignment Notice, the Bidding Procedures Order, and this Sale Order having been provided in accordance with the Bidding Procedures Order; and all objections, if any, to approval of the CA Sale Transaction having been withdrawn, resolved (including by separate agreement between the objecting party and the Debtors), adjourned, or overruled as provided in this Sale Order; and it appearing entry of this Sale Order and consummation of the CA Sale Transaction are in the best interests of the Debtors, their estates and creditors, and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11 cases; and after due deliberation thereon; and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing.  To the extent of any conflict, the oral rulings control.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Motion and the CA Sale Transaction described therein, and in the California APA, including, without limitation, the sale of the Transferred Assets, pursuant to 28 U.S.C. §§ 157 and 1334. Venue for these Chapter

11 Cases is proper pursuant to 28 U.S.C. § 1408.  This Court may enter a final order consistent with Article III of the United States Constitution.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C. **Statutory Predicates**.  The statutory authorization for the relief granted herein is found in sections 105(a), 363, and 365 of the Bankruptcy Code; Bankruptcy Rules 2002, 6004, and 9014; Rule 9013-1 of the Local Bankruptcy Rules; and Section E of the Complex Case Procedures.

D. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Time is of the essence in closing the CA Sale Transaction referenced herein, and the Debtors and the Purchaser intend to close the CA Sale Transaction as soon as practicable in accordance with the California APA, and there is no just reason for delay in the implementation of this Sale Order.  Specifically, the CA Sale Transaction must be approved and consummated promptly in accordance with the California APA to preserve the viability of the business in the hands of the Purchaser as a going concern, and to maximize the value to the Debtors, their estates, their creditors, and all other parties in interest.  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order in accordance with the California APA, waives any stay, and expressly directs entry of judgment as set forth herein.

E. **Incorporation By Reference**.  Findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

F. **Marketing Process**.  The Debtors and their professionals adequately marketed the Transferred Assets to all Potential Bidders (as defined in the Bidding Procedures, attached as

Exhibit 1 to the Bidding Procedures Order) in accordance with the Bidding Procedures Order. The sale process set forth in the Bidding Procedures Order afforded all Potential Bidders a full, fair, and reasonable opportunity to submit a higher or otherwise better offer to purchase the Transferred Assets and participate in the sale process. No other person, or group of persons, has offered to purchase the Transferred Assets for an amount that would give greater value to the Debtors than the value provided by the Purchaser pursuant to the California APA, which reflects the final bid comprising the aggregate consideration of (i) the assumption of the Assumed Liabilities *plus* (ii) either (x) an amount in cash equal to the borrowing base under the eCapital Line of Credit calculated with historical practices as presented in Exhibit C to the California APA (the "eCapital Borrowing Base") or (y) if the Purchaser enters into a new arrangement with eCapital Healthcare Corp. ("eCapital") and eCapital provides a payoff letter, release, assignment and assumption, or similar instrument (the "eCapital Payoff or Assumption Instrument") to the Seller Representative, then, an amount in cash equal to the positive difference between (1) the eCapital Borrowing Base and (2) any remaining Liability or amount due under the eCapital Line of Credit after application of the eCapital Payoff or Assumption Instrument *and* (iii) an additional $8.5 million in cash consideration (in addition to a $2 million credit bid of the Break-up fee) (collectively, the "Purchase Price"). The Purchase Price constitutes the highest and best bid for the Transferred Assets. The marketing process was robust and sufficiently tested the market to determine the highest and best offer for the Transferred Assets.

G. **Sale Hearing**. This Court conducted the Sale Hearing on August 28, 2025, at which time this Court considered the Motion, the evidence and testimony presented, and the statements and argument of counsel, as applicable, in support of the Motion, the California APA, and the CA Sale Transaction. Except as otherwise expressly provided in this Sale Order, all

objections to the CA Sale Transaction and the relief requested in the Motion, whether timely or untimely and whether written or made orally at the Sale Hearing, if any, were heard and considered by this Court. All such objections, if any, were either overruled by this Court, are resolved by the terms hereof or by separate agreement between the objecting party and the Debtors, or were adjourned or withdrawn as a result of an agreement between the objecting party and the Debtors.

H. **<u>Sound Business Purpose</u>**. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for consummation of the CA Sale Transaction pursuant to the California APA and all other agreements, instruments, certificates, and other documents to be entered into or delivered by any party in connection with the CA Sale Transaction, including, without limitation, any assumption and assignment agreements entered into in connection therewith (collectively, the "<u>Transaction Documents</u>"), outside of the ordinary course of business and in accordance with the requirements of section 363(b) of the Bankruptcy Code. Consummation of the CA Sale Transaction prior to and not as part of a chapter 11 plan is (i) justified under the circumstances, (ii) an appropriate exercise of the Debtors' business judgment, and (iii) in the best interests of the Debtors, their estates, and their creditors.

I. **<u>No Alternative Transaction</u>**. Following a robust prepetition marketing process, and together with the postpetition marketing process consistent with the Bidding Procedures Order, the California APA and the Purchase Price constitute the highest or otherwise best offer for the Transferred Assets. No other person, or group of persons, has offered to purchase the Transferred Assets for an amount that would give greater value to the Debtors than the value provided by the Purchase Price. The CA Sale Transaction is the best means available to the Debtors to maximize the return to their creditors and limit the losses to counterparties to the Assigned Contracts. No

alternative to the CA Sale Transaction exists that would provide a greater value to the Debtors, their creditors, or other parties in interest.

J.      **Necessity of Approval**.  Approval of the CA Sale Transaction is necessary to maximize the value the Debtors' estates will receive for the Transferred Assets.  It is important to the Debtors' employees, patients and suppliers that the transition from the Debtors to the Purchaser occurs smoothly and without unnecessary delay, so that any potential issues may be minimized.  It is also important that the CA Sale Transaction be consummated as expeditiously as possible to maintain patient care, minimize employee turnover, and ultimately preserve the value of the Transferred Assets.

K.      **Maximization of Value**.  Accordingly, the sale of the Transferred Assets pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code upon the terms and conditions set forth in the California APA is the optimal means to create value for the benefit of the Debtors' estates.  The CA Sale Transaction maximizes the value of the Transferred Assets because the Transferred Assets are being sold as part of a going concern, thereby preserving the continuity and remaining goodwill value associated with the Transferred Assets.  Unless the sale is concluded expeditiously, as provided for in the Motion and the California APA, creditor recoveries may be substantially diminished.

L.      **Fair Purchase Price**.  The Purchase Price provided by the Purchaser (i) is fair and adequate; (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and similar laws); and (iii) will provide an equal or greater recovery for the Debtors' creditors than would be provided by any other available alternative.  The terms of the California APA, the

Transaction Documents, and the CA Sale Transaction are fair and reasonable under the circumstances of the Debtors' chapter 11 cases, and the Debtors' determination to proceed with such transaction constitutes a valid and sound exercise of the Debtors' business judgment.

M. **Adequate and Reasonable Notice**. As evidenced by the affidavits of service filed with this Court [Docket Nos. 815, 860, 1369, 2766, 2798, 2877], and based upon the record of the Sale Hearing, and as previously determined by this Court in the Bidding Procedures Order, (i) due, proper, timely, adequate, and sufficient notice of the Motion, California Sale Notice, the Sale Hearing, the California APA, and the CA Sale Transaction has been provided to all parties in interest, (ii) such notice was and is good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all holders of Interests (as defined herein), including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities, and was provided in accordance with the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Complex Case Procedures, and the procedural due process requirements of the United States Constitution, and (iii) no other or further notice of the Motion, the Sale Hearing, the California APA, the CA Sale Transaction, or of the entry of this Sale Order is necessary or shall be required.

N. **Cure Notices**. In accordance with the Bidding Procedures Order, the Debtors filed with this Court and served the Cure Notices, containing (i) the list of all Assigned Contracts to potentially be assigned in connection with the CA Sale Transaction, (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Potentially Assigned Contracts (as defined in the Cure Notices) and rights thereunder, (iii) Cure Costs, where applicable, and (iv) the procedures for objecting thereto, on all counterparties to such Potentially Assigned Contracts and any party that has requested notice pursuant to Bankruptcy Rule 2002 (the

"Rule 2002 Notice List"), and caused such notices to be published on the website of the Debtors' noticing agent, Omni Agent Solutions, Inc. [Docket Nos. 1571 and 2701]. The Cure Notices (a) included the Debtors' good faith calculation of the Cure Costs with respect to each Potentially Assigned Contract; (b) stated that assumption or assignment of any Potentially Assigned Contract is not guaranteed and is subject to this Court's approval; and (c) prominently displayed the deadline to file a Cure Objection (as defined herein). The service and provision of the Cure Notices were good, sufficient, and appropriate under the circumstances, and no other or further notice need be given.

O.    **Assignment**. In accordance with the Bidding Procedures Order, the Debtors will serve the Assignment Notice on the counterparties to the Assigned Contracts, which will contain (i) the list of Assigned Contracts selected by the Purchaser, (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of the Assigned Contracts and rights thereunder, and (iii) the Cure Costs.

P.    **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the sale of the Transferred Assets, the assumption and assignment of the Assigned Contracts, and the determination of defaults and Cure Costs related thereto, as well as the California APA and the entry of this Sale Order, has been given to all interested Persons.

Q.    **Good Faith Purchaser**. The Debtors, the Purchaser, and their respective principals, counsel, and advisors have negotiated, proposed, and entered into the California APA, the Transaction Documents, and each of the transactions contemplated therein in good faith, without collusion and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in connection with the CA Sale Transaction and, as such, is entitled to all the protections

afforded thereby. The Purchaser has proceeded in good faith in all respects. The terms of the CA Sale Transaction, including the Purchase Price, were not controlled by any agreement among Potential Bidders and neither the Debtors nor the Purchaser have engaged in collusion or any conduct that would cause or permit the California APA to be challenged, avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. The California APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, or possession, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser have entered into the California APA or are consummating the CA Sale Transaction with any fraudulent or otherwise improper purpose. The Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Purchaser and the Debtors.

R. **Integrated Transaction**. The CA Sale Transaction, which includes the sale of the Transferred Assets pursuant to the California APA and all covenants in and conditions thereto, is an integrated transaction, meaning that each component is an essential part of every other component and that the CA Sale Transaction can be consummated only if all of the components are consummated. Accordingly, each component of the CA Sale Transaction is subject to, and is protected by, the provisions of section 363(m) of the Bankruptcy Code.

S. **Sale Free and Clear under Section 363(f)**. The Purchaser would not have entered into the California APA and would not consummate the CA Sale Transaction without entry of this Sale Order approving the CA Sale Transaction pursuant to section 363(f) of the Bankruptcy Code.

11

Except as expressly provided otherwise in the California APA or this Sale Order, the Debtors have satisfied the standard set forth in section 363(f) of the Bankruptcy Code for selling the Transferred Assets free and clear of (other than Permitted Liens and Assumed Liabilities) all of the following (collectively, "Interests"): liens, claims (including, but not limited to, those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, pledges, charges, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, royalties, hypothecations, preferences, debts, easements, suits, licenses, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), covenants, indentures, instruments, leases, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances, or interests of any kind or nature whatsoever against the Debtors, or any of the Transferred Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors or against any property of the Debtors, claims arising under state or federal antitrust laws, any indemnification claim or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing Date or any Excluded Liabilities, any derivative, vicarious, transferee or successor liability claims, alter ego claims, de facto merger claims, rights or causes of action (whether known or unknown, legal or equitable, contingent, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, filed or

unfiled, scheduled or unscheduled, perfected or unperfected, allowed or disallowed, noticed or unnoticed, recorded or unrecorded, material or non-material, statutory or non-statutory, and asserted or unasserted), whether arising prior to or subsequent to the commencement of the Debtors' chapter 11 cases (other than the Assumed Liabilities), whether imposed by agreement, understanding, law, equity or otherwise, including without limitation (i) those Interests that purport to give to any party a right or option to effect a setoff against or any forfeiture, modification, or termination of the Debtors' interests in the Transferred Assets, or any similar rights, if any, (ii) those Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, hypothecations, liens, judgments, demands, encumbrances, rights of first refusal or charges of any land or nature, if any, (iii) those Interests that are Excluded Liabilities as set forth in the California APA, and (iv) those Interests arising under or out of, in connection with, or in any way related to the Debtors or any of the Debtors' predecessors, Affiliates, or representatives, any of the Debtors' interests in the Transferred Assets, or the operation of any of the Debtors' businesses before the applicable Closing Date, including, without limitation, Interests based on successor liability, transferee liability, derivative liability, vicarious liability, de facto merger, continuation or continuity, or any similar theories under applicable state or federal law or otherwise. Each holder of an Interest in the Transferred Assets (a) has, subject to the terms and conditions of this Sale Order, consented or shall be deemed to have consented to the relief requested in the Motion and with respect to the CA Sale Transaction, (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest, or (c) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of Interests that did not object to, or withdrew their objections, if any, to, the relief requested in the Motion, the California APA, the CA Sale Transaction, or the Assignment

Notice are deemed to have consented to the relief requested in the Motion, including, without limitation, the sale of the Transferred Assets and the assumption and assignment of the Assigned Contracts to the Purchaser, pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests that did object that have an Interest in the Transferred Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their Interests that constitute interests in the Transferred Assets, if any, attach solely to the proceeds of the CA Sale Transaction ultimately attributable to the property in which they have an Interest, in the same order of priority and with the same validity, force, and effect that such holders had prior to the CA Sale Transaction, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, in addition to any limitations on the use of such proceeds pursuant to any provision of this Sale Order, the Settlement Order[3], the Interim Amended Junior DIP Order[4], and the Final Amended Junior DIP Order[5].

T. **Excluded Liabilities**. Except as expressly provided otherwise in the California APA or this Sale Order, neither the Purchaser nor any of the Purchasers' Affiliates (including any subsidiary of the Purchaser, any person or entity that could be treated as a single employer with

---

[3] The *Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief* [Docket No. 1288] (the "Settlement Order").

[4] The *Interim Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. 2739] (the "Interim Amended Junior DIP Order").

[5] The *Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. 2887] (the "Final Amended Junior DIP Order," and together with the Settlement Order and the Interim Amended Junior DIP Order, the "Junior DIP Orders").

the Purchaser pursuant to Section 4001(b) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended ("IRC"), and any of their respective managed funds or accounts, any of their respective lenders or investors, and, in each case of the foregoing, each of their respective former, current, or future, shareholders, equity holders, owners, members, managers, employees, representatives, officers, limited or general partners, directors, agents, professionals, successors, affiliates, or permitted assignees) (collectively with the Purchaser, the "Purchaser Group") shall be responsible for any Interests, including in respect of, based on, relating to, or arising under, without limitation, the following: (i) any labor, collective bargaining, or employment agreements; (ii) any mortgages, deeds of trust, or security interests; (iii) any intercompany loans and receivables between one or more of the Seller and any Debtor; (iv) any pension, multiemployer (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare plan participation or benefit trust, compensation or other employee benefit plans, agreements, practices and programs (including any Employee Benefit Plan) of or related to any of the Debtors or any of the Debtors' Affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) the Debtors' business operations or cessation thereof; (vi) any litigation involving one or more of the Debtors; (vii) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the Multi-Employer Pension Plan Amendments Act of 1980, including all amendments thereto, (f) the Worker Adjustment and

Retraining Notification Act of 1988 or any similar state or local law ("WARN"), (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the IRC and of any similar state law (collectively, "COBRA"), (i) the National Labor Relations Act, (j) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (k) state harassment, discrimination, or retaliation laws, (l) state unemployment compensation laws or any other similar state laws, or (m) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or relating to any wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (viii) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the applicable Closing Date; (ix) any product liability law; (x) any antitrust laws; (xi) any bulk sales or similar law; (xii) any tax statutes or ordinances, including, without limitation, the IRC; and (xiii) any Excluded Liabilities.

U. **No Successor, Transferee, or Similar Liability**. Except for the Assumed Liabilities and the Permitted Liens, as expressly set forth in the California APA or this Sale Order, the Purchaser has not expressly or impliedly assumed any obligation of the Debtors, or any other party, with respect to the Interests and the Excluded Liabilities, whether at law or in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, and whether from the Transferred Assets or otherwise, including, without limitation, based on successor, transferee, derivative, or vicarious liability.

V. **No Consolidation, Merger, or De Facto Merger**. The CA Sale Transaction described by the Transaction Documents does not amount to a consolidation, merger, or de facto merger of the Purchaser and any of the Debtors and/or any of the Debtors' estates.

W. **No Continuity**. There is no continuity between the Purchaser and any of the Debtors. The Purchaser is not holding itself out to the public as a continuation of any of the Debtors or their respective estates, businesses, or operations. The Purchaser is not a mere continuation of any of the Debtors or their respective estates, businesses, or operations. There is no common identity between any of the Debtors and the Purchaser. The Purchaser does not constitute a successor or a successor in interest to any of the Debtors or their estates.

X. **No Fraudulent Purpose**. The Purchaser and the Debtors are not entering into the Transaction Documents or consummating the CA Sale Transaction for the fraudulent purpose of escaping liability for the Debtors' obligations or to defraud creditors in any way.

Y. **Sale Free and Clear and Continuation of Existing Approvals Required by the Purchaser**. The Purchaser expressly negotiated for the protection of obtaining the Transferred Assets free and clear of all Interests (other than the Permitted Liens), including, without limitation, any potential successor liability claims (other than the Assumed Liabilities). The total consideration to be provided under the California APA reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, with title to and possession of the Transferred Assets free and clear of all Interests of any kind or nature whatsoever (including, without limitation, any potential successor liability claims (other than the Assumed Liabilities and Permitted Liens)). The Purchaser would not have entered into the California APA and would not consummate the CA Sale Transaction if the sale of the Transferred Assets to the Purchaser and the assumption and assignment of the Assigned Contracts to the

Purchaser by the Debtors were not free and clear of all Interests of any kind or nature whatsoever (other than the Assumed Liabilities and the Permitted Liens), as contemplated by this Sale Order, or if the Purchaser would, or in the future could, be liable for any of the Interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities. The Purchaser would not have entered into the California APA and would not consummate the CA Sale Transaction if the Purchaser would not be authorized, as of the Closing Date, to operate under or renew any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Transferred Assets (subject, in each case, to the terms and conditions of the California APA); if such licenses, permits, registrations, and governmental authorizations or approvals would not be deemed to have been transferred to the Purchaser as of the Closing Date; or if existing licenses or permits applicable to the business would not remain active and in place for the Purchaser's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred.

Z. **<u>Assumption and Assignment of the Assigned Contracts</u>**. The Assumption and Assignment Procedures approved pursuant to the Bidding Procedures Order are integral to the California APA, do not constitute unfair discrimination, are in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and are based on the reasonable exercise of sound business judgment by the Debtors. At the Closing and pursuant to Section 365 of the Bankruptcy Code and this Sale Order, the Debtors shall assume and, subject to the terms in the California APA, assign to the Purchaser, and Purchaser shall take assignment from the Debtors of, the Assigned Contracts.

AA. **<u>Cure Costs</u>**. On or before the Closing Date, the Purchaser will pay all Cure Costs with respect to the Assigned Contracts proposed to be resolved after the Closing Date in

accordance with Paragraph 17 below. Accordingly, the Debtors or the Purchaser, as applicable, will have, to the extent necessary, (i) cured any default existing prior to the Closing with respect to the Assigned Contracts, and (ii) provided compensation, if any, to each counterparty to an Assigned Contract for any actual pecuniary loss to such party resulting from a default prior to the Closing with respect to the Assigned Contract with such counterparty, all within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code.

BB.     **Assigned Contracts**.  Pursuant to section 365(f) of the Bankruptcy Code, each Assigned Contract required to be assumed and assigned under the California APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser, in accordance with their respective terms, notwithstanding any provision in such contract or other restrictions prohibiting its assignment or transfer.  No section of any of the Assigned Contracts that would directly or indirectly prohibit, restrict, or condition the assumption or assignment of any of the Assigned Contracts or would permit termination or modification of such Assigned Contracts, or rights and obligations thereunder, by a party other than the Debtors, on account of assignment of such shall have any force or effect in connection with the Transferred Assets.

CC.     **Assumption and Assignment**.  The assumption and assignment of the Assigned Contracts (i) are necessary to sell the Transferred Assets to the Purchaser, (ii) allow the Debtors to sell the Transferred Assets to the Purchaser as a going concern, (iii) limit the losses suffered by counterparties to the Assigned Contracts, and (iv) maximize the recoveries to other creditors of the Debtors by limiting the number of claims against the Debtors' estates by avoiding the rejection of the Assigned Contracts.  For these reasons, the Debtors have exercised sound business judgment in assuming and assigning the Assigned Contracts and such assumption and assignment is in the best interests of the Debtors' estates.

DD.    **<u>Adequate Assurance of Future Performance</u>**.  Counterparties to the Assigned Contracts were provided with the Assignment Notice and had the opportunity to request and review information with respect to the Purchaser's adequate assurance of future performance (*see* Docket No. 2738) and were required to file any objections to the Purchaser's ability to provide adequate assurance of future performance as contemplated under sections 365(b)(l)(C), 365(b)(3) (to the extent applicable) and 365(f)(1) of the Bankruptcy Code (each, an "<u>Adequate Assurance Objection</u>") on or prior to August 27, 2025 at 4:00 p.m. (prevailing Central Time).  Counterparties to Assigned Contracts that failed to timely file an Adequate Assurance Objection are hereby forever barred from objecting to the assumption and assignment of Assigned Contracts on the grounds of a failure to provide adequate assurance of future performance.  Based on evidence adduced at the Sale Hearing and based on the record in these chapter 11 cases, to the extent necessary, the Debtors have satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(l)(A), 365(b)(l)(B), 365(b)(l)(C), 365(b)(3) (to the extent applicable) and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Assigned Contracts to the extent provided under the California APA.  Accordingly, subject to payment of the Cure Costs, the Assigned Contracts may be assumed by the Debtors and assigned to the Purchaser as provided under the California APA and this Sale Order.

EE.    **<u>Sale Order Required by the Purchaser.</u>**  Entry of this Sale Order approving the California APA is a requirement of the California APA and such requirement is a reasonable and appropriate condition precedent to the Purchaser's consummation of the CA Sale Transaction.

FF.    **<u>Transferred Assets Property of the Estates</u>**.  The Transferred Assets constitute property of the selling Debtors' estates and title thereto is vested in the selling Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The selling Debtors have all title,

interest, and/or rights in the Transferred Assets required to transfer and to convey the Transferred Assets to the Purchaser, as required by the California APA.

GG. **Corporate Authority**. Subject to the entry of this Sale Order, (i) the Debtors have full corporate power and authority to perform all of their obligations under the Transaction Documents, and the Debtors' prior execution and delivery of, and performance of their obligations under, the Transaction Documents are hereby ratified, (ii) the Debtors have all of the corporate or applicable organizational power and authority necessary to consummate the CA Sale Transaction, (iii) the Debtors have taken all corporate or applicable organizational actions necessary to authorize, approve, execute, and deliver the Transaction Documents and to consummate the CA Sale Transaction, except for the actions required to satisfy the closing conditions expressly provided in the Transaction Documents, and (iv) no consents or approvals are required to consummate the CA Sale Transaction or otherwise perform the obligations under the California APA or the Transaction Documents, except for the consents or approvals required to satisfy the closing conditions expressly provided herein or therein.

HH. **Sale in Best Interests**. The relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtors, their respective creditors, estates, and all other parties in interest in the Debtors' chapter 11 cases.

II. **Prompt Consummation**. To maximize the value of the Transferred Assets, it is essential that the CA Sale Transaction occur within the timeframe set forth in the California APA and Bidding Procedures. Time is of the essence in consummating the CA Sale Transaction. Accordingly, there is cause to lift the stays established by Bankruptcy Rules 6004 and 6006 with regards to the CA Sale Transaction and the assignment of the Assigned Contracts.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1. **Motion Is Granted**. The Motion and the relief requested therein, and entry into and performance under the California APA, is GRANTED and APPROVED, as set forth herein.

2. **Objections Overruled**. Except as stated otherwise herein, all objections to, or reservation of rights regarding, the relief requested in the Motion, the entry of this Sale Order, or the relief granted herein, including, without limitation, any objections to the assumption or assignment of the Assigned Contracts (including Cure Costs related thereto) or relating to the cure of any defaults under any of the Assigned Contracts or to the assumption and assignment of any of the Assigned Contracts to the Purchaser by the Debtors, that have not been withdrawn, waived, settled, or adjourned as provided in Paragraph 17 below or otherwise, or that have not otherwise been resolved pursuant to the terms hereof are hereby denied and overruled on the merits with prejudice. All Persons that failed to timely object, or withdrew their objections, to the Motion or the entry of this Sale Order are deemed to consent to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code. No appeal, motion to reconsider, or similar pleading has been filed with respect to the Bidding Procedures Order, and the Bidding Procedures Order is a final order of this Court, has not been vacated, withdrawn, rescinded, or amended and remains in full force and effect.

3. **Notice**. Notice of the Motion, the Sale Hearing, and the assumption and assignment of Assigned Contracts was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, the Local Bankruptcy Rules and the Bidding Procedures Order, and as such no further or other notice is required.

4. **Approval and Authorization**. The sale of the Transferred Assets to the Purchaser on the terms and conditions contained in the Transaction Documents, including, without limitation,

the Closing of the CA Sale Transaction as required by the California APA, is hereby approved in all respects pursuant to sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform all obligations under and make all payments required by the Transaction Documents as and when due thereunder without further order of this Court. The Debtors, the Purchaser, and each of their respective officers, employees, and agents are hereby authorized to (i) execute the Transaction Documents, including the California APA, and any prior execution of such agreements, documents, and instruments, including the Transaction Documents, is hereby ratified, (ii) perform all obligations under the Transaction Documents, to consummate each of the foregoing, including, without limitation, deeds, assignments, and other instruments of transfer, and to consummate the CA Sale Transaction, and any prior performance of such obligations or any prior consummation of such CA Sale Transaction is hereby ratified, (iii) assume and assign the Assigned Contracts to the Purchaser, and (iv) take all other and further actions as may be reasonably necessary to consummate and implement the CA Sale Transaction and to perform all obligations under the Transaction Documents and the consummation thereof, without any further corporate action or order of this Court. The Purchaser shall not be obligated to proceed with the Closing under the California APA until all conditions precedent to its obligation to do so thereunder have been satisfied or waived.

5. **No Sub Rosa Plan**. The sale of the Transferred Assets, including, without limitation, the assignment of the Assigned Contracts, pursuant to the California APA outside a chapter 11 plan neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of the Debtors' subsequent chapter 11 plan. Neither the California APA nor the CA Sale Transaction constitutes a sub rosa chapter 11 plan.

6.    **Valid Transfer**.  As of the Closing, the consummation of the CA Sale Transaction shall effect a legal, valid, and enforceable sale and transfer of the Transferred Assets to the Purchaser, and shall vest the Purchaser with all legal, equitable, and beneficial right, title, and interest in and to the Transferred Assets free and clear of all Interests of any kind or nature whatsoever.  The Transaction Documents are valid and binding contracts between the Debtors and the Purchaser and shall be enforceable pursuant to their terms.  The Transaction Documents, and the CA Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and their respective Affiliates and subsidiaries and such parties' successors and assigns, the Debtors' estates, all creditors thereof (whether known or unknown), all holders of equity interests in any Debtor, holders of Interests in, against, or on all or any portion of the Transferred Assets, all non-Debtor parties to the Assigned Contracts, the Purchaser and its respective successors and assigns, any chapter 11 trustee appointed in these chapter 11 cases or any chapter 7 trustee appointed upon a conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

7.    **Free and Clear**.  Except as expressly provided for in the California APA or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors are authorized and directed to transfer the Transferred Assets to the Purchaser and, upon the Closing, other than the Purchaser's assumption of the Assumed Liabilities and the Purchaser's obligations under the California APA and the Assigned Contracts, the Purchaser shall have and take title to and possession of the Transferred Assets free and clear of and shall have no obligation with respect to all Interests (other than the Assumed Liabilities and the Permitted Liens) of any kind or nature whatsoever, including, without limitation, rights or claims based on any

24

successor, transferee, derivative, or vicarious liabilities; de facto merger, continuation or continuity, or any similar theories under applicable state or federal law or otherwise. All holders of Interests fall within one or more of the subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests attach to the net proceeds ultimately received by the Debtors and attributable to the Transferred Assets against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force, and effect, and in the same order of priority that such Interests now have against the Transferred Assets or their proceeds as of Closing, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto, in addition to any limitations on the use of such proceeds pursuant to any provision of this Sale Order and the Junior DIP Orders. This Sale Order: (a) is and shall be effective as a determination that, other than Assumed Liabilities, the Permitted Liens, or as otherwise provided herein, upon the applicable Closing in accordance with the California APA, all claims of any kind or nature whatsoever existing as to Transferred Assets, and any tax liability, prior to the applicable Closing have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, with such Interests and liens attaching in order of priority to the proceeds of the CA Sale Transaction, and (b) is and shall be binding upon and shall authorize all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Transferred Assets conveyed to the Purchaser. All recorded Interests against the

Transferred Assets from their records, official and otherwise, shall be deemed stricken upon the Closing in accordance with the California APA and the terms of this Sale Order without the need for further action on the part of either the Purchaser or the Seller. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors are authorized and directed to sell the Transferred Assets free and clear of any Interests (other than the Assumed Liabilities and the Permitted Liens).

8. **<u>Deemed Consent</u>**. Those holders of Interests who did not object (or who ultimately withdrew their objections, if any) to the CA Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object that have an interest in the Transferred Assets fall within one or more of sections 363(f)(1), 363(f)(3), 363(f)(4), or 363(f)(5) of the Bankruptcy Code and are therefore adequately protected by having their Interests that constitute interests in the Transferred Assets, if any, attach solely to the proceeds of the CA Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force, and effect that such holders had prior to the CA Sale Transaction, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, in addition to any limitations on the use of such proceeds pursuant to any provision of this Sale Order and the Junior DIP Orders.

9. **<u>Release of Interests</u>**. Any and all Persons that have filed a financing statement, mortgage, mechanic's lien, *lis pendens*, or other document or agreement evidencing an Interest against or in the Transferred Assets shall deliver to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or any other similar documents necessary for the purpose of documenting all Interests that such Person has against or in the Transferred Assets. For any Person

26

who has not delivered such termination statements to the Debtors prior to the Closing, (i) the Debtors and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such Person with respect to the Transferred Assets, (ii) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests of any kind or nature against or in the Transferred Assets, and (iii) the Purchaser may seek in this Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Interests that such Person has against or in the Transferred Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the sale and assignment of the Transferred Assets free and clear of all Interests shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

10. **<u>Surrender of Transferred Assets</u>**. All Persons that are presently, or on the Closing Date may be, in possession of some or all of the Transferred Assets are directed to surrender possession of such Transferred Assets to the Purchaser as of the Closing Date.

11. **<u>Injunction</u>**. All Persons are hereby prohibited and enjoined from taking any action that would adversely affect or interfere with, or that would be inconsistent with, the ability of the Debtors to sell and transfer the Transferred Assets to the Purchaser in accordance with the terms of the California APA, the Transaction Documents, or this Sale Order. Except as expressly

27

permitted by the California APA with respect to Assumed Liabilities, Permitted Liens, or this Sale Order, all Persons (and their respective successors and assigns), including, without limitation, all holders of claims or Interests, lenders, debt security holders, governmental, tax and regulatory authorities, parties to executory contracts and unexpired leases, creditors, contract counterparties, customers, landlords, licensors, employees and former employees, litigation claimants, pension plans, labor unions, trade creditors, and other Persons holding Interests of any kind or nature whatsoever against or in the Debtors or the Transferred Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Debtors' chapter 11 cases, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the operation of the Debtors' businesses prior to the Closing, the Transferred Assets, or the transfer of the Transferred Assets to the Purchaser (including, without limitation, any rights or claims based on any successor, transferee, derivative, or vicarious liabilities), shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Interests against the Purchaser, any of its Affiliates, officers, directors, members, partners, principals, or shareholders, any of their respective representatives, successors, designees, or assigns, the property of the foregoing, and the Transferred Assets transferred to the Purchaser or interests of the Debtors in such Transferred Assets (other than the Assumed Liabilities and the Permitted Liens). Following the Closing, no holder of an Interest against the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Debtors' former interests in the Transferred Assets, including, without limitation, taking any of the following actions with respect to or based on any Interest relating to the Transferred Assets or the transfer of the Transferred Assets to the Purchaser

(other than Assumed Liabilities and the Permitted Liens): (a) commencing or continuing in any manner any action or other proceeding against the Purchaser or its successors or assigns, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser or its successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Interest against the Purchaser, its successors or assigns, assets (including the Transferred Assets), or properties; (d) asserting any Interest as a setoff, right of subrogation, or recoupment of any kind against any obligation due Purchaser or its successors or assigns: (e) commencing or continuing any action in any manner or place that does not comply or is inconsistent with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof; (f) interfering with, preventing, restricting, prohibiting, or otherwise enjoining the consummation of the CA Sale Transaction; or (g) enforcing any provision of any Assigned Contract that prohibits, restricts or conditions, or which purports to terminate or modify, or permits a party other than the Debtors to terminate or modify, any such Assigned Contract, or any right or obligation under such Assigned Contract, because of the assumption and assignment of such Assigned Contract by the Debtors to the Purchaser. For the avoidance of doubt, and without limiting the generality of the foregoing or the operability of any other relief obtained pursuant to this Sale Order, any provision in an Assigned Contract, any other document, or any applicable law that purports to prohibit, restrict, modify or otherwise impair assignment of the Assigned Contracts or the Purchaser's ability to utilize the Transferred Assets in Purchaser's business is hereby void and of no force and effect with respect to the CA Sale Transaction, including without limitation any provision that (a) terminates or modifies any right or obligation of the Purchaser under such Assigned Contract; (b) cross-defaults to or from any other lease or executory contract that is not an Assigned Contract; (c) contains operating covenants or "go-dark"

29

provisions that would purport to terminate or modify any Assigned Contract before assumption and assignment to the Purchaser; (d) requires a third party's consent prior to assignment of the Assigned Contract to the Purchaser; or (e) restricts the Purchaser's use or assignment of any licenses or similar permits if transferred.

12. **General Assignment**. As of the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Transferred Assets and/or a bill of sale or assignment transferring indefeasible title and interest in the Transferred Assets, including the Assigned Contracts, to the Purchaser. Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the CA Sale Transaction and to reflect the effectiveness of the CA Sale Transaction.

13. **No Successor, Transferee, or Similar Liability**. Except as may be expressly set forth in the California APA, the Purchaser, its Affiliates, and any of their respective officers, directors, members, partners, principals, employees, independent contractors, and shareholders (or equivalent) and any of their respective representatives, agents, predecessors, successors, or assigns (collectively, the "Purchaser Released Parties") shall not be deemed, as a result of the consummation of the CA Sale Transaction or otherwise, to be a successor of, successor employer of, successor entity of, to have successorship obligations relating to, or to otherwise be deemed a successor, to the Debtors or the Debtors' estates. Except as expressly set forth in the California APA with respect to the Assumed Liabilities, the Purchaser Released Parties shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their respective estates, or any of their predecessors or Affiliates.

14.     **<u>Good Faith of the Purchaser</u>**. The CA Sale Transaction specified in the California APA is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the CA Sale Transaction, including, without limitation, the assumption and assignment of the Assigned Contracts, unless such authorization and consummation of the sale are duly and properly stayed pending such appeal.  The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

15.     **<u>No Avoidance of the California APA</u>**.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the California APA to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, the California APA and the CA Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the California APA or the CA Sale Transaction.  Specifically, the Purchaser has not acted in a collusive manner with any person or entity and the Purchase Price was not controlled by any agreement among bidders.

16.     **<u>Cure and Cure Dispute Resolution</u>**.  All defaults or other obligations of the Debtors under the Assigned Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) as to which no objections were interposed and remain pending as of the date of this Sale Order are deemed satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under such Assigned Contract in those amounts set forth in the

Assignment Notice, which was served in compliance with the Bidding Procedures Order, and which were satisfied, or shall be satisfied as soon as practicable. For all Assigned Contracts for which an Assignment Notice was served, the Purchaser is authorized and directed to pay all Cure Costs required to be paid by such parties upon the later of (a) the Closing, or (b) for any Assigned Contract for which an objection has been filed to the assumption and assignment of such agreement or the Cure Costs relating thereto and such objection remains pending as of the date of this Sale Order (a "Cure Dispute"), within ten (10) business days of the resolution of such objection by settlement or order of this Court. Any non-Debtor counterparty to an Assigned Contract that has not filed an objection on or before the deadline as set forth in the relevant Assignment Notice, or received an informal extension by the Debtors, shall be barred from objecting or asserting monetary or non-monetary defaults with respect to any such Assigned Contract other than the applicable amount set forth in the Assignment Notice, and such Assigned Contract shall be deemed assumed by the Debtors and assigned to the Purchaser on the Closing Date. To the extent that any Cure Dispute cannot be consensually resolved by the applicable parties, whether before or after the Closing Date, such Assigned Contracts shall be assumed and assigned only upon satisfactory resolution of the Cure Dispute, to be determined in the Purchaser's reasonable discretion. To the extent a Cure Dispute exists, the Assigned Contracts may be conditionally assumed and assigned, subject to the consent of the Purchaser, pending a resolution of the Cure Dispute by agreement of the parties or after notice and a hearing. If a Cure Dispute is not satisfactorily resolved, the Purchaser may determine that such Assigned Contracts should not be included on their schedule of Assigned Contracts and should be rejected and not assigned, in which case the Purchaser will not be responsible for any Cure Costs to the contract counterparty. The Debtors may then seek to reject the applicable contract or lease pursuant to section 365 of the Bankruptcy Code.

17. **<u>Determination of Cure Costs</u>**. Unless a counterparty to any Assigned Contract has filed a timely objection to the validity of the Cure Amount as determined by the Debtors (any such objection, a "<u>Cure Objection</u>"), which remains subject to an unresolved Cure Dispute as of the entry of this Sale Order, the Cure Costs set forth on the Assignment Notice shall constitute findings of this Court and shall be final and binding on the counterparties to the Assigned Contracts and their successors and designees upon the Closing and shall not be subject to further dispute or audit based on performance prior to the time of assumption and assignment, irrespective of the terms and conditions of such Assigned Contracts. Each counterparty to an Assigned Contract (other than a counterparty who filed a timely Cure Objection) shall be forever barred, estopped, and permanently enjoined from (i) asserting against the Purchaser or its property (including, without limitation, the Transferred Assets), any default arising prior to or existing as of the Closing, or any counterclaim, defense, recoupment, setoff, or any other Interest asserted or assertable against the Debtors (except as otherwise provided herein), and (ii) imposing or charging against the Purchaser or its Affiliates, any accelerations, assignment fees, increases, or any other fees or charges as a result of the Debtors' assumption and assignment to the Purchaser of the Assigned Contracts in connection with the CA Sale Transaction approved by this Sale Order. To the extent a counterparty to any of the Assigned Contracts received notice of the Debtors' proposed Cure Costs and fails to file a Cure Objection by the applicable deadline, such party shall be deemed to have (a) consented to the assumption and assignment of the applicable Assigned Contract and the payment of the Cure Costs provided in the Assignment Notice and (b) waived any right to assert or collect any other cure cost or enforce any default that may arise or have arisen prior to or as of the Closing.

18. **Payment of Cure Costs**. With respect to the Assigned Contracts, subject to the terms of the California APA, and subject to the entry of this Sale Order, the Purchaser shall make provision for the payment of the Cure Costs in cash at the Closing. The Purchaser's promise to perform the obligations under the Assigned Contracts arising after their assumption and assignment to the Purchaser shall constitute adequate assurance of future performance within the meaning of sections 365(b) and 365(f)(2) of the Bankruptcy Code. On the Closing Date, subject in all respects to the terms of this Sale Order, the Purchaser shall be deemed to be substituted for the Seller (and/or any other Debtor, to the extent any of them hold any rights, title, or interests in any of the Assigned Contracts) as a party to the applicable Assigned Contracts.

19. **Governmental Authorization to Effectuate Sale and Assignments**. Except as otherwise specifically provided in this Sale Order, each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept (i) any and all documents and instruments in connection with or necessary to consummate the CA Sale Transaction, subject to the payment of any filing fee or other fee imposed under non-bankruptcy law; and (ii) this Sale Order as sufficient evidence of the transfer of right, title, and interest in, to, and under the Transferred Assets. Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Closing, the Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors (including the Seller Permits) with respect to the Transferred Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals (including the Seller Permits) are deemed to have been, and hereby are, deemed to be transferred to the applicable Purchaser as of the Closing. To the extent any license or permit necessary for the operation of the Transferred Assets (including the Seller Permits) is determined not to be an

34

executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any such necessary license or permit promptly after the Closing Date, and, to the extent practicable, such license or permit of the Debtors shall remain in place for the Purchaser's benefit until a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to the applicable Purchaser is pending as of the Closing Date (whether pursuant to a notice period that has not expired as of the Closing Date or a required consent from an applicable governmental authority that has not been received as of the Closing Date), shall transfer to the Purchaser upon the expiration of such notice period or the receipt of such consent; *provided*, *however*, that the foregoing shall not apply to any Medicare Provider Agreements (as defined below), the transfer of which is governed by Paragraph 22 of this Sale Order. No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Transferred Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the CA Sale Transaction. For the avoidance of doubt, the CA Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

20. **Special Provisions for the United States.** Nothing in this Sale Order or related documents releases, nullifies, precludes or enjoins the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order.

21. Further, notwithstanding any provision to the contrary in this Order, the APA, or any other documents relating to the sale of the Purchased Assets, nothing shall: (1) authorize the

35

assumption, sale, assignment or other transfer to the Buyer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance by the Debtors and Purchaser with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts, or to require the federal government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of, any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights; (4) other than as set forth in paragraph 22 of this Sale Order, affect the setoff or recoupment rights of the United States; (5) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); or (6) expand the scope of 11 U.S.C. § 525.

22.     **Medicare Provider Agreements**.  Notwithstanding anything to the contrary in this Sale Order or the California APA, the following provisions apply to the Medicare provider agreements with the Centers for Medicare & Medicaid Services (together with its applicable regional offices, and Medicare Administrative Contractors, and other contractors or agents auditing or administering the Medicare program, collectively, "CMS") for the Debtors (collectively, the "Medicare Provider Agreements"):

   a.     Other than the provisions of this Paragraph 22, neither this Sale Order nor the California APA authorize any sale or transfer of any Medicare Provider Agreements of the Debtors, and the Medicare Provider Agreements are not among the Transferred Assets to be conveyed in the California APA.

   b.     The Purchaser may, but shall not be obligated to, apply to the CMS for recognition of a "change of ownership" ("CHOW") pursuant to 42 C.F.R. §§ 489.18 and

424.550, and applicable provisions of the Medicare Program Integrity Manual ("PIM") State Operation Manual ("SOM"), including but not limited to the procedures for such application in Chapter 10 of the PIM and Chapter 3 of the SOM.

c.      If CMS determines that, pursuant to applicable Medicare law, the Purchaser is qualified to serve as a Medicare provider and satisfies the requirements for recognition of a CHOW, CMS shall automatically assign the Medicare Provider Agreements to the Purchaser.

d.      To satisfy the requirement under 42 C.F.R. § 489.18 that the Purchaser assume all financial obligations associated with the Medicare Provider Agreements, the Purchaser, within five (5) business days following Closing, shall pay $160.21 for known outstanding liabilities (the "Outstanding Amount") and, as explained in further detail in section (e) hereunder, shall pay $890,877.00 to be placed into escrow by CMS (the "Additional Overpayment Escrow") for payment of any overpayments or liabilities due to CMS, whether known or unknown, arising from or in connection with the Medicare Provider Agreements during the period on or before the Closing Date (the "Pre-Closing Date Period") for which the Purchaser would be liable under 42 C.F.R. § 489.18 and *United States v. Vernon Home Health*, 21 F.3d 693 (5th Cir. 1994) (collectively, the "Pre-Closing Obligations"). In addition, CMS shall be entitled to hold any underpayments owed by CMS under the Medicare Provider Agreements for the Pre-Closing Date Period (the "Pre-Closing Date Underpayments") and apply the value of such Pre-Closing Date Underpayments to the Pre-Closing Obligations. Payment of the Outstanding Amount, application of funds from the Additional Overpayment Escrow, and the Pre-Closing Date Underpayments constitute the sole remedy against the Debtors and Purchaser for satisfaction of any Pre-Closing Obligations, and CMS will seek no payment from the Debtors or Purchaser beyond the Outstanding Amount, Additional Overpayment Escrow, and Pre-Closing Date Underpayments for the Pre-Closing Obligations.

e.      Purchaser shall pay the Additional Overpayment Escrow, as described in Exhibit 1 to this Order, subject to the following schedule:

   i.      Purchaser shall pay the Additional Overpayment Escrow amount due under the applicable Provider Agreement in the amounts set forth on Exhibit 1. Purchaser shall pay the applicable Additional Overpayment Escrow applicable to each Medicare Provider Agreement to CMS in six (6) equal monthly installments, without interest, with each installment due by the 15th day of each month, commencing thirty (30) calendar days after assignment of the applicable Medicare Provider Agreement.

   ii.     With respect to the Debtors' Medicare Accelerated and Advance Payment obligations (the "MAAP Obligations"), Purchaser shall pay the MAAP Obligations due under each applicable Medicare Provider Agreement, together with interest, at a rate of 4% per annum as required by the MAAP

program, through an extended repayment schedule (ERS) over a term of forty-eight (48) months beginning on the date such Purchaser receives assignment of the Medicare Provider Agreement; *provided*, *however*, that Purchaser shall pay interest only on each ERS for the first six months of the ERS term, and thereafter shall pay the balance of the principal and interest over the remaining forty-two (42) months of the ERS. After the closing of the sale transaction, and through the date the applicable Medicare Provider Agreement is assigned to Purchaser, CMS shall be entitled to recoup only interest payments on the Debtors' MAAP Obligations under each existing ERS from payments otherwise due under the applicable Medicare Provider Agreement.

f.      If the Purchaser fails to promptly pay all or any part of the Additional Overpayment Escrow, CMS shall have the right to recoup all Pre-Closing Obligations from payments otherwise due to the Purchaser at any time after CMS's assignment of the applicable Medicare Provider Agreements to the Purchaser.

g.      Upon CMS's completion of open cost reports audits relating to the Pre-Closing Date Period (the "Unaudited Cost Year Reports") and of any Reopened Cost Year Reports (as defined below), CMS shall first apply the amounts in the Additional Overpayment Escrow to any determined liabilities associated with such audits and then recoup any remaining determined liabilities from Pre-Closing Underpayments. If after such application, any amounts remain in the Additional Overpayments Escrow or there are any remaining Pre-Closing Underpayments, such amounts shall be released to, and constitute property of, the Debtors.  CMS shall complete the audits of the Unaudited Cost Year Reports, the Debtors' Final Cost Reports (as defined below), and any Reopened Cost Year Report (as defined below) by the later of (i) nine (9) months from the Closing Date and (ii) thirty (30) days after issuance of the SSI DSH adjustment tables for the applicable cost year, but in no event more than one year from the Closing Date.

h.      Within 120 days after the Closing Date, the Debtors shall file a terminating cost report for all services provided through the Closing Date (the "Debtors' Final Cost Reports").

i.      The provisions herein providing for the payment of the Outstanding Amount and Additional Overpayment Escrow, along with the application of any Pre-Closing Underpayments, fully satisfies and constitutes a release of the Debtors' and Purchaser's Pre-Closing Obligations.

j.      Notwithstanding any other provision hereof, CMS may reopen and audit the Debtors' pre-Closing Date Medicare cost reports (the "Reopened Cost Year Reports") in the ordinary course for purposes of calculating any amounts due under the Medicare Provider Agreements for the Pre-Closing Date Period.  However, CMS shall not seek any further payments for the Reopened Cost Year Reports, other than from the Additional Overpayment Escrow and application of the Pre-Closing Underpayments.  Nothing in this Sale Order will preclude CMS from

exercising its rights under applicable law to reopen any cost year report to adjust payment rates for any fiscal periods as part of adjustments in federal payment rates applicable to all similarly situated providers participating in Medicare. Notwithstanding anything contained herein to the contrary, the Purchaser and the Debtors shall retain all rights under applicable non-bankruptcy law to appeal the Debtors' pre-Closing Date Medicare cost reports and to continue ongoing appeals or make claims against CMS consistent with the rights each would have in the ordinary course (e.g., meaning in the case of the Purchaser, the rights of any party accepting assignment of a Medicare Provider Agreement pursuant to a CHOW).

k.      Nothing in this Sale Order waives or abrogates whatever rights, if any, CMS may have to recoup or offset against payments otherwise payable to the Purchaser in connection with the Transferred Assets for periods after the Closing Date; *provided*, *however*, that such offsets, recoupments, demands, fines or penalties do not arise out of or relate to the Pre-Closing Date Obligations, except as otherwise provided above in subparagraph (e).

l.      On and after the Closing Date, nothing in this Sale Order shall relieve or be construed to relieve the Purchaser from complying with all procedures, rules, and regulations of the Medicare program, and all plans of correction or other regulatory actions required by CMS.

m.      Except as set forth in this Paragraph 22, nothing in this Sale Order shall affect any right or obligation of CMS with respect to the regulatory assignment of the Medicare Provider Agreements, and CMS will process the assignment of the Medicare Provider Agreements in the ordinary course upon approval of any CHOW application submitted by the Purchaser.

n.      Nothing in this Sale Order releases, relates to, or limits any other claims that may be filed by the United States or any other federal entity, nor does it affect the rights and claims of any such federal entity. Further, nothing in this Sale Order shall bar the United States and its agencies from asserting any rights of setoff or recoupment that they may have or may acquire against any amounts now due, or which may become due, to the Debtors or their estates from any federal agency except as otherwise provided for in this Sale Order. All of the Debtors' rights and defenses thereto are preserved.

o.      The terms set forth in this paragraph regarding the Medicare Provider Agreements are subject to final approval by the United States. In the event the United States does not render such final approval within fourteen (14) days of the date of entry of this Order (or such later date consented to by the Debtors), the Debtors and the United States shall notify the Court, and the Court shall hold an emergency hearing to resolve the United States' objections to the sale of the Debtors' Medicare Provider Agreements free and clear of claims and Medicare obligations.

23. **Ipso Facto Clauses Ineffective**. Upon the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser pursuant to this Sale Order and the payment of the Cure Costs in accordance with this Sale Order and the California APA, no default shall exist under any Assigned Contract and no counterparty to any such Assigned Contract shall be permitted to declare or enforce a default by the Debtors or the Purchaser thereunder or otherwise take action against the Purchaser as a result of any Debtor's financial condition, change in control, bankruptcy, or failure to perform any of its obligations under the applicable Assigned Contract. For the avoidance of doubt, and without limiting the generality of the foregoing or the operability of any other relief obtained pursuant to this Sale Order, any provision in an Assigned Contract that prohibits or conditions, whether directly or indirectly, the assignment of such Assigned Contract (including, without limitation, the granting of an Interest therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment shall be deemed an unenforceable anti-assignment provision that is void and of no force and effect with respect to the CA Sale Transaction as approved by this Sale Order. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of the Debtors' or the Purchaser's right, as applicable, to enforce every term and condition of such Assigned Contract.

24. **Provisions Related to Cigna**. Notwithstanding anything to the contrary in this Sale Order, or any Notice related thereto, the active third party payor contracts between Cigna (as defined in the *Objection of Cigna to Notice of (i) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (ii) Cure Costs* [Docket No. 1797] (the "Cigna Objection")) and the Debtors relating to the Purchased Assets (collectively, the "Cigna Contracts")

shall be assumed and assigned to the Buyer as of the Closing Date and, in lieu of cure, all obligations due and unpaid under the Cigna Contracts accruing prior to the Closing Date shall pass through to the Buyer and survive assumption and assignment, and nothing in this Sale Order or section 365 of the Bankruptcy Code shall affect any rights of recovery and/or recoupment under the Cigna Contracts; provided that, in connection with such obligations, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under the Cigna Contracts and applicable law are preserved and unimpaired.  This fully resolves the Cigna Objection.

25.	**Provisions Related to CSCDA.**  The California Statewide Communities Development Authority's ("CSCDA") lien arising under the relevant PACE Financing documents pursuant to California Streets & Highway Code §§ 5898.30 and 8840 is a Permitted Lien and nothing in the Sales Order, Sales Motion, and/or Purchase Agreement alters, impairs, waives, releases, or otherwise affects CSCDA's lien rights and interests against the relevant MPT Real Property. At Closing, Purchaser shall pay any administrative costs accrued by the CSCDA prior to Closing with respect to CSCDA's lien, including, for the avoidance of doubt, any fees accrued by Allen Matkins and Frost Todd.  All outstanding LA Secured Roll Taxes, including the past-due Fiscal Year 2024-25 PACE Assessments with accrued penalties and interest through the Closing Date, shall be paid by Purchaser by December 10, 2025; provided that, if CSCDA is able to separate the PACE Assessments from the LA Secured Roll Taxes, only the past-due Fiscal Year 2024-25 PACE Assessments with accrued penalties and interest through the Closing Date shall be paid by Purchaser by December 10, 2025.

26.	**Provisions Related to Dext Capital.**  Notwithstanding anything to the contrary herein or in the California APA and unless otherwise agreed upon in writing by the Purchaser, the Debtors, and Dext Capital, LLC ("Dext Capital"), prior to or upon the Closing, the Purchaser and

Debtors shall, in accordance with 11 U.S.C. § 365, assume and assign or the Purchaser shall reject (i) the Short Form Rental Agreement Number 0010124682 by and between Southern California Healthcare System, Inc., as lessee, and Dext Capital's predecessor-in-interest, Flex Financial, a division of Stryker Sales Corporation, as lessor and (ii) the Equipment Lease Agreement Number 100-0007400-001 dated May 29, 2024 by and between Alta Los Angeles Hospitals, Inc., as lessee, and Dext Capital, as lessor (each such agreement shall be referred to herein as a "Dext Capital Equipment Lease"); *provided*, however, in no event shall any equipment owned or leased by Dext Capital under either Dext Capital Equipment Lease or otherwise the subject of either Dext Capital Equipment Lease (collectively, the "Dext Capital Equipment*")* be deemed sold free and clear of Dext Capital's interest or liens therein. Notwithstanding anything in the preceding sentence, all rights of the Debtors and Dext Capital under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Sellers' lease or use of the Dext Capital Equipment, including but not limited to, the Dext Capital Equipment Leases, this preservation of rights includes specifically any applicable rejection damages or administrative claim arising from the Dext Capital Leases or Dext Capital Equipment.

27.     **Provisions Related to Siemens.**  Notwithstanding anything to the contrary herein, in the *Notice of (I) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Amounts* [Docket No. 1571], or in the California APA and unless otherwise agreed upon in writing by the Purchaser, the Debtors, and Siemens Financial Services, Inc. ("Siemens Financial"), the Siemens California Leases (as defined in the Siemens Limited Objection[6]) are executory contracts, and prior to or upon the Closing, the Purchaser and the

---

[6]     The *Limited Objection and Reservation of Rights of Siemens Financial Services, Inc. to Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling Auction(s) and Sale Hearing(s), (D) Establishing Certain Assumption and Assignment Procedures*

Debtors shall, in accordance with 11 U.S.C. § 365, assume and assign or the Debtors shall reject the applicable Siemens California Lease. Upon any such rejection, Siemens can take possession of the leased equipment.

28. **Provisions Related to Elevance**. Notwithstanding anything herein to the contrary, nothing contained in this Order shall extinguish, impair, or otherwise affect any defenses of the Elevance Health Companies, Inc., on behalf of itself and its affiliates (including, without limitation, Anthem Health Plans, Inc. (CT); Anthem Blue Cross Life and Health Insurance Company; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Wellpoint Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc.; Blue Cross of California dba Anthem Blue Cross; Community Insurance Company; Anthem HealthChoice Assurance, Inc.; Anthem Insurance Companies, Inc.; Beacon Health Options, Inc.; and Carelon Medical Benefits Management, Inc. f/k/a Carelon Post Acute Solutions) (collectively, "**Elevance**") to any claim or right of payment asserted by Debtors or the Purchaser to the extent validly enforceable against the applicable Debtors or (solely to the extent accruing post-Closing) against the applicable Purchaser, including any applicable defense of recoupment or setoff; *provided, however*, that other than with respect to any preserved rights pursuant to the *Limited Objection of the Elevance Health Companies, Inc. and Affiliates to the Debtors' Notice of (I) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Amounts* (the "**Cure Objection**") [Docket No. 1858], as provided herein, or Elevance's proofs of claim, this paragraph shall not preserve any other applicable affirmative right of recovery or claim of Elevance against Debtors or Purchaser and this paragraph shall not extinguish, impair, or

---

*and Approving the Manner and Notice Thereof, and (II)(A) Authorizing the Sale of the Assets Free and Clear of all Encumbrances, and (B) Approving the Assumption and Assignment of the Assumed Contracts, and Granting Related Relief, and (III) Notice of Auction and Sale Hearing of the Debtors' California Assets* [Docket No. 2974] (the "Siemens Limited Objection").

otherwise affect any applicable defense or response that the Debtors or Purchaser may have. For the avoidance of all doubt, the amount of the Cure Amounts (as defined in the Cure Objection) owed to Elevance is subject to further determination and reconciliation between the applicable Elevance entity(ies) and the Purchaser.

29. **Provisions Related to WPM.** As set forth in the *Stipulation and Agreed Order Resolving Walter P. Moore and Associates, Inc.'s Motion to Set Cure Amount and Cure Schedule* (and as may be amended, the "WPM Stipulation") [Docket No. 2323], upon the closing of the sale of the CA Sale Transaction, the remaining balance owed by the Debtors to Walter P. Moore and Associates, Inc. ("WPM") shall be paid contemporaneously to WPM with the closing of the CA Sale Transaction. Such payment to WPM shall be made either (i) from the available net proceeds from the CA Sale Transaction, subject to prior orders of the Court, (ii) from the Debtors' cash on hand at the time of the closing of the CA Sale Transaction, or (iii) by the Purchaser if the Agreements (as defined in the WPM Stipulation) are assigned to the Purchaser.

30. **Provisions Related to eCapital Healthcare Corp**.

a. If the Purchaser enters into a new arrangement with eCapital, then the liens held by eCapital shall be deemed Permitted Liens and the Liabilities owed under the eCapital Line of Credit shall be deemed Assumed Liabilities.

b. Neither the Debtors nor Purchaser may waive, and this Court shall not deem waived, section 2.8(b) of the California APA or any condition to closing related to eCapital's rights, liens, and claims unless expressly agreed to in writing by eCapital.

c. The *Amended Final Order (I) Authorizing (A) Postpetition ABL Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 695] (the "DIP ABL Order") shall remain in full force and effect until the later of (i) the Closing of the CA Sale Transaction, and (ii) the effective date of the refinancing facility, if any, contemplated herein.

d. Notwithstanding anything to the contrary herein, eCapital reserves all rights conferred under the DIP ABL Order or otherwise under the Bankruptcy Code and

applicable law until the definitive documentation related to any assignment, assumption, or refinancing of the eCapital Line of Credit is executed by eCapital.

31. **Provisions Related to DHCS.** Notwithstanding anything to the contrary herein, the California Department of Health Care Services (the "DHCS") reserves all rights to assert that the Medi-Cal Provider Agreements (the "MPAs"), as defined in DHCS's *Motion to Compel Immediate Assumption or Rejection of Medi-Cal Provider Agreements as Executory Contracts* [Docket No. 1904], are executory contracts and subject to the requirements of section 365 of the Bankruptcy Code.

32. **Binding Effect**. This Sale Order and the California APA shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Transferred Assets. The terms and provisions of the California APA, the Transaction Documents, the Bidding Procedures Order, and this Sale Order shall be binding in all respects upon the Debtors and their respective Affiliates and subsidiaries and such parties' successors and assigns, the Debtors' estates, all creditors thereof (whether known or unknown), all holders of equity interests in any Debtor, holders of Interests in, against, or on all or any portion of the Transferred Assets, all non-Debtor parties to the Assigned Contracts, the Purchaser and its respective successors and assigns, and any and all third parties, notwithstanding any subsequent appointment of any trustee, examiners, "responsible persons" or other fiduciaries (collectively, the "Trustee") of the Debtors under any chapter of the Bankruptcy Code, as to which Trustee such terms and provisions likewise shall be

binding, and the California APA (including the Assigned Contracts) shall not be subject to rejection or avoidance under any circumstances.

33. **<u>Release, Discharge, and Termination of Interests</u>**. This Sale Order shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing prior to the Closing have been unconditionally released, discharged, and terminated solely as to the Transferred Assets (other than the Assumed Liabilities and the Permitted Liens), and that the conveyances described herein have been effected.

34. **<u>No Material Modifications</u>**. The Transaction Documents may be modified, amended, or supplemented by the Debtors and the Purchaser, in a writing signed by such parties, and in accordance with the terms thereof, without further order of this Court; *provided*, that (i) any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or its creditors, and (ii) has been agreed to between the Seller and the Purchaser (with respect to the Seller, such consent not to be unreasonably withheld) and approved by the Prepetition Term Loan Administrative Agent. Any material modification, amendment, or supplement to the Transaction Documents adversely affecting the Debtors' estates must be filed on the docket and served on all interested parties. Interested parties shall have five business days to file an objection to any such material modification, amendment, or supplement. If no objections are received within five business days or the Court overrules such filed objections, the modified Transaction Documents shall be effective.

35. **<u>Subsequent Orders and Plan Provisions</u>**. Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases or any subsequent order of this Court, including, without limitation, any order confirming any such chapter 11 plan, any order authorizing the sale of assets of the Debtors pursuant to any section of the Bankruptcy Code, and any order

approving wind-down or dismissal of any Debtor's chapter 11 case or any subsequent chapter 7 case shall change, supersede, abrogate, nullify, restrict, or conflict with the provisions of the California APA, the Transaction Documents, or this Sale Order, or in any way prevent or interfere with the consummation or performance of the CA Sale Transaction.

36. **Failure to Specify Provisions**. The failure to specify or include any particular provisions of the California APA or the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the California APA, the Transaction Documents, and the CA Sale Transaction be authorized and approved in their entirety.

37. **Automatic Stay**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to (i) allow the Purchaser to deliver any notice provided for in the Transaction Documents, and (ii) allow the Purchaser to take any and all actions permitted under the Transaction Documents in accordance with the terms and conditions thereof. The automatic stay imposed by section 362 of the Bankruptcy Code shall be modified solely to the extent necessary to implement the preceding sentence, and this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

38. **Bankruptcy Rules Satisfied or Waived**. The requirements set forth in Bankruptcy Rules 6004 and 6006 have been satisfied or are otherwise deemed to be waived. As provided by Bankruptcy Rule 9014, the terms of this Sale Order shall be effective and enforceable immediately upon entry and shall not be subject to stay provisions contained in Bankruptcy Rules 6004(h) and 6004(d). Time is of the essence in closing the CA Sale Transaction and the Debtors and the Purchaser intend to close the sale as soon as possible.

39. **Conflicts Between Sale Order and California APA**. To the extent anything contained in this Sale Order conflicts with a provision in the California APA or Transaction Documents, this Sale Order shall govern and control. Notwithstanding the foregoing, nothing in this Sale Order shall modify or waive any closing conditions or termination rights in the California APA, and all such conditions and rights shall remain in full force and effect in accordance with their terms. This Order shall not modify, amend, or supersede any provision of the Junior DIP Orders or the Settlement and Support Agreement attached as Exhibit 1 to the Settlement Order.

40. **Provisions Nonseverable and Mutually Dependent**. The provisions of this Sale Order, the California APA, and the Transaction Documents are non-severable and mutually dependent.

41. **Retention of Jurisdiction**. This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of the California APA, the Transaction Documents, the Bidding Procedures Order, and this Sale Order, and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned to the Purchaser by the Debtors, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the CA Sale Transaction. This Court retains jurisdiction to compel delivery of the Transferred Assets, to protect the Purchaser and its assets, including the Transferred Assets, against any Interests or successor or transferee liability and to enter orders, as appropriate, pursuant to sections 105(a), 363, or 365 (or other applicable sections) of the Bankruptcy Code necessary to transfer the Transferred Assets and the Assigned Contracts to the Purchaser. For the avoidance of doubt and notwithstanding anything to the contrary in this Sale Order, the Bidding Procedures Order, the California APA and the Transaction Documents, this Court shall retain exclusive jurisdiction to interpret, implement, and enforce any terms or matters

in respect of those Orders and documents, any Cure Costs, claims in respect of any Cure Costs, adequate assurance of future performance of the Purchaser in respect of any Assumed Contracts, or any matters related to the foregoing, and the Purchaser expressly consents to the exclusive jurisdiction of this Court in respect thereto and waives any right to contest or otherwise challenge the exclusive jurisdiction of this Court. In the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter referenced in this paragraph or is without jurisdiction, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

42. The Purchaser has standing to seek to enforce any terms of this Sale Order, the Bidding Procedures Order, the California APA, and the Transaction Documents in this Court or any other court with competent jurisdiction.

43. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**# # # END OF ORDER # # #**

Order submitted by:

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:          tom.califano@sidley.com
                rpatel@sidley.com
                mquejada@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:     (212) 839-5599
Email:          wcurtin@sidley.com
                pventer@sidley.com
                anne.wallice@sidley.com

*Attorneys to the Debtors
and Debtors in Possession*

<u>**Exhibit 1**</u>

**Schedule of Hospital Medicare Obligations**

## **Exhibit 1**

Schedule of Hospital Medicare Obligations

| Hospital | MAAP Obligations | Escrow Amt. |
|---|---|---|
| Southern California Hospital | Loan # L4369617: $1,541,835.47<br>Loan # L4087573: $7,801,454.14<br>Loan # L4087574: $8,150,377.20 | $487,833 |
| Alta Los Angeles Hospital | $0 | $403,044 |
| TOTAL | $17,493,666.81 | $890,877 |

**Exhibit 2**

**California APA**

**ASSET PURCHASE AGREEMENT**

**by and between**

**NOR HEALTHCARE SYSTEMS CORP.**

**and**

**PROSPECT MEDICAL HOLDINGS, INC. AND EACH ENTITY SET FORTH ON <u>SCHEDULE A</u> HERETO.**

**Dated as of August 3, 2025**

Table of Contents

ARTICLE 1 DEFINED TERMS ....................................................................................2

    1.1    *Defined Terms* ........................................................................................2

    1.2    *Other Definitional and Interpretive Matters* ...........................................17

ARTICLE 2 THE PURCHASE AND SALE; CLOSING ..............................................20

    2.1    *Purchase and Sale* .................................................................................20

    2.2    *Excluded Assets* ....................................................................................21

    2.3    *Assumption of Liabilities* ......................................................................24

    2.4    *Excluded Liabilities* ..............................................................................25

    2.5    *Excluded Contracts* ..............................................................................25

    2.6    *Nontransferable Assets and Liabilities* .................................................26

    2.7    *Closing* ..................................................................................................26

    2.8    *Closing Deliveries of the Parties* ..........................................................26

    2.9    *Purchase Price* ......................................................................................27

    2.10    *Transfer Taxes* ......................................................................................28

    2.11    *Allocation of Purchase Price* .................................................................28

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS ........28

    3.1    *Organization, Good Standing and Other Matters* ..................................28

    3.2    *Authority and Enforceability* .................................................................29

    3.3    *No Conflict; Required Filings and Consents* .........................................29

    3.4    *Compliance With Laws; Permits* ...........................................................29

    3.5    *[Intentionally Omitted.]* ........................................................................30

    3.6    *Real Property; Personal Property* ..........................................................30

    3.7    *Brokers and Finders* .............................................................................30

    3.8    *Employee Benefit Plans* ........................................................................30

    3.9    *Labor Matters* .......................................................................................30

    3.10    *Health Care Compliance* .......................................................................31

    3.11    *Financial Statements* .............................................................................31

    3.12    *No Other Representations or Warranties* ...............................................32

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ..........33

    4.1    *Organization, Good Standing and Other Matters* ..................................33

| | | |
|---|---|---|
| 4.2 | *Authority and Enforceability* | 33 |
| 4.3 | *No Conflict: Required Filings and Consents* | 33 |
| 4.4 | *Financing* | 34 |
| 4.5 | *Solvency* | 34 |
| 4.6 | *Litigation* | 34 |
| 4.7 | *Brokers and Finders* | 34 |
| 4.8 | *Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties* | 34 |
| 4.9 | *No Other Representations or Warranties* | 35 |
| 4.10 | *No Knowledge of Seller Parties' Breach* | 35 |

ARTICLE 5 BANKRUPTCY COURT MATTERS ............................................................36

| | | |
|---|---|---|
| 5.1 | *Competing Transaction* | 36 |
| 5.2 | *Bankruptcy Court Filings* | 36 |
| 5.3 | *Assumption of Assigned Contracts* | 37 |

ARTICLE 6 PRE-CLOSING COVENANTS .................................................................39

| | | |
|---|---|---|
| 6.1 | *Conduct of Business* | 39 |
| 6.2 | *Access to Information; Confidentiality* | 40 |
| 6.3 | *Efforts to Consummate* | 41 |
| 6.4 | *Notices and Consents* | 42 |
| 6.5 | *Regulatory Matters and Approvals* | 42 |
| 6.6 | *Public Announcements* | 44 |
| 6.7 | *Update of Schedules* | 45 |
| 6.8 | *Notification of Certain Matters* | 45 |
| 6.9 | *Transition Services* | 45 |
| 6.10 | *Employee Matters* | 46 |
| 6.11 | *[Intentionally Omitted.]* | 47 |
| 6.12 | *MPT Lease and Post-Closing Agreement Negotiations* | 47 |
| 6.13 | *Treatment of Accrued Property Taxes* | 47 |
| 6.14 | *Right to Bill* | 48 |

ARTICLE 7 POST-CLOSING COVENANTS ...............................................................48

| | | |
|---|---|---|
| 7.1 | *Access to Information; Books and Records* | 48 |
| 7.2 | *Post-Closing Receipt and Possession of Assets* | 48 |
| 7.3 | *Tax Matters* | 49 |

| | | |
|---|---|---|
| 7.4 | *Nonassignable Assets* | 50 |
| 7.5 | *Terminating Cost Reports.* | 51 |
| 7.6 | *Medicare Bad Debts.* | 51 |
| 7.7 | *HITECH Payments.* | 52 |
| 7.8 | *Medical Staff.* | 52 |

**ARTICLE 8 CONDITIONS PRECEDENT** ... 52

| | | |
|---|---|---|
| 8.1 | *Conditions to Each Party's Obligation* | 52 |
| 8.2 | *Conditions to Obligation of Purchaser* | 53 |
| 8.3 | *Conditions to Obligations of the Seller Parties* | 53 |
| 8.4 | *Waiver of Condition; Frustration of Conditions* | 54 |

**ARTICLE 9 TERMINATION** ... 54

| | | |
|---|---|---|
| 9.1 | *Events of Termination* | 54 |
| 9.2 | *Effect of Termination* | 55 |

**ARTICLE 10 GENERAL PROVISIONS** ... 56

| | | |
|---|---|---|
| 10.1 | *Survival of Representations, Warranties and Covenants* | 56 |
| 10.2 | *Entire Agreement* | 56 |
| 10.3 | *Amendment; No Waiver* | 57 |
| 10.4 | *Severability; Specific Versus General Provisions* | 57 |
| 10.5 | *Expenses and Obligations* | 58 |
| 10.6 | *Notices* | 58 |
| 10.7 | *Counterparts* | 59 |
| 10.8 | *Governing Law* | 59 |
| 10.9 | *Submission to Jurisdiction; Consent to Service of Process* | 59 |
| 10.10 | *Waiver of Jury Trial* | 60 |
| 10.11 | *Rights Cumulative* | 60 |
| 10.12 | *Assignment* | 60 |
| 10.13 | *Specific Enforcement; Remedies* | 61 |
| 10.14 | *Third-Party Beneficiaries* | 61 |
| 10.15 | *No Personal Liability of Directors, Officers and Owners* | 62 |
| 10.16 | *General Release* | 62 |
| 10.17 | *Legal Representation* | 63 |

**EXHIBITS AND SCHEDULES**

| | |
|---|---|
| Schedule A | Sellers |
| | |
| Exhibit A | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit B | MPT Lease Term Sheet |
| Exhibit C | eCapital Borrowing Base |
| | |
| Schedule 1.1-a | Bellflower Land |
| Schedule 1.1-b | Culver Land |
| Schedule 1.1-c | Facilities |
| Schedule 1.1-d | Hollywood Land |
| Schedule 1.1-e | Los Angeles Land |
| Schedule 1.1-f | Norwalk Land |
| Schedule 1.1-g | Permitted Liens |
| Schedule 1.1-h | Van Nuys Land |
| Schedule 2.1(e) | Assumed Personal Property |
| Schedule 2.1(f) | Owned Intellectual Property |
| Schedule 2.2(c) | Certain Excluded IP |
| Schedule 2.2(o) | Certain Excluded Assets |
| Schedule 2.3(g) | Other Assumed Liabilities |
| Schedule 2.11 | Allocation Principles |
| Schedule 3.1(b) | Sellers' Subsidiaries |
| Schedule 3.3 | Sellers' Consents |
| Schedule 3.4(a) | Sellers' Compliance with Laws |
| Schedule 3.4(b) | Sellers' Permits |
| Schedule 3.6(b) | Third Party Leases |
| Schedule 3.6(c) | Sellers' Personal Property Leases |
| Schedule 3.7 | Sellers' Brokers and Finders |
| Schedule 3.8(a) | Seller Benefit Plans |
| Schedule 3.8(b) | Sellers' Compliance with ERISA |
| Schedule 3.8(c) | Sellers' Multi-Employer Plans |
| Schedule 3.9 | Sellers' Labor Agreements Schedule |
| Schedule 3.10(a) | Sellers' Material Overpayments or Refunds |
| Schedule 4.3 | Purchaser Consents |
| Schedule 4.6 | Purchaser Litigation |
| Schedule 4.7 | Purchaser Brokers and Finders |
| Schedule 5.3(a) | Available Contracts |
| Schedule 5.3(a)-1 | Designated Contracts Schedule |
| Schedule 6.1 | Conduct of Business |
| Schedule 6.4 | Third-Party Consents |
| Schedule 6.10(a) | Scheduled Employees |
| Schedule 8.1(b) | Required Regulatory Approvals |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of August 3, 2025 (the "***Effective Date***") is entered into by and between NOR Healthcare Systems Corp., a Nevada corporation ("***Purchaser***"), on the one hand, and Prospect Medical Holdings, Inc., a Delaware corporation ("***Seller Parent***" or the "***Seller Representative***") and each of the entities listed on <u>Schedule A</u> (collectively, the "***Sellers***" and together with each of their respective Subsidiaries, the "***Seller Group***" and together with Seller Parent the "***Seller Parties***"), on the other hand. Purchaser and the Seller Parties are referred to collectively herein as the "***Parties***" and each individually as a "***Party***." Capitalized terms not otherwise defined in this Agreement shall be defined in <u>Article 1</u>.

## RECITALS

**WHEREAS**, on January 11, 2025 (the "***Petition Date***"), Seller Parent and certain of its affiliates, including the Seller Group, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Northern District of Texas (the "***Bankruptcy Court***") commencing chapter 11 cases (the "***Bankruptcy Cases***") which are jointly administered under Case No. 25-80002;

**WHEREAS**, the Seller Group are debtors-in-possession under the Bankruptcy Code and manage their respective properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller Group is engaged in the Business and owns, directly or indirectly, all of the Transferred Assets;

**WHEREAS**, the Seller Group desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller Group, all of the Transferred Assets Free and Clear, and the Seller Group desires Purchaser to assume, and Purchaser desires to assume from the Seller Group all of the Assumed Liabilities, in each case, upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, within one (1) Business Day of the Effective Date, Purchaser shall deposit an aggregate amount equal to the Deposit into a distribution checking account (the "***Deposit Account***") established and maintained by the Escrow Agent;

**WHEREAS**, MPT Lessors, Seller Parent, Southern California Healthcare System, Inc. and Alta Los Angeles Hospitals, Inc. will, pursuant to the terms of this Agreement, enter into that certain MPT Agreement, which provides for the leasing of the MPT Real Property in accordance with the terms and conditions set forth therein; and

**WHEREAS**, the Transactions are subject to approval by the Bankruptcy Court and will only be consummated pursuant to, among other things, the Sale Order to be entered in the Bankruptcy Cases.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1 *Defined Terms*. The following terms shall have the following meanings in this Agreement:

"*Accounts Receivable*" means all accounts, notes, interest and other receivables of the Seller Group, and all claims, rights, interests and proceeds related thereto, in each case arising from the rendering of services to inpatients and outpatients of the Business, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided prior to the Effective Time whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients of the Business relating to Government Reimbursement Programs and other third party patient claims due from beneficiaries or Third Party Payors.

"*Action*" means any action, proceeding, arbitration, audit, investigation or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"*Affiliate*" or "*Affiliates*" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, the election or appointment of board members, by contract or otherwise.

"*Agreement*" has the meaning set forth in the Preamble.

"*Allocation Principles*" has the meaning set forth in Section 2.11.

"*Alternate Transaction*" has the meaning set forth in Section 9.1(b).

"*Antitrust Laws*" has the meaning set forth in Section 6.5(b).

"*Apportioned Obligations*" has the meaning set forth in Section 7.3(c).

"*Asset Tax Return*" means a Tax Return relating to Asset Taxes.

"*Asset Taxes*" means any Taxes with respect to the ownership or operation of the Transferred Assets other than (a) Taxes based on net or gross income, and (b) Transfer Taxes.

"*Assigned Contracts*" has the meaning set forth in Section 2.1(c).

"***Assumed Liabilities***" has the meaning set forth in Section 2.3.

"***Assumed TSAs***" shall mean all transition services agreements and similar arrangements resulting from or related to, or executed in connection with, the disposition of the Seller Parties' and their Affiliates' assets, including the Existing TSAs, dated prior to, on or after the Closing Date, but which shall not include the Transition Services Agreement contemplated hereunder.

"***Attorney-Client Information***" has the meaning set forth in Section 10.17.

"***Auction***" has the meaning set forth in Section 5.2(b).

"***Available Contract***" has the meaning set forth in Section 5.3(a).

"***Avoidance Actions***" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Sellers or their respective estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"***Back-Up Bid***" means the next highest or otherwise next best bid after the Successful Bid.

"***Back-Up Bidder***" means the party providing the Back-Up Bid.

"***Back-up Termination Date***" means the first to occur of (a) ninety (90) days after the entry of the Sale Order, (b) consummation of the Transactions with the Successful Bidder, and (c) Purchaser's receipt of notice from the Seller Representative of the release by the Sellers of Purchaser's obligations under Section 5.2(b).

"***Bankruptcy Cases***" has the meaning set forth in the RECITALS.

"***Bankruptcy Code***" has the meaning set forth in the RECITALS.

"***Bankruptcy Court***" has the meaning set forth in the RECITALS.

"***Bellflower Land***" means certain real property located in the City of Bellflower, Los Angeles County, California as more particularly described on Schedule 1.1-a and made a part hereof by reference and incorporation.

"***Bellflower Property***" means the Bellflower Land and related Improvements located thereon.

"***Bid Procedures***" means those certain bidding procedures set forth as Exhibit 1 to the Bid Procedures Order, as such procedures may be amended from time to time thereafter in accordance with the Bid Procedures Order.

"***Bid Procedures Order***" means the Order of the Bankruptcy Court approving the Bid Procedures entered at Docket No. 1264.

"***Bid Protections***" has the meaning set forth in Section 5.2(c).

"*Bill of Sale and Assignment and Assumption Agreement*" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between each member of the Seller Group and Purchaser, substantially in the form attached hereto as Exhibit A.

"*Books and Records*" means originals, or where not available, copies (including in electronic format), of books and records maintained in connection with the Business or the Transferred Assets, including books and records relating to books of account, ledgers and general financial accounting records, non-income Tax records, complete personnel records and employee files (including Forms I-9), machinery and equipment maintenance files, patient and customer lists, Patient Data, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, complete billing and coding records, all Third Party Payor Contracts (to the extent they are among the Assigned Contracts) and communications with payors related to such Contracts, material and research, in each case, to the extent such books and records are located at the Facilities or are exclusively used or held for use in, or otherwise exclusively relate to, the Business.

"*Break-Up Fee*" has the meaning set forth in Section 5.2(c).

"*Business*" means collectively, the businesses owned and operated by the Seller Group immediately prior to the Closing, including the businesses operated at the Facilities.

"*Business Day*" means any day other than (a) a Saturday, Sunday or federal holiday, or (b) a day on which commercial banks in Los Angeles, California are authorized or required to be closed.

"*Capitation Claims*" has the meaning set forth in Section 2.3(m).

"*CARES Act*" means the Coronavirus Aid, Relief, and Economic Security Act, as amended from time to time, and the regulations promulgated thereunder.

"*CBAs*" has the meaning set forth in Section 5.3(a).

"*Closing*" has the meaning set forth in Section 2.7.

"*Closing Date*" has the meaning set forth in Section 2.7.

"*CMIR*" has the meaning set forth in Section 6.5(d).

"*CMS*" has the meaning set forth in Section 7.6.

"*Code*" means the Internal Revenue Code of 1986, or any successor law.

"*Competing Bid*" has the meaning set forth in Section 5.1.

"*Confidentiality Agreement*" means that certain Confidentiality and Non-Disclosure Agreement, dated as of February 18, 2025, by and between Seller Parent and Healthcare Systems of America.

"***Consent***" means any consent, approval, authorization, waiver or license.

"***Continuing Employee***" has the meaning set forth in Section 6.10(b).

"***Contract***" or "***Contracts***" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"***Contract and Cure Schedule***" has the meaning set forth in Section 5.3(a).

"***Contracting Parties***" has the meaning set forth in Section 10.15.

"***Cost Reports***" means all cost and other reports filed pursuant to the requirements of Government Reimbursement Programs, and similar or successor programs with or for the benefit of Governmental Authorities for payment or reimbursement of amounts due from them.

"***Counterparty Objection***" has the meaning set forth in Section 5.3(g).

"***COVID-19***" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2 and all related strains and sequences) or mutations (or antigenic shifts or drifts) thereof or a disease or public health emergency resulting therefrom.

"***COVID-19 Funds***" means all grants, payments, distributions, loans, funds or other relief applied for or provided prior to the Effective Time under the CARES Act, the Paycheck Protection Program Act, or any other program authorized by any Governmental Authority or Government Reimbursement Program in response to COVID-19, including the Paycheck Protection Program, Main Street Loan Program, Provider Relief Fund, Small Rural Hospital Improvement Program, Assistant Secretary for Preparedness and Response or Hospital Preparedness Program Grants, or any other Law or program enacted, adopted or authorized in response to COVID-19; *provided*, that COVID-19 Funds does not include any Medicare Accelerated and Advance Payments.

"***Culver Land***" means certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on Schedule 1.1-b and made a part hereof by reference and incorporation.

"***Culver Property***" means the Culver Land and related Improvements located thereon.

"***Cure Costs***" means any and all costs, expenses or actions that Purchaser is required to pay or perform to assume any of the Assigned Contracts pursuant to Section 365(f) of the Bankruptcy Code.

"***Deposit***" means an amount equal to Four Million Dollars ($4,000,000) and any earnings and interest thereon.

"***Deposit Account***" has the meaning set forth in the RECITALS.

"***Designated Contracts Schedule***" has the meaning set forth in Section 5.3(a).

"***Designated Courts***" has the meaning set forth in Section 10.9(a).

"**_Determined Cure Costs_**" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order.

"**_DOJ_**" has the meaning set forth in Section 6.5(a).

"**_eCapital Borrowing Base_**" has the meaning set forth in Section 2.9(a).

"**_eCAPITAL Line of Credit_**" means that certain credit facility provided for under that certain Credit and Security Agreement, dated as of June 5, 2024, as amended, by and among Southern California Healthcare System, Inc., a California corporation, and Alta Hospital System, LLC, a California limited liability company, as borrowers, and eCAPITAL HEALTHCARE CORP., a Delaware corporation, as lender.

"**_Effective Date_**" has the meaning set forth in the Preamble.

"**_Effective Time_**" has the meaning set forth in Section 2.7.

"**_Enforceability Exceptions_**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**_Environmental Laws_**" means any applicable Law relating to pollution or protection of the environment or worker health and safety (in respect of exposure to Hazardous Substances), including such Laws relating to the use, treatment, storage, disposal, Release or transportation of Hazardous Substances.

"**_Escrow Agent_**" means Omni Agent Solutions, Inc.

"**_Excluded Assets_**" has the meaning set forth in Section 2.2.

"**_Excluded Books and Records_**" means the following originals and copies of those Books and Records, documents, data and information (in whatever form maintained) of the Seller Parties: (a) all corporate minute books (and other similar corporate records) and equity records, (b) any Books and Records relating to the Excluded Assets or Taxes paid or payable by the Seller Parties, (c) all Tax Returns of the Seller Parties, or (d) any Books and Records that the Seller Parties (i) are required by Law to retain (copies of which, to the extent permitted by Law and this Agreement, will be made available to Purchaser upon Purchaser's reasonable request), (ii) reasonably believes is necessary to enable it to prepare and/or file Tax Returns (copies of which will be made available to Purchaser upon Purchaser's reasonable request), or (iii) is prohibited by Law from delivering to Purchaser.

"**_Excluded Contracts_**" has the meaning set forth in Section 2.5.

"**_Excluded IP_**" has the meaning set forth in Section 2.2(c).

"**_Excluded Liabilities_**" has the meaning set forth in Section 2.4.

"**_Excluded Payments_**" has the meaning set forth in Section 2.2(u).

"***Excluded Supplemental Payments***" has the meaning set forth in <u>Section 2.2(u)</u>.

"***Executory Contract***" means any executory Contract or unexpired lease for non-residential real property to which any Seller Party is a party within the meaning of Section 365 of the Bankruptcy Code, but excluding Contracts and unexpired Leases that are not solely related to the Business or related to the supply of goods or services, beyond the Business, on a national or regional basis.

"***Existing TSAs***" shall mean the Purchase Services Transition Agreement and Information Technology Transition Services Agreement identified on <u>Schedule 5.3(a)</u>.

"***Facilities***" means the facilities and sites licensed to be operated by the Seller Group under a Permit held by any Seller Group and any other facilities, sites, medical office buildings, surgery centers, physician offices, ancillary services facilities, land or buildings associated with the Business (whether owned or leased by a Seller Party) as set forth on <u>Schedule 1.1-c</u>.

"***Federal Health Care Program***" means any "*federal health care program*" as defined in 42 U.S.C. §1320a-7b(f), including Title XVIII of the Social Security Act ("***Medicare***"), Title XIX of the Social Security Act ("***Medicaid***"), state CHIP programs, TRICARE, the Civilian Health and Medical Program of the Department of Veterans Affairs, programs administered by the U.S. Department of Labor Employment Standards Administration's Office of Workers' Compensation Programs (e.g., administration of claims pursuant to the Black Lung Benefits Act), and similar or successor programs with or for the benefit of designated federal or state residents.

"***Final Order***" means an Order of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; *provided*, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"***Free and Clear***" means free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"***FTC***" has the meaning set forth in <u>Section 6.5(a)</u>.

"***GAAP***" means generally accepted accounting principles in the United States as of the Effective Date.

"***Government Reimbursement Programs***" means any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purposes of paying for health care services. Such programs shall include, but not be limited to, any Federal Health Care Program.

"***Governmental Authority***" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS).

"***Hazardous Substances***" means any substances, materials or wastes which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials,"

"toxic substances," "pollutants" or "contaminants" under any Environmental Law, including any petroleum or refined petroleum products, radioactive materials, friable asbestos or polychlorinated biphenyls.

"*Health Care Laws*" means (a) the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b), the Federal False Claims Act (31 U.S.C. § 3729 et seq.), and the Federal Civil Monetary Penalties Law (42 U.S.C. § 1320a-7b), (b) the Health Insurance Portability and Accountability Act of 1996, as amended by the HITECH Act, and their implementing regulations (collectively, "*HIPAA*"), (c) the federal physician self-referral Law (42 U.S.C. §1395nn and §1395(q)) (commonly known as the "*Stark Law*"), (d) Laws relating to the regulation, provision, administration of, billing of, coding of or payment for healthcare products or services, and (e) the federal Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act.

"*HIPAA*" has the meaning set forth in Section 1.1.

"*Historical Financial Statements*" has the meaning set forth in Section 3.11.

"*HITECH Act*" means the Health Information Technology for Clinical Health Act of 2009.

"*HITECH Payments*" means HITECH incentive payments and rights to receive such payments based on attestations submitted or to be submitted with respect to "meaningful use" of certified electronic health record technology ("certified EHR technology") (as those terms are defined under §§ 4101, 4102 and 4201 of the HITECH Act), pursuant to the requirements of the implementing regulations under the HITECH Act.

"*Hollywood Land*" means certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on Schedule 1.1-d and made a part hereof by reference and incorporation.

"*Hollywood Property*" means the Hollywood Land and related Improvements located thereon.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"*Improvements*" means the existing improvements on the Land and the buildings and any improvements constructed on the Land.

"*Information Privacy and Security Laws*" has the meaning set forth in Section 3.10(d).

"*Intellectual Property*" means any and all intellectual property rights arising from the following: (a) patents and patent applications; (b) trademarks, service marks, trade dress, service names, trade names, brand names, logos, business names, corporate names and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) copyrights and all registrations and applications for registration thereof; (d) trade secrets and know-how; and (e) internet domain name registrations.

"***Interim Lease Agreement***" means that certain Sale Leaseback Agreement to be entered into by and between Seller Group and Purchaser at Closing, which will provide for a lease or license to Seller Group of the Transferred Assets from the Purchaser pursuant to the terms thereof.

"***Interim Management Agreement***" means that certain Interim Management Agreement to be entered into by and between Seller Group and Purchaser at Closing which will provide for the continued management and operation of the Facilities by Purchaser in accordance with the terms and conditions set forth therein until the necessary licensure, permits, and government approvals have been obtained by Purchaser.

"***Interim Period***" has the meaning set forth in <u>Section 6.1</u>.

"***Inventory***" means all inventories of supplies, drugs, food, janitorial and office supplies, raw materials, work in progress, packaging, supplies, parts, and other disposables and consumables, including, but not limited to any rights to rebates, refunds or discounts due with respect to those Assets (i) located at, ordered for, or in transit to the Facilities or (ii) used in the operation of the Business or produced in the Business.

"***IRS***" means the United States Internal Revenue Service.

"***Knowledge***" means (a) with regard to the Sellers, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Von Crockett and Alfredo Sabillo, in each case, as of the Effective Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) and (b) with regard to Purchaser, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Faisal Gill, in each case, as of the Effective Date or the Closing Date, as applicable (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"***Land***" means collectively, the Van Nuys Land, the Hollywood Land, the Los Angeles Land, the Culver Land, the Bellflower Land and the Norwalk Land.

"***Law***" or "***Laws***" means any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute.

"***Law Firm***" means Sheppard Mullin Richter and Hampton LLP and its successors.

"***Lease***" means any lease, lease amendments, guarantees, exhibits, addenda, and riders thereto and any other documents creating a possessory interest in or to property.

"***Liabilities***" means debts, liabilities, duties, obligations or commitments of any nature, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"***Lien***" or "***Liens***" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens issued pursuant to Section 361, 363 or 364 of the Bankruptcy Code), encumbrance, defect or

irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under the Bankruptcy Code.

"***Lookback Period***" means the period of time beginning on the date that is exactly two (2) years prior to the Effective Date and ending on the Effective Date or the Closing Date, as applicable.

"***Los Angeles Land***" means certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on Schedule 1.1-e and made a part hereof by reference and incorporation.

"***Los Angeles Property***" means the Los Angeles Land and related Improvements located thereon.

"***Losses***" means, with respect to any Person, any actual losses, Liabilities, claims, demands, judgments, damages, fines, suits, actions, out-of-pocket costs and expenses (including reasonable attorneys' fees) against or affecting such Person; *provided*, *however*, that the Parties agree that "Losses" shall not include (a) any consequential, incidental, indirect, special, punitive, exemplary or treble damages, (b) calculations of damages or loss using loss of future revenue, income or profits or diminution of value, (c) damages based on a multiple of value or (d) loss of business reputation or opportunity.

"***Material Adverse Effect***" means a material adverse effect on the business, financial condition or results of operations of the Business (including the Transferred Assets and Assumed Liabilities) taken as a whole; *provided*, *however*, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by any Seller at the request of or with the consent of Purchaser or otherwise in compliance with the terms of this Agreement or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Laws or accounting rules (including GAAP) or any

interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) any matter described in the Sellers' Schedules or any matter of which Purchaser is aware as of the date hereof; (j) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the Parties, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (k) the sale of any assets other than the Transferred Assets to any third parties by the Sellers or any of their Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Cases; (m) any action required to be taken under any Law or Order or any existing Contract by which any Seller (or any of its properties) is bound; (n) seasonal changes in the results of operations of any Seller; (o) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions, or (p) the Retained Business.

"*Medicaid*" has the meaning set forth in <u>Section 1.1</u>.

"*Medicare*" has the meaning set forth in <u>Section 1.1</u>.

"*MPT*" means Medical Properties Trust, Inc.

"*MPT Agreement*" means that certain Master Agreement (California Lease) to be entered into by and among MPT Lessors, Seller Parent, Southern California Healthcare System, Inc. and Alta Los Angeles Hospitals, Inc.

"*MPT Lease Term Sheet*" "has the meaning set forth in <u>Section 6.12</u>.

"*MPT Lessors*" means collectively, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT of Culver City PMH, L.P., MPT of Bellflower PMH, L.P. and MPT of Norwalk PMH, L.P, each a Delaware limited partnership.

"*MPT Real Property*" means collectively, the Van Nuys Property, the Hollywood Property, the Los Angeles Property, the Culver Property, the Bellflower Property and the Norwalk Property.

"*MPT Real Property Deliverables*" means all documents and instruments identified as deliverables in the MPT Agreement.

 "*New MPT Lease*" has the meaning set forth in <u>Section 6.12</u>.

"*Nonparty Affiliates*" has the meaning set forth in <u>Section 10.15</u>.

"*Norwalk Land*" means certain real property located in the City of Norwalk, Los Angeles County, California as more particularly described on <u>Schedule 1.1-f</u> and made a part hereof by reference and incorporation.

"*Norwalk Property*" means the Norwalk Land and related Improvements located thereon.

"**October 2025 QAF Receivable**" means that amount scheduled to be paid on or around October 2025 pursuant to the Quality Assurance Fee Program and arising out of or attributable to services provided by the Business prior to the Closing.

"**OHCA**" means the California Office of Health Care Affordability.

"**OHCA Notice**" has the meaning set forth in <u>Section 6.5(d)</u>.

"**Order**" means any award, decision, injunction, judgment, ruling, decree or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the bylaws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in <u>clauses (a)</u> through <u>(d)</u>, and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in <u>Section 9.1(f)</u>.

"**Owned Intellectual Property**" means the Intellectual Property owned by the Sellers that is exclusively used in the Business.

"**PACE Financing**" means collectively, (a) the Assessment Contract by and between Alta Los Angeles Hospitals, Inc. and the California Statewide Communities Development Authority dated as of July 19, 2019, as may be amended from time to time and (b) the Assessment Contract by and between Southern California Healthcare System, Inc. and the California Statewide Communities Development Authority dated as of July 19, 2019, as may be amended from time to time.

"**Parties**" and "**Party**" has the meaning set forth in the Preamble.

"**Patient Data**" means all data (including Personal Information) that are in the possession or under the control of the Seller Group to the extent relating to the patients of the Business and collected in the context of such Persons acting in their capacity as patients of the Business, including patient lists, patient information and all medical servicing history. The Parties acknowledge that the patients of the Business may also be patients of the Retained Business and, thus, the same or similar information may be contained in Patient Data (to the extent collected in the context of such Persons acting in their capacity as patients of the Business) and the data retained by any member of the Seller Group (to the extent collected in the context of such Persons acting in their capacity as patients of any member of the Retained Business).

"**Permit**" means all permits, authorizations, license, registration, certificates, franchises, consents and other approvals from any Governmental Authority.

"**Permitted Liens**" means (a) Liens for Taxes, assessments or other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings; (b) mechanics',

carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business for obligations that are not overdue or are being contested in good faith by appropriate proceedings; (c) zoning, entitlement and building regulations and land use restrictions; (d) covenants, conditions, restrictions, easements, rights of way, zoning ordinances, and other similar encumbrances and matters of record and any other Liens affecting title to the MPT Real Property; (e) matters that would be disclosed by an inspection or accurate survey of each parcel of MPT Real Property; (f) purchase money Liens and Liens securing rental payments under capital lease arrangements; (g) Liens arising under Leases of property or equipment in favor of the owner thereof; (h) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (i) deposits to secure the performance of bids, Contracts (other than for borrowed money), Leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (j) licenses of Intellectual Property granted in the ordinary course of business; (k) gaps in the chain of title of Intellectual Property applications or registrations that are evident from the records of the relevant Governmental Authority maintaining such applications or registrations; (l) Liens arising under or created by this Agreement or any of the Related Documents; (m) Liens arising in the ordinary course of business which would not reasonably be expected to have a Material Adverse Effect; and (n) Liens set forth on Schedule 1.1-g.

"*Person*" or "*Persons*" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"*Personal Information*" means any information in the possession or control of the Seller Group (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller Group.

"*Petition Date*" has the meaning set forth in the RECITALS.

"*Post-Closing Agreements*" means the Interim Management Agreement and the Interim Lease Agreement.

"*Pre-Closing Tax Period*" means any taxable period (or a portion thereof) ending on or prior to the Closing Date including the portion of the Straddle Period ending on and including the Closing Date.

"*Previously Omitted Contract*" has the meaning set forth in Section 5.3(f).

"*Previously Omitted Contract Notice*" has the meaning set forth in Section 5.3(f).

"*Property Tax Liabilities*" has the meaning set forth in Section 2.3(h).

"*Provision*" has the meaning set forth in Section 10.4.

"*Public Health Measures*" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Laws,

Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic or outbreak of disease, or in connection with or in response to any other public health conditions.

"***Purchase Price***" has the meaning set forth in <u>Section 2.9(a)</u>.

"***Purchaser***" has the meaning set forth in the Preamble.

"***Purchaser Releasing Party***" has the meaning set forth in <u>Section 10.16(b)</u>.

"***Purchaser Schedules***" has the meaning set forth in <u>Article 4</u>.

"***Quality Assurance Fee Program***" shall mean the hospital quality assurance fee program enacted by the Medi-Cal Hospital Reimbursement Act of 2013.

"***Related Claims***" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents or any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the Parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"***Related Document***" or "***Related Documents***" means the Bill of Sale and Assignment and Assumption Agreement, the Interim Management Agreement, the Interim Lease Agreement, the MPT Agreement, the New MPT Lease, and any other document, agreement, certificate or instrument entered into in connection with this Agreement; *provided*, *however*, that the Bill of Sale and Assignment and Assumption Agreement shall not be a Related Document solely for purposes of applying the provisions in <u>Article 10</u> to the extent, and only to the extent, that any such document expressly conflicts with <u>Article 10</u>.

"***Release***" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment of any Hazardous Substances.

"***Required Regulatory Approvals***" means the approvals from Governmental Authorities set forth on <u>Schedule 8.1(b)</u>.

"***Retained Business***" means any and all businesses of the Seller Parties and their Affiliates, other than the Business.

"***Sale Order***" means an Order of the Bankruptcy Court issued pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance acceptable to Purchaser and the Sellers, in each Party's commercially reasonable discretion, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the Transactions

Free and Clear and containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"*Scheduled Employees*" has the meaning set forth in Section 6.10(a).

"*Scheduled Employees Schedule*" has the meaning set forth in Section 6.10(a).

"*Scheduled Exclusions*" has the meaning set forth in Section 2.2(o).

"*Seller(s)*" has the meaning set forth in the Preamble.

"*Seller Access Contact*" has the meaning set forth in Section 6.2(a).

"*Seller Benefit Plan*" or "*Seller Benefit Plans*" means each employee benefit plan, program, agreement, policy or arrangement that is currently maintained, sponsored, or contributed to by Seller Parent or the Seller Group for the benefit of any current or former employees of the Business and their respective dependents or beneficiaries, as set forth in Schedule 3.8(a).

"*Seller Group*" has the meaning set forth in the Preamble. For purposes of clarity, (a) any reference to the Seller Group shall be a reference to each member of the Seller Group, as applicable and (b) Seller Parent shall not be deemed to be a member of the Seller Group.

"*Seller Parent*" has the meaning set forth in the Preamble.

"*Seller Parties*" has the meaning set forth in the Preamble.

"*Seller Parties' Agency Settlements*" has the meaning set forth in Section 2.2(r).

"*Seller Permits*" has the meaning set forth in Section 3.4(b).

"*Seller Releasing Party*" has the meaning set forth in Section 10.16(a).

"*Seller Representative*" has the meaning set forth in the Preamble.

"*Seller Schedules*" has the meaning set forth in Article 3.

"*Seller Tax Claim*" has the meaning set forth in Section 7.3(e).

"*Sellers' Bad Debts*" has the meaning set forth in Section 7.6.

"*Sellers' Labor Agreements Schedule*" has the meaning set forth in Section 3.9.

"*Solvent*" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"***Specific Provision***" has the meaning set forth in <u>Section 10.4</u>.

"***Stark Law***" has the meaning set forth in <u>Section 1.1</u>.

"***Straddle Period***" has the meaning set forth in <u>Section 7.3(b)</u>.

"***Subsidiary***" or "***Subsidiaries***" of any Person means any corporation, partnership, limited liability company or other legal entity in which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, fifty percent (50%) or more of the equity securities entitled to vote to elect the board of directors or other governing body of such legal entity.

"***Successful Bidder***" means the prevailing party designated by the Sellers with respect to the Transferred Assets.

"***Supplemental Payments***" means any additional Medicaid fee-for-service or managed care payments to the hospital to offset uncompensated care and other costs including, but not limited to, disproportionate share, upper payment limits, §1115 waiver payments, low income pool payments, Medicaid graduate medical education payments and other similar payments.

"***Tax***" or "***Taxes***" means any tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"***Tax Return***" or "***Tax Returns***" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority or otherwise sent in connection with the determination, assessment, collection or payment, of any Tax.

"***Third Party Lease***" means any lease, sublease, timeshare, license, sublicense or other occupancy agreement to which the Seller Group currently leases, subleases, licenses or otherwise grants a right to use, possess or occupy to a third party all or some portion of the MPT Real Property as set forth on <u>Schedule 3.6(b)</u>.

"***Third Party Payor***" or "***Third Party Payors***" means Government Reimbursement Programs and any other publicly or privately owned organization or entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits), any health maintenance organization, managed care organization or any employer authorized under Law to self-insure its workers' compensation risk and that pays for or reimburses at least some of the health care expenses of its beneficiaries or workers.
"***Transactions***" means the transactions contemplated by this Agreement and the Related Documents.

"***Transfer Taxes***" means any real or personal property transfer, sales, use, excise, documentary, transfer, value added, stock transfer, stamp or similar Taxes, and any transfer, recording,

registration, and any other similar fees, levies, Taxes or amounts (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, in each case, imposed or payable in connection with this Agreement and the Transactions.

"*Transferred Assets*" has the meaning set forth in <u>Section 2.1</u>.

"*Transition Services*" has the meaning set forth in <u>Section 6.9(a)</u>.

"*Transition Services Agreement*" has the meaning set forth in <u>Section 6.9(a)</u>.

"*Treasury Regulations*" means the final and temporary regulations promulgated under the Code by the United States Department of Treasury.

"*Van Nuys Land*" means that certain real property located in the City of Los Angeles, Los Angeles County, California as more particularly described on <u>Schedule 1.1-h</u> and made a part hereof by reference and incorporation.

"*Van Nuys Property*" means the Van Nuys Land and related Improvements located thereon.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act.

    1.2    ***Other Definitional and Interpretive Matters***.

    (a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

    (i)    <u>Calculation of Time Period</u>. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the initial reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

    (ii)    <u>Dollars</u>. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

    (iii)    <u>Exhibits and Schedules</u>. The Exhibits and Schedules (including the Seller Schedules and Purchaser Schedules) to this Agreement are an integral part of this Agreement. All Exhibits and Schedules (including the Seller Schedules and Purchaser Schedules) annexed hereto or referred to herein are hereby incorporated in and made a part

of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule with reference to any <u>Section</u> of this Agreement shall be deemed to have been disclosed on each other Schedule to which such disclosure may apply. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) <u>Gender and Number</u>. Any reference to gender shall include all genders or no genders, and words imparting the singular number only shall include the plural and vice versa.

(v) <u>Headings</u>. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi) <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) <u>Including</u>. The word "including", or any variation thereof, means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii) <u>Successors</u>. A reference to any Party to this Agreement, any Related Document or any other agreement or document shall include such Party's successors and permitted assigns.

(ix) <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor, and all regulations and statutory instruments issued thereunder or pursuant thereto.

(x)     Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xi)     Lookback Periods. Any representation and/or warranty made as to any past fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction shall be deemed to have been made with respect to the Lookback Period unless another period is expressly stated.

(xii)     Made Available. Any reference in this Agreement to "made available" or "make available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)     All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the Parties have agreed that should any representations and warranties of any Party prove untrue, the other Parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any Party as a result of the untruth of any such representation and warranty. The phrase "to the Sellers' Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)     The Parties have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement and the Related Documents.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1     ***Purchase and Sale***. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, assume and accept from the Seller Group, and the Seller Group shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the assets primarily used in connection with the Business as the same shall exist on the Closing Date, in each case, to the extent transferrable (collectively, the "***Transferred Assets***", and for the sake of clarity, not including the Excluded Assets or Scheduled Exclusions) including, all right, title and interest of the applicable Seller Group thereof in and to all of the following:

(a)     all Inventory;

(b)     the Seller Permits, to the extent transferable, (including any applications that are in process and the Medicare and Medicaid provider numbers and provider agreements) exclusively used in the Business;

(c)     all interests, rights, claims and benefits of the Seller Group pursuant to the Executory Contracts set forth on the Designated Contracts Schedule, the Assumed TSAs and the CBAs (collectively, the "***Assigned Contracts***"); *provided*, *however*, that if any Assigned Contract is re-characterized by a Final Order to not be an Executory Contract or unexpired lease under Section 365 of the Bankruptcy Code, then the property that is subject to such Assigned Contract and all of the Seller Group's rights thereunder shall be a Transferred Asset transferred to Purchaser pursuant to Section 363 of the Bankruptcy Code pursuant to Section 5.3(b);

(d)     all Books and Records, documents, data and information of the Seller Group related to the Business (including the Patient Data), other than the Excluded Books and Records, except to the extent assignment or transfer thereof to Purchaser would violate any Law and unless otherwise ordered by the Bankruptcy Code pursuant to the Sale Order; *provided*, *however*, that the Seller Group shall be entitled to retain copies of any such materials;

(e)     all equipment, and other tangible personal property, including office furniture and fixtures, computers, networking equipment and supplies, listed on Schedule 2.1(e);

(f)     the Owned Intellectual Property set forth on Schedule 2.1(f);

(g)     all Accounts Receivable, including patient accounts receivable and the economic rights to receive cash paid pursuant to any Accounts Receivables owed from Government Reimbursement Programs or any other Third Party Payors, including any value-based programs, in each case relating to services provided by the Seller Group prior to, on or after the Effective Time;

(h)     all insurance policies and rights thereunder and all insurance proceeds arising in connection with loss of or damage to the Transferred Assets or other loss or damage in

respect of the operation of the Facilities or the Business, in each case, to the extent of any casualties occurring during the Interim Period that remain unrepaired or unrestored as of the Closing;

(i)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent used in or held for use for the Transferred Assets listed in clauses (a) through (h) above or the Assumed Liabilities but excluding any refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, attributable to a Pre-Closing Tax Period and any prepayments or deposits of or with respect to any Taxes attributable to a Pre-Closing Tax Period, or the Deposit;

(j)     all rights, title and interest in and to all QAF Receivables except for the October 2025 QAF Receivable, to the extent paid or payable after the Closing Date; and

(k)     the goodwill relating to or associated with the Transferred Assets.

2.2     ***Excluded Assets***. Purchaser and its designees shall acquire no right, title or interest in the assets, rights and properties of the Seller Parties set forth below (collectively, the "***Excluded Assets***") in connection with the Transaction:

(a)     any and all assets, rights and properties of the Seller Parties used in the Retained Business, including all accounts receivable (including all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source, including any accounts previously written off or charged off as bad debts), notes receivable and other rights to receive payment for goods or services provided by the Seller Parties in connection with the Retained Business;

(b)     all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, checks, funds in time and demand deposits, savings and loans or trust companies and similar cash items, including the Deposit, and all cash in the Seller Parties' adequate assurance account relating to utilities under Section 366 of the Bankruptcy Code, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(c)     all of the Seller Parties' right, title and interest in Owned Intellectual Property not set forth on Schedule 2.1(f), including as set forth on Schedule 2.2(c) (collectively, the "***Excluded IP***");

(d)     any interest of the Seller Parties under this Agreement or the Related Documents, including the right to receive the Purchase Price, and to enforce the Seller Parties' rights and remedies thereunder;

(e)     all Excluded Contracts and Contracts, other than the Assigned Contracts, to which any of the Seller Parties are a party;

(f)     any (i) Attorney-Client Information arising from communications between the Seller Parties (including any one or more officers, directors or stockholders), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;

(g)     (i) all Tax assets and attributes of the Seller Parties, (ii) all rights to refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, of the Seller Parties, (iii) any rights to refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, paid by or on behalf of the Seller Parties or attributable to any Pre-Closing Tax Period (as determined in accordance with Section 7.3(c) and (iv) all rights to refunds or credits of Taxes or other governmental charges of whatever nature, and interest paid or payable with respect to such refunds, with respect to any Excluded Asset or Excluded Liability;

(h)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not related solely to the Business or (ii) are not transferable to Purchaser under applicable Law;

(i)     the Excluded Books and Records;

(j)     any shares or other interests in any Person or any securities of any Person;

(k)     all invoices, shipping documents, purchase orders and other preprinted business forms;

(l)     any and all proceeds relating to any and all bonds, letters of credit, guarantees or other security provided by the Seller Parties;

(m)     any assets not otherwise designated as Transferred Assets or from time to time designated by the Parties as Excluded Assets;

(n)     the Avoidance Actions;

(o)     all of the Seller Parties' rights, claims or causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment against third parties relating to the assets, properties, business or operations of the Seller Parties (including all payments, awards or other proceeds resulting therefrom, guarantees, warranties, indemnities and similar rights in favor of the Seller Parties or any of their Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets, including, but not limited to, all such claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment, payments, awards or other proceeds that relate to any matter set forth on Schedule 2.2(o) (collectively, the items set forth on Schedule 2.2(o), the "***Scheduled Exclusions***"), or Excluded Liabilities or with respect to the Business, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date;

(p)     all consideration received by the Seller Parties pursuant to, and all rights of the Seller Parties under, this Agreement or any Related Document, subject to the terms hereof and thereof;

(q)     peer review materials and any writings, documents and other items that are Attorney-Client Information or otherwise protected from discovery by any other cognizable privilege or protection, in each case, except to the extent related to the Assumed Liabilities;

(r)     rights to positive or negative Cost Report settlements or retroactive adjustments on the Seller Parties' Cost Reports in respect of cost report periods ended on or prior to the Closing (collectively, "*Seller Parties' Agency Settlements*");

(s)     all intercompany assets, receivables or obligations between the Seller Parties and their Affiliates;

(t)     assets and liabilities of the Seller Parties under medical malpractice risk pools and workers compensation, employee benefits stop loss and employee retirement programs;

(u)     any receipts (i) relating to any Supplemental Payments the extent the right to receive the same arise or accrues prior to the Closing Date (the "*Excluded Supplemental Payments*"); (ii) relating to the Seller Parties' Cost Reports or Seller Parties' Agency Settlements (whether resulting from an appeal by a Selling Entity or otherwise) and other risk settlements to the extent the right to receive the same arise or accrues prior to the Closing Date, (iii) which result from a Selling Parties' pursuit of one or more appeals pertaining to Medicare, Medicaid (including, without limitation, disproportionate share hospital program payments) or TRICARE to the extent the right to receive the same arise or accrues prior to the Closing Date or (iv) relating to participation in any group purchasing organization (including any tax refunds, rebates or fee sharebacks for purchases made prior to the Closing) to the extent the right to receive the same arise or accrues to the Closing Date or (v) with respect to meaningful use attestations ("*Excluded Payments*");

(v)     all general intangibles of the Business;

(w)     all existing Third Party Leases and the MPT Real Property Leases;

(x)     all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat Laws;

(y)     all Medicare Accelerated and Advance Payments, COVID-19 Funds and any Provider Relief Fund payments under the CARES Act or similar legislation that are intended to compensate any member of the Seller Group for costs incurred or lost revenue with respect to time periods prior to the Effective Time;

(z)     any pharmaceuticals that cannot, by applicable Law, be sold by any member of the Seller Group to Purchaser;

(aa)    all of the Seller Parties' right, title and interest in and to the October 2025 QAF Receivable;

(bb)    the sponsorship of and all assets maintained pursuant to or in connection with any Seller Benefit Plan and any other compensation or benefit plan, program, policy, contract or arrangement that is or was at any time sponsored, maintained, contributed to or required to be

contributed to by or on behalf of any Seller Party or under or with respect to which any Seller Party has any current or contingent liability or obligation (including on behalf of or due to an ERISA Affiliate); and

(cc)  all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties (express or implied), indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent related to or used in or held with use for the Excluded Assets listed in clauses (a) through (bb) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller Parties and shall remain the property of the Seller Parties (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller Parties or any of its Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3  ***Assumption of Liabilities***. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms all Liabilities of the Seller Parties arising from or related to the Business or the Transferred Assets as the same shall exist on the Closing Date and irrespective of whether the same shall arise prior to, on or after the Closing Date (collectively, the "***Assumed Liabilities***"), including:

(a)  all Liabilities arising under (i) the Executory Contracts set forth on the Designated Contracts Schedule, such Liabilities as established and agreed through the Bankruptcy Cases, in accordance with Section 5.3 hereof, (ii) the MPT Real Property, (iii) the Assumed TSAs and (iv) the CBAs;

(b)  all Asset Taxes or Taxes relating to the Assumed Liabilities for any taxable period beginning after the Closing Date, including the portion of the Straddle Period beginning after the Closing Date (determined in accordance with Section 7.3(c)), for the avoidance of doubt, Purchaser shall have no liability for any Taxes imposed with respect to any period (or portion thereof) ending on or before the Closing Date, including Taxes assessed or payable after the Closing Date but attributable to pre-Closing periods;

(c)  all post-petition accounts payable and accrued expenses of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business prior to the Closing by or on behalf of the Seller Group (but excluding any professional fees related to the Transactions and/or restructuring efforts), not to exceed the amount of accounts payable and accrued expenses outstanding on the Effective Date;

(d)     all Determined Cure Costs related to Assigned Contracts;

(e)     all Liabilities arising out of or relating to any Action (including any cross-claim or counter-claim or appellate proceeding), inquiry, audit, examination or investigation with respect to the Business relating to any period at or after the Closing;

(f)     the Seller Parties' obligations and Liabilities under the PACE Financing;

(g)     other Liabilities that are listed on Schedule 2.3(g);

(h)     subject to Section 6.13, all Liabilities associated with accrued property taxes under the existing MPT Real Property Leases (the "*Property Tax Liabilities*");

(i)     all Liabilities arising under or pursuant to the eCapital Line of Credit (to the extent any Liabilities remain following the Closing);

(j)     all Liabilities for any Scheduled Employees associated with any claims for accrued vacation or paid time off, accrued employee medical claims, accrued payroll, and deferred payroll taxes, in each case, as of the Closing Date;

(k)     all Liabilities associated with or related to Medicare Accelerated and Advance Payments received by or paid to the Seller Group on or before the Closing Date;

(l)     all Liabilities arising under or in connection with amounts owed under or pursuant to the Hospital Quality Assurance Fee Program in California so long as scheduled future receipts less payables for QAF8 after receipt of the October 2025 QAF Receivable, in the aggregate, remains greater than $0.00;

(m)     all Liabilities and obligations relating to or arising from capitation-based healthcare services provided to "covered persons" under or pursuant to applicable capitation Contracts by or on behalf of the Seller Group prior to the Closing Date, including, but not limited to, all claims for services rendered under capitation Contracts that were incurred prior to the Closing Date but reported or paid thereafter ("*Capitation Claims*"); notwithstanding anything herein to the contrary, Purchaser shall be responsible for the adjudication and payment of any such Capitation Claims, regardless of whether such claims are known, unknown, reported, unreported, accrued, or contingent as of the Closing Date; and

(n)     all Liabilities arising under the WARN Act and similar state or local Laws, or otherwise resulting from Purchaser's breach of the obligations set forth in Section 6.10.

2.4     *Excluded Liabilities*. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller Parties and will not assume or be liable for any liabilities of the Seller Parties that are not Assumed Liabilities (all such liabilities not being assumed herein referred to as the "*Excluded Liabilities*").

2.5     *Excluded Contracts*. Any Executory Contract not listed on the Designated Contracts Schedule provided by Purchaser to the Sellers shall be considered an excluded contract

("***Excluded Contract***") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract.

2.6     ***Nontransferable Assets and Liabilities***. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Law.

2.7     ***Closing***. The closing of the Transactions (the "***Closing***") will take place remotely by electronic exchange of documents on the date (the "***Closing Date***") that is the second (2nd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the Party entitled the benefit of the same, unless another time or date is agreed to in writing by the Parties. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. The Closing shall be deemed to have occurred and to be effective as between the Parties as of 12:00 AM Pacific Time on the first calendar day after the Closing Date (the "***Effective Time***").

2.8     ***Closing Deliveries of the Parties***. At or prior to the Closing:

(a)     Purchaser and the Seller Group shall execute and deliver, and, where applicable, shall cause the MPT Lessors to execute and deliver, as applicable, each of the following:

(i)      the Bill of Sale and Assignment and Assumption Agreement;

(ii)     joint written instructions to the Escrow Agent instructing the Escrow Agent to release from the Deposit Account the entire Deposit to the Seller Parties, by irrevocable wire transfer of immediately available funds, to an account designated by the Seller Parties to the Escrow Agent;

(iii)    the Interim Management Agreement;

(iv)    the Interim Lease Agreement;

(v)     all documents required by such Party under the MPT Agreement; and

(vi)    the New MPT Lease.

(b)     Purchaser shall deliver, or cause to be delivered, to the Sellers or the applicable Person each of the following:

(i)     the eCapital Payoff Amount or the eCapital Payoff or Assumption Instrument;

(ii)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Sections 8.3(a) and 8.3(b); and

(iii)   the New MPT Lease.

(c)     the Sellers shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)     a certificate, dated as of the Closing Date, executed by or on behalf of each Seller as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b);

(ii)    an IRS Form W-9 with respect to each Seller (or, in the case of any Seller that is disregarded as an entity separate from its owner within the meaning of Section 301.7701-3(b)(1)(ii) of the Treasury Regulations, with respect to such owner), duly completed and executed; and

(iii)   such other documents or instruments as the Seller Parties reasonably request and are reasonably necessary to consummate the Transactions.

2.9     ***Purchase Price***.

(a)     In full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser upon the terms and subject to the conditions set forth herein, the aggregate consideration shall be (i) the assumption of the Assumed Liabilities plus (ii) either (x) an amount in cash (the "***eCapital Payoff Amount***") equal to the borrowing base under the eCapital Line of Credit calculated with historical practices as presented in Exhibit C (the "***eCapital Borrowing Base***") or (y) if the Purchaser enters into a new arrangement with eCapital Healthcare Corp. or otherwise assumes the existing eCapital Line of Credit and provides a payoff letter, release, assignment and assumption, or similar instrument (the "***eCapital Payoff or Assumption Instrument***") to the Seller Representative, then, an amount in cash (the "***eCapital Payoff Amount***") equal to the positive difference between (1) the eCapital Borrowing Base and (2) any remaining Liability or amount due under the eCapital Line of Credit after application of the eCapital Payoff or Assumption Instrument (clauses (i) and (ii) collectively, the "***Purchase Price***").

(b)     At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)     Concurrently with the execution of this Agreement (or if the execution of this Agreement occurs on a day that is not a Business Day, not later than the first Business Day following the execution of this Agreement), Purchaser shall deposit (or cause to be deposited) by wire transfer of immediately available funds an amount equal to the Deposit, until the Closing or earlier termination of this Agreement or in accordance with Section 5.2(c). All fees of the Escrow Agent shall be split evenly between the Seller Group and Purchaser. The Deposit shall become payable, and shall be paid, to the Sellers at the Closing in accordance with Section 2.8(a)(ii).

2.10     ***Transfer Taxes***. Purchaser and the Seller Group shall evenly split any applicable Transfer Taxes; *provided*, *however*, that, notwithstanding anything herein to the contrary, the Seller Parties shall have no obligation or Liability whatsoever with respect to any Transfer Taxes that may be due or otherwise arise in connection with the New MPT Lease. All necessary Tax Returns and other documentation with respect to Transfer Taxes will be prepared and filed by Purchaser.

2.11     ***Allocation of Purchase Price***. Purchaser and the Seller Parties agree to allocate the aggregate Purchase Price to be paid for the Transferred Assets in a manner consistent with Section 1060 of the Code and the allocation principles as mutually agreed upon by the Parties and attached hereto as Schedule 2.11 (the "Allocation Principles"). The Allocation Principles shall be final and binding upon Sellers and Purchaser with respect to the matters relating to required tax reporting by each such Party. The Parties will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation Principles.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as disclosed in a document or on a Schedule delivered by the Sellers to Purchaser as of the Effective Date (the "***Seller Schedules***"), the Sellers hereby make the representations and warranties contained in this Article 3 to Purchaser as of the Effective Date and the Closing Date.

3.1     ***Organization, Good Standing and Other Matters***.

(a)     Each Seller Party is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite limited liability company or corporate, as applicable, power and authority necessary to operate the Business and to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. Such Seller Party is duly qualified to do business as a foreign limited liability company or corporation in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Each Subsidiary of the Sellers is listed on Schedule 3.1(b) and is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Subsidiary of the Sellers is duly qualified to do business as a foreign limited

liability company or corporation in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2 **_Authority and Enforceability_**. Subject to Bankruptcy Court approval, each Seller Party has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which such Seller Party is (or at Closing, will be) a party, and the consummation by such Seller Party of the Transactions, has been duly authorized and approved by all necessary limited liability company or corporate action, as applicable, on the part of such Seller Party and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by such Seller Party and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of such Seller Party, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3 **_No Conflict; Required Filings and Consents_**. Except (a) as required by the HSR Act and any other Antitrust Laws that require the consent, waiver, approval, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority, (b) such filings as may be required in connection with the Transfer Taxes described in Section 2.10 and (c) as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by the applicable Seller Party does not and the execution and delivery of the Related Documents by such applicable Seller Party will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of the Seller Parties, (ii) subject to the entry of the Sale Order, violate any Law or Order to which the Seller Party is subject or by which its properties or assets are bound, (iii) require the Seller Party to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (iv) subject to the entry of the Sale Order and subject to the ongoing production of Available Contracts, as contemplated in Section 5.3(a), result in a breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any Assigned Contract or (v) subject to the entry of the Sale Order, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of the Seller Party; excluding from the foregoing clauses (ii) through (v) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4 **_Compliance With Laws; Permits_**.

(a) Except as set forth on Schedule 3.4(a), to the Sellers' Knowledge, (i) the Seller Group is conducting the Business in compliance in all material respects with all material Laws applicable to the Business, and (ii) the Seller Group has not received any written notice

during the Lookback Period of any material violations of any material Law applicable to its conduct of the Business.

(b) Except as set forth on Schedule 3.4(b), to the Sellers' Knowledge, (i) the Seller Group possess all material Permits required for the operation of the Business as currently conducted (the "*Seller Permits*"), and (ii) the Seller Group has not received as of the Effective Date any written notice of any cancellation, suspension, revocation, invalidation or non-renewal of any Seller Permit during the Lookback Period.

3.5 *[Intentionally Omitted.]*

3.6 *Real Property; Personal Property*.

(a) The Business does not include any real property owned by the Seller Group in fee simple.

(b) Schedule 3.6(b) sets forth a true and correct list, by description of the lease documents and addresses of the premises, of all Third Party Leases.

(c) Schedule 3.6(c) sets forth a list of all leases of tangible assets and other personal property of the Seller Group as of the Effective Date involving annual payments in excess of $500,000. The Seller Group has good and valid title to, or in the case of leased tangible assets and other personal property, a valid leasehold interest in (or other right to use), all of the material tangible assets and other personal property that are necessary for the Seller Group to conduct the Business, in each case, free and clear of all Liens to the maximum extent permitted by Section 363(f) of the Bankruptcy Code (other than Permitted Liens). All such material tangible assets and other personal property are in good condition and repair, normal wear and tear excepted.

3.7 *Brokers and Finders*. Except as set forth on Schedule 3.7, no Seller Party has, directly or indirectly, entered into any agreement with any Person that would obligate such Seller Party to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.8 *Employee Benefit Plans.* Schedule 3.8(a) contains a list of each Seller Benefit Plan and identifies each Seller Benefit Plan that is maintained or sponsored by Seller Parent. Except as set forth on Schedule 3.8(b), each Seller Benefit Plan (including any related trust) has been established, operated and administered in all material respects in compliance with its terms and all applicable Laws, including, as applicable in the circumstances, ERISA and the Code. Except as set forth on Schedule 3.8(c), no Seller Party maintains or contributes to (i) a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, or (ii) any "multiemployer plans" within the meaning of Section 3(37) of ERISA.

3.9 *Labor Matters.* Except as set forth in Schedule 3.9 (the "*Sellers' Labor Agreements Schedule*"), the Seller Group is not subject to any collective bargaining agreement or any labor agreement with a union or works council. There have not been any, and there are no pending, strikes, slowdowns or work stoppages. The Seller Group complies in all material respects with all applicable Laws relating to employment, labor, immigration and occupational safety and health, including wages and hours, classification, meal periods and rest breaks, drug testing,

recordkeeping, leaves of absence, workers' compensation, collective bargaining, and withholding and payment of social security and taxes. There are no pending or threatened, in writing, and for the Lookback Period there have been no employment, labor, immigration or occupational safety and health-related Actions. The Seller Group is not delinquent in any payment of wages and is not liable for any arrears to any employees or independent contractors for any wages earned. To the Sellers' Knowledge, no management-level employee or group of employees intends to terminate employment with the Seller Group. During the Lookback Period, no mass layoff, plant closing or other event as defined by the WARN Act or its state equivalents have occurred and no such events are planned.

3.10    *Health Care Compliance*.

(a)    To the Sellers' Knowledge, the Seller Group is, and during the Lookback Period has been, in each case with respect to the Business, in material compliance with all applicable Health Care Laws. Except as set forth in Schedule 3.10(a), the Seller Group, with respect to the Business, does not have any outstanding material overpayments or refunds due to any Federal Health Care Program.

(b)    To the Sellers' Knowledge, during the Lookback Period, the Seller Group has, with respect to the Business, in all material respects, timely filed all claims and reports required to be filed with respect to any Federal Health Care Programs, and all such claims and reports have been prepared in material compliance with Health Care Laws.

(c)    To the Sellers' Knowledge, during the Lookback Period, the Seller Group (i) has not been listed on the Office of Inspector General's List of Excluded Individuals and Entities or the General Services Administration's List of Excluded Individuals and Entities or been convicted of any crime or engaged in any conduct that could result in debarment under 21 U.S.C. Section 335a(a), 21 U.S.C. Section 225a(b) or any similar Laws, (ii) has not been assessed a civil monetary penalty under Section 1128A of the Social Security Act, and (iii) has not entered into a corporate integrity agreement, deferred prosecution agreement or similar arrangement with a Governmental Authority that has compliance obligations.

(d)    During the Lookback Period, the Seller Group has been in compliance in all material respects with HIPAA and applicable state Laws regulating the privacy or security of individually identifiable information (collectively, "*Information Privacy and Security Laws*"). To the Sellers' Knowledge, the Seller Group has not been under investigation by any Governmental Authority for a violation of HIPAA or any applicable Information Privacy or Security Law and has not received any written notices from the United States Department of Health and Human Services Office for Civil Rights or the Attorney General of any state or territory of the U.S. relating to any such violations, which written notice has not been resolved.

(e)    Notwithstanding anything to the contrary contained herein, the representations and warranties set forth in this Section 3.10 are the Seller Group's sole and exclusive representations and warranties regarding health care compliance matters.

3.11    *Financial Statements*. The Sellers have provided to Purchaser: (i) the unaudited consolidated balance sheets of the Sellers as of December 31, 2024; (ii) unaudited consolidated

income statements of the Sellers for the twelve-month periods ended December 31, 2024; (iii) the unaudited consolidated income statements of the Sellers for the years ended 2022, 2023 and 2024; and (iv) the unaudited consolidated balance sheet of the Sellers as of December 31, 2024 (collectively, the "***Historical Financial Statements***"). The Historical Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the period involved. The Historical Financial Statements fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated, and are true, complete and correct in all material respects.

3.12    ***No Other Representations or Warranties***.

(a)    THE TRANSFERRED ASSETS WILL BE SOLD BY THE SELLER GROUP AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE CLOSING DATE, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE MPT REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF THE SELLER GROUP INCLUDED IN THE ASSETS AND THE TRANSFERRED OBLIGATIONS ARE BEING ACQUIRED OR RECEIVED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE TRANSFERRED ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)    Except for the representations and warranties contained in this <u>Article 3</u>, none of the Seller Parties, nor do any other Persons on behalf of such Seller Party, make any other express or implied representation or warranty with respect to (a) the Retained Business, or (b) itself, the Business, the Facilities, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and such Seller Party disclaims any other representations or warranties, whether made by or on behalf of such Seller Party or any other Person. Such Seller Party will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document or on a Schedule delivered by Purchaser to the Sellers Parties (the "*Purchaser Schedules*"), Purchaser hereby makes the representations and warranties contained in this Article 4 to the Seller Parties as of the Effective Date and the Closing Date.

4.1     *Organization, Good Standing and Other Matters*. Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2     *Authority and Enforceability*. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its equityholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3     *No Conflict: Required Filings and Consents*. Except (a) as required by the HSR Act and any other Antitrust Laws that require the consent, waiver, approval, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority, (b) such filings as may be required in connection with the Transfer Taxes described in Section 2.10 and (c) as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Law or Order to which it is subject or by which any of its properties or assets are bound, (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date, (iv) result in a material breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any material Contract to which it is a party or (v) result in the imposition or creation of any Lien upon or with respect to any of its assets or properties; excluding from the foregoing clauses (ii) through (v) Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, (A) have a material

adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (B) otherwise prevent, hinder or delay the consummation of the Transactions.

4.4     ***Financing***. Purchaser has (a) the ability to obtain funds and at the Closing shall have cash in amounts necessary to consummate the Transactions by means of cash, credit facilities or otherwise and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5     ***Solvency***. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6     ***Litigation***. Except as set forth on Schedule 4.6, there is no Action pending or, to Purchaser's Knowledge, formally threatened in writing against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7     ***Brokers and Finders***. Except as set forth on Schedule 4.7, neither Purchaser nor any of its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate Purchaser to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8     ***Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties***.

(a)     Purchaser acknowledges that it and its representatives have received access to such Books and Records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees for itself and on behalf of its Affiliates that (i) it is a sophisticated purchaser and (ii) it has, with the assistance of its expert advisors, including legal counsel, conducted its own independent review, analysis, inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller Group, the Business, the Transferred Assets and the Assumed Liabilities.

(b)     Purchaser acknowledges and agrees that (i) it is purchasing the Transferred Assets on an "AS IS, WHERE IS" basis (as further described in and Section 3.12(a)), (ii) it has relied solely upon its own analysis and investigation of the Transferred Assets and Assumed Liabilities and (iii) the Seller Parties are not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of (i) the Retained Business, or (ii) except for the specific representations and warranties expressly made by the Seller Parties in

Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 10, the Business, the Transferred Assets, the Assumed Liabilities, or any of their operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, equityholder, agent, Affiliate, advisor, representative or employee of the Seller Parties has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and subject to the limited remedies herein provided.

(c)     Other than the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 10, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller Parties and the Seller Parties' Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller Parties or the Seller Parties' Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in Article 3 and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article 3.

(d)     Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 as further limited by the specifically bargained-for exclusive remedies as set forth in Article 10.

4.9     ***No Other Representations or Warranties.*** Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller Parties or their representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

4.10     ***No Knowledge of Seller Parties' Breach.*** Neither Purchaser nor any of its Affiliates has knowledge of any breach of any covenant, representation or warranty by the Seller Parties or of any condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to Section 9.1(c). If information comes to Purchaser's attention on or before the Closing Date (whether through the Seller Parties or otherwise and whether before or after the Effective Date) which indicates that the Seller Parties have breached any of their covenants, representations, warranties or any other provision or condition under this Agreement, then the effect shall be as if the covenants, representations and warranties or any other provision or condition of this

Agreement had been modified in accordance with the actual state of facts existing prior to the Closing Date such that there will be no breach under the Seller Parties' covenants, representations and warranties or any other provision or condition of this Agreement in relation to such information; *provided*, *further*, that Purchaser must immediately notify the Seller Parties if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify the Seller Parties shall constitute a waiver by Purchaser of the Seller Parties' breach, if any, of this Agreement or any ancillary agreements entered into pursuant to this Agreement. Upon written request of the Seller Parties, Purchaser shall promptly confirm and remake this representation in writing.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1 ***Competing Transaction***. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) (each, a "***Competing Bid***"). From the Effective Date (and any prior time) and until the closing of the Auction (or cancellation thereof), the Seller Parties are permitted to, and to cause their representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Transferred Assets or the Retained Business. In addition, until the closing of the Auction (or cancellation thereof), the Seller Parties shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets (whether in combination with other assets of Seller Parent or the Seller Group or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Order or other applicable Law, including supplying information relating to the Business and the Retained Business and the assets of Seller Parent or the Seller Group to prospective purchasers of the Business and the Retained Business.

5.2 ***Bankruptcy Court Filings***.

(a) Subject to <u>Section 5.1</u>, the Seller Parties shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. The Seller Parties shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. The Seller Parties further covenant and agree that, after entry by the Bankruptcy Court of the Sale Order, and contingent on the Sale Order becoming final and non-appealable, the terms of any other proposed order submitted by the Seller Parties to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller Representative to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of

providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each of the Parties shall use its respective commercially reasonable efforts to defend such appeal.

(b)    If an auction is conducted pursuant to the Bid Procedures Order (the "*Auction*") and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bid Procedures Order, be required to serve as the Back-Up Bid if Purchaser is the next highest or otherwise best bidder for the Transferred Assets at Auction. If Purchaser is chosen as the Back-Up Bid, Purchaser will be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as may be amended with the Seller Representative's written consent prior to or at the Auction) open and irrevocable until the Back-up Termination Date. If the agreement with the Successful Bidder (other than Purchaser) is terminated prior to closing under such agreement, Purchaser will be deemed to be the Successful Bidder and Purchaser will forthwith consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be amended with the Seller Representative's written consent prior to or at the Auction), subject to the right of Purchaser to elect to not serve as the Back-Up Bid at any time after the Back-up Termination Date.

(c)    The Seller Parties acknowledge and agree that Purchaser has expended considerable time and expense in connection with this Agreement and the Related Documents and the negotiation hereof and thereof and the identification and quantification of assets of the Seller Group. In consideration therefor, the Seller Parties have, in accordance with the terms hereof and the Bid Procedures Order, filed with and received the approval of the Bankruptcy Court to (i) provide Purchaser with bid protections (the "*Bid Protections*"), in an amount that shall not in the aggregate exceed $2,000,000 (the "*Break-Up Fee*"), and (ii) upon termination of this Agreement in accordance with Section 9.1(g), return the Deposit to Purchaser. The Sellers shall pay to Purchaser the Bid Protections in any event, no later than the third (3rd) Business Day after the consummation of an Alternate Transaction.

5.3    *Assumption of Assigned Contracts*.

(a)    Schedule 5.3(a) sets forth a complete list of all Executory Contracts to which the Seller Group is a party and that are used or held exclusively for use in the operation of, or relating to, the Business or the Transferred Assets, including the Cure Costs in respect of each such Executory Contract (each, an "*Available Contract*"). The Sellers have made available, or prior to the Closing will make available, to Purchaser true and complete copies of all such Available Contracts. No later than fourteen (14) days prior to the Closing, Purchaser shall designate in writing which Available Contracts from Schedule 5.3(a) that it desires to be assumed by the Seller Parties at the Closing and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and such Contracts shall be set forth on Schedule 5.3(a)-1 (the "*Designated Contracts Schedule*"). Notwithstanding anything to the contrary, the Existing TSAs, all agreements set forth on the Sellers' Labor Agreements Schedule (the "*CBAs*") and all other Assumed TSAs shall be deemed to be Assigned Contracts, whether or not such Contracts are listed on the Designated Contracts Schedule, and Purchaser shall assume such Contracts at the Closing.

(b)     Unless the Bankruptcy Court orders otherwise, each Available Contract listed on the Designated Contracts Schedule will be an Assigned Contract and assigned to Purchaser on the Closing Date. Purchaser shall pay on or before the Closing Date all Cure Costs with respect to any Assigned Contract that is consensually resolved or finally determined by the Bankruptcy Court. If any cure objection is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date with respect to any Assigned Contract, subject to a final resolution of such cure objection or final determination by the Bankruptcy Court, solely to the extent Purchaser is satisfied with such resolution or determination, the Seller Group shall assign such Assigned Contract to Purchaser. Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection, solely to the extent Purchaser is satisfied with such resolution or determination, Purchaser shall promptly pay to such non-Seller Group counterparty any remaining Cure Costs owing to such non-Seller Group counterparty with respect to such Assigned Contract.

(c)     Each Available Contract that is listed on Schedule 5.3(a) (as may be amended from time to time) that is not listed on the Designated Contracts Schedule will be deemed an Excluded Contract under this Agreement and all Liabilities thereunder shall be Excluded Liabilities.

(d)     The Seller Group and Purchaser will comply with the procedures set forth in the Bid Procedures Order with respect to the assumption and assignment of any Available Contract pursuant to, and in accordance with, this Section 5.3.

(e)     No designation of any Contract for assumption and assignment in accordance with this Section 5.3, the Bid Procedures Order or the Sale Order will give rise to any right to any adjustment to the Purchase Price.

(f)     If prior to the earliest of (i) confirmation of a plan in the Bankruptcy Cases, (ii) entry of an order dismissing the Bankruptcy Cases, or (iii) Closing, it is discovered that a Contract should have been listed on Schedule 5.3(a) but was not so listed (any such Contract, a "***Previously Omitted Contract***"), the Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract (the "***Previously Omitted Contract Notice***") and provide Purchaser with a copy of such Previously Omitted Contract and the Cure Cost (if any) in respect thereof. Purchaser shall thereafter deliver written notice to the Sellers, no later than three (3) Business Days following the receipt of such Previously Omitted Contract Notice, noting whether Purchaser elects to so include such Previously Omitted Contract on the Designated Contracts Schedule.

(g)     If Purchaser includes a Previously Omitted Contract on the Designated Contracts Schedule in accordance with Section 5.3(f), the Seller Group shall file and serve a notice on the counterparty to such Previously Omitted Contract notifying such counterparty of the Seller Group's intention to assign to Purchaser such Previously Omitted Contract, including the proposed Cure Cost (if any). Such notice shall provide such Contract counterparties with fourteen (14) calendar days to object, in writing, to the Sellers and Purchaser to the assignment and assumption of its Contract (the "***Counterparty Objection***"). If such counterparty, the Seller Group and Purchaser are unable to reach a consensual resolution with respect to any Counterparty Objection,

unless otherwise agreed by Purchaser, the Seller Parties will seek a hearing before the Bankruptcy Court to seek approval of the assumption and assignment of such Previously Omitted Contract to Purchaser. If no Counterparty Objection is timely served on the Seller Group and Purchaser, then such Previously Omitted Contract shall be deemed assumed by and assigned to Purchaser pursuant to the Sale Order. The Seller Group and Purchaser shall execute, acknowledge and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable for Purchaser to assume the rights and obligations under such Previously Omitted Contract. Purchaser shall pay or cause to be paid all Cure Costs in respect of any Previously Omitted Contract that becomes an Assigned Contract for which Purchaser has not paid or caused to be paid upon or before the Closing.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     ***Conduct of Business***. Except (w) as set forth on <u>Schedule 6.1,</u> (x) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; *provided*, *however*, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within forty-eight (48) hours after written request for such consent is provided by the Sellers to Purchaser), (y) for actions taken or omitted to be taken by Seller Parent or the Seller Group in response to any Public Health Measure, or (z) as is otherwise permitted, contemplated, or required by this Agreement, any Available Contract, by applicable Laws or by order of the Bankruptcy Court, from the Effective Date through the earlier of the Closing Date or the termination of this Agreement (the "***Interim Period***") in accordance with its terms:

(a)     Each Seller shall, and shall cause the Seller Group to, use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted during the twelve (12) months immediately preceding the Effective Date; and

(b)     The Sellers shall not, and shall cause the Seller Group not to:

(i)     sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii)     except in the ordinary course of business, acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except Inventory), that as of the Closing would constitute Transferred Assets;

(iii)     change its present accounting methods or principles in any material respect, except as required by GAAP or applicable Law;

(iv)     change the borrowing base under the eCapital Line of Credit, unless new base is fully assumed by Purchaser;

(v)     other than in the ordinary course of business, amend, modify or terminate any Assigned Contract that would have a Material Adverse Effect or affect the Transferred Assets in any material respect.

(c)     Subject to the Interim Management Agreement, notwithstanding anything to the contrary, (i) nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing, (ii) prior to the Closing, the Seller Parties shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over their Business, assets and operations, and (iii) the Seller Parties shall not be prohibited or restricted in any manner from taking all actions they deem necessary, in their sole discretion, in response to patient safety concerns or issues or in connection, generally, with maintaining patient safety at the Facilities.

(d)     Nothing in this Section 6.1 shall be deemed to limit the ability of or otherwise prohibit the Seller Parties or any of their Affiliates from having discussions with respect to, or otherwise taking actions in connection with, the Bankruptcy Cases or any potential sale or disposition of all or any portion of the Retained Business.

6.2     *Access to Information; Confidentiality*.

(a)     During the Interim Period, the Sellers shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least forty-eight (48) hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, Books and Records of Seller Parent or the Seller Group related to the Business or the Transferred Assets that are in the possession or under the control of the Seller Group; *provided*, *however*, that (i) all requests for access shall be directed to Andrew Turnbull (aturnbull@hl.com), Daniel Martin (dmartin@hl.com), and Grant Hubbell (grantland.hubbell@hl.com) or such other Person as the Sellers may designate in writing from time to time (the "***Seller Access Contact***"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller Group, (iii) the Sellers shall have the right to have one or more of their representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which Seller Parent or the Seller Group is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law, and (vii) nothing herein shall require the Sellers or their Affiliates or representatives to furnish to Purchaser or provide Purchaser with access to (A) Attorney-Client Information, (B) information that legal counsel for the Sellers reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to applicable Law (including any Public Health Measure), or (C) information that would cause significant competitive harm to Seller Parent or the Seller Group if the Transactions are not consummated.

(b)     Notwithstanding anything to the contrary contained in this Agreement, during the Interim Period, except with respect to MPT to the extent consistent with the Bid

Procedures Order and that certain Stipulation, dated February 13, 2025, by and among Seller Parent, MPT, and the other parties thereto, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning Seller Parent, the Seller Group, the Business, the Transaction or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of the Sellers, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in such Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)     Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto and hereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller Parties or the Retained Business, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the duration of the confidentiality of the Confidentiality Agreement shall be deemed extended, without any further action by the Parties, for a period of time equal to the period of time elapsed between the date such Confidentiality Agreement was initially signed and the date of termination of this Agreement.

(d)     Notwithstanding anything to the contrary contained herein, nothing in this Section 6.2 shall limit the ability of the Parties or any of their respective Affiliates to make any disclosure to their respective tax advisors or any taxing authority.

6.3     ***Efforts to Consummate.*** Except as otherwise provided in this Agreement (including Section 5.1), each of the Parties agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Effective Date, including satisfying the conditions precedent set forth in Article 8 applicable to such Party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed and (c) and executing any additional instruments reasonably requested by another Party (without cost or expense to the executing Party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; *provided*, *however*, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.4 or Section 6.5, neither the Sellers nor their Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4     ***Notices and Consents***. Reasonably promptly following the execution of this Agreement, the Sellers will give, or cause to be given, applicable notices to third parties and thereafter will use commercially reasonable efforts (as limited by Section 6.3) to obtain the third-party Consents set forth on Schedule 6.4; *provided*, *however*, that no representation, warranty, covenant or agreement of the Seller Parties shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (a) the failure to obtain any such third-party Consent, (b) any termination of a Contract as a result of the failure to obtain such third-party Consent or (c) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Consent or any such termination.

6.5     ***Regulatory Matters and Approvals***.

(a)     Each of Purchaser and the Sellers will provide any notices to and make any filings with any Governmental Authority that are necessary to consummate the Transactions. Without limiting the generality of the foregoing, the Sellers and Purchaser shall, no later than ten (10) days after the Effective Date, or at such other time as mutually agreed by the Parties, prepare and file with the United States Federal Trade Commission (the "***FTC***") and the United States Department of Justice (the "***DOJ***") the notification and report form required under the HSR Act for the Transactions and seek to obtain early termination of the waiting period thereunder. Each of Purchaser and the Sellers shall submit as soon as practicable and advisable any supplemental or additional information which may reasonably be requested by the FTC and the DOJ or by any other Governmental Authority in connection with such filings and shall comply in all material respects with all applicable Laws relating thereto.

(b)     Without limiting the generality of the foregoing: (i) Purchaser shall, and shall cause its Affiliates to, promptly take any and all steps necessary to avoid, eliminate or resolve each and every impediment and obtain all clearances, consents, approvals and waivers under the HSR Act, the Sherman Antitrust Act, the Clayton Act, the Federal Trade Commission Act, and any other United States federal or state or foreign statutes, rules, regulations, Orders, administrative or judicial doctrines or other Laws designed to prohibit, restrict or regulate actions for the purpose or effect of monopolization or restraint of trade (collectively "***Antitrust Laws***") that may be required by any Governmental Authority, so as to enable the Parties to cause the Closing to occur as soon as practicable and in any event prior to the Outside Date, including (A) proposing, negotiating, offering to commit and effect (and if such offer is accepted, committing to and effecting), by Order, consent decree, hold separate order, trust, or otherwise, the sale, divestiture, license, disposition or holding separate of such assets or businesses of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates), or otherwise offering to take or offering to commit to take any action (including any action that limits its freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, properties or services of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates)) to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (B) terminating, relinquishing, modifying or waiving existing relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates); (C) creating any relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Seller Parties or their respective Subsidiaries (or, in the case of Purchaser, its Affiliates); and (D) entering or offering to

-42-

enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Authority in connection with any of the actions contemplated by the foregoing clauses (A) through (C) (*provided*, that the Seller Parties shall not be obligated to take any such action unless the taking of such action is conditioned upon the consummation of the Transactions), in each case, as may be necessary, required or advisable in order to satisfy the requirements of any applicable Antitrust Law, to avoid the entry of, or to effect the dissolution of or to vacate or lift, any Order (whether temporary, preliminary or permanent) that would otherwise have the effect of restraining, preventing or delaying the consummation of the Transactions, or to avoid the commencement of any Action that seeks to prohibit the Transactions; and (ii) if any objections are asserted with respect to the Transactions under any applicable Antitrust Law or if any Action, whether judicial or administrative, is instituted by any Governmental Authority or any private party challenging the Transactions as violating any applicable Antitrust Law, each of Purchaser and the Seller Parties shall cooperate with one another and Purchaser shall use its best efforts to: (A) oppose or defend against any action to prevent or enjoin consummation of the Transactions, and (B) take such action as necessary to overturn any action by any Governmental Authority or private party to block consummation of the Transactions, including by defending any Action brought by any Governmental Authority or private party in order to avoid entry of, or to have vacated, overturned or terminated, including by appeal if necessary, any Law or Order (whether temporary, preliminary or permanent) that would restrain, prevent or delay the Transactions, or in order to resolve any such objections or challenge as such Governmental Authority or private party may have to such Transactions under such Laws so as to permit consummation of the Transactions.

(c)     Subject to Sections 6.5(a) and 6.5(d), Purchaser shall use its best efforts to prepare and submit all other required regulatory filings to applicable regulatory agencies within ten (10) days after the entry of the Sale Order.

(d)     Pursuant to the California Healthcare Transactions Laws, as soon as reasonably practicable following the Effective Date, Purchaser and the Sellers, as applicable, will each prepare and submit a Notice of a Material Change Transaction (the "***OHCA Notice***") with OHCA and shall request an expedited review of such OHCA Notice at the time of such submission; *provided*, *however*, that Purchaser and the Sellers will work collaboratively and in good faith to coordinate their respective OHCA Notices before they are submitted to OHCA. Purchaser and the Sellers shall incorporate mutually agreed upon comments provided by the other Party into the OHCA Notice and shall file the OHCA Notice accordingly. Purchaser and the Sellers shall timely respond to all requests from OHCA for additional information and/or documentation related to the OHCA Notice, the Transactions, or any cost and market impact review that OHCA determines is required under Cal. Code Regs. tit. 22, § 97441 (the "***CMIR***"), and shall provide the other Party with a reasonable opportunity to review and comment on any supplemental information or documentation that is submitted to OHCA in response to such requests prior to submission, and Purchaser and the Sellers shall consider in good faith and incorporate any such reasonable comments provided by the other Party into any such submission. Purchaser will not participate (or agree to participate) in any substantive meeting or discussion with OHCA regarding the OHCA Notice, the Transactions, or the CMIR (if applicable) unless it notifies the Sellers in writing promptly upon receipt of such request from OHCA, consults the Sellers in advance, and, to the extent permitted by OHCA, gives the Sellers the reasonable opportunity to attend and participate in such meeting or discussion to the extent permitted by applicable Law.

(e)     Each of Purchaser and the Sellers will promptly notify the other Party of any written communication made to or received by Purchaser, the Sellers or both, as the case may be, from any Governmental Authority regarding the Transactions, and, subject to applicable Law, if practicable, (i) permit the other Parties to review in advance any proposed written communication to any such Governmental Authority and incorporate the other Parties' reasonable comments, (ii) not agree to participate in any substantive meeting or discussion with any such Governmental Authority in respect of any filing, investigation, or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other Parties in advance, and (iii) to the extent permitted by such Governmental Authority, give the other Parties the opportunity to attend, and promptly furnish the other Parties with copies of all correspondence, filings, and written communications between them and their Affiliates and their respective representatives on one hand and any such Governmental Authority or its staff on the other hand, with respect to this Agreement and the Transactions; *provided*, *however*, that this Agreement shall not obligate any Party to disclose to any other Party such portions of any proposed or final correspondence, filing, or other written communication with a Governmental Authority or its staff as the Party to such correspondence, filing or communication may reasonably deem competitively-sensitive, privileged or confidential vis-à-vis the other Party, except that it shall disclose matters to the external counsel of the other Party to the extent reasonably necessary in order to enable the Party to fulfill its cooperation obligations in this <u>Section 6.5(e)</u>.

(f)     Purchaser shall not, and shall not permit any of its Affiliates to, acquire or agree to acquire by way of arrangement, amalgamation, merger or consolidation with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to or the consummation of such acquisition, arrangement, amalgamation, merger or consolidation would reasonably be expected to (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) significantly increase the risk of any Governmental Authority entering an order prohibiting the consummation of the Transactions, or (iii) delay the consummation of the Transactions.

(g)     Purchaser and the Sellers shall not withdraw any filings under the HSR Act or extend or consent to any extension of any applicable waiting or review period or enter into any agreement with a Governmental Authority to not consummate the Transactions, except upon the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed.

6.6     ***Public Announcements***. Between the date of this Agreement and the Closing Date, except to the extent required by or necessary in connection with any applicable Law or Action (including in connection with the Bankruptcy Cases), neither Purchaser nor the Seller Parties shall, and Purchaser and the Seller Parties shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any public press release or public announcement of any kind without the prior written consent of Purchaser, the Seller Parties and, if MPT is referenced therein, MPT; *provided*, *however*, that the Seller Parties and their Affiliates may make announcements or communications from time to time in reasonable coordination with Purchaser to their respective employees, customers, suppliers and other business relations and otherwise as the Seller Parties

may reasonably determine is necessary to comply with the Bankruptcy Code, applicable Law and/or the requirements of this Agreement, any other agreement to which the Seller Parties or any such Affiliate is a party or any securities exchange on which the securities of the Seller Parties or any such Affiliate are listed. Purchaser and the Seller Parties shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the Parties and, if MPT is referenced therein, MPT. MPT is expressly designated as a third-party beneficiary of this Section 6.6. Accordingly, MPT shall have the right to enforce this Section 6.6 directly against the Parties.

6.7     *Update of Schedules*. From time to time prior to the Closing, the Seller Parties may supplement or amend the Seller Schedules with respect to any matter hereafter arising or discovered which if existing or known by the Seller Parties as of the Effective Date would have been required to be set forth or described in such Seller Schedules. From and after the Closing, references to the Seller Schedules shall be references to the Seller Schedules as supplemented, modified, or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller Parties has occurred (other than through notice from the Sellers), Purchaser shall promptly so notify the Sellers, in reasonable detail. Nothing in this Agreement, including this Section 6.7, shall imply that the Seller Parties are making any representation or warranty as of any date other than the Effective Date and/or the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

6.8     *Notification of Certain Matters*. Until the Closing, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance, or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Article 8 becoming incapable of being satisfied.

6.9     *Transition Services*.

(a)     During the Interim Period, the Parties agree to work in good faith to identify any ongoing services related to the Business that Purchaser anticipates requiring from the Seller Parent or its Affiliates post-Closing that are not included in the Transferred Assets (the "*Transition Services*"). The Parties agree that to the extent such Transition Services are required for the continued operation of the Business, the Parties shall use commercially reasonable efforts to negotiate the terms of a Transition Services Agreement (the "*Transition Services Agreement*"), including, but not limited to, the fees and costs to be charged for the Transition Services, which such fees shall be consistent with fair market value, the duration of the Transition Services Agreement, and any other terms and provisions of the Transition Services Agreement. The Transition Services Agreement will not be assignable by the Seller Parent to a non-Affiliate third party without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)     Purchaser agrees that effective as of the later of the Closing Date or the effective date of the applicable Assumed TSA, other than with respect to the Seller Parent's obligations under the Transition Services Agreement, Purchaser will (i) assume any and all obligations of the Seller Parent, its Affiliates, its Subsidiaries or their permitted designees, under any Assumed TSA, regardless of whether such obligations arose prior to, on or after the Closing

Date, and (ii) perform all of the Seller Parent, its Affiliates, its Subsidiaries or their permitted designees' obligations under the Assumed TSAs.

6.10    ***Employee Matters.***

(a)    Schedule 6.10(a) sets forth the names of all individuals who are Seller Party employees as of the Effective Date and whose job responsibilities relate to the ownership, operation or use of the Transferred Assets (the "***Scheduled Employees***"). Schedule 6.10(a) also sets forth, for each Scheduled Employee, as applicable, the Scheduled Employee's job title, date of hire, location of employment, exempt or non-exempt status under applicable Law, annual base salary or hourly wage rate (as applicable), and target bonus opportunity for 2025 (if applicable) (the "***Scheduled Employees Schedule***"). The Scheduled Employees Schedule shall be held in confidence and shall not be filed with the Bankruptcy Court (unless under seal). From time to time following the Effective Date (and not later than fifteen (15) Business Days prior to the expected Closing Date), to the extent necessary, the Seller Parties shall update the Scheduled Employees Schedule to reflect any changes thereto permitted by this Agreement. The Seller Parties shall provide Purchaser with any such updated Scheduled Employees Schedule at least twelve (12) Business Days prior to the expected Closing Date.

(b)    At least sixty (60) days prior to the expected Closing Date, Purchaser shall deliver to the Seller Parties the form of written offer of employment that is to be provided to the Scheduled Employees in accordance with the requirements set out in this Section 6.10, and agrees to consider in good faith any comments provided by the Seller Parties on such form. No later than forty-five (45) days prior to the expected Closing Date, Purchaser shall offer employment, on an "at will" basis, in writing to substantially all of the Scheduled Employees effective as of the Closing. For purposes of this Section, "substantially all of the Scheduled Employees" shall mean at least ninety-five percent (95%) of all Scheduled Employees. No later than ten (10) Business Days prior to the expected Closing Date, Purchaser shall deliver to the Seller Parties a list identifying each Scheduled Employee who has then accepted Purchaser's offer of employment (each Scheduled Employee who accepts such offer on or prior to the Closing Date, successfully fulfills the conditions of such offer, as determined in Purchaser's sole discretion, and actually commences employment with Purchaser, a "***Continuing Employee***"). In the event any, some or all of the Scheduled Employees do not accept offers of employment with Purchaser, no Material Adverse Effect shall have been deemed to occur solely due to such refusal. Purchaser will not take any actions that would result in or cause the Seller Parties any Liability under the WARN Act or any similar state or local Law. Purchaser shall be responsible for any WARN Act Liability, as well as any Liabilities arising under any similar state or local Law, resulting from the termination of any Seller Party employee in connection with the Closing.

(c)    Except to the extent otherwise required by applicable Law, Purchaser shall provide each Continuing Employee with: (i) annual base salary or hourly wage rate and cash target incentive compensation opportunities that are no less favorable, in the aggregate, than the annual base salary or hourly wage rate and cash target incentive compensation opportunities provided by Purchaser to its similarly situated employees, and (ii) other employee benefits that are substantially comparable in the aggregate to those provided by Purchaser to its similarly situated employees; provided, in either case, if Purchaser has no such similarly situated employees, each such applicable Continuing Employee shall receive an annual base salary or hourly wage rate and cash

target incentive compensation opportunities and other employee benefits that are no less favorable than those which such Continuing Employee received immediately prior to the Closing Date from the Seller Parties. Notwithstanding anything herein to the contrary, Purchaser shall provide compensation to such Continuing Employees so as to not trigger any notification or other obligations under the WARN Act or similar state or local Laws. Purchaser shall provide Continuing Employees who are subject to a collective bargaining agreement with the same terms and conditions of employment provided for under their respective agreements for the term of such agreements.

(d)     The provisions of this Section 6.10 are solely for the benefit of the Parties, and no Continuing Employee (including any beneficiary or dependent thereof) or any other Person shall be regarded for any purpose as a third-party beneficiary of the Agreement, and no provision of this Section 6.10 shall create such rights in any such Persons with respect to the compensation, terms and conditions of employment or benefits that may be provided to any such employee or beneficiary or dependent by the Seller Parties, Purchaser or any of their respective Affiliates or under any benefit plan (including any Seller Benefit Plans) which the Seller Parties, Purchaser or any of their respective Affiliates may maintain, other than what is legally required in accordance with applicable Laws. Nothing in this Agreement is intended to (i) be treated as an amendment of any particular Seller Benefit Plan, (ii) prevent Purchaser or any of its Affiliates from amending or terminating any compensation or benefit plan of Purchaser or its Affiliates (including any Seller Benefit Plan) on or after the Closing Date in accordance with the terms of such plan or applicable Law, or (iii) prevent Purchaser or any of its Affiliates from terminating the employment of any Continuing Employee.

6.11     *[Intentionally Omitted.]*

6.12     *MPT Lease and Post-Closing Agreement Negotiations.*

(a)     Purchaser and Seller covenant and agree that they will use best efforts to (i) agree upon the form of Post-Closing Agreements to be entered into at Closing; and (ii) enter into the MPT Agreement with MPT and/or MPT Lessors, in each case, on or before the date that is two days before the Auction. The Parties shall not unreasonably withhold, condition, or delay their agreement to the MPT Agreement or the Post-Closing Agreements.

(b)     Purchaser covenants and agrees that it shall, at its sole cost and expense, use best efforts to finalize a written lease agreement and ancillary documents related thereto for the MPT Real Property (collectively, the "*New MPT Lease*") on terms materially consistent with the term sheet attached hereto as Exhibit B (the "*MPT Lease Term Sheet*"), subject to such changes as may be mutually agreed by Purchaser and the MPT Lessors. Purchaser shall not unreasonably withhold, condition, or delay its agreement to terms proposed by the MPT Lessors that are consistent with the MPT Lease Term Sheet. Purchaser shall keep the Seller Representative reasonably informed of the status of the New MPT Lease negotiations.

6.13     *Treatment of Accrued Property Taxes*. Purchaser shall have the right, but not the obligation, to address payment of the Property Tax Liabilities in the New MPT Lease. The Seller Group acknowledges and agrees that Purchaser need not pay for, or otherwise resolve, the Property Tax Liabilities in full at the Closing in order to satisfy Purchaser's obligations hereunder.

6.14    ***Right to Bill***. For a period of time mutually agreed to by the Parties, and to the extent consistent with the Interim Management Agreement and allowed by applicable Law, the Seller Group grants Purchaser and its Affiliates a license to use the Seller Group's billing identification information (which information shall include, as applicable, such Seller's name, Medicare and related Medicaid and Medi-Cal provider numbers, federal employer identification number, and such other information as may be reasonably necessary) for purposes of submitting claims to Medicare, Medicaid, Medi-Cal, and all other Government Reimbursement Programs for services provided at the Facilities by Purchaser or any of its Affiliates after the Effective Time.

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1    ***Access to Information; Books and Records***. The Parties acknowledge that subsequent to the Closing, the Seller Parties may need access to information or documents included in the Transferred Assets and in the control or possession of Purchaser for the purposes of concluding the Transactions, audits, compliance with Laws, and the prosecution or defense of third party claims. Accordingly, Purchaser shall for a period of ten (10) years after the Closing, and until the expiration of the applicable statute of limitations with respect to any governmental or third party claims, maintain in accordance with retention requirements under applicable Law and make reasonably available to the Seller Parties and their respective representatives and/or Governmental Authorities, upon written request and at the expense of the Seller Parties, copies of such documents and information as may be available relating to the Business for periods prior to the Closing Date to the extent necessary to facilitate concluding the Transactions, audits, compliance with Laws and the prosecution or defense of claims. The Parties shall reasonably cooperate with the other in connection with the handling of any such post-Closing matters as may reasonably be requested, in each case, at the sole cost and expense of the requesting Seller Party. On and after the end of the applicable retention period, Purchaser shall, and shall cause its Affiliates to, provide the Seller Parties with at least ten (10) Business Days prior written notice before destroying, altering or otherwise disposing any such Books and Records, during which period the Seller Parties may elect to take possession, at its own expense, of such Books and Records. In addition, following the Closing, Purchaser shall provide the Seller Group with reasonable access to, or provide copies (at the Seller Group's sole cost and expense) of patient and medical records used in connection with the Business prior to the Effective Time to the extent permitted by Law and as reasonably necessary for purposes of the Seller Group's bona fide compliance with applicable Laws, regulatory requirements or litigation matters.

7.2    ***Post-Closing Receipt and Possession of Assets***.

(a)    After the Closing Date, the Seller Group shall transfer, or shall cause to be transferred, promptly to Purchaser from time to time (but in any event no less frequently than on a monthly basis) any payments constituting Transferred Assets received by the Seller Group. After the Closing Date, Purchaser shall transfer promptly to the Seller Parties, from time to time (but in any event no less frequently than on a monthly basis), any payments constituting Excluded Assets, including any accounts receivable constituting Excluded Assets, received by Purchaser after the Closing.

(b)     In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any other Excluded Asset, Purchaser shall promptly notify the Seller Parties of its receipt or possession of such other Excluded Asset and transfer, at the Seller Group's expense, such Excluded Asset to the Seller Group. In the event that, after the Closing Date, the Seller Group receives or otherwise is in possession of any other Transferred Asset, the Seller Group shall promptly notify Purchaser of the Seller Group's receipt or possession of such other Transferred Asset and shall transfer, or cause to be transferred, at Purchaser's expense (unless the Seller Group was required to transfer such Transferred Asset to Purchaser at Closing, in which case, and without limitation of any other remedies available to Purchaser, such transfer will be at the Seller Group's expense), such Transferred Asset to Purchaser.

7.3     ***Tax Matters***.

(a)     The Seller Parties shall be responsible for preparing and filing or causing to be prepared and filed all Asset Tax Returns for taxable periods ending on or before the Closing Date that are required to be filed (taking into account all extensions properly obtained) after the Closing. After the Closing, Purchaser will assist and cooperate with the Seller Parties in preparing and filing such Asset Tax Returns.

(b)     Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Asset Tax Returns that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "***Straddle Period***"). Purchaser shall prepare such Tax Returns in a manner consistent with past practice except as required by applicable Law and shall provide the Sellers with completed drafts of such Tax Returns for the Sellers' review and comment at least thirty (30) days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within thirty (30) days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Tax Returns as are requested by the Sellers, and Purchaser shall not file such Tax Returns without the prior written consent of the Sellers (not to be unreasonably withheld, conditioned, or delayed).

(c)     For purposes of this Agreement, in the case of any Straddle Period, any Asset Taxes that are real property Taxes, personal property Taxes, ad valorem and similar periodic Taxes levied on or with respect to the Transferred Assets for any Straddle Period (collectively, the "***Apportioned Obligations***") shall be apportioned on a per diem basis. All property Taxes shall be pro-rated based on the period to which such Taxes apply with regard to the date of assessment. The Apportioned Obligations shall be prorated (based on the most recent available Tax statement, latest Tax valuation and latest bills) as of the Closing. If the Closing occurs before the Tax rate is fixed for the then current fiscal or calendar year, whichever is applicable, the proration of the corresponding Taxes shall be on the basis of the tax rate for the last preceding year applied to the latest assessed valuation. For the avoidance of doubt, to the extent the Seller Parties have prepaid or deposited any amounts of any Asset Taxes prior to the Closing, the Sellers shall receive credit for such amounts in determining payments of Asset Taxes.

(d)     Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return, or take any other action that could be reasonably likely to result in an adverse

Tax consequence in respect of any Pre-Closing Tax Period or Straddle Period relating to the Seller Group or Seller Parent or the Business without the prior written consent of the Sellers (not to be unreasonably withheld, conditioned, or delayed).

(e)    Purchaser shall promptly notify the Sellers in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened United States federal, state, local or foreign Tax audits, Actions or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller Group or Seller Parent may be liable (a "***Seller Tax Claim***").

(f)    The Seller Parties shall have the sole right to control the defense or resolution of any Seller Tax Claim, and to employ counsel of its choice at the Sellers' expense.

(g)    After the Closing, each of the Seller Parties and Purchaser shall use commercially reasonable efforts to (and shall cause their respective Affiliates to use commercially reasonable efforts to):

(i)    timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce) Transfer Taxes;

(ii)    cooperate fully in preparing for and defending any audits or Actions of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets payable by, the Seller Group or Seller Parent for any Pre-Closing Tax Period or Straddle Period;

(iii)    maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other Parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and

(iv)    furnish the other Parties, as reasonably requested, with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, Action, assessment or information request relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other Parties, as reasonably requested, with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other Party).

7.4    ***Nonassignable Assets***. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if, notwithstanding the provisions of Section 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the Consent of a third party, would constitute a breach or other contravention under any

Contract or Law to which any Seller Party is a party or by which it is bound, or in any way adversely affect the rights of any Seller Party or, upon transfer, Purchaser under such asset, permit, claim or right. Purchaser agrees that no Seller Party or any of their Affiliates shall have any liability to Purchaser arising out of or relating to the failure to obtain any such Consent that may be required in connection with the Transactions, except to the extent that such failure is caused by any breach by any Seller Party of its obligations hereunder.

7.5     ***Terminating Cost Reports***.

(a)     The Seller Parties shall prepare and timely file all Cost Reports relating to the periods ending on or prior to the Closing Date or required as a result of the consummation of the Transactions. Purchaser shall forward to the Seller Parties any and all correspondence relating to the Seller Parties' Cost Reports or the Seller Parties Agency Settlements within ten (10) Business Days after receipt by Purchaser. Purchaser shall not reply to any such correspondence without the Seller Parties' written approval. Purchaser shall remit any receipts relating to the Seller Parties' Cost Reports or the Seller Parties Agency Settlements within ten (10) Business Days after receipt by Purchaser and forward any demand for payments within ten (10) Business Days after receipt by Purchaser. The Seller Parties shall retain all rights to the Seller Parties' Cost Reports and Seller Parties' Agency Settlements, including the right to appeal any Medicare determinations relating to the Seller Parties' Agency Settlements and the Seller Parties' Cost Reports. The Seller Parties shall retain the originals of the Seller Parties' Cost Reports, correspondence, work papers and other documents relating to the Seller Parties' Cost Reports and the Seller Parties' Agency Settlements and furnish copies of such documents to Purchaser upon reasonable request.

(b)     Purchaser, upon reasonable notice, during normal business hours and at the sole cost and expense of the Seller Parties, shall reasonably cooperate with the Seller Parties in regard to the preparation, filing, handling and appeals of the Seller Parties' Cost Reports. Such cooperation shall include the providing of statistics and obtaining files at the Seller Parties' facilities and the coordination with the Seller Parties pursuant to adequate notice of Medicare and Medicaid exit conference or meetings. Purchaser shall, upon reasonable notice, during normal business hours and at the sole cost and expense of the Seller Parties, and subject to applicable Law regarding confidentiality of patient records, provide reasonable access by the Seller Parties to all records of the Business and, to the extent permitted by Law, shall allow the Seller Parties to copy any documents relating to the Sellers' Cost Reports and appeals thereof. Following the Closing, Purchaser shall not, and shall not permit any of their Affiliates to, refile, reopen, file any appeal with respect to or otherwise amend any Seller Parties' Cost Report relating to the periods ending on or prior to the Closing Date in each case without the prior written consent of the Seller Parties.

7.6     ***Medicare Bad Debts***. Purchaser shall have the right, in its sole discretion to submit a claim for reimbursement to The Centers for Medicare and Medicaid Services ("***CMS***") for any Medicare bad debt reimbursement associated with services furnished prior to the Closing Date ("***Sellers' Bad Debt***") on Purchaser's Cost Reports for the period in which Sellers' Bad Debt becomes uncollectible. In the event that Purchaser receives any payments from CMS as reimbursement for any of Sellers' Bad Debt claims submitted by Purchaser, Purchaser shall retain the full amount of such payment received by Purchaser for Sellers' Bad Debts. Any additional payment, to the extent that Purchaser receives such payment from CMS as a result of the Cost

Report audit of Sellers' Bad Debts claims submitted by Purchaser or any final settlement shall be retained by Purchaser.

7.7 ***HITECH Payments***. After the Closing Date, during normal business hours, the Seller Group will use commercially reasonable efforts to cooperate with Purchaser in providing documents or data that Purchaser reasonably and in good faith believes are necessary or appropriate to file with respect to receiving HITECH Payments for federal fiscal years (or portions thereof) ending prior to the Closing Date or to substantiate the Seller Parties' claim for HITECH Payments for such periods. In the event that there is any state or federal audit related to any attestation or other filing contemplated by this Section 7.7, the Seller Group shall reasonably cooperate with Purchaser, at Purchaser's expense, with respect to any such audit.

7.8 ***Medical Staff***. In support of the continuity of care in the community, excluding physicians and other practitioners whose medical staff membership or clinical privileges have been terminated or not renewed by Purchaser or any of its Affiliates, and subject to Purchaser's reasonable opportunity to conduct due diligence review of physicians and other practitioners at the Facilities, Purchaser will extend medical staff membership and clinical privileges to physicians and other practitioners at the Facilities who are in good standing as of the Closing Date. After the Closing, the medical staff at the Facilities will be subject to the medical staff bylaws and medical staff policies of the Facilities as of the Closing, as may be amended by Purchaser or any of its Affiliates, as applicable, to be generally consistent with the medical staff bylaws, medical staff policies, and credentialing policies and processes of Purchaser and its Affiliates.

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1 ***Conditions to Each Party's Obligation***. The respective obligations of the Parties to effect the Transactions are subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Seller Parties and Purchaser), at or prior to the Closing, of the following conditions:

(a)     HSR Act. The applicable waiting periods, together with any extensions thereof, under the HSR Act shall have expired or been terminated (and, for avoidance of doubt, such expiration or termination under the HSR Act shall be effective for purposes hereof regardless of whether any Party has been notified by a Governmental Authority that its investigation of the Transactions remains open and ongoing).

(b)     Required Regulatory Approvals. The Parties shall have obtained all Required Regulatory Approvals with applicable Governmental Authorities with respect to the Transactions.

(c)     No Injunctions or Restraints. No Order or Law preventing the consummation of the Transactions shall be in effect; *provided*, *however*, that, this Section 8.1 shall not apply to any Action arising out of any bankruptcy proceeding (the absence of which shall not be a condition to Closing).

(d)   <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Seller Parties and Purchaser in their respective sole discretion).

(e)   <u>MPT Agreement</u>. The MPT Agreement has been entered into and MPT Lessors shall have delivered, or caused to be delivered, to the Escrow Agent the MPT Real Property Deliverables and the closing of the transactions contemplated by the MPT Agreement shall have occurred in accordance with the terms thereof and hereof.

(f)   <u>New MPT Lease</u>. The MPT Lessors shall have delivered, or caused to be delivered, to the Escrow Agent the duly executed copy of the New MPT Lease.

8.2   ***Conditions to Obligation of Purchaser***. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)   <u>Representations and Warranties</u>. Each of the representations and warranties of the Sellers set forth in <u>Article 3</u> shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality," "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, in the aggregate, a Material Adverse Effect.

(b)   <u>Performance of Covenants and Obligations</u>. The Seller Parties shall have performed, or cause to have been performed, or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)   <u>Closing Deliverables</u>. The Seller Parties shall have delivered to Purchaser the closing deliverables required to be delivered by the Seller Parties pursuant to <u>Section 2.8(a)</u> and <u>Section 2.8(c)</u>.

8.3   ***Conditions to Obligations of the Seller Parties***. The obligation of the Seller Parties to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Seller Parties), at or prior to the Closing, of the following conditions:

(a)   <u>Representations and Warranties</u>. Each of the representations and warranties of Purchaser set forth in <u>Article 4</u> shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, in the aggregate, (i) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (ii) otherwise prevent, hinder or delay the consummation of the Transactions.

(b) <u>Performance of Covenants and Obligations of Purchaser</u>. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c) <u>Closing Deliverables</u>. Purchaser shall have delivered to the Seller Parties the closing deliverables required to be delivered by Purchaser pursuant to <u>Section 2.8(b)</u> and <u>Section 2.8(c)</u>.

8.4 ***Waiver of Condition; Frustration of Conditions***. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller Parties may rely on the failure of any condition set forth in this <u>Article 8</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, commercially reasonable efforts to consummate the Transactions.

## ARTICLE 9
## TERMINATION

9.1 ***Events of Termination***. Notwithstanding anything to the contrary, this Agreement may be terminated, and the Transactions may be abandoned at any time prior to the Closing:

(a) by mutual written consent of Purchaser and the Seller Representative;

(b) by Purchaser or the Seller Parties, by written notice to Purchaser or the Seller Parties from the other, if (i) the Bankruptcy Court shall enter an order approving a Competing Bid or any sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "***Alternate Transaction***"), and (ii) such Alternate Transaction is consummated;

(c) by Purchaser, by written notice from Purchaser to the Seller Representative, if there has been a material breach or inaccuracy of a covenant, representation or warranty made by the Seller Parties in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.2</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller Parties prior to the earlier of (i) thirty (30) Business Days after receipt of written notice from Purchaser requesting such breach be cured, or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(d) by the Seller Parties, by written notice from the Seller Representative to Purchaser, if there has been a material breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in <u>Section 8.1</u> or <u>Section 8.3</u> are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) thirty (30)

Business Days after receipt of written notice from the Seller Parties requesting such breach be cured or (ii) the Outside Date; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to the Seller Parties if the failure of the Seller Parties to fulfill any of their obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller Parties in this Agreement;

(e) by Purchaser or the Seller Parties, by written notice from Purchaser or the Seller Representative to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Law or taken any other action restraining, enjoining, or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; *provided*, *however*, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to the Party seeking to terminate if any action of such Party or any failure of such Party to act has contributed to such Order or other action and such action or failure constitutes a material breach of this Agreement;

(f) by Purchaser or the Seller Parties, by written notice from Purchaser or the Seller Representative to the other, if the Closing has not occurred on or prior to ninety (90) days following the Effective Date (the "*Outside Date*"); *provided*, *however*, that if the Required Regulatory Approvals have not been granted by the Outside Date, then the Sellers (in their sole discretion and immediately upon written notice to Purchaser prior to the expiration of the then current Outside Date) may extend the Outside Date up to a maximum period of six (6) months; *provided, further,* that the Party exercising the right to terminate this Agreement pursuant to this Section 9.1(f) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement; or

(g) by Purchaser, by written notice from Purchaser to the Seller Representative, if Purchaser is not the Successful Bidder or the Back-Up Bidder for all or substantially all of the Transferred Assets pursuant to the Sale Order.

9.2 **_Effect of Termination_**.

(a) In the event that this Agreement shall be terminated pursuant to Section 9.1, (i) Purchaser and its representatives shall promptly return all documents, work papers, and other materials of the Seller Parties including any confidential information, and (ii) all further obligations of the Parties under this Agreement shall terminate without further Liability or obligation to the other Parties; *provided*, *however*, that, notwithstanding the foregoing, the Liabilities and obligations under (A) the Confidentiality Agreement, and (B) Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b) If this Agreement is terminated prior to the Closing pursuant to Section 9.1(d), then the Seller Parties and Purchaser will deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release from the Deposit Account the entire Deposit to the Seller Parties, by irrevocable wire transfer of immediately available funds, to an account designated by the Seller Parties to the Escrow Agent and the Deposit, which shall constitute

liquidated damages (and not a penalty), shall be delivered to the Seller Parties within two (2) Business Days following delivery of such joint written instructions.

(c)     If this Agreement is terminated for any reason in accordance with the terms of this Agreement other than by the Seller Parties pursuant to Section 9.1(d), (i) the Seller Representative and Purchaser shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release from the Deposit Account the entire Deposit to Purchaser, by irrevocable wire transfer of immediately available funds, to an account designated by Purchaser to the Escrow Agent, and (ii) the Deposit shall be delivered to Purchaser within two (2) Business Days following delivery of such joint written instructions. Any issue regarding the entitlement to the Deposit shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

(d)     Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1, no such termination shall relieve Purchaser from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement and the Seller Parties shall be entitled to all remedies available at law or in equity; *provided*, *however*, that absent Fraud or willful misconduct, and other than as provided in this Section 9.2, notwithstanding anything to the contrary contained in this Agreement, the maximum Liability of the Seller Parties under this Agreement (including for any and all such breaches or if this Agreement is terminated by Purchaser or Seller pursuant to Section 9.1(b)) shall be limited to the return of the Deposit.

### ARTICLE 10
### GENERAL PROVISIONS

10.1   *Survival of Representations, Warranties and Covenants.*

(a)     All covenants and agreements contained in this Agreement that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefor terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 6.2, Section 9.2, this Article 10 and the Confidentiality Agreement shall survive the Closing.

(b)     Following the Closing, and except with respect to the Sellers' post-Closing covenants and obligations in this Agreement and the Post-Closing Agreements, none of the Seller Parties nor any of their representatives shall have any liability or obligation of any nature whatsoever to Purchaser, Purchaser's representatives, or any other Person arising out of or relating to (i) this Agreement or the Transactions, or (ii) the use, ownership or operation of the Business or the Transferred Assets following the Effective Time.

10.2   *Entire Agreement*. This Agreement, including the Exhibits and Schedules (including the Seller Schedules and Purchaser Schedules) hereto, the Confidentiality Agreement

and the Related Documents, contain the entire understanding of the Parties with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings, and understandings (including any letters of intent or term sheets), whether written or oral, among the Parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The Parties have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the Parties expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the Parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all Parties specifically acknowledge that no Party has any special relationship with another Party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the Parties hereby agree that neither Party shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3 ***Amendment; No Waiver***. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any Party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4 ***Severability; Specific Versus General Provisions***. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law. No Party shall assert, and each Party shall cause its respective Affiliates or related Parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant

or agreement of the Seller Parties contained in this Agreement or the Schedules (each, a "***Provision***") addresses a particular issue with specificity (a "***Specific Provision***"), and no breach by the Seller Parties exists under such Specific Provision, the Seller Parties shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Sellers' Knowledge, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

10.5 ***Expenses and Obligations***. Except as otherwise provided in this Agreement, all costs and expenses incurred by the Parties in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the Party that has incurred such expenses; *provided*, *however*, that Purchaser and Seller Group shall evenly split the cost of any filing fees that relate to any filing or notification required by any Governmental Authority, including filing fees under the HSR Act.

10.6 ***Notices***. All notices, demands, and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered to the recipient, (b) upon transmission by email to the recipient, if sent on a Business Day on or prior to 5:00 PM Pacific Time, and if not, it shall be deemed given on the next Business Day (*provided*, that no notice of failed transmission is received), (c) one (1) Business Day after the Business Day on which such notice, demand, or communication is deposited with a nationally recognized overnight courier service (charges prepaid) and addressed to the intended recipient, and (d) when delivered after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Notices, demands, and communications to the Parties shall, unless another address is specified in writing, be sent to the addresses indicated below:

If to Purchaser:

NOR Healthcare Systems Corp.
505 North Brand Blvd
Suite 1200
Glendale, CA 91203
Attention: Faisal Gill

Email: fgill@amhealthsystems.com

If to the Seller Parties:

Prospect Medical Holdings, Inc.
3415 South Sepulveda Blvd., 9th Floor
Los Angeles, CA 90034
Attention: General Counsel

Email: frank.saidara@pmh.com

with a copy to (which will not constitute notice):

Sheppard Mullin Richter & Hampton LLP
1901 Avenue of the Stars, 16th Floor
Los Angeles, California 90067
Attention:  Eric A. Klein, Esq.;
                    Nioura F. Ghazni, Esq.

Email:  EKlein@sheppardmullin.com;
             nghazni@sheppardmullin.com

and

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Attention:  Thomas R. Califano, Esq.;
                    William E. Curtin, Esq.;
                    Anne G. Wallice, Esq.

Email:  tom.califano@sidley.com;
             wcurtin@sidley.com;
             anne.wallice@sidley.com

10.7    ***Counterparts***. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronically transmitted portable document format (PDF) (in each case, complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com)) shall be effective as delivery of a manually executed counterpart of this Agreement and sufficient to bind the Parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the Party's intent or the effectiveness of such signature.

10.8    ***Governing Law.*** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any other jurisdiction.

10.9    ***Submission to Jurisdiction; Consent to Service of Process***.

(a)      Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed

and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; *provided*, *however*, that if the Bankruptcy Cases have closed or the Bankruptcy Court does not have jurisdiction, the Parties agree to irrevocably submit to the exclusive jurisdiction of the Court of Chancery located in the State of Delaware or, solely if such Court of Chancery declines jurisdiction, in any federal court located in the State of Delaware, or solely if such federal court declines jurisdiction, in any state court located in the State of Delaware (the "***Designated Courts***") over all Related Claims, and each Party hereby irrevocably agrees that all Related Claims may be heard and determined in the Designated Courts. The Parties hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in the Designated Courts or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)      Each of the Parties hereby consents to process being served by any Party in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.10  ***Waiver of Jury Trial***. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

10.11  ***Rights Cumulative***. All rights and remedies of each of the Parties will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or applicable Law.

10.12  ***Assignment***. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the Parties. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any Party at any time, whether or not by operation of law, without the prior written consent of the Seller Parties and Purchaser, and any attempted assignment without the required consent shall be void; *provided*, *however*, that (a) Purchaser may assign (i) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii) its rights, but not its duties, under this Agreement to any of its financing sources, and (b) the Seller Parties may assign any of their rights or delegate any of its duties under this Agreement (i) to any of their Affiliates, and (ii) for collateral security purposes to any lender of the Seller Parties or their Affiliates; *provided*, *further*, *however*, that, in each case, such assignment shall not release

Purchaser from its obligations under this Agreement and the Seller Parties shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

10.13 ***Specific Enforcement; Remedies***. The Parties agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the Parties in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (a) Purchaser, on the one hand, and the Seller Parties, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Seller Parties to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Seller Parties nor Purchaser would have entered into this Agreement. Remedies shall be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Agreement. Each of the Parties hereby (i) waives any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, (ii) waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief, and (iii) agrees not to assert that a remedy of specific performance or other equitable relief is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the Parties otherwise have an adequate remedy at law. Notwithstanding anything to the contrary, in no event shall this Section 10.13 be used, alone or together with any other provision of this Agreement, to require the Seller Parties to remedy any breach of any representation or warranty of the Seller Parties.

10.14 ***Third-Party Beneficiaries***. Except as set forth in Section 6.6 (solely with respect MPT's consent rights therein), Section 10.15 (with respect to the Nonparty Affiliates), and Section 10.16 (with respect to the released parties identified therein), Section 10.17 (with respect to the members of the Seller Group) and the next sentence, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement. From and after the Closing, all of the Persons identified as third-party beneficiaries in the first sentence of this Section 10.14 shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were Parties. The representations and warranties in this Agreement are the product of negotiations among the Parties and are for the sole benefit of the Parties. Any inaccuracies in such representations and warranties are subject to waiver by the Parties in accordance with this Agreement without notice or Liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the Parties of risks associated with particular matters regardless of the knowledge of any Party. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

10.15 ***No Personal Liability of Directors, Officers and Owners***. All Related Claims may be made only against (and are those solely of) the entities that are expressly identified as Parties (the "***Contracting Parties***"). No Person who is not a Contracting Party, including any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any Contracting Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any of the foregoing (collectively, "***Nonparty Affiliates***"), shall have any Liability pursuant to any Related Claim; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, and (b) each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Documents.

10.16 ***General Release***.

(a)     Effective as of the Closing, each Seller Party, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "***Seller Releasing Party***"), hereby fully, irrevocably and unconditionally releases and forever discharges Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Transferred Assets and Assumed Liabilities, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Seller Releasing Party of any Action it may have (i) under this Agreement or any of the other Related Documents or (ii) arising out of or related to the Retained Business.

(b)     Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "***Purchaser Releasing Party***"), hereby fully, irrevocably and unconditionally releases and forever discharges each of the Seller Parties, their respective Affiliates, and each of the Seller Parties' and their respective Affiliates' past and present directors, managers, officers, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based

upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Purchaser Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

10.17 ***Legal Representation***. Purchaser and the Seller Parties acknowledge and agree that the Law Firm has represented the Seller Parties and their Affiliates in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Related Documents and the consummation of the Transactions, and that the Seller Group, their Affiliates and their partners, officers, directors and representatives have a reasonable expectation that the Law Firm will represent them in connection with any Action involving any member of the Seller Group, on the one hand, and Purchaser or any of its Affiliates and representatives, on the other hand, arising under this Agreement, the Related Documents or the Transactions. Purchaser hereby, on behalf of itself and its Affiliates and representatives, irrevocably: (a) acknowledges and agrees that any attorney-client privilege, solicitor-client privilege, work product or other attorney-client or solicitor-client confidential information ("***Attorney-Client Information***") arising from communications prior to the Closing between the Seller Parties (including any one or more officers, directors or stockholders of the Seller Parties), on the one hand, and the Law Firm, on the other hand, are not included in the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Business or the Transferred Assets, that any such Attorney-Client Information shall be deemed property of, and controlled solely by, the Sellers for the benefit and on behalf of the Seller Group and, upon request, shall convey and transfer any Attorney-Client Information to the Sellers; (b) acknowledges and agrees that the Seller Group shall have the right to retain, or cause the Law Firm to retain, any such documentation or information in the possession of the Law Firm or the Seller Group at the Closing; (c) agrees not to access, retain or use any documentation or information constituting Attorney-Client Information and that Purchaser shall not have any right to waive any attorney-client privilege or other right to confidentiality with respect to such Attorney-Client Information; (d) disclaims the right to assert a waiver by any member of the Seller Group with regard to the attorney-client privilege, solicitor-client privilege or other right to confidentiality with respect to such Attorney-Client Information solely due to the fact that such documentation or information is physically in the possession of Purchaser after the Closing; (e) consents to the Law Firm's representation after the Closing of any member of the Seller Group in any Action that may relate to Purchaser or the Transactions and consents to and waives any conflict of interest arising therefrom without the need for any future waiver or consent; and (f) consents to the disclosure by the Law Firm to any member of the Seller Group of any documentation or information obtained by the Law Firm during the course of its representation of the Seller Parties or any Affiliate thereof prior to the Closing, whether related to this Agreement, the Related Documents, the Transactions or otherwise, whether or not such disclosure is made prior to or after the Closing and whether or not the documentation or information disclosed is subject to any attorney-client privilege, solicitor-client privilege or confidentiality obligation to any Seller Party, any Affiliate thereof, or any other Person. In the event that any Action arises after the Closing between Purchaser and a Person other than a member

of the Seller Group, Purchaser shall not disclose any documentation or information that is subject to an attorney-client privilege or other rights of confidentiality referenced in this <u>Section 10.17</u> without the prior written consent of the Sellers; *provided*, *however*, that if Purchaser is required by judicial order or other legal process to make such disclosure, Purchaser shall promptly notify the Sellers in writing of such requirement (without making disclosure) and shall provide the Sellers with such cooperation and assistance as shall be necessary to enable the Sellers to prevent disclosure by reason of such attorney-client privilege, solicitor-client privilege or other rights of confidentiality. This <u>Section 10.17</u> is for the benefit of the members of the Seller Group and such Persons are intended third-party beneficiaries of this <u>Section 10.17</u>.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed and delivered as of the Effective Date.

PURCHASER:

NOR HEALTHCARE SYSTEMS
By: _____
Name: _____
Title: _____

  **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed and delivered as of the Effective Date.

         **SELLER PARENT ON ITS OWN BEHALF, AS THE SELLER REPRESENTATIVE, AND ON BEHALF OF THE SELLERS:**

         PROSPECT MEDICAL HOLDINGS, INC.

By: _____

Name: Paul Rundell

Title: Chief Restructuring Officer

## Schedule A

(a)    Alta Hospitals System, LLC, a California limited liability company

(b)    Southern California Healthcare System, Inc. d/b/a Southern California Hospital at Hollywood, Southern California Hospital at Van Nuys and Southern California Hospital at Culver City

(c)    Alta Los Angeles Hospitals, Inc. d/b/a Los Angeles Community Hospital, Los Angeles Community Hospital at Norwalk and Los Angeles Community Hospital at Bellflower

(d)    Coordinated Regional Care Group, LLC