# <u>Exhibit F</u>

## Backstop Credit Agreement

# LOAN AND SECURITY AGREEMENT[1]

## by and among

## PROSPECT MEDICAL HOLDINGS, INC.,

## THE OTHER BORROWERS PARTY HERETO

## and

## MPT TRS LENDER PMH, LLC
## as Lender[2]

## Dated as of [●], 2025

---

[1] NTD: The contemplated sequence of events is as follows (which events are expected to occur on the same day except for step 8 below):

1. Debtors to apply cash on hand to pay Allowed Administrative Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims.
2. The GUC Trust shall be formed, the Assigned Estate Causes of Action shall have been transferred to the GUC Trust and the GUC Trust bank account shall have been set up.
3. The Plan Effective Date and the Existing Indebtedness Refinancing shall have occurred.
4. This Agreement shall be executed.
5. The Backstop Advance shall be funded.
6. Remaining Allowed Administrative Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims shall be paid with the proceeds of the Backstop Advance.
7. The GUC Trust Assumption will occur.
8. The MPT GUC Trust Advance shall be funded, to the extent needed, on or after the Closing Date.

[2] NTD: This draft is subject to MPT's further review and comment, and in particular, after MPT's review and comment on the GUC Trust Agreement and the Confirmation Order.

# TABLE OF CONTENTS [TO BE UPDATED]

**Page**

ARTICLE I.
DEFINITIONS AND CONSTRUCTION ........................................................................2
Section 1.01    Definitions .............................................................................2
Section 1.02    Accounting Terms ..............................................................13
Section 1.03    UCC.......................................................................................13
Section 1.04    Construction ........................................................................13
Section 1.05    Schedules and Exhibits.......................................................14
Section 1.06    Timing of Payment or Performance .................................14

ARTICLE II.
LOAN AND TERMS OF PAYMENT ......................................................................14
Section 2.01    Agreement to Lend; Delayed Draw; Security Documents; and Loan
                Documents. ..........................................................................14
Section 2.02    [Reserved] ............................................................................15
Section 2.03    Borrowing Procedures .......................................................15
Section 2.04    Payments; Prepayments.....................................................15
Section 2.05    Interest Rates and Rates, Payments, and Calculations. ............17
Section 2.06    Crediting Payments; Clearance Charge............................18
Section 2.07    Designated Account ............................................................18
Section 2.08    Statements of Obligations .................................................18
Section 2.09    [Reserved]. ...........................................................................18
Section 2.10    Borrower Representative; Assumptions............................18

ARTICLE III.
CONDITIONS; TERM OF AGREEMENT ...........................................................19
Section 3.01    Conditions Precedent to the Closing Date.......................19
Section 3.02    Conditions Precedent to Advances...................................20
Section 3.03    Maturity................................................................................21
Section 3.04    Effect of Maturity...............................................................21

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES.......................................................22
Section 4.01    Due Organization and Qualification ................................22
Section 4.02    Due Authorization ..............................................................22
Section 4.03    Binding Obligations ...........................................................22
Section 4.04    Title to Properties...............................................................23

Section 4.05  Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims ............23

Section 4.06  Litigation ......................................................................................23

Section 4.07  Fraudulent Transfer ......................................................................23

Section 4.08  [Reserved] .....................................................................................23

Section 4.09  Payment of Taxes ..........................................................................23

Section 4.10  [Reserved] .....................................................................................24

Section 4.11  [Reserved] .....................................................................................24

Section 4.12  [Reserved] .....................................................................................24

Section 4.13  No Other Representations ............................................................24

Section 4.14  Full Disclosure ..............................................................................24

ARTICLE V.
AFFIRMATIVE COVENANTS ..................................................................................24

Section 5.01  Notice of Certain Events ...............................................................24

Section 5.02  Reporting .......................................................................................24

Section 5.03  Existence ........................................................................................25

Section 5.04  [Reserved] .....................................................................................25

Section 5.05  Taxes ..............................................................................................25

Section 5.06  Inspection ......................................................................................25

Section 5.07  [Reserved] .....................................................................................25

Section 5.08  [Reserved] .....................................................................................26

Section 5.09  Compliance with Laws .................................................................26

Section 5.10  Disclosure Updates .......................................................................26

Section 5.11  Further Assurances ........................................................................26

Section 5.12  Deposit Account Control Agreements .........................................26

ARTICLE VI.
NEGATIVE COVENANTS .........................................................................................26

Section 6.01  Indebtedness ..................................................................................27

Section 6.02  Liens ...............................................................................................27

Section 6.03  Restrictions on Fundamental Changes .........................................27

Section 6.04  Disposal of Assets .........................................................................27

Section 6.05  Change Name ................................................................................27

Section 6.06  [Reserved] .....................................................................................27

Section 6.07  Material Leases or Contracts; Amendments ................................27

Section 6.08  Change of Control .........................................................................27

Section 6.09  Accounting Methods .....................................................................28

Section 6.10  Transactions with Affiliates ..........................................................28

Section 6.11   Use of Advances ....................................................................................28

Section 6.12   [Reserved] ..............................................................................................28

Section 6.13   Chapter 11 Cases ..................................................................................28

Section 6.14   [Reserved] ..............................................................................................28

Section 6.15   Acquisitions, Loans, or Investments ...................................................28

Section 6.16   [Reserved] ..............................................................................................28

Section 6.17   Distributions or Redemptions ...............................................................28

Section 6.18   Formation of Subsidiaries ....................................................................28

Section 6.19   GUC Trust Trustee ...............................................................................29

ARTICLE VII.
EVENTS OF DEFAULT ..................................................................................29

Section 7.01   Event of Default ....................................................................................29

Section 7.02   Rights and Remedies ............................................................................32

Section 7.03   Application of Proceeds upon Event of Default ....................................33

Section 7.04   Remedies Cumulative ...........................................................................33

ARTICLE VIII.
COLLATERAL SECURITY ............................................................................33

Section 8.01   Grant of Security Interest in the Collateral; Backstop Facility Claims ......33

Section 8.02   Representations and Warranties in Connection with Security Interest ......34

Section 8.03   Nature of Obligations and Liens ..........................................................34

Section 8.04   Power of Attorney ................................................................................34

Section 8.05   Lender's Ability to Perform Obligations on Behalf of Borrower with
Respect to the Collateral ......................................................................35

Section 8.06   Filing of Financing Statements ............................................................35

ARTICLE IX.
WAIVERS; INDEMNIFICATION ...................................................................35

Section 9.01   Demand; Protest; etc. ...........................................................................35

Section 9.02   Lender's Liability for Collateral ...........................................................35

Section 9.03   Indemnification .....................................................................................36

ARTICLE X.
NOTICES ........................................................................................................36

ARTICLE XI.
CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER .........................38

ARTICLE XII.
AMENDMENTS; WAIVERS; SUCCESSORS ................................................39

Section 12.01  Amendments and Waivers .....................................................................39

Section 12.02 No Waivers; Cumulative Remedies ..............................................................39

Section 12.03 Successors ..................................................................................................39

ARTICLE XIII.
GENERAL PROVISIONS ...................................................................................39

Section 13.01 Effectiveness ...............................................................................................39

Section 13.02 Section Headings ........................................................................................40

Section 13.03 Interpretation ..............................................................................................40

Section 13.04 Severability of Provisions ...........................................................................40

Section 13.05 Debtor-Creditor Relationship .....................................................................40

Section 13.06 Counterparts; Electronic Execution ............................................................40

Section 13.07 Revival and Reinstatement of Obligations..................................................40

Section 13.08 Lender Expenses .........................................................................................41

Section 13.09 [Reserved] ...................................................................................................41

Section 13.10 Integration ...................................................................................................41

ARTICLE XIV.
JOINT AND SEVERAL OBLIGATIONS ...........................................................41

ARTICLE XV.
ADDITIONAL BORROWERS............................................................................41

ARTICLE XVI.
TREATMENT OF CERTAIN INFORMATION ..................................................41

Schedules

Schedule A-1 – Authorized Persons
Schedule A-2 – Payment Account
Schedule B – Assigned Estate Causes of Action
Schedule D-1 – Designated Account and Designated Account Bank
Schedule 4.05 – Borrowers, Equity Ownership and Uniform Commercial Code Filing Information
Schedule 4.06 – Litigation and Commercial Tort Claims
Schedule 4.09 – Taxes


Exhibits

Exhibit A – Form of Compliance Certificate
Exhibit B – [Reserved]
Exhibit C – Reporting Requirements
Exhibit D – Form of Borrowing Notice

# BACKSTOP LOAN AND SECURITY AGREEMENT

**THIS BACKSTOP LOAN AND SECURITY AGREEMENT** (this "<u>Agreement</u>"), is entered into as of [●], 2025 (the "<u>Closing Date</u>")[3], by and among Prospect Medical Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), the other borrowers signatory hereto (together with Holdings, collectively, jointly and severally, prior to the GUC Trust Assumption (as defined below), the "<u>Borrowers</u>"; it being understood that from and after the GUC Trust Assumption, the "Borrowers" shall mean the GUC Trust (as defined below) and its Subsidiaries (as defined below) from time to time (if any)), and MPT TRS Lender PMH, LLC, a Delaware limited liability company, as lender (together with its successors and assigns, "<u>Lender</u>").

**WHEREAS,** Holdings and its hospital-related debtor affiliates, as debtors and debtors in possession, and PHP Holdings, LLC and its physician-related debtor affiliates, as debtors and debtors in possession, and Chamber Inc, Ivy Holdings Inc., and Ivy Intermediate Holding Inc., as debtors and debtors in possession, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>") on January 11, 2025, July 7, 2025, and September 19, 2025 (collectively, the "<u>Petition Date</u>"), respectively, which are being jointly administered under the lead Case No. 25-80002 filed by Holdings (collectively, the "<u>Chapter 11 Cases</u>");

**WHEREAS**, the Borrowers filed the *Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor Affiliates* [Docket No. [2986]] on [August 27][4], 2025 (together with all schedules, documents and exhibits contained therein and without giving effect to any subsequent amendment, supplement or other modification thereof, the "<u>Plan</u>");

**WHEREAS**, on [●], 2025, the Bankruptcy Court entered an order confirming the Plan with respect to the Borrowers [Docket No. [●]] (without giving effect to any subsequent amendment, supplement or other modification thereof, the "<u>Confirmation Order</u>");

**WHEREAS**, in connection with the consummation of the Plan, the Borrowers have requested that the Lender provide a senior secured exit credit facility to the Borrowers (such facility, the "<u>Backstop Facility</u>"), consisting of a single draw, new money term loan (the "<u>Backstop Term Loan</u>") in an aggregate principal amount of up to thirty million Dollars ($30,000,000), which the Borrowers shall be permitted to draw in an aggregate principal amount not to exceed the amount necessary to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims (in each case as defined below) which remain unpaid on the Plan Effective Date (as defined below) to the extent such claims are not (or will not) otherwise be paid from Net Proceeds (solely for purposes of this recital, as defined in the Plan) distributed in accordance with the Recovery Waterfall (as defined below) and/or the Debtors' available cash (including in any Professional Fee Reserve Account or other similar reserve);

---

[3] NTD: To be the Plan Effective Date and substantially concurrent with the occurrence of the Existing Indebtedness Refinancing (each term, as defined below).
[4] NTD: To be updated.

**WHEREAS**, if more than $5,000,000 of the Initial Contribution (as defined in the Plan) is used by the Debtors to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims in connection with consummation of the Plan, the Lender will advance in accordance with this Agreement (not subject to any fee) to the GUC Trust, promptly following written request by the GUC Trust, an amount equal to the difference between (x) $5,000,000 and (y) the portion of the Initial Contribution (which cannot be less than $0) not used by the Debtors to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims in connection with consummation of the Plan (the "MPT GUC Trust Term Loan" and, together with the Backstop Term Loan, the "Loans");

**WHEREAS**, substantially concurrently with the Closing Date, the GUC Trust will assume all of the obligations of Holdings and the other Borrowers signatory hereto under this Agreement (the "GUC Trust Assumption") and Holdings and such other Borrowers signatory hereto shall be wound down pursuant to the Plan;[5]

**WHEREAS**, Lender has indicated its willingness to make the Loans to Borrowers on the terms and conditions set forth herein and in the other Loan Documents (as defined below) so long as all of the Obligations are (a) secured by first-priority senior secured Liens on the Collateral (as defined below) granted by the Borrowers as provided herein and in the other Loan Documents and (b) given the priority status as Backstop Facility Claims (as defined below) as provided in the Relevant Orders (as defined below);

**WHEREAS**, each Borrower has agreed to grant to Lender a fully perfected first-priority senior lien on and security interest in the Collateral; and

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION

**Section 1.01    Definitions.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"Additional Documents" has the meaning assigned to such term in Section 5.11.

"Administrative Claims" has the meaning assigned to such term in the Plan.

"Advances" means, collectively, the Backstop Advance and the MPT GUC Trust Advance.

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly

---

[5] NTD:  Discuss mechanic for assumption of this agreement and the obligations hereunder.  Seems most efficient to include such assumption in the assignment instrument by which Assigned Estate Causes of Action are transferred to the GUC Trust.

or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Closing Date) of ten percent (10.00%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agreement" has the meaning assigned to such term in the preamble to this Agreement.

"Allowed" has the meaning assigned to such term in the Plan.

"Amendment No. 1 Orders" means the *Interim Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. 2739] entered by the Bankruptcy Court on August 5, 2025 and the *Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; and (IV) Granting Related Relief* [Docket No. 2887] entered by the Bankruptcy Court on August 20, 2025, in each case without giving effect to any subsequent amendment, supplement or other modification thereof.

"Assigned Estate Causes of Action" has the meaning assigned to such term in the Plan and shall include those Assigned Estate Causes of Action set forth on Schedule B hereto (the "Assigned Estate Causes of Action Schedule")[6].

"Assigned Estate Causes of Action Schedule" has the meaning assigned to such term in the definition of Assigned Estate Causes of Action.

"Authorized Person" means any of the individuals identified on Schedule A-1, which may be updated from time to time by written notice from Borrowers to Lender.

"Backstop Advance" has the meaning assigned to such term in Section 2.01(a)(i).

"Backstop Commitment" means the commitment of Lender to fund the Backstop Term Loan in an aggregate principal amount of up to thirty million Dollars ($30,000,000).

"Backstop Facility" has the meaning assigned to such term in the recitals to this Agreement.

"Backstop Facility Claims" has the meaning assigned to such term in the Plan.

"Backstop Liens" means the Liens granted by Borrowers in and to the Collateral in favor of Lender pursuant to this Agreement and the Relevant Orders.

---

[6] NTD: To attach agreed list included in the plan supplement.

"Backstop Term Loan" has the meaning assigned to such term in the recitals to this Agreement.

"Bankruptcy Code" has the meaning assigned to such term in the recitals to this Agreement.

"Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.

"Borrower Representative" has the meaning assigned to such term in Section 2.10.

"Borrowers" has the meaning assigned to such term in the preamble to this Agreement.

"Borrowing Notice" has the meaning assigned to such term in Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Change of Control" means, from and after the GUC Trust Assumption, the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or "group" (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), other than MPT, after the date of this Agreement, of (i) the beneficial ownership, directly or indirectly, of fifty percent (50.00%) or more of the voting equity interests of the GUC Trust or (ii) all or substantially all of the assets of the GUC Trust, taken as a whole.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Closing Date" has the meaning assigned to such term in the preamble to this Agreement.

"Collateral" means, collectively, each Borrower's right, title, and interest in, to and under the proceeds of Assigned Estate Causes of Action and all personal property and other assets, if any, transferred (or to be transferred) to the GUC Trust (other than the Assigned Estate Causes of Action), in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before, on or after the Closing Date, and wherever located, including, without limitation, the following: all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by such Borrower in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing,

all proceeds, and all "products," "accessions," "rents" and "profits" of or in respect of any of the foregoing (as such terms are defined in the UCC).

"Commitments" means the Backstop Commitment and the MPT GUC Trust Commitment.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A delivered by the Authorized Person of Borrowers to Lender.

"Confirmation Order" has the meaning assigned to such term in the recitals to this Agreement.

"Custodian" has the meaning assigned to such term in Section 7.01(h)(iii).

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, judicial management, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debtors" has the meaning assigned to such term in the Plan.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning assigned to such term in Section 2.05(b).

"Deposit Account" means a "deposit account" (as such term is defined in the UCC) of a Borrower.

"Deposit Account Control Agreement" means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to Lender that (a) is entered into among Lender, the financial institution or other person at which such Deposit Account is maintained, and such Borrower maintaining such Deposit Account, and (b) is effective for Lender to obtain "control" (within the meaning of Articles 8 and 9 of the UCC) of such Deposit Account.

"Designated Account" means the Deposit Account of Borrowers at the Designated Account Bank identified on Schedule D-1.[7]

"Designated Account Bank" has the meaning assigned to such term in Schedule D-1.

---

[7] NTD: Will an existing debtor account be transferred to the GUC Trust or a new deposit account opened? Presumably the schedule will list two designated accounts – one at the Debtors for the Backstop Advance (i.e., prior to the GUC Trust Assumption) and one at the GUC Trust for the MPT GUC Trust Advance (i.e., after the GUC Trust Assumption), and the latter will be subject to a DACA (but per the previous question, perhaps it could be the same account).

"Dollars" or "$" means United States dollars.

"eCapital DIP ABL Credit Agreement" has the meaning assigned to such term in the Plan.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial, or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral, (b) from adjoining properties or businesses of any real properties that constitute Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by Borrowers.

"Environmental Law" means any applicable federal, state, provincial, foreign, or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, in each case, to the extent binding on Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs, and expenses (including all reasonable fees, disbursements, and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Existing Indebtedness Refinancing" means (a) the repayment in full in cash (or otherwise in accordance with Section 7.02(f) of the Settlement Agreement or the Lease Repayment Option (as defined in the Junior DIP Credit Agreement)) of all indebtedness and other obligations outstanding under the Junior DIP Credit Agreement (other than contingent obligations as to which no claim has been made) and the eCapital DIP ABL Credit Agreement, (b) the cancellation and termination of all commitments outstanding under the Junior DIP Credit Agreement and the eCapital DIP ABL Credit Agreement and (c) the release of all Liens granted in connection with the Junior DIP Credit Agreement and the eCapital DIP ABL Credit Agreement.

"Fees" means all fees due to Lender under this Agreement, any Loan Document, or the Relevant Orders.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"GUC Trust" has the meaning assigned to such term in the Plan.

"GUC Trust Agreement" has the meaning assigned to such term in the Plan, without giving effect to any subsequent amendment, supplement or other modification thereof without the prior written consent of the Lender.[8]

"GUC Trust Assumption" has the meaning assigned to such term in the recitals to this Agreement.

"GUC Trust Expenses" has the meaning assigned to such term in the Plan.

"GUC Trust Trustee" has the meaning assigned to such term in the Plan.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity," (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Holdings" has the meaning assigned to such term in the preamble to this Agreement.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers' acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the Ordinary Course of Business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

---

[8] NTD: To include provisions listed under "GUC Trust" in Amendment No. 1 Term Sheet.

"Indemnified Liabilities" has the meaning assigned to such term in <u>Section 9.03</u>.

"Indemnified Person" has the meaning assigned to such term in <u>Section 9.03</u>.

"Information" has the meaning assigned to such term in <u>Article XVI</u>.

"Interest Payment Date" means each March 31st, June 30th, September 30th and December 31st, as applicable, commencing with [December 31, 2025].

"Junior DIP Credit Agreement" has the meaning assigned to such term in the Plan.

"Junior DIP Orders" means the Settlement Order and the Amendment No. 1 Orders.

"Lender" has the meaning assigned to such term in the preamble to this Agreement.

"Lender Expenses" means all reasonable and documented (a) costs or expenses (including taxes and insurance premiums) required to be paid by Borrowers under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out-of-pocket fees or charges paid or incurred by Lender in connection with its transactions with Borrowers under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) out-of-pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to Borrowers, (e) out-of-pocket costs, fees (including reasonable and documented external attorneys' fees) and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) out-of-pocket audit fees and reasonable and documented expenses of Lender (including travel, meals, and lodging) related to any inspections or audits, (g) out-of-pocket costs and expenses of third-party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with Borrowers, (h) reasonable and documented out-of-pocket costs and expenses (including reasonable and documented external attorneys' fees) incurred by Lender incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending the Loan Documents, (i) reasonable and documented out-of-pocket fees and expenses of Lender (including travel, meals, and lodging) related to any due diligence in connection with the Loan Documents or meetings with Borrowers in connection with the Loan Documents, and (j) reasonable and documented costs and expenses of Lender (including reasonable and documented external attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including reasonable and documented external attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning Borrowers or in

exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"<u>Lender Related Person</u>" means Lender, together with its officers, directors, employees, attorneys, representatives, and agents.

"<u>Lien</u>" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"<u>Loan Account</u>" means the loan accounts maintained by Lender in the name of Borrowers in which shall be recorded the date and amount of each Loan made by Lender and the amount of each payment in respect thereof.

"<u>Loan Documents</u>" means this Agreement, Settlement Order, the Relevant Orders, the Amendment No. 1 Term Sheet, the GUC Trust Agreement, the Additional Documents, and any other notes, account control agreements, financing statements, or security agreements executed by Borrowers in connection with this Agreement in favor of Lender, any other agreement entered into, now or in the future, by Borrowers and Lender in connection with this Agreement and designated a Loan Document, and all amendments, modifications, renewals, substitutions, and replacements of any of the foregoing; <u>provided</u> that, for the avoidance of doubt, all Loan Documents shall be in form and substance satisfactory to Lender.

"<u>Loans</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>Material Adverse Change</u>" means (a) a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Borrowers taken as a whole, (b) a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to Lender, or (c) a material adverse effect on the ability of the Borrowers to perform their obligations under any Loan Documents, in each case, excluding the GUC Trust Assumption.

"<u>Material Contract</u>" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration, or failure to renew by any party thereto could reasonably be expected to result in a Material Adverse Change.

"<u>Maturity Date</u>" means the earliest of (a) the fifth anniversary of the Closing Date and (b) the date of the acceleration of the Loans and the termination of the Commitments following the occurrence and during the continuation of an Event of Default in accordance with this Agreement.

"<u>MPT</u>" means Medical Properties Trust, Inc. and its affiliates.

"<u>MPT GUC Trust Advance</u>" has the meaning assigned to such term in <u>Section 2.01(a)(ii)</u>.

"**MPT GUC Trust Commitment**" means the commitment of Lender to fund the MPT GUC Trust Term Loan in an aggregate principal amount up to the difference between (x) $5,000,000 and (y) the portion of the Initial Contribution (which cannot be less than $0) not used by the Debtors to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims in connection with consummation of the Plan.

"**MPT GUC Trust Term Loan**" has the meaning assigned to such term in the recitals to this Agreement.

"**Net Proceeds**" means with respect to any (a) transaction entered into by any of the Borrowers, (b) sale or disposition by any person of Collateral or (c) damages, other recoveries or settlement payments received by the Borrowers in respect of any Assigned Estate Causes of Action, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or damages, other recoveries or settlement payment or through the payment of deferred consideration or damages, other recoveries or settlement payments) by or on behalf of any of the Borrowers (or any successor thereto) in connection therewith, after deducting therefrom only (x) fees, commissions, costs and expenses related thereto, in each case, incurred by the Borrowers and required to be paid in connection with such transaction and (y) taxes (other than taxes imposed on or measured by overall net income or any other similar measure) paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction or proceeding, as the case may be.

"**Obligations**" means all loans, including, without limitation, the Loans, the Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), obligations (including indemnification obligations), Fees, Lender Expenses, premiums, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute, or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants, and duties of any kind and description owing by Borrowers to Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments, or agreements described in <u>clause (i)</u> of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, of Borrowers to Lender under the Loan Documents, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents, by law, or otherwise in connection with the Loan Documents including, without limitation, in connection with the collection or enforcement of or preservation of rights of Lender under the Loan Documents.

"**Ordinary Course of Business**" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith except as such conduct has been changed resulting from the filing of the Chapter 11 Cases or the creation of the GUC Trust.

"**Organizational Documents**" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation; (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership; (c) for any limited liability company, the operating agreement or limited

liability company agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company; and (d) any agreement between a Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of such Borrower.

"Other Priority Claim" has the meaning assigned to such term in the Plan.

"Payment Account" means the Deposit Account of Lender identified on Schedule A-2, or otherwise identified to the Borrowers in writing by Lender.

"Permitted Liens" means:

(a)    all Liens created by the Loan Documents and the Relevant Orders;

(b)    Liens for taxes that are not delinquent or thereafter payable and that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with generally accepted accounting principles as in effect from time to time and any other taxes to the extent not required to be paid pursuant to Section 5.05; and

(c)    normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions incurred in connection with the maintenance of such deposits in the Ordinary Course of Business in connection with the issuance or repayment of indebtedness.

"Permitted Protest" means the right of any Borrower to protest any Lien (other than any Lien that secures any of the Obligations) or taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien) provided that (a) a reserve with respect to such obligation is established on such Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower in good faith, and (c) Lender is satisfied in its reasonable discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lien that secures any of the Obligations.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning assigned to such term in the recitals to this Agreement.

"PIK Payment Amount" has the meaning assigned to such term in Section 2.05(c)(i).

"Plan" has the meaning assigned to such term in the recitals to this Agreement.

"Plan Effective Date" has the meaning assigned to the term "Effective Date" in the Plan.

"Priority Tax Claim" has the meaning assigned to such term in the Plan.

"<u>Professional Fee Reserve Account</u>" has the meaning assigned to such term in the Plan.

"<u>Record</u>" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Recovery Waterfall</u>" means the order of distribution of proceeds among the parties in interest to the Chapter 11 Cases as set forth in Section 8.03 of the Settlement Agreement, the Amendment No. 1 Term Sheet, the Plan and the Relevant Orders.

"<u>Relevant Orders</u>" means the Junior DIP Orders and the Confirmation Order.

"<u>Remedial Action</u>" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"<u>Required Lien Priority</u>" means, with respect to any Lien on the Collateral in favor of Lender, the priority set forth in the Relevant Orders.[9]

"<u>Schedules</u>" means those certain schedules annexed hereto and made a part hereof.

"<u>Security Documents</u>" means (a) all UCC financing statements, or amendments or continuations thereof, and (b) all other security agreements, Deposit Account Control Agreements, documents or filings in connection with the perfection of the Liens granted or pledged pursuant to the terms of this Agreement or any other Loan Document, as same may be amended, modified, restated or supplemented from time to time.

"<u>Settlement Agreement</u>" means the Settlement and Support Agreement, dated as of March 20, 2025, by and among the Debtors, Medical Properties Trust, Inc. and the other parties thereto.

"<u>Settlement Order</u>" means the *Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief* [Docket No. 1287], without giving effect to any subsequent amendment, supplement or other modification thereof.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership, limited liability company, association, or other business entity of which more than fifty percent (50.00%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

---

[9] NTD:  Confirmation Order to provide Lender with first priority lien and security interest on the Collateral.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection, or non-perfection or priority.

"United States" means the United States of America.

"Voidable Transfer" has the meaning assigned to such term in Section 13.07.

**Section 1.02  Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided that, if Borrowers notify Lender that Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrowers that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Lender and Borrowers hereby agree that they will negotiate, in good faith, amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise.

**Section 1.03  UCC.**  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided that, to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

**Section 1.04  Construction.**  Unless the context of this Agreement or the Loan Documents clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except as otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or the Loan Documents refer to this Agreement or such other Loan Document, as the case may be, as a whole, and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Except as expressly set forth herein, any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals,

replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the irrevocable and indefeasible payment in full in cash of all Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all Commitments shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged. Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns. Any requirement of a writing contained herein or in any Loan Document shall be satisfied by the transmission of a Record.

**Section 1.05    Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**Section 1.06    Timing of Payment or Performance.** When the payment of any obligation or the performance of any covenant, duty, or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

## ARTICLE II.
## LOAN AND TERMS OF PAYMENT

**Section 2.01    Agreement to Lend; Delayed Draw; Security Documents; and Loan Documents.**

(a)     Subject to the terms and conditions of the Relevant Orders, this Agreement, and the satisfaction or waiver of the conditions precedent in Section 3.01 and Section 3.02, Lender agrees to make:

(i)     the Backstop Term Loan available, in cash, to the Borrower Representative (subject to Section 2.01(c)) in a single draw (such funding, the "Backstop Advance") on such date and in such amount (up to the maximum amount of the Backstop Commitment authorized by the Relevant Orders) as is specified in the applicable Borrowing Notice; and

(ii)     the MPT GUC Trust Term Loan available, in cash, to the Borrower Representative (subject to Section 2.01(c)) in a single draw (such funding, the "MPT GUC Trust Advance") on such date and in such amount (up to the maximum amount of the MPT GUC Trust Commitment authorized by the Relevant Orders) as is specified in the applicable Borrowing Notice.

(b)     Each Advance shall be made upon at least four (4) Business Days' written notice (or such shorter notice period as agreed by Lender in its sole discretion); provided that, if the Backstop Advance is made in an amount that is less than the maximum amount of the Backstop Commitment available hereunder at such time, the Backstop Advance shall be made in an

aggregate minimum amount of $[2,500,000][10] (and multiples of $[2,500,000] in excess thereof); provided, further, that no Advance shall be made on or after the date that is [ten (10)][11] Business Days after the Closing Date.

(c)     [Reserved].

(d)     Each Advance hereunder is subject to the satisfaction or waiver of the conditions precedent in Section 3.01 and Section 3.02.  The Backstop Commitment shall automatically terminate upon the making of the Backstop Advance.  The MPT GUC Trust Commitment shall automatically terminate upon the making of the MPT GUC Trust Advance.  Loans, or portions thereof, that are repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(e)     The Loans shall be secured by the Collateral as set forth in this Agreement, the Relevant Orders and the other Loan Documents.

(f)     Borrowers promise to indefeasibly pay the Obligations (including, for the avoidance of doubt, principal, interest, Fees, costs, and expenses) in Dollars in full in cash on or before the Maturity Date.

**Section 2.02    [Reserved].**

**Section 2.03    Borrowing Procedures.**  Each Advance under Section 2.01(a) shall be made by a written request substantially in the form of the Borrowing Notice attached hereto as Exhibit D (each such written request, a "Borrowing Notice") executed by an Authorized Person of the Borrower Representative, accompanied by a Compliance Certificate, and delivered to Lender no later than four (4) Business Days prior to the requested funding date in the case of each Advance (or such shorter period as Lender may permit in its sole discretion), but in no event later than [ten (10)][12] Business Days after the Closing Date; provided that the aggregate principal amount of the Backstop Advance shall not exceed the aggregate amount of the Backstop Commitment authorized by the Relevant Orders and the aggregate principal amount of the MPT GUC Trust Advance shall not exceed the aggregate amount of the MPT GUC Trust Commitment authorized by the Relevant Orders.  Upon satisfaction or waiver by Lender (in its sole discretion) of the conditions precedent set forth herein, Lender shall fund each Advance to the Borrower Representative on the requested funding date by causing the principal amount of such Advance to be credited to the applicable Designated Account.

**Section 2.04    Payments; Prepayments.**

(a)     **Payments by the Borrowers.**  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Payment Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (prevailing Eastern Time) on the dates set forth in this Section 2.04.  Any payment received by Lender later than 4:00 p.m.

---

[10] NTD:  To be confirmed by the parties.
[11] NTD:  Under review by MPT.
[12] NTD:  Under review by MPT.

(prevailing Eastern Time) shall be deemed to have been received on the following Business Day, and any applicable interest or fee shall continue to accrue until such following Business Day.

(b) **Application of Payments and Proceeds.** Except to the extent expressly set forth in Section 7.03, all payments remitted to Lender and all proceeds of the Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(1) first, to pay any Lender Expenses (including reasonable and documented cost or expense reimbursements, such as reasonable and documented attorneys' fees) then owed to Lender or any Lender Related Person in accordance with, or indemnities then due to Lender under, the Loan Documents, until indefeasibly paid in full in cash;

(2) second, to pay any interest due in respect of the Loans that has not been capitalized into PIK Payment Amounts in respect of such Loans, until indefeasibly paid in full in cash;

(3) third, to pay the principal of all Loans, until indefeasibly paid in full in cash;

(4) fourth, to pay any other Obligations, until indefeasibly paid in full in cash; and

(5) fifth, as contemplated by the Relevant Orders (including to the Borrowers for the benefit of the Persons entitled thereto in accordance therewith).

In the event of a direct conflict between the priority provisions of this Section 2.04(b) and any other provision contained in any Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.04(b) shall control and govern; provided that, in the event of any such actual, irreconcilable conflict between the terms and provisions of this Section 2.04(b) and Section 7.03, Section 7.03 shall control and govern.

(c) **Optional Prepayments.** Upon notice to Lender, Borrowers may prepay any Loan, in whole or in part, at any time; provided that (i) the aggregate principal amount being prepaid shall be an amount not less than two million five hundred thousand Dollars ($2,500,000) (and multiples of $2,500,000 in excess thereof); (ii) [reserved], and (iii) any such prepayments under this Section 2.04(c) shall be applied in the order set forth in Section 2.04(b).

(d) **Mandatory Prepayments.** [Subject to the provisions of the Plan, as][As][13] promptly as practicable following the receipt by any Borrower or any of its Subsidiaries of the Net Proceeds of or on account of any Assigned Estate Causes of Action or Net Proceeds of any Collateral and, in any case, within one (1) Business Day after the date of receipt of such Net Proceeds, such Borrower shall apply such Net Proceeds to prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.04(b) in an amount equal to one hundred

---

[13] NTD: To be assessed and removed at closing assuming pursuant to the Plan no Net Proceeds of Assigned Estate Causes of Action are to be paid prior to the repayment of the Backstop Facility.

percent (100.00%) of such Net Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received (and none of the Borrowers or their Affiliates shall use such Net Proceeds for any other purpose).

### Section 2.05    Interest Rates and Rates, Payments, and Calculations.

(a)    **Interest Rate.**  Except as provided in <u>Section 2.05(b)</u>, all Loans shall bear interest on the Daily Balance thereof at a rate equal to fourteen percent (14.00%) per annum.  For the purpose of calculating interest, the Daily Balance shall exclude accrued but uncapitalized or unpaid interest due or owing hereunder.

(b)    **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.00%) <u>plus</u> the then applicable interest rate (the "<u>Default Rate</u>") upon notice from Lender of its election to impose interest at the Default Rate.  Any such notice may impose interest at the Default Rate retroactively to the date of the occurrence of the related Event of Default.  For the purpose of calculating interest under this <u>Section 2.05(b)</u>, the Daily Balance shall exclude accrued but uncapitalized or unpaid interest due or owing hereunder.

(c)    **Payment.**  Except to the extent provided to the contrary herein:

(i)    all accrued interest payable hereunder or under any of the other Loan Documents shall be payable in kind, by increasing the aggregate principal amount of Loans by the face amount of such interest, in arrears, on each Interest Payment Date (each such capitalized amount of accrued interest, a "<u>PIK Payment Amount</u>") (<u>provided</u> that all accrued but uncapitalized or unpaid interest in respect of the Loans due and payable on the Maturity Date and on each date of prepayment with respect to the amount of principal prepaid shall be paid in cash); and

(ii)    all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Document, shall be due and payable in cash, in arrears, on the first (1st) day of each month at any time that Obligations or the Loans are outstanding and shall be paid to the Payment Account.

(d)    **Rights of Setoff.**  Borrowers hereby agree that Lender has all rights of setoff and bankers' lien provided by applicable law on account of any accounts maintained at Lender.

(e)    **Computation.**  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(f)    **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, <u>plus</u> any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; <u>provided</u> that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then,

*ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the applicable Obligations to the extent of such excess.

Section 2.06    **Crediting Payments; Clearance Charge.**    The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Payment Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment, and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. (prevailing Eastern Time).  If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. (prevailing Eastern Time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

Section 2.07    **Designated Account.**    Borrowers hereby agree to maintain the applicable Designated Account with the applicable Designated Account Banks and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

Section 2.08    **Statements of Obligations.**    Lender shall maintain true, correct, and complete electronic or written records evidencing the Indebtedness and other Obligations owed by Borrowers to Lender, in which Lender will record in the Loan Account (a) the amount of all Advances made under this Agreement, (b) the amount of any principal or interest due and payable or to become due and payable from Borrowers to Lender under this Agreement, and (c) all amounts received by Lender under this Agreement from Borrowers.

Section 2.09    **[Reserved].**

Section 2.10    **Borrower Representative; Assumptions**.    As of the Closing Date, prior to the GUC Trust Assumption, Holdings (i) is hereby designated and appointed by each Borrower as its representative and agent on its behalf (the "Borrower Representative") and (ii) accepts such appointment as the Borrower Representative, in each case, for the purposes of issuing Borrowing Notices, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents, and taking all other actions (including in respect of compliance with covenants, but without relieving any other Borrower of its joint and several obligations to pay and perform the Obligations) on behalf of any Borrower or the Borrowers under the Loan Documents.  Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative as a notice or communication from all Borrowers.  Each warranty, covenant, agreement, and undertaking made on behalf of a Borrower by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.  Substantially simultaneously with the Closing Date, the GUC Trust Assumption shall occur and every reference to the Borrowers, any Borrower and the Borrower Representative shall instead be a reference to the GUC Trust in its

capacity as the sole Borrower. Notwithstanding anything to the contrary in this Agreement or in any Loan Document, the GUC Trust Assumption shall be permitted for all purposes under this Agreement and each other Loan Document.

## ARTICLE III.
## CONDITIONS; TERM OF AGREEMENT

**Section 3.01   Conditions Precedent to the Closing Date**.   The effectiveness of this Agreement and the agreements of Lender hereunder shall be subject to the satisfaction of the conditions set forth below (unless waived in writing by Lender in its sole discretion):

(a)      The parties shall have executed and delivered this Agreement and all other documents (including the GUC Trust Agreement) required by Lender as a condition to the Closing Date and in connection with the transactions contemplated by this Agreement, all of which documents shall be in form and substance satisfactory to Lender.

(b)      Lender shall have received (i) the Assigned Estate Causes of Action Schedule, (ii) evidence satisfactory to Lender that all UCC financing statements necessary or, in the opinion of Lender, desirable to provide Lender with a valid, perfected first-priority security interest in the Collateral pledged by the Borrowers have been filed or will be filed by Lender promptly upon the Closing Date and (iii) all other documents and instruments reasonably requested by Lender required to create and perfect the Lender's security interests in the Collateral, which documents shall have been filed or delivered to the Lender, and if applicable, shall be in proper form for filing in accordance with applicable law.

(c)      The Relevant Orders, in each case in form and substance satisfactory to Lender, shall be entered by the Bankruptcy Court and be in full force and effect and not subject to appeal, and no order shall have been entered reversing, amending, staying, vacating, terminating or otherwise modifying the Relevant Orders or any material provision thereof in any manner without Lender's prior written consent.  Borrowers and Lender shall be entitled to rely in good faith upon the Relevant Orders and shall be permitted and required to perform their respective obligations in compliance with the Relevant Orders and this Agreement notwithstanding any such objections thereto.

(d)      On or prior to the Closing Date, the Existing Indebtedness Refinancing shall have occurred.

(e)      Lender shall have received copies of UCC, tax, and judgment lien searches and title reports, in each case satisfactory to Lender in its sole discretion.

(f)      On or prior to the Closing Date, the Plan Effective Date shall have occurred, and all conditions precedent thereto as set forth in the Plan shall have been satisfied or waived in a manner reasonably acceptable to the Lender.

(g)      On or prior to the Closing Date, all MPT Agreed Claims (as defined in the Plan) shall have been paid in accordance with the Recovery Waterfall.

(h)     On or prior to the Closing Date, the full amount of the GUC Trust Holdback (as defined in the Plan), as well as any amount allocated to the Estates (as defined in the Plan) under tranches 6, 7 or 8 of the Recovery Waterfall and/or for distribution to holders of General Unsecured Claims (as defined in the Plan) pursuant to Class 8 – General Unsecured Claims pursuant to Article III.B.8.b(ii) of the Plan shall have been used by the Debtors to pay allowed Administrative Claims, Priority Tax Claims and Other Priority Claims in connection with consummation of the Plan.

(i)     The GUC Trust shall have been formed for the exclusive benefit of the Lender and each holder of General Unsecured Claims (as defined in the Plan) (including the MPT Deficiency Claims (as defined in the Plan)) and the Assigned Estate Causes of Action and any proceeds in existence therefrom shall have been transferred to the GUC Trust.

(j)     The Wind-Down Budget (as defined in the Plan) shall be reasonably satisfactory to MPT.

(k)     The following statements shall be true and correct: (i) the representations and warranties of the Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Closing Date, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Closing Date or would immediately result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

**Section 3.02     Conditions Precedent to Advances.**  In addition to the conditions set forth in Section 3.01 above, Lender shall not be required to fund any Loans or Advances unless and until all of the conditions set forth below shall have been satisfied or waived in writing by Lender in its sole discretion:

(a)     No order has been entered reversing, amending, staying, vacating, terminating, or otherwise modifying in any manner adverse to Lender the Relevant Orders.

(b)     All accrued and unpaid Lender Expenses for which invoices have been presented that are required to be paid on or before the Closing Date, if any, shall have been paid.

(c)     (i) no trustee (other than the GUC Trust Trustee), examiner, or receiver shall have been appointed or designated with respect to the Borrowers' business, properties, or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Borrowers (or the GUC Trust Trustee) exercising control over their assets, and (ii) no Person other than the Borrowers (or the GUC Trust Trustee) shall have been granted control over the Collateral.

(d)     The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such Advance, as

though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(e)      No default or event of default under any of the Loan Documents (including any Default or Event of Default) shall have occurred and be continuing on the date of such Advance, nor shall either result from the making thereof.

(f)      No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against Borrowers or Lender.

(g)      No action, proceeding, investigation, regulation, or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain, or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

(h)      The Borrowers shall be in compliance in all respects with the Loan Documents (including the Relevant Orders).

(i)      Lender shall have received a fully executed and delivered Borrowing Notice and Compliance Certificate from Borrowers in accordance with <u>Section 2.03</u>.

(j)      Lender shall have received in advance, or will receive from the proceeds of such Advance, all Lender Expenses (including the fees and expenses of legal counsel) for which invoices have been presented before any such Advance. All such amounts shall be reflected in the funding instructions annexed to the relevant Borrowing Notice delivered in accordance with <u>Section 2.03</u>.

(k)      Since the Closing Date, there shall not have occurred any event, condition, circumstance, or contingency that, individually or in the aggregate, constitutes or could reasonably be expected to constitute a Material Adverse Change.

(l)      Solely with respect to the MPT GUC Trust Advance, (i) more than $5,000,000 of the Initial Contribution shall have been used by the Debtors to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims in connection with occurrence of the Plan Effective Date and (ii) the GUC Trust Assumption shall have occurred.

**Section 3.03   <u>Maturity</u>.** This Agreement shall continue in full force and effect until the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification). All Obligations including, without limitation, the outstanding unpaid principal balance and all accrued and uncapitalized or unpaid interest and Fees shall be due and payable on the Maturity Date.

**Section 3.04   <u>Effect of Maturity</u>.** On the Maturity Date the obligation of Lender to provide any additional credit or other accommodations under the Loan Documents shall automatically terminate and all Obligations (other than continuing Obligations with respect to

indemnification) shall immediately become due and payable without notice or demand. No termination of the obligations of Lender (other than payment in full in cash of the Obligations and termination of the Commitments) shall relieve or discharge any Borrower of its duties, obligations, or covenants hereunder or under any Loan Document, and Backstop Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations (other than continuing Obligations with respect to indemnification) have been indefeasibly paid in full in cash and the Commitments have been terminated. When all of the Obligations (other than continuing Obligations with respect to indemnification) have been indefeasibly paid in full in cash in immediately available funds and Lender has no further obligation hereunder to fund further Advances, Lender will, at the Borrowers' expense, execute and deliver any payoff letters, termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are necessary to evidence and confirm the repayment in full of the Obligations (other than continuing Obligations with respect to indemnification) and to release, as of record, Backstop Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement, each Borrower hereby makes the following representations and warranties to Lender (i) on the Closing Date, (ii) as of the date of the making of each Advance made thereafter, as though made on and as of the date of such Advance and (iii) on the date of the GUC Trust Assumption, as though made on and as of such date, and all such representations and warranties shall be true, correct, and complete, in all respects and shall survive the execution and delivery of this Agreement until all Obligations have been indefeasibly paid in full in cash:

Section 4.01    **Due Organization and Qualification.** Such Borrower (a) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (b) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (c) subject to the Bankruptcy Court's entry of the Relevant Orders, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

Section 4.02    **Due Authorization.** Subject to the Bankruptcy Court's entry of the Relevant Orders, the execution, delivery, and performance by such Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Borrower and with respect to such Borrower.

Section 4.03    **Binding Obligations.** Each Loan Document has been duly executed and delivered by each Borrower that is a party thereto and, subject to the entry of the Relevant Orders, as applicable, is the legally valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws

relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

**Section 4.04    Title to Properties.**  Borrowers have (a) good, sufficient, and legal title to, and (b) good and marketable title to (in the case of personal property), all of Borrowers' right, interest, and title in the Collateral, subject to Permitted Liens.

**Section 4.05    Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims.**

(a)    The name (within the meaning of Section 9-503 of the UCC), jurisdiction of organization, type of entity, direct equity owner and, to the extent required to be set forth in a financing statement under the UCC, organizational identification number (if any) of such Borrower is as set forth on Schedule 4.05 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).[14]

(b)    A primary mailing address of such Borrower is located at the address indicated on Schedule 4.05 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).

**Section 4.06    Litigation.**  Other than the Chapter 11 Cases and except as discharged pursuant to the Plan, there are no actions, suits, proceedings, claims, or disputes pending or, to the actual knowledge of such Borrower, threatened in writing, at law, in equity, in arbitration, or before any Governmental Authority, by or against such Borrower or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to such Borrower seeking authorization to enter into the Settlement Agreement and/or the Loan Documents and incur the obligations thereunder), or (b) except as set forth on Schedule 4.06, either individually or in the aggregate, could reasonably be expected to cause a Material Adverse Change.  As of the Closing Date, Schedule 4.06 sets forth all of the commercial tort claims any Borrower has against another Person known to any Borrower as of their respective Petition Date.

**Section 4.07    Fraudulent Transfer.**  No transfer of property is being made by such Borrower and no obligation is being incurred by such Borrower in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Borrower.

**Section 4.08    [Reserved].**

**Section 4.09    Payment of Taxes.**  Except as provided on Schedule 4.09 or as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change and subject to the terms of the Relevant Orders and any required approval by the Bankruptcy Court, all United States federal, state, and other material tax returns and reports of the Borrowers required to be filed by the Borrowers with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees, and other

---

[14] NTD:  Schedule to include GUC Trust and its subsidiaries (if any).

governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest.

**Section 4.10    [Reserved].**

**Section 4.11    [Reserved].**

**Section 4.12    [Reserved].**

**Section 4.13    No Other Representations.**  Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), no Borrower or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of a Borrower, including, without limitation, any representation or warranty as to the accuracy or completeness of any information, documents, or material delivered to Lender or made available to Lender.  Lender hereby acknowledges and agrees that:  (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Lender has relied solely upon its own investigation and the express representations and warranties of the Borrowers set forth in this Article 4 (including the related portions of the Schedules) and (b) no Borrower or any other Person has made any representation or warranty except as expressly set forth in this Article 4 (including the related portions of the Schedules hereto).

**Section 4.14    Full Disclosure.**    The representations, warranties, and other written statements made by any Borrower to Lender in connection with this Agreement and the other Loan Documents, taken as a whole, do not contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.

## ARTICLE V.
## AFFIRMATIVE COVENANTS

Each Borrower hereby covenants and agrees that until termination of the Commitments and indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), it shall comply with each of the following, as applicable:

**Section 5.01    Notice of Certain Events.**    The Borrowers shall deliver to Lender (a) promptly, but in any event within three (3) Business Days, upon becoming aware of any Default or Event of Default, notice of such Default or Event of Default; (b) promptly upon becoming aware of any litigation threatened in writing against any Borrower or filed (other than any adversary proceeding or other pleading filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases), in each case which could reasonably be expected to result in a Material Adverse Change, notice of such litigation or event; and (c) at the time a Borrowing Notice is furnished to Lender in connection with any requested Advance, a Compliance Certificate.  In addition, the Borrowers hereby agree to maintain a system of accounting that enables the Borrowers to produce the unaudited financial statements required pursuant to the terms of the GUC Trust Agreement.

**Section 5.02    Reporting.**

(a)     Each Borrower shall comply with the agreements, requirements, covenants, and undertakings applicable to it set forth in Exhibit C, in accordance with the terms thereof.

(b)     [Reserved.]

(c)     [Reserved].

(d)     [Reserved].

(e)     The Borrowers shall promptly furnish to Lender, as soon as available, all information or reports provided by the GUC Trust Trustee pursuant to the GUC Trust Agreement.

(f)     The Borrowers shall work diligently to prepare, and promptly furnish to Lender, as soon as available, all available information with regard to the Assigned Estate Causes of Action.

**Section 5.03    Existence.**  At all times, each Borrower shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to be in good standing or maintain any such rights and franchises, or licenses and permits would not reasonably be expected to result in a Material Adverse Change.

**Section 5.04    [Reserved].**

**Section 5.05    Taxes.**  Prior to the GUC Trust Assumption, except to the extent such payment is excused by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, the Borrowers shall, and shall cause each Subsidiary to, pay in full or discharge all assessments and taxes imposed, levied, or assessed against any Collateral, before delinquency (giving effect to any extension period), except to the extent such assessments and taxes are subject to a Permitted Protest.  On and after the GUC Trust Assumption, the Borrowers shall, and shall cause each Subsidiary to, pay in full or discharge all assessments and taxes imposed, levied, or assessed against any Collateral, before delinquency (giving effect to any extension period), except to the extent such assessments and taxes are subject to a Permitted Protest.

**Section 5.06    Inspection.**  Borrowers shall permit Lender and each of its duly authorized representatives or agents to visit any of its properties and inspect any of its Collateral or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, the its officers and employees (and, from and after the GUC Trust Assumption, the GUC Trust Trustee) at such reasonable times during regular business hours and intervals as Lender may require, in each case other than information subject to confidentiality obligations and/or attorney-client or other privilege; provided that no such visit or inspection shall unreasonably interfere with the normal business operation of the Borrowers and their tenants; and provided, further, that absent the existence of a Default or Event of Default, Lender shall provide Borrowers with reasonable prior notice before any such inspections.

**Section 5.07    [Reserved].**

**Section 5.08    [Reserved].**

**Section 5.09    Compliance with Laws.**    Each Borrower shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually, could not reasonably be expected to result in a Material Adverse Change.

**Section 5.10    Disclosure Updates.**    The Borrowers shall promptly, but in any event within five (5) Business Days after obtaining actual knowledge thereof, notify Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about the Borrowers' industry) furnished (after giving effect to any supplements thereto and when taken as a whole) to Lender that contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not materially misleading in light of the circumstances in which made.  Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

**Section 5.11    Further Assurances.**    Upon reasonable written notice from Lender, the Borrowers shall promptly execute and/or deliver to Lender any and all Security Documents, financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, descriptions of commercial tort claim and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue the Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

**Section 5.12    Deposit Account Control Agreements**.    The Borrowers shall cause each relevant financial institution or other person at which each Deposit Account that constitutes or holds Collateral is maintained to enter into a Deposit Account Control Agreement with respect to each such Deposit Account[15] in favor of Lender promptly, and, in any event no later than ten (10) days, following the Closing Date or, if earlier, the first date upon which Collateral is placed in such Deposit Account (which deadline may be extended with the written consent of the Lender (such consent not to be unreasonably withheld, conditioned or delayed)).

**ARTICLE VI.**
**NEGATIVE COVENANTS**

Each Borrower hereby covenants and agrees that, until termination of the Commitments and the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), such Borrower will not do any of the following without the prior written consent of Lender:

---

[15] [**NTD**: Subject to confirmation with GUC Trustee as to whether it is a new account.]

**Section 6.01  Indebtedness.**  Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Indebtedness evidenced by this Agreement and the Loan Documents and for the following:

(a)  obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, and other cash management and similar arrangements incurred in the Ordinary Course of Business; and

(b)  Indebtedness representing any taxes to the extent such taxes are permitted to not be paid or discharged at such time in accordance with Section 5.05;

**Section 6.02  Liens.**

(a)  Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens; or

(b)  Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien that is equal to or superior to the priority of any Liens granted by this Agreement and the Relevant Orders to or in favor of Lender on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

**Section 6.03  Restrictions on Fundamental Changes.**  (a) Except for the GUC Trust Assumption, enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests or (b) except as expressly set forth in the Plan, liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

**Section 6.04  Disposal of Assets.**  Except for the GUC Trust Assumption, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral.

**Section 6.05  Change Name.**  Except for the GUC Trust Assumption, change any Borrower's name, state of organization, or organizational identity.

**Section 6.06  [Reserved].**

**Section 6.07  Material Leases or Contracts; Amendments.**  Change or modify (a) the material terms of any material lease or contract in connection with the Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, (b) any of its Organizational Documents in a manner that is or would reasonably be expected to be adverse to Lender, or (c) the GUC Trust Agreement without the prior consent of Lender (such consent not to be unreasonably withheld, conditioned, or delayed).

**Section 6.08  Change of Control.**  Cause, permit, or suffer, directly or indirectly, any Change of Control.

**Section 6.09    Accounting Methods.**  Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**Section 6.10    Transactions with Affiliates.**  Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Borrower.

**Section 6.11    Use of Advances.**

(a)      Use the proceeds of the Backstop Advance for any purpose other than to pay Allowed Administrative Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims which remain unpaid as of the Plan Effective Date to the extent such claims are not (or will not) otherwise be paid from Net Proceeds (solely for purposes of this clause (a), as defined in the Plan) distributed in accordance with the Recovery Waterfall and/or the Debtors' available cash (including in any Professional Fee Reserve Account or other similar reserve).

(b)      Use the proceeds of the MPT GUC Trust Advance for any purpose other than to fund GUC Trust Expenses.

**Section 6.12    [Reserved].**

**Section 6.13    Chapter 11 Cases.**  Directly or indirectly, seek, consent to, or suffer to exist, without the prior written consent of Lender, (a) any modification, stay, vacation, or amendment to the Relevant Orders, (b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind set forth in Section 503(b), 506(b) or (c), or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Collateral or otherwise, other than those permitted by the Relevant Orders, and (c) any Lien on the Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations.

**Section 6.14    [Reserved].**

**Section 6.15    Acquisitions, Loans, or Investments.**  Make any acquisition, advance, loan or any other investment of any kind or nature; provided that the foregoing shall not prevent investments in cash equivalents.

**Section 6.16    [Reserved].**

**Section 6.17    Distributions or Redemptions.**  Pay any dividends or distributions on, or make any redemptions of, any equity interest of any Borrower; provided that the foregoing shall not prevent distributions contemplated under the GUC Trust Agreement.

**Section 6.18    Formation of Subsidiaries.**  Form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date, without the prior written consent of Lender in its sole discretion, unless such Subsidiary is joined as a Borrower under this Agreement.

**Section 6.19    GUC Trust Trustee.**  Dismiss or replace the GUC Trust Trustee without Lender's prior written consent (such consent not to be unreasonably withheld, conditioned, or delayed).

**ARTICLE VII.**
**EVENTS OF DEFAULT**

**Section 7.01    Event of Default.**  Any one or more of the following events shall constitute an event of default upon giving any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "<u>Event of Default</u>") under this Agreement:

(a)      [reserved];

(b)      [reserved];

(c)      any Borrower shall fail to pay when due and payable, any principal (including without limitation, pursuant to <u>Section 2.04(d)</u>), interest, or any Fees, Lender Expenses, or any other Obligations under this Agreement or any other Loan Document;

(d)      any Borrower shall fail to comply with its obligations under (i) <u>Section 5.01</u>, <u>Section 5.03</u>, <u>Article VI</u> and/or <u>Article VIII</u>, or (ii) <u>Section 5.02(a)</u> and/or <u>Section 5.02(f)</u>, and in the case of this <u>clause (ii)</u>, such failure or breach shall continue for five (5) days after the earlier to occur of (x) the date on which such failure to comply or breach is known to any officer (including the GUC Trust Trustee) of such Borrower and (y) the date on which Lender shall have notified such Borrower or its applicable representative of such failure;

(e)      other than as set forth in any other sub-section of this <u>Section 7.01</u>, any Borrower shall fail to perform, or otherwise breach, any of its covenants or obligations contained in this Agreement, which failure or breach shall continue for thirty (30) days after the earlier to occur of (i) the date on which such failure to comply is known to any officer (including the GUC Trust Trustee) of such Borrower, and (ii) the date on which Lender shall have notified such Borrower or its applicable representative of such failure; <u>provided</u>, <u>however</u>, that such thirty (30)-day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such thirty (30)-day period;

(f)      any representation or warranty made by any Borrower in this Agreement or in any agreement, certificate, instrument, financial statement, or other statement delivered to Lender pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made;

(g)      except upon Lender's prior written request or with Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of Lender), any Borrower shall file a motion with the Bankruptcy Court or any other court of competent jurisdiction seeking an order (or such order is otherwise entered), that by its terms modifies, reverses, revokes, stays, rescinds, vacates, or amends the Settlement Order (or any material provision thereof), this Agreement, the GUC Trust Agreement, the Amendment No. 1 Orders (or any material provision thereof), the Confirmation Order (or any material provision

thereof), the Plan or any other Loan Document, or the relief or transactions otherwise contemplated in any of the foregoing (or, in each case, purports to effect any of the foregoing);

(h)     any Borrower or any of their Subsidiaries:

(i)     institutes, resolves to institute or consents to the institution of any proceeding under any Debtor Relief Law, in each case relating to a winding-up, an administration, a dissolution, or a composition thereof;

(ii)     except to the extent contemplated by the GUC Trust Agreement, makes an assignment for the benefit of creditors or any other action is commenced (by way of voluntary arrangement, scheme of arrangement or otherwise);

(iii)     appoints, resolves to appoint, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee (other than the GUC Trust Trustee), custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer (any such person, a "Custodian") for it or for all or substantially all of its property;

(iv)     has a Custodian appointed with respect thereto without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 days; or

(v)     becomes subject to any proceeding under any Debtor Relief Law (including, without limitation, for the appointment of any Custodian with respect thereto) relating to such Person or to all or substantially all of its property without the consent of such Person, and such proceeding continues undismissed or unstayed for 60 days;

(i)     (x) any Borrower or any of their Subsidiaries admits in writing its inability or fails generally to pay its debts as they become due, or (y) any writ or warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Person and is not released, vacated or fully bonded within 60 days after its issue, commencement or levy;

(j)     any Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, or security interest, as applicable, ranking equal or senior in priority to the claims, liens, and security interests, as applicable, granted to Lender under Relevant Orders, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner;

(k)     one or more final non-appealable judgments (and the same shall remain undischarged for a period of thirty (30) consecutive calendar days during which execution shall not be effectively stayed) and orders for the payment of money exceeding $500,000 in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying party has not denied coverage thereof) shall be rendered against any Borrower and shall be subject to immediate collection and remain unsatisfied;

(l)     any damage to, or loss, theft or destruction of, any Collateral having a value in excess of $2,500,000 in the aggregate, unless such Collateral is insured in amounts acceptable to Lender, the insurance company has been notified of the occurrence of such event and has not denied coverage thereof and the claim has been settled within seventy-five (75) days (or such longer time as Lender may agree) of the occurrence of such event;

(m)     the occurrence of any default or event of default under the Relevant Orders and the continuance thereof after any applicable grace or cure period provided in the Relevant Orders, if any, or granted by order of the Bankruptcy Court;

(n)     [reserved];

(o)     [reserved];

(p)     the entry of an order (i) surcharging any of the Collateral under Sections 105 or 506(c), or any other section of the Bankruptcy Code or applicable law; (ii) allowing any administrative expense claim having priority over or ranking in parity with Lender's claims or rights under the Loan Documents; or (iii) otherwise adversely impacting Backstop Liens and priority in the Collateral, as set forth in <u>Article VIII</u> of this Agreement, and the Relevant Orders;

(q)     [reserved];

(r)     any Relevant Order, or any material provision thereof, (i) ceases to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court or (ii) is modified, reversed, revoked, remanded, stayed, rescinded, vacated, or amended on appeal or by the Bankruptcy Court without the express prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(s)     any Borrower brings any action to, or otherwise supports such action to, (i) challenge the rights and remedies of Lender under this Agreement or any other Loan Document or acts in a manner inconsistent with the Loan Documents or (ii) avoid or require disgorgement by Lender of any amounts received in respect of the Obligations;

(t)     [reserved];

(u)     [reserved];

(v)     [reserved];

(w)     [reserved];

(x)     any Borrower shall seek, or support any other person's motion, to (i) disallow in whole or in part the Obligations, (ii) challenge the validity and enforceability of the Backstop Liens, or (iii) contest any material provision of this Agreement or any Loan Document;

(y)     the entry of an order granting the relief sought in a motion which seeks to prosecute or settle a claim or controversy on account of, or that is part of, the Collateral (including, without

limitation, any commercial tort claims held by any Borrower or its estate), without the prior written consent of Lender (not to be unreasonably withheld, conditioned or delayed);

(z)     the Borrowers shall fail to execute and deliver to Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of Lender, subject to the time periods and terms set forth in this Agreement; or

(aa)    the occurrence of a Change of Control.

Notwithstanding the foregoing or anything to the contrary in any Loan Document, no Default or Event of Default shall be deemed to have occurred or arisen as a result of the GUC Trust Assumption.

**Section 7.02    Rights and Remedies.**

Upon the occurrence and during the continuance of an Event of Default, and notwithstanding (to the extent applicable) Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court of competent jurisdiction or the initiation of any further proceeding with Borrowers, in addition to taking any other action or exercising any other rights or remedies (including, without limitation, with respect to the Liens in favor of Lender) provided for hereunder or under any Loan Document (including the Relevant Orders) or by the UCC or any other applicable law, Lender may do any one or more of the following:

(a)     declare the Obligations, whether evidenced by this Agreement or by any Loan Document, are due and payable, and the Commitments are terminated, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, further notice, or other requirements of any kind, all of which are hereby expressly waived by the Borrowers;

(b)     [reserved];

(c)     charge interest at the Default Rate;

(d)     obtain and liquidate the Collateral, it being understood and agreed that (1) if notice of disposition of the Collateral is required by law, ten (10) days prior notice by Lender to Borrowers designating the time and place of any public sale or the time after which any private sale or other intended disposition of the Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and Borrowers hereby waive any other notice, (2) Lender may bid for and purchase the Collateral at any public sale and (3) Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(e)     exercise all voting and consensual rights and powers on account of any pledged securities;

(f)　　require Borrowers to assemble all of the Collateral without judicial process pursuant to Section 9-609 of the UCC;

(g)　　take possession of all Collateral without judicial process pursuant to Section 9-609 of the UCC; and

(h)　　exercise any of its other rights and remedies under the Loan Documents, any rights granted under the Relevant Orders, and applicable law.

**Section 7.03　　Application of Proceeds upon Event of Default.**　Lender shall apply the cash proceeds actually received from any foreclosure sale or other disposition of the Collateral upon an Event of Default as follows:

(1)　　<u>first</u>, to pay any Lender Expenses (including reasonable and documented cost or expense reimbursement, such as reasonable and documented attorneys' fees (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes, and other expenses)) then owed to Lender or any Lender Related Person in accordance with, or indemnities then due to Lender under, the Loan Documents (including in connection with attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement), until indefeasibly paid in full in cash or otherwise;

(2)　　<u>second</u>, to pay any interest due in respect of the Loans that has not been capitalized into PIK Payment Amounts in respect of such Loans, until indefeasibly paid in full in cash;

(3)　　<u>third</u>, to pay the principal of all Loans, until indefeasibly paid in full in cash;

(4)　　<u>fourth</u>, to pay any other Obligations, until indefeasibly paid in full in cash; and

(5)　　<u>fifth</u>, as contemplated by the Relevant Orders (including to the Borrowers for the benefit of the Persons entitled thereto in accordance therewith).

**Section 7.04　　Remedies Cumulative.**　The rights and remedies of Lender under this Agreement, the Loan Documents, and all other agreements shall be cumulative.　Lender shall have all rights and remedies not inconsistent herewith or with the Relevant Orders, as provided under the UCC, by law, or in equity.　No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

**ARTICLE VIII.**
**COLLATERAL SECURITY**

**Section 8.01　　Grant of Security Interest in the Collateral; Backstop Facility Claims.**

(a)     Subject to the terms and conditions of, and entry of, the Relevant Orders, to secure the payment and performance of the Obligations, each Borrower hereby (i) grants, collaterally pledges, and assigns to Lender a fully perfected senior first-priority lien on and security interest in all of each Borrower's right, title and interest in and to the Collateral and (ii) grants to Lender Backstop Facility Claims in the Chapter 11 Cases for the repayment of the Obligations.

(b)     In the event that any of the Collateral is transferred to any Borrower, such transfer shall be subject in all respects to the Backstop Liens.

**Section 8.02**   **Representations and Warranties in Connection with Security Interest.** Each Borrower represents and warrants to Lender as follows, that subject to the entry of the Relevant Orders:

(a)     The Borrowers have full right and power to grant to Lender a perfected, first-priority security interest and Lien, in accordance with the Required Lien Priority, on the Borrowers' respective interests in the Collateral pursuant to this Agreement and the other Loan Documents;

(b)     Upon the execution and delivery of this Agreement, Lender will have valid and automatically perfected first-priority Liens and security interests in the Collateral granted by the applicable Borrower, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, other than restrictions or Liens expressly permitted by Section 6.02; provided that, notwithstanding the automatic perfection and first-priority of Backstop Liens under the Relevant Orders, Lender may, in its sole discretion, file any financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, in respect of the Collateral and the Liens granted hereunder (including, without limitation, as contemplated in Section 8.06);

(c)     As of the Closing Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Borrower is on file in any public office except those on behalf of Lender; and

(d)     As of the Closing Date, such Borrower is not party or otherwise subject to any agreement, document or instrument that conflicts with this Section 8.02.

**Section 8.03**   **Nature of Obligations and Liens.**   The Backstop Liens and Backstop Facility Claims referred to in Section 8.01 shall have the priority afforded to such Backstop Liens and Backstop Facility Claims in the Relevant Orders.

**Section 8.04**   **Power of Attorney**.   Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for each Borrower (without requiring Lender to act as such) with full power of substitution to do the following (which appointment is irrevocable and coupled with an interest): subject to the Relevant Orders, (a) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is or they are obligated to give Lender under any of the Loan Documents; (b) do such other and further lawful acts and deeds in the name of such Person that Lender may deem necessary or desirable to perfect Lender's security interest or lien in any Collateral; or (c) after the occurrence of an Event of Default which is continuing, (i) enforce an account, (ii) exercise any voting or

consensual rights with respect to the pledged securities, (iii) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, (iv) notify, or to require any Borrower to notify, account debtors to make payment directly to Lender, (v) make, settle and adjust claims in respect of Collateral under policies of insurance, indorsing the name of such Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; provided that nothing herein contained shall be construed as requiring or obligating Lender to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, or (vi) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral.  Notwithstanding the foregoing, the foregoing power of attorney is a right and not an obligation of Lender and neither Lender nor its officers, directors, employees or agents shall be responsible to any Borrower for failure to exercise any of the foregoing rights.

**Section 8.05  Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral.**  Lender shall have the right, but not the obligation, to perform on the Borrowers' behalf, any or all of the Borrowers' obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account, and at the sole risk of such Borrower.

**Section 8.06  Filing of Financing Statements.**  Each Borrower irrevocably authorizes Lender without notice to such Borrower to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect Lender's security interest in the Collateral, in all jurisdictions in which Lender believes in its sole opinion that such filing is appropriate.  Each Borrower also irrevocably authorizes Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law.

**ARTICLE IX.**
**WAIVERS; INDEMNIFICATION**

**Section 9.01  Demand; Protest; etc.**  To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Borrower hereby waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Borrower may in any way be liable.

**Section 9.02  Lender's Liability for Collateral.**  As long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or

default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers, except any thereof resulting from the gross negligence, bad faith, fraud, or willful misconduct of Lender or its representatives or agents as finally determined by the Bankruptcy Court or other court of competent jurisdiction.

Section 9.03 **Indemnification.**  Borrowers shall pay, indemnify, defend, and hold harmless any Lender Related Person (each, an "Indemnified Person") (to the fullest extent permitted by law) for any losses, claims, damages, liabilities, expenses, penalties, fines, actions, judgement, and disbursements of any kind or nature whatsoever (including reasonable and documented out of pocket fees and disbursements of attorneys, experts, consultants, and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against imposed upon, or incurred by any of them (a) in connection with, as a result of, or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities, or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrowers shall have no obligation to any Indemnified Person under this Section 9.03 with respect to any Indemnified Liability that the Bankruptcy Court or other court of competent jurisdiction finally determines to have resulted from the bad faith, fraud, gross negligence, or willful misconduct of such Indemnified Person.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto.  **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON EXCEPT FOR ANY ACT OR OMISSION THAT CONSTITUTES GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON.**

## ARTICLE X.
### NOTICES

All notices or demands relating to this Agreement or any Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith).  In the case of notices or demands to any party hereunder

or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Borrowers prior to the GUC Trust Assumption:

Prospect Medical Holdings, Inc.
3415 South Sepulveda Blvd., 9th Floor
Los Angeles, CA  90034
Attention:  Frank Saidara
Email:  frank.saidara@pmh.com

with a copy to (which shall not constitute notice):

Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019
Attention:  Thomas Califano
Email:  tom.califano@sidley.com

If to the Borrowers after the GUC Trust Assumption:

[●]

with a copy to (which shall not constitute notice):

[●]

If to Lender:

MPT TRS Lender PMH, LLC

1000 Urban Center Drive Suite 501
Birmingham, AL  35242
Attn:  Legal Department
Email:  legal@medicalpropertiestrust.com

with a copy to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52nd St
New York, New York 10019
Attention:  Emil A. Kleinhaus; Michael S. Benn; Stephanie A. Marshak
Email:  EAKlienhaus@wlrk.com; MSBenn@wlrk.com; SAMarshak@wlrk.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Article X</u> shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; <u>provided</u> that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function.

## ARTICLE XI.
## <u>CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER</u>

(a) THE VALIDITY OF THIS AGREEMENT AND THE LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN THE LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b) EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (OTHER THAN WITH RESPECT TO ANY LOAN DOCUMENT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE THEREIN), OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) **BORROWERS AND LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE**

TRANSACTIONS CONTEMPLATED THEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWERS AND LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF THE BORROWERS AND LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

### ARTICLE XII.
### AMENDMENTS; WAIVERS; SUCCESSORS

**Section 12.01 Amendments and Waivers.** No amendment, waiver, or other modification of any provision of this Agreement or any Loan Document, and no consent with respect to any departure therefrom, shall be effective unless the same shall be in writing and signed by Lender and the Borrower Representative and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

**Section 12.02 No Waivers; Cumulative Remedies.** No failure by Lender to exercise any right, remedy, or option under this Agreement or any Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Lender's rights under this Agreement and the Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

**Section 12.03 Successors.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided that, except for the GUC Trust Assumption, no Borrower may assign this Agreement or any rights or duties hereunder without Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release such Borrower from its Obligations. Any assignment by such Borrower which is not explicitly permitted hereunder shall be void *ab initio*. Lender (with the consent of Borrowers, which shall not be unreasonably withheld or delayed, nor shall such consent be required if an Event of Default has occurred and is continuing, and which consent shall be deemed given if Borrowers do not respond to such request within three (3) Business Days) may freely assign all or part of its rights and duties hereunder to any Person.

### ARTICLE XIII.
### GENERAL PROVISIONS

**Section 13.01 Effectiveness.** This Agreement shall be binding and deemed effective when executed by Borrowers and Lender.

**Section 13.02** <u>**Section Headings.**</u>  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**Section 13.03** <u>**Interpretation.**</u>  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or Borrowers, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**Section 13.04** <u>**Severability of Provisions.**</u>  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**Section 13.05** <u>**Debtor-Creditor Relationship.**</u>  The relationship between Lender, on the one hand, and Borrowers, on the other hand, is solely that of creditor and debtor, as applicable.  Lender has not (and shall not be deemed to have) any fiduciary relationship or duty to Borrowers arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrowers, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

**Section 13.06** <u>**Counterparts; Electronic Execution.**</u>  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**Section 13.07** <u>**Revival and Reinstatement of Obligations.**</u>  If the incurrence or payment of the Obligations by Borrowers or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "<u>Voidable Transfer</u>"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable, documented, and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

**Section 13.08  Lender Expenses.**  The Borrowers hereby agree to pay any and all Lender Expenses on a monthly basis, within ten days of receiving summary invoices submitted by Lender and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

**Section 13.09  [Reserved].**

**Section 13.10  Integration.**  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## ARTICLE XIV.
## JOINT AND SEVERAL OBLIGATIONS

IN ADDITION TO, AND WITHOUT LIMITING ANY TERM OR PROVISION OF, THIS AGREEMENT, ALL OBLIGATIONS HEREUNDER AND UNDER THE LOAN DOCUMENTS OF EACH BORROWER IS JOINT AND SEVERAL.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGATIONS OF EACH BORROWER SHALL NOT BE AFFECTED BY (A) THE FAILURE OF LENDER TO ASSERT ANY CLAIM OR DEMAND OR TO ENFORCE OR EXERCISE ANY RIGHT OR REMEDY AGAINST ANY OTHER BORROWER UNDER THE PROVISIONS OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR OTHERWISE, (B) ANY RESCISSION, WAIVER, AMENDMENT OR MODIFICATION OF, OR ANY RELEASE FROM ANY OF THE TERMS OR PROVISIONS OF, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR (C) THE FAILURE TO PERFECT ANY SECURITY INTEREST IN, OR THE RELEASE OF, ANY OF THE COLLATERAL OR OTHER SECURITY HELD BY LENDER.

## ARTICLE XV.
## ADDITIONAL BORROWERS

In the event that a Borrower is added to this Agreement as required hereunder, all references herein to the Borrowers shall also apply to any such additional Borrower, including, without limitation and to the extent applicable, the granting of a security interest in the Collateral and all representations, warranties, covenants and other obligations of the Borrowers hereunder.

## ARTICLE XVI.
## TREATMENT OF CERTAIN INFORMATION

Lender agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all non-public information regarding any Borrower or any of its Subsidiaries pursuant to this Agreement that (a) is clearly identified by such Person as being confidential at the time the same is delivered to Lender or (b) constitutes any financial statement, financial projections or forecasts, budget, compliance certificate, audit report, management letter or accountants' certification delivered hereunder ("Information"); provided, however, that nothing herein shall limit the disclosure of any such Information (i) to any Lender Related Person that needs to know such Information, (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, (iii) to auditors or accountants, and any analogous counterpart

thereof, (iv) in connection with any litigation to which Lender is a party arising from or related to this Agreement or the Loan Documents, (v) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Agreement, (B) becomes available to Lender on a confidential basis from a source other than any Borrower or any of its Subsidiaries, so long as such source is not known by Lender to be bound by obligations of confidentiality with respect to such Information, or (C) was available to Lender on a non-confidential basis prior its disclosure to Lender by any Borrower or any of its Subsidiaries, or any of their advisors, and (vi) to the extent that any Borrower shall have consented to such disclosure in writing.

[Signature pages follow]