## Exhibit G

**TSAs**

# Exhibit G-1

## Astrana Purchased Services TSA

## PURCHASED SERVICES TRANSITION SERVICES AGREEMENT

This PURCHASED SERVICES TRANSITION SERVICES AGREEMENT (collectively, with all Schedules hereto, this "***Agreement***") is made and entered into as of July 1, 2025, by and between Prospect Medical Holdings, Inc., a Delaware corporation and its Affiliate Alta Hospitals System, LLC, a California limited liability company ("***Seller***"), and (i) Astrana Health, Inc., a Delaware corporation, and (ii) Alta Newport Hospital, LLC d/b/a Foothill Regional Medical Center, a California limited liability company (collectively, "***Buyer***"). Capitalized terms used but not defined herein shall have the meanings set forth in the Asset and Equity Purchase Agreement, dated as of November 8, 2024, by and between Seller and Buyer and the other parties thereto (the "***Purchase Agreement***"). Buyer and Seller are collectively referred to as the "***Parties***" and each individually as a "***Party***."

### RECITALS:

**WHEREAS**, pursuant to the Purchase Agreement, as of the date hereof Buyer is acquiring the Acquired Equity Interests and Purchased Assets and assuming the Assumed Liabilities from Sellers;

**WHEREAS**, in connection with such acquisition, Buyer and Seller desire to memorialize certain understandings regarding the transitioning of certain services related to the Acquired Equity Interests, Purchased Assets and Assumed Liabilities; and

**WHEREAS**, concurrently with the execution of this Agreement, the Parties have entered into an Information Technology Transition Services Agreement for the provision of certain transitional information technology services (the "***IT TSA***"):

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties do hereby agree as follows:

### ARTICLE 1
### SERVICES

1.1     Retention; Scope of Services.

(a)     Subject to and in accordance with the terms and conditions set forth herein and in Schedule A attached hereto, for and during the term, Buyer hereby engages Seller to provide certain management, administration and support services as set forth on Schedule A (the "***Services***"), either directly or through outsourcing arrangements as determined by the Parties in accordance with the procedures set forth in this Agreement, in exchange for the fees set forth in Schedule A. Services shall expressly exclude those services and items identified as exceptions on Schedule A. Buyer may receive and use the Services solely for its operation of the Hospital. Seller shall not be obligated to provide the Services to any Person other than Buyer. In addition to, and notwithstanding the foregoing, if any services were being provided to the Hospital by or for Seller or its Affiliates within the twelve (12) months prior to the Effective Date and such services are reasonably needed in order to operate the Hospital in accordance with Steady State (as defined

below) but were inadvertently omitted by the Parties from Schedule A, then, unless such services are listed as an excluded service or item on Schedule A, the Parties will enter into a Change Order (as defined below) pursuant to Section 1.1(b) to add such services ("**Included Services**") to Schedule A, and such Included Services thereafter will be deemed included within the Services. Any adjustment to fees for such inadvertently omitted Included Services shall be subject to the mutual written agreement of the Parties in a Change Order and, if such Included Services were provided by Seller to the Hospital prior to the Effective Date under that certain Support Services Agreement, effective as of March 31, 2023, by and between Prospect Medical Holdings, Inc., and PHP Holdings, LLC, on behalf of itself and its subsidiaries (the "**SSA**"), shall be charged additional costs only to the extent that Seller can demonstrate that the provision of such omitted Included Services will result in incremental, out-of-pocket costs not already accounted for in the Fees set forth in Schedule A.

(b)     Buyer may periodically engage Seller in good faith discussions regarding whether Buyer anticipates additional services related to, but not included in the Services provided hereunder, may be reasonably necessary to facilitate the transition of the Hospital to Buyer ("**Additional Services**"). In the event that Buyer requests Additional Services, the Parties shall enter into a written change order (a "**Change Order**") to cover such Additional Services and memorialize any Fees and Pass-Through Expenses (each as defined below) relating to such Additional Services. Changes to Schedule A shall become effective only upon the execution of a Change Order by officers of both Buyer and Seller. In addition to the Fees and Pass-Through Expenses described in the Change Order, each Change Order shall describe the impact of the change on the respective obligations of each Party to a schedule and is incorporated into the applicable schedule once executed by the Parties. For each Change Order, a change request shall be prepared by the Party requesting the change (a "**Change Request**") and the other Party will prepare a document describing the estimated impact of a change (a "**Change Response**"). The Parties will evaluate and consider any Change Request and the corresponding Change Response; provided, however, that neither Party shall be required to agree to any Change Order, but approval of a Change Request shall not be unreasonably withheld. Unless and until a Change Order is executed by both Parties, neither Party shall have any obligation to perform any requested change. If Seller reasonably anticipates that the review of Buyer's request for Additional Services will result in material out-of-pocket costs, Seller shall obtain Buyer's prior written approval before incurring such costs. Absent such written approval, Buyer shall have no obligation to reimburse Seller for any costs related to such review. For avoidance of doubt, a Change Order setting forth the applicable Fees and Pass-Through Expenses shall be required to amend Schedule A to include Services identified pursuant to Section 1.1(a).

(c)     In connection with the services in Schedule A, Seller shall establish and maintain internal controls to identify and account for all payments received from payors, patients, vendors, or other third parties that are attributable to services provided by or on behalf of the Hospital following the Effective Date ("**Hospital Revenue**"). Seller shall ensure accurate tracking and full allocation of Hospital Revenue to Buyer in accordance with this Agreement. To the extent practicable, Seller shall direct all Hospital Revenue to be deposited into one or more dedicated lockbox or deposit accounts. Where separate accounts cannot reasonably be established due to payor-related limitations, Seller shall ensure that it can timely and accurately identify, allocate, and remit Hospital Revenue to Buyer. Upon request, Seller shall provide reasonable access to supporting documentation and financial records necessary to verify the proper collection,

allocation and remittance of Hospital Revenue. Seller shall cooperate in good faith to resolve discrepancies and to support Buyer's efforts to establish direct payer relationships.

1.2 <u>Standards</u>.

(a) Seller hereby covenants, represents, and warrants that it will (i) perform the Services hereunder in accordance with this Agreement and through qualified personnel; (ii) use commercially reasonable efforts to provide the Services set forth in this Agreement in an efficient and cost effective manner; and (iii) provide or perform the Services in compliance, in all material respects, with all applicable Laws, and at the same level, in the same manner, and same duty of care as Seller historically provided such services to the Hospital prior to the Effective Date, and with the same degree of priority and same degree of treatment in relation to its other facilities within its enterprise ("***Steady State***"). Subject to the foregoing and to the other provisions of this Agreement, Seller shall furnish Services pursuant to this Agreement, solely to facilitate the orderly transition of the Hospital's operations to Buyer. All such Services shall be provided under the general direction and supervision of Buyer, and nothing in this Agreement shall be construed to grant Seller exclusive or independent control over the operation or management of the Hospital. Buyer shall retain at all times the ultimate professional and administrative authority and responsibility for the Hospital in accordance with California Code of Regulations, Title 22, Section 70713, along with all other obligations Buyer is required to maintain pursuant to the provisions set forth in <u>Article 3</u>. In performing the Services, Seller may rely on the recommendations of the Hospital's medical staff (and its designated committees) and departmental chairpersons (collectively "***Medical Staff***") relative to the quality of professional services provided by individuals with clinical privileges. Except as provided in this Agreement or any Schedule attached hereto, all matters requiring professional medical judgments shall remain the responsibility of the Hospital's Medical Staff (as defined herein) and allied health professionals, and Seller shall have no responsibility, obligation, or liability whatsoever for such judgments.

(b) Seller shall not be required to provide any Service, or to take any action, or omit to take any action under this Agreement if and solely to the extent that doing so would (i) result in a material violation of applicable Law; (ii) constitute a material breach of a written agreement between Seller and a non-affiliated third party that was in effect as of the Closing Date; or (iii) violate Seller's Policies (as defined below); provided, Seller represents and warrants that Steady State performance of the Services does not breach or violate any such third party agreements or any of Seller's Policies. In the event Seller believes a requested Service would cause such a breach or violation, Seller shall (x) notify Buyer promptly in writing, (y) continue to perform the Service to the extent reasonably possible, and (z) cooperate in good faith with Buyer to utilize the Governance Procedures (defined below) to agree on commercially reasonable steps to avoid, mitigate, or remedy the potential breach or violation or a commercially reasonable workaround or alternative for the affected Service. Notwithstanding the foregoing, Seller shall not be relieved of its obligations to provide Services under this Agreement pursuant to <u>Sections 1.2(b)(ii)</u> or <u>(iii)</u> in any instance where failure to provide such Service would impact Buyer's ability to maintain its licensure, Medicare or Medicaid participation, accreditation, or ongoing compliance with applicable law or regulatory obligations, or materially interfere with the continuity of patient care.

(c) Seller may, upon thirty (30) days' advance written notice to Buyer and in consultation with Buyer in connection with any changes that may affect Buyer's receipt of

Services, change, alter, substitute or supplement its standards and procedures for performing the Services from time to time only (i) as may be done for the same or substantially similar services provided to other similarly-situated hospitals owned by Seller or its Affiliates, or (ii) as may be required by changes of Law; provided, however, that no such changes, alterations, substitutions, or supplements to Seller's standards or procedures for performing the Services shall result in a material degradation of the Steady State performance or provision of the Services. Subject to Section 1.2(d), in no event shall Seller subcontract or delegate any material portion of the Services to a third-party without Buyer's prior written approval, except where such outsourcing arrangement was disclosed and agreed to in advance (which shall be deemed to include those arrangements set forth on Schedule A) or required by Law.

(d)     Seller shall not subcontract or delegate the performance of any material Service under this Agreement to a new subcontractor except in conformance with the requirements of this Section 1.2(d), or in accordance with Section 9.3. If Seller desires to delegate Services to a new subcontractor after the Effective Date other than in accordance with Section 9.3, Seller shall: (i) remain fully responsible for the performance of such Services and shall ensure that all subcontractors are bound by written agreements to comply with standards, requirements, and confidentiality obligations that are no less stringent than those set forth in this Agreement, to the extent applicable to the subcontracted Services; (ii) conduct commercially reasonable vendor diligence; (iii) following completion of vendor diligence, provide in writing the results of such vendor diligence to Buyer for review; and (iv) provide Buyer with at least sixty (60) days' written notice prior to the effective date of any delegation of any Service to a new subcontractor.. If Buyer has reasonable material concerns with the selected subcontractor, Buyer may notify Seller of its objections and the Parties shall in good faith cooperate to agree on a solution to such concerns. In the event of any material disruption in the Services due to subcontractor non-performance, Seller shall promptly notify Buyer and use commercially reasonable efforts to (x) cure the disruption, (y) procure an alternative provider, or (z) resume or assume direct provision of such Services. Except as provided herein, Seller shall not increase the Fees payable under this Agreement as provided for in Section 4.1 below without Buyer's prior written approval. Any proposed fee adjustment related to changes in subcontractor arrangements must be reasonable, directly related to actual, documented cost increases, and supported by written notice and substantiating documentation provided to Buyer no less than thirty (30) days in advance of implementation.

(e)     Notwithstanding any provision of this Agreement to the contrary, if the provision of any Service as contemplated by this Agreement requires the consent, license, sublicense, or approval of any third party not previously obtained, Seller shall use commercially reasonable efforts to obtain such consent, license, sublicense, or approval as necessary to provide the Services in accordance with this Agreement. Schedule D identifies (i) each Third-Party Contract or third-party agreement for which Seller has not yet obtained the necessary consent, license, sublicense or approval in order to provide the Services as of the Effective Date, and (ii) Schedule A of the IT TSA identifies any Third-Party Contract or third-party agreement which shall expire prior to the Expiration Date (defined below). Buyer shall reasonably cooperate with Seller in obtaining such third party consents, licenses, sublicenses, or approvals necessary to permit Seller to perform, or otherwise make available to Buyer and the Hospital, the Services set forth in this Agreement and shall bear the actual, documented, out-of-pocket costs and expenses required for and directly related to obtaining such consent, license, sublicense, or approval, whether incurred by Seller and to be reimbursed by Buyer, or to be incurred directly by Buyer, including,

where Buyer is required to enter into a direct contract with such third party, provided such costs incurred and expenses are submitted to Buyer for review with accompanying documentation sufficiently evidencing such costs and expenses. If Seller is unable to obtain the aforementioned third party consents, licenses, sublicenses or approvals, the Parties shall, and shall cause each of their respective Affiliates to, use commercially reasonable efforts to cooperate in any lawful and economically feasible alternative arrangement that provides substantially similar functionality as the affected Service such that Buyer shall receive materially similar Services as originally contemplated by the Parties in this Agreement.; *provided*, that Buyer shall pay the reasonable and additional costs and expenses associated with such alternative, provided further that such costs incurred by Seller are submitted to Buyer for review with accompanying documentation sufficiently evidencing such costs. If during the term of a Service, Seller must obtain or renew a contract to continue to provide the Service to Buyer, then, Buyer shall bear a pro rata portion of the out-of-pocket costs for such renewal or replacement contract, at the point it is obtained or renewed for the term offered by the vendor, regardless of whether Buyer earlier terminates the related Service, based on how Seller has historically allocated such cost to other similarly-situated hospitals owned by Seller; provided, if the renewal or contract is obtained solely to continue providing the Services to Buyer under this Agreement, then Buyer shall pay one hundred percent (100%) of such out-of-pocket costs, (excluding, for avoidance of doubt, any outstanding unpaid and past due amounts under such contract that are not otherwise discharged). If during the term of the Services, Seller must obtain a new Third-Party Contract to replace a Third-Party Contract that is terminated due to Seller's breach of such Third-Party Contract (except where such breach was caused by acts or omissions of Buyer or the Hospital) or exercise of its right to terminate for convenience, then Seller shall bear Buyer's pro rata portion of the out-of-pocket costs in obtaining a new Third-Party Contract. In the event the provision of Services requires disclosure to Buyer of third-party confidential or proprietary information, materials, or technology in possession of Seller, Seller shall obtain all consents necessary for Buyer to receive third-party confidential or proprietary information, materials or technology which are reasonably required for Seller to provide and for Buyer to receive the Services.

1.3     Independent Contractor Relationship. It is expressly agreed by the Parties that Seller is at all times acting and performing under this Agreement as an independent contractor of Buyer, and that no act, commission or omission by Buyer and/or Seller shall be construed to make or constitute the other its partner, member, joint venturer or associate by virtue of this Agreement. Seller shall be responsible for the compensation and supervision of its own employees used to perform the Services under this Agreement. Seller shall determine the methods, manner and means by which such services will be performed. Each Party shall be solely liable for the payment of all salaries, wages, and any unemployment, social security, and other payroll taxes for its officers and employees, including any related assessments or contributions required by Law. No employee of Buyer shall be considered an employee of Seller by virtue of such employee's participation in the Services process, whether as a Primary Coordinator or Service Coordinator (as such terms are defined below) or otherwise.

1.4     Licenses; Permits. Buyer shall be the holder of the respective licenses, permits and contracts pertaining to the Hospital, and shall be the "provider" within the meaning of all third-party contracts for the Hospital.

1.5     Representatives; Governance Procedures.

(a)    <u>Representatives</u>. Buyer and Seller will each designate a representative to act as its primary contact person to coordinate the provision of the Services (collectively, the "***Primary Coordinators***") (i) with whom the other Party may communicate about current issues, needs, and problem resolution; (ii) who has authority to make prompt decisions on a Party's part; (iii) who will be reasonably accessible by the other Party; and (iv) who will be reasonably knowledgeable about the policies, procedures and products of the Primary Coordinator's respective Party in connection with the provision or use of the Services. From time to time during the term of this Agreement, each Primary Coordinator may designate, or remove from such designation, one or more service coordinators for each specific Service (the "***Service Coordinators***"), in each case by amending <u>Schedule B</u> hereto to name such Service Coordinator and the applicable Service for which such Service Coordinator is responsible. Each Party may treat an act of a Primary Coordinator or Service Coordinator of the other Party as being authorized by such other Party; *provided, however*, that no Primary Coordinator or Service Coordinator has authority to amend or act in a manner inconsistent with this Agreement. Buyer and Seller will advise each other promptly in writing of any change in the Primary Coordinators or any Service Coordinator for a particular Service. All communications relating to the provision of the Services will be directed to the Service Coordinators for such Service with copies to the Primary Coordinators. Neither Party shall make service requests directly of any employee of the other Party other than a Primary Coordinator or Service Coordinator of the other Party or their designees. Each Party's initial Primary Coordinator is identified on <u>Schedule B</u>. From time to time during the term of this Agreement, each of Buyer and Seller may, by written notice to the other, remove, replace or appoint a new Primary Coordinator of such noticing Party.

(b)    <u>Governance Procedure</u>. The Parties will form a governance committee to facilitate communications between them ("***Governance Committee***"). The Governance Committee shall be composed of the Primary Coordinator of each Party, along with an equal number of other representatives of each Party, as mutually agreed to by the Parties. The Governance Committee shall meet in person or by telephone (as mutually agreed by the Parties) on a weekly basis for the first three (3) months after the Effective Date and, thereafter, twice monthly or more frequently as may be reasonably requested by either Party. Topics to be reviewed and discussed by the Governance Committee at such meetings may include: (i) the status of the Parties' activities under this Agreement, (ii) the status of any issues related to this Agreement that may impact the delivery of the Services or either Party's obligations under this Agreement, (iii) any upcoming projects and anticipated Service interruptions, (iv) necessary levels of training for up to ten (10) hours of in-person training and fifteen (15) hours of training provided virtually, in each case, upon Buyer's request for the end users of Buyer, its Affiliates, or third parties authorized to act on behalf of Buyer to facilitate the transition contemplated hereunder and to effectuate the training, education, and instruction of such end users, provided, in-person training shall be provided on-site at Seller's locations only and provided, further, any additional training requested by Buyer shall be documented pursuant to an executed Change Order and shall be charged at a FTE cost consistent with FTE allocations for other similar services, and (v) any other matters related to this Agreement that may be reasonably raised by either Party. The Governance Committee shall serve as informal arbiters of issues brought before the Governance Committee and shall work diligently, cooperatively, and in good faith to resolve such issues as they arise, and prior to the initiation of formal dispute resolution procedures pursuant to the Purchase Agreement. The governance procedures described in this <u>Section 1.5(b)</u> are referred to herein as the "***Governance Procedures***."

1.6     Cooperation With Respect to Services. Each Party shall make available to the other Party any information reasonably required or reasonably requested by such other Party regarding performance of Services, and shall be responsible for timely providing that information and for the accuracy and completeness of that information as provided or made available by the Party. Without limiting any of the terms set forth herein, the Parties shall cooperate with each other in good faith in all matters relating to the provision and receipt of Services. The Parties shall cooperate with each other in making such information available as needed in the event of any and all internal and external audits that are required to comply with applicable Law, provided any disclosed information remains subject to the confidentiality terms and obligations set forth in Article 7. If this Agreement is terminated in whole or in part, the Parties shall cooperate with each other in all reasonable respects in order to effect an efficient transition and to minimize disruption to the business of both Parties. Neither Party will incur liability in reasonably relying on or complying with any such instructions, authorizations, approvals, or other information supplied by the other Party, its Affiliates, or any third party acting on the behalf of such Party; provided, for clarity, Buyer shall retain ultimate responsibility for and control over its operations and the operation of the Hospital Business, including as provided in Section 3.8. Without limitation to the foregoing, each Party shall use good faith efforts to complete the transition of the Hospital Business as promptly as possible following the Closing Date.

1.7     Payment of Expenses. Except as otherwise expressly included in this Agreement, the costs, liabilities and expenditures incurred by Seller in connection with the performance of its obligations under this Agreement, including, without limitation, any costs incurred in connection with the operation of the Hospital during the transition period, are for the Buyer's account, and Buyer shall be liable for all such expenditures ("**_Expenditures_**"), except for Seller's Staff Services (described below), provided that such Expenditures are (i) consistent with the scope of Services described in this Agreement, (ii) reasonable and necessary to perform the Services in accordance with this Agreement and consistent with the past practices of Seller in operating the Hospital and (iii) supported by appropriate documentation, including invoices, time records, or other itemized statements sufficient to verify the nature and amount of the expenditure. With the exception of Expenditures set forth in Schedule A, with respect to any individual Expenditure exceeding $5,000 in any given month, Seller shall obtain Buyer's prior written approval before incurring such Expenditure. Subject to Seller's compliance with the terms and conditions of this Agreement, Seller is authorized by Buyer to pay such Expenditures from funds identified by and from Buyer and the Hospital. Buyer shall pay directly any Expenditures not paid from funds from the Hospital, and neither Seller nor any of its Affiliates shall be obligated to advance any of its own funds to or for the account of Buyer or the Hospital, or to incur any liability on behalf of the Buyer or the Hospital, unless Buyer shall have furnished Seller with funds necessary for the discharge thereof prior to incurring such liability. Seller's "Staff Services", which are not reimbursable by Buyer, are exclusively limited to the salaries and benefits of Seller's employees, officers and home office staff, as well as Seller's home office overhead expenditures, including but not limited to lease expenditures, accountant and/or audit expenses, insurance policies, legal fees, third party accounts, payroll processing and human resources administration.

1.8     No Abandonment. Seller shall not abandon this Agreement or, except as excused pursuant to this Agreement, including pursuant to Section 3.1 or Section 9.15, abandon or refuse to provide or perform all or any part of the Services. If Seller breaches or threatens to breach this Section 1.8, Seller agrees that Buyer shall be irreparably harmed, and, without any additional

findings of irreparable injury or harm or other considerations of public policy, Buyer shall be entitled to receive an injunction compelling specific performance by Seller of its obligations under this Agreement without the necessity of posting any bond or other security.

1.9 <u>Prospect Guarantee</u>. To the extent Seller delegates the performance of Services to any of its Affiliates, including Alta Hospitals Systems, LLC, Seller guarantees the performance of, and agrees to ensure such Affiliate promptly performs, in full, all of the obligations set forth under this Agreement, including obligations to comply with applicable law or regulatory requirements to the extent relating to the Services provided under this Agreement. If an Affiliate fails to fulfill its obligations or breaches or threatens to breach this Agreement, Seller will step in to ensure full performance.

1.10 <u>Access to Books and Records</u>. Seller shall make available to Buyer in a shared folder or folders, in each case to the extent not migrated as part of the Migration Services (as defined under <u>Section 1.2(h)</u> of the IT TSA) and in a reasonably usable format, the following materials: (a) records, including (i) all Medical Records (defined below), (ii) all financial, construction plans and specifications, documents, catalogs, books, files, operating policies and procedures, manuals and current personnel records, and all files, charts, books, records, ledgers, data, databases and documentation, in each case primarily used, held for use in or related to the Hospital Business, and (iii) all other data, books, records, information, and other data, in each case (i)-(iii) to the extent such data, books, records, information, and other data (A) was purchased by Buyer as a Purchased Asset under the Purchase Agreement; (B) is necessary for the operation of the Hospital Business; or (C) is Buyer and Hospital data and information processed in connection with and during the term of this Agreement, and the term of the IT TSA, by Seller or its Affiliates or subcontractors ("***Books and Records***"). For clarity, Books and Records will be provided (x) in their current form (i.e., Seller will have no obligation to modify any such Books and Records prior to or after making the same available in the shared folder(s)) and (y) Seller is not responsible for the completeness of any Books and Records provided by third-party vendors. Seller's responsibility with respect to any Books and Records requested from third-party vendors will be to make the same available in the shared folder(s). Seller shall reasonably cooperate with Buyer to address any gaps or deficiencies identified in such records that materially affect Buyer's operations or regulatory compliance. Seller shall maintain access to such shared folders and records for the term of the Agreement and for a period of three (3) months thereafter as is reasonably necessary to ensure operational continuity and compliance.

1.11 <u>Data Migration</u>. For clarity, Migration Services shall be conducted in accordance with the process set forth under <u>Section 1.2(h)</u> of the IT TSA and the applicable Change Order(s).

**ARTICLE 2**
**TERM OF PARTICULAR SERVICES**

Unless otherwise provided in this Agreement, the provision of particular Services by Seller to Buyer shall commence as of the date hereof and shall terminate upon the termination of this Agreement in accordance with the provisions of <u>Section 5</u> or upon expiration of the "Service Term" set forth opposite the description of such Service on <u>Schedule A</u>.

**ARTICLE 3**

## RIGHTS AND DUTIES OF BUYER

3.1     Cooperation. Buyer shall cooperate with Seller in the performance of Services to enable Seller to discharge its obligations hereunder in a complete and timely manner and in accordance with Seller's reasonable requests and coordination with Buyer's operational personnel. Without limiting the generality of the foregoing, Buyer shall (a) provide Seller with (i) access to its facilities, and remote access to any applicable systems and equipment, in each case as is reasonably necessary for Seller, its Affiliates or any subcontractor to perform the Services, and subject to Buyer's standard security, confidentiality, and access protocols, (ii) all data, data feeds, information and documentation reasonably necessary for Seller to perform the Services, and (iii) reasonable access to resources (including personnel) and timely decisions in order that Seller may perform its obligations hereunder; (b) comply, and shall cause its employees and personnel to comply, with all applicable Laws in connection with respect to its operations and obligations under this Agreement, including the receipt and use of the Services; and (c) remain solely responsible for the content, accuracy and adequacy of all data that Buyer or its employees or personnel transmit or have transmitted to Seller for processing or use in connection with the performance of the Services. Seller shall be entitled to rely on the accuracy and completeness of information provided by or on behalf of Buyer for the purpose of providing any Service; *provided*, however, that Seller shall be responsible for exercising reasonable diligence in reviewing the data it uses or relies on, shall promptly notify Buyer if it becomes aware of any material inaccuracies, omissions, or inconsistencies in such information and shall not knowingly rely on information it reasonably believes to be materially inaccurate or incomplete.

3.2     Compliance With Seller's Policies. Buyer acknowledges that certain Services are provided on a shared-services basis with other facilities and end users. Accordingly, Buyer agrees to use the Services in a manner that is consistent with the shared-service model and in accordance with Seller's policies, which include Seller's corporate compliance program materials and policies (as may be amended, restated or otherwise revised from time to time in accordance with Section 3.2), including Seller's code of ethics and Seller's policies and procedures related to the operation of the Facilities, including personnel policies, credentialing policies, privacy and security policies, HIPAA policies and patient transfer policies, each to the extent attached within Attachment 1 to Schedule A (collectively, "***Seller's Policies***"). Seller may make material changes to such policies during the term of this Agreement, provided that Seller gives Buyer no less than thirty (30) days' prior written notice of any such changes and consults with Buyer in good faith regarding any changes that may reasonably be expected to affect Buyer's receipt of the Services. Seller shall promptly provide written copies of any such updated Seller's Policies, provided, however, that no changes, revisions, or amendments to Seller's Policies shall result in a material degradation of the Steady State performance or provision of the Services without Buyer's prior written approval. For avoidance of doubt, in no event shall Seller's Policies materially lessen any obligations or responsibilities of Seller as it relates to the Services. In the event of a conflict between Seller's Policies and the terms of this Agreement, the terms of this Agreement shall control. During such notice period, Seller shall cooperate in good faith with Buyer to review and discuss any reasonable concerns raised by Buyer regarding the potential impact of such policy changes.

3.3     Operating Capital. Buyer shall use commercially reasonable efforts to ensure that the Hospital has access to a level of funding reasonable and necessary for the operation of the

Hospital on a sound financial basis (including the payment of Fees and Expenditures owed to Seller).

3.4 <u>Capital Improvements</u>. Buyer shall ensure that the Hospital has access to working capital reasonable and necessary to make all necessary capital improvements to the Hospital in order to maintain and continue standards of operation of the Hospital.

3.5 <u>Support Operations</u>. To the extent provided in <u>Schedule A</u> or in the IT TSA, Buyer shall provide and be responsible for administrative services, staffing, payroll. For clarity, all information technology systems and related services, including financial and accounting systems (e.g., billing, accounts payable, financial reports, and general ledger) shall be governed exclusively by the IT TSA, and nothing in this Agreement shall be construed to limit or modify the rights, obligations, or scope of services set forth in the IT TSA. To the extent Buyer is unable to provide any of the Services required by this <u>Section 3.5</u>, Buyer and Seller shall cooperate in good faith to identify alternative arrangements to ensure continuity of Services, subject to mutual agreement and applicable cost allocations in a Change Order.

3.6 <u>Insurance</u>. During the term of this Agreement and for a period of three (3) years thereafter, each Party shall maintain, at its sole expense (except as provided in <u>Schedule A</u>), professional liability and general liability insurance, Workers Compensation, Property, Directors & Officers Liability, Employment Practices Liability, Managed Care E&O, Cyber Liability, Crime, Fiduciary and other customary policies or appropriate tail coverage as may be required by applicable Law or Contracts to which they are a party, which insurance shall cover such Party and its employees or anyone engaged by or acting on behalf of such Party at the Hospital or otherwise in the performance of the Services hereunder. Such insurance coverages shall be provided by an insurer with at least an "A-" rating from A.M or a self-insurance program approved by California Office of Self-Insurance Plans or Healthplan. Best Company that is properly licensed and qualified to do business in the State of California. No insurance may be maintained through "self-insurance" unless approved in writing in advance by the other Party, which approval will not be unreasonably withheld, conditioned or delayed. Each Party shall submit to the other Party a COI evidencing the coverage required herein prior to the commencement of Services. The COI shall contain an unqualified requirement that the insurance company provide the other Party with thirty (30) days' written notice of any cancellation or lapse of said policy or any change to the other Party's additional insured status of said policy, unless related to the failure to pay any premium, in which event the insurance company shall provide Seller with ten (10) days' written notice.

3.7 <u>On-Site Management Facilities</u>. As part of the consideration for the Services provided under this Agreement, Buyer shall, at Seller's request, provide adequate space at the Hospital for the use of Seller to conduct the Services at the Hospital.

3.8 <u>Responsibility of Buyer</u>. Notwithstanding the authority granted to Seller in this Agreement, the governing body of the Hospital, including the Medical Staff of the Hospital, as the case may be, will at all times retain sole and ultimate control and authority over patient care (including the provision of all medical, clinical or professional services rendered by or on behalf of the Hospital or such providers at the Hospital and otherwise); medical, clinical or professional services (including professional judgment relating thereto); the Hospital (including, among other things all Hospital assets and operations); and such other duties and responsibilities that must be

retained under applicable Law, in each case to the fullest extent as may be required by applicable Law, including but not limited to:

(a)     Buyer shall have the sole and ultimate responsibility to be and remain the licensee of the Hospital and, as such, Buyer shall be fully liable and legally accountable and responsible at all times to all patients and governmental organizations for all patient care and funds received, and for all other aspects of the operation and maintenance of the Hospital. In this regard, it is specifically emphasized that during the term of this Agreement, Buyer shall be and remain fully liable and legally accountable and responsible to the governments of the United States and California, and the agents of said governments, with respect to all matters concerning the Hospital's continued participation in the Medicare and Medicaid programs under Title XVIII and Title XIX of the Social Security Act (42 U.S.C. § 1395 et seq.; 42 U.S.C. § 1396 et seq.);

(b)     Buyer shall remain solely responsible for all obligations as set forth in 42 C.F.R. § 482.12 and California Code of Regulations, Title 22, Section 70713 or the applicable regulations for the state in which a Facility is located; and

(c)     It is and will remain the ultimate responsibility of Buyer (or the board of the Medical Staff of the Hospital, as the case may be) to approve all decisions to credential, recredential, appoint, grant clinical privileges to and discipline such Hospital's Medical Staff in accordance with the medical staff bylaws and applicable Law.

## ARTICLE 4
## COMPENSATION

4.1     Fees. The compensation to be paid by Buyer to Seller for the Services shall be based on the rates set forth and solely to the extent provided in Schedule A or a Change Order as to the particular Services to be provided (collectively, the "**Fees**") and Pass-Through Expenses, which shall be paid according to the payment terms provided in this Section 4. The Fees consist of Fixed SSA Fees and Incremental Support Fees, as defined herein. "**Fixed SSA Fees**" are fixed fees that cover Services that are currently being provided by Seller at Steady State for the Hospital pursuant to the SSA. "**Incremental Support Fees**" will be charged for certain Services as set forth on Schedule A. As further set forth in Schedule A, the total Fixed SSA Fees chargeable by Seller, and payable by Buyer, shall continue at the existing level (i.e., one hundred ninety thousand dollars ($190,000.00) per month) **plus** seven and one-half percent (7.5%) margin to cover indirect operating expenses to facilitate performance under this Agreement for a period of six (6) months from the Effective Date. After six (6) months, Fixed SSA Fees will increase to three hundred twelve thousand and five hundred dollars ($312,500.000) per month **plus** seven and one-half percent (7.5%) margin. Except as provided herein, Buyer will not be responsible for any other fees, charges, or expenses of any kind related to the Services that are not identified in Schedule A or a Change Order, unless Buyer expressly agrees in writing. No amount agreed to be paid hereunder or actually paid in connection herewith is intended to be, nor shall it be construed to be, an inducement or payment for referral of, or recommending referral of, patients. The Parties agree that the Fees and all other fees and expenses payable hereunder have been or will be negotiated at arm's length. If any Governmental Authority determines that this Agreement violates any Law, or that the Fees, or any component thereof, exceed fair market value and/or are not commercially

reasonable, the Parties agree to take such actions as necessary to amend this Agreement and the Schedules hereto to comply with applicable Law.

4.2 <u>Payment</u>.

(a) Seller shall issue an invoice to Buyer in advance for all amounts due and owing under this Agreement for the Services to be rendered to Buyer each month. Incremental Support Fees will be invoiced based on the estimated monthly Fees set forth on <u>Schedule A</u>. Any variance in the actual Incremental Support Fees for a given month will be reconciled through the true-up process described in <u>Section 4.2(b)</u>. Fees and Pass-Through Expenses identified on <u>Schedule A</u> for the first month of the Term shall be paid by Buyer to Seller to be placed in a segregated account controlled by Seller (the "***TSA/OTA Payment Account***") upon execution of this Agreement and the invoice for each month thereafter shall be delivered on or about the tenth (10th) day following the end of each calendar month during the term of this Agreement. Seller will ensure that the TSA/OTA Payment Account will be an account free and clear of any liens, claims, interests or encumbrances from the lenders or other creditors of Seller or other liens from that may be implicated as a result of Seller's bankruptcy. Buyer shall pay to Seller all invoiced amounts within fifteen (15) days after Buyer's receipt of the invoice, except for any amounts disputed in good faith by Buyer in accordance with <u>Section 4.2(c)</u>. For any partial calendar months of this Agreement, including due to a termination by Buyer pursuant to <u>Section 4.2</u> or <u>4.4</u>, Buyer will pay Seller prorated Fees, as applicable. All payments shall be made in immediately available funds in lawful money of the United States of America.

(b) Within thirty (30) days following the end of each calendar month of the term, Seller shall provide Buyer with a statement detailing the actual costs incurred during the prior month for the Services rendered to Buyer pursuant to this Agreement (the "***True-Up Statement***"). The True-Up Statement shall solely address: (i) Pass-Through Expenses, rendered pursuant to and in accordance with <u>Section 4.3</u> of this Agreement during the prior month but excluding Pass-Through Expenses that were previously invoiced and paid in accordance with <u>Section 4.2(a)</u>; (ii) one or more invoices from Seller for any prepayments made directly to a third party solely at the direction and written request of the Buyer; and (iii) the variance between the prepaid Incremental Support Fees and the actual Incremental Support Fees for the prior month. If there is any discrepancy between the pre-paid amount to the actual amounts incurred, Buyer shall either pay Seller any shortfall or receive a credit on the following month's invoice for any overpayment. Any payment due to Seller in accordance with a True-Up Statement (the "***True-Up Payment***") must be made within ten (10) days of receipt of the True-Up Statement.

(c) Buyer shall notify Seller in writing of any dispute (including a reasonably detailed description of the dispute) prior to the due date of the applicable invoice and shall timely pay the undisputed portion of such invoice, provided that Buyer may only do so in good faith. In such event, each Party will provide to the other Party such information and documents as the other Party shall reasonably request and as are reasonably necessary to understand and resolve the dispute in a timely manner. Provided Buyer continues to remit ongoing undisputed Fees and Pass-Through Expenses, and reasonably cooperate with Seller to resolve the dispute, Seller shall not suspend or terminate Buyer's or the Hospital's access or use of the Services due to such dispute or attempt to threaten suspension as a means to resolve a dispute. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Buyer shall pay all amounts determined to be due

within ten (10) days of resolution of the dispute. For clarity, Buyer shall not be liable for any amounts disputed in good faith and ultimately determined not to be owed.

(d)     Except for amounts that Buyer has disputed, all late payments owed by Buyer that are more than thirty (30) days overdue shall bear interest at the lesser of the rate of 1.5% per month or the highest rate permissible under applicable Law, calculated daily and compounded monthly. Buyer shall also reimburse Seller for all reasonable costs incurred in collecting any late payments, including, without limitation, attorneys' fees.

(e)     In the event of a termination of a Service by Buyer pursuant to Section 5.2 or 5.4 or the expiration of the applicable "Service Term" set forth opposite the description of the applicable Service on Schedule A, the Fees set forth for the discontinued Service in Schedule A that are identified as "Incremental Support Fees" will terminate as of the effective date of such termination or expiration.

4.3     Expenses. Buyer shall reimburse to Seller all reasonable and necessary out-of-pocket expenses incurred by Seller or its contracting parties (including its Affiliates) in connection with this Agreement, including the Expenditures and those expenses set forth in Schedule A (collectively, "**Pass-Through Expenses**"); provided, with the exception of Pass-Through Expenses set forth in Schedule A as of the Effective Date, Seller must provide advance written notice to and obtain prior written approval of Buyer for any Pass-Through Expenses exceeding one thousand dollars ($1,000.00) for any one-time Pass-Through Expense, and, in any event, any Pass-Through Expenses exceeding two thousand five hundred dollars ($2,500.00) in the aggregate in any given month. Together with the True-Up Statement, Seller shall provide reasonable written documentation and receipts evidencing such expenses incurred by Seller or its contracting Parties.

4.4     Taxes. Buyer shall be responsible for all sales, personal, excise, and use taxes, or payments in lieu of taxes, however levied or assessed (collectively, "**Taxes**"), arising from the receipt of Services under this Agreement, excluding Taxes based on Seller's net income. All payments made under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes, except as required by applicable Law, in which case, any amounts deducted or withheld with respect to any such Taxes for which the a Party is responsible under this Section 4.4 will be grossed up such that Seller receives the amount due prior to the withholding (including any withholding imposed in respect of any additional amounts paid hereunder).

4.5     Services Records. Seller shall maintain books and records in connection with the amounts invoiced for the performance of the Services, including reasonable time records and backup invoices for Pass-Through Expenses and Services performed on a time and materials basis (collectively, "**Services Records**"), during the term of this Agreement and for one (1) year thereafter or such longer period to comply with applicable Law. Seller shall make copies of Services Records available to Buyer within thirty (30) days upon receiving Buyer's written request but not more than once in any given twelve (12) month period. In the alternative, Seller agrees to make available to Buyer's third-party auditor, upon reasonable written request and at a time and manner within Seller's reasonable discretion, books and records in connection with the Services performed under this Agreement; provided, that such third-party auditor agrees to execute a non-disclosure agreement in advance to such third-party auditor accessing Seller's Protected

Information. Buyer agrees that all such information shall be Seller Proprietary Information (as herein defined) and shall be treated as provided in <u>Section 7.1</u>.

## ARTICLE 5
## TERMINATION RIGHTS

5.1    <u>Termination</u>. This Agreement shall terminate with respect to the Services on the earlier of (a) the date on which the last of the Services to be provided under this Agreement is terminated pursuant to <u>Section 5.2</u>, <u>Section 5.3</u> or <u>Section 5.4</u> or (b) the date that is nine (9) months after the date hereof (the "***Expiration Date***"). Notwithstanding the foregoing, the term of this Agreement may be extended for one (1) additional three (3)-month period from the Expiration Date following Buyer's delivery of written notice to Seller at least sixty (60) days prior to the Expiration Date. Any extension beyond the one (1) potential three (3)-month extension period must be mutually agreed to by the Parties in writing and shall be subject to a reasonable Fee increase as determined by Seller. Except as provided in the preceding sentence or otherwise agreed in writing by the Parties, any extension shall be subject to the same terms and conditions of this Agreement.

5.2    <u>Breach of Agreement</u>. If either Party shall cause or suffer to exist a material breach of any of its obligations under this Agreement, including a failure to make undisputed payments when due, the non-breaching Party shall first utilize the Governance Procedures to resolve any issues associated with such alleged breach, unless (i) the breach damages the security or integrity of the non-breaching Party's or any of its Affiliates' data or systems, (ii) causes the non-breaching Party or any of its Affiliates to be in violation of applicable Law, or (iii) jeopardizes the good standing of a Party or any of its Affiliates with a Governmental Authority, (each of (i) through (iii), a "***Fundamental Breach***"). If the Governance Committee fails to resolve such issues within twenty (20) days of first being notified of such issue during a Governance Committee meeting or such breach is not a Fundamental Breach, the non-breaching Party may send written notice to the breaching Party regarding the alleged breach. If said Party does not cure such default within thirty (30) days after receiving written notice thereof from the non-breaching Party specifying the nature of the breach, then the non-breaching Party may terminate this Agreement, including the provision of Services pursuant hereto, immediately by providing written notice of termination to the other Party, provided, however, that, except with respect to a Fundamental Breach, if Buyer reasonably denies that it has breached and continues to remit the Fees and Pass-Through Expenses for the Services, or if Seller reasonably denies that it has breached and continues to provide Services, both Buyer and Seller must continue to perform under the Agreement until final resolution of such dispute, and in no case without providing at least thirty (30) days prior written notice of intent to do so. If a breach is a Fundamental Breach, the non-breaching Party may either send written notice to the breaching Party regarding the Fundamental Breach and request the breaching Party to cure such Fundamental Breach within ten (10) days after receiving written notice thereof or terminate this Agreement or the provision of the affected Service. Notwithstanding the foregoing, either Party may terminate this Agreement immediately upon written notice to the other Party if the other Party is confirmed to be debarred, suspended or excluded from any Program (as defined in <u>Section 8.2</u>).

5.3    <u>Intentionally Omitted</u>.

5.4    Termination by Buyer.

(a)    Buyer may terminate this Agreement, including as to any particular Service listed on Schedule A, by giving to Seller sixty (60) days' advance written notice of its election to do so. The effective date of such termination shall be the date specified by Buyer in the termination notice, provided that such date is no earlier than sixty (60) days after delivery of the notice, unless otherwise mutually agreed by the Parties in writing. Following receipt of such notice, Buyer and Seller shall work together in good faith to coordinate an orderly wind down of the applicable Services.

(b)    Within thirty (30) days following receipt of such notice, Seller shall inform Buyer in writing of any additional Services that are materially and operationally dependent on the Service(s) being terminated ("***Dependent Services***"), as determined in good faith by Seller based on objective criteria and the operational interdependencies of the Services. Seller agrees to discuss with Buyer in good faith if Buyer reasonably disagrees that the Dependent Services identified by Seller are Dependent Services or if Buyer has questions regarding Seller's determination. If the Dependent Services cannot reasonably be provided without the terminated Service(s), Buyer shall have the right, in its sole discretion, to determine whether to (i) proceed with the termination of both the originally requested Service(s) and the identified Dependent Services; or (ii) withdraw or modify its termination request to preserve the affected Services.

(c)    Buyer shall reimburse Seller for any and all contractually required breakage fees, early termination fees or charges, minimum volume charges, liquidated damages or similar costs or expenses payable to any third party in connection with the terminated Services; provided, however, that Seller shall use commercially reasonable efforts to mitigate such costs and expenses. Seller shall advise Buyer in writing of such fees and expenses within thirty (30) days after receiving Buyer's early termination notice. Buyer shall, within thirty (30) days of receiving such notification from Seller, notify Seller of whether Buyer is withdrawing its early termination notice; otherwise, Buyer shall pay the applicable fees and expenses. If Buyer provides Seller with notice of Buyer's option to terminate this Agreement or the Services, upon Buyer's request, Seller will reasonably cooperate with Buyer regarding the transition of such Services to Buyer or a third-party supplier, at Buyer's cost and expense as documented in a Change Order. If the Parties are unable to agree on the terms for such transition, the Parties shall continue to attempt in good faith to negotiate a resolution in accordance with the Governance Procedures and, if the Parties are unable to agree upon an appropriate course of action in accordance with the Governance Procedures, then either Party may proceed by escalating such issue to senior leadership of each Party.

5.5    Fees Due. In the event of the termination of this Agreement, Seller shall be entitled to receive payment of all undisputed outstanding amounts owing pursuant to this Agreement up to the date of termination, which shall be paid within thirty (30) business days after such termination. Section 4.2(c) shall survive the termination of this Agreement for purposes of any disputed amounts under this Section 5.5.

5.6    Effect of Termination. Section 1.10 (for a period of three (3) months after termination or expiration of this Agreement), Section 1.3, Section 4.2(b) (solely for purposes of completing final True-Up Statement and True-Up Payment), Section 4.3, Section 4.5, Section 5.5,

this Section 5.6, Section 8.3, Article 6, Article 7 and Article 9 shall survive any termination of this Agreement.

## ARTICLE 6
## NO LIABILITY; INDEMNIFICATION; EXPENDITURE LIMITATION

6.1     Indemnification of Buyer by Seller and Liability of Seller.

(a)     Seller hereby agrees to and shall defend, indemnify and hold harmless Buyer and its members, Affiliates, the Hospital, and its and their respective agents, officers, directors, managers, employees, and Representatives, and each of their successors and assigns (the "***Buyer Indemnitees***"), from and against any and all liability, claims, loss, fine, penalty, cost, damage or expense (including, without limitation, reasonable attorneys' fees and expenses and court costs) relating to this Agreement or arising out of or resulting from third party claims based on (i) Seller's, its Affiliate's, or its subcontractors' employees', personnel's, or agents' material breach of this Agreement, including but not limited to any representations or warranties made by Seller, (ii) property damage, death, or injury caused by the gross negligence or willful misconduct of Seller's employees, personnel, or agents in connection with the Services, or (iii) the Seller's gross negligence, willful misconduct, breach of applicable Law, or fraud in the performance of the Services under this Agreement, except to the extent resulting from Buyer's material breach of this Agreement or Buyer's gross negligence or willful misconduct. Seller's obligations under this Section 6.1(a) shall survive the expiration or earlier termination of this Agreement.

(b)     Subject to Section 6.1(a) hereof, Seller assumes no liability whatsoever for any acts, omissions or delinquencies of Buyer or any of its members, managers, Affiliates, and its and their respective agents, officers, directors or employees, or other agents of Buyer. Subject to Section 6.1(a) hereof and without limiting any applicable rights or remedies available to Buyer under the Purchase Agreement, Seller assumes no liability for previously unknown violations of environmental, healthcare laws or other laws or regulations which become known during the term. If Seller becomes aware of any such violations or hazards, it shall promptly notify Buyer in writing. Seller shall be responsible for such violations or hazards to the extent they arise from, relate to, or were exacerbated by (i) Seller's gross negligence or willful misconduct, (ii) Seller's failure to timely disclose such violations after discovery in accordance with the foregoing, or (iii) Seller's breach of this Agreement.

(c)     Except as otherwise provided in this Agreement, Seller makes no, and hereby disclaims any, warranties whatsoever, express or implied, including, without limitation, warranties of merchantability or fitness for a particular purpose, with regard to the Services or any goods or third-party services purchased or used by Buyer or the Hospital under this Agreement, except that Seller shall remain liable for any defects or failures arising from Seller's own gross negligence or willful misconduct in connection with the Services.

6.2     Indemnification of Seller by Buyer. Buyer shall indemnify and hold harmless Seller and its members, Affiliates and its and their respective agents, officers, directors, managers and employees (the "***Seller Indemnitees***") from and against any liability, claims, loss, cost, damage or expense (including, without limitation, reasonable attorneys' fees) to the extent arising out of third party claims based on Buyer's or Hospital's or its or their respective subcontractors', employees',

personnel's, or agents' fraud, willful misconduct, negligence, breach of applicable Law or material breach of this Agreement, except to the extent caused by Seller's gross negligence or willful misconduct or Seller's material breach of this Agreement. Notwithstanding anything to the contrary in this Agreement and without limiting the generalities of the foregoing, Buyer shall indemnify the Seller Indemnitees from and against any liability, claims, loss, cost, damage or expense (including, without limitation, reasonable attorneys' fees) incurred or sustained by, or imposed upon, the Seller Indemnitees arising out of, with respect to or by reason of claims or disputes in any way related to (i) Buyer's employees' employment-related claims arising after the Closing, as set forth in the Purchase Agreement; or (ii) the provision of the post-Closing payroll and employee benefits transition support requested by Buyer as described in Schedule A, to the extent such support is provided in accordance with the terms of this Agreement and is not caused by Seller's material breach of this Agreement, gross negligence, or willful misconduct.

6.3     Intentionally Omitted.

6.4     Limitation of Expenditure Obligation. Notwithstanding anything to the contrary in this Agreement, but excluding Seller's indemnity obligations set forth in Section 6.1 above, Seller shall have no obligation whatsoever to make any advance to or for the account of the Buyer or the Hospital, or to pay any amount contemplated for, or required of, Seller under this Agreement, or to incur any expenditure obligation – whether ordinary or capital – except to the extent that funds are available for such purpose (in Seller's reasonable judgment) either from capital funds provided by Buyer or otherwise from the Hospital's funds. Moreover, if Seller so requests, from time to time, Buyer shall sign, as principal, any contract or agreement which Seller is authorized or required to execute pursuant to this Agreement to evidence that Seller is acting solely as Buyer's and the Hospital's agent and not as principal.

6.5     Limitation on Liability. EXCEPT FOR A PARTY'S OBLIGATIONS UNDER SECTION 6.1(A) OR 6.2 OF THIS AGREEMENT, AS APPLICABLE, OR LOSSES (AS DEFINED IN THE PURCHASE AGREEMENT) RELATED TO (I) A BREACH OF THE APPLICABLE BUSINESS ASSOCIATE AGREEMENT ATTACHED HERETO, (II) SELLER'S ABANDONMENT OF THE SERVICES WITHOUT CAUSE, OR (III) A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF APPLICABLE LAW, OR FRAUD (THE "*EXCEPTED CLAIMS*"), IN NO EVENT WILL EITHER PARTY OR ITS SUBSIDIARIES OR AFFILIATES, OR ITS OR THEIR RESPECTIVE REPRESENTATIVES, BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ITS SUBJECT MATTER OR TRANSACTIONS CONTEMPLATED HEREIN, UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING, WITHOUT LIMITATION, TORT, STRICT LIABILITY, AND OTHERWISE, FOR ANY CONSEQUENTIAL DAMAGES, INCIDENTAL DAMAGES, INDIRECT DAMAGES, EXEMPLARY DAMAGES, SPECIAL, ENHANCED DAMAGES, OR PUNITIVE DAMAGES, INCLUDING LOST PROFITS, REVENUES, DATA, USE, OR SAVINGS, REGARDLESS OF WHETHER SUCH PERSONS WERE ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE, AND EACH PARTY HEREBY WAIVES ALL CLAIMS AGAINST THE FOREGOING AND ASSUMES ALL RISK RELATING TO THERETO, KNOWN AND UNKNOWN. EXCEPT FOR LOSSES ARISING FROM OR RELATED TO THE EXCEPTED CLAIMS AND NOTWITHSTANDING ANYTHING TO THE CONTRARY

IN THE PURCHASE AGREEMENT, THE MAXIMUM AGGREGATE LIABILITY OF EITHER PARTY AND ITS OR THEIR SUBSIDIARIES OR AFFILIATES, OR ITS OR THEIR RESPECTIVE REPRESENTATIVES RELATING TO THIS AGREEMENT OR ARISING OUT OF THE SERVICES PROVIDED BY SELLER SHALL NOT EXCEED THE AGGREGATE AMOUNT OF THE FEES PAID OR PAYABLE DURING THE TERM (ASSUMING THE THREE (3) MONTH EXTENSION IS EXERCISED BUT EXCLUDING, FOR CLARITY, ANY ADDITIONAL EXTENSION MUTUALLY AGREED TO BY THE PARTIES IN WRITING AS PROVIDED IN <u>SECTION 5.1</u>) BY BUYER TO SELLER HEREUNDER. FOR CLARITY, THIS <u>SECTION 6.5</u> DOES NOT AFFECT BUYER'S OBLIGATION TO PAY UNDISPUTED FEES AND PASS-THROUGH EXPENSES FOR THE SERVICES RENDERED HEREUNDER. FOR CLARITY, NOTHING HEREIN SHALL BE CONSTRUED TO LIMIT A PARTY'S LIABILITY IN CONNECTION WITH, OR OTHERWISE SUPERSEDE ANY PROVISIONS OF OR ALLOCATIONS OF RESPONSIBILITY AND LIABILITY UNDER, THAT CERTAIN SIDE LETTER DELIVERED BY ASTRANA HEALTH, INC. TO PROSPECT MEDICAL HOLDINGS, INC., AND THE OTHER PARTIES NAMED THEREIN.

6.6     <u>Cooperation</u>. In the event that a claim is commenced against either the Seller Indemnitees or Buyer Indemnitees, the applicable Party shall provide prompt written notice of such claim to the other Party and Buyer and Seller agree to cooperate to the extent the other Party reasonably requires, each at such Party's own expense (except as otherwise provided herein), in connection with (i) any claim asserted by any third party with respect to the performance of the Services, and (ii) any notice, action or undertaking that either Buyer or Seller or any of their respective Affiliates may be obligated to take with respect to the Services under any federal, state or local Law. The indemnifying Party shall have the right to compromise or settle such claim to the extent of its own interest and shall undertake the defense of any such suit. Notwithstanding the foregoing, if the indemnifying Party fails to assume their indemnification and defense obligations hereunder, the Seller Indemnitees or Buyer Indemnitees as applicable may do so to protect its interests and seek reimbursement from the indemnifying Party. Neither Party shall agree to any settlement without the prior written consent of the other Party, which consent shall not be unreasonably withheld.

**ARTICLE 7**
**PROTECTION OF PROPRIETY INFORMATION**

7.1     <u>Confidentiality of Seller's Protected Information</u>. All information concerning the Seller's businesses or assets that is not generally known to the public, including, but not limited to, the technical systems, methods, policies, procedures and controls, copyrights, trade names, trademarks, service marks, "know-how" and all other intellectual property rights related thereto employed by the Seller, along with the processes, procedures, and the information and materials compiled or prepared by or on behalf of Seller in connection with Seller's management of healthcare facilities, including without limitation marketing plans of Seller, business plans and strategies of Seller, pricing information of Seller, information on competition of Seller, demographics of relevance to Seller, suppliers and providers of services of Seller, structure, status and activities of the Seller; organizational documents of the Seller; books, records, tax returns, appraisals and similar documents of the Seller; financial and performance statements of the Seller; and financing arrangements of Seller (collectively "***Seller Protected Information***") are and shall remain the confidential property of the Seller and are not, at any time, to be utilized, distributed,

copied or otherwise employed or acquired by Buyer or the Hospital, except as authorized in writing by Seller or except as may be required by law. Seller Protected Information used in this <u>Section 7.1</u> does not include any information included in the Purchased Assets or collected or prepared by Seller exclusively for the benefit of or on behalf of Buyer in the performance of the Services.

7.2    <u>Ownership</u>. Seller shall own all rights, title and interest, including but not limited to all intellectual property rights, in and to Seller Protected Information. To the extent that ownership in such Seller Protected Information does not automatically vest in Seller, Buyer hereby transfers and assigns to Seller, as applicable, all rights, title and interest which Buyer may have in the Seller Protected Information. Buyer shall complete and execute any other documents reasonably requested by Seller to confirm the conveyance of all Seller Protected Information.

7.3    <u>Property Interests/Confidentiality of Buyer's Protected Information</u>.

(a)    <u>Work Product</u>. "***Work Product***" means all work, ideas, inventions, discoveries, processes and improvements, computer programs, specifications, operating instructions, notes, technical drawings, designs and all related documentation (whether or not patentable) created or first reduced to practice by Seller, alone or with others, in providing the Services to Buyer under this Agreement and exclusively related to the Purchased Assets and used in the provision of the Services and not at any other location by Seller.

(b)    <u>Owner of Medical Records, Buyer Protected Information and Work Product</u>. "***Medical Records***" mean all information concerning the healthcare services provided to an individual in any aspect of healthcare delivery by in the Hospital, and/or documenting healthcare or health status of an individual. "***Buyer Protected Information***" means all information concerning Buyer's businesses or assets that is not generally known to the public, including, but not limited to, information relating to the assets, business, operations, management, performance, structure, status and activities of Buyer; organizational documents of Buyer; books, records, tax returns, appraisals and similar documents of Buyer; financial and performance statements of Buyer; and business plans and strategies of Buyer. Buyer shall own all rights, title, and interest, including but not limited to all intellectual property rights, in and to all Medical Records and other Buyer Protected Information and Work Product. To the extent that ownership in such Buyer Protected Information and Work Product does not automatically vest in Buyer, Seller hereby transfers and assigns to Buyer, all rights, title, and interest which Seller may have in such Buyer Protected Information and Work Product. Seller agrees to complete and execute any other documents reasonably requested by Buyer to confirm the conveyance of all Buyer Protected Information and Work Product. Except for Work Product, all copyrights, patents, trade secrets, know-how, trademarks and other intellectual property rights conceived, created or first reduced to practice by Seller in the course of Seller's performance of Services and other activities under this Agreement shall be solely owned by Seller.

7.4    <u>Use and Disclosure of Medical Records, Protected Information and Work Product</u>. Seller acknowledges that it will be given access to Medical Records, Buyer Protected Information and Work Product in connection with the Services, and Buyer acknowledges that it will be given access to Seller Protected Information in connection with the Services. Each Party shall comply with all applicable Laws concerning the privacy, security and confidentiality of Medical Records. Each of the Parties agrees that it will use commercially reasonable efforts and take steps to protect

-19-

and safeguard the Seller Protected Information, Buyer Protected Information and Work Product (as applicable), that such Party will not, directly or indirectly, use, disclose, distribute, or disseminate to any other person, entity, business or corporation or otherwise employ the Seller Protected Information, Buyer Protected Information and Work Product (as applicable), either for such Party's own benefit or for the benefit of another, except as required in the ordinary course of Seller's engagement by Buyer, upon the approval of the owner of such information or as required by Law. Each of the Parties shall use such Seller Protected Information, Buyer Protected Information and Work Product (as applicable) only in the course of its duties to the other Parties under this Agreement and for no other purpose.

7.5     Ownership of Records and Copies. Any and all documents, records and copies of records, including, but not limited to, hard copies or copies stored on a computer or disk, e-mail, databases, etc. pertaining to Medical Records, Buyer Protected Information and Work Product that are made or received by Seller in the course of its engagement with Seller shall be deemed to be the property of Buyer. Any and all documents, records and copies of records, including, but not limited to, hard copies or copies stored on a computer or disk, e-mail, databases, etc. pertaining to Seller Protected Information that are made or received by Buyer in the course of its engagement with Seller shall be deemed to be the property of Seller.

7.6     Return Upon Termination. Upon termination of this Agreement for any reason, (a) Seller shall deliver to Buyer all documents, records and copies of records, including, but not limited to, hard copies or copies stored on a computer or disk, e-mail, databases, etc. pertaining to Medical Records, Buyer Protected Information and Work Product and all other property of Buyer, to the extent in Seller's possession or under Seller's custody or control, within ten (10) business days, *provided however*, Buyer agrees that Seller may retain a copy of such information for litigation, dispute resolution purposes and similar purposes and as otherwise provided herein, and (b) Buyer shall deliver to Seller all documents, records and copies of records, including, but not limited to, hard copies or copies stored on a computer or disk, e-mail, databases, etc. pertaining to Seller Protected Information and all other property of Seller, to the extent in Buyer's possession or under Buyer's custody or control, within ten (10) business days.

7.7     Remedies. The Parties agree that an aggrieved party who is the beneficiary of any restriction contained herein may not be adequately compensated for damages for a breach of the covenants contained in this Article 7, and such aggrieved party shall be entitled to seek injunctive relief and specific performance in addition to all other remedies.

**ARTICLE 8**
**REGULATORY MATTERS**

8.1     Regulatory Compliance. The Parties agree that no part of this Agreement shall be construed to induce or encourage the referral of patients or the purchase of health care services or supplies. The Parties acknowledge that there is no requirement under this Agreement or any other agreement between Buyer (or its Affiliates) and Seller (or its Affiliates) that either party refer any patients to any healthcare provider or purchase any healthcare goods or services from any source. No payment made under this Agreement shall be in return for such referral or purchase. All direct marketing of the Hospital and community liaison activities shall be performed by Buyer employees or contractors.

8.2 <u>Representations and Warranties</u>. Each Party represents and warrants that it is and shall remain throughout the term of this Agreement in compliance, in all material respects, with all applicable Laws related to this Agreement and the Services to be provided hereunder, including without limitation, statutes and regulations related to fraud, abuse, false claims/statements, referrals, prohibition of kickbacks and HIPAA. The Parties further represent, warrant and covenant to each other that as of the date of this Agreement, and during the term of this Agreement, with respect to any applicable federal health care program as defined in Section 1128B of the Social Security Act (42 U.S.C. 1320a-7b(f)) or any State health care program as defined in Section 1128B of the Social Security Act (42 U.S.C. 1320a-7b(h)) (collectively, the "***Programs***"): neither (i) the representing Party; (ii) any individual with a direct or indirect ownership of five percent (5%) or more of the representing Party; nor (iii) any director, officer, or, to the knowledge of such Party, employee of the representing Party; has ever been debarred, suspended or excluded from any Program. Each Party covenants to immediately notify the other in writing if this representation is no longer true, or if such Party is sanctioned or has a civil monetary penalty levied under any program.

8.3 <u>Access to Records</u>. Until the expiration of ten (10) years after the termination of this Agreement, the Parties upon request shall make available to the Secretary, United States Department of Health and Human Services, the U.S. Comptroller General or any of their duly authorized representatives, this Agreement and all other books, documents, and records necessary to certify the nature and extent of the costs incurred by the Parties under this Agreement. If a Party purchases such services through a subcontract worth Ten Thousand Dollars ($10,000) or more over twelve (12) month period with a related organization, the subcontract shall also contain a clause permitting access by said Secretary, Comptroller General, and their respective representatives to the books and records of the related organization. Each Party shall promptly notify the other via telephone and in writing if such access is requested.

8.4 <u>HIPAA</u>. As required by law, the Parties shall execute Business Associate Agreements in order to comply with the requirements of HIPAA Privacy and Security Rules. The Business Associate Agreements are incorporated into this Agreement as <u>Schedule C</u>. In addition, each of Seller and Buyer acknowledges that in receiving or otherwise dealing with any records or information from the other about patients receiving treatment for alcohol or drug abuse, Seller and Buyer respectively and their respective staffs are bound by the provisions of the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records, 42 C.F.R. Part 2, as amended from time to time.

8.5 <u>Personal Information</u>. To the extent that any records maintained or stored by either Seller or Buyer pursuant to this Agreement contain Personal Information (as herein defined) about their respective personnel or patients, such Party shall comply with all applicable Laws related to maintenance or storage of such records. "***Personal Information***" shall mean: an individual's first name or first initial and last name in combination with any one or more of the following data elements when either the name or the data elements are not encrypted: (i) Social Security number; (ii) driver's license or Identification Card Number; or (iii) account number, credit or debit card number in combination with any required security code, access code or password that would permit access to an individual's financial account. In the event of a breach of the security of the system involving such records, Seller or Buyer, as the case may be, shall immediately notify the other via telephone and in writing and shall comply fully with the Identity Theft Protection Act of 2005. For

purposes of this paragraph, the term breach of the security system shall mean: (x) the unauthorized acquisition of unencrypted computerized data that compromises the security, confidentiality or integrity of personal information; or (y) any other unauthorized use or acquisition of, or access to, Personal Information.

# ARTICLE 9
## MISCELLANEOUS

9.1     Further Assurances. The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; *provided*, *however*, at the reasonable request of a Party, the other Party shall execute and deliver, or cause to be executed and delivered, such additional, reasonable instruments as the requesting Party may reasonably deem necessary to carry out the intent and meaning of this Agreement.

9.2     Notices. Unless otherwise provided in this Agreement, all notices and other communications required or permitted hereunder shall be made in accordance with Section 11.1 of the Purchase Agreement.

9.3     Assignment and Delegation. Except as otherwise provided herein, neither this Agreement, nor any rights or obligations hereunder, shall be assigned, in whole or in part, by either Party. Buyer may assign this Agreement upon prior written notice to Seller in connection with any restructuring, reorganization, merger, or sale of all or substantially all of its assets or equity interests, or similar transaction. Seller may not assign this Agreement without the prior written consent of Buyer except that Seller may assign this Agreement in connection with any restructuring, reorganization, merger, or sale of all or substantially all of its California assets or equity interests, or similar transaction, whether as a single transaction or through a series of one or more related or unrelated transactions, without Buyer's prior written consent, only in cases where (i) Seller provides at least sixty (60) days' prior written notice of same to Buyer, and (ii) Seller and Buyer have jointly obtained any necessary regulatory approvals or confirmed with applicable regulatory authorities that such assignment does not require prior regulatory approval.

9.4     Amendment; Waivers. Except as set forth in Section 1.5 with respect to an amendment to Schedule B, no amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

9.5     Entire Agreement. This Agreement (including all attachments and schedules attached hereto) constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all previous Contracts, statements, representations, warranties, covenants, or agreements, both written and oral, between the Parties with respect to the subject matter hereof. As between the Parties, no oral statements, representations, warranties, covenants, agreements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements, representations, warranties, covenants,

agreements or prior written material. All prior statements, representations, warranties, covenants, agreements or material, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.

9.6     Binding Effect. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns.

9.7     Applicable Law; Venue. Except as otherwise provided herein, all Actions (as defined in the Purchase Agreement) (whether in contract or tort) arising out of or relating to this Agreement, the negotiation, execution or performance of this Agreement, the transactions contemplated hereby, any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (including its statutes of limitations), without regard to conflicts of law principles. Except as otherwise provided herein, the venue of all disputes, claims, and lawsuits arising hereunder shall lie in the state and federal courts located in Los Angeles County, California. Each Party hereby waives, and agrees not to assert, any defense in any Action arising out of or relating to this Agreement or the subject matter hereof that such Party is not subject thereto or that such Action may not be brought or is not maintainable in such courts or that this Agreement may not be enforced in or by such courts or that such Party's property is exempt or immune from execution or that such Action is brought in an inconvenient forum or that the venue of such Action is improper.

9.8     Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY ACTION OR PROCEEDING WHATSOEVER AMONG THEM RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

9.9     Severability. In the event any provision (or portion thereof) of this Agreement, is held to be invalid, illegal or unenforceable under Law for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

9.10    Counterparts. This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals. Notwithstanding any oral agreement or course of conduct of the Parties or their

Representatives to the contrary, no Party shall be under any legal obligation pursuant to this Agreement unless and until this Agreement shall have been executed and delivered, or caused to be delivered, by each Party.

9.11 <u>No Third Party Beneficiaries</u>. Nothing in this Agreement shall confer any rights upon any Person other than Buyer and Seller, and each of their respective successors and permitted assigns.

9.12 <u>Completion of Seller's Patient Billing</u>. Subject to applicable Law, Seller shall be permitted access to all patient Medical Records and to Buyer's Medical Records staff for the purpose of completing Seller's final submission of patient Medical Records, including inpatient and Emergency Department records.

9.13 <u>Purchaser Cooperation</u>. Buyer shall, at Buyer's own expense, (a) provide to Seller, in a timely manner, any information, including, but not limited to, information in connection with Cost Reports, internal and external audits, and receivables, and (b) prepare or file with a Governmental Authority, in a timely manner, any filing, in each case for the actions described in the foregoing <u>clauses (a)</u> and <u>(b)</u>, to the extent reasonably requested by Seller in connection with Seller's performance of the Services.

9.14 <u>Use of Seller Forms</u>. Seller shall permit Buyer to use any patient care forms contained within the Purchased Assets until Buyer's supplier has supplied Buyer with Buyer-specific forms or until the supply of such forms is exhausted, whichever occurs first; *provided* that Buyer shall first cover Seller's logo on all such patient care forms. SELLER MAKES NO WARRANTIES OR REPRESENTATIONS AS TO SAID FORMS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE COMPLETENESS AND EFFECTIVENESS OF SAID FORMS AND THEIR COMPLIANCE WITH APPLICABLE LAW FOLLOWING THE CLOSING DATE, HOWEVER, SELLER REPRESENTS THAT, TO ITS KNOWLEDGE, SUCH FORMS WERE IN MATERIAL COMPLIANCE WITH APPLICABLE LAW AS OF THE CLOSING DATE. BUYER ACCEPTS THE FORMS FROM SELLER ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS WITH ALL WARRANTIES WITH RESPECT TO SAID FORMS BEING SPECIFICALLY DISCLAIMED BY SELLER.

9.15 <u>Force Majeure</u>. If either Party's performance is prevented, hindered or delayed by reason of any cause(s) beyond such Party's reasonable control, including, without limitation, war, , civil disorders, governmental acts, embargoes, fires, earthquakes, storms, hurricanes, acts of terrorism, or acts of God, such Party shall be excused from performance to the extent that it is prevented, hindered or delayed thereby, for so long as such cause(s) prevent or delay performance, provided such Party provides reasonably prompt notice of such force majeure event. Each Party shall promptly resume performance of their respective obligations hereunder upon termination of any force majeure event.

9.16 <u>Seller Policies</u>. To the extent Buyer elects to adopt or utilize any of Seller's Policies applicable to the Purchased Assets, Buyer acknowledges that Seller's Policies are provided for reference only, and that SELLER MAKES NO WARRANTIES OR REPRESENTATIONS AS TO SAID POLICIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE COMPLETENESS AND EFFECTIVENESS OF SAID POLICIES AND THEIR COMPLIANCE

WITH APPLICABLE LAW FOLLOWING THE CLOSING DATE. Notwithstanding the foregoing, Seller acknowledges and agrees that it shall remain responsible for its own compliance with applicable Law during the term of this Agreement to the extent Seller continues to rely on such policies in connection with the Services provided under this Agreement.

# Exhibit G-2

## Astrana Information Technology TSA

## INFORMATION TECHNOLOGY TRANSITION SERVICES AGREEMENT

This INFORMATION TECHNOLOGY TRANSITION SERVICES AGREEMENT (collectively, with all Schedules hereto, this "***Agreement***") is made and entered into as of July 1, 2025, by and between Prospect Medical Holdings, Inc., a Delaware corporation and its Affiliate Alta Hospitals System, LLC, a California limited liability company (collectively, "***Seller***"), and (i) Astrana Health, Inc., a Delaware corporation, and (ii) Alta Newport Hospital, LLC d/b/a Foothill Regional Medical Center, a California limited liability company ("***Buyer***"). Capitalized terms used but not defined herein shall have the meanings set forth in the Asset and Equity Purchase Agreement, dated as of November 8, 2024, by and between Seller and Buyer and the other parties thereto (the "***Purchase Agreement***"). Buyer and Seller are collectively referred to as the "***Parties***" and each individually as a "***Party***."

## RECITALS:

**WHEREAS**, pursuant to the Purchase Agreement, as of the date hereof Buyer is acquiring the Acquired Equity Interests and Purchased Assets and assuming the Assumed Liabilities from Sellers;

**WHEREAS**, in connection with such acquisition, Buyer and Seller desire to memorialize certain understandings regarding the transitioning of certain services related to the Acquired Equity Interests, Purchased Assets and Assumed Liabilities;

**WHEREAS**, prior to the Effective Date, Seller provided certain information technology services to the Hospital;

**WHEREAS**, following the Closing Date, Buyer will operate the Hospital Business and desires to be assured of its access to certain information technology services, on a transitional basis, provided by Seller prior to the Effective Date;

**WHEREAS**, concurrently with the execution of this Agreement, the Parties have entered into a Purchased Services Transition Services Agreement for the provision of certain transitional management services (the "***Purchased Services TSA***"); and

**WHEREAS**, in order to facilitate the orderly transition of the operation of the Hospital and the Hospital Business from Seller to Buyer pursuant to the Purchase Agreement, Seller is willing and has agreed to provide Buyer with certain information technology services pursuant to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties do hereby agree as follows:

## SECTION 1
## INFORMATION SERVICES

**1.1**     <u>Scope of Services</u>.

(a)     Subject to and in accordance with the terms and conditions set forth herein and in Schedule A attached hereto, Seller shall provide to Buyer those certain information technology services set forth on Schedule A (the "***Information Services***"), either directly or, with Buyer's prior written consent, through outsourcing arrangements in exchange for the Fees (defined below) set forth in Schedule A. For clarity, Buyer consents to the outsourcing arrangements identified under the "Resource Vendors" heading on Schedule A. Except for those services and items identified as excluded from the Information Services on Schedule A, if any information technology services and support historically provided to the Hospital within the six (6) months prior to the Effective Date and reasonably needed to provide or make available the Information Services and Supported Software Applications under this Agreement in accordance with Steady State (as defined below) were inadvertently omitted by the Parties from Schedule A, then, unless such services are listed as an excluded service or item on Schedule A, the Parties will enter into a Change Order (as defined below) pursuant to Section 1.1(c) to add such services ("***Included Services***") to Schedule A, and such Included Services thereafter will be deemed included within the Information Services. If such Included Services were provided by Seller to the Hospital prior to the Effective Date under that certain Support Services Agreement, effective as of March 31, 2023, by and between Prospect Medical Holdings, Inc. and PHP Holdings, LLC, on behalf of itself and its subsidiaries (the "***SSA***"), such Included Services will be provided at no additional cost to Buyer.

(b)     The Information Services shall include support of the software applications identified on Schedule A (the "***Supported Software Applications***"), as such support is further described in Schedule A and subject to the limitations and exclusions described therein, and, to the extent Schedule A indicates that Buyer will have direct access to a Supported Software Application, access to such Supported Software Application. If any software application was being used by the Hospital within the six (6) months prior to the Effective Date that is reasonably needed to operate the Hospital in accordance with Steady State and such software application was inadvertently omitted by the Parties from Schedule A, then the Parties will enter into a Change Order (as defined below) pursuant to Section 1.1(c) to add such software application to Schedule A, and such software application thereafter will be deemed included within the Supported Software Applications. For any omitted Supported Software Application which the Parties add to Schedule A pursuant to a Change Order, if the omitted Supported Software Application was supported for the Hospital under the SSA, Seller may only charge those Pass-Through Expenses that are documented in the applicable Change Order, which shall not exceed Buyer's pro-rata portion of such Pass-Through Expenses in relation to other facilities owned, managed or operated by Seller that utilize or access such Supported Software Application, if any.

(c)     Buyer may periodically engage Seller in good faith discussions regarding whether Buyer anticipates additional services related to, but not included in the Information Services provided hereunder, including, without limitation, professional or consulting services, may be reasonably necessary to facilitate the transition of the Hospital to Buyer ("***Additional Information Services***"). In the event that Buyer requests Additional Information Services and Seller agrees to perform such Additional Information Services, the Parties shall enter into a written change order (a "***Change Order***") to cover such Additional Information Services and memorialize any Fees and Pass-Through Expenses (each as defined below) relating to such Additional Information Services. Changes or the addition of any services to Schedule A shall become effective only upon the execution of a Change Order by officers of both Buyer and Seller. In addition to the Fees and Pass-

Through Expenses described in a Change Order, each Change Order shall describe the impact of the change, including any additional services to be performed, on the respective obligations of each Party to a schedule and is incorporated into the applicable schedule once executed by the Parties. For each Change Order, a change request shall be prepared by the Party requesting the change (a "***Change Request***") and the other Party will prepare a document describing the estimated impact of a change (a "***Change Response***"). Buyer may submit Change Requests using the change management software and process described in <u>Attachment 1</u> to <u>Schedule A</u>. The Parties will evaluate and consider any Change Request and the corresponding Change Response; provided, however, that neither Party shall be required to agree to any Change Order, but approval of a Change Request shall not be unreasonably withheld. Unless and until a Change Order is executed by both Parties, neither Party shall have any obligation to perform any requested change. All reasonable out-of-pocket costs incurred by Seller to perform Buyer's request for Additional Information Services shall be borne by Buyer as and to the extent documented under the Change Order. For avoidance of doubt, a Change Order setting forth the applicable Fees and Pass-Through Expenses shall be required to amend <u>Schedule A</u> to include Supported Software Applications identified pursuant to <u>Section 1.1(b)</u>.

(d)     Information Services do not include, and the Hospital will continue to be responsible as of and following the Effective Date for, the information services identified as "exclusions", "exceptions" or similar designation on <u>Schedule A</u>. In furtherance of the foregoing, Seller will provide Buyer and the Hospital's local IT resources with reasonably available or ascertainable information regarding the use, support, maintenance, and customer relationship contacts in connection with any excluded information services as reasonably requested by Buyer or the Hospital's local IT resources, provided, Seller shall not be required to disclose any Confidential Information in connection with such request. Seller shall use commercially reasonable efforts to promptly respond to reasonable information requests made by Buyer and the Hospital's local IT resources and the Parties shall (i) stay in regular communication, including with the Hospital's local IT resources, with respect to the performance of Information Services at least in the same manner and to the same degree as Seller and the local IT resources communicated prior to the Effective Date, and (ii) continue to be available to each other (including the Hospital's local IT resources) to reasonably assist in the provision of support of Information Services to the Hospital.

(e)     Buyer may receive and use the Information Services as necessary for its operation of the Hospital, and Buyer's receipt and use and Seller's provision and performance of the Information Services shall conform to the procedures, requirements and limitations set forth in this Agreement. Unless otherwise agreed in writing by the Parties, Seller shall not be obligated to provide the Information Services to any Person other than Buyer.

**1.2**    <u>Standards</u>.

(a)     <u>General</u>. Seller hereby covenants, represents and warrants it will perform and provide, as applicable, the Information Services: (1) through qualified personnel, (2) in accordance with all applicable Laws, and (3) at the same level, in the same manner, and same duty of care as Seller historically provided such services to the Hospital prior to the Effective Date, and with the same degree of priority and same degree of treatment in relation to its other facilities within its enterprise ("***Steady State***"). Seller shall not be required to provide any Information Service, or to

take any action, or omit to take any action, that would require Seller to breach or violate: (i) any applicable Law; (ii) any executed written agreement in effect as of the Closing Date between Seller and a non-affiliated third party which directly relates to the Information Services and Supported Software Applications; or (iii) Seller's corporate compliance program materials and policies (as may be amended, restated or otherwise revised from time to time in accordance with <u>Section 1.2(e)</u>), including Seller's code of ethics and Seller's policies and procedures related to the operation of the Facilities, including personnel policies, credentialing policies, privacy and security policies, HIPAA policies and patient transfer policies (collectively, "***Seller's Policies***"); provided, Seller represents and warrants that Steady State performance of the Information Services and provision of the Supported Software Applications does not breach or violate any of Seller's Policies. Seller shall promptly (A) notify Buyer or its Primary Coordinator of such potential breach or violation of this Agreement, and (B) with respect to a potential breach or violation of <u>Section 1.2(a)(ii)</u>, provide upon Buyer's request a copy of the executed written agreement (redacted as needed), and the Parties shall utilize the Governance Procedures (defined below) to agree on commercially reasonable steps to try to avoid, mitigate, or remedy the potential breach or violation or a commercially reasonable workaround or alternative for the affected Information Service(s) or Supported Software Application(s), provided, however, each Party shall also take its own commercially reasonable steps to mitigate or remedy such breach or violation.

(b)    <u>Changes; Application Updates</u>. Seller may, upon thirty (30) days' advance written notice to Buyer and in consultation with Buyer in connection with any policy changes that may affect Buyer's receipt of Information Services, change, alter, substitute or supplement its standards and procedures for performing the Information Services from time to time (i) as may be done for the same or substantially similar services provided to other similarly-situated hospitals owned by Seller or its Affiliates, (ii) as necessary to comply with the contractual requirements of any applicable Supported Software Application or outsourced Information Service, or (iii) as may be required by applicable changes of Law (as reasonably determined by Seller); provided, however, that no such changes, alterations, substitutions, or supplements to Seller's standards or procedures for performing the Information Services shall result in a material degradation of the Steady State performance or provision of the Information Services. Except for updates described in <u>Section 5.3</u>, in the event that a new or updated version (an "***Application Update***") of any Supported Software Application is made available to Seller by the applicable Supported Software Application vendor (the "***Software Application Vendor***"), if such Application Update is being implemented on an enterprise-wide basis or on a general basis at Seller's similarly-situated hospitals and facilities, such Application Update will be implemented by Seller with respect to the Hospital and Buyer agrees to receive such Application Update. In furtherance of the foregoing, Seller shall provide Buyer written notice of Application Updates on the same timeline and in the same frequency as similarly situated facilities within Seller's or its Affiliates' enterprise. Buyer shall bear a pro rata portion of the out-of-pocket cost of the Application Update based on how Seller has historically allocated such cost to other similarly-situated hospitals or facilities owned, operated, or managed by Seller. In the case of any Application Updates that are not being implemented on an enterprise-wide basis or on a general basis at Seller's similarly-situated hospitals and facilities, and that are not subject to <u>Section 5.3</u>, Buyer will be informed by Seller of such Application Updates and their associated additional costs, if any, and can choose to implement such optional Application Update or not, provided that Seller shall not be responsible or liable for any failure, delay or other impact on the provision or receipt of the Information Services or Supported Software Applications that is caused by the failure to implement such Application Update. If Buyer chooses to implement the

Application Update, the Parties shall execute a Change Order documenting such Application Update and the associated Fees. Seller shall implement all enterprise-wide Application Updates at no additional implementation Fee to Buyer unless such update is specifically requested by Buyer as a custom deliverable, in which case, Buyer and Seller shall mutually agree upon the reasonable costs related thereto, which shall be documented in a Change Order between Buyer and Seller.

(c)     <u>Maintenance Shutdowns</u>. During the term of the Agreement, Seller agrees to provide the Information Services and all error resolution activities, maintenance, and support in material accordance with the help desk service levels set forth in <u>Schedule D</u>. Seller further agrees: (i) to use commercially reasonable efforts to enforce on Buyer's behalf in accordance with Steady State and whether or not Seller is enforcing such terms on behalf its other similarly-situated hospitals and facilities, any service level availability targets or support terms provided by each Software Application Vendor; (ii) that Seller's help desk will serve as the Tier 1 help desk regarding error resolution activities, maintenance, and support for Buyer's access and use of the Supported Software Applications; and (iii) to use commercially reasonable efforts to enforce contractual covenants in Third Party Contracts with Software Application Vendors and other third parties to ensure such parties reasonably cooperate with, promptly communicate with, and otherwise assist Buyer and the Hospital in relation to error resolution activities, maintenance, support of the Information Services or Supported Software Applications, in accordance with Steady State and whether or not Seller is enforcing such terms on behalf its other similarly-situated hospitals and facilities; provided, Seller shall not be required to enforce such terms to the extent doing so would adversely affect the rights of Seller or its Affiliates under such Third Party Contract. In the event Seller opts not to enforce such terms in accordance with the foregoing, the Parties shall discuss and use commercially reasonable efforts to implement a solution to address the vendor performance issue. In the event an Information Service or Supported Software Application fails to meet any service level availability targets or breaches any service level availability terms, in each case, provided by the third party or Software Application Vendor, Seller shall pass-through the applicable pro-rata portion of any service level credits made available to Seller by such third party or Software Application Vendor. If there is a disruption of Information Services to the Hospital Business, then Seller shall use the same level of diligence to restore (or have restored) such Information Services as it would use to restore (or have restored) services to similarly situated hospitals owned by Seller or its Affiliates under similar circumstances (including taking into account the health and safety of patients and obligations under applicable Law). Seller may shut down or suspend Information Services for emergency or routine scheduled maintenance purposes; provided, emergency and routine scheduled maintenance shall be performed pursuant to the terms of <u>Schedule D</u>. In the event of any unavailability of the Information Services for any reason, except scheduled downtime and events pursuant to <u>Section 6.19</u>, Seller will notify Buyer in accordance with the notification process and policies set forth in <u>Schedule D</u>. For clarity, except to the extent provided herein, this <u>Section 1.2(c)</u> does not apply to Supported Software Applications or Information Services provided by third parties, which are subject to the terms of <u>Section 1.2(d)</u> or <u>(f)</u>, as applicable.

(d)     <u>Subcontracting</u>. Seller may not delegate any of its Information Services (in whole or in part) hereunder to a new subcontractor except in conformance with the requirements of this <u>Section 1.2(d)</u> or in accordance with <u>Section 6.3</u>. If Seller desires to delegate Information Services to a new subcontractor after the Effective Date other than in accordance with <u>Section 6.3</u>, Seller shall: (i) conduct commercially reasonable vendor diligence, (ii) following completion of vendor

diligence, provide in writing the results of such vendor diligence to Buyer upon Buyer's request, and (iii) provide Buyer with at least sixty (60) days' written notice prior to the effective date of any delegation of any Information Service to a new subcontractor. If Buyer has reasonable material concerns with the selected subcontractor, Buyer may notify Seller of its objections and the Parties shall use commercially reasonable efforts to develop and implement a solution to address such concerns. Seller does not guarantee the availability of any outsourced Information Services, although Seller will provide help desk support in accordance with Section 1.2(c) in the event of a material disruption or other problem experienced by Buyer in connection with the use of any such service. To the extent Seller is unable to resolve a problem with a third party provided Information Service or Supported Software Application through ordinary course help desk support as described in Section 1.2(c), Seller will use commercially reasonable efforts (and best efforts if the Information Service implicates health or safety matters relating to patients of the Hospital Business) to procure an alternative provider or to provide such service directly. If the Information Services are not provided consistent with the requirements of this Agreement as a result of any non-performance by an outsourced provider under any outsourcing arrangement, Seller shall exercise its rights and remedies against such non-performing provider to remedy such non-performance to the same extent that Seller would pursue such rights and remedies for any similarly situated hospital owned by Seller or its Affiliates in addition to Seller's other obligations under this Agreement. Provided Seller uses commercially reasonable efforts to mitigate cost increases, in the event that Seller's costs to provide Information Services under this Agreement are increased as a result of changes in any outsourcing arrangement or Seller's decision to provide directly any Information Services previously provided through an outsourcing arrangement, Buyer acknowledges that the Fees provided for in Section 2.1 below shall increase on a pass-through basis; *provided*, that (x) Seller shall notify Buyer in writing of any fee increase as soon as practicable, (y) any increase to Fees is exclusive of any Seller FTE and legal costs incurred in the process of procuring such changed outsourcing arrangement, and (z) and any such increase to Fees shall be implemented in a manner consistent with, and on substantially the same terms and conditions as, similar fee increases implemented at similarly-situated hospitals owned by Seller or its Affiliates.

(e)     Buyer Obligations. Buyer shall reasonably cooperate with Seller in the performance of Information Services to enable Seller to discharge its obligations hereunder in a complete and timely manner. Without limiting the generality of the foregoing, Buyer (i) shall, upon prior written request by Seller, provide Seller with (x) access to its facilities, and remote access to the applicable systems and equipment, in each case as is reasonably necessary for Seller, its Affiliates or any subcontractor to perform the Information Services, (y) the data, data feeds, information and documentation of Buyer that is requested by and reasonably necessary for Seller to perform the Information Services, (and, in each case of the foregoing (x)-(y), Seller shall comply with any applicable policies and procedures of Buyer that have been provided or made available by Buyer in writing in connection with such facilities, systems, equipment, and information and documentation) and (z) reasonable access to necessary Buyer personnel and timely decisions as necessary for Seller to perform its obligations hereunder; (ii) shall comply, and shall cause its employees and personnel to comply, with applicable Laws in the receipt and use of the Information Services; and (iii) remains solely responsible, as between Buyer and Seller, for the content, accuracy and adequacy of the data as provided or transmitted by Buyer or its employees or personnel to Seller for processing or use in connection with the performance of the Information Services. Except as necessary in connection with Seller's obligations under applicable Law, Seller

shall not have any responsibility for verifying the accuracy or completeness of any information given to it by or on behalf of Buyer; provided, to the extent necessary for the provision of the Information Services, Seller will exercise reasonable diligence in reviewing the data it uses or relies on and shall promptly notify Buyer if it becomes aware of any material inaccuracies, omissions, or inconsistencies in such information. Buyer agrees to use the Information Services and Supported Software Applications in accordance with those Seller's Policies attached within Attachment 2 to Schedule A. Seller agrees to notify Buyer of any material changes to Seller's Policies during the term of this Agreement and shall promptly provide written copies of any such updated Seller's Policies, provided, however, that no changes, revisions, or amendments to Seller's Policies shall result in a material degradation of the Steady State performance or provision of Information Services. For avoidance of doubt, in no event shall Seller's Policies materially lessen any obligations or responsibilities of Seller as it relates to the Information Services or Supported Software Applications. In the event of a conflict between Seller's Policies and the terms of this Agreement, the terms of this Agreement shall control; provided, the Information Security Requirements (as defined below) shall control with respect to the subject matter thereof.

(f)     Third-Party Contracts. Buyer acknowledges that Seller's ability to make available third-party applications to Buyer is limited by the terms of Seller's agreements for such third-party applications and, and further acknowledges and agrees that (i) Information Services or Supported Software Applications provided by third parties may be subject to term-limited licenses or contracts between Seller and applicable third parties (collectively, "***Third-Party Contracts***"), (ii) the renewal periods under the Third-Party Contracts may be for fixed periods, and (iii) Seller may not have the right to renew certain Third-Party Contracts. If during the term of an Information Service, Seller must renew or extend a Third-Party Contract, or obtain a new Third-Party Contract to replace a Third-Party Contract that is terminated for any reason other than for convenience by Seller without mutual agreement from Buyer or cannot be renewed or extended, in order to continue to provide the Information Services and Supported Software Applications to Buyer, then Buyer shall bear a pro rata portion of the out-of-pocket costs for such renewal, extension or new Third-Party Contract, based on how Seller has historically allocated such cost to other similarly-situated hospitals or facilities owned, operated, or managed by Seller, for the duration of the term offered by the vendor, regardless of whether Buyer later terminates the related Information Service pursuant to Section 4; provided, if the renewal, extension or new Third-Party Contract is obtained solely to continue providing the Information Services and Supported Software Applications to Buyer under this Agreement, then Buyer shall pay one hundred percent (100%) of such out-of-pocket costs (excluding any outstanding unpaid and past due amounts under such contract that are not otherwise discharged). Notwithstanding the foregoing, if during the term of an Information Service, Seller must obtain a new Third-Party Contract to replace a Third-Party Contract that is terminated due to Seller's breach of such Third-Party Contract (except where such breach was caused by acts or omissions of Buyer or the Hospital) or exercise of its right to terminate early for convenience, then Seller shall bear Buyer's pro rata portion of the out-of-pocket costs in obtaining a new Third-Party Contract. In the event that a Third-Party Contract is terminated, or Seller is unable, using commercially reasonable efforts, to renew or extend any applicable Third-Party Contract, the impacted Information Service or Supported Software Application shall terminate as of the date of expiration of such Third-Party Contract; *provided*, the Parties will use commercially reasonable efforts to cooperate in any lawful and economically feasible alternative arrangement that provides substantially similar functionality as the affected Information Service or Supported Software Application such that Buyer shall receive materially similar Information Services or

Supported Software Applications as originally contemplated by the Parties in this Agreement; *provided*, that Buyer shall bear a pro rata portion of the additional costs and expenses associated with such alternative based on how Seller has historically allocated such cost to other similarly-situated hospitals or facilities owned, operated, or managed by Seller; provided, if the alternative arrangement is obtained solely to continue providing the Information Services and Supported Software Applications to Buyer under this Agreement, then Buyer shall pay one hundred percent (100%) of such additional costs and expenses. In addition to and without limiting Seller's obligations under Section 1.2(c), for all Supported Software Applications and Information Services contracted by Seller under a Third-Party Contract, Seller shall use commercially reasonable efforts to enforce the representations, warranties, indemnities, license terms, and service levels contained in such Third-Party Contract, including each Third-Party Contract with a Software Application Vendor, for the benefit of Buyer and the Hospital consistent with the manner in which it enforces such terms for other similarly-situated hospitals or facilities owned, managed, or operated by Seller or its Affiliates.

(g)     Consents. Notwithstanding any provision of this Agreement to the contrary, if the provision of any Information Service as contemplated by this Agreement requires the consent, license, sublicense, or approval of any third party not previously obtained, Seller shall use commercially reasonable efforts to obtain such consent, license, sublicense or approval as necessary to provide the Information Services and Supported Software Applications in accordance with this Agreement. Seller has identified (i) on Schedule E, each Third-Party Contract or third-party agreement for which Seller has not yet obtained the necessary consent, license, sublicense or approval in order to provide an Information Service or Supported Software Application as of the Effective Date, and (ii) on Schedule A, the expiration date for each Third-Party Contract or third-party agreement which shall expire prior to the Expiration Date (defined below). Buyer shall reasonably cooperate with Seller in obtaining such third party consents, licenses, sublicenses, or approvals, necessary to permit Seller to perform, or otherwise make available to Buyer and the Hospital, the Information Services and Supported Software Applications set forth in this Agreement and shall bear the out-of-pocket costs and expenses required for and directly related to obtaining such consent, license, sublicense, or approval, regardless of the nature of such consent, license, sublicense or approval requirement, and whether incurred by Seller and to be reimbursed by Buyer, or to be incurred directly by Buyer, including, where Buyer is required to enter into a direct contract with such third party, provided such costs and expenses are submitted to Buyer for review with accompanying documentation sufficiently evidencing such costs and expenses. If Seller is unable to obtain the aforementioned third party consents, licenses, sublicense or approvals, the Parties shall, and shall cause each of their respective Affiliates to, use commercially reasonable efforts to cooperate in any lawful and economically feasible alternative arrangement that provides substantially similar functionality as the affected Information Service or Supported Software Application such that Buyer shall receive materially similar Information Services or Supported Software Applications as originally contemplated by the Parties in this Agreement; *provided*, that Buyer shall pay the reasonable and additional costs and expenses directly associated with such alternative, provided further that such costs incurred by Seller are submitted to Buyer for review with accompanying documentation sufficiently evidencing such costs. In the event the provision of Information Services requires disclosure to Buyer of third-party confidential or proprietary information, materials, or technology in possession of Seller, Seller shall obtain all consents necessary for Buyer to receive third-party confidential or proprietary information, materials or technology which are reasonably required for Seller to provide and for Buyer to

receive the Information Services.

(h)     Data Migration. Seller shall provide all necessary data extraction, migration, testing, configuration and other related services described under this Section 1.2(h) that are requested by Buyer (collectively, "***Migration Services***") to ensure Buyer timely receives, and Seller shall continue to make available to Buyer, in each case, in a legally compliant manner: (i) electronic Medical Records (defined below), and (ii) all data that (A) was purchased by Buyer as a Purchased Asset under the Purchase Agreement; (B) is necessary for the operation of the Hospital Business; or (C) is Buyer and Hospital data processed in connection with and during the term of this Agreement, and the term of the Purchased Services TSA, by Seller or its Affiliates or subcontractors, in each case to the extent such records or data resides in Seller's Data Center System or any of the Supported Software Applications provided or made available hereunder. The Migration Services shall be Additional Information Services to be described in a Change Order and shall be provided at Buyer's cost and expense. Such Change Order shall also describe, at a minimum, (1) the data, information, and records to be provided to Buyer, (2) the format, and file in which such records shall be provided, (3) any testing or sampling procedures that will be utilized to ensure compatibility, integrity, accuracy, and completeness of such records, and (4) any delivery and acceptance criteria or procedures regarding such records. In furtherance of the foregoing, the Parties agree as follows:

(i)     Within ten (10) calendar days of the Effective Date of this Agreement, the Parties shall establish a "Migration Services Committee" with the appropriate business and technical subject matter experts of each Party who have the authority to make operational decisions on behalf of each such Party. The Migration Services Committee shall meet at least weekly to, at a minimum, (1) establish a plan and timeline to initiate and complete the Migration Services, (2) determine all the locations where Buyer's and the Hospital's data reside and the applicable data in scope of the Migration Services, (3) establish and determine the technical and operational requirements of each Party to facilitate and perform the Migration Services, and (4) establish reasonable testing procedures for any data migration or extraction and the frequency for extracting and migrating all such data.

(ii)     As part of the Migration Services, Seller shall conform the format of the data to a usable format reasonably requested by Buyer. In furtherance of the foregoing, the Migration Services Committee shall collaborate in good faith to reasonably document and define any data specifications and file formats to ensure compatibility with Buyer's software, applications, and systems. If issues with format, file integrity, readability, accuracy or compatibility are identified during testing, the Migration Services Committee will promptly cooperate to resolve such issues and make any necessary adjustments. Upon the expiration or termination of this Agreement, Seller will deliver to Buyer a final "catch-up" extract of data. This final extract will include all data and information provided by Buyer to Seller or otherwise processed by Seller, its Affiliates, or its subcontractors under this Agreement and the Purchased Services TSA between the date of the prior delivery of the batch extract(s) and the later of the effective date of the expiration or termination of this Agreement or the Purchased Services TSA. The Parties will apply the same testing and acceptance procedures as applied to prior batch extract(s) or otherwise agreed by the Parties to each catch-up extract.

(iii)     Each Party will designate a technical contact to facilitate prompt communication and resolution of any data extraction or compatibility issues, which may be the Primary or Service Coordinator of each Party. Any changes to data specifications, extraction methods, or file formats following execution of a Change Order for the Migration Services require the written consent of both Parties pursuant to a subsequent Change Order.

(iv)     Buyer acknowledges that data migration from Seller's Data Center System, network, and/or the Supported Software Applications may require the services of third-party vendors, and that different Supported Software Applications have different lead times for completing such migration. Depending on the complexity of the Migration Services involved or if Seller is unable to perform the Migration Services, Seller may, in consultation with Buyer at all times, engage a third-party vendor to perform the Migration Services at Buyer's cost (such cost to be solely approved by Buyer in advance prior to being incurred by Seller, such approval not to be unreasonably withheld) and subject to the terms of this Agreement. If Buyer objects to the cost of data migration presented by a third party, Buyer shall have the right to negotiate directly with such third party or an alternative third party and Seller shall reasonably cooperate with Buyer in Buyer's efforts. In furtherance of the foregoing, the Parties will cooperate in good faith to select an outside third-party vendor that holds itself out as being capable of performing the applicable extraction and migration, provided, however, if the third-party vendor was selected by Seller and contracts directly with Seller, Seller shall remain obligated and responsible for the completion of any Migration Services and shall be responsible and liable for the acts and omissions of any such third-party vendor. Seller shall not be responsible for any delay in performing the Migration Services to the extent such delay is caused by a force majeure event set forth in <u>Section 6.19</u>, and Seller shall promptly resume the performance of the Migration Services as soon as reasonably practicable.

(v)     In the event the Parties cannot complete the transfer of Buyer's or the Hospital's data prior to the expiration of this Agreement, then, the Parties shall enter into a Change Order to extend the term of this Agreement for up to an additional three (3) months, subject to an increase in the applicable Fees for any Information Services that need to continue as a result of the Data Migration not being completed. Except as agreed pursuant to a Change Order, Seller shall be under no obligation to provide any Information Services to Buyer after the expiration or termination of this Agreement or expiration of the applicable "Service Term" set forth opposite the description of the applicable Information Service on <u>Schedule A</u>.

(vi)     After the performance of the Migration Services, if any of Buyer's or Hospital's data remains in the custody or control of Seller, Seller (A) will treat and hold such data as the Confidential Information of Buyer; (B) will, at Buyer's election, return or securely delete any such data as soon as reasonably possible; and (C) will not use or further disclose such data to any other party except to the extent authorized by Buyer or required by applicable Law. Following migration of such data to Buyer, Buyer assumes all responsibility for any legal, regulatory and other data inquiries, either in process or arising after the date of such migration, including follow-up inquiries to existing requests, with respect to such data.

(vii)     The Parties agree that delivery by Seller to Buyer of all electronic and paper copies of patient lists, patient medical and treatment records (including images), patient billing records, medical staff, personnel records and other records, including accounts receivable records, equipment records, medical and administrative libraries, files, charts, books, records, ledgers, data,

databases and documentation, each to the extent contained within the Purchased Assets (collectively, "***Medical Records***") is necessary and critical for the provision of healthcare services, continuity of care, and quality of care to patients and that irreparable damage may occur to each Party or to patients if Seller fails to perform its obligations, undertakings, covenants or agreements relating to Migration Services for Medical Records. Accordingly, Seller agrees that a breach of the Change Order respecting Migration Services for Medical Records may cause immediate, irreparable, significant, and continuing harm and injury to Buyer entitling Buyer to seek equitable remedies, including specific performance, to enforce the terms and provisions of such Change Order in any court without proof of actual damages, in addition to any other remedy to which Buyer may be entitled to at law or in equity.

(i)     <u>Access to Books and Records</u>. Seller shall make available to Buyer in a shared folder or folders, in each case to the extent not migrated as part of the Migration Services: (i) records, including (A) all non-electronic Medical Records, (B) all financial, construction plans and specifications, documents, catalogs, books, files, operating policies and procedures, manuals and current personnel records, and all files, charts, books, records, ledgers, data, databases and documentation, in each case primarily used, held for use in or related to the Healthcare Business, and (C) all other data, books, records, information, and other data, in each case (A)-(C) to the extent such data, books, records, information, and other data (x) was purchased by Buyer as a Purchased Asset under the Purchase Agreement; (y) is necessary for the operation of the Hospital Business; or (z) is Buyer and Hospital data and information processed in connection with and during the term of this Agreement, and the term of the Purchased Services TSA, by Seller or its Affiliates or subcontractors ("***Books and Records***"). For clarity, Books and Records will be provided (a) in their current form (i.e., Seller will have no obligation to modify any such Books and Records prior to or after making the same available in the shared folder(s)) and (b) Seller is not responsible for the completeness of any Books and Records provided by third-party vendors. Seller's responsibility with respect to any Books and Records requested from third-party vendors will be to make the same available in the shared folder(s).

(j)     <u>No Abandonment</u>. Seller shall not abandon this Agreement or, except as excused pursuant to this Agreement, including pursuant to <u>Section 1.2(e)</u>, <u>Section 5.2(b)</u> or <u>(d)</u>, or <u>Section 6.19</u>, abandon or refuse to provide or perform all or any part of the Information Services. If Seller breaches or threatens to breach this <u>Section 1.2(j)</u>, Seller agrees that Buyer shall be irreparably harmed, and, without any additional findings of irreparable injury or harm or other considerations of public policy, Buyer shall be entitled to seek an injunction compelling specific performance by Seller of its obligations under this Agreement without the necessity of posting any bond or other security.

(k)     <u>Limitations</u>. Notwithstanding anything to the contrary contained herein, (i) Seller shall not be required to provide Buyer or the Hospital with (x) extraordinary levels of Information Services, or (y) the benefit of systems, equipment, facilities, training, or improvements procured, obtained, or developed by Seller after the Effective Date, unless and to the extent such systems, equipment, facilities, training or improvements are necessary for the provision or performance of the Information Services, and (ii) nothing in this Agreement will require Seller to unduly favor the business of Buyer over its own business. Seller will train Buyer on use of the Information Services and use of Supported Software Applications, upon Buyer's request, at no additional cost to Buyer, up to a maximum of twenty (20) virtual or in-person hours; provided, in-person training shall be

provided on-site at Seller's locations only and provided, further, any additional training requested by Buyer shall be documented pursuant to an executed Change Order and shall be charged at a FTE cost consistent with FTE allocations for other similar services.

**1.3**     Independent Contractor. Neither Party shall have any right or authority to enter into any contract, commitment or agreement or incur any debt or liability in the name of the other Party, and in no event shall this Agreement, or the provision of the Information Services, be construed to imply or provide that either Party has granted the other any express or implied right to create any obligation on behalf of or in the name of the other, or to bind the other in any manner with respect to either Party's relation with third parties. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between the Parties, or their respective employees, agents, or contractors and nothing in this Agreement shall be construed to create a joint venture, agency, or other legal relationship between Seller and Buyer which could result in either Party being responsible or liable for the acts or omissions of the other Party. Each Party shall act under this Agreement solely as an independent contractor and not as an agent of the other Party. For the avoidance of doubt, nothing in this Agreement shall preclude or restrict Seller from providing Information Services to its other hospitals and businesses or to any third party, provided the provision of services to Seller's other hospitals and business or to any third party shall not diminish or degrade the provision of Information Services to Buyer.

**1.4**     Personnel. In providing Information Services, Seller shall use its own personnel or those of its Affiliates or subcontractors. In carrying out its duties and responsibilities under this Agreement, Seller shall dedicate a sufficient number of Seller employees, Affiliates, and third-party vendors or subcontractors as reasonably necessary for the provision of the Information Services in accordance with this Agreement. Seller shall be responsible for all actions and omissions of such personnel. Each Party shall be solely liable for the payment of all salaries, wages, and any unemployment, social security, and other payroll taxes for its officers and employees, including any related assessments or contributions required by Law. In providing the Information Services, any employee of Seller providing such services will remain the employee of Seller or its applicable Affiliate and Seller or its Affiliate will bear the sole responsibility for payment of such employee's wages, benefits and all withholding obligations to federal and state taxation and insurance authorities. No Persons providing Information Services will be considered employees of Buyer. No employee of Buyer shall be considered an employee of Seller by virtue of such employee's participation in the Information Services process, whether as a Primary Coordinator or Information Service Coordinator (as such terms are defined below) or otherwise.

**1.5**     Representatives; Governance Procedures.

(a)     Representatives. Buyer and Seller will each designate a representative to act as its primary contact person to coordinate the provision of the Information Services (collectively, the "***Primary Coordinators***") (i) with whom the other Party may communicate about current issues, needs, and problem resolution; (ii) who has authority to make prompt decisions on a Party's part; (iii) who will be reasonably accessible by the other Party; and (iv) who will be reasonably knowledgeable about the policies, procedures and products of the Primary Coordinator's respective Party in connection with the provision or use of the Information Services and Supported Software Applications. From time to time during the term of this Agreement, each Primary Coordinator may designate, or remove from such designation, one or more service coordinators

for each specific Information Service (the "***Service Coordinators***"), in each case by amending Schedule B hereto to name such Service Coordinator and the applicable Information Service for which such Service Coordinator is responsible. Each Party may treat an act of a Primary Coordinator or Service Coordinator of the other Party as being authorized by such other Party; provided, however, that no Primary Coordinator or Service Coordinator has authority to amend or act in a manner inconsistent with this Agreement. Buyer and Seller will advise each other promptly in writing of any change in the Primary Coordinators or any Service Coordinator for a particular Information Service. All communications relating to the provision of the Information Services will be directed to the Service Coordinators for such Service with copies to the Primary Coordinators. Neither Party shall make service requests directly of any employee of the other Party other than through a Primary Coordinator or Service Coordinator of the other Party or their designees. Each Party's initial Primary Coordinator is identified on Schedule B. From time to time during the term of this Agreement, each of Buyer and Seller may, by written notice to the other, remove, replace or appoint a new Primary Coordinator of such noticing Party.

(b)     Governance Procedure. The Parties will form a governance committee to facilitate communications between them ("***Governance Committee***"). The Governance Committee shall be composed of the Primary Coordinator of each Party, along with an equal number of other representatives of each Party, as mutually agreed to by the Parties. The Governance Committee shall meet in person or by telephone (as mutually agreed by the Parties) on a weekly basis for the first three (3) months after the Effective Date and, thereafter, twice monthly or more frequently as may be reasonably requested by either Party. Topics to be reviewed and discussed by the Governance Committee at such meetings may include: (i) the status of the Parties' activities under this Agreement, (ii) the status of any issues related to this Agreement that may impact the delivery of the Information Services or either Party's obligations under this Agreement, (iii) any upcoming projects and anticipated downtime or system changes, and (iv) any other matters related to this Agreement that may be reasonably raised by either Party. The Governance Committee shall serve as informal arbiters of issues brought before the Governance Committee and shall work diligently, cooperatively, and in good faith to resolve such issues as they arise, and prior to the initiation of formal dispute resolution procedures pursuant to the Purchase Agreement. The governance procedures described in this Section 1.5(b) are referred to herein as the "***Governance Procedures***."

**1.6**     Cooperation With Respect to Services. Each Party shall make available to the other Party any information reasonably required or reasonably requested by such other Party regarding performance of Information Services, and shall be responsible for timely providing that information and for the accuracy and completeness of that information as provided or made available by the Party. Without limiting any of the other terms set forth herein, the Parties shall cooperate with each other in good faith in all matters relating to the provision and receipt of Information Services. The Parties shall cooperate with each other in making such information available as needed in the event of any and all internal and external audits that are required to comply with applicable Law, provided any disclosed information remains subject to the confidentiality terms and obligations set forth in Section 6.12. If this Agreement is terminated in whole or in part, the Parties shall cooperate with each other in all reasonable respects in order to effect an efficient transition and to minimize disruption to the business of both Parties. Neither Party will incur liability in reasonably relying on or complying with any such instructions, authorizations, approvals, or other information supplied by the other Party, such Party's affiliates, or any third party acting on behalf of such Party; provided, for clarity, Buyer shall retain ultimate

responsibility for and control over its operations and the operation of the Hospital Business. Without limitation to the foregoing, the Parties shall use good faith efforts to complete the transition of the Hospital Business as promptly as possible following the Closing Date.

**1.7**    Information Access Rights. Buyer shall allow Seller and Seller's Affiliates, at Seller's or its Affiliates', as applicable, sole cost and expense, to have reasonable access to and make copies of the information and data of the Hospital (excluding Protected Health Information, which shall be subject to the Business Associate Agreements (as defined below)), solely to the extent reasonably necessary to enable Seller to investigate, respond to and defend any claims, to respond to government audits, investigations, or inquiries, and to perform similar matters. Buyer shall designate a point of contact for such information access that will be authorized by Buyer to consent to granting Seller and its Affiliates such access.

**1.8**    Prospect Guarantee. To the extent Seller delegates the performance of Information Services to any of its Affiliates, Seller guarantees the performance of, and agrees to ensure such Affiliate promptly performs, in full, all of the obligations set forth under this Agreement. If an Affiliate fails to fulfill its obligations or breaches or threatens to breach this Agreement, Seller will step in to ensure full performance.

**1.9**    Representations and Warranties. Each Party represents and warrants that it is and shall remain throughout the term of this Agreement in compliance, in all material respects, with all applicable Laws related to this Agreement and the Information Services to be provided hereunder, including without limitation, statutes and regulations related to fraud, abuse, false claims/statements, referrals, prohibition of kickbacks and HIPAA. The Parties further represent, warrant and covenant to each other that as of the date of this Agreement, and during the term of this Agreement, with respect to any applicable federal health care program as defined in Section 1128B of the Social Security Act (42 U.S.C. 1320a-7b(f)) or any State health care program as defined in Section 1128B of the Social Security Act (42 U.S.C. 1320a-7b(h)) (collectively, the "***Programs***"): neither (i) the representing Party; (ii) any individual with a direct or indirect ownership of five percent (5%) or more of the representing Party; nor (iii) any director, officer, or, to the knowledge of such Party, employee of the representing Party; has ever been debarred, suspended or excluded from any Program. Each Party covenants to immediately notify the other in writing if this representation is no longer true, or if such Party is sanctioned or has a civil monetary penalty levied under any program.

## SECTION 2
## FEES AND PAYMENT FOR SERVICES

**2.1**    Information Service Fees. Buyer shall pay to Seller the Information Service fees in the amounts set forth under, and solely to the extent provided in, Schedule A or a Change Order, on the payment terms provided in this Section 2 (collectively, the "***Fees***") and Pass-Through Expenses (as defined below). The Fees consist of Fixed SSA Fees and Incremental Fees, as defined herein. "***Fixed SSA Fees***" are fixed fees that cover Information Services and Supported Software Applications that are currently being provided by Seller at Steady State for the Hospital pursuant to the SSA. "***Incremental Support Fees***" will be charged for all other Information Services and Supported Software Applications. As further set forth in Schedule A, the total Fixed SSA Fees chargeable by Seller, and payable by Buyer, shall continue at the existing level (i.e., one hundred

fourteen thousand dollars ($114,000.00) per month) ***plus*** seven and one-half percent (7.5%) margin to cover indirect operating expenses to facilitate performance under this Agreement for a period of six (6) months from the Effective Date. After six (6) months, Fixed SSA Fees will increase to one hundred eighty-seven thousand and five hundred dollars ($187,500.00) per month ***plus*** seven and one-half percent (7.5%) margin. For clarity, Incremental Support Fees as set forth on Schedule A are separate from and in addition to the Fixed SSA Fees. Except as provided herein, Buyer will not be responsible for any other fees, charges, or expenses of any kind related to the Information Services or Supported Software Applications that are not identified in Schedule A or a Change Order, unless Buyer expressly agrees in writing. No amount agreed to be paid hereunder or actually paid in connection herewith is intended to be, nor shall it be construed to be, an inducement or payment for referral of, or recommending referral of, patients. The Parties agree that the Fees and all other fees and expenses payable hereunder have been or will be negotiated at arm's length. If any Governmental Authority determines that this Agreement violates any Law, or that the Fees, or any component thereof, exceed fair market value and/or are not commercially reasonable, the Parties agree to take such actions as necessary to amend this Agreement and the Schedules hereto to comply with applicable Law.

2.2    Payment.

(a)    Seller shall issue an invoice to Buyer in advance for all amounts due and owing under this Agreement for the Information Services to be rendered to Buyer each month. Fees and Pass-Through Expenses identified on Schedule A for the first month of the Term shall be paid by Buyer to Seller to be placed in a segregated account controlled by Seller (the "***TSA/OTA Payment Account***") upon execution of this Agreement and the invoice for each month thereafter shall be delivered on or about the tenth (10th) day of each month for the upcoming months' Fees at the rates agreed in Schedule A or the applicable Change Order and Pass-Through Expenses. Incremental Support Fees will be invoiced based on the estimated monthly Fees set forth on Schedule A. Any variance in the actual Incremental Support Fees for a given month will be reconciled through the true-up process described in Section 2.2(b). Seller will ensure that the TSA/OTA Payment Account will be an account free and clear of any liens, claims, interests or encumbrances from the lenders or other creditors of Seller or other liens from that may be implicated as a result of Seller's bankruptcy. Buyer shall pay all invoiced amounts within fifteen (15) days of receipt of such invoice, except for any amounts disputed in good faith by Buyer in accordance with Section 2.2(c). For any partial calendar months of this Agreement, including due to a termination by Buyer pursuant to Section 4.2 or 4.4, Buyer will pay Seller prorated Fees, as applicable. All payments hereunder shall be in US dollars and made by electronic transfer.

(b)    Within thirty (30) days following the end of each calendar month of the term, Seller shall provide Buyer with a statement detailing the actual costs incurred during the prior month for the Information Services rendered to Buyer pursuant to this Agreement (the "***True-Up Statement***"). The True-Up Statement shall solely address: (i) Pass-Through Expenses, rendered pursuant to and in accordance with Section 2.3 of this Agreement during the prior month but excluding Pass-Through Expenses that were previously invoiced and paid in accordance with Section 2.2(a); (ii) one or more invoices from Seller for any prepayments made directly to a third party solely at the direction and written request of Buyer; and (iii) the variance between the prepaid Incremental Support Fees and the actual Incremental Support Fees for the prior month. If there is any discrepancy between the pre-paid amount to the actual amounts incurred, Buyer shall either

pay Seller any shortfall or receive a credit on the following month's invoice for any overpayment. Any payment due to Seller in accordance with a True-Up Statement (the "***True-Up Payment***") must be made within ten (10) days of receipt of the True-Up Statement. If the True-Up Payment is not made within this ten (10) day period, Seller may charge interest on the overdue amount in accordance with <u>Section 2.2(d)</u> until paid in full.

(c)     Buyer shall notify Seller in writing of any dispute (including a reasonably detailed description of the dispute) prior to the due date of the applicable invoice and shall timely pay the undisputed portion of such invoice, provided that Buyer may only do so in good faith. In such event, each Party will provide to the other Party such information and documents as the other Party shall reasonably request and as are reasonably necessary to understand and resolve the dispute in a timely manner. Provided Buyer continues to remit ongoing undisputed Fees and Pass-Through Expenses, and reasonably cooperate with Seller to resolve the dispute, Seller shall not suspend or terminate Buyer's or the Hospital's access or use of the Information Services or Supported Software Applications due to such dispute or attempt to threaten suspension as a means to resolve a dispute. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Buyer shall pay any amounts determined to be due within ten (10) days of resolution of the dispute.

(d)     Except for amounts that Buyer has successfully disputed, all late payments owed by Buyer that are more than thirty (30) days overdue shall bear interest at the lesser of the rate of 1.5% per month or the highest rate permissible under applicable Law, calculated daily and compounded monthly. Buyer shall also reimburse Seller for all reasonable costs incurred in collecting any late payments, including, without limitation, attorneys' fees.

(e)     In the event of a termination of an Information Service or Supported Software Application by Buyer pursuant to <u>Section 4.2</u> or <u>4.4</u> or the expiration of the applicable "Service Term" set forth opposite the description of the applicable Information Service on <u>Schedule A</u>, the Fees set forth for the discontinued Information Service or Supported Software Application in <u>Schedule A</u> that are identified as "Incremental Support Fees" shall terminate as of the effective date of such termination or expiration.

**2.3**     <u>Expenses</u>. In addition to the Fees, Buyer shall reimburse to Seller all reasonable and necessary out-of-pocket expenses incurred by Seller or its contracting parties (including its Affiliates) in connection with this Agreement, including those set forth in <u>Schedule A</u> (collectively, "***Pass-Through Expenses***"); provided, with the exception of Pass-Through Expenses set forth in <u>Schedule A</u> as of the Effective Date, Seller must provide advance written notice to and obtain prior written approval of Buyer for any Pass-Through Expenses exceeding one thousand dollars ($1,000.00) for any one-time Pass-Through Expense, and, in any event, any Pass-Through Expenses exceeding two thousand five hundred dollars ($2,500.00) in the aggregate in any given month. Together with the True-Up Statement, Seller shall provide reasonable written documentation and receipts evidencing such expenses incurred by Seller or its contracting parties.

**2.4**     <u>Taxes</u>. Buyer shall be responsible for all sales, personal, excise, and use taxes, or payments in lieu of taxes, however levied or assessed (collectively, "***Taxes***"), arising from this Agreement, excluding Taxes based on Seller's net income. All payments made under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes, except as required by applicable Law, in which case, any amounts deducted or withheld with

respect to any such Taxes for which a Party is responsible under this <u>Section 2.4</u> will be grossed up such that Seller receives the amount due prior to the withholding (including any withholding imposed in respect of any additional amounts paid hereunder).

**2.5**    <u>Services Records</u>. Seller shall maintain books and records in connection with the amounts invoiced for the performance of the Information Services, including reasonable time records and backup invoices for reimbursed Pass-Through Expenses and Information Services performed on a time and materials basis (collectively, "***Services Records***"), during the term of this Agreement and for one (1) year thereafter or such longer period to comply with applicable Law. Seller shall make copies of Services Records available to Buyer within thirty (30) days upon receiving Buyer's written request but not more than once in any given twelve (12) month period. In the alternative, Seller agrees to make available to Buyer's third-party auditor, upon reasonable written request and at a time and manner within Seller's reasonable discretion, books and records in connection with the Information Services performed under this Agreement; provided, that such third-party auditor agrees to execute a non-disclosure agreement in advance to such third-party auditor accessing Seller's Confidential Information. Buyer agrees that all such information shall be Seller's "Confidential Information" (as herein defined) and shall be treated as provided in <u>Section 6.12</u>.

**SECTION 3**
**TERM OF PARTICULAR SERVICES**

Unless otherwise provided in this Agreement, the provision of particular Information Services by Seller to Buyer shall commence as of the date hereof and shall terminate upon the termination of this Agreement in accordance with the provisions of <u>Section 4</u> or upon expiration of the "Service Term" set forth opposite the description of such Information Service on <u>Schedule A</u>.

**SECTION 4**
**TERMINATION**

**4.1**    <u>Termination</u>. This Agreement shall terminate with respect to the Information Services on the earlier of (a) the date on which the last of the Information Services to be provided under this Agreement is terminated pursuant to <u>Section 4.2</u>, <u>Section 4.3</u> or <u>Section 4.4</u> or (b) the date that is nine (9) months after the date hereof (the "***Expiration Date***"). Notwithstanding the foregoing, the term of this Agreement may be extended for one (1) additional three (3)-month period from the Expiration Date following Buyer's delivery of a written notice to Seller at least sixty (60) days prior to the Expiration Date. Any extensions beyond the one (1) potential three (3)-month extension period must be mutually agreed to by the Parties in writing and shall be subject to a Fee increase as reasonably determined by Seller. Except as provided in the preceding sentence or otherwise agreed in writing by the Parties, any extension shall be subject to the same terms and conditions of this Agreement.

**4.2**    <u>Breach of Agreement</u>. If either Party shall cause or suffer to exist any breach of any of its obligations under this Agreement, including but not limited to any failure to make payments when due, the non-breaching Party shall first utilize the Governance Procedures to resolve any issues associated with such alleged breach, unless (i) the breach threatens or actually damages the security or integrity of the non-breaching Party's or any of its Affiliates' data or systems, or (ii) actually causes or could reasonably be anticipated to cause the non-breaching Party or any of its Affiliates

to be in violation of applicable Law, or (iii) jeopardizes the good standing of a Party or any of its Affiliates with a Governmental Authority (each of (i) through (iii), a "**Fundamental Breach**"). If the Governance Committee fails to resolve such issues within twenty (20) days of first being notified of such issue during a Governance Committee meeting or such breach is not a Fundamental Breach, the non-breaching Party may send written notice to the breaching Party regarding the alleged breach. If the said Party does not cure such default within thirty (30) days after receiving written notice thereof from the non-breaching Party, then the non-breaching Party may terminate this Agreement, including the provision of Information Services pursuant hereto, immediately by providing written notice of termination to the other Party, provided, however, that, except with respect to a Fundamental Breach, if Buyer reasonably denies that it has breached and continues to remit the Fees and Pass-Through Expenses for the Information Services, or if Seller reasonably denies that it has breached and continues to provide Information Services, both Buyer and Seller must continue to perform under the Agreement until final resolution of such dispute, and in no case without providing at least thirty (30) days prior written notice of intent to do so. If a breach is a Fundamental Breach, the non-breaching Party may either send written notice to the breaching Party regarding the Fundamental Breach and request the breaching Party to cure such Fundamental Breach within ten (10) days after receiving written notice thereof or terminate this Agreement or the provision of the affected Information Service. Notwithstanding the foregoing, either Party may terminate this Agreement immediately upon written notice to the other Party if the other Party is confirmed to be debarred, suspended or excluded from any Program (as defined in Section 1.9).

**4.3**     Intentionally Omitted.

**4.4**     Termination by Buyer.

(a)     Buyer may terminate this Agreement, including as to any particular Information Service or Supported Software Application listed on Schedule A, by giving to Seller sixty (60) days' advance written notice of its election to do so.

(b)     Following receipt of such notice, Buyer and Seller shall discuss in good faith a mutually-agreeable termination schedule utilizing the Governance Procedures. In addition, within thirty (30) days following receipt of such notice, Seller shall inform Buyer of any additional Information Services which will also have to be terminated as a result of the termination of the requested Information Service due to such other, additional Information Services being dependent on or linked to the terminating Information Service (such dependent or linked Information Services, the "**Dependent Services**"), as determined by the Seller in good faith. Seller agrees to discuss with Buyer in good faith if Buyer reasonably disagrees that the Dependent Services identified by Seller are Dependent Services or if Buyer has questions regarding Seller's determination. If Buyer does not withdraw its request for termination, such Information Services and any Dependent Services shall be discontinued on the effective date of such termination and thereafter, this Agreement shall be of no further force and effect with respect to such Information Services and Dependent Services, except as to obligations accrued prior to the date of termination.

(c)     Buyer shall reimburse Seller for any and all contractually required breakage fees, early termination fees or charges, minimum volume charges, liquidated damages, charges to terminate users, or similar costs or expenses payable to any third party under a Third-Party

Contract directly in connection with the early termination of an Information Service (solely to the extent that such costs or expenses are due to a reduction in volume or user count, cancellation of service line, or other similar reduction of the services provided by the applicable vendor where such volume, user count, service line or level of service was expressly maintained or added by Seller under or to the Third Party Contract solely to provide the terminated Information Service to Buyer) or a Supported Software Application; provided, however, that Seller shall use commercially reasonable efforts to mitigate such costs and expenses. Seller shall advise Buyer in writing of such fees and expenses within thirty (30) days after receiving Buyer's early termination notice. Buyer shall, within thirty (30) days of receiving such notification from Seller, notify Seller of whether Buyer is withdrawing its early termination notice; otherwise, Buyer shall pay the applicable fees and expenses. If Buyer provides Seller with notice of Buyer's option to terminate this Agreement or the Information Services or the Supported Software Applications and upon Buyer's request, Seller will reasonably cooperate with Buyer regarding the transition of such Information Services or Supported Software Applications to Buyer or a third-party supplier, at Buyer's cost and expense as documented in a Change Order. If the Parties are unable to agree on the terms for such transition, the Parties shall continue to attempt in good faith to negotiate a resolution in accordance with the Governance Procedures and, if the Parties are unable to agree upon an appropriate course of action in accordance with the Governance Procedures, then either Party may proceed by escalating such issue to senior leadership of each Party.

**4.5**   Fees Due. In the event of the termination of this Agreement, Seller shall be entitled to receive payment of all undisputed outstanding amounts owing pursuant to this Agreement up to the date of termination, which shall be paid within thirty (30) business days after such termination. Section 2.2(c) shall survive the termination of this Agreement for purposes of any disputed amounts under this Section 4.5.

**4.6**   Effect of Termination. Section 1.4, Section 1.7, Section 2.2(b) (solely for purposes of completing final True-Up Statement and True-Up Payment and payment of any unpaid amounts due for periods prior to termination or expiration, subject to Section 2.2(c)), Section 2.3, Section 2.5, Section 4.5, this Section 4.6, Section 5.2(a), Section 5.4(c) and Section 6 shall survive any expiration or termination of this Agreement.

**SECTION 5**
**SUPPORTED SOFTWARE APPLICATIONS; PROPRIETARY RIGHTS**

**5.1**   License; Restrictions.

(a)   Seller's centralized computer processors and systems are referred to herein as the "***Data Center System***," which shall be operated in accordance with Steady State and be maintained and managed in accordance with the help desk services levels and incident response processes set forth in Schedule D. Buyer shall obtain no rights in the Data Center System or Supported Software Applications as a result of this Agreement, including, without limitation, any systems, programs, operating instructions and other documentation relating to the Data Center System or the Supported Software Applications and any derivatives thereof, except for the limited license to Supported Software Applications granted pursuant to Section 5.1(b) below.

(b)     Seller hereby grants to Buyer a non-exclusive, non-transferable, non-sublicensable, revocable, limited license to use the Supported Software Applications subject to the terms, conditions and limitations of this Agreement to the same extent such Supported Software Applications were used at the Hospital as of the Closing and for three (3) months prior to the Closing. Such license shall expire contemporaneously upon the expiration or termination of this Agreement with respect to such Supported Software Application. For excluded applications identified on Schedule A as requiring a direct license or for Supported Software Applications that are identified on Schedule A as requiring a direct license, Buyer is responsible for obtaining (or maintaining, as applicable) the requisite licenses from the Software Application Vendors for use and support of such application ("***Direct Licensed Software***"), and Seller shall, to the extent Buyer does not have as of the Effective Date licenses for any Direct Licensed Software that are required for Buyer to receive the Information Services, use commercially reasonable efforts to cooperate with Buyer's efforts to obtain the requisite licenses from such Software Application Vendors; provided, for clarity, Seller shall not be required to incur any out-of-pocket expenses in connection therewith. Seller agrees to provide operational support of the Supported Software Applications and Direct Licensed Software for the term set forth on Schedule A with respect to each such application. Buyer's use of the Supported Software Applications shall comply with the applicable permissions and usage restrictions of the license agreement with the Software Application Vendor that have been communicated by Seller to Buyer in writing as well as any updates thereto made by Software Application Vendor from time to time which have been communicated by Seller to Buyer in writing.

(c)     The Parties acknowledge and agree that for Direct Licensed Software and Supported Software Applications, the Software Application Vendors are primarily responsible for service and support for their respective applications. Seller is not liable or responsible for the Software Application Vendors' services and support; provided, for clarity, that Seller will comply with its obligations under this Agreement, including under Sections 1.2(c), (d) and (f).

(d)     Buyer shall not copy, decompile, modify, alter, create derivative works of, or otherwise reverse engineer the Supported Software Applications. Buyer shall comply (i) with the terms of the underlying license agreements, including any and all usage guidelines pertaining to any Information Service and provided by or on behalf of Seller that have in each case been provided to Buyer in accordance with Section 5.1(b), and (ii) the other policies and procedures that Seller utilizes for the same Information Services and Supported Software Applications in connection with similarly-situated hospitals it owns which have been provided by Seller in writing, including, without limitation, the data security requirements attached within Attachment 3 to Schedule A.

(e)     Upon termination or expiration of this Agreement with respect to a Supported Software Application, or the earlier termination of Buyer's use of the Supported Software Application in accordance with Section 5.1(a), Buyer's access to the Supported Software Applications pursuant to this Agreement shall be discontinued and Buyer shall return the documentation requested in writing by Seller to Seller and shall certify to Seller that Buyer has divested itself of all ability to implement and access the Supported Software Applications.

(f)     For the avoidance of doubt, nothing in this Agreement or the provisions of Information Services hereunder shall be deemed an assignment, novation or other transfer of any

license agreement to which Seller is a party that relate to centralized or other applications made available by Seller to other hospitals or businesses owned or operated by Seller or its Affiliates. As a result, Buyer acknowledges that it shall be solely responsible for obtaining its own license or other access to such applications from the appropriate third parties to the extent Buyer desires to continue using such applications following the expiration or termination of this Agreement.

**5.2** <u>Ownership of Intellectual Property; License</u>.

(a)     Any Intellectual Property owned by a Party or its Affiliates and used after the Closing Date in connection with the provision or receipt of the Information Services, as applicable, shall remain the property of such Party or its Affiliates. Other than the license granted to Buyer pursuant to <u>Section 5.1(a)</u> and the license granted to Seller pursuant to <u>Section 5.2(b)</u> below, neither Party nor its Affiliates shall have any right, title or interest in the Intellectual Property owned by the other Party or its Affiliates, and each Party retains all such rights, titles, and interests to its respective Intellectual Property.

(b)     Subject to <u>Section 5.2(c)</u> and the terms of the Business Associate Agreements attached hereto, Buyer hereby grants, and shall cause its Affiliates to grant, to Seller, its Affiliates and any subcontractor (subject to <u>Section 1.2(d)</u>) of Seller or its Affiliates providing Information Services hereunder, a royalty-free, fully paid-up, limited, revocable, non-exclusive, non-transferable, non-sublicensable license to use Buyer's and Hospital's data during the term of this Agreement, solely to the extent necessary for Seller, its Affiliates and subcontractors to provide the Information Services. Buyer hereby grants to Seller a limited, revocable, non-exclusive, non-transferable, non-sublicensable license to access and use Buyer's systems, network, and other resources solely as necessary for Seller to perform its obligations under this Agreement and solely in accordance with <u>Section 5.2(d)</u> and Buyer's policies and procedures for systems access in each case. Buyer acknowledges and agrees that if it revokes either of the licenses set forth in this <u>Section 5.2(b)</u>, Seller's ability to provide the Information Services and Supported Software Applications may be impacted. Seller shall not be responsible or liable for any failure, delay or other impact on the provision of the Information Services or Supported Software Applications that is caused by Buyer revoking of the licenses set forth in this <u>Section 5.2(b)</u>.

(c)     Buyer agrees that, in connection with the provision of the Information Services hereunder, Seller may, upon prior written consent by Buyer, provide Buyer's and Hospital's data to Seller's third-party vendors to the extent reasonably necessary for Buyer to continue to obtain services from such third-party vendors in a manner consistent with the provision of such services to the Hospital prior to the Effective Date. Buyer hereby consents to Seller providing such data to the third-party vendors identified on <u>Schedule A</u>. As between Buyer and Seller, all of Buyer's and Hospital's data (in any format whatsoever), whether provided or made available by or on behalf of Buyer or its Affiliates in connection with this Agreement along with any data or information processed by Seller pursuant to this Agreement (including any reports or records provided by Seller concerning the Information Services) shall be deemed to be the exclusive property of Buyer and, as applicable, its respective Affiliates. Seller will not, and will cause its Affiliates and its and their personnel, employees, agents and subcontractors not to, use, disclose, sell, assign, loan, lease, dispose of, encumber, or commercially exploit (or authorize any third party to do so) any of Buyer's or Hospital's data for any purpose other than to provide the Information Services and Supported Software Applications to Buyer as required under this Agreement or as expressly

permitted hereunder. For clarification, the foregoing does not grant any person or entity the right to use Buyer's or Hospital's data to train any algorithms, e.g., artificial intelligence or machine learning. In no event shall Seller claim any rights with respect to the Buyer's or Hospital's data. Upon Buyer's request, the Parties shall negotiate a Change Order pursuant to which Seller shall supply, or cause to supply, to Buyer a copy of Buyer's data within Seller's, its Affiliates', or its and their personnel's, employees', agents' and subcontractors' possession, in a format mutually agreed, at Buyer's cost and expense. Upon such a failure by Seller to comply with this Section 5.2(c), Buyer will be entitled to seek all remedies available at law or equity.

(d)     Each Party reserves the right, in its sole and absolute discretion, to suspend access to its data, network, systems, and applications if such Party reasonably believes or suspects any employee, personnel, agent or subcontractor acting on the other Party's or its Affiliate's behalf is accessing or using such Party's data network, systems, and applications in violation of this Agreement or applicable Law, and such Party is not responsible or liable for any suspension of access thereto. Each Party shall remain responsible for the acts and omissions of any employee, personnel, agent or subcontractor acting on its or its Affiliate's behalf and any breach of this Agreement caused by such individuals or parties. In the event a Party determines any such individual or party has violated or failed to comply with the terms of this Agreement, it shall notify the other Party and the other Party will take all necessary efforts to promptly cause such individual or party to remedy such non-compliance. During the time of such violation or non-compliance, such Party will have the right, in its sole discretion, to suspend access to its data, network, systems, and applications until such time as such individual or party has remediated the non-compliance to such Party's sole but reasonable satisfaction. Each Party acknowledges and agrees that if it suspends the other Party's end users' access to its data, network, systems and applications, the other Party's ability to provide (or receive, as applicable) the Information Services and Supported Software Applications may be impacted. In such case, as between the Parties, the non-suspending Party shall not be responsible or liable for any failure, delay or other impact on the provision or receipt of the Information Services or Supported Software Applications that is caused by such suspension.

**5.3**     Updates. Seller will implement all security, error corrections and regulatory updates provided by the Software Application Vendors of the Supported Software Applications as part of the Information Services, including security patches and error corrections, in each case in the same manner as Seller provides such updates to other similarly situated hospitals to which Seller is providing services. Buyer shall bear a pro rata portion of the out-of-pocket costs for such update based on how Seller has historically allocated such cost to other similarly-situated hospitals or facilities owned, operated, or managed by Seller.

**5.4**     Access to Data; Data Integrity Measures.

(a)     As part of the Information Services, Buyer will have access to Seller's electronic health record (the "***EHR***"). Buyer acknowledges and agrees that it will only access data related patients of the Hospital Business, and will maintain and enforce internal policies to cause its personnel who have access to the EHR to comply with the foregoing restriction.

(b)     In connection with the Information Services provided under this Agreement, Seller and Buyer shall each implement and maintain reasonable firewalls and other security methods and

procedures, including, without limitation, utilizing appropriate hardware and software necessary to monitor, maintain and ensure the integrity of Buyer's and Seller's data.

(c)     Without limiting the generality of the foregoing, each Party hereby covenants, represents, and warrants it will, in connection with the provision and performance of the Information Services and, with respect to Buyer, use of the Supported Software Applications, implement and maintain appropriate internal administrative, technical, and operational procedures, measures, and safeguards necessary to ensure (x) the security, confidentiality, integrity, and availability of the other Party's data, any Protected Health Information of the other Party, and any systems or networks of the other Party, (y) comply with the applicable Business Associate Agreement, and (z) comply with the confidentiality and security obligations under this Agreement and use industry standard or better controls to prevent unauthorized access to and disclosure of the other Party's Confidential Information and unauthorized access to the other Party's network and systems. With respect to the Supported Software Applications, Seller will include in its Third-Party Contracts with the Software Application Vendors commercially reasonable controls respecting the processing of Buyer's and the Hospital's data, any Protected Health Information of Buyer, and other Confidential Information made available by Buyer to Seller by or through such Supported Software Applications, in each case as and to the extent applicable to such Software Application Vendor. In furtherance of the foregoing, both Parties shall adhere to those information and data security policies and procedures set forth in <u>Attachment 3</u> attached to <u>Schedule A</u> (as applicable to each Party, the "***Information Security Requirements***"), which are designed to address: (1) the minimum security requirements to which a Party's systems, networks, and other resources that will process or access the other Party's data or network or systems will conform, (2) a commercially reasonable business continuity and disaster recovery plan, (3) an incident response and data breach notification plan and procedure in the event of a Security Incident (defined below), (4) user access credentialing processes and procedures, and (5) any training policies and procedures the other Party utilizes to ensure that all of its personnel are trained and aware of their roles in the implementation of the Information Security Requirements, as applicable.

(d)     Each Party will use commercially available virus-scanning software to monitor its system and network, including any Supported Software Applications to which Buyer has direct access. Seller hereby represents and warrants that (i) to Seller's knowledge, the Supported Software Applications, as of the Effective Date, do not contain any virus, worm, built-in or use-driven destruction mechanism, injurious or damaging algorithm, time bomb, trojan horse or other software or hardware that can disable or adversely affect the Information Services and/or their operation or destroy any of Buyer's or Hospital's data or other software or hardware of Buyer or the Hospital, and (ii) Seller and its Affiliates will not knowingly introduce or allow into Buyer's, its Affiliates, or the Hospital's network, systems, infrastructure, software or hardware any such malicious or harmful code or materials. If a Party becomes aware that: (a) a virus or malicious or other harmful code has been introduced into the Supported Software Applications, (b) the integrity of the other Party's data or systems or network have been compromised, or (c) unauthorized access to the other Party's data has occurred (each, a "***Security Incident***"), it will, among other things, promptly follow the incident response and data breach procedures, as applicable, set forth in the Information Security Requirements and promptly notify the other Party and use commercially reasonable efforts to eradicate the virus or malicious or harmful code or otherwise resolve the applicable issue as promptly as reasonably practicable.

**5.5**    Infringement. In the event that the use of any Supported Software Application is alleged by a third party or held by a court of competent jurisdiction to infringe or constitute the wrongful use of any third party's proprietary rights and Buyer's right to use the Supported Software Application is enjoined, or if Seller, in its reasonable exercise of discretion, instructs Buyer to cease using the Supported Software Application in order to mitigate potential damages arising from a third party's claim that use of the Supported Software Application infringes on its rights, Buyer shall cease using the Supported Software Application. In such event, Seller shall use commercially reasonable efforts to enforce any contractual rights Seller has against the third-party licensor of the Supported Software Application to either replace or modify the infringing Supported Software Application with suitable non-infringing software or to procure the right for Buyer to use the Supported Software Application. Notwithstanding the foregoing, the Parties will use commercially reasonable efforts to cooperate in any lawful and economically feasible alternative arrangement that provides substantially similar functionality as the affected Supported Software Application such that Buyer shall receive materially similar Information Services or Supported Software Applications as originally contemplated by the Parties in this Agreement, which may include Seller identifying, selecting, and implementing a replacement to the infringing Supported Software Application that provides functionality that is substantially similar to the infringing Supported Software Application; provided, Buyer shall bear a pro rata portion of the reasonable out-of-pocket costs directly related to the replacement of such Supported Software Application, provided further that any such costs incurred by Seller must be submitted to Buyer for reimbursement accompanied with sufficient documentation evidencing such costs. To the extent Seller fails to provide Information Services in accordance with the terms of this Agreement due to such infringement, Seller shall, at its cost, correct or re-perform the non-conforming Information Services upon obtaining such replacement.

**SECTION 6**
**MISCELLANEOUS**

**6.1**    Further Assurances. The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; *provided, however*, at the reasonable request of a Party, the other Party shall execute and deliver, or cause to be executed and delivered, such additional, reasonable instruments as the requesting Party may reasonably deem necessary to carry out the intent and meaning of this Agreement.

**6.2**    Notices. Unless otherwise provided in this Agreement, all notices and other communications required or permitted hereunder shall be made in accordance with Section 11.1 of the Purchase Agreement.

**6.3**    Assignment and Delegation. Except as otherwise provided herein, neither this Agreement, nor any rights or obligations hereunder, shall be assigned, in whole or in part, by either Party. Buyer may assign this Agreement upon prior written notice to Seller in connection with any restructuring, reorganization, merger, or sale of all or substantially all of its assets or equity interests, or similar transaction. Seller may not assign this Agreement without the prior written consent of Buyer except that Seller may assign this Agreement in connection with any restructuring, reorganization, merger, or sale of all or substantially all of its California assets or equity interests, or similar transaction, whether as a single transaction or through a series of one

or more related or unrelated transactions, without Buyer's prior written consent, only in cases where (i) Seller provides at least sixty (60) days' prior written notice of same to Buyer, and (ii) Seller and Buyer have jointly obtained any necessary regulatory approvals or confirmed with applicable regulatory authorities that such assignment does not require prior regulatory approval.

**6.4** <u>Amendment; Waivers</u>. Except as set forth in <u>Section 1.5</u> with respect to an amendment to <u>Schedule B</u>, no amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time and any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**6.5** <u>Entire Agreement</u>. This Agreement (including all attachments and schedules attached hereto) constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all previous Contracts, statements, representations, warranties, covenants, or agreements, both written and oral, between the Parties with respect to the subject matter hereof. As between the Parties, no oral statements, representations, warranties, covenants, agreements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements, representations, warranties, covenants, agreements or prior written material. All prior statements, representations, warranties, covenants, agreements or material, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.

**6.6** <u>Binding Effect</u>. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns.

**6.7** <u>Applicable Law; Venue</u>. Except as otherwise provided herein, all Actions (as defined in the Purchase Agreement) (whether in contract or tort) arising out of or relating to this Agreement, the negotiation, execution or performance of this Agreement, the transactions contemplated hereby, any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (including its statutes of limitations), without regard to conflicts of law principles. Except as otherwise provided herein, the venue of all disputes, claims, and lawsuits arising hereunder shall lie in the state and federal courts located in Los Angeles County, California. Each Party hereby waives, and agrees not to assert, any defense in any Action arising out of or relating to this Agreement or the subject matter hereof that such Party is not subject thereto or that such Action may not be brought or is not maintainable in such courts or that this Agreement may not be enforced in or by such courts or that such Party's property is exempt or immune from execution or that such Action is brought in an inconvenient forum or that the venue of such Action is improper.

**6.8** <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO

TRIAL BY JURY IN ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY ACTION OR PROCEEDING WHATSOEVER AMONG THEM RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

**6.9**     <u>Severability</u>. In the event any provision (or portion thereof) of this Agreement, is held to be invalid, illegal or unenforceable under Law for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**6.10**     <u>Counterparts</u>. This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals. Notwithstanding any oral agreement of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation pursuant to this Agreement unless and until this Agreement shall have been executed and delivered, or caused to be delivered, by each Party.

**6.11**     <u>No Third Party Beneficiaries</u>. Nothing in this Agreement shall confer any rights upon any Person other than Buyer and Seller, and each of their respective successors and permitted assigns.

**6.12**     <u>Confidential Information</u>.

(a)     <u>Definition</u>. "***Confidential Information***" is defined as all non-public data or information data and materials, in each case whether or not marked, designated, or otherwise identified as "confidential" or "proprietary", furnished by one Party to the other Party in connection with this Agreement, including, without limitation, all trade secrets and/or confidential proprietary information of a Party in any physical, electronic, computerized or other form, including but not limited to: technical and non-technical data related to operations, computer programs, software, technology, know-how, inventions, developments, Intellectual Property, manuals, videotapes, methods, techniques, processes, policy, procedures and/or personnel manuals, the identity of patients, customers or suppliers, the content of any medical records, financial and tax information, procurement requirements, business forecasts and marketing plans, information regarding Medicare and Medicaid claims submission and reimbursements, and, with respect to Seller, the object and source codes for the Supported Software Applications, the documentation, such other information constituting the Data Center System and the Supported Software Applications. Confidential Information includes any information which has been disclosed to such Party by a third party which such Party is obligated to treat as confidential and any other data or information of a Party that is disclosed in writing or orally, or otherwise made available or accessible to the Receiving Party.

(b)     Obligations. Each Party acknowledges that it may acquire, be exposed to or obtain access to Confidential Information from the other Party. The Party receiving the Confidential Information (the "***Receiving Party***") from the Party who owns or holds in confidence such Confidential Information (the "***Owning Party***") may use the Confidential Information solely for the purpose of performing its obligations or enforcing its rights under this Agreement in accordance with this Agreement.

(c)     Protection. The Receiving Party shall not disclose, produce, use, copy, distribute or otherwise disseminate any of the Confidential Information except to those persons (i) having a need to know for the purpose of performing the Receiving Party's obligations or enforcing its rights under this Agreement and (ii) who are bound by confidentiality and restricted use obligations prior to receipt of such Confidential Information. Each Party shall take appropriate action and precautions, by instruction to or agreement with its affiliates, employees, agents and subcontractors, to hold and maintain the confidentiality of the Confidential Information. Each Party shall exercise at least the same degree of care to safeguard the confidentiality of Confidential Information as it does to safeguard its own proprietary confidential information of equal importance, but not less than a reasonable degree of care. The Receiving Party shall promptly notify the Owning Party in the event that the Receiving Party learns of an unauthorized release of Confidential Information and, upon request of Owning Party, provide reasonable assistance and cooperation to recover any released Confidential Information and mitigate the impact of such unauthorized release, at the Owning Party's expense, provided that any such costs incurred by the Receiving Party must be submitted to the Owning Party for reimbursement accompanied with sufficient documentation evidencing such costs.

(d)     Exceptions. Confidential Information shall not include information with respect to:

(i)     Information that is or made available to the general public without restriction by the Owning Party or by an authorized third party, through no fault of the Receiving Party;

(ii)     Information known to or in the possession of the Receiving Party independently of disclosures by the Owning Party under this Agreement without violation of any confidentiality restriction and without any restriction on the Receiving Party's further use or disclosure; or

(iii)     Information independently developed by the Receiving Party without use of, reference to, or reliance on the Owning Party's Confidential Information.

(e)     Legally Required Disclosures. To the extent the Receiving Party is required to disclose any Confidential Information of the Owning Party (i) pursuant to subpoena or as required by any court or other governmental body or (ii) as otherwise required by applicable Law, such disclosure shall not be a breach of this Section; provided, however, that the Receiving Party promptly notifies the Owning Party in writing prior to making any such disclosure, to the extent legally permissible, in order to allow the Owning Party, at its sole cost and expense, to appear and protect its interests in such Confidential Information or to limit the scope of such disclosure and the Receiving Party cooperates as reasonably requested by the Owning Party with the Owning Party's efforts to obtain a protective order for such Confidential Information, at the Owning Party's

expense. To the extent the Receiving Party remains required pursuant to this Section to disclose any Confidential Information, the Receiving Party shall disclose only that portion of the Confidential Information that, on the advice of the Receiving Party's legal counsel, the Receiving Party is legally required to disclose and shall use commercially reasonable efforts to obtain assurances from the applicable court or other presiding authority that such Confidential Information will be afforded confidential treatment.

(f)    <u>Return of Confidential Information</u>. Upon request by the Owning Party, and in any event upon the termination or expiration of this Agreement, the other Party shall (i) immediately cease to use the Owning Party's Confidential Information, (ii) return or destroy, at the election of the Owning Party, such Confidential Information and all copies thereof within ten (10) business days of the request or termination, unless otherwise provided in this Agreement, and (iii) upon request, certify in writing to the Owning Party that it has complied with its obligations set forth in this Section. Notwithstanding the foregoing, Seller shall have the right to retain archival or back-up copies of Buyer's Confidential Information or otherwise to retain Buyer's Confidential Information in the event Seller does not have the technical capabilities to fully delete Buyer data, but in no event shall Seller be obligated to retain copies of any Buyer Confidential Information or other data after the termination of this Agreement. Confidential Information that cannot be destroyed will be maintained in accordance with applicable Law and the terms and conditions of this <u>Section 6.12</u>.

(g)    <u>Equitable Remedies</u>. The Parties acknowledge that monetary remedies may be inadequate to protect rights in Confidential Information and that, in addition to legal remedies otherwise available, injunctive relief is an appropriate judicial remedy to protect such rights, and in the event of a breach or threatened breach of this <u>Section 6.12</u>, the non-breaching Party will be entitled to seek and obtain injunctive or other equitable relief, without posting bond or proving damages.

(h)    <u>Reasonable Assistance</u>. Each Party agrees to provide reasonable assistance and cooperation upon the reasonable request of the other Party in connection with any litigation against third parties to protect the requesting Party's Confidential Information, provided that the Party seeking such assistance and cooperation shall reimburse the other Party for its reasonable out-of-pocket expenses.

**6.13**    <u>Protected Health Information</u>.

(a)    Each of Seller and Buyer shall comply with all federal and state laws and regulations, regarding the confidentiality of Protected Health Information (as defined in the Purchase Agreement). Simultaneously herewith, the Parties shall enter into Business Associate Agreements (the "***Business Associate Agreements***") in accordance with the applicable provisions of HIPAA. The Business Associate Agreements are incorporated into this Agreement as <u>Schedule C</u>. In addition, each of Seller and Buyer acknowledges that in receiving or otherwise dealing with any records or information from the other about patients receiving treatment for alcohol or drug abuse, Seller and Buyer respectively and their respective staffs are bound by the provisions of the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records, 42 C.F.R. Part 2, as amended from time to time.

(b)    To the extent that any records maintained or stored by either Seller or Buyer pursuant to this Agreement contain Personal Information (as herein defined) about their respective personnel or patients, such Party shall comply with all applicable Laws related to maintenance or storage of such records. "***Personal Information***" shall mean: an individual's first name or first initial and last name in combination with any one or more of the following data elements that, separately or when combined with other data, identifies, relates to, describes, or is reasonably capable of being associated with or could reasonable be linked directly or indirectly to an individual: (i) Social Security number; (ii) driver's license or Identification Card Number; (iii) account number, credit or debit card number in combination with any required security code, access code or password that would permit access to an individual's financial account, (iv) email address or photograph; or (v) any data otherwise defined as personal information, personal data, personally identifiable information, or such similar terms under applicable Healthcare Information Laws (as defined in the Purchase Agreement). In the event of a breach of the security of the system involving such records, Seller or Buyer, as the case may be, shall immediately notify the other via telephone and in writing and shall comply with applicable Information Security Requirements and applicable Law. For purposes of this paragraph, the term "breach of the security system" shall mean: (x) the unauthorized acquisition of unencrypted computerized data that compromises the security, confidentiality or integrity of Personal Information; or (y) any other unauthorized use or acquisition of, or access to, Personal Information.

**6.14**    Record Retention. If required by applicable Law, including any Healthcare Information Law, until the expiration of four (4) years after the termination of this Agreement or such other period required by Law, the Parties upon request shall make available to the Secretary of the United States Department of Health and Human Services and the U.S. Comptroller General or any of their duly authorized representatives, this Agreement and all other books, documents, and records necessary to certify the nature and extent of the costs incurred by the Parties under this Agreement. If a Party purchases such services through a subcontract worth Ten Thousand Dollars ($10,000) or more over twelve (12) month period with a related organization, the subcontract shall also contain a clause permitting access by said Secretary, Comptroller General, and their respective representatives to the books and records of the related organization. Each Party shall promptly notify the other via telephone and in writing if such access is requested. No attorney-client, accountant-client or other legal privilege shall be deemed to have been waived by the Parties by virtue of this provision. Buyer shall have the right during normal business hours and with reasonable advance written notice to Seller, to review and photocopy Seller's books and records that pertain directly and exclusively to the accounts of Buyer, the Fees payable to Seller under this Agreement or the goods and services provided by Seller hereunder. Buyer agrees that all such information shall be Seller's "Confidential Information" (as herein defined) and shall be treated as provided in Section 6.12.

**6.15**    Limitation on Liability. EXCEPT FOR A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 6.16 OR LOSSES (AS DEFINED IN THE PURCHASE AGREEMENT) RELATED TO (I) A BREACH OF THE APPLICABLE BUSINESS ASSOCIATE AGREEMENT, (II) SELLER'S ABANDONMENT OF THE INFORMATION SERVICES WITHOUT CAUSE OR (III) A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF APPLICABLE LAW, OR FRAUD (THE "***EXCEPTED CLAIMS***"), IN NO EVENT WILL EITHER PARTY OR ITS SUBSIDIARIES OR AFFILIATES, OR ITS OR THEIR RESPECTIVE REPRESENTATIVES, BE LIABLE TO THE OTHER

PARTY OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ITS SUBJECT MATTER OR TRANSACTIONS CONTEMPLATED HEREIN, UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING, WITHOUT LIMITATION, TORT, STRICT LIABILITY, AND OTHERWISE, FOR ANY CONSEQUENTIAL DAMAGES, INCIDENTAL DAMAGES, INDIRECT DAMAGES, EXEMPLARY DAMAGES, SPECIAL, ENHANCED DAMAGES, OR PUNITIVE DAMAGES, INCLUDING LOST PROFITS, REVENUES, DATA, USE, OR SAVINGS, REGARDLESS OF WHETHER SUCH PERSONS WERE ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE, AND EACH PARTY HEREBY WAIVES ALL CLAIMS AGAINST THE FOREGOING AND ASSUMES ALL RISK RELATING TO THERETO, KNOWN AND UNKNOWN. EXCEPT FOR LOSSES ARISING FROM OR RELATED TO THE EXCEPTED CLAIMS AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PURCHASE AGREEMENT, THE MAXIMUM AGGREGATE LIABILITY OF EITHER PARTY AND ITS OR THEIR SUBSIDIARIES OR AFFILIATES, OR ITS OR THEIR RESPECTIVE REPRESENTATIVES RELATING TO THIS AGREEMENT OR ARISING OUT OF THE SERVICES PROVIDED BY SELLER SHALL NOT EXCEED TWO TIMES (2X) THE AGGREGATE AMOUNT OF THE FEES PAID OR PAYABLE PRIOR TO THE EXPIRATION DATE (I.E. THE FEES TO BE PAID BY BUYER TO SELLER FOR ALL INFORMATION SERVICES UNDER THIS AGREEMENT PRIOR TO THE EXPIRATION DATE) BY BUYER TO SELLER HEREUNDER. FOR CLARITY, THIS SECTION 6.15 DOES NOT AFFECT BUYER'S OBLIGATION TO PAY UNDISPUTED FEES AND PASS-THROUGH EXPENSES FOR THE SERVICES RENDERED HEREUNDER. FOR CLARITY, NOTHING HEREIN SHALL BE CONSTRUED TO LIMIT A PARTY'S LIABILITY IN CONNECTION WITH, OR OTHERWISE SUPERSEDE ANY PROVISIONS OF OR ALLOCATIONS OF RESPONSIBILITY AND LIABILITY UNDER, THAT CERTAIN SIDE LETTER DELIVERED BY ASTRANA HEALTH, INC., TO PROSPECT MEDICAL HOLDINGS, INC. AND THE OTHER PARTIES NAMED THEREIN.

**6.16** <u>Indemnity Obligations</u>.

(a) Buyer shall indemnify and hold harmless Seller and its Affiliates, and its and their respective Representatives (the "***Seller Indemnified Parties***") from and against any loss, cost, claim, liability, obligation, fine, penalty, damage or expense (including reasonable attorneys' fees and expenses regardless of whether suit is filed and expressly including any attorneys' fees) to the extent arising out of third party claims based on Buyer's or Hospital's or its or their respective subcontractors', employees', personnel's, or agents' fraud, willful misconduct, negligence, breach of applicable Law or material breach of this Agreement, except to the extent resulting from Seller's material breach of this Agreement or Seller's gross negligence or willful misconduct.

(b) Seller shall defend, indemnify and hold harmless Buyer and its Affiliates, the Hospital, and its and their respective Representatives, and each of their successors, assigns, directors, officers and employees (the "***Buyer Indemnified Parties***") from and against any loss, cost, claim, liability, obligation, fine, penalty, damage or expense (including reasonable attorneys' fees and expenses regardless of whether suit is filed and expressly including any attorneys' fees and expenses incurred by an Indemnified Party in connection with any discovery requests by third parties, including Governmental Authorities) relating to this Agreement or arising out of or resulting from third party claims based on (i) Seller's, its Affiliate's, or its subcontractors',

employees', personnel's, or agents' material breach of this Agreement, including but not limited to any representations or warranties made by Seller, or (ii) Seller's gross negligence, willful misconduct, breach of applicable Law, or fraud in the performance of the Information Services, except to the extent resulting from Buyer's material breach of this Agreement or Buyer's gross negligence or willful misconduct. To the extent permitted under the terms of the applicable Third-Party Contracts, Seller will pass through to Buyer the benefit and proceeds of any indemnification that it receives from a Software Application Vendor with respect to the Software Application Vendor's indemnification obligations for third party claims that Supported Software Applications infringe third party Intellectual Property Rights, on a pro rata basis with Seller and its Affiliates and its and their respective hospitals and other facilities.

(c)     In the event that a claim is commenced against either the Seller Indemnified Parties or Buyer Indemnified Parties, the applicable Party shall provide prompt written notice of such claim to the other Party and Buyer and Seller agree to cooperate to the extent the other Party reasonably requires, each at such Party's own expense (except as otherwise provided herein), in connection with (i) any claim asserted by any third party with respect to the performance of the Information Services, and (ii) any notice, action or undertaking that either Buyer or Seller or any of their respective Affiliates may be obligated to take with respect to the Information Services under any federal, state or local Law. The indemnifying Party shall have the right to compromise or settle such claim to the extent of its own interest and shall undertake the defense of any such suit. Notwithstanding the foregoing, if the indemnifying Party fails to assume their indemnification and defense obligations hereunder, the Seller Indemnified Parties or Buyer Indemnified Parties as applicable may do so to protect its interests and seek reimbursement from the indemnifying Party. Neither Party shall agree to any settlement without the prior written consent of the other Party, which consent shall not be unreasonably withheld.

**6.17**   Insurance. During the term of this Agreement and for a period of three (3) years thereafter, each Party shall maintain, at its sole expense (except as provided in Schedule A), professional liability and general liability insurance, Workers Compensation, Property, Directors & Officers Liability, Employment Practices Liability, Managed Care E&O, Cyber Liability, Crime, Fiduciary and other customary policies, or applicable tail coverage, as may be required by applicable Law or Contracts to which they are a party, which insurance shall cover such Party and its employees or anyone engaged by or acting on behalf of such Party at the Hospital or otherwise in the performance of the Information Services hereunder. Each Party's Cyber Liability policy shall provide a minimum coverage of $10,000,000.00. Such insurance coverages shall be provided an insurer with at least an "A-" rating from A.M. or a self-insurance program approved by California Office of Self-Insurance Plans or Healthplan. Best Company that is properly licensed and qualified to do business in the State of California. No insurance may be maintained through "self-insurance" unless approved in writing in advance by the other Party, which approval will not be unreasonably withheld, conditioned or delayed. Each Party shall submit to the other Party a COI evidencing the coverage required herein prior to the commencement of Services. The COI shall contain an unqualified requirement that the insurance company provide the other Party with thirty (30) days' written notice of any cancellation or lapse of said policy or any change to the other Party's additional insured status of said policy, unless related to the failure to pay any premium, in which event the insurance company shall provide Seller with ten (10) days' written notice.

**6.18**   DISCLAIMER. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT,

SELLER DOES NOT MAKE AND EXPRESSLY DISCLAIMS ALL WARRANTIES WITH RESPECT TO THE INFORMATION SERVICES, THE SUPPORTED SOFTWARE APPLICATIONS OR THE DATA CENTER SYSTEM, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, PERFORMANCE, NON-INFRINGEMENT, COMMERCIAL UTILITY, QUANTITY, SUITABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN PARTICULAR, SELLER DOES NOT WARRANT ANY EQUIPMENT OR SOFTWARE.

**6.19** <u>Force Majeure</u>. If either Party's performance is prevented, hindered or delayed by reason of any cause(s) beyond such Party's reasonable control, including, without limitation, war, labor disputes, strikes, lockouts (excluding disputes, strikes or lockouts involving such Party's own workforce), civil disorders, governmental acts, embargoes, fires, earthquakes, storms, hurricanes, acts of terrorism, widespread infrastructure failures, or acts of God, such Party shall be excused from performance to the extent that it is prevented, hindered or delayed thereby, for so long as such cause(s) prevent or delay performance, provided such Party provides reasonably prompt notice of such force majeure event. Each Party shall promptly resume performance of their respective obligations hereunder upon termination of any force majeure event.

**6.20** <u>Seller Policies</u>. To the extent Buyer adopts any of Seller's Policies applicable to the Purchased Assets as Buyer's policies with respect thereto, Buyer agrees and acknowledges that SELLER MAKES NO WARRANTIES OR REPRESENTATIONS AS TO SAID POLICIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE COMPLETENESS AND EFFECTIVENESS OF SAID POLICIES AND THEIR COMPLIANCE WITH APPLICABLE LAW, AND BUYER ACCEPTS THE POLICIES FROM SELLER ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS WITH ALL WARRANTIES WITH RESPECT TO SAID POLICIES BEING SPECIFICALLY DISCLAIMED BY SELLER.