The Law Office of Vincent P. Slusher
Vincent P. Slusher (00785480)
2121 N. Akard St., Suite 250
Dallas, Texas 75201
Telephone:   (214) 478-5926
Email:       vince.slusher@proton.ne

*Conflicts Counsel for the HCo and PCo*
*Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |
| | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF AN ORDER (I) MODIFYING THE AUTOMATIC STAY TO
PERMIT MLS MOVANTS TO LIQUIDATE THEIR PL/GL CLAIMS AND TO
COLLECT AGAINST THE DEBTORS' AVAILABLE INSURANCE COVERAGE
AND (II) GRANTING RELATED RELIEF**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

> **Emergency relief has been requested. Relief is requested not later than 9:30 a.m. prevailing Central Time on October 10, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on the matters set forth in this motion on October 10, 2025, at 9:30 a.m. a.m. prevailing Central Time in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242. You may participate in the hearing either in person or by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 650.479.3207. The meeting code is 2304 154 2638. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting. WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.**
>
> **Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Prospect Medical Holdings, Inc. ("PMH") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this emergency motion (this "Motion"). In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT[2]

1. The Debtors, all parties in interest, and this Court were all made aware that this Motion would be filed if an agreement with the Debtors' insurers and reinsurers could not be reached.[3] This Motion is not a new development, but rather a continuation of—and consent to—the numerous motions for relief from stay that the MLS Movants (as defined below) have already filed and set for hearing in these chapter 11 cases.

---

[2] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed thereto in the remainder of the Motion.

[3] *See* Sept. 18, 2025 Hr'g Tr. at 4:12–14 (Mr. Califano: "[W]e have not been able to come up with an agreement supported by both the Reinsurers and the Plaintiffs' counsel. We believe that we've come to an impasse."), & 4:21–23 (Mr. Califano: "[O]n October 9th we'll consent to the relief from stay and other relief as appropriate.").

2

2. At the outset of these chapter 11 cases, the Debtors faced more than three hundred (300) pending actions alleging professional liability or general liability claims (the "PL/GL Claims") related to the Debtors' hospital operations. To address this overwhelming volume of litigation in an orderly and equitable manner for the benefit of all stakeholders to these chapter 11 cases, the Debtors sought and obtained this Court's approval of the Claims Resolution Procedures, which were carefully negotiated with numerous parties in interest and were intended to provide a comprehensive framework for resolving PL/GL Claims through mediation, while preserving the Debtors' estates and maximizing recoveries from insurers and reinsurers. The Debtors have stressed throughout this process that the Claims Resolution Procedures would not work without the active consent and participation of the Debtors' insurers and reinsurers.

3. Unfortunately, due to the unwillingness of the Debtors' insurers and reinsurers to fund the Claims Resolution Process, little progress was made following the Court's approval, forcing the Debtors to pivot to a post-confirmation claims resolution process (the "PCCRP") and the creation of an Insurance Trust to be funded by Debtors' insurers and reinsurers for the benefit of holders of PL/GL Claims. Once again, however, the insurers and reinsurers have refused to participate meaningfully in settlement discussions regarding funding the Insurance Trust.

4. Since the relevant insurers have not agreed to participate in any meaningful manner it is no longer fair or appropriate to subject the plaintiffs to the automatic stay. Thus, the Debtors now seek to modify the automatic stay to allow parties that have filed motions to lift the stay (the "MLS Movants") to pursue their PL/GL Claims against the Debtors. The Debtors respectfully request that the Court modify the automatic stay to permit the MLS Movants to liquidate their PL/GL Claims to final judgment or settlement, including any appeal, and to collect against any available insurance coverage provided by the Debtors' insurers and reinsurers.

## RELIEF REQUESTED

5. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) modifying the automatic stay to permit the MLS Movants to liquidate their PL/GL Claims to final judgment or settlement, including any appeal, and to collect solely against any available insurance coverage provided by the Debtors' insurers and reinsurers; and (b) granting related relief.

6. In support of this Motion, the Debtors rely upon and incorporate the *Declaration of Vincent P. Slusher in Support of the Debtors' Motion for Entry of an Order (I) Modifying the Automatic Stay to Permit Movants to Liquidate Their PL/GL Claims and to Collect Against the Debtors' Available Insurance Coverage and (II) Granting Related Relief* (the "Slusher Declaration"), filed contemporaneously herewith.[4]

## JURISDICTION AND VENUE

7. The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The legal predicates for the relief requested in this Motion are sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code"), rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-1 and 9014-1 of

---

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Slusher Declaration or the Claims Resolution Procedures Motion, as applicable.

the Local Bankruptcy Rules for the Northern District of Texas (the "Local Bankruptcy Rules"), and the Procedures for Complex Cases in the Northern District of Texas.

9. The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

**A. General Background**

10. Beginning on January 11, 2025 (the "HCo Petition Date"), each of PMH and its hospital subsidiaries (the "HCo Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. A detailed description of the HCo Debtors and their business and certain of the facts and circumstances of the HCo Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Paul Rundell in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "HCo First Day Declaration").

11. On January 29, 2025, the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors in the HCo Debtors' chapter 11 cases [Docket No. 295].

12. On January 30, 2025, the U.S. Trustee appointed Suzanne Koenig as the patient care ombudsman in the HCo Debtors' chapter 11 cases [Docket No. 325].

13. On July 7, 2025 (the "PCo Petition Date"), each of PMH's physician-related debtor affiliates (the "PCo Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

14. On September 19, 2025 (the "TopCo Petition Date"), each of the TopCo Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5

15. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The HCo Debtors' and the PCo Debtors' chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 93 and 2473]. The Debtors have also filed a motion requesting procedural consolidation and joint administration of the TopCo Debtors' chapter 11 cases with the HCo Debtors' and the PCo Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 3185].

**B.     The Debtors' Insurance Program**

16. The Debtors maintain a broad insurance program, covering, among other things, director and officer liability, property liability, employment practice liability, cyber liability, crime liability, fiduciary liability, errors and omissions liability, professional liability, automobile liability, aviation liability, pollution liability, workers' compensation liability, and general liability. In addition, the insurance program includes several layers of excess liability coverage.

17. PMH is the parent company of a wholly-owned non-Debtor subsidiary, Connecticut Healthcare Insurance Company ("CHIC"). Non-Debtor CHIC is a captive insurance company subject to the local insurance laws and regulations of the Cayman Islands, where CHIC is incorporated and domiciled. CHIC works with brokers, third-party administrators, and actuaries to evaluate, procure, and administer excess coverage for the Debtors' workers' compensation, professional liability, and general liability insurance policies that is fully reinsured by third-party insurers.

18. With respect to the professional liability and general liability programs, which cover most of the PL/GL Claims, the Debtors' insurance program is divided between hospitals and medical operations outside of Pennsylvania and hospitals and medical operations inside Pennsylvania.

19. *Outside Pennsylvania*. With respect to the Debtors' hospitals and other medical operations outside Pennsylvania, for policy periods starting October 1, 2020, the first $7.5 million of defense and indemnity payments for each claim is self-insured by PMH (*i.e.*, PMH is the primary insurer). After that $7.5 million is paid, CHIC provides an excess healthcare professional liability and umbrella liability insurance policy, on a claims-made basis, covering healthcare professional liability and general liability (as well as automobile liability, employers' liability, helipad liability, and non-owned aircraft liability). The policy limit is $80,000,000, for each loss event and in the annual aggregate, excess of the primary coverage layers described above. This coverage is fully reinsured by third-party carriers.

20. For policy periods from October 1, 2017 through September 30, 2018, the first $2 million per claim is self-insured by PMH (*i.e.*, PMH is the primary insurer). Coverage in excess of the $2 million SIR is provided by third-party excess insurers. For policy periods from October 1, 2018 through September 30, 2020, the first $5 million per claim is self-insured by PMH, with an aggregate self-insured retention of $37 million per policy period. Coverage in excess of the $5 million SIR is provided by CHIC, and then fully reinsured. For all policy periods, both pre- and post-2020, the CHIC excess policies are claims-made policies with respect to professional liability and general liability; as such, they only cover those claims actually reported during the policy term.

21. CHIC's insurance policies are reimbursement policies. As such, PMH initially pays the costs for any claims that exceed the applicable SIR limit (described below), including defense costs and settlement payments. Upon request from PMH, non-debtor CHIC will promptly seek to recover such amounts from third-party reinsurers pursuant to its reinsurance contracts. Once CHIC has recovered the full amount of the claims from the third-party reinsurers, CHIC then reimburses PMH for the portion of PMH's initial payment that exceeds the self-insured retention.

7

22. *Pennsylvania*. With respect to the Debtors' hospitals and other medical operations in Pennsylvania, medical professional liability and general liability coverage are provided by non-Debtor affiliate Prospect Medical Holdings Risk Retention Group, Inc. ("RRG"). RRG is a self-insurance program incorporated and domiciled in the state of Vermont, and is owned by Debtors as the sole Class A Unit holder, and insured professional corporations or other healthcare provider entities or individuals (with whom the Debtors have contractual relationships) as the Class B Unit holders. RRG contracts directly with service providers, such as third-party administrators, managers, legal advisors, actuarial consultants, tax advisors, investment managers, and auditors, to manage and administer medical professional liability and general liability policies for its members.

23. RRG provides primary malpractice insurance coverage with legally-required limits of (a) for physicians, a $500,000 per-occurrence limit and $1,500,000 aggregate limit, and (b) for hospitals, a $500,000 per-occurrence limit and $2,500,000 aggregate limit. RRG also provides general liability coverage with a $1,000,000 per-occurrence limit and a $2,000,000 aggregate limit. The Debtors ensure that RRG has adequate capitalization for such coverage by prefunding liabilities on a quarterly basis with cash sufficient to meet expected losses.

24. For policy periods from October 1, 2020 through the current date, RRG's primary coverage is subject to a $250,000 deductible. Policy periods prior to October 1, 2020 have a $0 deductible. For all policy periods, the MCARE Fund provides $500,000 of additional coverage in excess of the $500,000 RRG malpractice coverage for physicians, hospitals, and certain professional corporations. The MCARE Fund is subject to a $1,500,000 aggregate limit per-institution and per physician, which has already been exhausted for some policy years in the State Court Actions.

25. For policy periods prior to October 1, 2020, coverage in excess of RRG and, if not exhausted, the MCARE Fund, is provided by third-party excess insurers. However, those excess policies are subject to a $4,000,000 SIR, which has to be paid by PMH.

26. For policy periods from October 1, 2020 through the current date, coverage in excess of RRG and, if not exhausted, the MCARE Fund, is provided by CHIC. The total excess policy limit is typically $80,000,000, for each loss event and in the annual aggregate, excess of the primary coverage layers described above. These CHIC policies have a $12.5 million SIR, which has to be paid by PMH.

27. The Debtors maintain employment practices liability insurance (the "EPLI Policy"), which provides coverage for defense costs and damages relating to various employment-related claims, including the Non-Debtor Employment Lawsuits which allege violations of applicable employment law by the Debtors' employee(s). Under the EPLI Policy, the Debtors are first responsible for making payments up to the amount of the applicable SIR—$500,000—and, only once the Debtors have made such payment is the applicable third-party insurer obligated to reimburse the remaining cost of the claim up to the appropriate policy limit. Until the Debtors meet such SIR limit, the Debtors are compelled to cover any costs and judgments imposed relating to the Non-Debtor Employment Lawsuits. The EPLI Policy does not differ inside and outside of Pennsylvania, and the coverage afforded under the Policy is identical across all jurisdictions where the Debtors operate and have placed coverage. The EPLI Policy is also a claims-made and reported policy, and the layers of excess coverage are identical across the policy years that are triggered by the Non-Debtor Employment Lawsuits.

28. Debtors maintain $5 million in primary coverage, which is subject to the aforementioned $500,000 SIR, and coverage in excess of the primary limit is provided by third party excess insurers, in an aggregate amount of $15 million.

C. **The Motions to Lift the Automatic Stay**

29. Since the HCo Petition Date, the MLS Movants filed fourteen (14) motions to lift the automatic stay (the "Lift Stay Motions"), requesting that the Court lift the automatic stay to allow the MLS Movants to proceed with their actions and recover from any available insurance proceeds.[5]

30. The Debtors filed objections to ten (10) of the Lift Stay Motions,[6] arguing that the movants did not show that "cause" existed to justify lifting the automatic stay, and that the harm the Debtors would experience as a result of lifting the stay outweighed the harm to the movants by maintaining the automatic stay. Two of the Lift Stay Motions were adjourned indefinitely.[7] Additionally, the Debtors agreed to partially lift the stay as to two defendants, permitting them to continue their state court actions as to non-Debtor defendants and conduct limited discovery.[8]

31. The contested Lift Stay Motions were adjourned pending the hearing on the Claims Resolution Procedures (defined below). At the hearing on May 21, 2025, the Court approved the Claims Resolution Procedures, subject to comments from the MLS Movants. The MLS Movants agreed to adjourn indefinitely their Lift Stay Motions, given the approval of streamlined procedures.[9]

---

[5] Docket Nos. 893, 1144, 1203, 1205., 1207, 1209, 1467, 1498, 1525, 1728, 2342, 2343, 2406, 2891.

[6] Docket Nos. 1307, 1386, 1421, 1598, 1631, 1687, 1713, 1932.

[7] Docket Nos. 2407, 2982.

[8] Docket No. 3071.

[9] The Claims Resolution Order also provided for an injunction that would go into effect upon service of a notice. Claims Resolution Procedures ¶ 3.

## D. The Claims Resolution Procedures

32. In response to the Lift Stay Motions, and to establish an orderly framework to facilitate the efficient mediation and resolution of the substantial volume of PL/GL Claims, on April 29, 2025, the HCo Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving and Authorizing Mandatory Claims Resolution Procedures to Resolve Professional Liability and General Liability Claims; (II) Requiring the Debtors' Insurers to Satisfy Their Obligations under the Applicable Policies; and (III) Granting Related Relief* [Docket No. 1712] (the "Claims Resolution Procedures Motion"), seeking approval of mandatory claims resolution procedures and requiring insurers to satisfy their obligations under the applicable policies.[10]

33. On June 4, the Court entered the *Order (I) Approving and Authorizing Mandatory Claims Resolution Procedures to Resolve Professional Liability and General Liability Claims; and (II) Granting Related Relief* [Docket No. 2181] (the "Claims Resolution Order"), whereby the Court approved the Claims Resolution Procedures.[11]

34. Following entry of the Claims Resolution Order, the Debtors promptly began implementing the Claims Resolution Procedures, including selecting and appointing mediators in coordination with JAMS.[12] The Debtors filed proposed mediator selections for the Pennsylvania, New Jersey, and California claims, with the mediator lists reflecting input from various parties in interest, including the Ad Hoc Insured Claims Counsel.[13]

---

[10] Slusher Decl. ¶ 4.

[11] Slusher Decl. ¶ 5.

[12] Slusher Decl. ¶ 6.

[13] Slusher Decl. ¶ 6; *see Notice of Proposed Mediators for Pennsylvania and New Jersey Claims* [Docket No. 2414]; *Notice of Proposed Mediators for California Claims* [Docket No. 3007]; *and Notice of Proposed Additional Mediators for Claims Resolution* [Docket No. 3008]. The Debtors have also been in active conversations with JAMS and the Ad Hoc Insured Claims Counsel regarding the appointment of Connecticut and Rhode Island mediators

35. The Debtors have also continued settlement discussions with insurers and reinsurers in an effort to secure funding.[14] Despite these efforts, as of late August—three months into discussions—the reinsurers remained unwilling to reach any form of settlement or agreement that would allow the Claims Resolution Procedures to proceed with sufficient funding.[15]

E.  **Post-Confirmation Claims Resolution Process**

36. As a result of the lack of progress made with respect to the Claims Resolution Procedures, the Debtors pivoted to the PCCRP.[16] As further described in the *Disclosure Statement for the Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor* [Docket No. 2987] (the "Disclosure Statement"), the Debtors intended to create a trust (the "Insurance Trust") where funds from the reinsurers would be deposited for disbursement to holders of the PL/GL Claims. The Insurance Trust would be administered by a trustee (the "Insurance Trustee") and unresolved claims would be sent to mediation pursuant to the PCCRP.[17] Additionally, under the PCCRP, holders of PL/GL Claims would retain the option to pursue their claims through litigation if they did not wish to utilize the Insurance Trust.

37. Following significant discussions with counsel for the holders of the PL/GL Claims during the hearing on August 28, 2025, the Debtors committed to an October 1, 2025, deadline for approval of insurance settlements.[18] Since then, the Debtors maintained ongoing dialogue with the insurers and reinsurers, emphasizing the October 1, 2025, deadline and the potential cost-

---

[14] Slusher Decl. ¶ 7.

[15] *Id.*; *see also* Aug. 20, 2025 Hr'g Tr. at 45, 58-59.

[16] Slusher Decl. ¶ 8.

[17] While not finalized, the Debtors intended to model the PCCRP largely based off the Claims Resolution Procedures already approved by the Court. *See Chapter 11 Plan* [Docket No. 2986] Art. I.215 (PCCRP to conform to Claims Resolution Procedures with only necessary Plan-related modifications).

[18] Aug. 28, 2025 Hr'g Tr. at 9:15.

saving benefits of the PCCRP.[19] Unfortunately, as of the filing of this Motion and despite the Debtors' significant efforts, the insurers and reinsurers have remained unwilling to reach any settlement with the Debtors and have failed to deposit any funds into the Insurance Trust.[20]

## F. The Motion to Modify the Automatic Stay.

38. The refusal of reinsurers to negotiate in good faith has left the Debtors with no alternative options but to seek modification of the automatic stay to permit all MLS Movants to pursue their PL/GL Claims against the Debtors for the sole purpose of liquidating their PL/GL Claims to final judgment or settlement, and to collect against any available insurance coverage provided by the Debtors' insurers and reinsurers.[21]

39. This Motion seeks to grant the MLS Movants substantially the relief requested in the Lift Stay Motions, whereby they are permitted to liquidate their PL/GL Claims to final judgment or settlement, including any appeal, and to collect against any available insurance coverage provided by the Debtors' insurers and reinsurers. Additionally, this Motion permits the MLS Movants to treat any unrecovered amounts of the PL/GL Claims as general unsecured claims.

40. The inability to pay the SIR amount as a result of insolvency is not a valid defense to the insurers and reinsurers providing coverage. *See e.g.*, *In re OES Env't, Inc.*, 319 B.R. 266, 269 (Bankr. M.D. Fla. 2004) (finding that any award against the debtor in excess of the SIR must be covered by the insurer regardless of the debtors' ability to pay); *Pinnacle Pines Cmty. Ass'n v. Everest Nat. Ins. Co.,* No. CV-12-08202-PCT-DGC, 2014 WL 1875166 at *5 (D. Ariz. May 9, 2014) (same); *In re FF Acquisition Corp.*, 422 B.R. 64, 67-68 (Bankr. N.D. Miss. 2009) (holding that the insurer must indemnify and defend the debtor when the SIR has not been paid). Receiving

---

[19] Slusher Decl. ¶ 9.

[20] *Id*; *see also* Sept. 18, 2025 Hr'g Tr. at 3–5.

[21] Slusher Decl. ¶ 10.

a general unsecured claim, not subject to objection by the Debtors, is *prima facie* payment of the SIR. By lifting the stay, the Debtors are not relinquishing any rights they hold against the insurers, all of which are retained or otherwise reserved for the benefit of the MLS Movants.

41. In addition, the Motion seeks to authorize any PL/GL Claimant who has not filed a Lift Stay Motion to file a notice lifting the automatic stay (a "Supplemental Lift Stay Notice") as to their PL/GL Claim. The Debtors will have five (5) business days to object to such relief. A form Supplemental Lift Stay Notice is attached to the Lift Stay Order as **Exhibit 1**.

## BASIS FOR RELIEF

**A.    There is "Cause" to Lift the Automatic Stay.**

42. Section 362(d)(1) of the Bankruptcy Code provides that a court shall grant relief from the automatic stay "for cause." However, the Bankruptcy Code does not offer guidance as to what constitutes "cause," but rather, the reviewing court must determine whether cause exists on a case-by-basis. *See, e.g.*, *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998); *In re Mosher*, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017) (explaining that whether "cause" exists is a fact-intensive inquiry "committed to the discretion of the bankruptcy judge … that must be determined on a case-by case basis.").

43. While there is no set list of circumstances that a bankruptcy court is required to consider in evaluating whether § 362(d)(1) "cause" exists to lift the automatic stay, courts have often looked to the following case-specific factors: (i) whether lifting the stay will result in any great prejudice to the debtor or the bankruptcy estate, (ii) whether any hardship to a non-debtor of continuation of the stay outweighs any hardship to debtor, and (iii) whether the creditor has a probability of prevailing on the merits of the case. *BDA Design Group, Inc. v. Official Unsecured Creditors' Committee*, No. 3:13-cv-01568-O, 2013 WL 12100467, at *6 (N.D. Tex. Sept. 2, 2013).

44. The Debtors request that the automatic stay be lifted to allow MLS Movants to pursue their claims against the Debtors' insurers and reinsurers. The MLS Movants will only seek damages first against the insurers and reinsurers, and will simply be granted general unsecured claims for any unrecovered amounts. Therefore, lifting the automatic stay will not impose great prejudice to the Debtors' estate.

45. Additionally, courts in the Fifth Circuit have also relied up on a set of twelve factors, the so-called "*Sonnax Factors*," when assessing motions for relief from stay. *See In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014) (citing *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990)). The *Sonnax Factors* include:

   1) whether relief would result in a partial or complete resolution of the issues;
   2) lack of any connection or interference with the bankruptcy case;
   3) whether the other proceeding involves the Debtor as a fiduciary;
   4) whether a specialized tribunal with the necessary expertise has been established to hear the case the cause of action;
   5) whether the debtor's insurer has assumed full responsibility for defending it;
   6) whether the action primarily involves third parties;
   7) whether litigation in another forum would prejudice the interests of other creditors;
   8) whether the judgment claim arising from the other action is subject to equitable subordination;
   9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
   10) the interests of judicial economy and the expeditions and economical resolution of litigation;
   11) whether the parties are ready for trial in the other proceeding; and
   12) impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286; *In re Celsius Network LLC*, 642 B.R. 497, 502 (Bankr. S.D.N.Y. 2022).

46. Consideration of the Sonnax factors favors lifting the automatic stay. First, the Debtors will not incur any substantial costs for defense and judgments because the Debtors will not pay out any judgment in the non-bankruptcy court actions, do not intend to actively defend against these actions, and will only pay out unrecovered amounts converted into general unsecured claims on a pro-rata basis pursuant to the terms of the Plan. *See In re Edgeworth*, 993 F.2d 51, 54

(5th Cir. 1993) (holding that allowing actions against a debtor does not inequitably burden the debtor when "the costs of defense are borne by the insurer and there is no execution on judgment against the debtor personally"). Second, there is minimal prejudice to other creditors; this Motion seeks to expedite the liquidation of preexisting claims and does not allow the PL/GL Claimants to race ahead of other creditors. *See In re Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005) (holding that a central purpose of the automatic stay is to prevent creditors from "scramble[ing] to obtain as much property of the debtor's limited estate as possible"). Finally, lifting the stay would be in the interest of judicial economy, as the pending actions cannot be resolved entirely within the bankruptcy court, and such fragmented litigation would be antithetical to the principles of judicial economy. *See In re Trust*, 526 B.R. 668, 684 (Bankr. N.D. Tex. 2015); *In re Fowler*, 259 B.R. 856, 861 (Bankr. E.D. Tex. 2001); *In re U.S. Brass Corp.*, 176 B.R. 11, 13 (Bankr. E.D. Tex. 1994) (finding that "[t]he factor of judicial economy may be considered in deciding whether to lift the automatic stay; in fact, a decision to lift the stay may be upheld on this ground alone").

**B.     The Debtors Consent to Lifting the Automatic Stay.**

47.     The movant carries the initial burden on the stay relief, and only if the movant makes a *prima facie* case does the debtor need to respond. *See In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999) (citing *In re Sonnax*, 907 F.2d at 1280).

48.     Here, the Debtor is the movant, both requesting and consenting to the relief requested herein. There is no need for the creditor to prove a *prima facie* case or for the Debtors to respond.

<b><u>EMERGENCY CONSIDERATION</u></b>

49.     The Debtors request emergency consideration of this Motion. The MLS Movants' actions have been stayed since the commencement of these chapter 11 cases, and the MLS Movants should not be further delayed from seek resolution. Accordingly, the Debtors request that the

Court approve the relief requested in this Motion on an emergency basis to prevent further delay in resolving these actions.

## **RESERVATION OF RIGHTS**

50. The Debtors reserve all rights to supplement or add to the legal and factual arguments raised in this Motion, on any basis whatsoever, at a future date. Nothing herein shall be interpreted as an admission that any claim described herein is valid, and the Debtors reserve all rights with respect thereto.

## **NO PREVIOUS REQUEST**

51. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of the page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto, granting the relief requested herein and granting such other relief as is just and proper.

Dated:  October 6, 2025
Dallas, Texas

*/s/ Vincent P. Slusher*
The Law Office of Vincent P. Slusher
Vincent P. Slusher (00785480)
2121 N. Akard St., Suite 250
Dallas, Texas 75201
Telephone:	(214) 478-5926
Email:		Vincent.slusher@proton.me

*Conflicts Counsel for the HCo and PCo Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on October 6, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Vincent P. Slusher*
Vincent P. Slusher