SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
rpatel@sidley.com
mquejada@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    wcurtin@sidley.com
pventer@sidley.com
anne.wallice@sidley.com

*Attorneys for the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) Rel. to Dkt. No. 606 |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) GRANTING RELIEF FROM THE CENTURION SALE ORDER AND (A) AUTHORIZING THE TRANSFER OF THE RHODE ISLAND HOSPITALS TO THE STATE OF RHODE ISLAND, OR (B) IN THE ALTERNATIVE, APPROVING THE CLOSURE OF THE RHODE ISLAND HOSPITALS; AND (II) GRANTING RELATED RELIEF

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

> If you object to the relief requested, you must respond in writing.  Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txnb.uscourts.gov/ no more than 21 days after the date this motion was filed.  If you do not have electronic filing privileges, you must file a written response that is actually received by the clerk and filed on the docket no more than 21 days after the date this motion was filed.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.
>
> A status conference will be conducted on the matters set forth in this motion on <u>November 4, 2025, at 9:30 a.m. prevailing Central Time</u> in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242.  You may participate in the status conference either in person or by an audio and video connection.
>
> Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 650.479.3207.  The meeting code is 2304 154 2638.  Video communication will be by the use of the Cisco WebEx platform.  Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page.  Click the settings icon in the upper right corner and enter your name under the personal information setting.  WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.
>
> Hearing appearances must be made electronically in advance of electronic hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, "<u>Prospect</u>" or the "<u>Debtors</u>")[2] in the above-captioned chapter 11 cases, file this motion (this "<u>Motion</u>").  In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT[3]

1.     The Debtors do not seek the relief set forth in this Motion lightly.  When the Court approved the sale of the Debtors' Rhode Island hospitals (including the Roger Williams Medical Center and Our Lady of Fatima Hospital) and related operations (the "<u>RI Hospitals</u>") to The Centurion Foundation, Inc., CharterCARE Health of Rhode Island, Inc., and each of their

---

[2]   Prospect Medical Holdings, Inc. and its hospital-related debtor affiliates (the "<u>HCo Debtors</u>"), PHP Holdings, LLC ("<u>PHPH</u>"), the physician-related debtor affiliates (together with PHPH, the "<u>PCo Debtors</u>"), as well as the HCo Debtors' and PCo Debtors' parent entities, Chamber Inc., Ivy Holdings Inc., and Ivy Intermediate Holding Inc. (the "<u>TopCo Debtors</u>") are the debtors and debtors-in-possession in the above-captioned chapter 11 cases.

[3]   Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed thereto in the Motion.

successors and assigns (collectively, "Centurion") on February 12, 2025 (the "Centurion Sale"),[4] the Debtors were assured that closing would occur "30 to 60 days after entry of the sale order."[5] Now, more than eight months after approval of the Centurion Sale, and six months after that promised closing date, the Debtors can no longer afford to fund the RI Hospitals on the hope that Centurion may finally obtain adequate financing to close the Centurion Sale.

2.      While the Debtors have made it clear from the outset of these cases that they are committed to transitioning their hospitals to new owners acceptable to state regulators, the Debtors also have a fiduciary duty to their creditors (including to the vendors who have supported these hospitals) to maximize the value of their estates and avoid administrative insolvency.  After the Debtors raised concerns regarding the delay, Centurion and the State of Rhode Island through its Attorney General (the "Rhode Island Attorney General") reached an agreement that would purportedly allow the Centurion Sale to close by the end of October.  However, despite the Rhode Island Attorney General's accommodations, Centurion still does not have the necessary financing, although Centurion **hopes** to have such financing by December 1 ***at the earliest***.  As has become obvious from this process, a closing is not guaranteed at any point, much less at any time in the near future.  The Debtors cannot risk any further delay in the event that Centurion remains unable to meet its obligations under the APA and close the sale.  Therefore, the Debtors regretfully come before this Court, seeking authority to start a process either to (a) transfer the RI Hospitals to the State of Rhode Island or its designee, or, (b) in the alternative, begin an orderly closure of the RI Hospitals.

---

[4]   *See Order (I) Approving and Authorizing (A) the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets Free and Clear of Interests, (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Assignment of Certain Permits; and (II) Granting Related Relief* [Docket No. 606] (the "Centurion Sale Order").

[5]   *See* Hr'g Tr. 10:19-21, Feb. 12, 2025.

3.      The RI Hospitals operate at a significant loss.  At the first day hearing in these chapter 11 cases, the Debtors stated that they would transfer the RI Hospitals to Centurion, a buyer that had the support of the Rhode Island Attorney General and the Rhode Island Department of Health ("RIDOH").[6]  Although the Debtors would receive little direct consideration under the Centurion Sale, in addition to allowing for continuity of care and jobs for the Rhode Island community, the contemplated benefit to the Debtors' estates was  the ability to shed the continuing losses being incurred by the Debtors.[7]  However, this benefit proved illusory, as the closing of the Centurion Sale has been repeatedly delayed due to Centurion's inability to obtain the financing necessary to meet the conditions imposed on the sale by the Rhode Island regulators.  This six-month delay in closing has required the Debtors to incur significant, unanticipated additional losses of approximately $18.7 million, with an additional $6 million in losses expected by the end of November.

4.      The major barrier to closing the Centurion Sale (and also any potential sale to another hypothetical buyer) are the financial requirements imposed by the Rhode Island Attorney General and RIDOH, as well as the buyer's failure to raise sufficient funds.  As outlined in the Rhode Island Opinions[8] and the CEC Decision,[9] the Rhode Island Attorney General and RIDOH conditioned their approval on Centurion setting aside (i) $45 million dollars of the sale proceeds (the "True-Up Funding") and (ii) an additional $35 million in funding (the "Additional True-Up

---

[6]    *See* Hr'g Tr. 20:1-7, Jan. 14, 2025.

[7]    *See* Hr'g Tr. 12:22-25, Jan. 14, 2025.

[8]    The "Rhode Island Opinions" collectively means the Rhode Island DOH Opinion, the Rhode Island DOH 2024 Opinion, the Rhode Island AG Opinion, and the Rhode Island AG 2024 Opinion (each as defined in the APA), as the same may be amended from time to time, copies of which are annexed hereto as **Exhibits D through G**, respectively.

[9]    The "CEC Decision" means the November 25, 2024, Change in Effective Control Decision issued by the Rhode Island Department of Health, as the same may be amended from time to time, a copy of which is annexed hereto as **Exhibit H**.

Funding") for the exclusive benefit of the Rhode Island Hospitals post-closing. Further, Centurion is required to fund approximately an additional $15 million into a restricted fund (the "Hospital Fund"), to be used for the express purpose of continuing operations at the RI Hospitals, making necessary improvements at the RI Hospitals, and meeting the health care needs of the Rhode Island community served by the RI Hospitals.[10] The requirements of the True-Up Funding, Additional True-Up Funding, and Hospital Fund total approximately $95 million, which must be funded by Centurion as part of its purchase. As is discussed herein, the regulators imposed these conditions on Centurion because of concerns about the "feasibility" of Centurion's financing, Centurion's "commitment and competence," and Centurion's "lack of experience operating health care facilities."[11]

5.    Additionally, as discussed herein, the Hospital Fund has already been funded with required contributions from Prospect and Leonard Green & Partners and has a cash balance of approximately $51.5 million. These amounts are currently held in an escrow account under the control of the Rhode Island Attorney General pursuant to the Rhode Island AG Opinion (the "Cash Escrow"),[12] which was funded by Prospect and Leonard Green & Partners prior to the Petition Date under the terms of the Original Agreement.

6.    Altogether, the financial requirements imposed by the Rhode Island Attorney General and RIDOH requires total balance sheet cash and Hospital Fund cash of $146.8 million. Requiring these significant cash balances raises the required financing amount above a feasible level and presents a challenge to closing for Centurion (or any other hypothetical buyer).

---

[10]    *See* Rhode Island AG 2024 Opinion at 81.

[11]    *Id.* at 27, 28 and 47 [internal quotations removed].

[12]    At the behest of the Unsecured Creditors Committee (as defined below) in these chapter 11 cases, the Debtors reserve all rights with respect to the Cash Escrow, including the right to seek to vacate the Centurion Sale Order to access the Cash Escrow.

7.     Centurion has been attempting to finance the transaction for the past six (6) months. In May 2025, Centurion first went to market with a bond issuance, seeking to raise approximately $140 million to finance the transaction.  These efforts unfortunately failed.  In August 2025, the transaction terms were amended in cooperation with the Rhode Island Attorney General, and Centurion launched another round of bond financing, seeking to raise approximately $105 million. Centurion again failed to raise adequate funds.

8.     Prior to the filing of this Motion, the Debtors unsuccessfully engaged with Centurion and the Rhode Island Attorney General to try and identify alternative options to closing the RI Hospitals, including asking the Rhode Island Attorney General to use the $51.5 million cash balance included in the Hospital Fund to support the ongoing operations of the RI Hospitals or to cover the losses and provide the Debtors more time to transition the RI Hospitals, either to Rhode Island, Centurion, or another approved buyer.[13]

9.     The Debtors cannot continue to operate the RI Hospitals indefinitely.  Continued operations at these facilities past December 31, 2025 would risk further administrative insolvency of these chapter 11 cases.  It is particularly inequitable to burden the Debtors' creditors with these losses under the current circumstances, where the Debtors will receive little, if any, consideration from the transfer of these assets.[14]  Although the Debtors have not terminated the APA at this time, the Debtors have clear cause for termination based on the failure to close by the Termination Date

---

[13]   The Debtors shared a draft of this Motion with the Rhode Island Attorney General on October 8, 2025 (the "October 8 Draft").  The October 8 Draft included the request, as outlined in this Motion, to transition the operations to the Rhode Island Attorney General on an expedited basis to ensure no disruption in healthcare services in the Rhode Island community the RI Hospitals serve or, in the alternative, close the RI Hospitals.

[14]   *See* Conditional Waiver Letter (as defined below) at 2 ("The Attorney General requires that the Transacting Parties reduce the purchase price that will go to Prospect by no less than $10 million from the August 25, 2025 draft Closing Statement so that the amount of the purchase price that is remitted to Prospect is equal to the lesser of (a) the amount calculated under the APA after a $10 million reduction in Purchase Price or (b) $5 million.").

(as defined in the APA), and will do so absent a timely closing. The Debtors are continuing to evaluate and pursue all pathways pending the authorization of the relief requested in this Motion.

10. After six months of attempts to close the Centurion Sale, the Debtors unfortunately are left in an impossible position. Unless there can be some certainty that the Centurion Sale will close, or the Rhode Island Attorney General agrees to lower its requirements to whatever level of funding Centurion can meet, the Debtors will be forced to continue to operate the RI Hospitals indefinitely at a considerable loss. On one hand, the Debtors remain committed to closing the Centurion Sale, but are held hostage by the Rhode Island Attorney General's closing conditions and Centurion's inability to raise the necessary financing. The Debtors have tried unsuccessfully to gain the Rhode Island Attorney General's agreement to an alternative plan in the event Centurion is unsuccessful in meeting the Rhode Island Attorney General's preconditions to approval of the sale. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## **RELIEF REQUESTED**

11. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) granting relief from the *Order (I) Approving and Authorizing (A) the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets Free and Clear of Interests, (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Assignment of Certain Permits; and (II) Granting Related Relief* [Docket No. 606] to: (a) authorize the transfer of the RI Hospitals to the State of Rhode Island or its designee, subject to the assumption of the post-petition operating liabilities of the RI Hospitals and the agreement of the State of Rhode Island, or, in the alternative, (b) approve the safe and orderly closure of the

RI Hospitals on an expedited basis and authorize the liquidation of their assets; and (ii) granting related relief.

12.    In support of this Motion, the Debtors submit the *Declaration of Andrew Turnbull in Support of Debtors' Motion for Entry of an Order (I) Granting Relief From the Centurion Sale Order and (A) Authorizing the Transfer of the Rhode Island Hospitals to the State of Rhode Island, or (B) in the Alternative, Approving the Closure of the Rhode Island Hospitals; and (II) Granting Related Relief* (the "Turnbull Declaration") and the *Declaration of Paul Rundell in Support of Debtors' Motion for Entry of an Order (I) Granting Relief From the Centurion Sale Order and (A) Authorizing the Transfer of the Rhode Island Hospitals to the State of Rhode Island, or (B) in the Alternative, Approving the Closure of the Rhode Island Hospitals; and (II) Granting Related Relief* (the "Rundell Declaration"), filed contemporaneously herewith.

## JURISDICTION AND VENUE

13.    The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.    The legal predicates for the relief requested in this Motion are sections 105, 363, 554, 704, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003, 6004, 9023, and 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 60 of the Federal Rules of Civil Procedure (the "Federal Rules"), rule 2002 of the Local

Bankruptcy Rules for the Northern District of Texas (the "Local Bankruptcy Rules"), and the Procedures for Complex Cases in the Northern District of Texas.

15. The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### A. General Background

16. The Debtors and their non-Debtor affiliates (collectively, the "Company") are significant providers of regional healthcare services in California, Connecticut, Rhode Island, and formerly Pennsylvania. The Company's primary business is hospital operations, which consist of, among other things, the ownership and/or operation of acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services spanning multiple states.

17. Beginning on January 11, 2025 (the "HCo Petition Date"), each of the Debtors related to the HospitalCo business filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. A detailed description of these Debtors and their business and certain of the facts and circumstances of the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Paul Rundell in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "First Day Declaration").

18. On January 29, 2025, the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors in the Debtors' chapter 11 cases [Docket No. 295] (the "Unsecured Creditors Committee").

19. On January 30, 2025, the U.S. Trustee appointed Suzanne Koenig as the patient care ombudsman in the HCo Debtors' chapter 11 cases [Docket No. 325].

20.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 93, 2473, and 3474].

### B.     RI Hospital Cash Escrow

21.     In the fall of 2019, Prospect sought regulatory approval from the Rhode Island Attorney General and RIDOH for the buy-out of private equity investor Leonard Green & Partners ("Leonard Green") from its interest in the Company (the "Ivy Merger").   As detailed in the agreement and plan of merger dated October 2, 2019 (the "Merger Agreement") this transaction contemplated Ivy Holdings Inc. undergoing a change of ownership, whereby a new entity, Chamber Inc., would be created to assume full control of Ivy Holdings Inc. and the Company, including operations at the RI Hospitals.

22.     On June 1, 2021, regulatory approval of the Ivy Merger was conditionally granted and the transaction was consummated pursuant to the terms outlined in the Rhode Island AG Opinion and the Rhode Island DOH Opinion.   These terms required, *inter alia*, the establishment the Cash Escrow in three accounts totaling $80 million: (i) an escrow account in the amount of $12 million (the "Global Conditions Escrow"); (ii) an escrow account in the amount of $41 million (the "CAPEX Escrow"); and (iii) an escrow account in the amount of $27 million (the "MAAP Escrow").[15, 16] The Cash Escrow was established "for the sole benefit" of the RI Hospitals, and these funds "can only be accessed if [Prospect] fails to comply with the [c]onditions requiring

---

[15]   As further required by the Rhode Island AG Opinion, a $10 million payable to Leonard Green under the Ivy Merger was redirected pursuant to a payment direction letter (the "Payment Direction Letter"), executed on the same day, to support Leonard Green's contributions to the Cash Escrows.  *See* Rhode Island AG Opinion at 22.

[16]   *See* Rhode Island AG Opinion at 75.

payment of operating losses and capital expenditures, or in the event of insolvency" at the discretion of the Rhode Island Attorney General.[17]

23.     The Cash Escrow was funded pursuant to an escrow agreement dated June 1, 2021 (the "Escrow Agreement") between City National Bank (the "Escrow Agent"), certain affiliates of Prospect, certain affiliates of Leonard Green, and James P. Carris (the "Escrow Trustee").  As required by the Rhode Island AG Opinion and the Escrow Agreement, the Global Conditions Escrow was funded by $4 million in contributions from Prospect and $8 million from Leonard Green.[18]  Similarly, the CAPEX Escrow was jointly funded by $14.2 million from Prospect and $26.8 million from Leonard Green.[19]  The CAPEX Escrow was to be released back to Prospect and Leonard Green in installments, upon certain capital expenditure thresholds being met at the RI Hospitals.[20]  The $27 million MAAP Escrow was funded entirely by Prospect.[21]  In the event that Prospect failed to make sufficient payments under the CMS Accelerated and Advance Payment Program or the Medicare Advance Payment Program, the MAAP Escrow would insulate the RI Hospitals from liability.[22]

24.     On November 14, 2024, when the Rhode Island AG 2024 Opinion was issued, approximately $47 million remained in the Cash Escrow.[23]  The Cash Escrow now contains

---

[17]   *See id*. at 7.

[18]   *See id*. at 75.

[19]   *See id*.

[20]   With the exception of the initial $8 million installment, of which 40% was designated to Prospect and 60% to Leonard Green, the reductions in the CAPEX Escrow would be split 33.33% to Prospect and 66.67% to Leonard Green.  *See* Rhode Island AG Opinion at 76-77.

[21]   *See* Rhode Island AG Opinion at 75.

[22]   *See id.* at 34.

[23]   *See* Rhode Island AG 2024 Opinion at viii.

approximately $51.5 million and is under the control of the Rhode Island Attorney General.[24] If

the Centurion Sale had closed, no portion of the Cash Escrow would have been returned to either

Prospect or Leonard Green and the balance would have been allocated to support the creation of

the Hospital Fund, to be "used for the purpose of supporting the continued operations of the Rhode

Island Hospitals, making necessary and prudent capital improvements to the Rhode Island

Hospitals, and meeting the health care needs of the community served by the Rhode Island

Hospitals."[25]

### C.    Court Approval of the Centurion Sale and Expected Closing

25.    On November 18, 2022, Prospect and certain of its affiliates (collectively, the

"Seller")[26] and Centurion entered into an asset purchase agreement (as amended on April 18, 2023

and November 7, 2023, the "Original Agreement") for the sale of certain assets, including the RI

Hospitals.[27]   The Original Agreement, as previously amended, was amended and restated on

February 2, 2025, (as amended and restated, the "APA") to facilitate consummation of the

Centurion Sale following the commencement of the Debtors' chapter 11 cases.

26.    On February 3, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order*

*(I) Approving and Authorizing (A) the Asset Purchase Agreement, (B) the Sale of the Debtors'*

---

[24]  *See* Attorney General Peter F. Neronha, *Attorney General Neronha announces new and enhanced conditions and amendments to Centurion decision*, Official State of Rhode Island website, July 31, 2025, https://riag.ri.gov/press-releases/attorney-general-neronha-announces-new-and-enhanced-conditions-and-amendments (the "July Press Release").

[25]  *See* Rhode Island AG 2024 Opinion at 81.

[26]  "Seller" means, collectively, Debtors Prospect Medical Holdings, Inc., Prospect CharterCARE, LLC d/b/a CharterCARE Health Partners, Prospect CharterCARE RWMC, LLC d/b/a Roger Williams Medical Center f/k/a Roger Williams General Hospital, Prospect RI Home Health and Hospice, LLC, Prospect CharterCARE Home Health and Hospice, LLC, New University Medical Group, LLC d/b/a University Medical Group, Prospect CharterCARE SJHSRI, LLC d/b/a Our Lady of Fatima Hospital, Prospect CharterCARE Physicians, LLC d/b/a CharterCARE Medical Associates, Prospect CharterCARE Ancillary Services, LLC, and Prospect Blackstone Valley Surgicare, LLC.

[27]  As laid out more fully in the Original Agreement, the RI Hospitals are part of the "Purchased Assets" in the Centurion Sale transaction.

*Assets Free and Clear of Interests, (C) the Assumption and Assignment of Certain Executory*
*Contracts and Unexpired Leases, and (D) the Assignment of Certain Permits; and (II) Granting*
*Related Relief* [Docket No. 349] (the "<u>Centurion Sale Motion</u>"), along with the *Declaration of*
*Paul Rundell in Support of the Centurion Sale Transaction* [Docket 369] (the "<u>Sale</u>
<u>Declaration</u>"),[28] seeking approval of a private sale to Centurion pursuant to the terms of the APA.

27.     On February 12, 2025, the Bankruptcy Court approved the Centurion Sale and
entered the Centurion Sale Order.  At the time the Centurion Sale Order was entered, ***the Centurion***
***Sale was expected to close within 30-60 days***.[29]

### D.     Operating Losses at the RI Hospitals

28.     In the intervening eight months since the Centurion Sale Order was entered, and six
months since the transaction's expected closing date, the Debtors have maintained their steadfast
commitment to patient care and continued, at great expense, to fund the RI Hospitals.[30]  During
the six-month period following the anticipated closing date, the RI Hospitals have incurred
negative cash flow of $18.7 million, which was funded by the Debtors' other operations and DIP
financing.[31]  Negative cash flow at the RI Hospitals is forecasted to be approximately $6 million
for the month of November and exceed $5 million for the month of December.[32]

29.     As the Debtors and their advisors have stated multiple times throughout their sale
processes, the elimination of ongoing expenses and accrual of administrative claims is critical to

---

[28]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day
Declaration, the Sale Declaration, the Centurion Sale Order, the Rhode Island Opinions, or the APA, as applicable.

[29]   *See* Hr'g Tr. 10:19-21, Feb. 12, 2025.

[30]   *See* Turnbull Decl., ¶ 12.

[31]   *See id.*

[32]   *See id.*

the success of these chapter 11 cases.[33]  While the Debtors have made it clear from the outset of

these cases that they are committed to transitioning their hospitals to new owners acceptable to

state regulators, the Debtors also have a fiduciary duty to their creditors (including to the vendors

who have supported these hospitals) to maximize the value of their estates and avoid administrative

insolvency.  The Debtors believe they have been more than reasonable in supporting the Centurion

transaction as approved by the Rhode Island regulators.[34]

30.     Regrettably, it is imprudent for the Debtors to continue to sustain operations at the

RI Hospitals due to the mounting losses and mounting administrative claims.[35]  Operating losses

at the RI Hospitals are simply a financial burden the Debtors' estates can no longer bear without a

certain end in sight.[36]

### E.     Barriers to Closing of the Centurion Sale

31.     The Centurion Sale Order, the APA and certain regulatory approvals require, *inter

alia*, the satisfaction of certain requirements and conditions (the "AG Conditions")[37] set forth by

the Rhode Island Attorney General and RIDOH.[38]  Specifically, the AG Conditions as originally

amended set certain initial funding requirements (the "AG Funding Requirements") for the

Centurion Sale, including: (a) the retention of $45 million in True-Up Funding for the RI Hospitals,

with $35 million in Additional True-Up Funding secured within 90 days of closing, and (b) the

---

[33]   *See id.*, ¶ 13.

[34]   *See id.*

[35]   *See id.*

[36]   *See id.*

[37]   As indicated above, the AG Conditions are outlined in the Rhode Island Opinions and the CEC Decision.

[38]   *See id.*, ¶ 14.

contribution of approximately $15 million to a Hospital Fund held exclusively for the benefit of the RI Hospitals.[39]

32.     The AG Funding Requirements and figures outlined above do not include the $51.5 million held in the Cash Escrow pursuant to the Rhode Island AG Opinion, which was funded by Prospect and Leonard Green & Partners prior to the Petition Date under the terms of the Original Agreement.  The Cash Escrow has already been secured by the Rhode Island Attorney General and is set aside to support the creation of the Hospital Fund.[40]

33.     Neither the True-Up Funding, the Additional True-Up Funding, nor the Hospital Fund accrue for the benefit of the Debtors' estates.  The True-Up Funding and Additional True-Up Funding are held exclusively for the benefit of the RI Hospital system following the transition to new operators.[41]  Similarly, the Hospital Fund must be used for the express purpose of continuing operations at the RI Hospitals, making necessary improvements at the RI Hospitals, and meeting the health care needs of the Rhode Island community.[42]

34.     Although Centurion was initially required to set aside up to $95.3 million in bond financing in order to meet the AG Funding Requirements, which was amended to $60.3 million in August 2025 (with a commitment to raise the $35 million of Additional True-Up Funding after the Centurion Sale closing) and, as detailed below, further reduced to $51.3 million in September 2025 (with the Additional True-Up Funding waived).  Despite these modifications, Centurion has been

---

[39]   *See id.*

[40]   *See* July Press Release.

[41]   *See* Rhode Island AG 2024 Opinion at 80.

[42]   *See id.* at 81.

unable to raise sufficient financing to satisfy the AG Funding Requirements, contributing to an impasse to consummation of the sale.[43]

### F.    Attempts to Obtain Bond Financing by Centurion

35.    Following the execution of the Original Agreement, Centurion engaged a financing partner and underwriter to secure bond financing for the Centurion Sale.[44]

36.    In the Rhode Island AG 2024 Opinion issued on November 14, 2024, The Rhode Island Attorney General raised concerns with Centurion's bond financing structure and viability as a healthcare operator in the Rhode Island Opinions, finding that "there exists no pathway that does not result in the Hospitals requiring additional financial support [for a sale to Centurion]"[45] and "[t]he lack of financial investment by Centurion, and their further insistence that they will not guarantee the bond financing plan, create a scenario where Centurion may not be adequately incentivized to ensure that the Hospitals succeed in their turnaround."[46]  Further, the Rhode Island Attorney General "identified a number of risks to the completion of [Centurion's] financing strategy,"[47] including the uncertain valuation of the hospital system, the feasibility of the bond financing model developed by Barclays, and "whether the bonds that are issued . . . would be put at risk by subsequent corporate reorganization."[48]  The Rhode Island Attorney General ultimately

---

[43]    *See* Turnbull Decl., ¶ 15.

[44]    *See* Rhode Island AG 2024 Opinion at 39.

[45]    *See id.* at 33.

[46]    *See id.* at 35-36.

[47]    *See id.* at 41.

[48]    *See id.* at 43.

concluded that "the feasibility of a successful bond financing appears to be at risk"[49] and "[i]t is possible that these risks could lead to an inability of the system to access bond financing."[50]

37.     Centurion has been attempting to finance the Centurion Sale post-petition through a bond issuance for the past six (6) months.[51]   In May 2025, Centurion first went to market with a bond issuance, seeking to raise approximately $140 million to finance the transaction.[52]   These efforts unfortunately failed.[53]   In August 2025, after the regulatory requirements were lessened in cooperation with the Rhode Island Attorney General, Centurion launched another round of bond financing, seeking to raise approximately $105 million, but again failed to raise adequate funds.[54]

### G.     Coordination of Conditional Waiver of Certain Funding Requirements

38.     On September 22, 2025, the Debtors sent a letter, a copy of which is attached hereto as **Exhibit B** (the "Closing Conditions Letter") to counsel to Centurion and the Rhode Island Attorney General, outlining the necessity for the two parties to reach a consensual resolution on the AG Funding Requirements that will allow the Centurion Sale to close.[55]

39.     On September 26, 2025, the Rhode Island Attorney General issued a response to the Closing Conditions Letter, attached hereto as **Exhibit C**, indicating that the funding requirements had been lessened to allow Centurion to close the Centurion Sale by October 31, 2025 (the "Conditional Waiver Letter").[56]   The Conditional Waiver Letter (a) lowers the True-Up

---

[49]   *See id.* at 47.

[50]   *See id.* at 49.

[51]   *See* Turnbull Decl., ¶ 16.

[52]   *See id.*

[53]   *See id.*

[54]   *See id.*

[55]   *See id.*, ¶ 17.

[56]   *See id.*

Funding from $45 million to $36 million, and (b) waives the requirement for $35 million in Additional True-Up Funding (collectively with the Hospital Fund, which remains unchanged, the "Modified AG Funding Requirements"), subject to the satisfaction of certain conditions.[57]  These conditions include (a) a $10 million reduction in sale proceeds flowing to the Debtors' estates under the APA, such that the Debtors shall not receive more than $5 million total from the Centurion Sale (the "Purchase Price Reduction"), and (b) a $1.5 million reduction in Centurion's closing costs, with payment deferred on at least $2 million in closing costs until 6 months after closing (the "Closing Costs Reduction").[58]

40.    As detailed in the Conditional Waiver Letter, the Modified AG Funding Requirements provided that the Centurion Sale must close by October 31, 2025.[59]   It is now clear that the closing of the Centurion Sale will not occur within this timeframe.[60]

### H.    Closure Discussions Between the Parties

41.    On October 8, 2025, the Rhode Island Attorney General issued a letter to Centurion, requesting a progress report on financing efforts for the Centurion Sale (the "Financing Progress Letter"), a copy of which is attached hereto as **Exhibit I**.  The Financing Progress Letter states that "[c]ontinued uncertainty concerning closing [of the Centurion Sale] creates challenges to the health care system in Rhode Island, as, for example, doctors and other professionals seek alternatives to the CharterCARE System" and *the challenges being faced by Prospect in its*

---

[57]    *See* Conditional Waiver Letter at 2.

[58]    *See id.*

[59]    *See* Turnbull Decl., ¶ 18.

[60]    *See id.*

18

***chapter 11 case, including the ability to cover losses at the CharterCARE System, add to this
uncertainty and make timely closing a necessity***." [emphasis added].[61]

42.      On October 8, 2025, the Debtors shared the October 8 Draft of this Motion with
counsel to Centurion and the Rhode Island Attorney General.[62]   The October 8 Draft, like the
current Motion, included a request to transition the RI Hospitals to the Rhode Island Attorney
General on an expedited basis to ensure no disruption in healthcare services in the Rhode Island
community the RI Hospitals serve or, in the alternative, close the RI Hospitals.[63]   The Rhode Island
Attorney General issued a letter in response to the October 8 Draft on October 10, 2025, stating,
*inter alia*, that the Rhode Island Attorney General would oppose the requested relief.[64]   Following
this exchange, the Debtors, Centurion, and the Rhode Island Attorney General engaged in
discussions on the closure of the Centurion Sale, beginning on October 14, 2025 and continuing
through the filing date of this Motion.[65]

43.      In these discussions, the Debtors unsuccessfully engaged with the Rhode Island
Attorney General to try and identify alternative options to closing the RI Hospitals, including
requesting the Rhode Island Attorney General to allocate some portion of the $51.5 million cash
balance already funded in the Hospital Fund to (i) support the ongoing operations of the RI
Hospitals, or (ii) fund the operational losses and provide the Debtors more time to transition the

---

[61]    Financing Progress Letter at 2.

[62]    *See* Turnbull Decl., ¶ 19.

[63]    *See id*.

[64]    *See id*.

[65]    *See id*.

RI Hospitals, either to Rhode Island, Centurion, or another approved buyer.[66]  Unfortunately, the

parties were unable to reach agreement on any of these potential alternative solutions.[67]

## I.      Centurion's Current Financing Status

44.      Following the issuance of the Conditional Waiver Letter on September 26, 2025,

and the issuance of the Financing Progress Letter on October 8, 2025, Centurion continued to

engage with the Rhode Island Attorney General and the Rhode Island Health and Educational

Building Corporation ("RIHEBC") concerning the financing process for the Centurion Sale.

Before relaunching the bond raise process, Centurion also engaged with various banks and

financial institutions to supplement the efforts of its existing underwriter.[68]  Currently, Centurion

is pursuing a bridge loan with a money center bank to obtain the necessary financing to close the

transaction.[69]

45.      On October 24, 2025, the Bank of America provided Centurion with a non-binding

term sheet and letter concerning bridge financing for the Centurion Sale.[70]  Centurion has indicated

that the bridge loan could potentially provide funding for the Centurion Sale on December 1, 2025,

although this is an estimated date.[71]

## J.      No Alternative Sale Exists on an Expedited Timeline

46.      The Debtors began widely marketing the RI Hospitals for sale in early 2021.[72]  The

Debtors recently began conversations with an alternate potential purchaser, but, at this time, the

---

[66]   *See id.*, ¶ 20.

[67]   *See id.*

[68]   *See id.*, ¶ 21.

[69]   *See id.*

[70]   *See id.*, ¶ 22.

[71]   *See id.*

[72]   *See* Sale Decl., ¶ 4.

alternate potential purchaser has not made a commitment to a transaction, and the Debtors cannot continue to fund the ongoing losses at the RI hospitals without assistance.[73]    Preliminary discussions indicate that this potential buyer would be acceptable to the State of Rhode Island.[74] If, at any time during the closure process, this potential buyer (or any other buyer) is ready to commit to a purchase, the Debtors expect to pivot to a sale.

47.    The Debtors are willing to transition the RI Hospitals to the State of Rhode Island or its designee, permitting the State of Rhode Island to use the escrow for its original stated purpose.    Short of such a transition, given the mounting losses at the RI, the Debtors are seeking approval for a safe and expeditious closing process for the RI Hospitals, as outlined in this Motion.

## PROPOSED TRANSFER TO THE STATE OF RHODE ISLAND

48.    The Debtors are prepared to promptly transfer operational control of the RI Hospitals (and all of the Debtors' right, title and interest in the assets which constitute the RI Hospitals, except cash on hand and accounts receivable) to the State of Rhode Island or a designee selected by the State of Rhode Island pursuant to section 363 of the Bankruptcy Code (the "Transfer").

## PROPOSED HOSPITAL CLOSURE PLAN

49.    Absent the transfer of the RI Hospitals to the State of Rhode Island or its designee, the Debtors will have no choice but to wind-down operations at the RI Hospitals to preserve patient safety and mitigate the risks of administrative insolvency on these chapter 11 cases.    Therefore, the Debtors will further prepare a closure plan in collaboration with the local health authorities (the "Closure Plan") for the RI Hospitals that provides for, among other things: (i) the safe transfer

---

[73]    *See* Turnbull Decl., ¶ 23.

[74]    *See id.*

and discharge of patients; (ii) the protection, transfer, and storage of medical records; (iii) the
disposition of personal property, including pharmaceuticals, hazardous materials, and medical
waste at such hospitals; (iv) rejection of executory contracts related to such hospitals; and (v)
abandonment of certain surplus, burdensome, or non-core assets, if any, at such hospitals. These
safeguards ensure that the closures proceed in a safe, orderly, and efficient manner, while serving
to protect patient safety, safeguard patient information, support employees, and minimize
disruption.

50. The following reflects a summary of the Debtors' Closure Plan with respect to the
RI Hospitals:[75]

| | |
|---|---|
| **Proposed Closure Date**[76] | • **December 31, 2025**<br>  o The Debtors will adjust the date for cessation of clinical operations at each facility if necessary to ensure safe patient care. |
| **Timeline for Closure** | • **Prior to hearing to consider approval of the Motion**:<br>  o Deliver WARN Act notifications to substantially all employees at the RI Hospitals.<br>• **Contemporaneous with the hearing to consider approval of the Motion**:<br>  o File the Closure Plan with the appropriate regulatory authorities.<br>• **At Closure Date**:<br>  o Post notice of closure at all entrances.<br>  o Cease elective inpatient admissions.<br>  o Cease trauma, surgical, obstetrics and gynecology, burn, behavioral health, oncology, and outpatient services.<br>• **Within 4 days of Closure Date**:<br>  o Cease EMS Services and close Emergency Department plus ancillary support services for Emergency Department.<br>• **Within 2-4 weeks of Closure Date**:<br>  o Discharge or transfer all remaining inpatients, while prioritizing patient safety and continuity of care.<br>  o Close all ambulatory services (ambulatory services will remain open according to staffing and scheduling needs until this time).<br>• **Ongoing**: Discharge patients in the ordinary course, identify |

---

[75]   A complete list of the RI Hospitals and related facilities to be closed is attached to the Order as <u>Schedule 1</u>.

[76]   The Debtors propose to close the RI Hospitals no later than the date of closure proposed herein (any such date, the "<u>Proposed Closure Date</u>").

| | |
|---|---|
| | appropriate alternative locations for any patients who will need ongoing care and arrange for transfer. Participate in any required public hearings.<br>• **Proposed Closure Date**: Upon completion of emergency department closure.<br>    o Submit Application to MAC to voluntarily terminate Medicare enrollment. |
| **Plan for Employees** | • The Debtors intend to provide WARN Act notices to substantially all non-unionized employees of the RI Hospitals and, with respect to unionized employees, the Debtors intend to provide WARN Act notices to each of the relevant union representatives, contemporaneously with the hearing to consider approval of this Motion.<br>• The Debtors intend to work with the relevant unions and employees to assist in the facilitation of any bumping rights in accordance with the terms of the relevant collective bargaining agreements.<br>• With regard to any unionized employees at the RI Hospitals, the Debtors intend to provide appropriate notice and engage in effects bargaining with the relevant labor unions upon such union's request, as well as discuss shutdown plans with such unions. |
| **Plan for Transfer/Discharge of Patients** | • The majority of currently-admitted patients will be discharged in the ordinary course and, if necessary, provided with information and assistance to make follow-up appointments with replacement providers. Inpatients will be notified of the anticipated closure and will be transferred, along with their medical record information, to a hospital in the area or a hospital of their choice. The Debtors will complete the transfer or discharge of acute care patients prior to closure. |
| **Plan for Transfer and Storage of Medical Records** | • The Debtors intend to contract with a medical records custodian to ensure records are properly stored and patients can access their medical records after the closure. The Debtors will send written notification of how to locate patient records to all practitioners currently on the active staff of the respective hospitals. The transfer and discharge of all patients shall be conducted in a manner that ensures the protection of patient health, privacy, and safety. |
| **Plan for the Disposition of Personal Property, Including Pharmaceuticals, Hazardous Materials, and Medical Waste** | • The Debtors will manage and dispose of pharmaceuticals, hazardous materials, and medical waste in accordance with state and federal guidelines. Medications, radioactive materials, chemicals, medical waste, infectious materials and other hazardous materials will be identified, secured and inventoried, then destroyed, disposed of, returned to vendors, or transferred to other providers as appropriate. Each hospital has hired vendors to manage the disposal of medical waste and infectious materials. After termination of services, the Debtors will also retain an outside vendor to decontaminate hot rooms. |
| **Communications Plan** | • The Debtors are developing a comprehensive approach to keep patients, employees, government agencies, area hospitals and the community at large informed of the closure. In particular, the Debtors intend to contact area hospitals and outpatient practices to inform them of the proposed closure and to discuss procedures for the transfer of patients. In addition, the Debtors will notify the fire |

| | department and the appropriate government agencies of the proposed closure.   The Debtors will place public notices in local newspapers regarding the location of patient medical records, and provide written notice to all active physicians as to how to locate patient records. |
|---|---|

## BASIS FOR RELIEF REQUESTED

I.   **The Court May Authorize (A) Transfer of the RI Hospitals to the State of Rhode Island or, Alternatively, (B) Closure of the RI Hospitals Pursuant to Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code, Federal Rule 60(b) and Bankruptcy Rule 9024.**

    A.   **Transfer of the RI Hospitals to the State of Rhode Island and Closure of the RI Hospitals are Appropriate Uses of Estate Property.**

51.   The Debtors must be able to stem the mounting losses from the operations of the RI Hospitals and preserve available liquidity to ensure patient safety at the Debtors' other hospitals.   Ideally, such use of estate property under section 363(b) of the Bankruptcy Code manifests in the Transfer of the RI Hospitals to the State of Rhode Island or its designee, subject to the assumption of operational liabilities by the State of Rhode Island or its designee.   However, if such a transfer cannot be effectuated, section 363(b) authorizes the closure of the RI Hospitals.

52.   Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).   Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.   *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation marks and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or

the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation and quotation marks omitted).  As outlined in greater detail below, both proposed uses of estate property under section 363(b) are supported by sufficient business justification.

53.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).   Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."   11 U.S.C. § 105(a).

54.     Furthermore, section 1108 of the Bankruptcy Code grants a debtor in possession the *right* to operate its businesses, providing that the trustee (or debtor in possession) "*may* operate the debtor's business."  11 U.S.C. § 1108 (emphasis added).   But, in its use of the permissive "may," the statute "clearly indicates that a trustee is not required to operate the debtor's business . . . ." *In re Thrifty Liquors, Inc.*, 26 B.R. 26, 28 (Bankr. D. Mass. 1982).   Indeed, section 1108 "necessarily implies the lesser authority [of a debtor] to modify the operation of the business on such grounds

as [it] deems appropriate under the circumstances." *Id.* Thus, a debtor is not required to operate

its business "if such operations will reduce the value of the debtor's assets or if the debtor's business

is moribund." 7 Collier on Bankruptcy ¶ 1108.13 (Alan N. Resnick & Henry J. Sommer eds.,

16th ed. 2009). Indeed, in such circumstances "continued operation of a business that ought to be

closed down and liquidated may be a breach of the fiduciary duties of a trustee or debtor in

possession." *Id.*

55.      With regard to the proposed Transfer, bankruptcy courts have authorized the

transfer of hospital operations to a government body pursuant to the authority provided in sections

105(a) and 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Steward Health Care System, LLC*, No.

24-90213 (CML) (Bankr. S.D. Tex. Sept. 13, 2024) [Docket No. 2523] (authorizing the seizure of

a hospital by the State of Massachusetts through eminent domain to effect the transfer of the

hospital to a new operator, pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code);

*In re Mercy Hospital, Iowa City, Iowa,* No. 23-00623 (Bankr. N.D. Iowa, November 7, 2023)

[Docket No. 476] (approving the sale of a hospital to a state-owned entity pursuant to sections

105(a), 363(b) and 363(f) of the Bankruptcy Code); *In re Verity System of California, Inc.*, No.

2:18-bk-20151-ER (Bankr. C.D. Cal. Mar. 19, 2020) [Docket No. 4315] (authorizing the lease of

a hospital to the State of California pursuant to sections 105(a), 363(b) and 363(f) of the

Bankruptcy Code); *In re Verity Health System of California, Inc.*, 598 B.R. 283, 297 (Bankr. C.D.

Cal. Dec. 26, 2018) (authorizing the sale of hospitals to the County of Santa Clara, free and clear

of conditions set by the California Attorney General, pursuant to section 363(f) of the Bankruptcy

Code). Similar relief is necessary here to ensure that the RI Hospitals can continue to administer

patient care and serve their communities.

56.    In the alternative, Bankruptcy courts including, regrettably, this Court in this case, have authorized the closure of hospitals pursuant to the authority provided in section 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.    *See In re Prospect Medical Holdings, Inc.*, No. 25-80002 (SGJ) (Bankr. N.D. Tex. Apr. 23, 2025) [Docket No. 1613] (authorizing the closure of certain of the Debtors' hospitals in Pennsylvania pursuant to sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code);  *In re Verity System of California, Inc.*, No. 2:18-bk-20151-ER (Bankr. C.D. Cal. Jan. 9, 2020) [Docket No. 3934] (authorizing the closure of a hospital pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code; *In re Saint Vincents Catholic Med. Ctrs. of New York*, No. 10-11963-CGM (Bankr. S.D.N.Y. May 14, 2010) [Docket No. 276] (authorizing the implementation of a plan of closure pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code; *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 16-17463 (Bankr. C.D. Cal. Jan. 20, 2017) [Docket No. 633] (authorizing the closure of a hospital pursuant to section 363(b) of the Bankruptcy Code).  In the absence of the transition of the RI Hospitals to the State of Rhode Island or its designee, similar relief is regrettably appropriate here.

57.    To the extent the relief requested requires the Court to modify or set aside the Centurion Sale Order, the Court may do so under Federal Rule 60(b).  *See* Fed. R. Civ. P. 60(b) ("the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons: . . . (5) . . . applying [the judgment]  prospectively is no longer equitable; or (6) any other reason that justifies relief.").  Bankruptcy courts retain jurisdiction to modify or set aside their own orders, including orders approving section 363 sales.[77]

---

[77]    Federal Rule 60(b) is made applicable to bankruptcy proceedings by Bankruptcy Rule 9024.  *See* Fed. R. Bankr. P. 9024; *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981) (stating that "Motions under Rule 60(b) are directed to the sound discretion of the [] court"); *Strudel Holdings*, 656 B.R. at 411-12 (Bankr. S.D. Tex.

58.     Rule 60(b)(6), applicable to the current instance, requires the movant to show "extraordinary circumstances" to grant relief from a final order.  *Hess v. Cockrell*, 281 F.3d 212, 215 (5th Cir. 2002).  Such extraordinary circumstances are present here, where (a) the risk of administrative insolvency did not arise before the Centurion Sale Order became final;[78] (b) the Debtors took every reasonable action to close the Centurion Sale, including funding over $15.4 million in negative cash flow to maintain the RI Hospitals for five months after the expected closing date; (c) this Motion is brought within a reasonable time;[79] (d) the ability to consummate the transaction on the required timeline is outside of the Debtors' control; (e) the "intervening equities" at play—including the Debtors' fiduciary duties and the fact that no alterative buyer exists—all favor granting relief from the order; and (f) any disturbance of rights and expectations that rest on the finality of the order are heavily outweighed by the prospect of ensuring patient safety and avoiding administrative insolvency.[80]  *Seven Elves*, 635 F.2d at 402 (collecting the applicable factors relevant to "extraordinary circumstances"); *see also United States v. Gould*, 301 F.2d 353, 357 (5th Cir. 1962) (stating that Rule 60(b) should be liberally construed in the interest of "substantial justice").

---

2024) (modifying a section 363 sale order under Rule 60(b) and 105(a)); *see also In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 265 n.5 (3d Cir. 1991) ("[i]t is well settled that a bankruptcy court has the power to vacate or modify its [sale] orders, as long as it is equitable to do so.") (citing *In re Texlon Corp.*, 596 F.2d 1029, 1101 (2d Cir. 1979)).

[78]   Therefore, this Motion is not "be[ing] used as a substitute for an appeal." *Seven Elves*, 635 F.2d at 402.  Although "[l]itigants frequently make motions under Rule 60(b) after they have failed to perfect a timely appeal," this is not the case here.  *Nestle Co. v. Chester's Mkt., Inc.*, 596 F. Supp. 1445, 1450 (D. Conn. 1984).

[79]   This Motion is brought well within the 1-year requirements for other subjections of 60(b) and any delay in bringing this Motion was a direct consequence of the parties' efforts to close the Centurion Sale.  *See Clark v. Davis*, 850 F.3d 770, 780 (5th Cir. 2017) ("What constitutes a 'reasonable time' [under Rule 60(b)] depends upon the facts of each case, taking into consideration the interest in finality, the reason for the delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and the prejudice to other parties.").

[80]   *See Razvi v. Dall. Fort Worth Int'l Airport*, No. 21-10016, at *14 (5th Cir. 2022) (stating that "[w]hile finality of judgments serves a useful purpose for society, the courts, and the litigants, Rule 60(b) should be liberally construed to achieve substantial justice.") (internal citations omitted).

**B.  Transfer of the RI Hospitals to the State of Rhode Island or, Alternatively, Closure of the RI Hospitals Constitutes an Exercise of the Debtors' Sound Business Judgment.**

59.  The Debtors have the ability to transfer property of the estate to new operators where cause exists for doing so. *See, e.g., In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011). "Great judicial deference is given to the [debtor in possession's] exercise of business judgment" regarding the use of estate property. *In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005). The Debtors also have the ability, and the duty, in an exercise of their business judgment, to determine whether to cease operations at certain hospitals, particularly where there is no other reasonable viable solution to keep such hospital open. *See In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) ("The debtor's duty to maximize estate assets may require the cessation of operations at one … location."); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap.'") (citation omitted); *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 16-17463-ER (Bankr. C.D. Cal. Jan. 20, 2017), at ¶ 3 ("Public health and safety would be jeopardized if the Debtor continued to admit new patients when it lacks funds to adequately sustain operations. In fact, the Board would be acting in violation of its fiduciary duties to the community if it attempted to continue operating the hospital despite the lack of sufficient cash to sustain operations."); *Saint Vincents Cath. Med. Ctrs. of New York*, 429 B.R. at 151 ("The Debtors correctly point out that the power to operate the debtor's business pursuant to 11 U.S.C. § 1108 also allows the debtor to modify or cease operations of the debtor if it is appropriate under the circumstances.").

60.  Absent closing of the Centurion Sale, transfer of the RI Hospitals (and responsibility for ongoing costs) to the State of Rhode Island is the Debtors' only viable course of action that will permit these hospitals to continue operating. Absent such a transfer, the Debtors

will be forced to cease operations to stem the RI Hospitals' substantial cash losses and avoid further risks of administrative insolvency.

61. Once a debtor articulates a good business reason for the use of estate property outside the ordinary course of business, it is presumed that the debtor's decision to move forward with the use of estate property was made "on an informed basis, in good faith, and in the honest belief that the [use] was in the best interests of the [debtor] company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990); *see Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as [the transfer or use of estate property] appears to enhance [the] debtor's estate, court approval of a [debtor in possession's] decision . . . should only be withheld if the [debtor's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (internal quotation marks and citation omitted).

62. Given the substantial operating losses at the RI Hospitals and the absence of any viable bidder, non-governmental operator, or third-party funding source for such hospitals, transferring the RI Hospitals to the State of Rhode Island is the only way for these hospitals to continue operating.

63. Under section 704 of the Bankruptcy Code, which is incorporated herein pursuant to section 1106(a)(1) of the Bankruptcy Code, following the decision to close a hospital, a trustee is required to use "all reasonable and best efforts to transfer patients from a health care business that is in the process of being closed to an appropriate health care business . . . ." 11 U.S.C. § 704(a)(12); *see also* 11 U.S.C. § 1106(a)(1) (requiring a chapter 11 trustee to perform certain duties of a trustee set forth in section 704 of the Bankruptcy Code, including transferring patients of a closed healthcare facility).

64.     The Closure Plan for the RI Hospitals is carefully crafted to effectuate an orderly, funded wind-down that, first and foremost, protects patient safety.   In particular, the Closure Plan specifies, among other things, the plan for (i) the transfer or discharge of patients, (ii) the protection, transfer, and storage of medical records, and (iii) the disposition of personal property, including pharmaceuticals, hazardous materials, and medical waste at such hospital.   The Closure Plan minimizes, to the extent possible, the disruption to patient care and the communities in which the RI Hospitals are located, while effectuating the cessation of operations in an effective timeframe.

65.     Courts, including the Court earlier in this case, have approved expedited timelines for hospital closures in other similar cases.   *See, e.g.*, *Prospect Med. Hold.*, No. 25-80002 (SGJ) [Docket No. 1613] (approving the closure of certain of the Debtors' hospitals in Pennsylvania on an 11-day timeline); *Verity Health Sys.*, 2020 WL 223909, at *4 (approving expedited regulatory timeline over the objection of union); *Saint Vincents*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010) (*appeal dismissed)* 2010 WL 4456975 (S.D.N.Y. Oct. 26, 2010) (approving expeditious closing timeline over the objection of a party in interest) (citation omitted).

66.     In sum, the Debtors are unable to continue funding operations at the RI Hospitals without an unacceptable risk of administrative insolvency.   Any delay in effectuating the transfer or closure of the RI Hospitals would prejudice estate stakeholders, risk the execution of a safe and orderly closure process, and increase the chance of administrative insolvency.   Transfer to the State of Rhode Island is the only hope for the RI Hospitals to continue providing patient care, and, absent the Transfer, the Debtors will be forced to work in coordination with state regulators to ensure that closure the RI Hospitals is safely executed in an effective timeframe.

II.     **In the Event the Debtors are Forced to Close the RI Hospitals, Approval of the Closing of the RI Hospitals on Shortened and Limited Notice Is Appropriate and Necessary.**

67.     The notice and hearing requirements contained in section 363(b)(1) of the Bankruptcy Code are satisfied if appropriate notice and an opportunity for a hearing are given in light of the particular circumstances of a proposed transaction.   *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" to mean such notice and opportunity for a hearing "as [are] appropriate in the particular circumstances").   Courts have noted that "[t]he notice requirements of bankruptcy law are 'founded in fundamental notions of procedural due process.'"   *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 467 B.R. 694, 706 (S.D.N.Y. 2012) (citations omitted).     Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."   *Id.* (internal quotation marks and citations omitted).

68.     Bankruptcy Rules 2002(a)(2) and 2002(i) require that a minimum of twenty-one (21) days' notice of the proposed use of property outside the ordinary course of business be provided by mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed under section 1102 of the Bankruptcy Code, unless a debtor shows "cause."   *See* Fed. R. Bankr. P. 2002(a)(2) and (i).   Once the debtor shows "cause," however, Bankruptcy Rule 2002(a)(2) authorizes this Court to shorten the generally applicable 21-day notice period and direct a method of giving notice other than by mail.   *See* Fed. R. Bankr. P. 2002(a)(2).   Moreover, this Court is authorized to limit notice of the proposed use of property outside of the ordinary course of a debtor's business, even without a prior showing of cause, to any official committee appointed under section 1102 of the Bankruptcy Code and any creditor or equity holder requesting notice.   *See* Fed. R. Bankr. P. 2002(i).

69.    In addition, the sale, use, or transfer of property outside the ordinary course of business may be authorized without an actual hearing, if no party in interest timely requests such a hearing.    *See* 11 U.S.C. § 102(1)(B)(i) (notwithstanding the statutory requirement for "notice and a hearing," the Bankruptcy Code "authorizes an act without an actual hearing if such notice is given properly and if such a hearing is not requested timely by a party in interest").

70.    Cause exists to shorten the notice period, as required, for the transfer or closure of the RI Hospitals.   The Debtors have expended a significant amount of estate resources to fund the operations of the RI Hospitals, as these facilities incurred losses of approximately $18.7 million during the last six months.   Further losses are not sustainable for the Debtors' estate.

71.    Based on the foregoing, sufficient cause exists to implement the transfer or closure of the RI Hospitals on shortened notice.

## III.    In the Event the Debtors are Forced to Close the RI Hospitals, Abandonment of the Abandoned Assets Should Be Approved.

72.    Although the Debtors will remove equipment and other items at any of the RI Hospitals undergoing a closure, if feasible and of value to the Debtors' ongoing operations, and will dispose of regulated materials (including medical waste) and transfer, store and make available patient medical records, as required by applicable law, the Debtors also request authority to abandon certain surplus, burdensome, or non-core assets—which will include any personal property remaining at any hospital on the Proposed Closure Date that the Debtors determine is not necessary for their restructuring and too difficult to remove or expensive to store, such that the economic benefits of removing or storing such remaining property would be outweighed by the attendant costs (the "Abandoned Assets").   Any landlord or other designee will be free to sell or dispose of the Abandoned Assets after the Proposed Closure Date without notice or liability to any party.  The Abandoned Assets will primarily consist of medical equipment, fixtures, furniture, and

other office equipment.   To the best of the Debtors' knowledge, the abandonment of the Abandoned Assets would not be in violation of any state or local statutes or regulations reasonably designed to protect the public health or safety.   Accordingly, abandonment of the Abandoned Assets as of the Proposed Closure Date should be approved.

73.     Under section 554(a) of the Bankruptcy Code, a debtor, after notice and a hearing, is authorized to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).  The right to abandon property is virtually unfettered, unless (a) abandonment of the property will contravene laws designed to protect public health and safety or (b) the property poses an imminent threat to the public's welfare. *See Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot., (In re Midlantic Nat'l Bank)*, 474 U.S. 494, 501 (1986).  Neither of these limitations is relevant under the instant facts.

74.     The proposed abandonment procedures are necessary for the efficient administration of the Debtors' estates because they provide the Debtors with a streamlined mechanism by which they can: (a) stop the accrual of expenses associated with retaining Abandoned Assets; (b) avoid the often difficult and expensive process of locating buyers for assets that are damaged or in premises that the Debtors no longer use; and (c) minimize any distraction that may result from the challenges involved in attempting to sell illiquid assets that are of inconsequential value to the Debtors' estates.

75.     For the foregoing reasons, should closure of the RI Hospitals regrettably come to pass, the abandonment of the Abandoned Assets is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases and should be authorized by the Court.

IV.    **In the Event the Debtors are Forced to Close the RI Hospitals, Section 554(a) of the Bankruptcy Code Preempts State Regulatory Timing Requirements to the Extent Such Requirements Are Not Waived.**

76.    The Closure Plan for the RI Hospitals is consistent with the objectives of state regulations governing the sale and closure of hospitals related to patient health, privacy and safety. The Closure Plan ensures the safe transfer or discharge of patients; the protection, transfer, and storage of medical records; and the proper disposition of pharmaceuticals, and hazardous and medical waste.    These plans and procedures will protect the health, wellbeing, and safety of the Debtors' patients and the communities the Debtors serve in a manner consistent with applicable substantive state and federal laws, regulations, and guidelines.

77.    The Debtors recognize that under current Supreme Court law, as generally applied to property subject to environmental damage, a debtor's ability to abandon property of the estate is not unlimited.    In particular, the Supreme Court held in *Midlantic Nat'l Bank v. N.J. Dept. of Env't Protection*, 474 U.S. 494, 507 (1986), that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards."    Further, a Bankruptcy Court does not have the power to authorize an abandonment "without formulating conditions that will adequately protect the public's health and safety." *Id.*

78.    This exception, however, does not cover time limits for hospital closures exceeding 30 or 60 days, as applicable, when a shorter duration safeguards patient health and safety.    "The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from *imminent and identifiable harm*."    *Id.* at 507 n.9 (emphasis added); *see also Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1185 (5th Cir. 1986).    "[T]he party opposing abandonment under Midlantic has the burden to prove that. . . the property [in question] creates an imminent and identifiable harm to the public which will be

aggravated by the abandonment." *United States Sec. & Exch. Comm'n v. Heartland Grp. Ventures*, LLC, 2023 WL 10554515, at *4 (N.D. Tex. Aug. 15, 2023) (quoting *In re St. Lawrence Corp.*, 239 B.R. 720, 726-27 (Bankr. D.N.J. 1999), aff'd, 248 B.R. 734 (D.N.J. 2000)).

79.   Any opposition to the closing of the RI Hospitals on the basis of the duration of notice procedure could not meet this burden, for at least two reasons.   First, the state timing requirements are not required "to protect public health or safety."   For abandonment to be harmful to public health and safety, it must be demonstrated to pose a harm to public health that is both imminent and identifiable.   *Heartland*, 2023 WL 10554515, at 4 (N.D. Tex. Aug. 15, 2023). Speculative harm, or the mere belief or fear of a future problem, does not constitute imminent harm to the public.   *See Midlantic*, 474 U.S. at 507 n.9 (specifying that the exception does not "encompass a speculative or indeterminate future violations of such laws that may stem from abandonment"); *Heartland*, 2023 WL 10554515, at *4 ("[B]elief and fear of a future problem does not present evidence of an imminent harm to the public").   Indeed, cases find that when all known harms have been addressed by the Debtors and only speculative harms remain, no *Midlantic* issue exists.   *See Heartland*, 2023 WL 10554515, at *4 (N.D. Tex. Aug. 15, 2023).

80.   Here, the timelines provided for in the Closure Plan for the RI Hospitals plainly do not undermine public health or safety.   Rather, the Debtors believe that the two (2) month period will provide adequate time to implement all other state law requirements to safely close the hospitals.   In these circumstances, requiring hospitals to remain fully functional and operational for 90 or 120 days would be *detrimental* to the patient welfare at the closing hospitals.   For one thing, it could lead to impractical and unsustainable operational challenges—including severe and dangerous staffing shortages.   It is also likely that doctors, nurses, other healthcare providers and essential employees will understandably migrate to other healthcare opportunities well before the

end of the extended period.    Requiring hospitals to remain fully operational in the face of

dwindling healthcare and operational staffing increases, rather than mitigates, the risks to the

public health.    Rather than protecting health and safety, forcing the Debtors to continue to operate

closing hospitals beyond the time contemplated by the Closure Plan risks imperiling patient health

and safety, especially in light of the robust protections provided for in the Closure Plan – a plan

that was otherwise carefully formulated to follow state requirements as closely as possible.

81.    Second, *Midlantic* left open that Section 554 may preempt "certain state laws

imposing conditions on abandonment [that] may be so onerous as to interfere with the bankruptcy

adjudication itself."    *Midlantic*, 474 U.S. at 507.    Indeed, courts have recognized this important

limit on the *Midlantic* exception to abandonment: "[a] bankruptcy court has some discretion if

precluding abandonment would be so onerous as to interfere with the bankruptcy adjudication

itself."    *In re ATP Oil & Gas Corp*., 2013 WL 3157567, at *4.    In such cases, "the bankruptcy

court is free to formulate conditions short of full compliance with state law that will adequately

protect the public's health and safety."    *State Dep't of Envtl. v. Atkinson*, 248 B.R. 734, 736 n.6.

(D.N.J. 2000).

82.    These are the precise circumstances here.    The conditions proposed by the Debtors

in the Closure Plan for the RI Hospitals more than adequately protect patients and the interests of

public health and safety.    Indeed, the Debtors have a plan to address everything from patient

discharge and transfer, patient confidentiality and medical records, and the disposition of medical

waste.    At the same time, requiring the RI Hospitals to remain operational for longer periods—thus

prolonging the drain on the Debtors' estates without any commensurate or measurable public

health benefit—are exactly the onerous state regulations that must yield to federal bankruptcy law.

## **REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS**

83.   The Debtors request a waiver of any applicable notice requirements under
Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to
Bankruptcy Rule 6004(h).   As explained above and in the Turnbull Declaration, the relief
requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing
operations and value-maximization process.   Accordingly, ample cause exists to justify the waiver
of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by
Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **RESERVATION OF RIGHTS**

84.   Nothing contained herein or any action taken pursuant to relief requested is
intended to be or shall be construed as (a) an admission as to the validity of any claim against the
Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of,
basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a
promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in
interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or
granting of approval for assumption of any agreement, contract, program, policy, or lease under
section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability,
or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors'
estates.   Likewise, if the Court grants the relief sought herein, any payment made pursuant to the
Court's order is not intended to be and should not be construed as an admission to the validity of
any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such
claim.

## NOTICE

85.     Notice of this Motion has been provided to: (a) the Complex Service List (as defined in the Complex Service List [Docket No. 1416]); and (b) any other party entitled to notice pursuant to Bankruptcy Rule 2022.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PREVIOUS REQUEST

86.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of the page intentionally left blank]*

WHEREFORE, the Debtors request entry of an order substantially in the form attached

hereto granting the relief requested herein and granting such other relief as is just and proper.

Dated: October 30, 2025
Dallas, Texas

/s/ Thomas R. Califano

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:         tom.califano@sidley.com
               rpatel@sidley.com
               mquejada@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:     (212) 839-5599
Email:         wcurtin@sidley.com
               pventer@sidley.com
               anne.wallice@sidley.com

*Attorneys for the Debtors and*
*Debtors in Possession*

## <u>Certificate of Service</u>

I certify that on October 30, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Thomas R. Califano*
Thomas R. Califano
