# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>PROSPECT MEDICAL HOLDINGS, INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-80002 (SGJ)<br><br>(Jointly Administered)<br>Rel. to Dkt. No. 3666 |

**DECLARATION OF ANDREW TURNBULL IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) GRANTING RELIEF FROM THE CENTURION SALE ORDER AND (A) AUTHORIZING THE TRANSFER OF THE RHODE ISLAND HOSPITALS TO THE STATE OF RHODE ISLAND, OR (B) IN THE ALTERNATIVE, APPROVING THE CLOSURE OF THE RHODE ISLAND HOSPITALS; AND (II) GRANTING RELATED RELIEF**

I, Andrew Turnbull, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order (I) Granting Relief From the Centurion Sale Order and (A) Authorizing the Transfer of the Rhode Island Hospitals to the State of Rhode Island, or (B) in the Alternative, Approving the Closure of the Rhode Island Hospitals; and (II) Granting Related Relief* (the "Motion"),[2] filed contemporaneously herewith, which seeks to authorize the transfer of the Debtors' RI Hospitals to the State of Rhode Island or its designee, or in the alternative, effect the safe and orderly closure of the RI Hospitals.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

1

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors and their management team and advisors, my review of relevant documents and information concerning the Debtors' operations and financial affairs or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## BACKGROUND AND QUALIFICATIONS

3. I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), and I have been authorized to make this Declaration on behalf of Houlihan Lokey. During the course of my career, I have advised both debtors and creditors in financial restructurings, distressed mergers and acquisitions, private placements, and fairness opinions. My notable recent restructuring engagements in the healthcare sector include, without limitation, the following: Christian Care Centers (sale of three senior living facilities), Heywood Healthcare, Inc. (reorganization of two acute care hospitals), Steward Health Care System (sales, transfers and restructuring related to 31 acute care hospitals), Nashville Senior Care (sale of five senior living facilities), and The Stayton at Museum Way (sale of a senior living facility).

4. I received a B.Sc. in Biology from the University of Western Ontario and an Honors Business Administration degree from the Ivey Business School at the University of Western Ontario.

5. Houlihan Lokey, together with the other subsidiaries of its direct parent company, Houlihan Lokey, Inc., is an internationally recognized investment banking and financial advisory firm, with offices worldwide and approximately 2,000 professionals. Houlihan Lokey is a leader in providing such services to debtors, unsecured and secured creditors, acquirers, and other parties

in interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey has served as an investment banker to the Debtors since December 2024.

6. Since its retention, Houlihan Lokey has provided extensive prepetition and postpetition services to the Debtors for the Debtors' restructuring, financing and sale transaction efforts, including assisting management in evaluating strategic alternatives, conducting extensive meetings and negotiations with the various parties in interest, facilitating diligence for the various parties in interest, and providing additional financial advice and investment banking services.

7. As a result of the work performed on behalf of the Debtors, I have acquired significant knowledge of the Debtors and their businesses and am familiar with the Debtors' financial affairs, debt structure, operations, and related matters. In providing prepetition and postpetition services to the Debtors, I have worked closely with the Debtors' senior management and their other advisors and have familiarity with the other major stakeholders that are involved in these chapter 11 cases. The Houlihan Lokey team and I have further familiarized ourselves with the Debtors' day-to-day operations, organizational structure, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team, the Debtors' advisors, and the Alvarez & Marsal professionals providing financial advisory services to the Debtors. I am also familiar with the circumstances leading to the commencement of these chapter 11 cases.

8. Although Houlihan Lokey is being compensated for its work as the investment banker retained by the Debtors, Houlihan Lokey is not being compensated separately for this Declaration or testimony. Unless otherwise stated herein, all facts, statements, or opinions included in this Declaration are based upon my personal knowledge of the Debtors' operations and financial performance, information learned from my review of relevant financial and operational

3

data regarding the Debtors, information provided to me by financial professionals involved in advising the Debtors in these chapter 11 cases, information provided to me or verified by the Debtors or the Debtors' other professional advisors and the Houlihan Lokey team, my involvement with the Debtors' restructuring, financing, and sale efforts, including the stalled sale process for the RI Hospitals and negotiations with Centurion and the Attorney General, or my experience advising both distressed and non-distressed businesses. If called upon to testify, I could and would testify to the facts set forth herein on that basis.

## BACKGROUND ON THE RI HOSPITALS

9. The Debtors and their non-Debtor affiliates (collectively, the "Company") are significant providers of regional healthcare services in California, Connecticut, Rhode Island, and formerly Pennsylvania. The Company's primary business is hospital operations, which consist of, among other things, the ownership and/or operation of acute care and behavioral hospitals, providing a wide range of inpatient and outpatient services spanning multiple states.

10. The Company owns and operates two hospitals in the State of Rhode Island, Roger Williams Medical Center and Our Lady of Fatima Hospital, along with other healthcare facilities associated with these hospitals (collectively, the "RI Hospitals"), which are the subject of the Motion.

## OPERATING LOSSES AT THE RI HOSPITALS

11. On November 18, 2022, Prospect and certain of its affiliates and Centurion entered into the Original Agreement for the sale of certain assets, including the RI Hospitals. The Original Agreement, as previously amended, was amended and restated on February 2, 2025, (as amended and restated, the "APA") to facilitate consummation of the Centurion Sale following the commencement of the Debtors' chapter 11 cases, and on February 12, 2025, the Bankruptcy Court approved the Centurion Sale and amended APA through entry of the Centurion Sale Order.

12. In the intervening eight months since the Centurion Sale Order was entered, and six months since the transaction's expected closing date, the Debtors have maintained their steadfast commitment to patient care and continued, at great expense, to fund the RI Hospitals. During the six-month period following the anticipating closing date, the RI Hospitals have incurred negative cash flow of $18.7 million, which was funded by the Debtors' other operations and DIP financing. Negative cash flow at the RI Hospitals is forecasted to be approximately $6 million for the month of November and exceed $5 million for the month of December.

13. The elimination of ongoing expenses and accrual of administrative claims is critical to the success of these chapter 11 cases. Regrettably, it is imprudent for the Debtors to continue to sustain operations at the RI Hospitals due to the mounting losses and mounting administrative claims, as the Debtors' estates can no longer continue to suffer operating losses at the RI Hospitals. The Debtors believe they have been more than reasonable in supporting the Centurion transaction as approved by the Rhode Island regulators.

## **BARRIERS TO CLOSING THE CENTURION SALE**

14. The Centurion Sale Order, the APA and certain regulatory approvals require, among other things, the satisfaction of certain AG Conditions set forth by the Rhode Island Attorney General and RIDOH. Specifically, the AG Conditions as originally amended set certain initial AG Funding Requirements for the Centurion Sale, including: (a) the retention of $45 million in True-Up Funding for the RI Hospitals, with $35 million in Additional True-Up Funding secured within 90 days of closing, and (b) the contribution of approximately $15 million to a Hospital Fund held exclusively for the benefit of the RI Hospitals.

15. Centurion has been unable to raise sufficient financing to satisfy the AG Funding Requirements, contributing to an impasse to consummation of the sale.

## **ATTEMPT TO OBTAIN BOND FINANCING BY CENTURION**

16. Centurion has been attempting to finance the Centurion Sale post-petition through a bond issuance for the past six (6) months. In May 2025, Centurion first went to market with a bond issuance, seeking to raise approximately $140 million to finance the transaction. These efforts failed. In August 2025, after the regulatory requirements were lessened in cooperation with the Rhode Island Attorney General, Centurion launched another round of bond financing, seeking to raise approximately $105 million, but again failed to raise adequate funds.

## CONDITIONAL WAIVER OF CERTAIN AG FUNDING REQUIREMENTS

17. On September 22, 2025, the Debtors sent the Closing Conditions Letter to counsel to Centurion and the Rhode Island Attorney General, outlining the necessity for the two parties to reach a consensual resolution on the AG Funding Requirements that will allow the Centurion Sale to close. On September 26, 2025, the Rhode Island Attorney General issued the Conditional Waiver Letter in response to the Closing Conditions Letter, indicating that the funding requirements had been lessened to allow Centurion to close the Centurion Sale by October 31, 2025.

18. As detailed in the Conditional Waiver Letter, the Modified AG Funding Requirements provided that the Centurion Sale must close by October 31, 2025. It is now clear that the closing of the Centurion Sale will not occur within this timeframe..

## CLOSURE DISCUSSIONS BETWEEN THE PARTIES

19. On October 8, 2025, the Debtors shared the October 8 Draft of the Motion with counsel to Centurion and the Rhode Island Attorney General. The October 8 Draft, like the current Motion, included a request to transition the RI Hospitals to the Rhode Island Attorney General on an expedited basis to ensure no disruption in healthcare services in the Rhode Island community the RI Hospitals serve or, in the alternative, close the RI Hospitals. The Rhode Island Attorney

6

General issued a letter in response to the October 8 Draft on October 10, 2025, stating, among other things, that the Rhode Island Attorney General would oppose the requested relief. Following this exchange, the Debtors, Centurion, and the Rhode Island Attorney General engaged in discussions on the closure of the Centurion Sale, beginning on October 14, 2025 and continuing through the filing date of the Motion.

20.   In these discussions, the Debtors unsuccessfully engaged with the Rhode Island Attorney General to try and identify alternative options to closing the RI Hospitals, including requesting the Rhode Island Attorney General to allocate some portion of the $51.5 million cash balance already funded in the Hospital Fund to (i) support the ongoing operations of the RI Hospitals, or (ii) fund the operational losses and provide the Debtors more time to transition the RI Hospitals, either to Rhode Island, Centurion, or another approved buyer. Unfortunately, the parties were unable to reach agreement on any of these potential alternative solutions.

**CENTURION'S CURRENT FINANCING STATUS**

21.   Following the issuance of the Conditional Waiver Letter on September 26, 2025, and the issuance of the Financing Progress Letter on October 8, 2025, it is my understanding that Centurion continued to engage with the Rhode Island Attorney General and the Rhode Island Health and Educational Building Corporation ("RIHEBC") concerning the financing process for the Centurion Sale. Before relaunching the bond raise process, it is my understanding that Centurion also engaged with various banks and financial institutions to supplement the efforts of its existing underwriter. Currently, Centurion is pursuing a bridge loan with a money center bank to obtain the necessary financing to close the transaction.

22.   Centurion has indicated that the bridge loan could potentially provide funding for the Centurion Sale as early as December 1, 2025, although this is an estimated date.

**NO ALTERNATIVE SALE EXISTS ON AN EXPEDITED TIMELINE**

7

23. The Debtors began widely marketing the RI Hospitals for sale in early 2021. The Debtors recently began conversations with an alternate potential purchaser, but, at this time, the alternate potential purchaser has not made a commitment to a transaction. Preliminary discussions indicate that this potential buyer would be acceptable to the State of Rhode Island. If, at any time during the closure process, this potential buyer (or any other buyer) is ready to commit to a purchase, the Debtors expect to pivot to a sale.

24. The Debtors are willing to transition the RI Hospitals to the State of Rhode Island or its designee, permitting the State of Rhode Island to use the escrow for its original stated purpose. Short of such a transition, given the mounting losses at the RI Hospitals, the Debtors are seeking approval for a safe and expeditious closing process for the RI Hospitals, as outlined in the Motion.

**TRANSFER OR CLOSURE OF THE RI HOSPITALS IS AN
EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT**

25. Given the Debtors' inability to continue funding operating losses and therefore operating the RI Hospitals on a go-forward basis, transferring the RI Hospitals to the State of Rhode Island in an expedited manner is a much preferred alternative to closing. This transfer would minimize the disruption to the Debtors' employees at the RI Hospitals and provide patients with the opportunity to continue receiving uninterrupted care once under the control of the State. Additionally, this transfer will avoid the expenses required to support the closure process. Further, I believe that the Debtors' proposed transfer to the State of Rhode Island is a commercially reasonable request of the Debtors under the circumstances.

26. The Debtors must use their property in a manner that protects all patients in their care. Accordingly, absent a third party's willingness to take over or fund the operations of the RI Hospitals, the Debtors must be able to stem the mounting losses from the operations of the RI

Hospitals and preserve available liquidity to ensure patient safety at the Debtors' other hospitals. I therefore believe that, if the State of Rhode Island is unwilling to take responsibility for the RI Hospitals and no third party emerges to assume operational costs at the RI Hospitals, the proposed closure of the RI Hospitals is the only commercially reasonable option available, given the cost of funding these facilities in the upcoming months, coupled with the correlated risks of administrative insolvency.

27. The announcement of the potential closure of the RI Hospitals risks the potential for disruptions of hospital operations. Such risks will undoubtedly be magnified if employees face continuing uncertainty in the stalled Centurion Sale process. As such, Debtors will benefit from the ability to consummate the transfer or closure of the RI Hospitals expeditiously following this announcement.

28. In light of the Debtors' circumstances, as well as the demonstrable benefits of streamlined procedures to transfer or close the RI Hospitals, it is my opinion and belief that sufficient business justification exists to facilitate the transfer or closure of the RI Hospitals as outlined in the Motion.

**CONCLUSION**

29. Accordingly, based on my experience with healthcare restructuring transactions, my involvement in these chapter 11 cases and in the Centurion Sale process, and consultations with the Debtors' other advisors, it is apparent that transfer or closure of the RI Hospitals is important to the successful confirmation of the Debtors' chapter 11 cases and consummation of the Debtors' other ongoing sale processes. The Debtors are unable to financially support the RI Hospitals any longer, and continuing to do so risks administrative insolvency.

30. For all the above reasons, I respectfully submit that the Court should grant the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 30, 2025
Chicago, Illinois

*/s/ Andrew Turnbull*
Andrew Turnbull
Managing Director
Houlihan Lokey Capital, Inc.