**Exhibit B**

**Upsize DIP Term Sheet**

# AMENDED AND RESTATED UPSIZE SUPERPRIORITY DIP TERM SHEET
(this "Term Sheet")

Reference is made to (a) that certain Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of March 20, 2025, as amended by that certain Amendment No. 1 to Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of August 20, 2025 (as in effect immediately prior to the effectiveness of the amendments described herein, the "DIP Term Loan Agreement" and the DIP Term Loan Agreement, as amended to reflect the terms described below, the "Amended DIP Term Loan Agreement"), by and among Prospect Medical Holdings, Inc., a Delaware corporation ("Holdings"), the other borrowers signatory hereto (together with Holdings, collectively, jointly and severally, the "Borrowers") and MPT TRS Lender PMH, LLC, a Delaware limited liability company, as the DIP Lender, (b) the Amended Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor Affiliates filed with the bankruptcy court on December 3, 2025 [Docket No. 4048] (as such plan may be amended after such date with the consent of the DIP Lender and the Backstop Facility Lender, the "Plan"),[1] (c) that certain Loan and Security Agreement, to be dated as of the effective date of the Plan (the "Effective Date"), by and among Holdings and the other Debtors party thereto, as borrowers, and MPT, as the Backstop Facility Lender, on the terms set forth in the Loan and Security Agreement filed with the bankruptcy court on October 1, 2025 (as filed, the "Backstop Credit Agreement" and the Backstop Credit Agreement, as modified to reflect the terms described below, the "Amended Backstop Credit Agreement"), and (d) that certain Upsize Superpriority DIP Term Sheet, dated as of November 17, 2025 (the "Original Upsize Term Sheet").

No legally binding obligation of any party shall be established unless and until this Term Sheet is executed and delivered by the parties hereto and approved by the bankruptcy court.

Presentation of this Term Sheet shall not constitute a waiver of any existing defaults or events of default under the DIP Term Loan Agreement or otherwise, or an agreement or offer to forbear with respect to any rights or remedies under, or to otherwise amend, the DIP Term Loan Agreement or the Settlement Agreement (as defined in the DIP Term Loan Agreement).

The Original Upsize Term Sheet shall be superseded hereby in its entirety upon the effectiveness of this Term Sheet.

| Provision | Summary |
|---|---|
| **Borrowers** | The Borrowers (as defined above). |
| **DIP Lender and Backstop Facility** | MPT TRS Lender PMH, LLC, a Delaware limited liability |

---

[1] Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the Plan, the DIP Term Loan Agreement or the Backstop Credit Agreement, as applicable.

| Provision | Summary |
|---|---|
| **Lender** | company, together with its designees, successors and assigns. |
| **DIP Facility Upsize Amount** | New money commitments (the "<u>New DIP Commitments</u>") for:<br><br>(x) a single draw secured new money term loan in an amount equal to $15,000,000 (the "<u>Initial New DIP Loan</u>"), which shall be available (as set forth below) upon execution of the Amended DIP Term Loan Agreement and entry of an order, reasonably acceptable to each of the Borrowers and the DIP Lender, approving the Amended DIP Term Loan Agreement, plus<br><br>(y) a multi draw secured new money term loan in an amount up to $10,000,000 in the aggregate (the "<u>Minimum Cash Need Advance</u>") of term loans, which shall be available after the Initial New DIP Loan has been funded subject to satisfaction of the Minimum Cash Need Advance Condition (as defined below) at the time each advance is requested, plus<br><br>(z) a delayed draw, secured new money term loan in an aggregate principal amount up to $5,000,000 (the "<u>CT DIP Loan</u>").<br><br>The CT DIP Loan, the Minimum Cash Need Advances and the Initial New DIP Loan collectively are referred to herein as the "<u>New DIP Loans</u>".<br><br>On the Effective Date, any undrawn portion of the Minimum Cash Need Advance commitments shall terminate.<br><br>The DIP Lender will fund the CT DIP Loan after the closing of the Connecticut ECHN Sale Transaction solely out of the proceeds of the closing of such sale transaction and payable to MPT under Tranche 6 in a single draw.<br><br>The New DIP Loans and all fees and interest on account thereof (collectively, the "<u>New DIP Obligations</u>") shall, in each case, be rolled into loans under the Backstop Facility on the Effective Date.<br><br>The Borrowers shall not be permitted to repay the New DIP Obligations other than pursuant to clause (iv) in the section below with the heading *Additional Conditions to New DIP Loan Draws*, unless the DIP Lender shall consent in its sole discretion. |

| Provision | Summary |
|---|---|
| | There shall be a 50% reduction in the accrual of adequate protection payments, other than professional fees, upon the closing of the Acceptable CA Operations Disposition,[2] which occurred on December 5, 2025. Such adequate protection accrual (other than professional fees) for December 2025 shall be $2,903,225.81. |
| **Incremental Backstop Tranche and Waterfall Provisions** | Contemporaneously with the Effective Date, the Backstop Facility Lender will enter into the Amended Backstop Credit Agreement, which shall provide for, in addition to the $30,000,000 single draw, secured new money term loan already committed by the Backstop Facility Lender as set forth in the Plan (together with, if applicable, the MPT GUC Advance, the "Original Backstop Facility"): <br><br>(x) delayed draw, secured new money term loans in an aggregate principal amount of $25,000,000 (the "A/R Backstop Facility"), plus <br><br>(y) a secured term loan in an amount equal to the outstanding New DIP Obligations on the Effective Date (the "DIP Rolled Facility"), plus <br><br>(z) a single draw, secured new money term loan in an amount of $3,000,000, funded solely from certain PhysicianCo Assets consisting of cash otherwise payable to MPT on the Effective Date (the "PCo-based Facility", and together with the A/R Backstop Facility and the DIP Rolled Facility, the "Incremental Backstop Tranche", and the Incremental Backstop Tranche together with the Original Backstop Facility, the "Backstop Facility"). <br><br>The Backstop Facility Lender will fund term loans under the A/R Backstop Facility solely out of the proceeds (net of collection fees) of accounts receivables related to the Waterbury, Manchester and Rockville hospital sale transactions arising prior to the closing of each such Acceptable CT Operations Disposition and payable to MPT under Tranche 6 of the recovery Waterfall pursuant to the Plan (the "CT Accounts Receivables Proceeds") in three draws. The first A/R Backstop Facility advance (the "First A/R Backstop |

---

[2] "Acceptable CA Operations Disposition" means (i) the sale by the applicable Borrowers of the assets supporting the operation of the California Hospitals to NOR Healthcare Systems Corp. and/or its affiliates ("CA Purchaser") and (ii) the lease of the California Hospitals by MPT and/or its affiliates to CA Purchaser, in each case as applicable, pursuant to that certain Asset Purchase Agreement, dated as of August 3, 2025 (as amended and modified from time to time with the consent of MPT) and the related lease between MPT and CA Purchaser.

| Provision | Summary |
|---|---|
| | Facility Advance") will be in an amount equal $5,000,000, the second A/R Backstop Facility advance (the "Second A/R Backstop Facility Advance") will be in an amount equal $12,500,000, and the third A/R Backstop Facility advance (the "Third A/R Backstop Facility Advance") will be in an amount equal to $7,500,000.<br><br>All amounts owing by the Borrowers under the Backstop Facility shall be secured by a perfected, first-priority security interest in and lien (the "Backstop Liens") on the proceeds of the Assigned Estate Causes of Action and all other assets, if any, transferred (or to be transferred) to the GUC Trust.<br><br>Substantially concurrently with the Effective Date, the GUC Trust will assume all of the Debtors' obligations under the Backstop Facility and the Debtors shall be wound down pursuant to the Plan.<br><br>Interest on the term loans (i) advanced under the Original Backstop Facility shall accrue at a rate equal to 14% per annum and (ii) advanced under the Incremental Backstop Tranche shall accrue at a rate equal to 17% per annum, in each case, payable in kind (capitalizing at the end of each fiscal quarter) and shall have a 5-year maturity (the "Backstop Maturity Date") with mandatory repayment provisions upon the earlier of the Backstop Maturity Date or recovery of the Backstop Facility through application of Net Proceeds under the Recovery Waterfall as set forth below.<br><br>Net Proceeds of the Assigned Estate Causes of Action (paid only from proceeds of the Assigned Estate Causes of Action (excluding any PhysicianCo Cause of Action) (after satisfaction of Tranches 1 through 4b) shall be used by the Debtors (x) first, to repay any and all amounts (including interest) owed in connection with the Original Backstop Facility, in full in cash, (y) second, to repay any and all amounts (including interest) owed in connection with the Incremental Backstop Tranche, in full in cash, and (z) only thereafter, to fund distributions in accordance with the Plan, Settlement Agreement and Recovery Waterfall, including the GUC Trust Expenses and distributions to Holders of General Unsecured Claims (including any MPT Deficiency Claims (it being understood that, after repayment in full of the Backstop Facility and then all priority claims payable under the Plan, the MPT Deficiency Claims shall share pro rata in all distributions to Holders of General Unsecured Claims based on the Claim |

| Provision | Summary |
|---|---|
| | amount)). |
| | If/when the Borrower pays, for any reason (including, but not limited to, payment upon maturity, any optional prepayment, or any mandatory prepayment, whether or not after the occurrence of an Event of Default or after acceleration, including in connection with the commencement of any insolvency proceeding), all or any part of the principal balance of any term loans outstanding under the Incremental Backstop Tranche at any time on or after the six month anniversary of the Effective Date, the Borrower shall pay to the Backstop Facility Lender a premium (the "Payment Premium") on the amount so repaid or prepaid in an amount that would result in the Backstop Facility Lender having received cash payments in an amount equal to at least the MOIC Threshold (defined below). |
| | "MOIC Threshold" means the point at which the aggregate amount of payments of principal (including cash payments on account of principal comprised of interest previously paid in kind) and interest paid in cash equals at least (x) to the extent such amounts under the Backstop Facility are paid on or after the six month anniversary and before the one-year anniversary of the Plan Effective Date, 1.5x, (y) to the extent such amounts under the Backstop Facility are paid on or after the one-year anniversary and before the two-year anniversary of the Plan Effective Date, 1.75x and (z) to the extent such amounts under the Backstop Facility are paid on or after the two-year anniversary of the Effective Date, 2.00x, in each case, multiplied by the original principal amount of the term loans subject to such Payment Premium (prior to giving effect to any capitalized in-kind interest). |
| **New DIP Loan Provisions** | |
| **Priority of New DIP Loans** | Subject to the Carve-Out and Permitted Prior Liens (as defined in the DIP Term Loan Agreement) and junior in claim and lien priority only to the DIP ABL Facility in tranche "1a" under the Recovery Waterfall (for as long as such claims remain outstanding).[3] |

---

[3] The New DIP Obligations, including the New DIP Loans (and fees and interest on account thereof) to be classified as additional MPT Junior DIP Facility, i.e., '4b' under the Recovery Waterfall, subject to the terms hereof.

| Provision | Summary |
|---|---|
| | Obligations under the Amended DIP Term Loan Agreement (the "<u>DIP Obligations</u>") will be secured by liens in the Collateral (as defined in the DIP Term Loan Agreement). <br><br> The DIP Obligations shall constitute superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code. <br><br> Unless consented to by the DIP Lender in its sole discretion, the Lease Repayment Option (as defined in the DIP Term Loan Agreement) shall not apply to the New DIP Obligations. <br><br> On the Confirmation Date, (i) the Debtors shall exercise the Lease Repayment Option (which shall not apply to the New DIP Obligations or any adequate protection amounts that have not yet accrued) and (ii) MPT shall, in accordance with Section 7.02(f) of the Settlement Agreement, fund an amount equal to $22,231,160.15, which represents the amount allocated to the Debtors' Estates under Tranche 5 and Tranche 6, in each case pursuant to the Recovery Waterfall, less $8,012,202.52 (the amount remaining in the Segregated Seismic Account[4] which shall be simultaneously released to the Debtors) less any Overfunding Repayment calculated on a pro-forma basis as a result of this cash funding from MPT. For the avoidance of doubt, from and after such time, the New DIP Obligations, and any Professional Fee Loans and Accrued Loans incurred from and after such time, shall be outstanding Obligations under the Amended DIP Term Loan Agreement (and the Amended DIP Term Loan Agreement shall otherwise remain in full force and effect). |
| **Non-Default Interest Rate in respect of New DIP Loans** | 14% per annum, payable in cash. |
| **Commitment Fee in respect of New DIP** | 4%, payable in kind. |

---

[4] As defined in the Stipulation and Agreed Order (I) Authorizing the (A) Consent under Junior DIP Credit Agreement, (B) Payment of Prepetition Seismic Obligations, (C) Continuation of Postpetition Performance, and (II) Granted Related Relief [Docket No. 2531].

| Provision | Summary |
|---|---|
| **Loans** | |
| **Exit Fee in respect of New DIP Loans** | 3%, payable in kind. |

| | |
|---|---|
| **Additional Conditions to New DIP Loan Draws** | i. The Borrowers shall have delivered to the DIP Lender a cash-flow budget for Holdings and its subsidiaries through at least January 2, 2026, in form and substance reasonably acceptable to the DIP Lender, the most recent version of which is attached hereto as **Exhibit A** and is acceptable to MPT (the "Approved Budget"). <br><br> ii. The DIP Lender shall make available the New DIP Loans (other than the CT DIP Loan) under the New DIP Commitments subject to (x) entry of an order, in form and substance satisfactory to the DIP Lender in its reasonable discretion, following the hearing on November 18, 2025, authorizing and approving, among other things, the terms and conditions of the proposed upsize and amendment to DIP Term Loan Agreement set forth herein and in the definitive documentation therefor on a final basis and (y) payment of then accrued and unpaid MPT professional fees (which amounts may be payable or netted from the Initial New DIP Loan draw). <br><br> iii. The DIP Lender shall make available the CT DIP Loan under the New DIP Commitments subject to (x) entry of an order, in form and substance satisfactory to the DIP Lender in its reasonable discretion, following the hearing on December 12, 2025, authorizing and approving, among other things, the terms and conditions of the proposed upsize and amendment to DIP Term Loan Agreement set forth herein and in the definitive documentation therefor on a final basis and (y) payment of then accrued and unpaid MPT professional fees. <br><br> iv. Beginning with the week following the initial draw of the New DIP Commitments, and for each subsequent week, the Borrowers shall deliver to the DIP Lender, no later than close of business each Friday (the "Weekly Measurement Date"), an officer's certificate setting forth (x) projected available cash in the Borrowers' bank accounts for the applicable week, (y) the budgeted operating expenses for the applicable week, identified therein in detail reasonably acceptable to the DIP Lender (the "Identified Operating Expenses"), and (z) in connection with each borrowing request, a calculation demonstrating that, absent the specific amount of the requested Minimum Cash Need Advance, the Borrowers' available cash in such accounts would be projected to fall |

| Provision | Summary |
|---|---|
| | below $5,000,000 during such week (the "<u>Minimum Cash Need Advance Condition</u>"). Upon satisfaction of the Minimum Cash Need Advance Condition and delivery of a valid borrowing request, the DIP Lender shall fund the requested Minimum Cash Need Advance within three (3) Business Days of such request. If, however, as of the subsequent Weekly Measurement Date, the Borrowers' available cash exceeds $5,000,000 after receipt of the Minimum Cash Need Advance and payment of the Identified Operating Expenses for the applicable week, the Borrowers shall, within two (2) business days thereafter, repay the lesser of (a) the amount of such excess or (b) the aggregate amount of such Minimum Cash Need Advance (each such repayment, an "<u>Overfunding Repayment</u>").<br><br>v. Prior to the Effective Date, the amount of any Overfunding Repayment may be re-borrowed, from time to time, in accordance with the terms and conditions set forth herein, up to the aggregate principal amount of all Overfunding Repayments. |
| **Additional Conditions to Backstop Facility** | i. The First A/R Backstop Facility Advance shall be available subject to MPT's receipt of CT Accounts Receivables Proceeds in an amount not less than $10,000,000.<br><br>ii. The Second A/R Backstop Facility Advance shall be available subject to MPT's receipt of CT Accounts Receivables Proceeds in an amount not less than $30,000,000.<br><br>iii. The Third A/R Backstop Facility Advance shall be available subject to MPT's receipt of CT Accounts Receivables Proceeds in an amount not less than $45,000,000.<br><br>iv. Availability of the Incremental Backstop Tranche shall be subject to entry of an order, in form and substance satisfactory to the Backstop Facility Lender in its reasonable discretion, following the hearing on December 12, 2025, authorizing and approving the Incremental |

| Provision | Summary |
|---|---|
| | Backstop Tranche on a final basis.<br><br>v. Each of the Connecticut ECHN Sale Transaction, the Connecticut Waterbury Sale Transaction, the Acceptable CA Operations Disposition and the residual Acceptable PA Operations Disposition shall have been consummated and the Net Proceeds thereof distributed consistent in all respects with the Amended DIP Term Loan Agreement, Settlement Agreement and Recovery Waterfall. |
| **Additional DIP Covenants / Milestones** | i. The Connecticut ECHN Sale Transaction shall have been consummated by January 1, 2026.<br><br>ii. The CON related to the Connecticut Waterbury Sale Transaction shall have been filed by December 5, 2025.<br><br>iii. The Acceptable CA Operations Disposition shall have been consummated by December 12, 2025.<br><br>iv. Net Proceeds allocated to the Debtors' Estates (in each case as defined in the Settlement Agreement) under the Recovery Waterfall (including, without limitation Net Proceeds of the California Sale Transaction) shall be used by the Debtors without delay as needed to fund their operations.<br><br>v. The DIP Lender shall waive any right to defer cash funding of the value of the lease in the California Sale Transaction, notwithstanding 7.02(f) of the Settlement Agreement.<br><br>vi. No later than December 9, 2025, the Debtors shall retain Stephen Gray to act as the wind down monitor between the Confirmation Date and the Effective Date, to, among other things, monitor consummation of the asset sale transactions and negotiation and satisfaction of Administrative Claims, Priority Tax Claims and Other Priority Claims and to monitor the establishment of the transition services structure. Beginning on the Effective Date of the Plan, a Plan Administrator mutually acceptable |

| Provision | Summary |
|---|---|
| | to the Debtors and MPT shall be retained to wind down each Debtor's remaining business operations and oversee the Plan implementation after the Effective Date in accordance with the Plan (including, among other things, to administer transition services and coordinate with the GUC Trust Trustee). |
| | vii. The Plan Administrator shall not enter into any settlement or other transaction involving $250,000 or more in value or consideration without the prior consent to MPT (not to be unreasonably withheld).[5] The Plan Administrator will provide MPT with periodic written updates, on a monthly basis or such other schedule agreed by MPT and the Plan Administrator, regarding the financial position of Wind-Down Debtors and Reorganized PMH and the Plan Administrator's primary activities |
| | viii. On the Effective Date, the Chief Restructuring Officer shall resign. |
| | ix. No later than December 15, 2025, the Debtors shall use commercially reasonable efforts to (a) retain an investment banker acceptable to MPT in its reasonable discretion and (b) commence a marketing process with respect to the Blue Cross/Blue Shield antitrust claims, provided, that if MPT identifies an investment banker to market the claims, the Debtors shall retain such investment banker and commence such marketing process. Prior to the transfer of the Blue Cross/Blue Shield antitrust claims to the GUC Trust in accordance with the Plan on the Effective Date, the Debtors shall be required to transfer, sell or otherwise dispose of such claims if MPT so directs, subject to the consent of the Committee (not to be unreasonably withheld, conditioned or delayed). |
| | x. Neither the Debtors nor the GUC Trust shall waive any preference claim otherwise constituting an Assigned Estate Cause of Action without the consent of MPT in its |

---

[5] This covenant shall also be included in the amended Plan and/or Amended Backstop Credit Agreement.

| Provision | Summary |
|---|---|
| | sole discretion.[6] |
| | xi. The Debtors shall use good-faith efforts to defer claims payments to the extent permitted by the Bankruptcy Code and the Plan so that such payments can be funded from accounts receivables collections distributed under the Recovery Waterfall. |

---

[6] This covenant shall also be included in the Amended Backstop Credit Agreement.