SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        tom.califano@sidley.com
              rpatel@sidley.com
              mquejada@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        wcurtin@sidley.com
              pventer@sidley.com
              anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |

## DEBTORS' EMERGENCY MOTION SEEKING
## ENTRY OF AN ORDER ENFORCING THE ORDER
## (I) AUTHORIZING THE SALE OF THE CALIFORNIA ASSETS
## FREE AND CLEAR OF ALL ENCUMBRANCES, (II) APPROVING
## THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED
## CONTRACTS, AND (III) GRANTING RELATED RELIEF

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

**Emergency relief has been requested.  Relief is requested not later than 2:30 p.m. prevailing Central Time on January 13, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A status conference will be conducted on the matters set forth in this motion on January 13, 2026, at 2:30 p.m. prevailing Central Time in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242. You may participate in the status conference either in person or by an audio and video connection.  A full evidentiary hearing on this motion will be scheduled for a later date, subject to the availability of the Court.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 650.479.3207.  The meeting code is 2304 154 2638.  Video communication will be by the use of the Cisco WebEx platform.  Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page.  Click the settings icon in the upper right corner and enter your name under the personal information setting.  WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judgejernigans-hearing-dates.**

**Hearing appearances must be made electronically in advance of electronic hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Prospect Medical Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion (this "Motion").  In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

1.       The actions of NOR Healthcare Systems Corp. ("NOR") over the past month have put the Debtors' estate at risk of administrative insolvency.  Notwithstanding repeated attempts by the Debtors to force compliance, NOR has repeatedly failed to pay amounts due to the Debtors and third parties.

2.       NOR's noncompliance began on December 8, 2025—the first business day after the sale of the non-MPT Real Property assets closed under the bifurcated closing construct.  When initial informal attempts to bring NOR into compliance failed, on December 18, 2025 (three days after the MPT Real Property was transferred and the CA Sale Transaction closed),  the Debtors, pursuant to the California APA (as defined below), sent an initial demand letter to NOR (the

"Initial Demand Letter"), demanding payment for outstanding pre- and post-Closing accounts payable and amounts due under the California APA in connection with the eCapital Healthcare Corp. arrangements.  NOR failed to comply.  A true copy of the Initial Demand Letter is attached hereto as **Exhibit B**.

3.      After numerous additional informal communication attempts, on January 6, 2026, the Debtors sent a second demand letter (the "Second Demand Letter" and, together with the Initial Demand Letter, the "Demand Letters").  This Second Demand Letter stated that, absent compliance within 48 hours, the Debtors would seek this Court's intervention.  A true copy of the Second Demand Letter is attached hereto as **Exhibit C**.

4.      The outstanding obligations owed to the Debtors as of the Second Demand Letter are summarized below and can be found in more detail in the chart attached hereto as **Exhibit E**:

- Satisfaction of NOR's $11.6 million in outstanding funding obligations and maintenance of adequate funding in the Alta Account moving forward, including:

  - payment of all currently post-petition accounts payable, including $2.52 million of post-petition accounts payable that must be paid to the Debtors so that the Debtors can pay NOR's portion of certain enterprise-level contracts;

  - payment of the eCapital Amount Due (as defined below), in the amount of $950,000;

  - compliance with the agreement to prefund purchase orders ("POs") related to purchases made by NOR pursuant to the Debtors' supply chain contracts, as well as payment of the outstanding $741,000 of obligations for orders already placed;

  - payment of $3.3 million for underfunded capitation liabilities, as well as (i) funding a weekly cash reserve in the Alta Account of $3.5 million to cover future capitation payments and (ii) payment for the $129,000 of outstanding capitation; and

  - payment of $440,000 for the Accounts Payable Check Float Clearing.

5.      On January 9, 2026, NOR provided a response to the Demand Letters (the "<u>NOR Response</u>").  A true copy of the NOR Response is attached as **<u>Exhibit D</u>**.  Among other arguments, the NOR Response alleged, for the first time, that the Debtors actually owe NOR $9.9 million.  On January 10, 2026, the Debtors and NOR met to discuss the Demand Letters and the NOR Response.  As of the time of filing this Motion, the parties failed to reach a resolution  as to NOR's outstanding obligations.

6.      By its non-compliance, NOR is forcing the Debtors to incur incremental liabilities related to the operation of the California hospitals, notwithstanding the closing of the CA Sale Transaction, and is putting the Debtors at risk of administrative insolvency.  Accordingly, NOR's refusal to comply with its obligations require the Court's intervention to enforce the CA Sale Order.  The transactions between the Debtors and NOR were designed to insulate the Debtors from the costs of operating the California facilities and NOR's refusal to comply puts the Debtors' confirmed plan at risk.

## <u>RELIEF REQUESTED</u>

7.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Order</u>"), directing NOR to comply with the Sale Order and requiring it to refund the Debtors' estates for all costs incurred, including professional fees and other costs resulting from NOR's default.  Additionally, the Debtors seek an order finding NOR in contempt and requiring it to pay an appropriate fine until it complies with its obligations.

8.      The Debtors seek to use the hearing set for January 13, 2026, at 2:30 p.m. (prevailing Central Time) as an emergency status conference to discuss NOR's outstanding obligations under the Agreements, with a full evidentiary hearing on this Motion scheduled for a later date, subject to the availability of the Court.

## JURISDICTION AND VENUE

9.       The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.       The legal predicates for the relief requested in this Motion is section 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").   Further, this Court has jurisdiction to interpret, clarify, and enforce the Sale Order pursuant to its own inherent authority, section 10.9 of the California APA, and paragraph 41 of the CA Sale Order.

11.       The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.       General Background of the Cases.

12.       Beginning on January 11, 2025 (the "Petition Date"), each of the HCo Debtors (including the Seller) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the HCo Debtors and their business, and the facts and circumstances of the HCo Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Paul Rundell in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "First Day Declaration").

13.     On January 29, 2025, the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors in the HCo Debtors' chapter 11 cases [Docket No. 295]. On January 30, 2025, the U.S. Trustee appointed Suzanne Koenig as the patient care ombudsman in the HCo Debtors' chapter 11 cases [Docket No. 325].

14.     On July 7, 2025 (the "PCo Petition Date"), each of the PCo Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15.     On September 19, 2025 (the "TopCo Petition Date"), certain additional entities related to the Debtors' holding companies filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

16.     The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 93, 2473, and 3474].

17.     On December 15, 2025, the Court entered the *Order Confirming the Amended Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and Its Debtor Affiliates* [Docket No. 4230] (the "Confirmation Order").  Pursuant to the Confirmation Order, the Debtors' chapter 11 plan (the "Plan") has been confirmed.  The effective date of the Plan has not yet passed.

## II. The CA Sale Transaction.

18.     On August 3, 2025, the Debtors designated NOR as the stalking horse bidder for the CA Sale Transaction.  Thereafter, certain of the Debtors and NOR entered into that certain *Asset Purchase Agreement*, dated as of August 3, 2025 (the "California APA," and the sale transaction contemplated thereunder, the "CA Sale Transaction").

19.     On August 26, 2025, the Debtors held an auction (the "Auction") for the sale of the Transferred Assets.  Following the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, designated NOR as the Successful Bidder for the CA Sale Transaction.

20.     On August 29, 2025, the Court entered the CA Sale Order, authorizing the sale of the Transferred Assets to NOR free and clear of all Interests (other than Permitted Liens and Assumed Liabilities).  In response to objections from various parties regarding NOR's financial wherewithal, Mr. Faisal Gill, NOR's general counsel, testified that NOR would have access to the personal assets of Mr. Michael Sarian, the Chairman and Chief Executive Officer of Healthcare Systems of America, to ensure that NOR was properly capitalized to run the California hospitals safely and appropriately.  *See* Hr'g Tr. 72:12–13, Aug. 28, 2025 ("NOR is capitalized by…Mike Sarian's personal assets").  Mr. Gill also indicated that, in addition to Mr. Sarian's personal assets, NOR would also have access to additional funding through certain of its affiliates.  *See* Hr'g Tr. 73:17–20, Aug. 28, 2025 ("NOR is an affiliate of American Healthcare Systems as well as [Healthcare Systems of America].  Both of those are fully-functioning companies, both of those have assets that can be used to satisfy debts, and both of [their] assets will be available").

21.     On December 5, 2025, the Debtors and NOR entered that certain (i) Transition Services Agreement, dated December 5, 2025 (the "TSA"), and (ii) Interim Management Agreement, dated December 5, 2025 (the "IMA", and, collectively with the California APA and the TSA, the "Agreements").

22.     On December 5, 2025, all the operations of the CA Assets transferred to NOR, other than the MPT Real Property, and, on December 15, 2025, the MPT Real Property was transferred to NOR (such bifurcated closing, the "Closing").

### III.    TSA Negotiations and Post Sale Closing Events.

23.    Following the Court's approval of the California APA, the Debtors and NOR began negotiating the terms of the TSA contemplated under the California APA.  The TSA was executed on December 5, 2025.

        a.    *TSA Fees.*

24.    Section 2.1 of the TSA sets out the amounts payable to the Debtors by NOR, which include (a) fees in the amounts set forth under section 2.1 or a Change Order, (b) the Seller's Actual Costs (as defined in section 2.3 of the TSA),  and (c) any other fees, costs, or expenses contemplated under section 2.1 (collectively, the "TSA Fees").  NOR satisfied the outstanding $1.1 million related to TSA Fees on January 9, 2026, which was due on January 2, 2026.

25.    Under the TSA, NOR is required to pay the TSA Fees (i) for the first month following the Effective Date of the TSA, on the timeline set forth in Schedule A-3 to the TSA, and (ii) for every month thereafter, in two equal installments due on the first and fifteenth day of the month.  *See* TSA, Section 2.2(a).  Due to liquidity issues, NOR sent a request to the Debtors to pay on a weekly basis.  *See* Rundell Declaration, ¶ 9.  While the Debtors did not agree to a modification of the TSA Fee payment schedule, if there is an ongoing liquidity issue, the Debtors remain open to working with NOR on potential solutions to address cash flow limitations.  *Id.* However, the Debtors will only offer accommodations to NOR if NOR begins complying with all of their other obligations under the Agreements.

        b.    *Post-Petition Accounts Payable.*

26.    Section 2.3(c) of the California APA provides that:

> Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms all Liabilities of the Seller Parties arising from or related to the Business or the Transferred Assets as the same shall exist on the Closing Date and irrespective of whether the same shall arise prior to, on or

after the Closing Date, *including all post-petition accounts payable and accrued expenses of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business prior to the Closing* by or on behalf of the Seller Group (but excluding any professional fees related to the Transactions and/or restructuring efforts), not to exceed the amount of accounts payable and accrued expenses outstanding on the Effective Date

California APA, Section 2.3(c) (emphasis added).

27.     The California APA makes it clear that NOR is responsible for the post-petition accounts payable under the California APA, regardless of when such Liabilities were incurred. However, as of the date of filing this Motion, NOR has failed to provide funding for several post-petition accounts payable, despite repeated requests from the Debtors that NOR comply with its obligations under section 2.3(c) of the California APA.  As a result, approximately $2.52 million in past due amounts are owed to the Debtors on account of the post-petition accounts payable related to the Debtors' enterprise contracts.  *See* Rundell Declaration, ¶ 16.  A further $5.5 million is owed by NOR to vendors directly.  *Id.*

28.     The NOR Response attempts to obfuscate the clear allocation of liability related to the post-petition accounts payable.  NOR attempts to read in a due date limitation to the term "ordinary course of business" in section 2.3(c) of the California APA.  However, such a limitation was never considered during the diligence and negotiation of the California APA, nor does the California APA contemplate such a limitation.  During and after NOR's diligence on the California hospital assets, they were provided with information related to the post-petition accounts payable balance.  For example, on June 2, 2025, the balance was $8,420,046, as provided to NOR through the data room for the CA Sale Transaction.  Further, on August 4, 2025, one day after the execution of the California APA, the post-petition accounts payable balance was $8,900,094.

29.    As of January 8, 2026, the post-petition accounts payable that remains outstanding is $8,010,359[2]—however, the Debtors have not asked NOR to fund the full $8.01 million to the Debtors directly.  Instead, as noted above, only $2.52 million in past due amounts are owed to the Debtors for the payment of NOR's outstanding liabilities under certain of the Debtors' enterprise contracts.  The remaining balance—approximately $5.5 million—must be paid by NOR directly to the vendors as and when it comes due.  Currently, $5.4 million of the $5.5 million owing to vendors is past due.

c.    *eCapital-Related Payments.*

30.    Section 2.9(a) of the California APA provides:

In full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser…, the aggregate consideration shall be (i) the assumption of the Assumed Liabilities plus (ii) either (x) an amount in cash (the "***eCapital Payoff Amount***") equal to the borrowing base under the eCapital Line of Credit calculated with historical practices as presented in Exhibit C (the "***eCapital Borrowing Base***") or (y) if the Purchaser enters into a new arrangement with eCapital Healthcare Corp. or otherwise assumes the existing eCapital Line of Credit and provides a payoff letter, release, assignment and assumption, or similar instrument (the "***eCapital Payoff or Assumption Instrument***") to the Seller Representative, then, an amount in cash (the "***eCapital Payoff Amount***") equal to the positive difference between (1) the eCapital Borrowing Base and (2) any remaining Liability or amount due under the eCapital Line of Credit after application of the eCapital Payoff or Assumption Instrument (clauses (i) and (ii) collectively, the "***Purchase Price***").

California APA, Section 2.9(a).

31.    Prior to Closing, eCapital placed a reserve on the Debtors' borrowing base in the amount of $950,000, to ensure payment of the Assignment Fee under NOR's new credit agreement with eCapital (a NOR obligation).  The reserve remained in place at Closing which is inconsistent

---

[2]    The NOR Response includes a $12 million figure in outstanding accounts payable.  The Debtors have been unable to verify or evaluate this number as it is hard-coded into the exhibit attached to the NOR Response and is not reflective of the total outstanding post-petition accounts payable balance at issue, which the Debtors have calculated to be $8.01 million.

with historical practices of the eCapital Borrowing Base as of the Effective Date as presented in Exhibit C of the California APA. Therefore, the Debtors effectively paid the assignment fee through the reserve, despite the assignment fee being a NOR liability. The California APA requires a cash payment from NOR to the Debtors for this change in the eCapital Borrowing Base of $950,000.

32.     As of the filing of this Motion, NOR has not paid to the Debtors the required cash payment relating to the eCapital borrowing base.

<blockquote>d.     <em>Supported Supply Chain Contracts and Excluded Contracts Payments.</em></blockquote>

33.     As part of the TSA negotiations, NOR agreed to prefund any purchases made under the Supported Supply Chain Contracts prior to submitting the order to the applicable vendor. *See* Schedule A-6 to the TSA. Additionally, neither the American Red Cross Contract nor the Medline contract (the "Excluded Contracts") were included in the TSA, as NOR purported to have a standalone agreement with those entities. *See* Rundell Declaration, ¶ 10. The Debtors have been providing access to the Excluded Contracts as an accommodation to NOR. However, NOR was required to prefund the Debtors for any orders placed under the Excluded Contracts. *Id*. NOR has failed to prefund such orders; as a result, NOR currently owes the Debtors approximately $741,000 for unfunded POs made under the Supported Supply Chain Contracts and the Excluded Contracts. *See* Rundell Declaration, ¶ 12. NOR has confirmed the amounts owing through January 2, 2026, which account for $614,000 of the total outstanding orders. *Id.*

34.     Several of the Debtors' suppliers with respect to the Supported Supply Chain Contracts have enterprise contracts with the Debtors. Due to NOR's failure to prefund its POs, certain of these suppliers have threatened to cut off service to the Debtors' other hospitals, jeopardizing the Debtors' ability to operate their remaining hospitals and to perform obligations

owed with respect to the buyers of the Debtors' non-California assets. *See* Rundell Declaration, ¶ 13.  For instance, on January 7, 2026, Boston Scientific informed the Debtors that it would be holding shipments for all orders placed under the Boston Scientific contract until the outstanding invoices for orders placed by NOR were paid.  *Id*.  The hold on the Debtors' Boston Scientific orders was released on January 9, 2026, after NOR paid the outstanding amounts.  *Id*.

      e.    *Capitation Disbursements and Claims.*

35.    Section 2.3(m) of the California APA provides:

> Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms all Liabilities of the Seller Parties arising from or related to the Business or the Transferred Assets as the same shall exist on the Closing Date and irrespective of whether the same shall arise prior to, on or after the Closing Date…[including] all Liabilities and obligations relating to or arising from capitation-based healthcare services provided to "covered persons" under or pursuant to applicable capitation Contracts by or on behalf of the Seller Group prior to the Closing Date, including, but not limited to, all claims for services rendered under capitation Contracts that were incurred prior to the Closing Date but reported or paid thereafter ("***Capitation Claims***"); notwithstanding anything herein to the contrary, Purchaser shall be responsible for the adjudication and payment of any such Capitation Claims, regardless of whether such claims are known, unknown, reported, unreported, accrued, or contingent as of the Closing Date

California APA, Section 2.3(m).

36.    NOR has been in breach of its obligation to pay the Capitation Claims.  Since Closing, NOR has underfunded the capitation liabilities by $3.3 million and utilized $129,000 of restricted cash funded by the Debtors.  *See* Rundell Declaration, ¶ 20.  NOR has confirmed the balance for underfunded capitation payments through January 2, 2026, which accounts for $3.1 million of the capitation liabilities.  *Id*.

37.    Furthermore, pursuant to an informal agreement between NOR and the Debtors, NOR committed to opening its own bank account (the "New Account") within 30 days of Closing from which capitation liabilities would be funded.  *See* Rundell Declaration, ¶ 24.  As of the filing

of this Motion, the Debtors do not have any information on a timeline on which NOR's bank account will be opened. *Id.* While Capitation Claims continue to be funded out of the Debtors' bank account, NOR must provide sufficient funding into the account to cover the Capitation Claims and ensure an appropriate reserve.

38.     On December 31, 2025, due in large part to NOR's failure to fund the Capitation Claims, the Alta Account went negative, forcing the Debtors to fund $1.5 million that same day to avoid the closure of all of the Debtors' accounts at City National Bank ("CNB").  CNB relayed to NOR in a phone conversation that, because of the negative balance in the Alta Account, CNB may be forced to close all of the Debtors' CNB bank accounts.  Such an outcome would have been disastrous for the Debtors' ongoing hospital operations.

39.     On December 18, 2025, and on January 6, 2025, the Debtors sent NOR the Initial Demand Letter and the Second Demand Letter, respectively.  In addition to sending NOR the Demand Letters, the Debtors and their advisors have informally reached out to NOR multiple times since December 5, 2025, in an attempt to get NOR to perform its obligations under the Agreements. *See* Rundell Declaration, ¶¶ 23–25.

40.     On January 9, 2026, NOR sent the Debtors the NOR Response, which purportedly addressed the contents of the Demand Letters.  On January 10, 2026, a meeting was held between NOR and the Debtors to discuss the Demand Letters and the NOR Response.  Though many of the issues discussed at the meeting were initially raised on December 18, 2025, in the First Demand Letter, NOR was neither prepared nor in a position to resolve any of the open issues in the near term.  As a result, no resolution was reached between the Debtors and NOR prior to the filing of this Motion.  NOR has not cooperated with the Debtors, and the Debtors continue to accrue liabilities as a result of NOR's actions.

## BASIS FOR RELIEF

41.     The Court has both jurisdiction to enforce its own sale orders and the authority to

do so.  *See Travelers Ins. v. St. Jude Hosp*., 38 F.3d 1414, 1416–17 (5th Cir. 1994) (providing that

the court's authority to enforce its own orders is explicit); *see also Travelers Indem. Co. v. Bailey*,

557 U.S. 137, 151 (2009) (providing that a bankruptcy court "plainly ha[s] jurisdiction to interpret

and enforce its own prior orders."); *Rodriguez v. EMC Mortg. Corp. (In re Rodriguez)*, No. 00-

50657, 2001 WL 360713, at *2 (5th Cir. Mar. 15, 2001) ("When an estate is in administration, a

bankruptcy court retains jurisdiction to interpret and enforce its own orders to ensure their proper

execution"); *Galaz v. Katona*, No. 5:14-CV-967, 2015 WL 5565266, at *4 (W.D. Tex. Sept. 21,

2015) ("[I]t is well established that a bankruptcy court has jurisdiction to interpret and enforce its

own prior orders"); *In re Motors Liquidation Co.*, 513 B.R. 467, 477 (Bankr. S.D.N.Y. 2014)

("And it need hardly be said that I have jurisdiction to interpret and enforce my own orders, just

as I've previously done, repeatedly, with respect to the very [s]ale [o]rder here.") (internal citations

omitted); *In re Protarga, Inc.*, 329 B.R. 451, 479 (Bankr. D. Del. 2005) (citing *In re Cont'l

Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999)) ("It is axiomatic that a court possesses

the inherent authority to enforce its own orders."); *see also* CA Sale Order, ¶ 41 ("This Court shall

retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms

and provisions of the California APA, the Transaction Documents, the Bidding Procedures Order,

and this Sale Order, and each of the agreements executed in connection therewith to which the

Debtors are a party or which has been assigned to the Purchaser by the Debtors, and to adjudicate,

if necessary, any and all disputes concerning or relating in any way to the CA Sale Transaction.").

42.     Further, section 105(a) of the Bankruptcy Code also "gives the bankruptcy court

the power and the jurisdiction to enforce its valid orders."  *Protarga*, 329 B.R. at 479 (citations

omitted); *see also* 11 U.S.C. § 105(a).  Section 105(a) of the Bankruptcy Code empowers the Court

to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."

11 U.S.C. § 105(a).  Courts have consistently recognized that section 105 of the Bankruptcy Code

grants bankruptcy judges, broad (though not unlimited) authority to take actions necessary or

appropriate to prevent an abuse of process.  *See, e.g.*, *Marrama v. Citizens Bank*, 549 U.S. 365,

375 (2007) (recognizing the "broad authority granted to bankruptcy judges to take any action that

is necessary or appropriate to prevent an abuse or process described in section 105(a) of the Code"

(quotes omitted)); *Feld v. Zale Corp. (In re Zale Corp.*), 62 F.3d 746, 760 (5th Cir. 1995)

(recognizing that "we interpret section 105 liberally" as long as any action taken is otherwise

consistent with the Bankruptcy Code).

43.     It is a long-standing principle that a federal court does not need an independent

basis of jurisdiction to construe or enforce its own prior orders.  *See Local Loan Co. v. Hunt*, 292

U.S. 234, 239 (1934) ("That a federal court of equity has jurisdiction of a bill ancillary to an

original case or proceeding in the same court, whether at law or in equity, to secure or preserve the

fruits and advantages of a judgment or decree rendered therein, is well settled . . . . And this,

irrespective of whether the court would have jurisdiction if the proceeding were an original one.")

(citations omitted); *see also Baker v. Baker (In re Baker)*, 593 F. App'x 416, 417 (5th Cir. 2015)

(citations omitted).

44.     Notably, courts in the Fifth Circuit have granted similar such relief in the past.  *See

e.g.*, *In re KLD Energy Technologies*, No. 16-10345 (HCM) (Bankr. W.D. Tex Aug. 3, 2017)

[Docket No. 536] (order requiring purchaser of debtor's assets to make certain payments pursuant

to both the parties' asset purchase agreement and sale order entered by the bankruptcy court); *see

also Hr'g Tr.* at 16:8–18:11, *In re AppHarvest Products, LLC*, No. 23-90745 (DRJ) (Bankr. S.D.

Tex. Oct. 12, 2023) [Docket No. 546] (expressing displeasure with purchaser's non-compliance

with court's entered sale order and noting that continued non-compliance could lead to sanctions

and issuance of show-cause order).  Here, the Court is well within its power and jurisdiction to

enter an order enforcing the CA Sale Order and the California APA.

45.    In addition to the authority to enforce its own orders, a bankruptcy court also has

authority to sanction those parties who do not abide by its orders.  Indeed, a bankruptcy court's

"right to sanction those who flout th[e] Court's authority is both necessary and integral to th[e]

Court's performance of its duties."  *In re SkyPort Global Communications, Inc.*, 2013 WL

4046397 at *1 (Bankr. S.D. Tex. Aug. 7, 2013) *aff'd*, 661 F. App'x 835 (5th Cir. 2016).

"Bankruptcy Code provisions, Bankruptcy Rules and court orders may not be violated without

recourse."  *In re Rodriguez*, 517 B.R. 724, 729 (Bankr. S.D. Tex. 2014).  Thus, it is well established

that bankruptcy courts possess civil contempt power.  *In re White-Robinson*, 777 F.3d 792, 795

(5th Cir. 2015). Section 105(a) expressly authorizes bankruptcy courts to "issue any order

. . . necessary or appropriate to carry out the provisions" of Title 11 or to take any action or make

any "determination necessary or appropriate to enforce or implement court orders or rules, or to

prevent an abuse of process."  11 U.S.C. § 105(a); *see also Placid Refining Co. v. Terrebonne Fuel

and Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir. 1997) (holding

that a bankruptcy court has the power under section 105 to issue sanctions, including civil contempt

proceedings, in order to carry out the provisions of the Bankruptcy Code).

46.    Civil contempt is "appropriate when a party fails to comply with a specific and

definite court order."  *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 400 (5th

Cir. 1987).  "Civil contempt can serve two purposes, either coercing compliance with an order or

compensating a party who has suffered unnecessary injuries or costs because of contemptuous

conduct." *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 263 (5th Cir. 2009) (citation omitted).

47.     Courts in this district have held that in order for a bankruptcy court to make a finding of civil contempt, there must be a showing by clear and convincing evidence that: (i) a court order was in effect; (ii) the order required certain conduct by the respondent; and (iii) the respondent failed to comply with the order. *See In re Hester*, 554 B.R. 143, 148 (Bankr. N.D. Tex. 2016) (citing *Petroleos Mexicanos*, 826 F.2d at 401); *see also In re LATCL&F, Inc.*, 2001 WL 984912, at *3 (Bankr. N.D. Tex. Aug. 14, 2001). The intent behind a respondent's actions is not relevant to a finding of civil contempt. *In re Highland Capital Management, L.P.*, 98 F.4th 170, 176 (5th Cir. 2024).

I.      **NOR's Failure to Satisfy its Financial Obligations or Prefund the POs Is a Violation of the Agreements.**

48.     As of January 9, 2026, NOR owes the Debtors approximately $11.6 million. *See* Rundell Declaration, ¶ 22. Without this Court's enforcement of the CA Sale Order, this number will only grow. From December 10, 2025, to January 9, 2026, NOR's funding obligation has increased from approximately $4.9 million to $11.6 million. *Id*. This continued trend of increasing exposure is unacceptable, especially given that NOR has previously represented that it had committed funding from multiple sources, including the personal assets of Mr. Sarian. *See* Hr'g Tr. 72:7–74:12, Aug. 28, 2025.

> a.      *NOR's Funding Obligations Are Unambiguous, and Continued Failure to Abide by the Terms of the Agreements Is a Clear Violation of the CA Sale Order.*

49.     Pursuant to section 2.3 of the California APA, NOR has an obligation to pay for the post-petition accounts payable under the California APA. This obligation is undisputed, regardless of when such Liabilities were incurred.

50.    The following post-petition accounts payable amounts remain outstanding, and, through this Motion, the Debtors request payment thereof on or before the corresponding due dates set forth below:

**California & PMH Allocated AP as of 12/05/2025**
in 000s

| AP Category | Total | Past Due as of: | | | |
|---|---|---|---|---|---|
| | | WE 1/9 | WE 1/16 | WE 1/23 | WE 1/30 |
| Alta | 5,494 | 5,441 | 18 | 18 | 18 |
| PMH | 2,517 | 2,510 | - | 7 | - |
| Total | $   8,010 | $   7,950 | $   18 | $   25 | $   18 |

Rundell Declaration, ¶ 17.

51.    As reflected in the above chart, NOR currently owes the Debtors approximately $2.52 million in relation to the outstanding post-petition accounts payable. On top of the amounts they owe directly to the Debtors, NOR also owes approximately $5.49 million in outstanding post-petition accounts payable that must be paid directly to vendors (the "Alta AP"). *See* Rundell Declaration, ¶ 18.  Several of the vendors to which portions of the Alta AP are owed have enterprise contracts with the Debtors. *Id.*  Thus, though the Alta AP is not owed to the Debtors directly, NOR's failure to pay the Alta AP has broader implications for the Debtors' operations, as certain enterprise vendors may refuse to provide products and services to the Debtors as a whole.

52.    NOR argues that the vast majority of the outstanding post-petition accounts payable are the Debtors' responsibility. In particular, NOR alleges that because (i) many of the accounts had a due date prior to December 5, 2025 and (ii) it is in the ordinary course of business to pay an account on the due date, the outstanding amounts do not fall within the scope of NOR's assumed liabilities under the California APA. *See* NOR Response at 3. The plain text of the California APA, however, makes clear that NOR's liability is for "*all* post-petition accounts payable and

accrued expenses of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials, or services in the ordinary course of business prior to the Closing". *See* California APA, Section 2.3(c) (emphasis added). There is nothing in the APA that suggests that a pre-Closing payment date absolves NOR from liability with respect to the post-petition accounts payable. Section 2.3 of the California APA also provides that NOR has assumed the assumed liabilities, including the post-petition accounts payable, "as the same shall exist on the Closing Date and irrespective of whether the same shall arise prior to, on or after the Closing Date," making it clear that liabilities arising prior to December 5 are nonetheless NOR's responsibility if they continue to exist as of the Closing. *See* California APA, Section 2.3.

53.     Furthermore, the amounts associated with the outstanding post-petition accounts payable at Closing are consistent with the outstanding amounts at all material times during the transaction process with respect to the CA Sale Transaction. In July 2025, a document reflecting $8,420,046 of outstanding post-petition accounts payable, as of June 2, 2025, was uploaded to the sale data room for NOR as part of the diligence process. *See* Rundell Declaration, ¶ 15. Further, on August 4, 2025, one day after the execution of the California APA, the Debtors had $8,900,094 of outstanding post-petition accounts payable. *Id.* As of January 8, 2026, the outstanding amount of post-petition accounts payable is $8.01 million, and the Debtors have requested that NOR pay to the Debtors $2.52 million in satisfaction of NOR's outstanding liabilities under certain of the Debtors' enterprise contracts. *See* Rundell Declaration, ¶ 16.

54.     The NOR Response further asserts that the Debtors *owe* $9,948,000.03 to NOR. Specifically, NOR asserts that the Debtors are responsible for $12,070,000 of post-petition accounts payable, which, when offset against the amounts that NOR owes the Debtors, results in almost $10 million owing from the Debtors to NOR. *See* NOR Response at 3. Not only is this

materially inconsistent with the terms of the California APA, but the Debtors are unable to find any basis for the $12,070,000 figure. Based on all available data, the Debtors have calculated that the full universe of liabilities relating to the post-petition accounts payable as of the Closing equals $8,010,359. *See* Rundell Declaration, ¶¶ 15–16.

55.      In addition to NOR's failure to pay the post-petition accounts payable, pursuant to section 2.9 of the California APA, the Debtors were to receive a cash payment equal to the positive difference between the eCapital Borrowing Base (calculated consistent with historical practices as presented in Exhibit C of the California APA) and the eCapital Payoff or Assumption Instrument. On December 10, 2025, eCapital confirmed that, prior to the Closing Date, eCapital placed an incremental reserve of $950,000 on the Debtor's borrowing base in order to satisfy the Assignment Fee under NOR's credit agreement with eCapital. Therefore, the amount due from NOR to the Debtors under section 2.9 of the California APA is $950,000 (the "eCapital Amount Due"). *See* Rundell Declaration, ¶ 19.

56.      NOR asserts that it does not owe the eCapital Amount Due. What the NOR Response fails to address is that, while the Assignment Fee was a NOR obligation, payment of the Assignment Fee was ultimately satisfied out of the cash that eCapital restricted from the Debtors' borrowing base prior to the Closing. Accordingly, NOR improperly paid the Assignment Fee with funds of the Debtors' estates, and must remit the eCapital Amount Due to the Debtors. The eCapital Amount Due constitutes a material component of the Purchase Price due to the Debtors under the California APA. The Debtors therefore requests payment of the eCapital Amount Due.

57.      NOR has also failed to comply with its funding obligations with respect to the capitation liabilities. Since Closing, NOR has underfunded the capitation liabilities by $3.3 million and utilized $129,000 of restricted cash funded by the Debtors. With respect to the capitation

liabilities, NOR asserts that it does not owe any amounts to the Debtors because it has assumed the capitation contracts and will deal directly with the counterparties for the disbursement of capitation amounts as they come due. *See* NOR Response at 3. However, post-Closing capitation disbursements have already been made from the Alta Account while the Debtors wait for NOR to open the New Account. Not only have these disbursements been made from Debtor funds, but they have also affected the Debtors' other operations. For instance, the capitation disbursements resulted in the Alta Account being overdrawn on December 31, 2025, causing CNB to threaten to freeze of all of the Debtors' bank accounts. The Debtors therefore had to provide $1.5 million of emergency funding to the Alta Account to prevent the closure of their other CNB bank accounts. *See* Rundell Declaration, ¶ 21.

58.     Accordingly, NOR must reimburse the Debtors for disbursements made from the Alta Account (a Debtor account) on account of the capitation liabilities.

59.     Additionally, NOR has failed to comply with the following funding obligations:

- Accounts Payable Check Float Clearing. The Debtors funded $2.1 million to cover outstanding checks at the time of the Closing. As of January 8, 2026, $440,000 remains outstanding and should be treated as restricted cash in the Alta Account.

- TSA Fee Payments. While there have been delays in making certain payments, the previously outstanding TSA Fee payments were paid prior to the filing of this Motion. The Debtors are working with NOR to address any further liquidity issues in an attempt to prevent future disruptions to ongoing patient care; however, the Debtors will only be able to offer accommodations to NOR with respect to the TSA Fee payments if NOR begins to comply with its remaining obligations under the Agreements.

    *b.     Prefunding the POs Is a Required Obligation of the Agreements.*

60.     Further, NOR currently owes the Debtors approximately $741,000 for orders placed under the Supported Supply Chain Contracts and the Excluded Contracts. Following Closing of the CA Sale Transaction, NOR has continued to place orders under the Supported

Supply Chain Contracts, which are identified in Schedule A-6 of the TSA.  Schedule A-6 provides

that "[f]unding for any purchases made under the supported supply chain contracts [are] to be

prefunded prior to [the] order being submitted to [the] vendor."  Despite this condition, however,

NOR has continued to place orders under the Supported Supply Chain Contracts without providing

the requisite prefunding.  This failure to pay is in direct contravention of the terms of the TSA.

61.     NOR's failure to prefund the POs has already resulted in harm to the Debtors' other

hospitals.   For instance, Boston Scientific, a counterparty under a Supported Supply Chain

Contract, temporarily froze shipments to all Debtor entities under their enterprise contract due to

NOR's failure to fund the POs.  *see* Rundell Declaration, ¶ 13.

62.     In addition, at the request of NOR, the Excluded Contracts are not within the scope

of the TSA.  However, as an accommodation to NOR, the Debtors are providing NOR access to

the Excluded Contracts in exchange for prefunding of any orders prior to approval of such orders.

*See* Rundell Declaration, ¶ 10.  However, NOR has continued to place orders under the Excluded

Contracts without reimbursement to the Debtors, thereby increasing the Debtors' obligations to

third parties.  Moving forward, should NOR continue to accrue or not prepay the obligations under

the Excluded Contracts, the Debtors will exercise their unilateral right to make those contracts

unavailable to NOR.

63.     While the NOR Response asserts that NOR will pay for all supplies in accordance

with the TSA and resolve issues with vendors, NOR's response fails to address the crucial element

of timing.  NOR may intend to pay its obligations eventually, but the Debtors cannot afford to wait

for a payment that may or may not come.  The Debtors have already reached out to NOR multiple

times regarding payments for orders placed under the Supported Supply Chain Contracts and the

Excluded Contracts.  With respect to the Medline contract alone, the Debtors have reached out to

NOR 12 times since the Closing.  *See* Rundell Declaration, ¶ 23.  During these communications, NOR made repeated representations that it will pay for the orders it placed, but, to date, $484,000 of past due payables remain outstanding under the Medline contract.  *Id.*  The Debtors therefore have no confidence that NOR will fulfill its obligations to prefund the POs absent an order of the Court.

64.    The Debtors therefore request that the Court direct NOR to fund the outstanding obligations and transfer the necessary funds into the Alta Account prior to approval of any future PO related to the Supported Supply Chain Contracts.  The Debtors further request that the Court direct NOR to either (a) immediately cease placing orders under the Excluded Contracts or (b) fund the outstanding obligations and begin prefunding any orders placed under the Excluded Contracts prior to submitting any orders to the Excluded Contracts.

## II.    The Debtors Should Not be Required  to Provide Credit to NOR with Respect to Capitation and Claim Payments from the Alta Account.

65.    NOR has continued to use the Alta Account to fund the claims and capitation checks and disbursements related to NOR's operation of the California hospitals.  To avoid this scenario, the Debtors and NOR informally agreed on two matters—*first*, that NOR would open a new, standalone account to fund the capitation and claim payments, and, *second*, prior to the opening of the New Account, NOR would ensure that the Alta Account would not go negative and continues to be funded weekly and maintains a cash reserve of $3.5 million.  However, despite repeated representations that NOR would open the New Account within 30 days of the Closing, the Debtors have yet to see evidence that the New Account will be opened anytime soon.  *See* Rundell Declaration, ¶ 24.

66.    The Debtors request that the Court direct NOR to open the New Account as soon as reasonably practicable.  In the interim, the Debtors further request that the Court direct NOR to

fund the Alta Account weekly, maintaining a cash reserve of $3.5 million and ensuring that the Alta Account does not go negative.

### III. NOR Should Be Directed to Pay the Professional Fees and Related Costs Incurred by the Debtors Related to NOR's Violation of the Agreements.

67.     Since the Closing, the Debtors have incurred significant expenses related to NOR's noncompliance, including those professional fees relating to the drafting and servicing of the Demand Letters and the filing of this Motion.

68.     The Court of Appeal for the Fifth Circuit recently stated that "civil contempt sanctions must be calculated either to (1) coerce the contemnor into compliance with a court order or (2) compensate another party for the contemnors' violations." *In re Highland Capital Management*, 98 F.4th 170, 174 (5th Cir. 2024). A bankruptcy court may shift "only those attorney fees incurred because of the misconduct at issue." *Id.* Here, the professional fees incurred by the Debtors in relation with the Demand Letters and this Motion would not have been incurred but for NOR's actions and should not further burden the Debtors' estate. It is therefore appropriate to shift the Debtors' professional fees to NOR as compensation for NOR's violations.

69.     Accordingly, the Debtors request that the Court order NOR to pay monetary sanctions, including the professional fees and costs incurred by the Debtors as a result of addressing NOR's failure to comply with their obligations under the CA Sale Order and the Agreements.

### <u>EMERGENCY CONSIDERATION</u>

70.     The Debtors respectfully request emergency consideration of this Motion to enforce the Sale Order. As described herein, the Debtors believe that immediate relief is necessary to avoid irreparable harm to the Debtors and their estates. The Debtors seek payment from NOR in the aggregate amount of $11,570,555 to cover NOR's outstanding obligations under the

Agreements, which include the payment of the post-petition accounts payable, payment of the eCapital Amount Due, the payment of any POs placed by NOR under the Supported Supply Chain Contracts and the Excluded Contracts, and the payment of the underfunded capitation liabilities.

71.    Failure to receive the requested relief would disrupt the Debtors' operations and significantly impact the Debtors' ability to operate their remaining hospitals and to implement the terms of their confirmed plan.  Accordingly, the Debtors request the Court approve the relief requested herein on an emergency basis.

## <u>RESERVATION OF RIGHTS</u>

72.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## **NOTICE**

73.     Notice of this Motion has been provided by email, facsimile, or first class mail to: (a) the Complex Service List [Docket No. 2190] and (b) NOR.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PREVIOUS REQUEST**

74.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors request entry of an order substantially in the form attached hereto granting the relief requested herein and granting such other relief as is just and proper.

Dated:  January 11, 2026
Dallas, Texas

/s/ Thomas R. Califano

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Maegan Quejada (24105999)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:      (214) 981-3300
Facsimile:      (214) 981-3400
Email:          tom.califano@sidley.com
                rpatel@sidley.com
                mquejada@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:      (212) 839-5300
Facsimile:      (212) 839-5599
Email:          wcurtin@sidley.com
                pventer@sidley.com
                anne.wallice@sidley.com

*Attorneys for the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on January 11, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Thomas R. Califano*
*Thomas R. Califano*