# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered) |
| | Rel. to Dkt. No. 4393 |

**DECLARATION OF PAUL RUNDELL
IN SUPPORT OF DEBTORS' EMERGENCY MOTION
SEEKING ENTRY OF AN ORDER ENFORCING THE ORDER
(I) AUTHORIZING THE SALE OF THE CALIFORNIA ASSETS FREE AND
CLEAR OF ALL ENCUMBRANCES, (II) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED
CONTRACTS, AND (III) GRANTING RELATED RELIEF**

I, Paul Rundell, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer ("CRO") of Prospect Medical Holdings, Inc. ("PMH") and its debtor affiliates (collectively, the "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases, and a Managing Director of Alvarez & Marsal North America, LLC ("A&M"), a turnaround management consulting firm. I have served as the CRO of the Debtors since January 11, 2025.

2. As CRO of the Debtors, I am familiar with and knowledgeable about the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of these chapter 11 cases. I submit this declaration

---

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

(this "Declaration") in support of the *Debtors' Emergency Motion Seeking Entry of an Order Enforcing the Order (I) Authorizing the Sale of the California Assets Free and Clear of All Encumbrances, (II) Approving the Assumption and Assignment of the Assigned Contracts, and (III) Granting Related Relief* [Docket No. 4393] (the "Enforcement Motion"), [2] which seeks to compel NOR Healthcare Systems Corp. ("NOR") to perform its obligations under (i) the *Asset Purchase Agreement*, dated as of August 3, 2025, by and among NOR, as Purchaser, and Prospect Medical Holdings, Inc. ("PMH"), as Seller Representative, and each entity set forth on Schedule A to the California APA, as Seller (the "California APA"), and the related (ii) Transition Services Agreement, dated December 5, 2025 (the "TSA"), and (iii) Interim Management Agreement, dated December 5, 2025 (the "IMA", and, collectively with the California APA and the TSA, the "Agreements").

3. As part of their discussions with the Debtors and the other Debtors' professionals regarding NOR's failure to comply with their obligations under the Agreements, A&M prepared a report summarizing the outstanding NOR funding obligations (the "Report"). I have reviewed the Report, a copy of which is attached as **Exhibit A** hereto.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors and their management team and advisors, discussions between the Debtors and the Movants, my review of relevant documents and information concerning the Debtors' operations and financial affairs or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

2    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

**BACKGROUND**

    A. **The CA Sale Transaction**

    5.    On August 3, 2025, the Debtors designated NOR as the stalking horse bidder for the CA Sale Transaction and the Seller and NOR entered into the California APA in connection therewith.

    6.    On August 26, 2025, the Debtors held an auction (the "Auction") for the sale of the Transferred Assets. Following the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, in their reasonable business judgment designated NOR as the Successful Bidder for the CA Sale Transaction.

    7.    On August 29, 2025, the Court entered the CA Sale Order, authorizing the sale of the Transferred Assets to NOR free and clear of all Interests (other than Permitted Liens and Assumed Liabilities). On December 5, 2025, the Debtors and NOR (together, the "Parties") consummated the first part of the bifurcated closing for the CA Sale Transaction (such bifurcated closing, the "Closing"). On December 15, 2025, the remainder of the CA Sale Transaction was closed following the transfer of the MPT Real Property to NOR.

    B. **Negotiation of the TSA**

    8.    Following the approval of the CA Sale Order, and in the months leading up to the Closing of the CA Sale Transaction, the Debtors and NOR entered into negotiations concerning the terms of the TSA and the IMA. As part of these discussions, NOR provided the Debtors with a list of contracts that it wished to make available as Supported Supply Chain Contracts under the TSA. The Supported Supply Chain Contracts are set forth on Schedule A-6 to the TSA. NOR also agreed to prefund any purchases made under the Supported Supply Chain Contracts prior to submitting the order to the applicable vendor.

### C. TSA Fees

9.      Under the TSA, starting in January 2026, NOR must pay TSA Fees on the first and fifteenth day of each month. Due to liquidity constraints, NOR send a request to the Debtors to allow them to pay the TSA fees on a weekly basis. While the Debtors have not agreed to a modification of the TSA Fee payment schedule, if there is an ongoing liquidity issue, the Debtors remain open to working with NOR on potential solutions to address cash flow limitations.

### D. American Red Cross and Medline Contracts

10.     It is my understanding that, during the TSA negotiations, NOR represented to the Debtors that it had standalone agreements with the American Red Cross and Medline. Therefore, at NOR's request, the American Red Cross contract and the Medline contract (together, the "Excluded Contracts") were not included as Supported Supply Chain Contracts under the TSA. Nonetheless, the Debtors have been providing access to the Excluded Contracts as an accommodation to NOR. As a condition of this access, NOR was required to prefund the Debtors for any orders placed under the Excluded Contracts prior to approval of such orders.

### THE DISPUTE BETWEEN NOR AND THE SELLER

### A. NOR's Outstanding Obligations Under the Agreements.

*i.     The Supported Supply Chain Contracts and Excluded Contracts*

11.     Pursuant to the terms of the TSA, any purchase orders ("POs") made under the Supported Supply Chain Contracts identified on Schedule A-6 of the TSA are to be prefunded prior to the order being submitted to the vendor. However, NOR has continued to place orders under the Supported Supply Chain Contracts without providing the requisite prefunding. In fact, NOR has placed orders under the Supported Supply Chain Contracts nearly every weekday since December 8, 2025, despite only having provided funding on 9 of those days. *See* Report at 5.

12. Since December 5, 2025, NOR has also placed multiple orders under the Excluded Contracts without reimbursement to the Debtors. To date, NOR owes the Debtors approximately $741,000 for orders placed under the Supported Supply Chain Contracts and the Excluded Contracts. NOR has confirmed the amounts owing through January 2, 2026, which account for $614,000 of the total outstanding orders.

13. Several of the Debtors' suppliers under the Supported Supply Chain Contracts have enterprise contracts with the Debtors. Due to NOR's failure to prefund the POs and pay vendors timely, certain of these suppliers have threatened to cut off service to the Debtors' under the enterprise contracts as a whole, jeopardizing the Debtors' ability to operate their remaining hospitals and to perform obligations owed with respect to the buyers of the Debtors' non-California assets. For instance, on January 7, 2026, Boston Scientific informed the Debtors that it would be holding shipments for all orders placed under the Boston Scientific contract until the outstanding invoices for orders placed by NOR were paid. The hold on the Debtors' Boston Scientific orders was released on January 9, 2026, after NOR paid the outstanding amounts.

      *ii.*    *The Accounts Payable Check Float Clearing*

14. The Debtors funded $2.1 million to cover outstanding checks at the time of the Closing. As of January 8, 2026, $440,000 remains outstanding and should be treated as restricted cash in the Alta Account.

      *iii.*    *The Post-petition Accounts Payable*

15. The California APA requires that NOR assume and pay, as of the Closing, all post-petition accounts payable and accrued expenses that relate to the Transferred Assets or that arise out of or relate to the purchase of goods, materials or services in the ordinary course of business prior to the Closing. However, NOR has failed to pay for certain post-petition accounts payable.

At the Closing on December 5, 2025, there were post-petition accounts payable in the aggregate amount of $8,010,359; this is consistent with the ordinary course post-petition amounts payable at all other points during the 12 months preceding the Closing. For instance, in July 2025, NOR was granted access to a data room which included a document reflecting $8,420,046 of outstanding post-petition accounts payable as of June 2, 2025. Further, the outstanding post-petition accounts payable as of August 4, 2025, one day after the execution of the California APA, was $8,900,094.

16. As of January 8, 2026, there remain outstanding post-petition accounts payable in the aggregate amount of approximately $8.01 million. Of this amount, $2.52 million is owed to the Debtors directly for NOR's portion of expenses under certain of the Debtors' enterprise contracts. This number has risen from the $1.9 million that was owed at the time of sending the Initial Demand Letter, and will only continue to grow when as remaining post-petition accounts payable come due. The remaining $5.5 million of post-petition accounts payable is due directly to the vendors—of this $5.5 million, approximately $5.4 million is currently past due.

17. The due dates for each of the post-petition accounts payable are set forth below:

**California & PMH Allocated AP as of 12/05/2025**
in 000s

| AP Category | Total | Past Due as of: | | | |
| --- | --- | --- | --- | --- | --- |
| | | WE 1/9 | WE 1/16 | WE 1/23 | WE 1/30 |
| Alta | 5,494 | 5,441 | 18 | 18 | 18 |
| PMH | 2,517 | 2,510 | - | 7 | - |
| **Total** | **$ 8,010** | **$ 7,950** | **$ 18** | **$ 25** | **$ 18** |

18. As reflected in the above chart, NOR currently owes the Debtors approximately $2.52 million in relation to the outstanding post-petition accounts payable. On top of the amounts they owe directly to the Debtors, NOR also owes approximately $5.49 million in outstanding post-petition accounts payable that must be paid directly to vendors (the "Alta AP"). Several of the

vendors encompassed within the Alta AP have enterprise contracts with the Debtors. Thus, though the Alta AP is not owed to the Debtors directly, NOR's failure to pay the Alta AP has broader implications for the Debtors' operations, as vendors may refuse to provide products and services under these enterprise contracts to the Debtors as a whole.

    *iv.    The eCapital Amount Due*

19. In addition to NOR's failure to pay the post-petition accounts payable, NOR has also failed to pay the required cash payment under section 2.9 of the California APA. Pursuant to section 2.9, the Debtors were to receive a cash payment equal to the positive difference between the eCapital Borrowing Base (calculated consistent with historical practices as presented in Exhibit C of the California APA) and the eCapital Payoff or Assumption Instrument. On December 10, 2025, eCapital confirmed that, prior to the Closing Date, eCapital placed an incremental reserve of $950,000 on the Debtor's borrowing base in order to satisfy the Assignment Fee under NOR's credit agreement with eCapital. Therefore, the amount due from NOR to the Debtors under section 2.9 of the California APA is $950,000 (the "eCapital Amount Due").

    *v.    The Capitation Claims*

20. Under Section 2.3(m) of the California APA, NOR is obligated to pay all liabilities and obligations relating to or arising from capitation-based healthcare services provided to "covered persons" under or pursuant to the applicable capitation contracts by or on behalf of the Seller Group prior to the Closing Date. However, since Closing, NOR has underfunded the capitation liabilities by $3.3 million and has utilized $129,000 of restricted cash funded by the Debtors. *See* Report at 2. NOR has confirmed the balance for underfunded capitation payments through January 2, 2026, which accounts for $3.1 million of the capitation liabilities.

21. Additionally, NOR's failure to fund the capitation claims resulted in a negative balance to the Alta Account on December 31, 2025. As a result, City National Bank ("CNB") threatened to freeze all of the Debtors' bank accounts, and the Debtors had no choice but to provide $1.5 million of emergency funding to the Alta Account to prevent the closing of all of the Debtors' CNB bank accounts.

### B. Exposure to NOR Has Grown Rapidly.

22. As of January 9, 2026, NOR owes the Debtors approximately $11.6 million in outstanding funding obligations. From December 10, 2025 to January 9, 2026, NOR's funding obligation has increased from approximately $4.9 million to $11.6 million. *See* Report at 2–3. The Report clearly shows that there is a trend of rapidly increasing costs to the Debtors resulting from NOR's failure to (i) prefund the orders made under the Supported Supply Chain Contracts and the Excluded Contracts, (ii) pay the post-petition accounts payable, (iii) pay the eCapital Amount Due, and (iv) pay the Capitation Claims. *Id.* Based on NOR's actions thus far and this clear trend of increasing costs to the Debtors, I believe that the Debtors' exposure to NOR will continue to grow unless the Court enforces the CA Sale Order against NOR.

### C. Communications Between NOR and the Debtors.

23. The Debtors and their advisors have reached out to NOR and its advisors multiple times since December 5, 2025, in an attempt to get NOR to perform its obligations under the Agreements. For instance, the Debtors have reached out to NOR 12 times since the Closing regarding the payment of orders placed pursuant to the Medline contract. Though NOR has consistently represented that it will fund the orders it placed pursuant to the Excluded Contracts and the Supported Supply Chain Contracts, there still remain significant amounts outstanding, including $484,000 with respect to the Medline contract.

24. The Debtors have also reached out to NOR several times regarding the creation of the New Account. Pursuant to an informal agreement between NOR and the Debtors, NOR committed to opening a new bank account from which capitation liabilities would be funded within 30 days of the Closing. However, despite these representations, NOR has yet to open the New Account and has not provided any definitive evidence that the New Account will be opened in the near future.

25. Finally, the Debtors have sent NOR and its advisors two demand letters, on December 18, 2025 and January 6, 2025, respectively, regarding the payment of the outstanding liabilities and the cure of NOR's other defaults under the Agreements (the "Demand Letters"). NOR responded to the second Demand Letter (the "Second Demand Letter") on the morning of January 9, 2026. On January 10, 2026, the Debtors and NOR met to discuss the Second Demand Letter and NOR's response thereto, but no resolution was reached.

26. I believe the relief requested in the Enforcement Motion is required to ensure that NOR begins to comply with its obligations under the Agreements. I further believe that, absent the relief requested, NOR will continue to breach its obligations and to incur further costs to the Debtors' estates.

[*Remainder of Page Intentionally Left Blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 11, 2026

/s/ Paul Rundell
Paul Rundell
Chief Restructuring Officer