**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br>PROSPECT MEDICAL<br>HOLDINGS, INC., *et al.*<br>Debtors. | Chapter 11<br>Case No. 25-80002 (SGJ)<br>(Jointly Administered) |

**NOR HEALTHCARE SYSTEMS CORP.'S RESPONSE TO DEBTORS' EMERGENCY MOTION SEEKING ENTRY OF AN ORDER ENFORCING THE ORDER (I) AUTHORIZING THE SALE OF THE CALIFORNIA ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACTS, AND (III) GRANTING RELATED RELIEF**
**[Relates to Dkt. 4393]**

NOR Healthcare Systems Corp. ("NOR") hereby submits their Response to Debtors' Emergency Motion Seeking Entry of an Order Enforcing the Order (i) Authorizing the Sale of the California Assets Free and Clear of All Encumbrances, (ii) Approving the Assumption and Assignment of the Assigned Contracts, and (iii) Granting Related Relief ("Motion"), as follows:

**I. Preliminary Statement**

1. NOR does not owe the Debtors any monies and all obligations of NOR under the APA are fully satisfied.

2. The Debtors purposefully slowed down paying vendors in order to pay its own professional fees. Between August 8, 2025 and December 6, 2025, Debtors paid $37,241,480 of professional fees. Under the APA, NOR was responsible for trade payables while the Debtors were responsible for professional fees. After signing the APA, Debtors slowed down payments for vendors while continuing to pay professional fees like clockwork every week, increasing the accrued AP up until Closing.

3. NOR could have never imagined that the Debtors would simply withhold payments to post-petition vendors for amounts owed and not pay vendors owed for hospital operations, just leaving them for NOR to pay. The Debtors actions of not paying any bills have severely harmed hospital operations and have endangered patients.

4. The Debtors purposefully and in bad faith failed to pay the most basic of bills owed to third parties only to leave them for NOR to pay. This has severely impacted NOR's cash and ability to operate the hospitals in a safe manner.

5. In certain circumstances, Debtors went so far as to entice vendors to enter into contracts with them promising to pay the vendor in a timely manner and then when the vendor sought payment, Debtors stated that they would not pay and that NOR would have to pay.

6. Under the Asset Purchase Agreement, the parties agreed that Debtors would continue to pay post-petition vendors in the ordinary course of business and that, knowing there would be invoices for vendors that would become due after Closing, NOR would take on those invoices in order to keep the steady operations of the hospitals.

7. The Parties agreed there would be a cap to how much NOR would be obligated for, but this is no way was an agreement that NOR would in fact pay that maximum amount and that Debtors could let payments to vendors lapse in order to reach that cap.

8. From the moment of signing the Asset Purchase Agreement, Debtors purposefully and in bad faith chose to withhold payments to post-petition vendors for goods, materials, and services that benefited Debtors prior to Closing, thus intending to

saddle NOR with such outstanding accrued expenses, causing significant issues to NOR in the operation of the hospitals immediately upon taking over at Closing.

9. As a result of Debtors' actions, Debtors improperly benefitted themselves by delaying and withholding payments to vendors, including promising to pay vendors themselves prior to the Closing, knowing these statements to be false, then refusing to pay them, and then attempting to saddle NOR with the liability.

10. These actions are a clear showing of bad faith and a violation of its obligations as a debtor in bankruptcy and under the Asset Purchase Agreement.

11. The Debtors argue that NOR owes them $950,000 because the Debtors' lender, eCapital, raised its reserve requirement. The actions of eCapital are not the responsibility of NOR. Under the APA, NOR was responsible for paying the assignment fee, and there is no dispute that NOR paid that fee in full. Thus, NOR has satisfied its APA obligations.

## II.     Relief Requested

12. NOR requests this Court find that NOR is not liable for the Debtors' inability to borrow money based on a decision from their lender.

13. NOR requests this Court find that the Debtors, not NOR, are liable for the accounts payable the Debtors chose not to pay in the ordinary course of business.

14. NOR requests this Court find in favor of NOR and award an amount determined from discovery in damages to NOR against Debtors based on their failure to fund outstanding checks during their time of operations.

## III.    Jurisdiction and Venue

15. This Court has jurisdiction over the parties. However, this proceeding is one to obtain money from NOR and to obtain a declaratory judgment as to rights and liabilities of the parties under their APA or other equitable relief. As such, it is required to be brought as an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(1), (7), (9). A matter under Rule 7001 attempted to be initiated by motion rather than by service of a summons and complaint fails on procedural grounds.

**IV. Background**

    a. *Seller's Failure to Fund Outstanding Checks During Their Operations*

16. During their operation of the Business at issue in this matter, Debtors wrote checks to pay expenses for their capitation agreements but failed to fund the accounts for such expenses. Prior to closing, Debtors cleared those accounts of all revenue, leaving those checks outstanding with no funds to clear the amounts paid.

    b. *eCapital Amount*

17. Under the APA, the Parties agreed that the purchase price would be calculated under a specific formula. Per the language of the contract,

> (a) In full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser upon the terms and subject to the conditions set forth herein, the aggregate consideration shall be (i) cash proceeds of Eight Million Five Hundred Thousand Dollars ($8,500,000), plus (ii) the assumption of the Assumed Liabilities, plus (iii) either (x) an amount in cash (the "eCapital Payoff Amount") equal to the borrowing base under the eCapital Line of Credit calculated with historical practices as presented in Exhibit C (the "eCapital Borrowing Base") or (y) if the Purchaser enters into a new arrangement with eCapital Healthcare Corp. or otherwise assumes the existing eCapital Line of Credit and provides a payoff letter, release, assignment and assumption, or

similar instrument (the "eCapital Payoff or Assumption Instrument") to the Seller Representative, then, an amount in cash (the "eCapital Payoff Amount") equal to the positive difference between (1) the eCapital Borrowing Base and (2) any remaining Liability or amount due under the eCapital Line of Credit after application of the eCapital Payoff or Assumption Instrument (clauses (i), (ii), and (iii) collectively, the "Purchase Price").

18. After NOR took over the eCapital loan and paid off Debtor's liability, NOR paid the Assignment Fee equal to $950,000.00, which was the obligation for NOR, under their loan agreement with eCapital.

   c. *Accounts Payable*

19. Under the APA in Section 2.3(c), NOR agreed to assume "all post-petition accounts payable and accrued expenses of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business prior to the Closing by or on behalf of the Seller Group (but excluding any professional fees related to the Transactions and/or restructuring efforts)." This assumption of liabilities was capped at "the amount of accounts payable and accrued expenses outstanding on the Effective Date."

20. Further, Debtors agreed that during the interim period from the signing of the APA until closing to "use its commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted during the twelve (12) months immediately preceding the Effective Date."

V. **Basis For Relief**

   a. Applicable Law

      i. Governing Law of the Asset Purchase Agreement

21. When determining the obligations of the parties under the Asset Purchase Agreement, this Court must look to the law that the Parties agreed to govern the contract. *See Mirant Americas Energy Mktg., LP v. City of Vernon (In re Mirant Corp.)*, 319 B.R. 489 (N.D. Tex. 2004). Here, the Parties agreed under the APA that the Agreement would be governed by the laws of Delaware, thus Delaware law must apply to the interpretation of the contract.

    b. *Seller's Failure to Fund Outstanding Checks During Their Operations*

22. Debtors failed to comply with Capitation funding during their operation of the hospitals pre-closing by writing checks in the amount of $2,100,000.00 and depleting the account immediately before closing, dumping the pending hot check liabilities on NOR. Debtor should not be allowed to write out checks and then remove the funds for the outstanding liabilities. This is not in the ordinary course of business and it causes a significant operational disfunction for NOR as NOR just began the transition of ownership and operation of the hospitals. It also causes potential regulatory issues for NOR should those funds not be paid. Debtors should not unjustly benefit by depleting the capitation account to nothing and leaving NOR with the potential of a negative balance for checks Debtors wrote.

    c. *eCapital Amount*

23. Debtors argue that because eCapital restricted its loan prior to closing with NOR, which eCapital did on their own volition, that NOR is responsible for Debtors' inability to pull out more money from the loan. In Debtors' argument, they forget key words in the contractual language of the APA that should not be overlooked by the Court.

24. Specifically, the eCapital Borrowing Base is defined as "the borrowing base under the eCapital Line of Credit calculated with historical practices as presented in Exhibit C". Thus, Exhibit C showed the calculation of getting to the Borrowing Base for Debtors' loan with eCapital. eCapital at any time had the right to restrict Debtor from borrowing from the loan by increasing the reserves, which is what they did in this case. Historically, eCapital was able to move certain line items under the calculation shown in Exhibit C which would increase or decrease Debtors' ability to borrow at the discretion of eCapital.

25. For these reasons, NOR is not liable to Debtors based on their lender's choice to change Debtors' ability to borrow from their loan.

   d. *Accounts Payable*

      i. Law

26. As commonly understood, "ordinary" is defined as "[b]elonging to the regular or usual order or course of things; having a place in a fixed or regulated sequence; occurring the course of regular custom or practice; occurring in the course of regular custom or practice; normal; customary; usual." Black's Law Dictionary defines "ordinary" as "[o]ccurring in the regular course of events; normal; usual." When "ordinary" is used in conjunction with "course of business," Black's defines it as "[t]he normal routine in managing a trade or business. — Also termed *ordinary course of business*." Delaware courts have interpreted "ordinary course" as "[t]he normal and ordinary routine of conducting business." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 268 A.3d 198, 210 (Del. 2021).

      ii. Prospect Priority of Paying Professional Fees over Vendors

27. From the signing of the Asset Purchase Agreement until closing, Debtors prioritized paying professional fees over vendors who provided goods and services to the hospital and kept the operations of the hospital going for the community, paying over $37,241,480.00 in professional fees during the interim period.

28. Debtors knew that they could have NOR pay liabilities for vendors under 2.3(c) of the APA, but this clause also did not allow Debtors to give any liabilities to NOR of their professional fees. So they prioritized paying professional fees over third party vendors, which was not the ordinary course of business for the last twelve months prior to signing, as required by Section 6.1 of the APA.

29. An analysis of Exhibit A of Debtors' Motion and past practices of payments for the vendors shows a stark contrast between how the Debtors would pay numerous vendors from the list before and after the signing of the APA.

30. For example, for multiple vendors, before signing the APA, Debtors would pay prior to the due date, however, after signing the APA, not only did the Debtors not pay on the due date, but in many instances were paying twenty-five (25) to forty-five (45) days late.

31. Based on this priority of paying professional fees, Debtors refused to pay post-petition fees. This was not in the ordinary course of business for the hospital operations. Debtors' actions of bad faith was an attempt to saddle NOR with as much as they possibly could reach to the cap of NOR's assumed liabilities.

32. One example of Debtors' bad faith was the retaining of services from a vendor right before Closing, enticing them to agree to perform services by promising to pay them before Closing. However, Debtors knew when they promised this payment

that they would never pay the invoice and instead expected NOR to make a payment for these services.

33. Due to Debtors' actions of bad faith, accounts payable increased due to lack of payment, which was Debtors' entire goal to reach the cap of NOR's liabilities under the APA.

> *iii. NOR has not failed to pay any Accounts Payable as Required Under the Contract*

34. In addition to the arguments above, while Debtors argue that NOR must pay the assumed liabilities immediately, the language of the APA is clear that NOR need only pay the liabilities in a "timely manner." While NOR contests the amount of assumed liabilities for the reasons above, NOR is also continuously initiating discussions with vendors regarding outstanding liabilities and creating a relationship going forward.

WHEREFORE, NOR respectfully requests this Court find in favor of NOR in all respects of the issues before the Court and grant such other relief to which NOR is entitled.

DATED:    January 19, 2026        Respectfully submitted,

ROSS SPENCE, PC

By: */s/ Ross Spence*
Ross Spence
State Bar No. 18918400
ross@rossspence.com
4582 Elm
Bellaire, TX  77401
(713) 201-0878

and

By: */s/ Faisal Gill*
Faisal Gill (*pro hac vice* pending)
GILL LAW FIRM
505 N Brand Blvd, Suite 1200
Glendale, CA 91203

**ATTORNEYS FOR NOR HEALTHCARE SYSTEMS CORP.**

### CERTIFICATE OF SERVICE

I certify that on January 19, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Ross Spence*
Ross Spence